# UNITED STATES DISTRICT COURT
## OF MASSACHUSETTS

| | |
|---|---|
| Johnny Cruz, on behalf of himself and all others similarly situated,<br><br>Plaintiff,<br><br>vs.<br><br>Raytheon Company, Kelly B. Lappin, in her capacity as Plan Administrator for the Raytheon Company Pension Plan for Hourly Employees, the Raytheon Company Pension Plan for Salaried Employees, the Raytheon Non-Bargaining Retirement Plan, the Raytheon Bargaining Retirement Plan, and the Raytheon Retirement Plan for Engineers & Contractors, Inc. and Aircraft Credit Employees, and John/Jane Does 1-10.<br><br>Defendants. | Civil Action No.:  1:19-cv-11425<br><br><br><br><br>CLASS ACTION |

## COMPLAINT

Plaintiff Johnny Cruz, on behalf of himself and all others similarly situated, based on personal knowledge with respect to his own circumstances and based upon information and belief pursuant to the investigation of his counsel as to all other allegations, alleges the following.

## INTRODUCTION

1.      This is a class action against Defendant Raytheon Company ("Raytheon") concerning the failure to pay benefits under several of its defined benefit pension plans[1] that are

---

[1]      The Plans include: the Raytheon Retirement Plan for Engineers & Contractors, Inc. and Aircraft Credit Employees ("Engineer and Contractor Plan"); the Raytheon Bargaining Retirement Plan ("Bargaining Plan"); the Raytheon Company Pension Plan for Hourly Employees ("Hourly Plan"); the Raytheon Company Pension Plan for Salaried Employees ("Salaried Plan"); and the Raytheon Nonbargaining Retirement Plan ("Non-Bargaining Plan") (collectively, "the Plans").

part of the Raytheon Master Pension Trust ("Master Trust") in amounts that are actuarially equivalent to a single life annuity, as required by the Employee Retirement Income Security Act of 1974, 29 U.S.C. § 1001, *et seq*. ("ERISA").  By not offering benefits that are actuarially equivalent to the single life annuity, Raytheon is causing retirees to lose part of their vested retirement benefits in violation of ERISA.

2.      The Plans are sponsored by Raytheon, administered by the same Raytheon employee who is appointed by Raytheon's VP of Human Resources and have their assets pooled together in a common Master Trust.

3.      Under the Plans, participants accrue benefits in the form of a single life annuity ("SLA").  When participants retire, they can receive their benefits in one of several annuity options, including joint and survivor annuities ("JSA") and certain and life annuities (collectively, "Qualified Annuities").  Raytheon calculates the amount a participant will receive as a Qualified Annuity, by converting the SLA to the other form of benefit using actuarial assumptions to calculate the present value of the future payments.

4.      These actuarial assumptions include a mortality table — to predict how long the participant and the participant's beneficiary will live — and interest rates to discount the value of the expected payments to present value.  The mortality table and interest rate together are used to calculate a "conversion factor" which is used to determine the amount of the benefit that would be equivalent to the SLA.  For example, a Qualified Annuity with a "conversion factor" of .90 means participants receive 90% of the monthly retirement benefit they would have received if they had selected the SLA. ERISA requires that these Qualified Annuities be "actuarially equivalent" to an SLA, meaning that the present value of the payment streams must be equal.  *See* 29 U.S.C. § 1055 (d)(1)(B), (2)(A)(ii); 29 U.S.C. § 1002(27).

5.      Mortality rates have improved over time with advances in medicine and better collective lifestyle habits. People who recently retired are expected to live longer than those who retired in previous generations.  Older morality tables predict that people will die at a faster rate (higher mortality rate) than current mortality tables.  As a result, using an older mortality table to calculate a conversion factor decreases the present value of the Qualified Annuities and — interest rates being equal — the monthly payment that retirees who select these Qualified Annuities receive.

6.      The interest rate also affects the calculation.  Using lower interest rates — mortality rates being equal — decreases the present value of these Qualified Annuities and the amount of the monthly payment.

7.      Defendants use unreasonable and improper actuarial assumptions to calculate the Qualified Annuities, resulting in "conversion factors" that do not generate actuarially equivalent benefits.   For the Hourly Plan and the Salaried Plan, Defendants use a .90 conversion factor to calculate a 50% joint and survivor annuity and a .80 conversion factor for a 100% joint and survivor annuity.  Defendants use mortality assumptions from 1971 to calculate the Qualified Annuities in the Bargaining, Non-Bargaining and Engineers & Constructors Plan. By using these unreasonable conversion factors (based on unreasonable actuarial assumptions) Defendants depress the present value of Qualified Annuities — in violation of ERISA's actuarial equivalence requirement — resulting in participants and beneficiaries receiving monthly payments that are materially *lower* than they would be if Defendants used reasonable actuarial assumptions and conversion factors, such as the current, market-based assumptions that Raytheon uses to calculate the present value of benefits under the Plans in its 10-Ks filed with the Securities and Exchange Commission.

8.      Plaintiff worked for Raytheon for more than 32 years and is a participant in the Hourly Plan. He retired in 2015 at age 55. Defendants' application of an unreasonable conversion factor to Plaintiff's retirement benefits causes him to receive $57 less per month than he should, improperly reducing the present value of his benefits by $10,741.34, causing him substantial harm. This improper reduction will continue to affect Plaintiff throughout his retirement. Plaintiff brings this case on behalf of himself and the thousands of participants and beneficiaries of the Plans who, just like him, have not been receiving actuarially equivalent benefits.

9.      Thus, Defendants caused Plaintiff and Class Members to unknowingly lose part of their vested benefits and forfeit those benefits in violation of ERISA's anti-forfeiture rule.

10.     Plaintiff seeks an Order from the Court reforming the Plans to conform to ERISA, payment of future benefits in accordance with the reformed Plans, as required under ERISA, payment of amounts improperly withheld and such other relief as the Court determines to be just and equitable.

## JURISDICTION AND VENUE

11.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 because it is a civil action arising under the laws of the United States, and pursuant to 29 U.S.C. § 1332(e)(1), which provides for federal jurisdiction of actions brought under Title I of ERISA.

12.     This Court has personal jurisdiction over Defendant Raytheon because it is headquartered, transact business, or reside in, or has significant contacts with this District, and because ERISA provides for nationwide service of process.

13.     Venue is proper in this District pursuant to ERISA § 502(e)(2), 29 U.S.C. § 1132(e)(2), because some or all the violations of ERISA occurred in this District and Defendant

may be found in this District.  Venue is also proper in this District pursuant to 28 U.S.C. § 1391 because Defendant does business in this District and a substantial part of the events or omissions giving rise to the claims asserted herein occurred within this District.

**PARTIES**

**Plaintiff**

14.     Plaintiff Johnny Cruz is a resident of New Hampshire, and a participant in the Hourly Plan. Mr. Cruz worked for Raytheon until he retired in 2015 at age 55.  Mr. Cruz is currently receiving a 50% joint and survivor annuity, with his wife as the beneficiary.

**Defendants**

15.     Raytheon is a defense contractor specializing in the development of electronics, mission systems integration and cybersecurity solutions with its headquarters in Waltham, Massachusetts. Raytheon sponsors each of the Plans.

16.     Kelly B. Lappin is the Plan Administrator for each of the Plans.  Upon information and belief, she is a citizen and resident of Massachusetts.  Ms. Lappin is Raytheon's Director of Compensation and Benefits and, upon information and belief, is an Enrolled Actuary under ERISA.

17.     John/Jane Does 1 through 10 are any other individuals who have served as the Plan Administrator for the Plans during the Class Period.

**APPLICABLE ERISA REQUIREMENTS**

***Pension Benefit Options Must Be Actuarially Equivalent***

18.     ERISA provides that "if an employee's accrued benefit is to be determined as an amount other than an annual benefit commencing at normal retirement age . . . the employee's accrued benefit . . . ***shall be the actuarial equivalent of such benefit*** . . . ." 29 U.S.C. § 1054(c)(3)

5

(emphasis added). There are several forms of pension benefits that are subject to this requirement, including early retirement benefits like those Plaintiff receives.

19.     ERISA requires that defined benefit plans pay married participants their benefits in the form of a qualified joint and survivor annuity (a "QJSA").  Unless the participant, with the consent of his or her spouse, elects an alternative form of payment, the QJSA is the default benefit for employees who are married.  *See* ERISA § 205(a) and (b), 29 U.S.C. § 1055(a) and (b).

