# UNITED STATES DISTRICT COURT
## OF MASSACHUSETTS

| | |
|---|---|
| Johnny Cruz, on behalf of himself and all others similarly situated,<br><br>                    Plaintiff,<br><br>          vs.<br><br>Raytheon Company, Kelly B. Lappin, in her capacity as Plan Administrator for the Raytheon Company Pension Plan for Hourly Employees, the Raytheon Company Pension Plan for Salaried Employees, the Raytheon Non-Bargaining Retirement Plan, the Raytheon Bargaining Retirement Plan, and the Raytheon Retirement Plan for Engineers & Contractors, Inc. and Aircraft Credit Employees, and John/Jane Does 1-10,<br><br>                    Defendants. | **Case No.: 1:19-cv-11425-PBS**<br><br><br><br><br><br>CLASS ACTION |

# PLAINTIFF'S OPPOSITION TO
# <u>DEFENDANTS' MOTION TO DISMISS PLAINTIFF'S COMPLAINT</u>

## <u>TABLE OF CONTENTS</u>

I.   INTRODUCTION ................................................................................................... 1

II.  BACKGROUND ................................................................................................... 2

III. ARGUMENT.......................................................................................................... 5

    A.   Plaintiff Used Raytheon's Own Actuarial Assumptions to Calculate
         What His Benefit  Should Have Been.......................................................... 5

    B.   Defendant's Conversion Factors Improperly Reduced Plaintiff's Benefits ............... 10

    C.   ERISA Requires that Plans Update Actuarial Factors When They No
         Longer Reflect Reasonable Actuarial Assumptions .................................... 16

IV.  CONCLUSION ..................................................................................................... 19

## <u>TABLE OF AUTHORITIES</u>

**Cases**

*Amara v. CIGNA Corp.,* 559 F. Supp. 2d 192 (D. Conn. 2008),
　　*aff'd,* 348 F. App'x 627 (2d Cir. 2009) ............................................................ 15

*Amara v. CIGNA,* 925 F. Supp. 2d 242 (D. Conn. 2012) ........................................ 15

*Artistic Carton Co. v. Paper Indus. Union-Mgmt. Pension Fund,*
　　971 F.2d 1346 (7th Cir 1992) ......................................................................... 12

*Bakery & Confectionary Union & Indus. Int'l Pension Fund v. Just Born II, Inc.,*
　　888 F.3d 696 (4th Cir. 2018) ......................................................................... 12

*Bd of Trs. Much. United Food and Com. Workers Union v. Eberhard Foods, Inc.,*
　　831 F.2d 1258 (6th Cir. 1987) ....................................................................... 12

*Bird v. Eastman Kodak Co.*, 390 F. Supp. 2d 1117 (W.D.N.Y. 2005). ..................... 3

*Bruesewitz v. Wyeth LLC,* 562 U.S. 223 (2011) ................................................... 11

*CIGNA Corp. v. Amara,* 563 U.S. 421 (2011) ...................................................... 15

*Combs v. Classic Coal Corp.,* 931 F.2d 96 (1991) .............................................. 12

*Concrete Pipe and Products of Calif., Inc. v.*
　　*Constr. Laborers Pension Trust for S. Cal.*, 508 U.S. 602 (1993) ..................... 9

*Dooley v. Am. Airlines, Inc.,* No. 81 C 6770,
　　1993 WL 460849 (N.D. Ill. Nov. 4, 1993) ....................................................... 16

*Esden v. Bank of Boston,* 229 F.3d 154 (2d Cir. 2000) ...................................... 4, 10

*Hendrian v. Astrazeneca Pharmaceuticals L.P.*, 2015 WL 404533 (M.D. Pa. 2015) ........... 15, 16

*McCarthy v. Dun & Bradstreet,* 482 F.3d 184 (2d Cir. 2007) .............................. 12, 17

*Meiners v. Wells Fargo & Co.,* 898 F.3d 820 (8th Cir. 2018) ............................... 12

*Michigan v. U.S. Army Corps of Engineers,* 667 F.3d 765 (7th Cir. 2011) ............... 11

*Miller v. CBS Ret. Plan,* No. 12-cv-3697, 2013 WL 864610 (S.D.N.Y. Mar. 7, 2013) ........... 14

*Reed v. Zipcar, Inc.,* 527 F. Ap'x 20, 23 (1st Cir. 2013) .................................... 12

*Retirement Committee of DAK Americas LLC v. Brewer,* 867 F.3d 471 (4th Cir. 2017) ............ 14

*Smith v. U.S. Bancorp*, No. CV 18-3405 (PAM/KMM),
    2019 WL 2644204 (D. Minn. June 27, 2019)........................................ 10, 13, 16

*Stephens v. US Airways Group, Inc.*, 644 F.3d 437 (D.C. Cir. 2011) ........................ 3, 11, 15, 16

*Tulley v. Ethyl Corp.*, 861 F.2d 120 (5th Cir. 1988) ........................................................ 4

*Vartanian v. Monsanto Co.,* 131 F.3d 264 (1st Cir. 1997) .......................................... 19

**Statutes**

26 U.S.C. § 401(a)(11)............................................................................................ 13

26 U.S.C. § 401(a)(25)............................................................................................. 4

26 U.S.C. § 411(a)(7).............................................................................................. 17

26 U.S.C. § 411(d)(6) ............................................................................................. 17

26 U.S.C. § 417(a) .................................................................................................. 13

92 Stat. 3790 (Oct. 17, 1978), *codified at* 29 U.S.C. § 1001 ................................. 4

ERISA § 204(c)(3), 29 U.S.C. § 1054(c)(3) .............................................................. 3, 5

ERISA § 205(a)(1), 29 U.S.C. § 1055(a)(1) .............................................................. 13

ERISA § 205(c)(3)(A)(i), 29 U.S.C. § 1055(c)(3)(A)(i) ............................................ 13

ERISA § 205(c), 29 U.S.C. § 1055(c) ....................................................................... 13

ERISA § 205(d)(1), 29 U.S.C. § 1055(d)(1).......................................................... 1, 3, 5

ERISA § 205(d)(2), 29 U.S.C. § 1055(d)(2)............................................................... 3, 5

ERISA § 205(e)(1)(A), 29 U.S.C. § 1055(e)(1)(A) ...................................................... 3

ERISA § 3(23)(a), 29 U.S.C. § 1002(23)(a) ............................................................... 17

