# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| Johnny Cruz, on behalf of himself and all others similarly situated,<br><br>        Plaintiff,<br><br>      v.<br><br>Raytheon Company, Kelly B. Lappin, in her capacity as Plan Administrator for the Raytheon Company Pension Plan for Hourly Employees, the Raytheon Company Pension Plan for Salaried Employees, the Raytheon Non-Bargaining Retirement Plan, the Raytheon Bargaining Retirement Plan, and the Raytheon Retirement Plan for Engineers & Contractors, Inc. and Aircraft Credit Employees, and John/Jane Does 1-10,<br><br>        Defendants. | Civil Action No.:   1:19-cv-11425<br><br>Leave to file excess pages granted on August 24, 2020 |

## DEFENDANTS' MEMORANDUM IN SUPPORT OF MOTION FOR JUDGMENT

## TABLE OF CONTENTS

INTRODUCTION ................................................................................................................. 1

BACKGROUND ................................................................................................................. 4

    A.    The Raytheon Hourly Plan................................................................................. 4

    B.    Plaintiff Cruz...................................................................................................... 5

    C.    The Parties' Experts .......................................................................................... 6

    D.    Procedural History ............................................................................................ 8

ARGUMENT ...................................................................................................................... 8

I.      THE 0.90 CONVERSION FACTOR USED BY THE PLAN TO CONVERT
       SLAs TO JSAs RESULTS IN ACTUARIALLY EQUIVALENT BENEFITS................. 9

    A.    The Plan's 0.90 Conversion Factor Is Reasonable. ............................................... 11

    B.    Plaintiff's Criticisms of the 0.90 Conversion Factor Are Unavailing. ................. 15

II.    EVEN IF THE PLAN'S CONVERSION FACTOR IS ANALYZED SOLELY
       BY REFERENCE TO PLAINTIFF'S ATYPICAL CHARACTERISTICS,
       PLAINTIFF IS STILL RECEIVING AN ACTUARIALLY EQUIVALENT
       BENEFIT. .................................................................................................................. 29

III.   PLAINTIFF IS RECEIVING A SUBSIDIZED BENEFIT UNDER THE
       HOURLY PLAN AND THUS HAS NO COGNIZABLE CAUSE OF ACTION........... 31

IV.   ERISA DOES NOT REQUIRE A PENSION PLAN TO UPDATE ACTUARIAL
       ASSUMPTIONS OR FACTORS IN THE MANNER SUGGESTED BY
       PLAINTIFF................................................................................................................ 34

CONCLUSION.................................................................................................................. 35

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Ariz. Governing Comm. for Tax Deferred Annuity & Deferred Comp. Plans v. Norris*,
  463 U.S. 1073 (1983)..................................................................................13, 30, 31

*Artistic Carton Co. v. Paper Indus. Union-Mgmt. Pension Fund*,
  971 F.2d 1346 (7th Cir. 1992) .................................................................10

*Bakery & Confectionary Union & Indus. Int'l Pension Fund v. Just Born II, Inc.*,
  888 F.3d 696 (4th Cir. 2018) ...................................................................10

*Bd. of Trs., Mich. United Food and Commercial Workers Unions v. Eberhard Foods, Inc.*,
  831 F.2d 1258 (6th Cir. 1987) .................................................................10

*City of Los Angeles, Dep't of Water & Power v. Manhart*,
  435 U.S. 702 (1978)....................................................................17, 18, 20

*Combs v. Classic Coal Corp.*,
  931 F.2d 96 (D.C. Cir. 1991) ...................................................................10

*Conkright v. Frommert*,
  559 U.S. 506 (2010)..................................................................................21

*DuBuske v. PepsiCo, Inc.*,
  2019 WL 4688706 (S.D.N.Y. Sept. 25, 2019)..........................................33

*Engers v. AT&T*,
  2002 WL 32159586 (D.N.J. Oct. 17, 2002)...............................................32

*Hughes Aircraft Co. v. Jacobson*,
  525 U.S. 432 (1999).................................................................................12

*Laurent v. PricewaterhouseCoopers LLP*,
  794 F.3d 272 (2d Cir. 2015)....................................................................31

*Lockheed Corp. v. Spink*,
  517 U.S. 882 (1996).................................................................................11

*McCarthy v. Dun & Bradstreet Corp.*,
  482 F.3d 184 (2d Cir. 2007).........................................................14, 15, 35

*Merrimon v. Unum Life Ins. Co. of Am.*,
  758 F.3d 46 (1st Cir. 2014)...............................................................11, 12

*Ret. Comm. of DAK Americas LLC v. Brewer*,
   867 F.3d 471 (4th Cir. 2017) ................................................32

*Rybarczyk v. TRW, Inc.*,
   235 F.3d 975 (6th Cir. 2000) ................................................34

*Stephens v. US Airways Grp.*,
   644 F.3d 437 (D.C. Cir. 2011) ................................................9

*Thole v. U.S. Bank N.A.*,
   140 S. Ct. 1615 (2019) ................................................27

**Statutes**

26 U.S.C. § 401 ................................................4

29 U.S.C. § 1002 ................................................31

29 U.S.C. § 1053 ................................................33

29 U.S.C. § 1054 ................................................33

29 U.S.C. § 1055 ................................................*passim*

29 U.S.C. § 1082 ................................................27

29 U.S.C. § 1103 ................................................27

**Other Authorities**

26 C.F.R. § 1.401(a)-11 ................................................*passim*

26 C.F.R. § 1.401(a)-20 ................................................18, 19

26 C.F.R. § 1.411(a)-11 ................................................34

26 C.F.R. § 1.411(d)-3 ................................................32

120 Cong. Rec. 3977 (Feb. 25, 1974) (statement of Rep. Perkins) ................................................18

68 Fed. Reg. 70141-01 (Dec. 17, 2003) ................................................32

H.R. 93-1280 (1974) ................................................22

Rev. Rul. 79-90 ................................................5, 12

# INTRODUCTION

Plaintiff Johnny Cruz ("Plaintiff") claims that the monthly pension benefit that he receives under the Raytheon Company Pension Plan for Hourly Employees (the "Hourly Plan" or "Plan") would be ~4% higher if the Plan calculated his benefit using a conversion factor based on actuarial assumptions that his expert identifies as his "preferred inputs," rather than the conversion factor specified in the Plan.  The Court should enter judgment for Defendants because Plaintiff cannot meet his burden of establishing that the Hourly Plan's 0.90 conversion factor is *un*reasonable.

Plaintiff's expert did not determine whether the 0.90 conversion factor used by the Hourly Plan falls outside a "range of reasonableness."  As this Court has already recognized, reasonableness with respect to actuarial equivalence is a range, not a fixed point.  Although Plaintiff's expert acknowledges this principle, he fails to apply it.  Specifically, Plaintiff's expert made no effort to define a range of reasonable conversion factors or to assess whether the Plan's conversion factor falls below that range.  Instead, he merely established that use of his "preferred inputs" would result in a slightly higher monthly benefit for Plaintiff.  Because that alone does not establish that the Plan's conversion factor is unreasonable, Plaintiff's claims all fail.

Plaintiff's assumption that the Plan's 0.90 conversion is based on an outdated mortality table from the 1970s, moreover, does not withstand scrutiny.  For starters, there is no evidence that the Plan's conversion factor is based on such a table, as Plaintiff's expert admits.  More fundamentally, the specific mortality table or tables (if any) that underlie the Plan's conversion factor are *undisputedly irrelevant* to the question before the Court.  If the Plan's 0.90 conversion factor provides Plaintiff with an "actuarially equivalent" benefit, then he is receiving everything he is entitled to under ERISA, no matter what assumptions were initially used to create the factor.

Furthermore, there is no reason to believe that a conversion factor developed decades ago would be outdated or unreasonable today.  This is because a conversion factor represents a *ratio*

of the present values of two form of benefits—in this case, a single life annuity and a joint and survivor annuity. While mortality improvements will necessarily increase a benefit's present value, they do not necessarily imply any change (up or down) in a conversion factor—as Plaintiff's expert admits. Rather, because any changes in mortality are reflected in both the factor's numerator (based on the life of the participant) and its denominator (based on the lives of the participant and beneficiary), mortality changes have only a muted impact on conversion factors.

In addition, any changes to conversion factors that have resulted from improvements in mortality since the 1970s or 1980s have been offset by dramatic decreases in interest rates over the same time period. It is undisputed that, all else equal, lower interest rates yield lower conversion factors. As demonstrated by the reports of both parties' experts, changes in mortality and interest rates over the last several decades have largely offset one another, resulting in conversion factors that have remained relatively stable.

For these reasons—and contrary to the allegations in Plaintiff's complaint—this is *not* a case about outdated mortality tables. Indeed, Defendant's expert demonstrated that the Plan's 0.90 conversion factor falls within the range of reasonableness even when using Plaintiff's expert's "preferred" mortality table. Rather, three other assumptions that go into calculating conversion factors—assumptions about mortality table gender blend, retirement age, and interest rates—drive the divergence between the parties' positions. On each score, the assumptions used by Defendants' expert to benchmark the Plan's conversion factor are reasonable, and the mere fact that Plaintiff's expert "prefer[s]" somewhat different assumptions is insufficient to establish an ERISA violation.

Mortality Table Gender Blend. Pension plans that use mortality tables typically devise "unisex" tables by blending together the distinct mortality experiences of men and women. While Plaintiff's expert used a default 50% male/50% female gender-blend assumption, Defendants'

expert relied on the Plan's actual experience and demographics to derive a 75% male/25% female gender blend for participants selecting joint and survivor annuities. This approach, which has been endorsed by IRS and Treasury Department actuaries, is both typical and reasonable.