20.     ERISA defines a QJSA as an annuity for the life of the plan participant with a survivor benefit for the life of the spouse that is not less than 50%, and not greater than 100% of the annuity payable during the joint lives of the participant and the spouse.  *See* ERISA § 205(d)(1), 29 U.S.C. § 1055(d)(1).  For example, if a plan participant receives $1,000 per month under a 50% joint and survivor annuity, the spouse will receive $500 a month for the rest of the spouse's life after the participant's death. A QJSA must be actuarially equivalent to an SLA. *See* 29 U.S.C. § 1055(d)(1); 26 U.S.C. § 417(b).

21.     Pension plans may also offer participants alternative forms of survivor annuities, known as qualified optional survivor annuities ("QOSA").  *See* ERISA § 205(d)(2), 29 U.S.C. § 1055(d)(2)); *see also* 26 U.S.C. § 417(g).  Common forms of QOSAs are joint and survivor annuities that have a different survivor benefit than the QJSA, "certain and life" annuities and "year certain" annuities.  ERISA requires that all QOSAs be actuarially equivalent to an SLA. *See* ERISA § 205(d)(2)(A)(ii), 29 U.S.C. § 1055(d)(2)(A)(ii).

22.     ERISA also requires that defined benefit plans provide a qualified pre-retirement survivor annuity ("QPSA"). *See* ERISA § 205(a)(2), 29 U.S.C. § 1055(a)(2).  A QPSA is an annuity for the life of the participant's surviving spouse (i.e. a beneficiary) if the participant dies before reaching the plan's normal retirement age.  *See* ERISA § 205(e), 29 U.S.C. § 1055(e).  A

QPSA must be actuarially equivalent to what the surviving spouse would have received under the plan's QJSA and any QOSAs. *See* ERISA § 205(e)(1)(A), 29 U.S.C. § 1055(e)(1)(A).

23.     Reorganization Plan No. 4 of 1978 transferred authority to the Secretary of the Treasury to issue regulations for several provisions of ERISA, including § 205 concerning alternative forms of benefits. *See* 92 Stat. 3790 (Oct. 17, 1978), codified at 29 U.S.C. § 1001; *see also* ERISA § 3002(c); 29 U.S.C. § 1202(c).

24.     The Treasury regulations ("Regulations") corresponding to ERISA § 205 (26 U.S.C. § 401(a)(11)), similarly provide that a QJSA "must be at least the actuarial equivalent of the normal form of life annuity or, if greater, of any optional form of life annuity offered under the plan."[2]  Indeed, a QJSA "must be at least as valuable as any other optional form of benefit under the plan at the same time."  26 C.F.R. § 1.401(a)-20 Q & A 16; *see* 26 C.F.R. § 1.417(a)(3)-1(c)(2)(iv) ("All other optional forms of benefit payable to the participant must be compared with the QJSA using a single set of interest and mortality assumptions that are reasonable and that are applied uniformly with respect to all such optional forms payable to the participant . . . .").

25.     ERISA does not require that pension plans offer lump sum distributions of vested benefits to retirees upon their retirement.  *See* ERISA § 205(g), 29 U.S.C. § 1055(g). However, if plans choose to offer a lump sum distribution as an optional benefit, ERISA § 205(g)(3), 29 U.S.C. § 1055(g)(3), requires that the amount of the lump sum distribution be determined by calculating the present value of the benefit using the applicable mortality table (the "Treasury Mortality

---

[2]     26 C.F.R. § 1.401(a)-11(b)(2). The term "life annuity" includes annuities with terms certain in addition to single life annuities. As the Regulations explain, "[t]he term 'life annuity' means an annuity that provides retirement payments and requires that survival of the participant or his spouse as one of the conditions for payment or possible payment under the annuity.  For example, annuities that make payments for 10 years or until death, whichever occurs first or whichever occurs last, are life annuities."   26 C.F.R. § 1.401(a)-11(b)(1)(i)

Table")[3] and applicable interest rate (the "Treasury Interest Rate")[4] (collectively, the "Treasury Assumptions"), set by the Secretary of the Treasury pursuant to 26 U.S.C. §§ 417(e) and 430(h), which are based on current market rates and mortality assumptions. *See* 29 U.S.C. §§ 1055(g)(3)(B) and 1083(h); 26 U.S.C. §§ 417(e) and 430(h).   By requiring the use of current market rates and mortality assumptions to calculate the present value of participants' accrued benefits, the Regulations ensure that lump sum distributions must be at least the actuarial equivalent of the QOSA, QJSA and QPSA.

26.     ERISA § 203(a), 29 U.S.C. § 1053(a), provides that an employee's right to the vested portion of his or her normal retirement benefit is non-forfeitable; the corresponding Regulation states that "adjustments in excess of reasonable actuarial reductions, can result in rights being forfeitable."  26 C.F.R. § 1.411(a)-4(a).

### Reasonable Factors Must be Used When Calculating Actuarial Equivalence

27.     "Two modes of payment are actuarially equivalent when their ***present values are equal*** under a given set of assumptions." *Stephens v. US Airways Group, Inc.*, 644 F.3d 437, 440 (D.C. Cir. 2011) (emphasis added).[5]  Actuarial equivalence should be "cost-neutral," meaning that neither the Plans nor the participants should be better or worse off if the participant selects either the normal retirement benefit or an optional form of benefit. *See Osberg v. Foot Locker, Inc.*, 138 F. Supp. 3d 517, 540 (S.D.N.Y. 2015).

28.     Under ERISA, "present value" must "reflect anticipated events."  Such adjustments "shall conform to such regulations as the Secretary of the Treasury may prescribe." ERISA § 3(27),

---

[3]     *See* 26 C.F.R. § 1.430(h)(2)-1.
[4]     *See* 26 C.F.R. § 1.430(3)-1.
[5]     According to Merriam Webster: "Equivalent" means "equal." https://www.merriam-webster.com/dictionary/equivalent. "Equal" means the "same." https://www.merriam-webster.com/dictionary/equal.

29 U.S.C. § 1002(27). The Secretary has prescribed numerous Regulations describing how present value should reasonably reflect anticipated events, including the following:

(a) The Regulation concerning QJSAs provides that "[e]quivalence may be determined, on the basis of consistently applied *reasonable actuarial factors*, for each participant or for all participants or reasonable groupings of participants." 26 C.F.R. § 401(a)-11(b)(2) (emphasis added).

(b) A plan must determine optional benefits such as QJSAs, QOSAs and QPSAs using "a single set of *interest and mortality assumptions that are reasonable* . . . ." 26 C.F.R. § 1.417(a)(3)-1(c)(2)(iv) (emphasis added).

(c) The term actuarial present value means "actuarial present value (within the meaning of § 1.401(a)(4)-12) determined using *reasonable actuarial assumptions*." 26 C.F.R. §1.411(d)-3(g)(1) (emphasis added).

(d) With respect to benefits under a lump sum-based formula, any optional form of benefit must be "at least the actuarial equivalent, using *reasonable actuarial assumptions* . . . ." 26 C.F.R. § 1.411(a)(13)-1(b)(3) (emphasis added).

29. The Regulations also rely on the standards of the American Society of Actuaries (the "SOA") for determining the present value of pension liabilities. *See, e.g.,* 26 C.F.R. § 1.430(h)(3)-1(a)(2)(C); IRS Notices: 2008-85, 2013-49, 2015-53, 2016-50, 2018-02; 82 Fed. Reg. 46388-01 (Oct. 5, 2017) ("Mortality Tables for Determining Present Value Under Defined Benefit Plans"), 72 Fed. Reg. 4955-02 (Feb. 2, 2007) ("Updated Mortality Tables for Determining Current Liability"). Like the Regulations and the ERISA present value definition, the SOA requires actuaries to use "reasonable assumptions." Actuarial Standard of Practice No. 35, Para. 3.3.5 ("Each demographic assumption selected by the actuary should be reasonable").