ERISA § 3(27), 29 U.S.C. § 1002(27)................................................................ 3, 9, 16

ERISA § 3002 (c), 29 U.S.C. § 1202 (c) .................................................................... 4

**Regulations**

26 C.F.R § 1.417 (a)-20 .......................................................................................... 13

26 C.F.R. § 1.401(a)-11(b)(2)................................................................................. 1, 4

26 C.F.R. § 1.401(a)-20 ......................................................................................... 1, 14

26 C.F.R. § 1.411(d)-3 .............................................................................................. 18

26 C.F.R. § 1.411(d)-3(a) ......................................................................................... 18

26 C.F.R. § 1.411(d)-3(b) ......................................................................................... 18

26 C.F.R. § 1.417(a)(3)-1(c)(2)(iv) ............................................................................ 4

26 C.F.R. § 1.430(h)(3)-1(a)(3) ................................................................................ 19

68 Fed. Reg. 70141 at 41 .......................................................................................... 14

68 Fed. Reg. 70141 at 42. (Dec. 17, 2003) ............................................................... 14

## Other Authorities

Rev. Rul. 2007-67, 2007-2 C.B. 1047 ....................................................................... 19

Rev. Rul. 81-12, 1981-1 C.B. 228 (1981) .................................................................. 18

M. Mikhitarian and J. Wukitsch, Revising Contributory Defined Benefit Plans: An Old Idea
     Whose Time Has Come (Again?), 2010 Benefits Quarterly, 2d Quarter ............................ 9

## I.     INTRODUCTION

Plaintiff Johnny Cruz ("Plaintiff") alleges that Defendants violated the Employee Retirement Income Security Act of 1974 ("ERISA") when they improperly calculated his retirement benefits, causing his monthly benefit check to be lower than it should be. When Plaintiff retired in 2015 after working 32 years at Raytheon, he was entitled to a pension under the Raytheon Company Pension Plan for Hourly Employees (the "Hourly Plan") and was given several choices of how to receive it. Complaint, ECF No. 1 ("Compl."), ¶¶ 8, 40.  He chose a 50% Joint and Survivor Annuity (a 50% JSA), under which he would receive monthly benefits for life, and his spouse would receive 50% of that monthly benefit for the rest of her life if he predeceased her.  *Id.* at ¶ 14.  The 50% JSA is the "Qualified Joint and Survivor Annuity" ("QJSA") for the Hourly Plan, and is the default option for married participants.  *Id.* at ¶ 40.

ERISA requires that a QJSA must be actuarially equivalent to a Single-Life Annuity (an "SLA").  ERISA § 205(d)(1), 29 U.S.C. § 1055(d)(1). Applicable regulations likewise require that a QJSA "must be at least the actuarial equivalence of the normal form of life annuity or, if greater, of any optional form of life annuity offered under the plan." 26 C.F.R. § 1.401(a)-11(b)(2). Indeed, a QJSA "must be *as least as valuable* as any other optional form of benefit under the plan at the same time."  26 C.F.R. § 1.401(a)-20 Q&A 16 (emphasis added).  The formula Defendants used to calculate Plaintiff's benefit (and the benefits of all other class members) results in benefit payments that are not "actuarially equivalent" to an SLA in violation of ERISA. Compl., ¶¶ 1, 84, 89.  Specifically, Plaintiff is receiving $57 less per month than he would receive if his benefits *were* actuarially equivalent to an SLA.  *Id.* at 89.  Defendants attempt to minimize Plaintiff's injury by repeatedly asserting his benefit payment would only be "slightly" higher if he prevails (Def. Br. at 1, 4, 6, 7, 10 and 11), demonstrating an appalling lack of awareness of the difference that an

extra $57 each month can make to someone whose monthly pension income is only just over $1000 to begin with.  ERISA requires more.

Plaintiff brings suit on behalf of himself and a class of persons who have been similarly injured.[1]  The Complaint contains detailed allegations describing the relevant provisions of ERISA and its implementing regulations (*id.* at ¶¶ 18–30), the applicable provisions of the Hourly Plan and other plans that Raytheon sponsors and administers (*id.* at ¶¶ 31–63), and, importantly, how the Hourly Plan's formula for converting an SLA into the QJSA improperly decreased Plaintiff's monthly benefits.  *Id.* at ¶¶ 83–89.  It compares the benefits Plaintiff and other class members receive to what they would receive if Defendants used reasonable actuarial assumptions to calculate benefits. *Id.* at ¶¶ 85, 89. It also sets out how Defendants' actions violate ERISA (*id.* at ¶¶ 123-126; 129-131; 136-139), and enumerates the relief that Plaintiff seeks.  *Id.* at ¶¶ 127; 132-134; 140-142, and pp. 38-39. The allegations are detailed, fact-based, non-conclusory and eminently plausible.  Accordingly, the Motion to Dismiss should be denied.

## II.     BACKGROUND

The Hourly Plan is an "employee pension benefit plan" and a "defined benefit plan" under ERISA. Compl., ¶ 32. It provides participants with retirement benefits based on their compensation

---

[1] The Class Plaintiff seeks to represent includes participants in several defined benefit retirement plans sponsored by Raytheon other than the Hourly Plan, specifically, the Raytheon Retirement Plan for Engineers & Contractors, Inc. and Aircraft Credit Employees (the "Engineer and Contractor Plan"), the Raytheon Bargaining Retirement Plan (the "Bargaining Plan"), the Raytheon Company Pension Plan for Salaried Employees (the "Salaried Plan") and the Raytheon Nonbargaining Retirement Plan (the "Non-Bargaining Plan").  *See* Compl., ¶ 2 n.1.  While the Complaint contains detailed allegations demonstrating how each of these additional retirement plans fails to provide actuarially equivalent alternative benefit forms (*see, e.g., id.* at 43-63 and 83-109), as Defendants acknowledge, for purposes of a Motion to Dismiss, the proper focus is on whether Plaintiff's own claims, based on benefits he is receiving under the Hourly Plan, state a claim for relief.  Def. Br. at 5-6.  Accordingly, this brief will not address the other Raytheon plans at issue in the litigation.

and the number of years they worked.  *Id.*, ¶ 40.  The "normal form" of benefit is an SLA for unmarried participants and a 50% JSA for married participants.  *Id.*  Participants can also elect a ten-year certain and life annuity ("10YCLA") and JSAs where survivor benefits are two-thirds, three-quarters and 100% of the amount of the participant's benefit (these are "Qualified Optional Joint and Survivor Annuities, or "QOSAs").  *Id.*