Retirement Age. The Hourly Plan uses a single conversion factor of 0.90 to convert single life annuity benefits into actuarially equivalent 50% joint and survivor annuity benefits. Accordingly, the Plan necessarily applies the same conversion factor to all participants regardless of their age or other personal characteristics—as the law allows. In benchmarking the Plan's 0.90 conversion factor, Defendant's expert used a retirement age assumption based on the average retirement age of Plan participants. While Plaintiff insists that ERISA prohibits this approach, he is wrong as a matter of law. In any event, Defendant's expert also showed that the Plan's conversion factor falls within the range of reasonableness even if calibrated with respect to an atypical participant, like Plaintiff, who retired at age 55.

Interest rate. Defendant's expert benchmarked the 0.90 conversion factor by reference to a range of high-quality corporate and government bond rates over approximately the past decade, as is typical in the actuarial field. While Plaintiff's expert suggests that a higher interest rate assumption (derived from corporate bond rates in effect on December 31, 2014) must be used instead, he forthrightly admits that no pension plan actually employs the approach that he is "recommending." To the contrary, if Raytheon were to adopt that approach, it would, according to Plaintiff's expert, be the "first" pension plan in the country to do so.

In sum, even assuming that several of Plaintiff's expert's "preferred inputs" are reasonable, Plaintiff has failed to come forward with evidence that the assumptions relied upon by Defendant's expert to calculate his range of conversion factors are *un*reasonable. For this fundamental reason, and the additional reasons explained below, the Court should enter judgment for Defendants.

## BACKGROUND

There is no dispute regarding the material facts in this case. While the parties disagree about the law—and their experts reach different conclusions about the reasonableness of the Plan's 0.90 conversion factor—the relevant *facts* are undisputed.

### A.    The Raytheon Hourly Plan

The Plan provides benefits to certain former employees of Defendant Raytheon Company ("Raytheon"). Statement of Material Facts ("SOF"), ¶ 1. Under the Plan, a participant's "accrued benefit" is specified as a single life annuity ("SLA") payable at "normal retirement age," which is defined under the Plan as age 65. *Id.* ¶ 13. With an SLA, a retiree receives a fixed monthly benefit beginning at the date of retirement and continuing until her death. *Id.* ¶ 5. While the normal retirement age under the Plan is 65, the Plan allows participants to retire and begin receiving benefits as early as age 55—and for those who do, the Plan provides "subsidized" benefits more valuable than the accrued benefit. *Id.* ¶¶ 16–17, 19.

For married participants, the default form of benefit under the Plan is a 50% joint and survivor annuity ("JSA"). *Id.* ¶ 14. With a 50% JSA, a participant receives a fixed monthly benefit for life and, upon the participant's death, the participant's surviving beneficiary (typically a spouse) receives one-half of that amount. *Id.* ¶ 10. In order to account for the greater number of monthly payments that are likely to be made under a JSA, the monthly benefit amounts payable in the form of a JSA are typically lower than the monthly benefit amounts payable in the form of an SLA of equal value. *Id.* ¶ 20–21.

Pension plan documents are required to specify the actuarial assumptions or actuarial factors that are used to convert SLA benefits into JSA benefits. 26 U.S.C. § 401(a)(25). Plan sponsors, however, are given latitude in terms of how to express those factors or assumptions in plan documents. In particular, Treasury guidance provides that (1) plans may use either fixed or

variable standards for converting SLAs into JSAs, and (2) if fixed standards are used, plans may choose to list either the actuarial assumptions to be used in performing the calculations or a table of "adjustment" or conversion factors.  Rev. Rul. 79-90.  In other words, plans are required to specify *either* actuarial assumptions *or* conversion factors—but not both.  Terry ¶¶ 90–103.

In the Plan document, Raytheon specified a fixed conversion factor of 0.90 to convert a participant's SLA benefit into an actuarially equivalent 50% JSA benefit.  SOF ¶ 29.[1]  As a result of that plan design decision, the Plan's conversion factor does not vary based on the age or other characteristics of individual Plan participants or on short-term fluctuations in interest rates.[2]

### B.    Plaintiff Cruz

Plaintiff Johnny Cruz retired from Raytheon in 2015.  SOF ¶ 88.  At that time, he began receiving a 50% JSA benefit of $1,021.33 per month.  *Id.* ¶ 93.  Plaintiff asserts that he is instead entitled to a JSA benefit of $1,065.91 per month.  Serota I ¶ 110.  Each of his claims is premised entirely on the approximately 4% difference between (1) the benefit he is receiving in accordance with the terms of the Plan and (2) the slightly higher benefit to which he claims to be entitled based on the preferred assumptions selected by his expert.

It is undisputed that Plaintiff, who retired at age 55, is receiving a substantial early retirement subsidy.  SOF ¶ 184–86.  It is likewise undisputed that the present value of Plaintiff's subsidized 50% JSA *exceeds by approximately 20%* the present value of Plaintiff's accrued benefit—*i.e.*, the unsubsidized, age-65 SLA he earned under the Hourly Plan.  *Id.* ¶ 186.

---

[1] In other words, the amount of a participant's monthly 50% JSA benefit = (monthly SLA benefit) x (0.90).

[2] The Hourly Plan does account for differences in age between the participant and the beneficiary.  Reply Declaration of Mitchell I. Serota, dated June 30, 2020 ("Serota II"), ¶ 38 (attached as Exhibit 4 to the Declaration of Christian J. Pistilli ("Pistilli Declaration").  That adjustment, however, has no material impact here because there is no material difference between Plaintiff's age and his spouse's age.  Declaration of Mitchell I. Serota, dated April 24, 2020 ("Serota I"), ¶ 11 & n.2 (attached as Exhibit 3 to the Pistilli Declaration).

## C.       The Parties' Experts

The gravamen of Plaintiff's claims is that the 0.90 conversion factor specified in the Plan for converting SLAs into 50% JSAs violates ERISA because it does not result in a 50% JSA benefit that is the actuarial equivalent of the SLA benefit to which Plaintiff was otherwise entitled.

Two benefits are actuarially equivalent if they have the same present value under a specified set of actuarial assumptions.  SOF ¶ 35.  While ERISA does not require that any particular assumptions be used for purposes of converting SLAs into JSAs, relevant Treasury regulations provide that the actuarial factors used must be "reasonable."  26 C.F.R. § 1.401(a)-11(b)(2).  The parties' experts agree that, in developing or assessing JSA conversion factors, both interest rate assumptions and mortality assumptions (including assumptions regarding the gender blend and age of participants and beneficiaries) are required.  SOF ¶ 24.  The parties' experts also agree that different actuaries could use different assumptions, and that both sets of assumptions might be reasonable, even if they lead to different results.  *Id.* ¶¶ 37–38.  Thus, in order to assess whether a plan-specified conversion factor is reasonable, an actuary must compare the plan's conversion factor with the range of conversion factors that could result from the use of a reasonable range of mortality and interest rate assumptions.  Terry ¶¶ 212, 229.[3]

Plaintiff's expert is Dr. Mitchell Serota.[4]  Serota has spent almost the entirety of his career as an actuary for small ERISA pension plans; he has little or no experience regarding the design or operation of large pension plans, like the Hourly Plan.  SOF ¶ 140.  Serota operates as a *de facto* business partner with Plaintiff's lawyers, who have brought cases similar to this one against a

---

[3] References to "Terry" are to the Declaration of Thomas S. Terry, dated May 29, 2020, attached as Exhibit 1 to the Pistilli Declaration.

[4] Serota's doctorate is in History; he has no advanced degrees in mathematics, economics, finance, or actuarial science.  SOF ¶ 138.

(continued…)

number of large corporate pension plan sponsors.  *Id.* ¶¶ 143–47.  Long before the involvement of any particular plaintiff, Serota worked with (and was compensated by) Plaintiff's counsel to develop the theories underlying Plaintiff's claims and to identify potential targets for litigation. *Id.* ¶¶ 144–47; Serota Dep. at 39:25–46:15.[5]

Serota did not make any effort to determine whether the Plan's 0.90 conversion factor falls below any range of reasonableness.  SOF ¶¶ 149–50.  Instead, Serota calculated a conversion factor of approximately 0.94 based on his "preferred inputs," and opined that the Plan's conversion factor violates ERISA merely because it is lower than 0.94.  Serota I ¶¶ 106, 109–10.  Among Serota's "preferred inputs" is a variable interest rate based on a corporate bond index that Serota admits no pension plan actually uses for this purpose.  SOF ¶ 178.  In addition, Serota conducts his analysis solely by reference to an atypical, age-55 participant, *id.* ¶ 159, even though (1) the Hourly Plan design provides a fixed conversion factor that, by definition, applies to all participants, irrespective of their age at retirement, and (2) the average age of Plan participants who take JSAs at retirement is over 63 (and the Plan's "normal retirement age" is 65), *id.* ¶¶ 13, 18, 30.

Defendants' expert is Thomas Terry.  Terry has spent the bulk of his distinguished career as an actuary for large pension plans, such as the Hourly Plan.  *Id.* ¶ 99.  Terry is a past president of the American Academy of Actuaries, a past president of the International Actuarial Association, and has been a pension actuary for over 40 years.  *Id.* ¶ 98.

Terry relied on current economic conditions and Plan-specific demographic factors to develop a range of reasonable interest rate and mortality assumptions.  *Id.* ¶ 101.  Specifically, in order to benchmark the Plan's 0.90 conversion factor, Terry relied on (1) a mortality table based

---

[5] References to "Serota Dep." are to the deposition transcript of Mitchell I. Serota, dated July 23, 2020, attached as Exhibit 2 to the Pistilli Declaration.

on relevant data from 2010–2014, (2) the observed gender breakdown of Plan participants who have selected the JSA option under the Hourly Plan since 2011, (3) the average retirement age of Plan participants, and (4) a range of high-quality corporate and government bonds rates over the past decade.  Terry ¶ 237–41, 247–60.  Using those assumptions, Terry developed a range of reasonable conversion factors spanning from 0.887 to 0.912, and opined that the Plan's 0.90 conversion factor is reasonable (in part) because it falls comfortably within that range.  SOF ¶ 127. Terry also demonstrated that the difference between the mortality table that he used for purposes of his analysis and the slightly more outdated table that Serota used as his "preferred input" did not have a material impact on that conclusion.  *Id.* ¶¶ 129–30; Terry ¶ 265.