30.     Courts interpreting ERISA's actuarial equivalence requirements when calculating benefits have stated that "***special attention must be paid to the actuarial assumptions underlying the computations***." *Pizza Pro Equip. Leasing*, 147 T.C. at 411 (emphasis added), *aff'd,* 719 Fed. Appx. 540 (8th Cir. 2018).  As the court explained in *Dooley v. Am. Airlines, Inc.* concerning the actuarial equivalence of QJSAs, QOSAs and QPSAs, the assumptions must be reasonable:

> When the terms of a plan subject to ERISA provide that plan participants may opt to receive their accrued pension benefits in forms other than as a single life annuity, the amount payable to the plan participant under such circumstances must be "actuarially equivalent" to the participant's accrued benefits when calculated as a single life annuity.  The term actuarially equivalent means equal in value to the present value of normal retirement benefits, ***determined on the basis of actuarial assumptions with respect to mortality and interest which are reasonable in the aggregate***.

*Dooley v. Am. Airlines, Inc.*, 1993 WL 460849, at * 10 (N.D. Ill. Nov. 4, 1993) (emphasis added); *see also Dooley v. Am. Airlines, Inc.*, 797 F.2d 1447, 1453 (7th Cir. 1986) (citing expert testimony that "actuarial equivalence must be determined on the basis of reasonable actuarial assumptions.").

## SUBSTANTIVE ALLEGATIONS

**I.     THE PLANS**

**A.     Overview**

31.     Raytheon sponsors and administers several retirement and pension plans, including the Plans. The Plans cover eligible employees hired prior to January 1, 2007 and include the defined benefit plans of former subsidiaries or affiliates that merged into the Plans.

32.     The Plans are "employee pension benefit plans" within the meaning of ERISA § 3(2)(A), 29 U.S.C. § 1002(a)(A), and defined benefit plans within the meaning of ERISA § 3(35), 29 U.S.C. § 1002(35).

33.     The Plans' assets are pooled and held in the Master Trust, which Raytheon established to invest the Plans' assets.

34.     All participants and beneficiaries of the Plans are current and former employees of Raytheon or its subsidiaries and affiliates, spouses of current and former employees or other beneficiaries.

35.     Under the Plans, participants are entitled to receive monthly benefits that begin at the Normal Retirement Date around the participant's 65th birthday, although various early retirement options are available.

36.     While the Plans use different formulae and actuarial assumptions to calculate pension benefits for participants that receive Qualified Annuities, all of the Plans use unreasonable conversion factors or actuarial assumptions.

**B.      The Hourly Plan**

37.     Plaintiff is a participant in the Hourly Plan.

38.     The Hourly Plan covers Raytheon's eligible hourly employees.

39.     The Plan Administrator of the Hourly Plan is appointed by Raytheon's Vice President of Human Resources.  Ms. Lappin signed the Hourly Plan's most recent Form 5500 as Plan Administrator.

40.     Under the Hourly Plan, the normal form of benefit for unmarried participants is an SLA based on their final average pay and years of service.  For married participants, the normal form of benefit, and the Hourly Plan's QJSA, is a 50% JSA.  The Hourly Plan also offers a 10-year certain and life annuity ("10YCLA"), a 66 2/3% JSA, a 75% JSA and a 100% JSA as QOSAs.

41.     To convert participants' benefits from an SLA to the QJSA or a QOSA (*i.e.*, the Hourly Plan's Qualified Annuities), the Hourly Plan applies fixed conversion factors which represent the percentage of the participant's SLA that the participant will receive if he selects another form of benefit. For example, if a participant was entitled to an SLA of $1,000 per month,

a .90 conversion factor means that the participant will receive $900 per month. Defendants apply

the following conversion factors for the Hourly Plan's JSAs:

- .90 for the 50% JSA (+/- .5% for each year the spouse is older/younger)

- .87 for the 66 2/3% JSA (+/- .66% for each year the spouse is older/younger)

- .85 for the 75% JSA (+/- .75% for each year the spouse is older/younger)

- .80 for the 100% JSA (+/- 1.0% for each year the spouse is older/younger)

42.     Defendants apply the following conversion factors for the 10YCLA.

| Age | Percentage of the SLA |
|---|---|
| 65 or over | 91.0% |
| 64 | 92.0% |
| 63 | 93.0% |
| 62 | 94.0% |
| 61 | 95.0% |
| 60 | 95.5% |
| 59 | 96.0% |
| 58 | 96.3% |
| 57 | 96.6% |
| 56 | 96.9% |
| 55 | 97.2% |

**C.     The Salaried Plan**

43.     The Salaried Plan was established on January 1, 1950 and covers Raytheon's

eligible salaried employees.

44.     The Plan Administrator of the Salaried Plan is appointed by Raytheon's Vice

President of Human Resources.  Ms. Lappin signed the Salaried Plan's most recent Form 5500 as

Plan Administrator.

45.     Under the Salaried Plan, the normal form of benefit for unmarried participants is

an SLA based on their final average pay and years of service.  For married participants, the normal

form of benefit, and the Salaried Plan's QJSA, is a 50% JSA.  The Salaried Plan also offers a

10YCLA, a 66 2/3% JSA, a 75% JSA and a 100% JSA as QOSAs.

46.     Defendants apply the same conversion factors as the Hourly Plan to calculate the QJSA and QOSAs (*i.e.*, the Salaried Plan's Qualified Annuities), which are set forth in ¶¶ 41 – 42, above.

**D.     The Bargaining Plan**

47.     The Bargaining Plan provides retirement benefits to eligible Raytheon employees that are in a bargaining unit.

48.     Effective December 31, 2002, the Pension and Retirement Plan for Local 6-0254 of PACE (the "Local 6-0254 Part") merged into the Bargaining Plan.

49.     The Plan Administrator of the Bargaining Plan is appointed by Raytheon's Vice President of Human Resources.  Ms. Lappin signed the Bargaining Plan's most recent Form 5500 as Plan Administrator.

50.     Under the Bargaining Plan, the normal form of benefit for unmarried participants is an SLA based on their final average pay and years of service.  For married participants, the normal form of benefit is a 50% JSA.  The Bargaining Plan also offers a 5YCLA, a 10YCLA, a 15YCLA a 66 and 2/3% JSA, 75% JSA and a 100% JSA as QOSAs.  Participants can also receive their benefits as a 5-year period certain annuity, a 10-year period certain annuity or a 15-year period certain annuity (collectively the "Period Certain Annuities").

51.     To convert a participant's SLA to the QJSA or one of the QOSAs (*i.e.*, the Bargaining Plan's Qualified Annuities), Defendants use the 1971 Group Annuity Mortality table ("1971 GAM table") (blended 80% male, 20% female) and the interest rate used by the PBGC for valuing immediate annuities on October 1st (or December 1st, if the rate is lower) of the year before the participant's pension payments begin.

52.     The Bargaining Plan's plan year is December 1 to November 30.  Defendants have used the following, below-market interest rates to calculate the Bargaining Plan's QJSA and QOSAs:

| Plan Year | Interest Rate |
|---|---|
| Dec. 1, 2018 to Nov. 30, 2019 | 1.25% |
| Dec. 1, 2017 to Nov. 30, 2018 | .75% |
| Dec. 1, 2016 to Nov. 30, 2017 | .5% |
| Dec. 1, 2015 to Nov. 30, 2016 | 1.25% |
| Dec. 1, 2014 to Nov. 30, 2015 | 1.00% |
| Dec. 1, 2013 to Nov. 30, 2014 | 1.75% |
| Dec. 1, 2012 to Nov. 30, 2014 | .75% |

53.     But, to convert an SLA into the Period Certain Annuities for a participant who elects that form, Defendants use the Treasury Assumptions.

54.     Under the Local 6-0254 Part of the Bargaining Plan, the normal form of benefit for unmarried participants is an SLA of $22 a month for each year of credited service, less applicable offsets.   For married participants, the normal form of benefit is a 50% JSA.  The Local 6-0254 Part also offers a 10YCLA as a QOSA.

55.     To convert a participant's SLA to the Local 6-0254 Part's QJSA or QOSA, the Defendants use the 1984 Uninsured Pension Mortality table (the "UP-84 table") and the interest rates used by the PBGC on January 1st of the year a participant starts receiving benefits.

    **E.      The Non-Bargaining Plan**

56.     Raytheon established the Non-Bargaining Plan on December 18, 1997 as part of Raytheon's merger with Hughes Electronics' defense businesses, with certain assets and liabilities of the Hughes Non-Bargaining Retirement Plan being transferred to the Non-Bargaining Plan.

57.     The Plan Administrator of the Non-Bargaining Plan is appointed by Raytheon's Vice President of Human Resources.  Ms. Lappin signed the Non-Bargaining Plan's most recent Form 5500 as Plan Administrator.