ERISA requires that forms of benefit payments other than an SLA, such as QJSAs and QOSAs, be at least the "actuarial equivalent" of the SLA.  *Id.,* ¶¶ 18, 22, 64 (citing, *inter alia,* ERISA § 204(c)(3), 29 U.S.C. § 1054(c)(3), ERISA § 205(d)(1) and (2), 29 U.S.C. § 1055(d)(1) and (2), and ERISA § 205(e)(1)(A), 29 U.S.C. 1055(e)(1)(A)).  This requirement prevents plans from offering participants a "bad deal" where the plan pays less if participants select Non-SLA annuities.  *Bird v. Eastman Kodak Co.*, 390 F. Supp. 2d 1117, 1118-19 (W.D.N.Y. 2005).  "Two modes of payment are actuarially equivalent when their ***present values are equal*** under a given set of assumptions." *Stephens v. US Airways Group, Inc.*, 644 F.3d 437, 440 (D.C. Cir. 2011) (emphasis added).  Thus, converting an SLA into an actuarially equivalent JSA requires a comparison of the present value of the aggregate future benefits the participant (and, if applicable, the beneficiary) is expected to receive under each form of benefit.

The two main components of the present value calculation are (1) the interest rate (often called a "discount rate" because it discounts the value of future payments); and (2) the mortality table, which determines the expected duration of the future payment stream by predicting how many people at a given age will die before attaining the next higher age.  Compl., ¶ 4. Both the interest rate and the mortality table must "reflect anticipated events."  *Id.,* ¶ 28 (quoting ERISA § 3(27), 29 U.S.C. § 1002(27). Moreover, ERISA's present value definition provides that such adjustments "shall conform to such regulations as the Secretary of the Treasury may prescribe."

*Id.*[2]  Applicable regulations specify that "[e]quivalence may be determined, on the basis of consistently applied ***reasonable actuarial factors***, for each participant or for all participants or reasonable groupings of participants." 26 C.F.R. § 1.401(a)-11(b)(2) (emphasis added); *see also* 26 C.F.R. § 1.417(a)(3)-1(c)(2)(iv) (QJSAs and QOSAs must be calculated using "a single set of ***interest and mortality assumptions that are reasonable*** . . . ." (emphasis added).

Although ERISA does not require that the actuarial factors used by the Plan be included in the Plan document, the Tax Code does.  *See* 26 U.S.C. § 401(a)(25).  For purposes of meeting this requirement of the Tax Code, the Treasury Department allows plans to (a) specify the actuarial assumptions used (for example, the interest rate and mortality table); or (b) include "a table of adjustment factors to be used"; or (c) "specify a variable standard which provides for self-adjusting changes which are independent of employer discretion."  Rev. Rul. 79-90.  The Hourly Plan uses option "b," providing a table of "conversion factors" which represent the percentage of a participant's SLA that the participant will receive if he or she selects another form of benefit payment (for example, if a participant is entitled to an SLA of $1000 per month and the "conversion factor" for a 50% JSA is .9, a participant who selects that JSA will receive $900 per month, and the participant's beneficiary will receive $450 per month if the beneficiary outlives the participant).  Compl., ¶ 41.

Satisfying Section 401(a)(25) of the tax code does not relieve a plan from ERISA's independent requirement that alternative forms of benefit be "actuarially equivalent" to the SLA, or change the fact that under ERISA, two forms of benefit are actuarially equivalent if they have

---

[2] In addition to this specific incorporation, Reorganization Plan No. 4 of 1978 transferred authority to the Secretary of the Treasury ("Secretary") to issue regulations for several provisions of ERISA, including § 205 concerning alternative forms of benefits. *See* ERISA § 3002 (c), 29 U.S.C. § 1202 (c); *Esden v. Bank of Boston,* 229 F.3d 154, 157, n. 2 (2d Cir. 2000); *Tulley v. Ethyl Corp.*, 861 F.2d 120, 125 (5th Cir. 1988)); *see also* 92 Stat. 3790 (Oct. 17, 1978), *codified at* 29 U.S.C. § 1001.

the *same* present value when calculated using actuarial assumptions that are (1) the *same* for each form of benefit being compared; and (2) *reasonable.*  As set forth in the Complaint, the Hourly Plan's conversion factors do *not* produce QJSAs and QOSAs that are actuarially equivalent to the SLA because the present values of these benefits are lower than the present value of the SLA. Compl., ¶ 84.  In Plaintiff's case, if the Plan had used reasonable assumptions, his monthly pension check would be $57.33 more than he is receiving – an increase of more than 5.6 percent.  *Id.,* ¶ 89. Indeed, by using the Hourly Plan's unreasonable conversion factors instead of the actuarial assumptions Raytheon acknowledges are reasonable in its Form 10-K, Defendants reduced the present value of Plaintiff's benefits by *$10,741.34.  Id.*

## III.    ARGUMENT

Defendants wrongly argues that, because ERISA does not specify a single set of actuarial assumptions that must be used to calculate QJSAs or QOSAs for purposes of ERISA §§ 204(c)(3) and 205(d)(1) and (2), Plaintiff has not plausibly alleged that the Hourly Plan's conversion factors are unreasonable.  While ERISA allows plans some flexibility to select actuarial factors, the selected factors must be *reasonable,* and Plaintiff has plausibly alleged that Defendant's conversion factors are not.  Unlike the inapposite cases on which Defendants rely, the complaint compares Defendant's conversion factors to the actuarial factors Raytheon *itself* uses to calculate its benefits and corresponding pension liabilities.  To the extent that Defendants claim as a factual matter that its own assumptions are invalid or irrelevant, that issue should not be decided on the pleadings.

### A.    Plaintiff Used Raytheon's Own Actuarial Assumptions to Calculate What His Benefit  Should Have Been

Raytheon's audited financial statements, which are filed with the SEC on Form 10-K and prepared under General Accepted Accounting Principles ("GAAP"), calculate the present value of

Raytheon's benefit obligations under its pension plans, including the Hourly Plan.  Compl. ¶ 78. These annual calculations are based on assumptions about both mortality and interest rates.  *Id.,* ¶¶ 78 and 80.  As required by GAAP, these assumptions represent Raytheon's, and its own actuaries', "'best estimate' for that assumption" as of the date of the report.  *Id.,* ¶¶ 78, 80. Furthermore, Raytheon's 10-Ks specifically stated that the selected interest rates were based on ASOP 27, which "requires the selection of a ***reasonable*** [rate] that considers multiple criteria including . . . the actuary's professional judgment, historical and current economic data and estimates of future experience and has no significant bias."  *Id.,* ¶ 80.