### D.      Procedural History

Because courts in the ERISA context "typically regard the reasonableness of actuarial assumptions as 'a zone, not a point,'" this Court held in this case that a "'range of reasonableness' framework" applies to the determination "whether the conversion of a single life annuity to another benefit option satisfies ERISA's 'actuarial equivalence' standard."  Dkt. No. 28, at 5–6.  Based on its determination that Plaintiff's "actuarial claim cannot be assessed without a more developed record," the Court denied Defendants' motion to dismiss, *id.* at 7, and ordered briefing on the "threshold" question of "whether the 0.90 conversion factor used by the portion of the Raytheon Hourly Plan in which Mr. Cruz participates to convert his [SLA] into a 50% [JSA] violates 29 U.S.C. § 1053(a), § 1054, or § 1055," Dkt. No. 34, at 2.

### ARGUMENT

Part I below demonstrates that the Hourly Plan's 0.90 conversion factor is (1) within a range of reasonable conversion factors based on current conditions and (2) results in 50% JSA benefits that are (at least) actuarially equivalent to the SLA benefits that would begin at the same time under the terms of the Plan.  Part II demonstrates that, even if one does not apply standard

averaging or pooling conventions commonly used by actuaries and, instead, focuses myopically on a participant with Plaintiff's age and gender, Plaintiff is *still* receiving a benefit that is actuarially equivalent to his SLA benefit beginning at the same age.

Parts III and IV present alternative, independently dispositive legal arguments. Part III demonstrates that the 50% JSA should be compared not to the subsidized early retirement SLA, as Plaintiff suggests (and Parts I and II assume), but instead to a participant's "accrued benefit," and that the 0.90 conversion factor provides Plaintiff with a 50% JSA that *undisputedly* exceeds the value of his "accrued benefit." Part IV demonstrates that, even if the 0.90 factor did not result in an actuarial equivalent 50% JSA based on 2015 conditions (which it does), Plaintiff still would not have demonstrated that the Plan's conversion factor is unreasonable because, as a matter of law, plan sponsors have the latitude to adopt conversion factors that are designed to be reasonable over longer periods of time.

## I.   THE 0.90 CONVERSION FACTOR USED BY THE PLAN TO CONVERT SLAs TO JSAs RESULTS IN ACTUARIALLY EQUIVALENT BENEFITS.

Because Plaintiff's 50% JSA benefit is "actuarially equivalent" to the subsidized SLA benefit available to him upon retirement, he cannot carry his burden of showing that the Plan's 0.90 conversion factor violates ERISA.

ERISA defines a qualified joint and survivor annuity benefit as being at least the "actuarial equivalent" of the SLA benefit. *See* 29 U.S.C. § 1055.[6] "Two modes of payment are actuarially equivalent when their present values are equal *under a given set of assumptions*." *Stephens v. US Airways Grp.*, 644 F.3d 437, 440 (D.C. Cir. 2011) (emphasis added). ERISA does not define

---

[6] ERISA requires plans to offer benefits in the form of a "qualified joint and survivor annuity," or "QJSA," and makes that form of benefit the default option for married participants. 29 U.S.C. §§ 1055(a) & (c). The QJSA under the Hourly Plan is the 50% JSA. SOF ¶ 15.

"actuarial equivalence" or specify any particular set of assumptions that must be used in determining whether two benefits are actuarially equivalent. Treasury regulations, however, provide that "[e]quivalence" is to be "determined[] on the basis of . . . reasonable actuarial factors." 26 C.F.R. § 1.401(a)-11(b)(2). Accordingly, in order to prevail on any of his claims, Plaintiff must (at a minimum) establish that the 0.90 factor used by the Plan to convert SLA benefits into 50% JSA benefits is unreasonable.[7] No competent evidence supports that conclusion.

There is no single, "correct" conversion factor that must be used in actuarial equivalence calculations. To the contrary, courts recognize that "[g]reat differences of opinion exist as to actuarial methods," *Combs v. Classic Coal Corp.*, 931 F.2d 96, 100 (D.C. Cir. 1991), and thus "typically regard the reasonableness of actuarial assumptions as 'a zone, not a point,'" Dkt. No. 28, at 5 (quoting *Bakery & Confectionary Union & Indus. Int'l Pension Fund v. Just Born II, Inc.*, 888 F.3d 696, 706 (4th Cir. 2018)).[8] Indeed, Plaintiff's expert agrees that "[t]here will often be a range of reasonable assumptions and two actuaries could both use reasonable methods and assumptions and reach different but reasonable results." Serota Dep., at 104:11–105:2.

When assessing the reasonableness of an actuarial conversion factor, the focus is on whether the factor produces an actuarially equivalent *result*. If the factor used to convert an SLA to a JSA results in an actuarially equivalent benefit, ERISA's requirements are satisfied, even if the individual ingredients used to derive the factor are unreasonable or unknown. SOF ¶ 40.

---

[7] For purposes of this Part I, Defendants assume *arguendo* that Plaintiff's 50% JSA benefit must be actuarially equivalent to the subsidized, age-55 SLA benefit that he earned under the terms of the Plan. In fact, however, ERISA requires that the 50% JSA be compared only to the SLA payable at normal retirement age—which, in the Hourly Plan, is age 65. *See infra* Part III.

[8] *See also Artistic Carton Co. v. Paper Indus. Union-Mgmt. Pension Fund*, 971 F.2d 1346, 1348 (7th Cir. 1992) (noting "wide range of 'reasonableness'" among actuarial valuation methods); *Bd. of Trs., Mich. United Food & Commercial Workers Unions v. Eberhard Foods, Inc.*, 831 F.2d 1258, 1261 (6th Cir. 1987) (noting that selection of actuarial assumptions is "not an exact science," and thus there is a "range of reasonable actuarial determinations").

Indeed, as Plaintiff's expert admitted, a conversion factor that results in an actuarially equivalent benefit provides participants with everything to which they are entitled under ERISA, even if the conversion factor was derived by "throwing darts at a dart board." *Id.*

As a corollary to this proposition, there is no requirement that the individual assumptions used to calculate actuarial equivalence or develop conversion factors be reasonable, so long as the resulting factor provides for a JSA that is actuarially equivalent to the SLA. *Id.* Here, the parties agree that numerous different sets of actuarial assumptions could be used to develop a 0.90 conversion factor. *Id.* ¶ 96. And, as Plaintiff's expert concedes, a conversion factor that results in an actuarially equivalent benefit does so even if the interest rate or other assumptions that might underlie the factor are "unreasonabl[e]." Serota Dep. at 79:20–80:6. Indeed, any other approach could lead to the absurd result that one plan's conversion factor is "reasonable" while the exact same conversion factor used by a different (demographically identical) plan is unreasonable, simply because the inputs used to calculate the conversion factor are different.

For the reasons explained in Part A below, the 0.90 conversion factor used by the Plan to convert SLAs into 50% JSAs falls comfortably within a range of reasonableness—and thus provides Plaintiff with a 50% JSA that is actuarially equivalent to the SLA benefit he earned under the terms of the Hourly Plan. And for the reasons explained in Part B below, none of Plaintiff's contrary arguments has any merit. Accordingly, Plaintiff has not met his burden of establishing that the Plan's 0.90 conversion factor falls outside the range of reasonableness.

A.     **The Plan's 0.90 Conversion Factor Is Reasonable.**

ERISA does not mandate that employers provide employees with pension plans or (with minor and irrelevant exceptions) dictate the terms that employers must include in the plans they provide. *Lockheed Corp. v. Spink*, 517 U.S. 882, 887 (1996). Instead, employers are given "considerable latitude" in structuring the benefits they offer. *Merrimon v. Unum Life Ins. Co. of*

11

*Am.*, 758 F.3d 46, 58–59 (1st Cir. 2014).  One respect in which employers are given discretion is the manner in which the plan expresses conversion factors.  As recognized in relevant Treasury guidance, plans may use either "fixed" or "variable" standards in setting actuarial conversion factors.  *See* Rev. Rul. 79-90.  And for plans that use fixed standards, the guidance specifies that two methods are "acceptable": (1) "specifying the actuarial assumptions (interest, mortality, etc.) to be used" in calculating factors, *or* (2) "including a table of adjustment factors."  *Id.*

Here, Raytheon elected to use the second "acceptable" approach, *i.e.*, to design a pension plan that uses a fixed tabular factor to convert SLA benefits into actuarially equivalent 50% JSA benefits.  Of course, Raytheon could have designed a plan that uses variable interest rate or mortality assumptions (as Plaintiff would apparently prefer), but it was not required to do so.[9] Accordingly, the question for the Court is whether the Plan's 0.90 fixed tabular factor is reasonable *for a plan that uses a fixed tabular factor*, not whether it might have been preferable as a matter of policy or plan design to use variable interest rate or mortality assumptions or to include a table of conversion factors that varies by age.[10]

Defendants' expert Terry performed an actuarial assessment—based on relevant, current demographic and economic conditions—of the 0.90 conversion factor.  In particular, Terry developed a set of reasonable benchmarking assumptions based on current economic conditions (*e.g.*, interest rates) and the observed demographics of Plan participants (*e.g.*, average retirement

---

[9] In his reply report, Plaintiff's expert (who has little experience with large pension plans) stated that the use of fixed factors is "archaic," but at his deposition, he admitted that he has undertaken no analysis to determine whether tabular factors are, in fact, uncommon.  SOF ¶ 32.  Defendants' expert, by contrast, testified that plans do continue to use fixed factors today.  *Id.* ¶ 31.  In any event, the question is irrelevant because the decision whether to use a fixed factor is a plan design or "settlor" decision subject to the discretion of plan sponsors.  *See, e.g.*, *Hughes Aircraft Co. v. Jacobson*, 525 U.S. 432, 444 (1999).