58.     The relevant terms of the Non-Bargaining Plan and the Bargaining Plan are identical. The Non-Bargaining Plan's normal form of benefit for unmarried participants is an SLA based on their final average pay and years of service, and the normal form of benefit for married participants is a 50% JSA.  The Non-Bargaining Plan offers the same QOSAs and Period Certain Annuities as the Bargaining Plan.

59.     To convert a participant's SLA into the QJSA or one of the QOSAs (*i.e.*, the Non-Bargaining Plan's Qualified Annuities), Defendants use the 1971 GAM table (blended 80% male, 20% female) and the interest rate used by the PBGC for valuing immediate annuities on the October 1st (or December 1st, if less) of the year the participant's pension payments begin.

**F.      The Engineers & Constructors Plan**

60.     Raytheon established the Engineers & Constructors Plan on January 1, 1956.  The Engineers & Constructors Plan covers the salaried employees of Raytheon Aircraft Credit Corporation ("RACC") and former salaried employees of Raytheon Engineers & Constructors, Inc. ("RE&C").

61.     The Plan Administrator of the Engineers & Constructor Plan's is appointed by Raytheon's Vice President of Human Resources.  Ms. Lappin signed the Engineers & Constructors Plan's most recent Form 5500 as Plan Administrator.

62.     Under the Engineers & Constructors Plan, the normal form of benefit for unmarried participants is an SLA based on their final average pay and years of service.  For married

participants, the normal form of benefit is a 50% JSA.  The Engineers & Constructors Plan also

offers a 66 2/3% JSA, 5YCLA and a 10YCLA as QOSAs.

63.     To convert a participant's SLA into the QJSA and the QOSAs (*i.e.*, the Engineers

& Constructors Plan's Qualified Annuities), Defendants use the 1971 TPF&C[6] Forecast Mortality

table ("1971 TPF&C") and a 7% interest rate.

## II.     THE PLANS' QUALIFIED ANNUITIES ARE NOT ACTUARIALLY EQUIVALENT TO THE SLA

### A.     Converting an SLA to Other Forms of Benefit

64.     As set forth above, ERISA requires that a plan's QJSA and QOSAs be the "actuarial

equivalent" of the SLA.  *See* ERISA § 205(d)(1) and (2), 29 U.S.C. § 1055(d)(1) and (2); *see*

ERISA § 205(e)(1)(A), 29 U.S.C. 1055(e)(1)(A).  Accordingly, each of the Plans' QJSAs and

QOSAs (*i.e.*, the Plans' Qualified Annuities) must be actuarially equivalent to the SLA that

participants could have received under the Plans when they retired.

65.     To convert an SLA into a QJSA or a QOSA, the present value of the ***aggregate***

(*i.e.*, total) future benefits that the participant (and, if applicable, the beneficiary) is expected to

receive under both the SLA and the QJSA or QOSA must be determined.[7]  The present values are

then compared to determine the "conversion factor."[8]  As discussed above, when calculating a

"conversion factor" (and present value), ERISA requires the use of reasonable actuarial

---

[6]     TPF&C stands for "Towers, Perrin, Forster & Crosby," which became known as "Towers Perrin" in 1987.  Towers Perrin merged with Watson Wyatt Worldwide in 2010, becoming known as "Towers Watson & Co."  Towers Watson & Co. then merged with Willis Group in 2015, with the merged company becoming "Willis Towers Watson."

[7]     As alleged above, a QPSA is the survivor annuity portion of a plan's QJSA.

[8]     The conversion factor is easily calculated by a computer model.  Defendant simply inputs the assumptions and the model instantaneously calculates the conversion factor.

assumptions.  There are two main components in determining a "conversion factor:" an interest rate and a mortality table.

66.     An interest rate is used to determine the present value of each future payment.  This is based on the time value of money, meaning that money available now is worth more than the same amount in the future due to the ability to earn investment returns.  The rate is often called a "discount rate" because it discounts the value of a future payment.

67.     The interest rate used by a defined benefit plan to calculate present value must be reasonable based on prevailing market conditions, which "reflect anticipated events." *See* 29 U.S.C. § 1002(27).  The interest rate may be broken into segments of short-term, medium-term and long-term expectations pertaining to each future payment. *See, e.g.*, 29 U.S.C. §§ 1055(g)(3)(B)(iii), 1083(h)(2).

68.     Pursuant to Actuarial Standard of Practice No. 27 ("ASOP 27"), para. 3.6 of the Actuarial Standards Board,[9] "each economic assumption used by an actuary should be reasonable."[10]  An assumption is "reasonable" if it "reflects the actuary's professional judgment," "takes into account historical and current economic data that is relevant as of the **measurement date**," and "reflects the actuary's estimate of future experience."  *Id*. (emphasis in original).  The Treasury Interest rates are reasonable because they reflect current economic conditions.

69.     A mortality table is a series of rates which predict how many people at a given age will die before attaining the next higher age.

---

[9]      Courts look to professional actuarial standards as part of this analysis. *See, e.g. Stephens*, 644 F.3d at 440 (citing Jeff L. Schwartzmann & Ralph Garfield, Education & Examination Comm. of the Society of Actuaries, Actuarially Equivalent Benefits 1, EA1–24–91 (1991)).
[10]     Available at: https://www.actuarialstandardsboard.org/asops/selection-economic-assumptions-measuring-pension-obligations/ (last accessed on June 25, 2019).

70.     More recent mortality tables are "two-dimensional" in that the rates are based not only on the age of the individual but the year of birth. The SOA publishes the mortality tables that are the most widely used by defined benefit plans when doing these conversions.   The SOA published mortality tables in 1971 (the 1971 GAM table), 1976, 1983, 1984 (the UP-84), 1994, 2000 (the "RP-2000") and 2014 ("RP-2014") to account for changes to a population's mortality experience.

71.     Since at least the 1980s, the life expectancies in mortality tables have substantially improved as shown below:



Source: Aon Hewitt, *Society of Actuaries Finalizes New Mortality Assumptions: The Financial and Strategic Implication for Pension Plan Sponsors* (November 2014), at 1.  According to this paper, there have been "increasing life expectancies over time" and just moving from the RP-2000 to the RP-2014 table would increase pension liabilities by 7%.

72.     Pursuant to Actuarial Standard of Practice No. 35 ("ASOP 35"), para. 3.5.3 of the Actuarial Standards Board,[11] actuarial tables must be adjusted on an ongoing basis to reflect improvements in mortality.[12]

73.     Accordingly, in the years between the publication of a new mortality table, mortality rates are often "projected" to future years to account for expected improvements in mortality.  For example, in 2017, the Treasury Mortality Table was the RP-2000 mortality table adjusted for mortality improvement using Projection Scale AA to reflect the impact of expected improvements in mortality (the "2017 Treasury Mortality Table"). *See* IRS Notice 2016-50.[13] In 2018, the Treasury Mortality Table was the RP-2014 mortality table projected to account for additional improvement in mortality rates that have occurred since 2014 (the "2018 Treasury Mortality Table"). *See* IRS Notice 2017-60.[14]

74.     For purposes of the present value (and conversion factor) analysis under ERISA, the mortality table must be reasonable and updated "to reflect anticipated events." 29 U.S.C. § 1002 (27). The Treasury Mortality Tables are updated and reasonable. *See* 26 C.F.R. § 1.417(a)(3)-1(c)(2)(iv).  Accordingly, the Treasury Assumptions are reasonable.

75.     Using the selected interest rate and mortality table, the present value of the SLA and the QJSA or QOSA can be compared to determine whether the amount of the QJSA or QOSA is actuarially equivalent to the SLA.

---

[11]     *See* n. 9, *supra*.
[12]     Available at: http://www.actuarialstandardsboard.org/asops/selection-of-demographic-and-other-noneconomic-assumptions-for-measuring-pension-obligations/#353-mortality-and-mortality-improvement (last accessed on June 25, 2019).
[13]     Available at: https://www.irs.gov/pub/irs-drop/n-16-50.pdf.
[14]     Available at: https://www.irs.gov/pub/irs-drop/n-17-60.pdf.

76.     Changes to mortality assumptions can have dramatic effects on the conversion factor and the value of a QJSA or QOSA.  Using an antiquated mortality table generates lower present values of future payments, and the amount of the monthly benefit under a QJSA, QPSA or QOSA decreases.