Contrary to Defendant's repeated assertions, the Complaint compared the value of the benefits that Plaintiff is receiving to the value he ***would*** have received if Defendants had used the actuarial assumptions in their own form 10-K to calculate his 50% JSA.  Raytheon's 10-K reports have consistently used mortality rate assumptions that are consistent with the assumptions it is required to use for the calculation of lump-sum benefits pursuant to Treasury Regulations (*Id.,* ¶ 79); accordingly, Plaintiff used the same Treasury mortality assumptions to calculate the actuarial equivalent of the SLA that he could have received.  *Id.,* ¶ 89 ("If Defendants applied the applicable Treasury Mortality Table . . .").  Similarly, Plaintiff used the same discount rate that Raytheon used to calculate its pension benefit liabilities in its most recent Form 10-K.  *Id.* ("If Defendants had applied . . . the discount rate Raytheon used in its 10-K to calculate Plaintiff's benefits . . . .").

Defendants raise several meritless complaints with Plaintiff's assumptions.  First, Defendant complains that Plaintiff "borrowed" the Treasury department's mortality assumptions for lump-sum distributions (Def. Br. at 11, 13), ignoring the Complaint's specific allegation that the mortality assumptions that Raytheon used in its 10-K to estimate its pension liabilities were

6

consistent with the Treasury assumptions.   Compl., ¶ 79.   The complaint used the Treasury assumptions because Raytheon tended to do so as well.

Plaintiff did deviate from Defendant's own practice with respect to the Treasury assumptions in one way, to ensure that his estimate of damages was, if anything, conservative. The Society of Actuaries ("SOC") published a new mortality table in 2014 (referred to as the RP-2014).   The Treasury Regulations did not adopt the RP-2014 Table until 2018; instead, the Regulations continued to use the SOC's RP-2000 table, updated to account for improvements in mortality since the RP-2000 was published. *Id.,* ¶ 73.   Defendants, on the other hand, switched to the RP-2014 when reporting pension liabilities in the 2014 10-K.  Compl., ¶ 85 n. 27.  To calculate Plaintiff's actuarially equivalent QJSA, the Complaint used the Treasury assumption that was applicable when he retired in October of 2015 (which was the updated RP-2000) assumption, rather than the RP-2014 mortality rates, because the Treasury Regulation's mortality assumption was more conservative.  *Id.*  Thus, using the Treasury mortality assumption, Plaintiff calculated that the monthly benefit that he receives would be $57.33 higher.  Had he instead used the RP-2014 assumption that the Plan included in its 2014 10-K report, his calculated benefit would have been closer to $59 higher than what he is presently receiving.   Thus, Plaintiff's selection of a mortality rate was based on Defendant's practice, but tailored to be slightly more conservative to avoid claims that he was "cherry-picking" his data.

Defendants similarly argue that Plaintiff erred in using the 5.06% interest rate assumption from Raytheon's 2014 10-K report, suggesting that Plaintiff should have used the lower interest rate in Defendants' 2015 10-K filing, or one of the other blended rates in Defendant's 2014 10-K report.  Def. Br. at 11-12.  Plaintiff's choice was not irrational; Defendants **could not** have used the interest rate from their 2015 10-K Report because the 10-K was not prepared and filed until

the following year, and expert testimony will demonstrate that the assumptions from the immediately preceding 10-K should be used.  And, Defendants have not presented any argument as to why one of the other interest rate assumptions included in its 2014 10-K was more appropriate than the one Plaintiff used.  Moreover, although the selectin of the interest rate will ultimately be a matter for expert testimony, Plaintiff notes that even using the ***lowest*** interest rate that Defendants suggest he should have selected from Raytheon's 10-K reports (4.06%), he would still be short over $50 per month.[3]  Thus, the "conversion factors" Defendant uses for the Hourly Plan generate materially lower benefits compared to ***any*** variation of the mortality and interest rate assumptions that Raytheon uses in its 10-K report.

Defendant's final complaint is that the actuarial assumptions the Raytheon in its 10-K report are "formulated for the purposes of financial accounting, not the calculation of individual pension benefits."  Def. Br. at 12.  Defendant's attempt to distinguish its own numbers doesn't make sense.  Importantly, as alleged in the Complaint and as required by GAAP, these calculations represent Raytheon's – and it's actuary's – "best estimate" of "reasonable actuarial factors" to be used in measuring the present value of the pension benefit liabilities it owes to Plaintiff and members of the putative class.  Compl. ¶ 78.  In other words, Defendant's GAAP assumptions are measuring the present value of exactly the same pensions due exactly the same people over exactly the same projected period.  Its "pension liability" is the aggregation of the present value of all participant's collective benefits, viewed from the perspective of the payor rather than the payee class members.  It simply the other side of the same coin.  While Defendants may find an expert

---

[3] Although not relevant for purposes of a motion to dismiss, while the amount of loss will vary depending on the ages of both the participant and the beneficiary, ***all*** participants who receive the QJSA or a QOSA under the Hourly Plan are not receiving an actuarially equivalent form of benefit because the present value of those benefits are less than the actuarial equivalent of the SLA they could have taken.  *Id.* at ¶ 88.

to testify that Raytheon's 10-K assumptions do not reasonably reflect applicable interest rate and mortality assumptions, and therefore do not reasonably reflect "anticipated event" as required by ERISA Section 3(27), that "battle of the experts" should not be decided on a motion to dismiss.