[10] In fact, there are substantial advantages to using the fixed factor approach, including simplicity of communication and administration.  SOF ¶ 33.

age) to benchmark a range of reasonable factors.  SOF ¶¶ 100–27.  The actuarial assumptions that Terry used in his analysis—and the bases for those assumptions—are summarized below:

Mortality Table.  Terry used a mortality table—known as Pri-2012—that reflects the experience of private-sector U.S. pension plan mortality for the period 2010 to 2014.  *Id.* ¶¶ 102–03.  Terry used this table as his baseline because it is indicative of relevant, current mortality experience and is thus an appropriate benchmark for assessing the conversion factor for an employee retiring in 2015.  *Id.* ¶ 104.

Participant and Beneficiary Gender Blend.  The Supreme Court has forbidden the use of gender-distinct mortality tables for calculating pension benefits.  *See Ariz. Governing Comm. for Tax Deferred Annuity & Deferred Comp. Plans v. Norris*, 463 U.S. 1073, 1083–84 (1983).  Accordingly, ERISA plans that use mortality tables typically develop "unisex" tables by blending the male and female mortality rates found in baseline, gender-distinct tables.  SOF ¶ 55.  To develop a unisex table for his benchmarking analysis, Terry relied on empirical data showing that the gender blend of the Hourly Plan participants who retired in 2011 or later and elected to receive their benefits in the form of a JSA was 75% male/25% female.  *Id.* ¶¶ 109–10.  On the basis of those observed demographics, as well as a published study showing a comparable gender blend for pension plans nationwide, Terry constructed a 75% male/25% female unisex mortality table for Plan participants.  *Id.* ¶¶ 109–10, 112.  He similarly constructed a 25% male/75% female unisex mortality table for beneficiaries, based on the assumption that beneficiaries are typically of the opposite gender as participants.  *Id.* ¶ 111.  Terry used those unisex tables because they "not only represent[] U.S. pensioner mortality experience, but [also] reflect[] the demographic profile of [Hourly] Plan retirees who actually elected [JSAs] . . . in recent years."  Terry ¶ 254.

Terry's approach has been expressly endorsed by IRS and Treasury actuaries in informal

guidance provided to enrolled actuaries[11] in the "Gray Book." The Gray Book is a "compendium of questions [and answers] that actuaries have asked representatives of the Internal Revenue Service [and Treasury Department] when there is some vagueness" in the regulations, "and the actuaries don't know exactly how to solve [a particular] problem." SOF ¶ 48. The answers provided by IRS and Treasury actuaries in the Gray Book are illustrative of mainstream actuarial practice and "carry weight" in the actuarial profession. SOF ¶ 49. The 2013 Gray Book provides that an "acceptable" method for "determining reasonable actuarial equivalence factors" is to use "flat factors which are reasonable for the *average* participant expected to elect [a particular benefit] option." *Id.* ¶ 49. As Serota admits, that is precisely what Terry did here. *Id.* ¶ 114.

Retirement Age. As discussed above, the Hourly Plan uses a fixed tabular factor to convert SLAs to actuarially equivalent JSAs. A plan that uses fixed factors, by definition, applies the same factor to all participants regardless of their age (or gender). Accordingly, Terry used the average age of Hourly Plan participants who select JSAs at retirement—age 63.8—for purposes of his benchmarking analysis. SOF ¶ 115.[12] Again, the use of "flat factors which are reasonable for the average participant expected to elect the option" has been expressly endorsed by IRS and Treasury actuaries for purposes of determining "reasonable actuarial equivalence factors." *Id.* ¶ 116.

Discount Rate. ERISA does not "specify a discount rate" that pension plans must use when converting SLAs into JSAs; instead, it provides plan sponsors with a "degree of discretion in setting discount rates." *See, e.g.*, *McCarthy v. Dun & Bradstreet Corp.*, 482 F.3d 184, 203-04 (2d

---

[11] An "enrolled actuary" is an actuary who has been approved by the Joint Board for the Enrollment of Actuaries "to perform actuarial services required under" ERISA. SOF ¶ 43.

[12] Terry also looked in his report at age 65 because that is (1) the "normal retirement age" specified in the Plan and (2) the age at which Plan participants most commonly retire. The "reasonable range" he calculated using age 65 was from 0.884 to 0.909. SOF ¶¶ 156–57. For purposes of simplicity and because there is no material difference between the two analyses, this motion focuses on the range of 0.887 to 0.912 that Terry calculated using the average age of Plan participants who select JSAs at retirement—*i.e.*, age 63.8.

Cir. 2007). In performing his benchmarking exercise, Terry surveyed rates on publicly issued and market-traded high-quality U.S. bonds, including both corporate and Treasury bonds, over the past eight-plus years. SOF ¶ 120. He did so because "actuaries typically look to such interest rates to perform actuarial calculations of different types." *Id.* ¶ 121. Indeed, the IRS examination process endorses the use of such interest rates, including Treasury rates, for purposes of converting SLAs to JSAs. *Id.* ¶ 122. Based on his survey, Terry concluded that a range of interest rate assumptions between 1.5% and 5.0% is both current and reasonable for purposes of benchmarking. *Id.* ¶ 125.

Using the current and reasonable assumptions discussed above, Terry calculated a range of reasonable conversion factors for the Hourly Plan of 0.887 to 0.912. *Id.* ¶ 127.[13] Because the Hourly Plan's actual conversion factor fell comfortably within that range, Terry concluded that (1) the 0.90 conversion factor was, from an actuarial perspective, reasonable, and (2) Plaintiff is receiving a JSA benefit that is at least the actuarial equivalent of the SLA benefit to which he was entitled under the terms of the Hourly Plan. Terry ¶ 29.

### B.    Plaintiff's Criticisms of the 0.90 Conversion Factor Are Unavailing.

The opinions of Plaintiff's expert Serota are insufficient to establish that the Plan's 0.90 conversion factor is unreasonable, and his criticisms of Terry's methodology are unfounded.

Serota's report sets forth a list of "actuarial assumptions" that he views as the "most reasonable" for converting an SLA into a JSA. Serota I ¶ 102. These "preferred inputs" include: (1) a retirement age of 55, (2) a default 50/50 gender blend, (3) a mortality table published in 2014,

---

[13] Terry also noted that the Hourly Plan's 0.90 conversion factor is consistent with conversion factors used by other authoritative bodies. SOF ¶¶ 131–36. For example, the PBGC, a federal agency that insures individuals' pension benefits up to a guaranteed maximum amount, uses a fixed conversion factor of 0.90 when converting the maximum guaranteed amount from an SLA to a 50% JSA. *Id.* ¶¶ 131–32. The IRS similarly directs pension plans to use a conversion factor of 0.88 when converting a participant's accrued benefit attributable to employee contributions from an SLA into a 50% JSA under the same anti-forfeiture rules under which Plaintiff brings his claim. *Id.* ¶¶ 133–36.

and (4) a variable interest rate based on a corporate bond index.  *Id.* ¶¶ 101-06.   Using those

assumptions, Serota calculates a conversion factor of approximately 0.94.  *Id.* ¶ 109.  Based solely

on the fact that Plaintiff's monthly benefit would be approximately 4% higher using Serota's

"preferred inputs," Serota suggests that the Hourly Plan's 0.90 conversion factor is unreasonable.

*Id.* ¶ 106.   The myriad legal and actuarial infirmities in that opinion—and in Serota's related

criticisms of Terry's methodology—are discussed below.[14]

    <u>Range of Reasonableness</u>.  As this Court has previously recognized, the reasonableness of

actuarial assumptions is considered to be "a zone, not a point."  Dkt. No. 28, at 5.  Serota, however,

admits that he made no effort to develop a range of reasonableness or to determine what the lower

bound of the reasonable range might be:

> Q. . . . Did you make any effort to determine a lower bound conversion factor that
> would in your opinion be unreasonable from an actuarial perspective?
>
> A. I wasn't honing in on the lowest or the highest, I was honing in on reasonable.
>
> Q. You were honing in on the most reasonable, right?
>
> A. Right.
>
> Q. And there could be some that are lower that are still reasonable?
>
> A. There could.
>
> Q. And you didn't make any effort to figure out what that lower bound is?
>
> A. No, I did not.

Serota Dep. at 306:7–24.  Because Serota did not attempt to ascertain the lower bound of a range

of reasonable conversion factors, there is no basis for any conclusion that the Hourly Plan's 0.90

conversion factor is unreasonable.  Serota's opinions illustrate nothing more than the unsurprising

---

[14] Notably, Serota does not utilize his recommended approach outside of the litigation context.  For
example, his firm uses a mortality table from 1994 and a fixed interest rate assumption for purposes of
converting SLAs into JSAs under its pension plan.  SOF ¶ 188.  And Serota serves as the enrolled actuary
for a number of clients that use mortality tables from the 1970s and 1990s, and fixed interest rate
assumptions to convert SLAs to JSAs.  *Id.* ¶ 190. As these clients' enrolled actuary, Serota attests that the
plans' actuarial assumptions are "reasonable."  *Id.* ¶ 191.

fact that, if the Hourly Plan were to use a different conversion factor based on Serota's preferred inputs, it would result in a somewhat higher monthly payment to Plaintiff. They do not show that the conversion factor that the Plan actually uses to calculate participants' benefits is *un*reasonable, and thus Plaintiff's claims fail as a matter of law.