77.     As discussed, plans must use reasonable interest rates and reasonable mortality tables to evaluate whether the present values (and conversion factors) of benefit options produce equivalent benefits for participants and beneficiaries.

**B.     The Actuarial Assumptions Raytheon Uses to Calculate the Plans' Liabilities Are Significantly Different Than Those Used to Calculate the Qualified Annuities**

**1.     Raytheon Uses Updated Actuarial Assumptions to Predict Its Financial Obligations to Pay Benefits.**

78.     Raytheon's audited financial statements are prepared under Generally Accepted Accounting Principles ("GAAP") and filed with the SEC as Form 10-K.  Under GAAP, mortality assumptions "should represent the 'best estimate' for that assumption as of the current measurement date."[15] In each of its Form 10-Ks since 2012, Raytheon has used reasonable, current

---

[15]     As noted in an October 2015 "Financial Reporting Alert" by Deloitte:

> Many entities rely on their actuarial firms for advice or recommendations related to demographic assumptions, such as the mortality assumption. Frequently, actuaries recommend published tables that reflect broad-based studies of mortality. Under ASC 715-30 and ASC 715-60, each assumption should represent the "best estimate" for that assumption as of the current measurement date. The mortality tables used and adjustments made (e.g., for longevity improvements) should be appropriate for the employee base covered under the plan. Last year, the Retirement Plans Experience Committee of the Society of Actuaries (SOA) released a new set of mortality tables (RP-2014) and a new companion mortality improvement scale (MP-2014). Further, on October 8, 2015, the SOA released an updated mortality improvement scale, MP-2015, which shows a decline in the recently observed longevity improvements. Although entities are not required to use SOA mortality tables, the SOA is a leading provider of actuarial research, and its mortality tables

mortality assumptions to calculate the present value of, its benefit obligations under the Plans. In its Form 10-K for the year ending December 31, 2014, Raytheon began using the RP-2014 mortality table, recognizing the well-documented improvements to morality.  Raytheon's 10-K states:

> A recent study released by the Society of Actuaries indicated that life expectancies have increased over the past several years and are longer than what was assumed by most existing mortality tables. ***Our pension obligation as of December 31, 2014 reflects a change in the underlying mortality assumption, which reflects improvements in life expectancy consistent with the Society of Actuaries study***. Our pension obligation also reflects an increase in the expected rate of future longevity improvement taking into consideration data from multiple sources including the Society of Actuaries study and Social Security Administration data.[16] (Emphasis added).

79.    The mortality assumptions that Raytheon has used to calculate the present value of its benefit obligations in its 10-Ks have been consistent with the Treasury Mortality Table.

80.    Raytheon also used reasonable, market-based discount rates when calculating the actuarial present value of the Plans' benefits.  Raytheon relies on ASOP 27, which it states in its 10-K filings "requires the selection of a reasonable [rate] that considers multiple criteria including

---

and mortality improvement scales are widely used by plan sponsors as a starting point for developing their mortality assumptions. Accordingly, it is advisable for entities, with the help of their actuaries, to (1) continue monitoring the availability of updates to mortality tables and experience studies and (2) consider whether these updates should be incorporated in the current-year mortality assumption.

*See* Deloitte, Financial Reporting Considerations Related to Pension and Other Postretirement Benefits, Financial Reporting Alert 15-4, October 30, 2015 at 3. https://www2.deloitte.com/content/dam/Deloitte/us/Documents/audit/ASC/FRA/2015/us-aersfra-financial-reporting-considerations-related-to-pension-and-other-postretirement-benefits103015.pdf.

[16]    *See* Raytheon's Form 10-K for the year ending December 31, 2014 at 41, available at: http://investor.raytheon.com/phoenix.zhtml?c=84193&p=irol-sec.

. . . the actuary's professional judgment, historical and current economic data and estimates of

future experience and has no significant bias."[17]

81.     Raytheon's most-recent 10-K states:

> The discount rate represents the interest rate that should be used to
> determine the present value of future cash flows currently expected to settle
> [Raytheon's] pension obligations.   The discount rate assumption is
> determined by using a theoretical bond portfolio model consisting of bonds
> rate AA or better by Moody's Investors' Services for which the timing and
> amount of cash flows approximate the estimated benefit payments for each
> of our pension plans.[18]

82.     The discount rates Raytheon used to calculate the actuarial present value of the

Plans' liabilities since 2012 are shown in the chart below.[19]

| Year | Discount Rate |
|------|---------------|
| 2012 | 5.00%[20] |
| 2013 | 4.13%[21] |
| 2014 | 5.06%[22] |
| 2015 | 4.06%[23] |
| 2016 | 4.45%[24] |

---

[17]     *See* Raytheon's Form 10-K for the year ending December 31, 2018 at 36 available at:
http://investor.raytheon.com/phoenix.zhtml?c=84193&p=irol-sec.

[18]     *Id*.

[19]     Raytheon's use of high-grade corporate bonds to select the Plans' discount rate is common.
Another, similar methodology is to use the FTSE (formerly Citi) Pension Liability Index, which
represents a single discount rate that would produce the same present value as calculated by
discounting a pension plan's standardized set of liabilities using AA zero coupon bonds.   The
"segment" interest rates prescribed by ERISA § 205(g)(3), 29 U.S.C. § 1055(g)(3) and § 417(e)(3)
of the Tax Code, which are used to calculate the present value of a lump sum payment, is another
method.  ERISA's "segment" interest rates provide an average of bonds with maturities for years
0-5 ("1st Segment"), years 5-19 ("2nd Segment") and years 20 and later ("3rd Segment") of a
future benefit stream such as an annuity.  26 U.S.C. §§ 417(e)(3)(C) and (D).  Raytheon's method
is essentially a weighted average of ERISA's segment interest rates.

[20]     *See* Raytheon's Form 10-K for the year ending December 31, 2014 at 108, available at:
http://investor.raytheon.com/phoenix.zhtml?c=84193&p=irol-sec.

[21]     *Id*.

[22]     *Id*.

[23]     *See* Raytheon's Form 10-K for the year ending December 31, 2017 at 113, available at:
http://investor.raytheon.com/phoenix.zhtml?c=84193&p=irol-sec

[24]     *Id*.

| 2017 | 4.31%[25] |
| 2018 | 3.68%[26] |

### 2. Defendants Use Unreasonable Assumptions to Calculate the Present Value of the Qualified Annuities.

#### i. The Hourly Plan and the Salaried Plans' Fixed Conversion Factors Do Not Provide Actuarially Equivalent Benefits.

83.     The Hourly Plan and the Salaried Plan have the same QJSA (a 50% JSA) and QOSAs (a 66 2/3% JSA, a 75% JSA, a 100% JSA and a 10YCLA).  *See* ¶¶ 40, 45, above.  These plans do not use an interest rate or mortality table; instead they use the same fixed conversion factors to calculate these forms of benefits.  *See* ¶¶ 41 – 42, 46, above.

84.     The Hourly Plan and the Salaried Plans' conversion factors do ***not*** produce QJSAs and QOSAs that are actuarially equivalent to the SLA offered to a participant at the same time because the present values of these benefits are lower than the present value of the SLA.

85.     The chart below illustrates how the benefits for a 65-year-old participant who earned an SLA of $1,000 per month who retired in 2015 were reduced using the Hourly and Salaried Plans' fixed conversion factors instead of the applicable Treasury Mortality Table[27] and the 5.06% discount rate that Raytheon used in its Form 10-K.

---

[25]     *Id*.

[26]     *See* Raytheon's Form 10-K for the year ending December 31, 2018, *supra* note 19, at 111.

[27]     The applicable Treasury Mortality Table in 2015 was the RP-2000 projected to 2015, which uses slightly more conservative mortality rates than the RP-2014 that Raytheon used in its Form 10-K for the year ending December 31, 2014.

| Benefit Form | Monthly Amount Using Hourly Plan and Salaried Plan's Conversion Factors | Monthly Amount Using Updated Mortality Table and Raytheon's Discount Rate | Monthly Difference | Percent Difference |
|---|---|---|---|---|
| SLA | $1,000.00 | $1,000.00 | n/a | n/a |
| 10YCLA | $910.00 | $965.77 | $55.77 | 5.8% |
| 50% JSA | $900.00 | $924.10 | $24.10 | 2.7% |
| 66 2/3% JSA | $870.00 | $901.30 | $31.30 | 3.6% |
| 75% JSA | $850.00 | $890.32 | $40.32 | 4.7% |
| 100% JSA | $800.00 | $858.92 | $58.92 | 7.4% |

86.     Defendants' application of these fixed, unreasonable conversion factors to calculate benefits for participants receiving the Hourly and Salaried Plan's Qualified Annuities results in benefits that are not actuarially equivalent to the participant's SLA and lower monthly payments than the participant should be receiving.