Defendants content that Actuarial Standard of Practice 27, which it uses to formulate the actuarial assumptions in its 10-K, is not relevant here because it was not designed for making "individual benefit calculations." But, this case concerns the reasonableness of the assumptions that are in Raytheon's *plans,* and which are applied to *every* plan participant – the very antithesis of an individualized, participant-by-participant determination. Moreover, Defendants don't explain why they would *not* want to use the interest rate Raytheon selected under the ASOP 27 standard, which, like ERISA's actuarial equivalence requirement, requires a *reasonable* rate, and is based on "multiple criteria including . . . the actuary's professional judgment, historical and current economic data and estimates of future experience and has no significant bias." Compl., ¶ 80. Indeed, this is the precise circumstance where "[u]sing different assumptions [for different purposes] could very well be attacked as presumptively unreasonable . . . ." *Concrete Pipe and Products of Calif., Inc. v. Constr. Laborers Pension Trust for S. Cal.*, 508 U.S. 602, 633 (1993).[4]

---

[4] In a footnote, Defendant suggests that a 40-year-old revenue ruling involving the allocation of accrued benefits between employer and employee contributions provides a "more relevant" benchmark for assessing the reasonableness of Defendant's equally antiquated conversion factors. Def. Br. at 13, n. 12. The regulation does not even involve the determination of benefit amounts, nor does it involve pension plans, like Raytheon's, that are 100% employer-funded. T the contrary, it concerns allocation of benefits for purposes of vesting rules and taxation of benefits funded from different sources. Moreover, defined benefit pension plans that include provisions for employee contributions have largely disappeared. *See, e.g.,* M. Mikhitarian and J. Wukitsch, Revising Contributory Defined Benefit Plans: An Old Idea Whose Time Has Come (Again?), 2010 Benefits Quarterly, 2d Quarter, at 15 (noting that less than 4 percent of defined benefit plans in the United States permitted employee contributions). https://us.milliman.com/uploadedFiles/insight/eb-published/revisiting-contributory-defined-benefit.pdf (last accessed Sept. 25, 2019). Given the dearth of contributory defined benefit plans, the Treasury Secretary would have had little reason to revisit this particular ruling. An antiquated and inapplicable Revenue Ruling that doesn't even

The benchmark employed in the Complaint was not "arbitrary," "irrational," "cherry-picked," or a "Frankenstein's Monster."  Def. Br. at 11-13.  To the contrary, Plaintiff relied upon Defendant's own "best estimate" of the actuarial assumptions that would best estimate the present value of the pension benefits it owed to plan participants – the members of the class.  The only way that Plaintiff deviated from Raytheon's own "best estimate" was by continuing to use the updated RP-2000 table, as specified by the Treasury Regulations for 2015, rather than the RP-2014 table Raytheon adopted more quickly, even though using the RP-2014 table would have yielded slightly greater damages.

### B.  Defendant's Conversion Factors Improperly Reduced Plaintiff's Benefits

Defendants argue, because ERISA does not specify precisely which actuarial assumptions they must employ to calculate QJSAs and QOSAs, Plaintiff's allegations are insufficient as a matter of law.  Def. Br. at 7.  Defendants' argument would effectively render ERISA's explicit actuarial equivalence requirement, ***and*** the regulations that specify that equivalence must be determined based on ***reasonable*** mortality and interest rates, unenforceable.  *Smith v. U.S. Bancorp*, No. CV 18-3405 (PAM/KMM), 2019 WL 2644204, at *3 (D. Minn. June 27, 2019) (rejecting a similar argument and noting that "'[i]f plans were free to determine their own assumptions and methodology, they could effectively eviscerate the protections provided by ERISA's requirement of 'actuarial equivalence.'") (quoting *Esden v. Bank of Boston,* 229 F.3d 154, 164 (2d Cir. 2000)).

---

concern calculation of benefit amounts for a type of plan that barely exists anymore scarcely provides a rational benchmark – much less a "more relevant" one – for determining whether the Hourly Plan's conversion factors generate benefits calculations that are actuarially equivalent based on reasonable mortality and interest rates.

In *Smith,* as here, plaintiff claimed that the optional form of benefit that he was receiving, which had been calculated in accordance with a conversion factor set out in the plan document, was lower than it would have been if it had been calculated using reasonable actuarial factors. *Id.* at *1. The *Smith* court found that even though ERISA did not specifically define actuarial equivalence, "'Congress intended that term of art to have its established meaning.'" *Id.* at *3 (quoting *Stephens v. U.S. Airways Grp., Inc.,* 644 F.3d 437, 440 (D.C. Cir. 2011). Furthermore, the court determined that, under applicable ERISA regulations, "actuarial equivalence" "must be determined on the basis of actuarial assumptions with respect to mortality and interest which are reasonable in the aggregate", and thus, a complaint that alleged that a plan participant's allegations that conversion factors that generated lower benefit payments than factors based on "current prevailing interest rates and mortality assumptions" was sufficient to state a claim. *Id.* (internal quotations and citations omitted). The same is clearly true here.

Defendants' contrary arguments are without merit. Defendant argues that because Congress amended certain provisions of ERISA to specify the mortality tables and interest rates that plans use for lump sum benefits, but did not do likewise for annuities, plans have a degree of discretion in selecting actuarial factors for annuities. Def. Br. at 9. To the extent that Defendants are arguing that Congress' failure to amend ERISA's actuarial equivalence requirements to compel the use of particular assumptions for annuity benefit calculations in the same way that Congress amended the lump sum payment requirements, Defendants are "read[ing] too much into congressional silence." *Michigan v. U.S. Army Corps of Engineers,* 667 F.3d 765, 775–76 (7th Cir. 2011). Post-enactment legislative history is a "contradiction in terms" and "not a legitimate tool of statutory interpretation." *Bruesewitz v. Wyeth LLC,* 562 U.S. 223, 242 (2011). That Congress was presented with and addressed a specific problem concerning reduced pensions

11

through lump-sum buyouts implies nothing about the meaning of other provisions of the statute that were never addressed or amended, including those that form the basis for Plaintiff's suit.

Defendants' broader point, that ERISA provides benefit plans with "a degree of latitude" in selecting actuarial assumptions for annuities (*see* Def. Br. at 7-8 (quoting *McCarthy v. Dun & Bradstreet,* 482 F.3d 184, 203-04 (2d Cir. 2007)), is uncontroversial. But "a degree of latitude" does not mean "all bets are off," and even cases Defendants cite, like *Combs v. Classic Coal Corp.,* 931 F.2d 96 (1991), acknowledge that the "assumption package" must be "reasonable in the aggregate" – which is exactly Plaintiff's point here.[5]  And, contrary to Defendants' claim, Plaintiff does not simple allege "that a different set of actuarial assumptions specified in the Complaint would result in his receiving a different, slightly higher monthly benefit." Def. Br. at 10.  Rather, Plaintiff alleges that he would be receiving over $57 more each month under Defendant's ***own*** "best estimate" of the mortality and interest rate assumptions that should be used to measure the present value of the pension benefits at issue.[6]

---

[5] Neither *Combs* nor the other cases Defendants cite even ***involve*** optional forms of benefit, and they recognize that while actuarial assumptions can differ, the assumptions must be "reasonable." *See* Def. Br. at 8, citing *Bakery & Confectionary Union & Indus. Int'l Pension Fund v. Just Born II, Inc.,* 888 F.3d 696, 706 (4th Cir. 2018), *Artistic Carton Co. v. Paper Indus. Union-Mgmt. Pension Fund,* 971 F.2d 1346, 1348 (7th Cir 1992), and *Bd of Trs. Much. United Food and Com. Workers Union v. Eberhard Foods, Inc.,* 831 F.2d 1258, 1261 (6th Cir. 1987) (all cited in Def. Br. at 7).