Age Pooling. In his report, Defendant's expert Terry demonstrated that the Plan's 0.90 conversion factor is reasonable when judged by reference to a participant who retires at an average age—here, age 63.8. SOF ¶ 127. Serota, by contrast, focuses on the reasonableness of the Hourly Plan's 0.90 conversion factor as applied to an unusually young (55-year-old) retiree like Plaintiff. Serota I ¶ 7; Serota Dep. at 57:6–20; *see* Terry App'x E, ¶ 7 (noting that only ~5% of Plan participants retire at age 55). This difference is significant because mortality increases with age, and conversion factors calibrated against only younger retirees tend to be higher than factors calibrated against only older ones. Serota II ¶ 26. Actuarial equivalence, however, need not be calculated on an individual basis, and thus the relevant question is whether the Plan's 0.90 conversion factor is reasonable as applied to the Plan *as a whole*. Terry ¶¶ 135, 200. Serota's myopic focus on a 55-year-old retiree—and his criticism of Terry for focusing on the average retiree receiving a JSA benefit—are unsupported by actuarial practice and governing law.[15]

Pooling is an actuarial term that refers to the aggregation of risk for common treatment. SOF ¶ 47. It is a fundamental principle underlying pension plans. Terry ¶ 125. As the Supreme Court has explained, risk pooling is a "common practice" that has never been considered "unfair," even though "the better risks always subsidize the poorer risks" in a pooling arrangement. *City of*

---

[15] Serota's improper retirement age assumption is the principal driver of his inflated, 0.94 conversion factor. As Serota himself explains, using an "average" age of 64 and all of Serota's other "preferred inputs" reduces the difference between Serota's 0.94 conversion factor and the Plan's 0.90 conversion factor by 50%. Serota II at Rebuttal Figure 1 (calculating a 0.92 conversion factor).

*Los Angeles, Dep't of Water & Power v. Manhart*, 435 U.S. 702, 710 (1978) ("Healthy persons subsidize medical benefits for the less healthy; unmarried workers subsidize the pensions of married workers; persons who eat, drink, or smoke to excess may subsidize pension benefits for persons whose habits are more temperate.").

The concept of pooling—and its relevance to the calculation of actuarial equivalent benefits—was recognized by Congress when enacting ERISA in 1974. Specifically:

> The reduction permitted on the basis of actuarial equivalence [in calculating QJSAs] need not involve a variety of reductions dependent on the life expectancy of each participant and of the participant's spouse. *A **uniform reduction** or a simplified schedule of reductions will fulfill the intent of this provision if it can be established to provide actuarial equivalence in the case of the **average participant***.

120 Cong. Rec. 3977 (Feb. 25, 1974) (statement of Rep. Perkins) (emphasis added).

Pooling is also expressly permitted by relevant regulations. For example, in describing how actuarial equivalence is to be determined when calculating QJSA benefits, IRS regulations provide that (so long as a plan does not discriminate in favor of highly compensated employees):

> Equivalence may be determined on the basis of consistently applied reasonable actuarial factors, for each participant *or **for all participants** or reasonable groupings of participants*. . . .

26 C.F.R. § 1.401(a)-11(b)(2) (emphasis added). The reference to "reasonable actuarial factors . . . for all participants or reasonable groupings of participants" is a reference to pooling. Terry ¶ 135. Under the regulation, unique conversion factors need not be calculated "for each participant," but instead a factor can be calculated "for all participants." Stated differently, when developing a JSA conversion factor, it is permissible to calculate a conversion factor that is reasonable for the "average" or "typical" plan participant, not each individual retiree. *Id.*; *see* SOF ¶ 50 (actuarial equivalence may be determined on the basis of "flat factors which are reasonable for the average participant") (citing 2013 Gray Book)).

While acknowledging that it is ultimately a legal question for the Court, Serota Dep. at

89:4–90:9, Serota claims that pooling by age is prohibited by two specific Treasury regulation Q&As: (i) Q&A 16, which provides that a QJSA offered under a plan "must be at least as valuable as any other optional form of benefit payable under the plan at the same time"; and (ii) Q&A 17, which provides that a plan must offer a QSJA "when the participant attains the earliest retirement age under the plan."  26 C.F.R. § 1.401(a)-20.  Contrary to Serota's assertion, these Q&As have nothing to do with age pooling.  Q&A 16 and 17 merely specify that an individual, at any age, must receive an actuarially equivalent "QJSA."  They do not define actuarial equivalence or provide any information about the factors or assumptions that should be used to calculate actuarial equivalence.  Indeed, 26 C.F.R. § 1.401(a)-11(b)(2) confirms that actuarially equivalent benefits may be calculated based on actuarial factors that are reasonable "for each participant or for all participants or reasonable groupings of participants."  Thus, contrary to Serota's unfounded legal opinion, nothing in the Q&As indicates that a plan violates ERISA unless it converts an SLA into a QJSA using a conversion factor based on a participant's unique retirement age.[16]

Serota's opinion that age pooling is somehow improper is also self-contradictory and actuarially unsound.  Defined benefit plans routinely and necessarily rely on pooling.  The use of mortality tables for purposes of calculating benefits or deriving conversion factors is itself an example of pooling: while individual mortality varies widely, pension plans do not calculate conversion factors based on the health characteristics of their participants, but instead on averages for a given relevant population (*e.g.*, the population of participants in the plan).  Similarly, the use

---

[16] Serota claims that 26 C.F.R. § 1.401(a)-11(b) was overruled by regulations promulgated under the Retirement Equity Act of 1984 (the "REA"), which he claims "significantly changed the qualified joint and survivor annuity rules."  Serota II at ¶ 34.  But post-REA regulations supersede pre-REA regulations only to the extent that the regulations are "inconsistent."  26 C.F.R. § 1.401(a)-11(g).  Here, there are no inconsistencies between 26 C.F.R. § 1.401(a)-11(b) and 26 C.F.R. § 1.401(a)-20 Q&A 16 and 17.  To the contrary, the Treasury regulations call out 26 C.F.R. § 1.401(a)-11(b) as an example of a pre-REA regulation that is "the same as or consistent with REA."  26 C.F.R. § 1.401(a)-11(g)(2)(ii).

of unisex mortality tables also inherently involves pooling: a unisex mortality table groups together the mortality experience of men and women for purposes of benefit calculations despite the observed fact that women (on average) live longer than men.  Indeed, even the grouping together of all people who were born in the same calendar year as being of the same age is an example of pooling—treating as equivalent people who were born on January 1 and December 31 of a given year.  Serota relies on pooling in each of these ways: he pools mortality risk by (i) using a mortality table based on the population of U.S. private pension plan retirees as a whole, (ii) using a unisex mortality table that blends together the disparate mortality experiences of men and women, and (iii) effectively grouping people together into 12-month age pools.

Against this backdrop, Serota's opinion that it is somehow impermissible to pool Plan participants together by a wider age band (*i.e.*, age 55 to 70) collapses on itself.  To be sure, all else equal, someone who retires at age 55 has a lower mortality risk than someone who retires at age 70.  But it is equally true that a woman retiring at age 55 has a lower mortality risk than a man retiring at age 55, and yet—as the Supreme Court has recognized— there is nothing "inherently unfair" about "treating men and women alike" for purposes of calculating pension benefits. *Manhart*, 435 U.S. at 710.  Nothing in either ERISA or actuarial practice provides any basis on which to distinguish between (1) the myriad forms of pooling endorsed by and relied upon by Serota (and the Supreme Court), and (2) the pooling of Plan participants by age.

Finally, it bears emphasis that the decision to use a single, fixed factor for purposes of converting SLAs into 50% JSAs is a plan design decision vested in Raytheon as the plan sponsor. *See supra* at 12 & n.9.  Whenever a plan uses such a factor (as ERISA permits), it necessarily applies to all plan participants regardless of the age at which they retire.  Recognizing this, Serota suggests that—for plans that use a single fixed factor—the only permissible approach is to

20

calibrate the conversion factor based on the plan's earliest retirement age, and thus to subsidize the JSA benefits of all other plan participants.  Serota II ¶ 28.  But nothing in ERISA requires employers to provide such a subsidy, and the Court should reject Plaintiff's attempt to engraft such an unexpected and expensive subsidy requirement onto the statute.  *See Conkright v. Frommert*, 559 U.S. 506, 517 (2010) (In enacting ERISA, "Congress sought 'to create a system that is not so complex that administrative costs, or litigation expenses, unduly discourage employers from offering ERISA plans in the first place.'" (alterations omitted)).

Gender Blend.  As discussed above, pension plans that use mortality tables typically rely on unisex tables—*i.e.*, tables that blend or pool together the disparate mortality experiences of men and women.  SOF ¶ 55.  Both parties' experts created such unisex mortality tables in this case, but they did so using different gender ratios:  Defendants' expert Terry used a 75% male/25% female ratio for Plan participants based on empirical data regarding the Plan, while Plaintiff's expert Serota used a default assumption of 50% male/50% female.  (Both used the inverse assumption for beneficiaries, who are typically the participants' spouses.)  Terry ¶ 252; Serota I ¶ 104.  Even assuming *arguendo* that Serota's default assumption represents an acceptable approach, there is no basis on which to conclude that Terry's data-driven approach is *un*reasonable for purposes of benchmarking the Plan's 0.90 conversion factor.[17]

The parties' experts agree that when deriving or evaluating an actuarial conversion factor, it is appropriate to consider the empirically observed behavior of plan participants.  SOF ¶ 65.  One

---

[17] Serota faults Terry's reliance on valuation data from 2011 to the present to derive his 75% male/25% female gender blend because not all of this data was available to Raytheon as of Plaintiff's 2015 retirement date.  Serota II ¶ 120.  But Terry's consideration of data from 2011 to the present is consistent with an assessment of the Plan's 0.90 conversion factor based on "relevant, current demographic and economic conditions."  Terry ¶ 14.  As Terry explained, "pensions are long-term promises, based on benefits earned throughout a career and then paid for many years (even decades) in retirement.  Accordingly, a benchmark of reasonableness is not necessarily based on any single point in time."  *Id.* ¶ 218.

way to account for plan participants' behavior is to consider the demographics of the participants who select a particular benefit option, such as a JSA, when deriving or evaluating an actuarial conversion factor.   Terry ¶ 116.   Indeed, the Gray Book expressly endorses this approach, explaining that actuarial equivalence may be determined using conversion factors "which are reasonable for the average participant expected to elect [a particular benefit] option."  SOF ¶ 50.