87.     As shown above, the conversion factors Defendants use for the Hourly Plan and the Salaried Plan are **substantially lower** (*i.e.*, worse for participants) than conversion factors that would be generated using the interest and mortality rates that Raytheon acknowledged were reasonable in its Form 10-K.

88.     While the amount of the loss suffered will vary depending on the ages of the participant and the beneficiary, **all** who receive Qualified Annuities under the Hourly Plan and the Salaried Plan are not receiving an actuarially equivalent form of benefit because the present values are not equal to that of the SLA that they earned.

89.     Plaintiff retired at age 55 and 0 months and accrued an SLA of $1,135.34 per month. He is receiving a 50% joint and survivor annuity which pays $1,021.33 a month.  If Defendants

applied the applicable Treasury Mortality Table and the discount rate Raytheon used in its 10-K to calculate Plaintiff's benefits, Plaintiff would be receiving $1,078.66, or $57.33 more per month. By using the Hourly Plan's unreasonable assumptions instead of the assumptions Raytheon acknowledges are reasonable in its Form 10-K, Defendants reduced the present value of Plaintiff's benefits at the time of his retirement by $10,741.34.

> ### ii.   The Bargaining Plan and the Non-Bargaining Plans' Actuarial Assumptions Do Not Provide Actuarially Equivalent Benefits.

90.     The Bargaining Plan and the Non-Bargaining Plan use the 1971 GAM table (80% male, 20% female) and the interest rate used by the PBGC to value immediate annuities to calculate their QJSAs and QOSAs.  *See* ¶¶ 51, 59, above.

91.     Using the 1971 GAM table to calculate these benefits is unreasonable because it is severely outdated and does not "reflect anticipated events" (i.e. the anticipated mortality rates of participants).  The 1971 GAM table is more than 45 years old and does not incorporate the improvements to life expectancy that have occurred since the table was published.  According to the Centers for Disease Control and Prevention, in 1970, a 65-year-old had an average life expectancy of 15.2 years.[28]  In 2010, a 65-year-old had a 19.1-year life expectancy, a 20% increase, which would result in an additional 46 months of annuity payments. Accordingly, by 2010, the average employee would have expected to receive, and the average employer would have expected to pay, benefits for a substantially longer amount of time than in 1971.

92.     Raytheon acknowledges that using the 1971 GAM table is unreasonable when it used updated mortality tables to calculate the present value of its pension obligations.

---

[28]     *See* https://www.cdc.gov/nchs/data/hus/2011/022.pdf

93.     The use of the PBGC's interest rate to value immediate annuities exacerbated the harm suffered by participants receiving one of the Bargaining or Non-Bargaining Plan's Qualified Annuities.  When calculating a joint and survivor annuity, using a low interest rate results in a lower conversion factor.  As set forth above, the rates used by the PBGC for immediate annuities are significantly lower than the discount rate Raytheon used to calculate the Plans' liabilities.  For example, in 2016, Raytheon used a 4.45% discount rate in its Form 10-K while the PBGC's rate for immediate annuities was only 1.25%.  Raytheon acknowledged the wide discrepancy between the PBGC's interest rate and market interest rates used by plan sponsors to value benefit obligations in, among other places, the Bargaining Plan's 2014 Form 5500 when it noted that the PBGC's rate was historically 2% lower than the interest rates for *government bonds*, whose yields are even lower than the AA-rated corporate bonds that Raytheon uses in setting the discount rate in its Form 10-K.  *See* Bargaining Plan's 2014 Form 5500 at Schedule SB, Part V.

94.     Using this outdated mortality table decreases the values of the Bargaining and Non-Bargaining Plan's Qualified Annuities relative to the SLA, thereby materially reducing the monthly benefits participants and beneficiaries receive in comparison to the monthly benefits participants and beneficiaries would have received had the Bargaining Plan and the Non-Bargaining Plan used updated, reasonable mortality and interest rate assumptions.

95.     The chart below illustrates how the benefits for a 65-year-old participant who earned an SLA of $1,000 per month that retired in 2015 were reduced using the 1971 GAM (80% male blend) and the PBGC's interest rate instead of the applicable Treasury Mortality Table and the 5.06% discount rate that Raytheon used in its Form 10-K.

| Benefit Form | Monthly Amount Using 1971 GAM (80-20 m/f blend) and PBGC Interest Rate | Monthly Amount Using Updated Mortality Table and Raytheon's Discount Rate | Monthly Difference | Percent Difference |
|---|---|---|---|---|
| SLA | $1,000.00 | $1,000.00 | n/a | n/a |
| 5YCLA | $981.26 | $991.30 | $10.04 | 1.0% |
| 10YCLA | $921.88 | $965.77 | $43.89 | 4.8% |
| 15YCLA | $830.47 | $926.06 | $95.59 | 11.5% |
| 50% JSA | $871.23 | $924.10 | $52.87 | 6.1% |
| 66 2/3% JSA | $835.37 | $901.30 | $65.93 | 7.9% |
| 75% JSA | $818.53 | $890.32 | $71.79 | 8.8% |
| 100% JSA | $771.84 | $858.92 | $87.08 | 11.3% |

96.     As shown above, the actuarial assumptions Defendants use for the Bargaining Plan and the Non-Bargaining Plan are *substantially lower* (*i.e.*, worse for participants) than conversion factors that would be generated using the interest rate and mortality table that Raytheon acknowledged were reasonable in its Form 10-K.

97.     While the amount of the loss suffered will vary depending on the ages of the participant and the beneficiary, *all* who receive Qualified Annuities under the Bargaining Plan and the Non-Bargaining Plan are not receiving an actuarially equivalent form of benefit because the present value is not equal to that of the SLA that they earned.

### iii.     The Engineers & Constructors Plan's Actuarial Assumptions Do Not Provide Actuarially Equivalent Benefits.

98.     Defendants use the 1971 TPF&C mortality table and a 7% interest rate to calculate the Engineers & Constructor Plan's Qualified Annuities.  *See* ¶ 63, above.

99.     Using the 1971 TPF&C mortality table to calculate these benefits is unreasonable because it is based on mortality data that is 45 years old and does not "reflect anticipated events" (i.e. the anticipated mortality rates of participants).  *See* ¶ 91, above.

100.     While the 7% interest rate is higher than the discount rates Raytheon used during the Class Period and ERISA's segment interest rates, the higher rate does not offset the harm caused by using the outdated mortality table and these assumptions together result in conversion factors that are significantly lower (*i.e.*, worse for participants) than those generated using reasonable actuarial assumptions.

101.     The chart below illustrates how the benefits for a 65-year-old participant who earned an SLA of $1,000 per month that retired in 2015 were reduced using the 1971 TPF&C table and a 7% interest rate instead of the applicable Treasury Mortality Table and the 5.06% discount rate that Raytheon used in its Form 10-K.

| Benefit Form | Monthly Amount Using 1971 TPF&C and 7% | Monthly Amount Using Updated Mortality Table and Raytheon's Discount Rate | Monthly Difference | Percentage Difference |
|---|---|---|---|---|
| SLA | $1,000.00 | $1,000.00 | n/a | n/a |
| 5YCLA | $974.42 | $991.30 | $16.88 | 1.7% |
| 10YCLA | $911.12 | $965.77 | $54.65 | 6.0% |
| 50% JSA | $873.57 | $924.10 | $50.53 | 5.8% |
| 66 2/3% JSA | $838.24 | $901.30 | $63.06 | 7.5% |

102.     As shown above, the actuarial assumptions Defendants use for the Engineers & Constructors Plan are **substantially lower** (*i.e.*, worse for participants) than conversion factors that would be generated using the interest and mortality rates that Raytheon acknowledged were reasonable in its Form 10-K.