[6] Thus, unlike plaintiffs in the cases Defendants cite at pages 10-11 of their brief, *Reed v. Zipcar, Inc.,* 527 F. Ap'x 20, 23-24 (1st Cir. 2013) and *Meiners v. Wells Fargo & Co.,* 898 F.3d 820, 823 (8th Cir. 2018), Plaintiff has properly alleged a "meaningful benchmark" for assessing the reasonableness of Defendant's conversion factors.  In *Reed,* the First Circuit upheld dismissal of an unfair trade practices claim against a car rental company, where plaintiff attempted to establish that the company's late fees were "grossly disproportionate to the expected damages arising from a breach of the . . . agreement." *Reed,* 527 F. App'x at 23.  The court found that the complaint's allegations concerning the lower fees charged by competitors were insufficient to demonstrate, as required by applicable law, that the liquidated damages charged by Zipcar did not reasonably approximate the losses *Zipcar* might have anticipated at the outset of its contract with plaintiff, since two of the competitors had not been in existence at that time and plaintiff failed to include

The mere fact that actuaries may disagree about whether one actuarial assumption is better than another does not mean that reasonableness has no boundaries.  A defined benefit is a fixed monthly payment just like the payment of interest on a bond or other fixed income investment, where the difference between "reasonable" and "unreasonable" is measured in a few basis points. "Conversion factors" that generated annuity benefit calculations that are anywhere from 2.7% to 7.4% lower, on average, than benefits that would be calculated with current actuarial assumptions are not only unreasonable, they are egregious.

In a footnote, Defendants note that Treasury regulations allow plans to group benefit payment options together in summary disclosure forms sent to plan participants if the options provide monthly benefits that are within five percentage points of the actuarial equivalent of the QJSA.  Def. Br. at 8, n.7.[7]  These Disclosure Regulations do not govern whether benefit options

---

any allegations to suggest that the fees charged by the other two firms represented a "pervasive industry standard" or would otherwise be representative of Zipcar's actual costs.  *Id.*  Similarly, in *Meiners,* the Eighth Circuit upheld dismissal of a claim that fiduciaries of a defined contribution plan imprudently selected Wells Fargo Target Date Funds, because plaintiff had only alleged that a Vanguard fund with a different investment strategy "ultimately" outperformed the Wells Fargo TDFs.  898 F.3d at 823.  There is obviously no way to know, at the time that funds are selected for inclusion in a defined contribution plan, which one will perform better, and funds with "different investment strategies" are likely to perform better or worse over time depending on market conditions that cannot be predicted in advance.    In contrast to either case, Plaintiff has used Defendant's own "best estimates" for actuarial assumptions applicable to the *same* pension benefits at the *same* time as Plaintiff retired to demonstrate that Defendants' conversion factors generate lower benefit payments.  Thus *Reed* and *Meiner,* which (unlike *Smith v. U.S. Bank*), did not even involve standards for pleading a violation of ERISA's actuarial equivalence requirements, do not even provide guidance by analogy.

[7] ERISA requires that pension plans pay benefits to married participants as a QJSA unless the participant's spouse consents in writing.  ERISA §§ 205(a)(1) and 205(c), 29 U.S.C. §§ 1055(a)(1) and 1055(c).  Accordingly, plans must provide a written explanation of the "terms and conditions" of the QJSA and any QOSAs in accordance with regulations prescribed by the Treasury Secretary. ERISA § 205(c)(3)(A)(i), 29 U.S.C. § 1055(c)(3)(A)(i).    The Tax Code contains parallel provisions.  26 U.S.C. §§ 401(a)(11) and 417(a).  The Treasury Regulations that implement these statutory mandates require that plans provide a written explanation of the relative values of optional benefits. 26 C.F.R § 1.417 (a)-20 Q & A-36.  The explanation must contain a "general

---

meet ERISA's actuarial equivalence requirements; to the contrary, they addresses circumstances where, as a result of permissible subsidies, the QJSA has a greater present value — *i.e.,* is **higher than** the actuarial equivalent — than other benefit forms.[8]  Nor does the fact that the Disclosure Regulations permit the grouping together of benefits with "approximately equal value" for purposes of a summary disclosure suggest that **ERISA's actuarial equivalence requirements** are satisfied by options that are "approximately equal in value." The two standards are not remotely the same.  Defendant appears to be conflating "actuarial factors that are reasonable" – ERISA's requirement for actuarial equivalence – with "actuarial factors that generate **results** that are **reasonably close** to actuarial equivalence" – a standard which neither ERISA nor its regulations employs to determine actuarial equivalence.  Simply put, "approximately," "roughly" or "within 5 percentage points of" equal does not mean "equivalent" or "equal."

---

description" of the "material features of the optional forms of benefit" and "sufficient information to explain the relative values of the optional forms of benefit available under the plan (e.g. the extent to which optional forms are subsidized relative to the normal form of benefit or interest rates used to calculate the optional forms.)"  Disclosure of Relative Values of Optional Forms of Benefit, 68 Fed. Reg. 70141 at 42. (Dec. 17, 2003).  It must also describe the "'relative value' of the optional form of benefit compared to the QJSA" to "give the participant and the spouse a 'numerical comparison' of the relative values between the optional benefit . . . and the value of the QJSA."  *Miller v. CBS Ret. Plan,* No. 12-cv-3697, 2013 WL 864610, at *5 (S.D.N.Y. Mar. 7, 2013).  The purpose of the explanation is "provide a spouse with a written explanation as to what is being waived" if an alternative form of benefit is being selected.  *Id.*

[8] A QJSA "must be as least as valuable as any other optional form of benefit payable under the plan at the same time."  26 C.F.R. § 1.401(a)-20, Q-16.  However, ERISA permits plans to subsidize a QJSA so it is more valuable than an SLA, which creates potential differences in "relative value" between the SLA, the QJSA and other forms of benefit.  *See* Preamble to Disclosure Regulation, 68 Fed. Reg. 70141 at 41; *see also, Retirement Committee of DAK Americas LLC v. Brewer,* 867 F.3d 471, 483 (4th Cir. 2017) (early retirement subsidy must apply to the QJSA but did not have to apply to the lump-sum option).  The Disclosure Regulation does not define what is "reasonable" for purposes of actuarial equivalence, but instead says that plans must tell participants the relative value of benefit options which, as a result of subsidies, are not actuarially equivalent.