There are good reasons to consider the demographics of plan participants who select a benefit option when evaluating conversion factors.  For example, it is well established that women tend to outlive men.  *Id.* ¶ 52.  For this reason, among others, men are more likely than women to select JSA benefits upon retirement, and women are more likely to select SLA benefits.  Terry Report ¶ 150 (citing Urban Institute study finding that "28 percent of married men and 69 percent of married women opt for single life annuities instead of joint and survivor annuities").  Because men are more likely than women to select JSAs and because their beneficiary spouses are typically women (who will usually live longer and, accordingly, receive benefits for longer), the cost to plans of providing a JSA option is (all else equal) greater than providing only an SLA.  SOF ¶ 72.  Accordingly, in developing or benchmarking JSA conversion factors, it is often appropriate to account for the gender blend of the participant population likely to select the JSA option.

Congress has expressly endorsed this practice, stating in a conference report that ERISA "does not require the plan to 'subsidize' the joint and survivor feature[]."  H.R. 93-1280, at 280 (1974).  Accordingly, "plans may make reasonable actuarial adjustments to take account of the possibility that total costs of the plan might be increased because of adverse selection."  *Id.*; *see* 29 U.S.C. § 1055(i) ("[P]lan may take into account in any equitable manner . . . any increased costs resulting from providing a qualified joint and survivor annuity.").   In other words, ERISA authorizes plans to account for the fact that men are more likely to select a JSA benefit in setting

22

conversion factors to ensure that offering the JSA option does not increase costs to the plan.

<u>Mortality Table</u>.  Serota and Terry use two slightly different mortality tables for purposes of their assessments.  Even assuming that the table used by Serota represents a reasonable choice, Plaintiff has no evidence that the table used by Terry for purposes of his benchmarking exercise was *un*reasonable.  In any event, the minor differences between Serota's and Terry's baseline mortality assumptions did not have a material impact on their conversion factor calculations.

Serota used as his "preferred input" a mortality table published by the Society of Actuaries in 2014.  Serota I ¶ 101–02.  Because that "RP 2014" table was based on mortality experience from the mid-2000s, Serota also elected to use an "improvement scale" to take into account possible future improvements in mortality.  *Id.*  Terry, by contrast, used a mortality table—known as Pri-2012—published by the Society of Actuaries based on mortality experience data for the period 2010 to 2014.  Terry ¶ 248.

Both parties' experts used mortality tables published by the same reputable body.  And both used *current* tables, reflective of recent mortality experience.  Indeed, the table used by Terry is reflective of *more recent* mortality experience: the table relied on by Terry was based on mortality data for the period 2010 to 2014, *i.e.*, the period immediately preceding Plaintiff's 2015 retirement.  Terry ¶ 248.  Nonetheless, Serota criticizes Terry for using the Pri-2012 table because the table had not been published as of the date of Plaintiff's retirement.  Serota II ¶ 98.  That criticism makes no sense:  The purpose of Terry's benchmarking exercise was to determine whether application of the Plan's 0.90 conversion factor in 2015 was reasonable based on current conditions.  Terry ¶ 14.  And mortality data from 2010 to 2014 allowed Terry to assess precisely that question.[18]  There is no basis on which to assert that an actuary must ignore relevant, available

---

[18] It bears emphasis that the data relied on by Terry all pre-dated Plaintiff's actual retirement; he did not (continued…)

information when benchmarking the reasonableness of an actuarial conversion factor.[19]   At a minimum, it was not unreasonable for Terry to use the Pri-2012 mortality table.

In any event, the record reflects that there is no material difference between Serota's "preferred" mortality table and the table used by Terry.   Terry performed an alternative analysis in which he calculated a range of conversion factors using Serota's preferred mortality table (including his preferred mortality improvement scale and weighting), and it had only a negligible effect on the range calculated by Terry.   Terry ¶ 265.   Specifically, the use of Serota's table resulted in a range of 0.891 to 0.919.   *Id.*[20]   Accordingly, even using Serota's preferred mortality table and adjustments, Terry's benchmarking exercise demonstrated that the Plan's 0.90 conversion factor is within the range of reasonableness.

<u>Interest Rate</u>.  In his report, Terry looks to a range of interest rates—including investment-grade government and corporate bond rates—over the past eight-plus years for purposes of his benchmarking analysis.  Serota criticizes Terry for considering Treasury bond rates, and bases his analysis almost exclusively on indexes of "high-quality corporate bond rates."  Serota I ¶ 96.

Serota calculates his preferred 0.94 factor using an interest rate based on the FTSE Above Mean AA Index, a third-party index based on high-quality corporate bond rates, as of December

---

rely on changes in observed mortality that occurred after Plaintiff's retirement date.

[19] Serota also criticizes Terry's selection of the Pri-2012 mortality table on the ground that Terry used a "headcount-weighted" version of the table as opposed to a "benefits-weighted" version.  Serota II ¶¶ 102–05.  Serota's criticism has no merit.  A headcount-weighted mortality table is a table that gives equal weight to each participant, regardless of their compensation level or benefit amount.  As such, a headcount-weighted table is best equipped to "predict how many people at a given age will die before attaining the next higher age."  Dkt. No. 1, ¶ 69.  Although Serota suggests that the Society of Actuaries has specified that "benefits-weighted" tables were generally developed for use in the pension context, Serota II ¶ 103, he admits that the Society has provided no specific guidance for "individual benefit calculations," Serota Dep. at 150:19–151:20.

[20] For purposes of this analysis, Terry used the same interest rate, age and gender blend assumptions as in his primary benchmarking analysis.  Terry ¶ 265.

31, 2014.  *Id.* ¶ 102.  In his report, Serota states that he utilized that index for purposes of calculating a conversion factor because it "closely track[s]" Raytheon's "own 'best estimate' discount rate" for pension liabilities, "as shown in [its ASC] 715-30 Reports for [2014]."  *Id.* ¶ 105.

Serota admits, however, that the use of corporate bond rates for purposes of calculating or benchmarking actuarial equivalent conversion factors is not a "best practice"; rather, it is merely something he is "recommending."  Serota Dep. at 302:2–13.  Serota, moreover, concedes that he is unaware of even a single pension plan that uses his recommended approach for purposes of calculating conversion factors:

> Q. Are you aware of any pension plans that use high quality corporate bonds for purposes of performing actuarial equivalence calculations?
> A. No, but there can always be a first.
> ***
> Q…. A[re] you aware of any pension plans that use the FTSE above mean double-A index for purposes of performing actuarial equivalence calculations?
> A. No, I am not aware.

*Id.* at 302:2–303:19.  There are, moreover, several good reasons for *not* deriving or evaluating conversion factors based solely on high-quality corporates bond rates.

*First*, ASC 715-30 assumptions have nothing to do with benefit calculations.  ASC 715-30 is an accounting standard promulgated by the Financial Accounting Standards Board ("FASB") that specifies the rules that a U.S. company must follow when reporting its pension liabilities in GAAP financial statements.  SOF ¶¶ 165–67.  The FASB's objective for company accounting is for companies to calculate and report their pension liabilities in a uniform way that is "mark to market" as of a precise date.  *Id.* ¶ 166; Terry ¶ 157.  The rules have nothing to do with the calculation of actuarially equivalent benefits in individual benefit determinations.

*Second*, ASC 715-30 imposes stringent requirements on companies when selecting an interest rate for purposes of financial reporting.  As Serota concedes, to comply with ASC 715-30,

25

a company *must* select an interest rate assumption based on actual bond market yields—on a precise measurement date—from a narrow universe of high-quality corporate bonds.  Serota Dep. at 158:2–161:10.[21]  Accordingly, when a company says that its ASC 715-30 interest rate is a "best estimate," what it means is that it is a best estimate of high-quality corporate bond yields subject to the narrow constraints prescribed by the FASB; it is making no pronouncement with respect to the interest rate that should be used for calculating benefits.  Terry ¶ 159.

*Third*, there are good reasons not to use ASC 715-30 rates for purposes of calculating benefits.  For example, ASC 715-30 mandates a "mark-to-market" approach to setting the interest rate, which values a company's pension liabilities as of a specific date.  Terry ¶ 167.  Because ASC 715-30 rates reflect prevailing interest rates on a single day, they are extremely volatile, rendering them inappropriate for setting or assessing conversion factors.  *Id.*  Indeed, using ASC 715-30 assumptions to calculate conversion factors would result in otherwise similarly situated employees (same years of service, salary, etc.) receiving different benefits based on minor differences in retirement date.  *Id.* ¶ 168; Serota Dep. 314:20–317:6; *see also* Serota I ¶ 97 (noting year-over-year changes in interest rates as high as 22% in FTSE Above Mean AA Index).

In contrast to the novel approach that Serota is "recommending," pension plans routinely rely on U.S. Treasury bond rates in setting or evaluating conversion factors.  Terry ¶ 238; SOF ¶ 122.  IRS guidance endorses plan sponsors' consideration of Treasury (and PBGC) rates for purposes of calculating actuarially equivalent benefits.  SOF ¶ 122.  And prior to 2008, Treasury regulations *mandated* the use of Treasury bond rates for purposes of converting SLA benefits to actuarially equivalent lump sum benefits.  *Id.* ¶ 123.  Indeed, even Serota admits that Treasury

---

[21]  The FASB prescribes the use of high-quality corporate bond rates for this purpose to promote comparability.  Requiring all companies to calculate pension liabilities in a similar fashion enables the market more readily to assess reported information regarding pension liabilities.  Terry ¶ 157.

rates are a "good [place to] start" for calculating conversion factors.  Serota Dep. at 180:9–17.