103.    While the amount of the loss suffered will vary depending on the ages of the participant and the beneficiary, ***all*** who receive Qualified Annuities under the Engineers & Constructors Plan are not receiving an actuarially equivalent form of benefit because the present value is not equal to that of the SLA that they earned.

v.     **The Actuarial Assumptions Used in the Local 6-0254 Part of the Bargaining Plan Do Not Produce Actuarially Equivalent Benefits.**

104.    As set forth above, Defendants use the UP-84 mortality table and the PBGC's rate for valuing immediate annuities to calculate the Local 6-0254 Part of the Bargaining Plan's Qualified Annuities.  *See* ¶ 55, above.

105.    Using the UP-84 mortality table to calculate benefits is unreasonable because it is severely outdated and does not "reflect anticipated events" (*i.e.*, the anticipated mortality rates of participants).  The UP-84 mortality table is roughly 35 years out of date, and as such it understates mortality rates. According to the Centers for Disease Control and Prevention, in 1984, a 65-year-old had an average life expectancy of 16.8 years in 1984.[29] In 2010, a 65-year-old had a 19.1-year life expectancy, a 13% increase, which would result in an additional 28 months of annuity payments. Accordingly, by 2010, the average employee would have expected to receive, and the average employer would have expected to pay, benefits for a substantially longer amount of time than in 1984.

106.    As alleged above, using the PBGC's interest rate to value immediate annuities was unreasonable because it is significantly below the rates and indexes Raytheon used to calculate the present value of its benefit obligations under the Plans.

---

[29]    *See* https://www.cdc.gov/nchs/data/hus/2011/022.pdf

107.    The chart below illustrates how the benefits for a 65-year-old participant who earned an SLA of $1,000 per month that retired in 2015 were reduced using the Local 6-0254 Part's actuarial assumptions instead of the applicable Treasury Mortality Table and the 5.06% discount rate Raytheon used in its Form 10-K.

| Benefit Form | Monthly Amount Using UP-84 (with setbacks) and PBGC Interest Rates | Monthly Amount Using Updated Mortality Table and Raytheon's Discount Rate | Monthly Difference | Percent Difference |
|---|---|---|---|---|
| SLA | $1,000.00 | $1,000.00 | n/a | n/a |
| 10YCLA | $917.30 | $965.77 | $48.47 | 5.3% |
| 50% JSA | $873.59 | $924.10 | $50.51 | 5.8% |

108.    As shown above, the actuarial assumptions Defendants use for the Local 6-0254 Part are *substantially lower* (i.e. worse for participants) than conversion factors that would be generated using the interest rate and mortality table that Raytheon acknowledged were reasonable in its Form 10-K.

109.    While the amount of the loss suffered will vary depending on the ages of the participant and the beneficiary, *all* who receive Qualified Annuities under the Local 6-0254 Part of the Bargaining Plan are not receiving an actuarially equivalent form of benefit because the present value is not equal to that of the SLA that they earned.

**C.    Defendants' Unreasonable Actuarial Assumptions and Conversion Factors Significantly Harm the Plans' Participants**

110.    Because Raytheon used reasonable actuarial assumptions to calculate the Plans' benefit liabilities in its filing with the SEC, Defendants knew or should have known the Qualified Annuities were not actuarially equivalent to the SLAs participants earned under the Plans in which they participated.

30

111.   Defendants' conduct was especially egregious because Ms. Lappin, the Plan Administrator for the Plans, is an Enrolled Actuary under ERISA.  To become an Enrolled Actuary, a candidate must fulfill knowledge and experience requirements promulgated in federal regulations, including determining "the present value of payments to be made" and "making determinations that the methods and assumptions adopted in the procedures followed in actuarial services are appropriate in light of all pertinent circumstances . . . ."  26 C.F.R. § 901.1(a) and (b)(1).   As an Enrolled Actuary, Ms. Lappin knew or should have known the Plans' fixed conversion factors and actuarial assumptions used to calculate the Qualified Annuities were unreasonable and not based on current interest and mortality rates, and were therefore inconsistent with ASOP 27, ASOP 35 and ERISA's definition of present value.  Ms. Lappin knew or should have known that using mortality assumptions from 1971 and 1984 was unreasonable and harmful to participants who receive Qualified Annuities.

112.   Discovery will likely show that Defendants' use of unreasonable actuarial assumptions deprived retirees and their spouses of tens of millions of dollars.

113.   Because the Plans used unreasonable conversion factors throughout the relevant time period, the benefits paid to certain participants and beneficiaries who receive Qualified Annuities are **not** actuarially equivalent to what they would have been had participants selected an SLA, in violation of ERISA § 205 (d)(1)(B) and (d)(2)(A), 29 U.S.C. § 1055 (d)(1)(B) and (d)(2)(A).  Rather, the benefits paid to these retirees are much lower than they should be.

114.   Since Plaintiff's benefits were calculated using the unreasonable fixed conversion factors under the Hourly Plan, Plaintiff has been harmed because he is receiving less each month than he would have received if Defendants used current, reasonable actuarial assumptions to

calculate his benefits. Plaintiff, along with other participants and beneficiaries, has been substantially damaged as a result of receiving benefits below an actuarially equivalent amount.

## CLASS ACTION ALLEGATIONS

115.    Plaintiff brings this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of himself and the class (the "Class") defined as follows:

> All participants in and beneficiaries of the Plans who are receiving Qualified Annuities calculated using: (1) the Hourly Plan and the Salaried Plans' fixed conversion factors, (2) the 1971 GAM table (80% male, 20% female) and the PBGC's interest rate for immediate annuities (3) the 1971 TPF&C mortality table and a 7% interest rate, or (4) the UP-84 mortality table and the PBGC's interest rates. Excluded from the Class are Defendants and any individuals who are subsequently determined to be fiduciaries of the Plans.

116.    The members of the Class are so numerous that joinder of all members is impractical.  Upon information and belief, the Class includes thousands of persons.

117.    Plaintiff's claims are typical of the claims of the members of the Class because Plaintiff's claims and the claims of all Class Members arise out of the same policies and practices as alleged herein, and all members of the Class are similarly affected by Defendants' wrongful conduct.

118.    There are questions of law and fact common to the Class and these questions predominate over questions affecting only individual Class Members.  Common legal and factual questions include, but are not limited to:

A.    Whether the Plans' formulae for calculating Qualified Annuities provide benefits that are actuarially equivalent to the SLA;

B.    Whether the Plans' actuarial assumptions are reasonable;

C.    Whether the Plans should be reformed to comply with ERISA; and

D.    Whether Plaintiff and Class Members should receive additional benefits.

119.     Plaintiff will fairly and adequately represent the Class and has retained counsel experienced and competent in the prosecution of ERISA class actions.  Plaintiff has no interests antagonistic to those of other members of the Class.  Plaintiff is committed to the vigorous prosecution of this action and anticipates no difficulty in the management of this litigation as a class action.

120.     This action may be properly certified under either subsection of Rule 23(b)(1). Class action status is warranted under Rule 23(b)(1)(A) because prosecution of separate actions by the members of the Class would create a risk of establishing incompatible standards of conduct for Defendants.  Class action status is warranted under Rule 23(b)(1)(B) because prosecution of separate actions by the members of the Class would create a risk of adjudications with respect to individual members of the Class that, as a practical matter, would be dispositive of the interests of other members not parties to this action, or that would substantially impair or impede their ability to protect their interests.

121.     In the alternative, certification under Rule 23(b)(2) is warranted because Defendant has acted or refused to act on grounds generally applicable to the Class, thereby making appropriate final injunctive, declaratory or other appropriate equitable relief with respect to the Class as a whole.

122.     In the alternative, certification under Rule 23(b)(3) is warranted because the questions of law or fact common to the members of the Class predominate over any questions affecting only individual members, and a class action is superior to other available methods for the fair and efficient adjudication of the controversy.

## FIRST CLAIM FOR RELIEF
### Declaratory and Equitable Relief
### (ERISA § 502(a)(3), 29 U.S.C. § 1132(a)(3))

123.    Plaintiff re-alleges and incorporates herein by reference all prior allegations in this Complaint.

124.    Defendants improperly reduce benefits for participants and beneficiaries who receive Qualified Annuities calculated using fixed conversion factors or outdated, unreasonable actuarial assumptions, resulting in Qualified Annuities that are not actuarially equivalent to an SLA as ERISA requires.

125.    ERISA § 502(a)(3), 29 U.S.C. § 1132(a)(3), authorizes a participant or beneficiary to bring a civil action to:  "(A) enjoin any act or practice which violates any provision of this title or the terms of the plan, or (B) to obtain other appropriate equitable relief (i) to redress such violations or (ii) to enforce any provisions of this title or the terms of the plan."