The distinction between "actuarial equivalence" in calculating benefit payments and grouping together benefit options of "approximately equal value" under the Disclosure Regulations is illustrated by *Amara v. CIGNA Corp.,* 559 F. Supp. 2d 192, 217–18 (D. Conn. 2008), *aff'd,* 348 F. App'x 627 (2d Cir. 2009), *vacated on other grounds, CIGNA Corp. v. Amara,* 563 U.S. 421 (2011). *Amara* included claims involving a misleading disclosure of optional benefits. The district court considered the relative equivalency standard in the Disclosure Regulation as a "reference point" in the design of its remedy, and found that the plan would not have to pay an annuity to participants, so long as the actuarial value of the lump sum selected was not less than 95 percent of the value of the normal form of benefit, reasoning that it would be expensive to send out separate monthly checks for small dollar amounts. *Amara,* 559 F. Supp. 2d at 217. Critically, however, the *Amara* court held that the defendant plan did have to repay the full difference in value between the lump sum and the annuity, even if it fell within the five percent range; the plan was simply permitted to make the payment in the form of a single lump sum rather than a series of monthly payments. *Id.; see also Amara v. CIGNA,* 925 F. Supp. 2d 242, 265 (D. Conn. 2012) (adhering to previous determination after remand, holding that plan must pay the "full value" of participants' benefits), *aff'd* 775 F.3d 510 (2d Cir. 2014).[9]

---

[9] Similarly, in *Stephens,* a plan delayed making lump sum payments of $488,477.22 and $672,162.79 for 45 days, resulting in lost interest of $3,665.06 and $5,043.25 respectively — a reduction of only 0.75%. *Stephens,* 644 F.3d at 439. The court ordered payment of the deficiency; in a concurring opinion, then-Judge Kavanaugh noted that the lost interest from the 45-day delay meant the paid benefits were not actuarially equivalent. *Id.* at 436–47. *Stephens* demonstrates that even a .75% shortfall is not "actuarially equivalent." And, the .75% shortfall in *Stephens* is minimal compared to that which Plaintiff suffered – and will continue to suffer throughout his retirement. In *Hendrian v. Astrazeneca Pharmaceuticals L.P.*, 2015 WL 404533 (M.D. Pa. 2015), a plan miscalculated a retiree's monthly benefits by using the wrong actuarial factors, resulting in a $72.18 monthly overpayment. *Id.* at *2. When the plan threatened to recoup the overpayment, the retiree sued, claiming the plan materially misrepresented his benefits. *Id.* The court held that whether a 2% reduction in benefits was ***material*** was a question of fact for trial because an

Plaintiff's allegations that the conversion factors do not generate a benefit that is actuarially equivalent to an SLA, based on Defendant's own "best estimates" cannot be dismissed as insufficient based on arguments concerning the theoretical possibility that other, unspecified actuarial factors *might* exist. Plaintiff's allegations are at the very least *plausible*. A final determination of whether Defendants' conversion factors satisfy ERISA's actuarial equivalence requirements will require an evidentiary record, including expert actuarial testimony. As the *Smith* court rightly determined,

> Although Defendants dispute [plaintiff's] contentions, an analysis of the underlying allegations is not appropriate when considering a motion to dismiss. The Court must accept Plaintiffs' factual allegations as true. Plaintiffs' allege that the [conversion factors] are not in conformity with actuarial equivalence requirements. Discovery will reveal whether these allegations are correct. For now, Plaintiffs have alleged a plausible claim that the [conversion factors] fail to provide the participants with an actuarially equivalent benefit in violation of § 1054(c)(3).

*Smith*, 2019 WL 2644204, at *3.

## C. ERISA Requires that Plans Update Actuarial Factors When They No Longer Reflect Reasonable Actuarial Assumptions

Defendants argue in the alternative that Plaintiff's claims fail because "ERISA does not require pension plans to periodically update their actuarial assumptions. Def. Br. at 13. "Actuarial equivalence" means that two benefit forms have an equal present value, not an equal past value. *Stephens,* 644 F.3d at 440; *Dooley v. Am. Airlines, Inc.,* No. 81 C 6770, 1993 WL 460849, at *11 (N.D. Ill. Nov. 4, 1993). ERISA requires that "present value" calculations "reflect anticipated events," not assumptions made decades ago. ERISA Section 3(27), 29 U.S.C. § 1002(27). Thus, while plans need not "periodically" update their actuarial assumptions, they must update them

---

employee might make a retirement decision based on that difference. *Id*. at *9. Critically, the materiality standard in *Hendrian* is far less demanding than the "equivalence" standard for optional forms of benefits under ERISA § 205(d). Thus, dismissal here is even less proper than in *Hendrian.*

when they no longer accurate reflect "anticipated events," like the number of years a retiree and spouse are likely to continue receiving benefit payments.[10]

The argument that plan participants would receive some kind of a "windfall" unless actuarial assumptions are set in stone (Def. Br. at 14-15) fails.   ERISA's anti-cutback rule does not lock in formulas for determining benefits, it locks in benefit amounts accrued as of the date of the amendment.   Both Section 204(g) of ERISA and the IRC's parallel provision provide that plan amendments may not decrease a participant's "accrued benefit." 29 U.S.C. 1054(g); 26 U.S.C. § 411(d)(6).   The "accrued benefit" is a dollar amount, "expressed in the form of an annual benefit commencing at normal retirement age." 29 U.S.C. § 1002(23)(a); 26 U.S.C. § 411(a)(7).   Thus, a plan amendment cannot reduce the dollar amount that a participant is entitled to receive on the date that the plan amendment occurs.