Serota's recommendation that pension plans use corporate bond rates for purposes of calculating actuarial equivalence is based on his belief that the discount rate used should depend in part on the risk profile of the corporation sponsoring the plan.  Serota Dep. at 205:7–16.  But that approach makes little sense.  For starters, the risk profile of a pension plan's sponsor does not reflect the risk that a plan participant will not receive her benefits.  Corporate bond rates are based on the issuer's unsecured, uninsured promise to pay the holder, while an ERISA pension plan's promise to pay benefits is both secured and insured.  ERISA requires that plans satisfy stringent funding requirements under which contributions to the plan are made to a trust held for the exclusive purpose of paying plan benefits—a system designed to ensure that plans have the ability to pay promised benefits irrespective of the ongoing financial health of their sponsors.  *See* 29 U.S.C. §§ 1082, 1103.  Moreover, pension benefits are (subject to certain limits) guaranteed by PBGC, and thus benefits will be paid even if the corporate sponsor becomes insolvent.  *Id*. § 1301 *et seq.*; *see Thole v. U.S. Bank N.A.*, 140 S. Ct. 1615, 1622 n.2 (2019).  In other words, unlike an unsecured creditor of a company, a retiree has the security of a pension trust as well as insurance coverage by the PBGC.  Thus, if anything, the lower level of risk reflected by U.S. Treasury rates is a better comparator than corporate bond rates such as the FTSE Above Mean AA Index.

Finally, Serota's approach would imply the perverse result that two participants in plans of different employers who accrued identical SLA benefits might receive different JSA benefit amounts based solely on the comparative creditworthiness of the respective corporations that sponsor their plans.  Serota Dep. at 206:24–207:20.  Nothing in ERISA or actuarial practice even suggests (let alone compels) this outcome.

Conversion Factor Age and Origin.  In his report, Serota speculates that the Plan's 0.90

conversion factor was based on a mortality table published in 1971, and suggests that this is *prima facie* evidence that the continued use of the 0.90 factor is unreasonable.  Serota I ¶¶ 12–13.  For at least four reasons, neither Serota's premise nor his conclusion withstands scrutiny.

*First*, at his deposition, Serota admitted that he does not know how the Plan's conversion factor was generated, and that there are other sets of mortality and interest rate assumptions that would likewise result in a 0.90 conversion factor.  Serota Dep. at 152:12–155:10.  Serota thus has no basis for his opinion that the 0.90 factor was originally created using a 1971 mortality table.

*Second*, as Serota admitted, the provenance of the 0.90 conversion factor is irrelevant to the question before the Court.  The Court must determine whether the JSA benefit that Plaintiff is receiving is (at least) actuarially equivalent to the SLA benefit that he earned.  This is an objective inquiry:  if two (relevantly similar) pension plans use the same conversion factor, then that factor either is or is not reasonable, even if the two plans developed the factor using different assumptions.  Indeed, as Serota admits, a conversion factor that results in an actuarially equivalent benefit provides plan participants with everything they are entitled to under ERISA, even if the conversion factor was developed by "throwing darts at a dart board."  *Id.* at 82:19–83:23.

*Third*, from an actuarial standpoint, conversion factors are relatively stable over time, and there is no reason to expect that a conversion factor developed several decades ago would not continue to be reasonable today.  A conversion factor constitutes a *ratio* of the present value of an SLA and the present value of a JSA.  SOF ¶ 23.  Accordingly, as Serota acknowledges, the mere fact that mortality is improving does not imply any change in conversion factors—they may go up, down, or stay the same as mortality improves.  *Id.* ¶ 79.  For the same reason, conversion factors tend to remain stable over time.  Terry ¶¶ 43, 83.  Because a change in mortality affects the present value of both an SLA and a JSA, the change has a muted effect on the conversion factor

—it is reflected in both the factor's numerator and denominator. *Id.* ¶ 85. Serota's own rebuttal report illustrates this point: using a range of mortality tables in place from the 1970s to today, a 50/50 gender blend, and holding interest rates constant, Serota shows that the impact of mortality improvements has only been approximately 1% over the last ~50 years. Serota II Figure 2.

*Fourth*, long-term interest rate trends cut against the suggestion that improvements in mortality over the last 40 or 50 years have resulted in changes in conversion factors. The parties' experts agree that (1) an interest rate assumption is needed in order to develop or benchmark a conversion factor, (2) all else equal, lower interest rates will result in lower conversion factors, and (3) the general trend in interest rates since the 1980s has been downward. SOF ¶¶ 24, 76, 81. For example, U.S. Treasury bond rates ranged from ~14% to ~7% in the 1980s, but from ~4.5% to ~1.5% in the 2010s. *Id.* ¶ 82. As Terry demonstrates, the *combined* impact of mortality and interest rate trends over the past several decades has resulted in extremely stable conversion factors. Terry ¶¶ 86–89. Accordingly, there is no reason to believe that a conversion factor put in place several decades ago does not remain reasonable and appropriate today (or in 2015).

* * *

In sum, because there is no basis on which to conclude that the Plan's 0.90 conversion factor falls outside the range of reasonableness, Defendants are entitled to judgment.

## II.   EVEN IF THE PLAN'S CONVERSION FACTOR IS ANALYZED SOLELY BY REFERENCE TO PLAINTIFF'S ATYPICAL CHARACTERISTICS, PLAINTIFF IS STILL RECEIVING AN ACTUARIALLY EQUIVALENT BENEFIT.

Plaintiff's expert Serota calculates his "preferred" 0.94 conversion factor by reference to an atypical, 55-year-old retiree, based upon the legally erroneous premise that a pension plan may not apply to *all* participants a fixed conversion factor calibrated based on an average or typical plan participant. Even assuming *arguendo* that actuarial equivalence in this case must be judged by reference to Plaintiff's own idiosyncratic characteristics, Defendant's expert Terry has

demonstrated that a 0.90 conversion factor would *still* fall within the range of reasonableness.

The assumptions underlying Terry's principal analysis are set forth in Part I.A above.  For purposes of his alternative analysis, Terry adjusted two of those assumptions.  First, he changed his retirement age assumption to age 55 because Plaintiff was 55 years old when he retired.  Terry ¶ 267.  Second, he changed his participant gender assumption to 100% male (and his beneficiary gender assumption to 100% female) based on the fact the Plaintiff is a male (and his beneficiary is a female).  *Id.*  The "reasonable range" calculated by Terry after making these adjustments was 0.890 to 0.922, which encompasses the Plan's 0.90 conversion factor.  *Id.* ¶ 268.

Serota criticizes Terry's gender blend assumptions, asserting that Plaintiff "is not the only member of the Hourly Plan, and thus using a 100% male gender blend" is inappropriate. Serota II ¶ 128.  But that assertion perfectly illustrates the self-contradictory nature of Serota's and Plaintiff's position.  While it is true that the Plan's participants include both men and women, it is equally true that the Plan's participants include people who retired at age 55, at age 70, and everywhere in between.  Thus, Serota is effectively suggesting that pension plans *must* use a blended mortality table that averages together the disparate mortality experiences of men and women (which is beneficial to Plaintiff), but *cannot* use a blended age assumption that averages together the disparate mortality experiences of participants who retire at different ages (which is not beneficial to Plaintiff).  There is no sound basis for that self-serving approach.

Plaintiff may argue that the Plan is required to use a blended mortality table under the Supreme Court's *Norris* decision, but that argument would be unavailing for two reasons.  *First*, that decision requires only that plans use the same mortality tables for men and women; it does not require the use of a table that averages together male and female mortality.  *Norris*, 463 U.S. at 1084–85.  As Serota concedes, a pension plan complies with *Norris* if it uses an all-male or all-

female table to calculate conversions, as long as it uses same table for all participants—and, unless an all-female table is used, females are disadvantaged by being averaged with males.  Serota Dep. at 229:22–230:2, 230:16–231:25.

*Second*, Serota misapprehends the nature of the benchmarking exercise.  There is no question that the Plan's terms comply with the requirements of *Norris*.  Rather, the relevant question is whether (assuming *arguendo* that pooling is impermissible) Plaintiff is receiving an actuarially equivalent benefit when calculated by reference to his individual characteristics.  Serota does not explain why, for purposes of this assessment, it is necessary to take Plaintiff's age into account and yet impermissible to take Plaintiff's gender into account—nor could he.

In short, because the Plan's 0.90 conversion factor results in an actuarially equivalent benefit when benchmarked by reference to a male who retires at age 55, it is clear that Plaintiff— a male who retired at age 55—is receiving a JSA benefit that is actuarially equivalent to the SLA he earned under the terms of the Plan.

## III.   PLAINTIFF IS RECEIVING A SUBSIDIZED BENEFIT UNDER THE HOURLY PLAN AND THUS HAS NO COGNIZABLE CAUSE OF ACTION.

Plaintiff's claims fail for a yet another, independent reason.  It undisputed that Plaintiff's JSA benefit includes a substantial early retirement subsidy.  Because ERISA protects only Plaintiff's *unsubsidized*, age-65 benefit—and because it is undisputed that the value of the 50% JSA benefit Plaintiff is receiving exceeds the value of the unsubsidized, age-65 benefit he accrued under the terms of the Plan—his claims fail as a matter of law.

ERISA provides that a defined benefit plan's "accrued benefit" is "expressed in the form of an annual benefit commencing at normal retirement age."  *Laurent v. PricewaterhouseCoopers LLP*, 794 F.3d 272, 274 (2d Cir. 2015) (quoting 29 U.S.C. § 1002(23)(A)).  In other words, "an employee's accrued benefit is the amount she would receive annually as an annuity *after she*

*reaches normal retirement age.*"   *Id.* (emphasis added).   Thus, "an accrued benefit is not the amount of pension payment a recipient receives by retiring early, it is the amount of pension payment a recipient achieves at normal retirement age."   *Engers v. AT&T*, 2002 WL 32159586, at *8 (D.N.J. Oct. 17, 2002); *see also* Serota I ¶ 16 & n.3.