126.    Pursuant to this provision, 28 U.S.C. §§ 2201 and 2202 and Rule 57 of the Federal Rules of Civil Procedure, Plaintiff seeks declaratory relief, determining that the Plans' established methodologies for calculating actuarial equivalence of Qualified Annuities violate ERISA because they do not provide an actuarially equivalent benefit. By not providing an actuarially equivalent benefit, Defendants have violated ERISA's anti-forfeiture clause, ERISA § 203(a), 29 U.S.C. § 1053(a), and ERISA's "actuarial equivalence" rule, ERISA §§ 204 and 205, 29 U.S.C. §§ 1054 and 1055.

127.    Plaintiff further seeks Orders from the Court providing a full range of equitable relief, including but not limited to:

(a)    re-calculation, correction and payment of benefits wrongfully withheld for participants and beneficiaries receiving Qualified Annuities;

(b)      an "accounting" of all prior benefits and payments;

(c)      a surcharge;

(d)      disgorgement of amounts wrongfully withheld;

(e)      disgorgement of profits earned on amounts wrongfully withheld;

(f)      a constructive trust;

(g)      an equitable lien;

(h)      an injunction against further violations; and

(i)      other relief the Court deems just and proper.

<u>SECOND CLAIM FOR RELIEF</u>
**For Reformation of the Plans and Recovery of Benefits Under the Reformed Plans**
**(ERISA § 502(a)(1) and (3), 29 U.S.C. § 1132(a)(1) and (3))**

128.     Plaintiff re-alleges and incorporates herein by reference all prior allegations in this Complaint.

129.     ERISA § 502(a)(3), 29 U.S.C. § 1132(a)(3), authorizes a participant or beneficiary to bring a civil action to:  "(A) enjoin any act or practice which violates any provision of this title or the terms of the plan, or (B) to obtain other appropriate equitable relief (i) to redress such violations or (ii) to enforce any provisions of this title or the terms of the plan."

130.     Defendants improperly reduce benefits for participants and beneficiaries who receive Qualified Annuities by using fixed conversion factors or outdated, unreasonable actuarial assumptions, resulting in the Qualified Annuities that are not actuarially equivalent to an SLA as ERISA requires.

131.     By not providing an actuarially equivalent benefit, Defendant has violated ERISA's anti-forfeiture clause, ERISA § 203(a), 29 U.S.C. § 1053(a), and ERISA's "actuarial equivalence" rule, ERISA §§ 204 and 205, 29 U.S.C. §§ 1054 and 1055.

132.     Plaintiff is entitled to reformation of the Plans to require Defendants to provide actuarially equivalent benefits.

133.     ERISA § 502(a)(1)(B), 29 U.S.C. § 1132(a)(1)(B), authorizes a participant or beneficiary to bring a civil action to "recover benefits due to him under the terms of his plan, to enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the terms of the plan."

134.     Plaintiff is entitled to recover actuarially equivalent benefits, to enforce his rights to the payment of past and future actuarially equivalent benefits, and to clarify his rights to future actuarially equivalent benefits under the Plans following reformation.

**THIRD CLAIM FOR RELIEF**
**Breach of Fiduciary Duty**
**(ERISA §§ 1104 and 502(a)(3), 29 U.S.C. §§ 1104 and 1132(a)(3))**

135.     Plaintiff re-alleges and incorporates herein by reference all prior allegations in this Complaint.

136.     As the Plan Administrator for the Plans, Ms. Lappin is a fiduciary of the Plans.

137.     ERISA § 404(a)(1), 29 U.S.C. § 1104(a)(1), provides that a fiduciary shall discharge its duties with respect to a plan in accordance with the documents and instruments governing the plan insofar as the Plan is consistent with ERISA.

138.     The Plans violate ERISA because the Qualified Annuities are not actuarially equivalent to participants' SLAs, causing participants to forfeit part of their vested benefits.

139.     As an Enrolled Actuary under ERISA, Ms. Lappin knew or should have known that the Plans' conversion factors and actuarial assumptions were unreasonable, harmful to participants and beneficiaries who selected Qualified Annuities and did not provide actuarially equivalent benefits as ERISA requires.  In following the terms of the Plans, which did not conform with

ERISA, Ms. Lappin exercised her fiduciary duties and control over the Plans' assets in breach of her fiduciary duties.

140.    ERISA § 502(a)(3), 29 U.S.C. § 1132(a)(3), authorizes a participant or beneficiary to bring a civil action to: "(A) enjoin any act or practice which violates any provision of this title or the terms of the plan, or (B) to obtain other appropriate equitable relief (i) to redress such violations or (ii) to enforce any provisions of this title or the terms of the plan."

141.    Pursuant to this provision, 28 U.S.C. §§ 2201 and 2202 and Federal Rule of Civil Procedure 57, Plaintiff seeks declaratory relief, determining that the Plans' established methodologies for calculating Qualified Annuities violate ERISA because they do not provide an actuarially equivalent benefit.

142.    Plaintiff further seeks orders from the Court providing a full range of equitable relief, including but not limited to:

(a)     re-calculation, correction and payment of benefits wrongfully withheld to participants and beneficiaries receiving Qualified Annuities;

(b)     an "accounting" of all prior benefits and payments;

(c)     a surcharge;

(d)     disgorgement of amounts wrongfully withheld;

(e)     disgorgement of profits earned on amounts wrongfully withheld;

(f)     a constructive trust;

(g)     an equitable lien;

(h)     an injunction against further violations; and

(i)     other relief the Court deems just and proper.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays that judgment be entered against Defendants on all claims and requests that the Court award the following relief:

A.      Certifying this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure;

B.      Declaring that Defendants fail to properly calculate and pay Qualified Annuities in violation of ERISA §§ 205(d)(1)(B) and (d)(2)(A), and 204(c)(3), 29 U.S.C. §§ 1055(d)(1)(B) and (d)(2)(A), and 1054(c)(3);

C.      Ordering Defendants to bring the Plans into compliance with ERISA, including, but not limited to, reforming the Plans' terms regarding how Qualified Annuities are calculated;

D.      Ordering Defendants to correct and re-calculate benefits that have been paid to participants and beneficiaries receiving Qualified Annuities;

E.      Ordering Defendants to provide an "accounting" of all prior payments of benefits to participants and beneficiaries receiving Qualified Annuities under the Plans to determine the proper amounts that should have been paid;

F.      Ordering Defendants to pay all benefits improperly withheld, including under the theories of surcharge and disgorgement;

G.      Ordering Defendants to disgorge any profits earned on amounts improperly withheld;

H.      Imposition of a constructive trust;

I.      Imposition of an equitable lien;

J.      Reformation of the Plans;

K.      Ordering Defendants to pay future benefits in accordance with ERISA's actuarial equivalence requirements;

L.      Ordering Defendants to pay future benefits in accordance with the terms of the Plans, as reformed;

M.      Awarding, declaring or otherwise providing Plaintiff and the Class all relief under ERISA § 502(a), 29 U.S.C. § 1132(a), or any other applicable law, that the Court deems proper;

N.      Awarding attorneys' fees and expenses as provided by the common fund doctrine, ERISA § 502(g), 29 U.S.C. § 1132(g), and/or other applicable doctrine; and

O.      Any other relief the Court determines is just and proper.

Dated: June 27, 2019                      Respectfully submitted,

*/s/ Douglas P. Needham*

**IZARD, KINDALL & RAABE LLP**
Douglas P. Needham, BBO No. 671018
Robert A. Izard (to be admitted *pro hac vice*)
Mark P. Kindall (to be admitted *pro hac vice*)
Oren Faircloth (to be admitted *pro hac vice*)
29 South Main Street, Suite 305
West Hartford, CT 06107
Tel: (860) 493-6292
Fax: (860) 493-6290
Email:  dneedham@ikrlaw.com
Email:  rizard@ikrlaw.com
Email:  mkindall@ikrlaw.com
Email:  ofaircloth@ikrlaw.com

Gregory Y. Porter (to be admitted *pro hac vice*)
Mark G. Boyko (to be admitted *pro hac vice*)
**BAILEY & GLASSER LLP**
1054 31st Street, NW, Suite 230
Washington, DC 20007
(202) 463-2101
(202) 463-2103 fax
gporter@baileyglasser.com
mboyko@baileyglasser.com

***Counsel for Plaintiff***