For example, assume a 35-year old with 10 years of service could select a QJSA at age 65 worth $1,000 for each year of service, and the plan is amended that year to reduce the annual benefit to $500 per year of service. If the participant retires at age 65, his receipt of a QJSA worth $20,000 per year ($500 x 40 years) would not violate the anti-cutback rule, because his accrued benefit was only $10,000 per year on the date that the plan was amended ($1,000 x 10 years).   So long as the amendment protects already accrued benefit amounts, such as through grandfathering

---

[10] Defendants' reliance on *McCarthy*, 482 F.3d 184 (Def. Br. at 14), is misplaced. *McCarthy* noted only that ERISA did not require a plan to update assumptions ***periodically***. It did ***not*** hold that a plan could continue to use ***unreasonable*** assumptions.   The court found that plaintiffs failed to ***prove*** that the plan's discount rate was unreasonable or that it "failed to comply with industry standards," and credited evidence that the discount rate was consistent with market rates. *Id.* at 205–206.   Had the *McCarthy* court adopted Defendants' view that plan assumptions never need to be updated, it would not have even evaluated the reasonableness of the plan's discount rate compared to current market rates.

provisions (e.g., providing participants with the greater of the benefits accrued under the pre- and post-amendment plans), plans can, and often do, change their actuarial formulas.[11]

Revenue Ruling 81-12 also allows plan sponsors to use variable actuarial assumptions, *i.e.,* ones that update automatically to track changes in mortality and interest rates. *Id.* For example, the Revenue Ruling describes a plan using "an interest rate equal to 50% of the prime rate of a specified unrelated bank." Rev. Rul. 81-12, 1981-1 C.B. 228 (1981), at Example 2. Where a variable standard is adopted, variation in the plan's calculation of actuarial equivalence based on the adopted standard does not require any plan amendment. *Id.* For example, plans that specify that they will calculate annuity benefits using the Treasury assumptions mandated for calculating lump-sum benefits, as many do, do not need to amend their plans every time the Treasury Department updates the lump-sum assumptions. While plans are not required to take this approach, it is available to them if they want to reduce the administrative hassle of plan amendments.

Defendant finally presents a matched pair of policy arguments for why it should be permitted to use whatever conversion factor it likes, so long as it is consistent about it. Def. Br. at 14 (arguing that Plaintiff benefited from being able to calculate, at any time over the course of his

---

[11] This is explained in § 1.411(d)-3 of the Treasury Regulations, which clearly states:

> Section 411(d)(6) only protects benefits that accrue before the applicable amendment date. Thus, a plan is permitted to be amended to eliminate or reduce an early retirement benefit, a retirement-type subsidy, or an optional form of benefit with respect to benefits that accrue after the applicable amendment date without violating section 411(d)(6).

26 C.F.R. § 1.411(d)-3. Examples 1 and 2 in this Regulation demonstrate that plan amendments that change formulas are permissible so long as the dollar amounts of the benefits plan participants had already accrued are protected. 26 C.F.R. § 1.411(d)-3(a). Additional examples demonstrate that the anti-cutback rules work in exactly the same way for optional forms of benefit. 26 C.F.R. § 1.411(d)-3(b). Revenue Ruling 81-12 is similarly clear: Plan amendments that change actuarial assumptions are permitted so long as the dollar value of benefits accrued prior to the plan amendment are not reduced. The Revenue Ruling even suggests several ways that this can be accomplished. Rev. Rul. 81-12, 1981-1 C.B. 228 (1981), at Example 1.

32-year employment, the value of the optional benefit forms he might select at retirement that would correspond to the SLA he might otherwise collect) and 16 (arguing that requiring employers to calculate annuity benefits using actuarial assumptions consistent with reasonable actuarial assumptions would upset ERISA's goals of promoting "predictability, uniformity, and efficiency"). Such unsubstantiated policy arguments have no relevance to statutory interpretation, and are, in any event, easy to counter. Plan participants are unlikely to care greatly about the hypothetical value of optional benefit forms decades before they retires, when they has no way of even knowing what their SLA will be when they retire; on the other hand, there is no set of circumstances in which *any* Plan participant would prefer to receive a JSA that was worth *less* than the actuarial equivalent of his SLA. Nor is there any reason to believe that using updated actuarial assumptions to calculate JSAs would cripple plan sponsors or undercut ERISA's goals – especially since the *primary* goal of the statute is "to protect employee pensions and other benefits . . . ." *Vartanian v. Monsanto Co.,* 131 F.3d 264, 271 (1st Cir. 1997) (internal quotation omitted). For example, while Plans have been required to update the actuarial assumptions that they use to calculate lump sum benefits for many years, that has not stopped plans from offering such benefits.[12]

## IV.    CONCLUSION

Plaintiff respectfully requests that the Court deny the Motion. Should the Court grant any portion of the Motion, Plaintiff respectfully moves for leave to file an amended complaint.

---

[12] Defendants' suggestion that actuarial assumptions can only be changed by an act of Congress with a corresponding change in the anti-cutback provisions (Def. Mem. at 15 n. 14) is wrong. The Secretary of the Treasury changes the interest rate monthly and the mortality table when necessary to reflect changes in mortality through Revenue Rulings. *See,* 26 C.F.R. § 1.430(h)(3)-1(a)(3). *See,* e.g., Rev. Rul. 2007-67, 2007-2 C.B. 1047.

Dated: September 30, 2019                    Respectfully submitted,

_/s/ Douglas P. Needham_____
**IZARD, KINDALL & RAABE LLP**
Douglas P. Needham, BBO No. 671018
Robert A. Izard (to be admitted _pro hac vice_)
Mark P. Kindall (to be admitted _pro hac vice_)
Seth R. Klein (to be admitted _pro hac vice_)
Oren Faircloth (to be admitted _pro hac vice_)
29 South Main Street, Suite 305
West Hartford, CT 06107
Tel: (860) 493-6292
Fax: (860) 493-6290
Email:  dneedham@ikrlaw.com
Email:  rizard@ikrlaw.com
Email:  mkindall@ikrlaw.com
Email:  sklein@ikrlaw.com
Email:  ofaircloth@ikrlaw.com


Gregory Y. Porter (to be admitted _pro hac vice_)
Mark G. Boyko (to be admitted _pro hac vice_)
**BAILEY & GLASSER LLP**
1054 31st Street, NW, Suite 230
Washington, DC 20007
(202) 463-2101
(202) 463-2103 fax
gporter@baileyglasser.com
mboyko@baileyglasser.com

_**Counsel for Plaintiff**_