ERISA permits plans to provide subsidized benefits that exceed the value of a participant's accrued benefit.   Of relevance here, plans may provide an early retirement subsidy, which is a benefit that starts before normal retirement age and has a greater value than the accrued benefit. 26 C.F.R.  §  1.411(d)-3(g)(6)(v).   In contrast to accrued benefits, ERISA provides only limited protections for subsidized benefits.   For example, plans are permitted to subsidize one form of early retirement benefits without subsidizing other forms of the same benefit.[22]

Under the Hourly Plan, Plaintiff's accrued benefit was an SLA beginning at age 65—not the subsidized SLA benefit that he could have elected to begin receiving at age 55.   SOF ¶ 13.   Of critical importance, the value of the benefit Plaintiff is currently receiving *undisputedly exceeds* the value of Plaintiff's unsubsidized "accrued benefit."   Terry ¶¶ 27, 272–77; Serota Dep. at 72:8– 24.   Indeed, even using *all* of Serota's preferred actuarial assumptions to perform the required comparison, the value of Plaintiff's JSA benefit, calculated using the 0.90 factor, *exceeds by 19%* the value of his accrued benefit.   Terry ¶¶ 27, 276.

Plaintiff does not dispute that the value of the benefit he is receiving exceeds the value of his "normal retirement benefit," *i.e.*, the age-65 SLA that is his "accrued benefit" under the terms of the Hourly Plan.   Serota I ¶ 16 n.3; Serota Dep. Tr., at 72:8–24.   Instead, Plaintiff argues that

---

[22] *Ret. Comm. of DAK Americas LLC v. Brewer*, 867 F.3d 471, 483 (4th Cir. 2017) (confirming that "ERISA plans may opt to subsidize early retirement benefits" in one form "but not when taken in other forms"); 68 Fed. Reg. 70141-01 (Dec. 17, 2003) (similar).

(continued…)

ERISA requires the Plan to provide him with a 50% JSA that is (at least) the actuarial equivalent of the subsidized, age-55 SLA that he earned under the terms of the Plan.[23]  But that is not the law: ERISA protects only the unsubsidized, age-65 benefit that is the Plaintiff's "accrued benefit."

Plaintiff asserts that Raytheon violated ERISA's anti-forfeiture provision, 29 U.S.C. § 1053(a), by providing him with a JSA benefit that is less than the actuarial equivalent of the subsidized SLA benefit he was entitled to at age 55.  Dkt. No. 1, ¶ 126.  By its terms, however, the anti-forfeiture provision "applies only to normal retirement benefits."  *DuBuske v. PepsiCo, Inc*., 2019 WL 4688706, at *3 (S.D.N.Y. Sept. 25, 2019), *vacated on other grounds*, 2019 WL 5864995 (S.D.N.Y. Nov. 8, 2019).  *DuBuske* is on all fours with this case:  There, the plaintiffs alleged that a pension plan's use of fixed conversion factors to convert SLAs into JSAs violated 29 U.S.C. § 1053(a), but the court dismissed the case.  *Id.* at *3–5.  Because the plaintiffs failed to allege that they were "deprived . . . of the full amount of pension payments they would achieve at normal retirement age," they failed to allege a violation of 29 U.S.C. § 1053(a).  *See id.* at *4.

Plaintiff fares no better in arguing that Raytheon violated Section 204 of ERISA.  That section states, in relevant part, that "if an employee's accrued benefit is to be determined as an amount other than an annual benefit commencing at normal retirement age, . . . the employee's accrued benefit . . . shall be the actuarial equivalent of such benefit."  29 U.S.C. § 1054(c)(3).  In other words, Section 204 provides that the benefit a participant receives may not be less than the actuarial equivalent of the participant's accrued benefit; it does not require a comparison of one form of early retirement benefit (such as an SLA) to another form of early retirement benefit (such as a 50% JSA).  Because the value of the benefit that Plaintiff is receiving undisputedly exceeds

---

[23] For the reasons explained in Parts I and II, the value of Plaintiff's JSA benefit *is* actuarially equivalent to the value of the subsidized SLA benefit that he earned under the terms of the Plan.

the value of his accrued benefit, Plaintiff's Section 204 claim fails as a matter of law.

Finally, Plaintiff cannot establish that Defendants violated Section 205 of ERISA.  That provision states that "the accrued benefit payable to [specified] participant[s] shall be provided in the form of a qualified joint and survivor annuity," 29 U.S.C. § 1055(a), and defines "qualified joint and survivor annuity," in relevant part, as "the actuarial equivalent of a single annuity for the life of the participant," *id.* § 1055 (d)(1)(B).  Thus, Section 205 requires only that a participant's JSA benefit be (at least) actuarially equivalent to the participant's "accrued benefit" expressed in the form of an SLA.[24]  That provision is satisfied here because the value of the JSA that Plaintiff is receiving *exceeds* the value of his accrued benefit—*i.e.*, the single life annuity payable to Plaintiff commencing at normal retirement age.

## IV.   ERISA DOES NOT REQUIRE A PENSION PLAN TO UPDATE ACTUARIAL ASSUMPTIONS OR FACTORS IN THE MANNER SUGGESTED BY PLAINTIFF.

Finally, ERISA does not require pension plans to revise a conversion factor each time a participant retires.  Instead, plans have significant latitude and are permitted to adopt conversion factors that will produce reasonable results over longer periods of time.  Because Plaintiff and his expert focus *solely* on the question whether Plaintiff's JSA benefit is actuarially equivalent to the SLA he earned using interest rate and mortality assumptions prevailing at the time of Plaintiff's retirement *in 2015*, he has failed to show that the Plan's 0.90 conversion factor violates ERISA.[25]

---

[24] Section 205 also specifies that, when a pension plan pays a benefit in the form of a *lump sum*, the minimum amount that may be paid is the actuarial equivalent of the JSA. 29 U.S.C. § 1055(g)(1). Regulations interpreting Section 205 make clear that, at a minimum, a lump sum may not be less than the actuarial equivalent, using the specified assumptions, of the normal retirement benefit—the accrued benefit—even when the plan offers early retirement subsidies in other forms. 26 C.F.R. § 1.411(a)-11(a)(2). *See also Rybarczyk v. TRW, Inc.*, 235 F.3d 975, 983 (6th Cir. 2000) (same).  In other words, the lump sum must be based on the JSA, and the lump sum need not include early retirement subsidies, so it is clear that the JSA need not include early retirement subsidies.

[25] Serota suggests that two Actuarial Standards of Practice require the use of actuarial assumptions in place "as of" Plaintiff's benefit commencement date.  Serota ¶¶ 27, 35.  But those standards (i) do not have the (continued…)

*McCarthy v. Dun & Bradstreet Corp.*, 482 F.3d 184 (2d Cir. 2007), is illustrative.  In that case, plaintiffs alleged that a pension plan improperly reduced their benefits by using a too-high interest rate in performing an actuarial calculation.  *Id.* at 206.  The court began by observing that the 6.75% interest rate assumption used by the plan was "not unreasonable," in part, because it was "comparable to the interest rate on thirty-year government securities" in 1995, when the rate was put into the plan.  *Id.* at 205–06.  The court then considered and rejected plaintiffs' argument "that although application of the 6.75 percent discount rate may have been reasonable in 1995, it is not reasonable in today's low interest rate environment."  *Id.*; *see id.* at 206 n.5 (noting a then-current interest rate of 4.9%).  As the court explained, ERISA does not "require that retirement plans periodically adjust their actuarial interest rates" to mirror current conditions.  *Id.* at 206.

*McCarthy* demonstrates why Plaintiff's claims fail.  Nothing in ERISA requires plans to update actuarial assumptions, *e.g.*, annually, based on short-term fluctuations in interest rates (or each time a new mortality table is published).  Rather, plan sponsors have the latitude to adopt and apply conversion factors that are designed to be reasonable over a period of many years—especially since conversion factors tend to be stable over time.  Accordingly, in order to establish that the Plan's conversion factor falls outside the range of reasonableness, it would (at a minimum) be necessary to consider the reasonableness of that conversion factor over time.  Because Plaintiff's expert Serota does not even attempt to do that, and instead focuses myopically on the year 2015, he fails to establish that the Plan's 0.90 conversion factor is unreasonable.

## CONCLUSION

For the reasons explained above, the Court should enter judgment in favor of Defendants.

---

force of law, (ii) by their terms, do not apply to individual benefit calculations like those at issue here, and (iii) do not govern ERISA plan sponsors or enrolled actuaries.  SOF ¶¶ 42–46; Terry ¶¶ 307–08.

Dated: September 4, 2020

Respectfully submitted,

*/s/ Christian J. Pistilli*
Christian J. Pistilli (*pro hac vice*)
Robert Newman (*pro hac vice*)
**COVINGTON & BURLING LLP**
850 Tenth Street, NW
Washington, DC 20001
Tel: (202) 662-6000

James O. Fleckner (BBO # 641494)
Kline C. Moore (BBO # 698365)
**GOODWIN PROCTER LLP**
100 Northern Avenue
Boston, MA 02210
(617) 570-1000

*Attorneys for Defendants Raytheon
Company and Kelly B. Lappin*

## <u>CERTIFICATE OF SERVICE</u>

I, Kline C. Moore, hereby certify that the foregoing Memorandum in Support of Motion for Judgment, filed through the CM/ECF system, will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) on September 4, 2020.

Dated: September 4, 2020                    _/s/ Kline C. Moore_
                                            Kline C. Moore

37