## UNITED STATES DISTRICT COURT
## OF MASSACHUSETTS

Johnny Cruz, on behalf of himself and all others
similarly situated,

Plaintiff,

vs.

Raytheon Company, Kelly B. Lappin, in her
capacity as Plan Administrator for the Raytheon
Company Pension Plan for Hourly Employees,  the
Raytheon Company Pension Plan for Salaried
Employees, the Raytheon Non-Bargaining
Retirement Plan, the Raytheon Bargaining
Retirement Plan, and the Raytheon Retirement Plan
for Engineers & Contractors, Inc. and Aircraft
Credit Employees, and John/Jane Does 1-10.

Defendants.

Civil Action No.:  1:19-cv-11425

SEPTEMBER 4, 2020

# EXHIBIT 10

# UNITED STATES DISTRICT COURT
# OF MASSACHUSETTS

| | |
|---|---|
| Johnny Cruz, on behalf of himself and all others similarly situated,<br><br>    Plaintiff,<br><br>  vs.<br><br>Raytheon Company, Kelly B. Lappin, in her capacity as Plan Administrator for the Raytheon Company Pension Plan for Hourly Employees, the Raytheon Company Pension Plan for Salaried Employees, the Raytheon Non-Bargaining Retirement Plan, the Raytheon Bargaining Retirement Plan, and the Raytheon Retirement Plan for Engineers & Contractors, Inc. and Aircraft Credit Employees, and John/Jane Does 1-10,<br><br>    Defendants. | **Case No.: 1:19-cv-11425-PBS**<br><br><br><br><br><br><br><br><br><br><br><br><br><br>CLASS ACTION |

## Declaration of Mitchell I. Serota

1. My name is Mitchell I. Serota, President of Mitchell I. Serota & Associates, Inc. in Skokie IL. Prior to the establishment of Serota & Associates in 1988, I was Vice President of Alexander & Alexander Consulting Group and Vice President of Johnson & Higgins, Inc., both international consulting actuarial firms.  As a Consulting Actuary, my responsibilities have included meeting with clients, understanding their Human Resource needs and their financial goals and tailoring employee benefits programs to fit their specific circumstances. I also perform pension valuations for United States corporations with domestic or foreign pension plans; analyze and immunize investment portfolios; research markets for asset management and annuity placement;

analyze self-funded group medical and long-term disability programs; value liabilities for post-retirement medical plans; and train and supervise employees. Pension valuations involve estimating the present value of a pension's liabilities, which require the selection of actuarial and demographic assumptions, including mortality and discount rate assumptions. Over the course of my practice, I performed thousands of such valuations.

2.      I earned a Ph. D. from the University of Chicago, Department of History (1976). I also received a Master of Arts from the University of Chicago Division of Social Sciences (1972). I hold two Bachelors of Science from the Massachusetts Institute of Technology, one in Mathematics (1971), and the other in Humanities and Science (1971). I was a Visiting Professor of History and of Business at Carthage College in Kenosha, Wisconsin.

3.      I am a Fellow of the Society of Actuaries and a Member of the American Academy of Actuaries. I am an Enrolled Actuary under ERISA. Over the last decade, I have been an active participant and member of the Pension Committee of the American Academy of Actuaries. The Committee, comprised of two dozen pension actuaries with various perspectives from their client base and geographic location, addresses actuarial issues affecting public and private pension plans, while monitoring federal tax, Pension Benefit Guarantee Corporation ("PBGC"), and other ERISA-related developments. It consults with Congress and relevant regulatory agencies on the effect of regulation on employer pensions and retirement security, and comments on pending legislation and regulations.

4.      For six years, I was a member of the Pension Committee of the Actuarial Standards Board. The Committee constantly reviews the Standards of Practice of the pension sector of the actuarial profession in particular. The Committee publishes Standards of Practice as they relate to setting assumptions and validating methods of valuing and disclosing liabilities and costs of

pension plans. In particular, I was a member of the Committee when it published Actuarial Standards of Practice 4, 6, 27, 34 and 35, some of which are discussed below. All Members of the Academy are bound by the rules set forth by the Actuarial Standards Board. I meet all Qualification Standards necessary to issue all actuarial opinions contained in this report.

5.     For the past 30 years, I have participated in a monthly discussion group, "Retirement Income Planners," (aka "RIPpers") with 18 prominent Employee Benefit attorneys practicing in Chicago.  Our discussions include all aspects of Employee Benefits that may relate to our clients.  The structure of the group encourages the members to speak freely with no embarrassment of opinion or position.  As the only actuary to have been admitted to the group, I have brought insight that the attorney-members would not necessarily have been able to acquire easily and frankly.

6.     A copy of my CV, including publications authored in the previous 10 years, is attached as Exhibit A. A list of the materials I have considered in forming my opinions is attached as Exhibit B. A list of my testimony over the past 4 years is attached as Exhibit C. I am being compensated at the rate of $950 for my study and testimony in this case.  The opinions set forth in this report are informed by my education, my decades of work as a consulting actuary, my work on the Actuarial Standards Board and my participation on the Pension Committee.

## I.  SCOPE AND PURPOSE

7.     I was engaged by the firms of Izard, Kindall and Raabe, LLP and Bailey and Glasser LLP to conduct a review and analysis and present testimony regarding the benefit calculation practices of the Retirement Benefit Plans of Raytheon Company.  For purposes of this report, I have been asked to focus on the pension benefit that was calculated for the plaintiff, Johnny Cruz,

who is a participant in the Raytheon Company Pension Plan for Hourly Employees (the "Hourly Plan").

8.      Mr. Cruz retired in 2015 and took his pension in the form of a Joint and Survivor Annuity (a "JSA"), which pays a fixed monthly amount so long as he is alive, and after his death will pay a percentage of that amount (in Cruz's case, 50%) to his spouse.  I have been asked to analyze whether the amount of Mr. Cruz's JSA is "actuarially equivalent" to the single-life annuity ("SLA") that he could have chosen when he retired.  Two benefits are actuarially equivalent when the present values represented by their cash flow streams are equal.

9.      I have also been asked to calculate the difference between Mr. Cruz's monthly benefit and the amount of a JSA that *was* actuarially equivalent to the SLA he could have selected, and, based on that calculation, to determine the dollar amount of the shortfall in Mr. Cruz's benefits to date and the present value of the future benefits Mr. Cruz would be losing based on the Plan's benefits calculation.

## II.  SUMMARY OF CONCLUSIONS

10.      To calculate the benefit that Mr. Cruz would receive each month based on his selection of a 50% JSA, the Plan Administrator used a set formula to convert an SLA to a 50% JSA for the specific purpose of offering Mr. Cruz and his spouse an optional form of benefit.  The formula multiplied his SLA by a percentage, referred to as a "Conversion Factor."  The Hourly Plan's Conversion Factors were set out in the Plan Document to establish a "definitely determinable" benefit, as required by Section 401(a)(25) of the Tax Code.  However, ERISA further requires that a JSA be at least the "actuarial equivalent" of an SLA, and Mr. Cruz' JSA is not.  Using actuarial assumptions that were reasonable on the date Mr. Cruz's benefits were calculated, the present value of Mr. Cruz's 50% JSA is less than the present value of the SLA he

4

could have chosen.  Accordingly, the Conversion Factor specified in the Plan Document for the 50% JSA was too low.

11.     In the case of Mr. Cruz, the Plan Administrator multiplied the amount of the SLA he was entitled to receive on the date his benefits commenced (the "Benefit Commencement Date" or "BCD") by .899583. (For the sake of simplicity, I will refer to this factor as the ".90 Conversion Factor.")  This ".90 Conversion Factor" generated a monthly benefit for Mr. Cruz that is less valuable than the SLA that was available at Mr. Cruz's BCD.  That is, the present value of Mr. Cruz's 50% JSA in 2015, when he retired, was less than the present value of the SLA he could have chosen at that time, based on actuarial assumptions that were reasonable on his BCD.

12.     I have not seen any documents that provide the basis for the Hourly Plan's .90 Conversion Factor, and Raytheon has apparently indicated that it has not been able to find documents that show how the Conversion Factor was originally determined when it was inserted in the Plan Document.[1]  However, reverse engineering the .90 Conversion Factor, it appears to be the product of (or at least consistent with) actuarial assumptions that might have plausibly been used 40 years ago.  In particular, the benefits Mr. Cruz is receiving using the Plan's Conversion Factor ($1,021.33) are very close to the $1,021.13 monthly benefit that would result from calculating actuarial equivalence using the 1971 Group Annuity Mortality Table (with the male table used for participants and the female table used for beneficiaries), coupled with a discount rate of 5%.[2]

---

[1] Jan. 17, 2020 email from Christian Pistilli to Robert Izard.

[2] The Plan administrator slightly reduced the .90 Conversion Factor when calculating Mr. Cruz's monthly benefit to account for the difference between his age and the age of his wife.  The Plan decreases the Conversion Factor by 1/24th of 1% for each month by which the participant's age exceeds the beneficiary's age.  For comparison purposes, I have modified the Conversion Factor that would result from using the 1971 GAM and 5% interest rate by the same percentage.

13.     The 1971 Group Annuity Mortality Table (the "1971 GAM") was based on mortality experience measured in the 1960s.  As such, the 1971 GAM would not be reasonable for calculating Mr. Cruz's optional forms of benefit in 2015 because it does not reflect recent mortality experience or improvements in longevity, particularly improvements in life expectancy for retirees, that have occurred over the past 40-50 years. To generate a Conversion Factor of .90 for a 50% JSA using **modern** mortality assumptions rather than the 1971 GAM, an actuary would have to use assumptions about discount rates that are as unrealistic as the mortality assumptions in the 1971 GAM.

14.     If Mr. Cruz were receiving the actuarial equivalent of the SLA he could have chosen when he retired, one whose present value was equal to the present value of the original SLA, he would be receiving an additional $44.58 each month.  Instead, the Plan is keeping that money, which reduces Raytheon's future funding obligations, once the reduced benefit was accepted by the retiring participant.

### III.   BACKGROUND

#### A.      Accrual of Pension Benefits and How They Are Paid Out to Retirees

15.     A defined benefit plan has historically provided plan participants with annuities at retirement.  An annuity, in the context of a Qualified Pension Plan under ERISA, is fundamentally a monthly stream of payments for life. The amount of each payment may be calculated according to the provisions of the formula contained in the plan document.  The monthly amount is thus a benefit "defined" by the terms of the plan using an arithmetic formula which will produce exactly one result. Most often, this monthly payment is an annuity over the lifetime of the retiree, starting at a pre-determined Normal Retirement Age, again, defined in the plan document.

16.    The Hourly Plan's "defined benefit" is a single life annuity ("SLA") for the participant starting at age 65, which is called the "Normal Retirement Pension."[3]

17.    Participants in the Hourly Plan can begin receiving their pension benefits as early as age 55 or after age 65 if they are still working for Raytheon.[4]  When a retiree retires at an age other than 65, the Hourly Plan adjusts the participant's Normal Retirement Pension depending on the retiree's age when the retiree begins receiving benefits.[5]  Thus, the SLA that the retiree earned at the time he retires, the BCD, is the benefit from which the optional forms described below are based.

**B.        Options Available to Retirees**

18.    At retirement, a retiree is not required to receive payments as an SLA. There are choices available to meet the financial needs of the retiree. In lieu of an SLA, the retiree may elect to have the benefit paid as a JSA.  Because a JSA is payable over two lifetimes instead of one, the monthly benefit is reduced to account for that fact.

19.    JSAs are stated as a percentage of the benefit payable during the retiree and spouse's joint lives (i.e., when they are both are alive) that the spouse will receive after the retiree's death.  A JSA that pays the surviving spouse 50% of the monthly benefit payable while the retiree lives is a 50% JSA.

20.    The Hourly Plan offers JSAs in percentages of 50%, 66-2/3%, 75% and 100%.[6] While a plan can offer multiple JSAs, ERISA requires that a plan designate one as its "qualified

---

[3] Plan Document at § 6.1, RTN-Cruz-00001030.  Under ERISA, the Normal Retirement Pension is the Hourly Plan's "accrued benefit."  ERISA § 3(23)(A), 29 U.S.C. § 1002(23)(A).

[4] Plan Document at § 6.2, RTN-Cruz-00001031.

[5] Plan Document at §§ 6.1, 6.2 and 9.1, RTN-Cruz-00001030, 31 and 46.

[6] Plan Document at § 7.2, RTN-Cruz-00001040.

joint and survivor annuity" (a "QJSA"), which means it is the default form of benefit for married retirees.[7]  A plan's QJSA must be actuarially equivalent to the SLA that the retiree had earned when he retired because it must be "as least as valuable as any other optional form of benefit payable at the same time."[8]  The Hourly Plan's QJSA is a 50% JSA.[9]  Mr. Cruz selected the QJSA.

21.     The Hourly Plan Administrator calculates its 50% JSA by multiplying the SLA that the retiree earned as of BCD by the .90 Conversion Factor.[10]  The Hourly Plan also applies an "Adjustment Factor" which increases or decreases the .90 Conversion Factor for each month that the retiree's spouse is younger or older than the retiree.[11]  The .90 Conversion Factor and the Adjustment Factor for the 50% JSA are set out in the Plan document, as required Section 401(a)(25) of the Tax Code, in order to ensure that the benefit amount is "definitely determinable" and not subject to employer discretion.  The same formulae are used for all participants and beneficiaries.

22.     When Mr. Cruz started receiving benefits on November 1, 2015, he was informed that he could take it in the form of an SLA paying $1,135.34 per month or alternative payment forms that paid different amounts.  The 50% JSA that he selected paid $1,021.33 per month.[12] Even though the dollar value of the JSA is less than the dollar value of the SLA he could have taken, they can be actuarially equivalent if their present values are the same at the time they were

---

[7] ERISA §§ 205(a) and (c), 29 U.S.C. § 1055(a) and (c).

[8] ERISA § 205(d), 29 U.S.C. § 1055(d).

[9] Plan Document at § 6.5, RTN-Cruz-00001032.

[10] Plan Document at §§ 6.5 and 7.2, RTN-Cruz-00001032 and 1040.

[11] The Hourly Plan calculates the 66 and 2/3% JSA, the 75% JSA and the 100% JSAs using the same basic methodology but with different conversion factors and adjustment factors.

[12] RTN-Cruz-00000965

calculated.[13]  In order to determine whether Mr. Cruz's 50% JSA benefit is actuarially equivalent to the SLA available at BCD, we must calculate and compare the "present value" of each benefit.

23.     As will be discussed in more depth below, present value calculations require actuarial assumptions involving mortality rates (to show the probabilities that the monthly payments under each benefit type will indeed be made) as well as a discount rate to account for the time value of money of each future payment.[14]  The Hourly Plan does not state the actuarial assumptions used for benefit conversion, but rather uses set factors detailed within the Plan.[15] Using unreasonable actuarial assumptions (or unreasonable plan conversion factors) in a present value calculation results in false equivalence – benefit options that the ***administrator declares*** to be actuarially equivalent by following the instructions in the plan document but are not really financially equivalent in the market as it existed when Mr. Cruz made his selection.  Here, the Hourly Plan's .90 Conversion Factor generates benefits that are not actuarially equivalent, because, as I will demonstrate, the present value of Mr. Cruz's QJSA was considerably less than the present value of the SLA Mr. Cruz could have selected when the two benefits are compared using reasonable actuarial assumptions.  In fact, the Hourly Plan's .90 Conversion Factor appears to be

---

[13] Jeff L. Schwartzmann & Ralph Garfield, Education & Examination Comm. of the Society of Actuaries, Actuarially Equivalent Benefits 1, EA1–24–91 (1991)) ("Schwartzman & Garfield"), at 1.

[14] Schwartzmann & Garfield at 11.

[15] The Hourly Plan's definition of "Actuarial Equivalent" uses the UP-84 mortality table and the interest rates used by the Pension Benefit Guaranty Corporation for converting immediate and deferred annuities into a single lump sum payment.  The plan does not use those assumptions to convert SLAs into JSAs, using fixed Conversion Factors instead.  Plan Document at §§ 1.2(a) and 7.2, RTN-Cruz-00001012 and 1040.  Nor does it appear likely that the Plan's Conversion Factors were based on the UP-84 mortality table.  In the case of Mr. Cruz, for instance, the UP-84 mortality table would only generate a .90 conversion factor is if it were coupled with an unrealistically low discount rate of 1.75 percent.

based on actuarial assumptions from forty to fifty years ago that have not been reasonable for decades.

## IV.     THE CONCEPT OF PRESENT VALUE

24.     Present value calculations are used for many purposes and are routinely used by accountants and economists to reduce a discounted cash flow into a single number.   The methodology used to perform present value calculations is a standard and fundamental tool for actuaries.   Whereas economists and accountants generally compute discounted cash flows using discount rates alone, actuaries combine the concept of contingencies in their calculations. That is, instead of observing a stream of payments, actuaries build into their models assumptions about the likelihood that a given payment will actually have to be made.   In the case of pension plans, the plan trust pays only when the plan participant retires and, in the case of a Single Life Annuity, lives to continue receiving benefits.   The cash flow stops when the Plan has met its obligations to pay.   This is not at all to say that the cash flow stops at life expectancy—not hardly. Actuaries build in the probability that the retiree will remain alive at a future point in time. Thus, when measuring the present value of a single retiree's pension benefits or the present value of the pension benefits of *all* participants in a plan, present value represents the sum of the stream of payments, discounted by an interest factor while  incorporating the likelihood that any given payment might ever be paid.   I examine each of these concepts, the discount and the likelihood of payment, separately, before combining them to show their interaction.

### A.  Discount Rates

25.     The discounting mechanism of present value equates a future payment to its current value if the cash were available at a given determined time.   As long as interest rates are greater than 0%, a future payment is not worth as much to a recipient as a current payment.   The further in the future the payment, the less it is worth to the recipient.

26.     As an example, if a contract were to provide payments of $1,000 each, on the first day of the contract and every anniversary thereof for four years, the total outlay of the contract would be $5,000, because the contract provides for five payments of $1,000 each.  The present value of each payment, however, is dependent on a prevailing interest rate, in this case for a five-year period. For the sake of simplicity, let us say the prevailing interest rate is 5.00%.  The present value of the first payment would be $1,000, because there is no delay in its payment; it is due when the contract is executed.  The second payment, which would be paid one year from the execution, is worth less than $1,000 because it does not have to be paid immediately.  At a 5.00% discount rate, the present value of the second payment is only $952.38.  That is because if the party who owed money under the contract had invested $952.38 for one year at 5%, he or she would have $1,000 at the end of the year.  Similarly, the present value of the third $1,000 payment would be $907.03 because that amount, if invested at 5.00% compounded annually, would grow to $1,000 after two years. Using the same logic, the present value of the fourth payment is $863.84 and the present value of the fifth and final payment is $822.70.  The sum of the present value of the five payments is $4,545.95.

27.     The standards for determining discount rates are set forth in Actuarial Standards of Practice #27 ("ASOP 27"). ASOP 27 requires that discount rate assumptions be "reasonable" and account for "historical and current economic data that is relevant as of the measurement date."  *See* ASOP 27, § 3.6.

28.     A discount rate may be a single rate or a series of rates, such as a yield curve.  In the above example, the 5% discount rate is a single rate.  In contrast, a yield curve provides different discount rates depending on when the payments are due, or the "yield" will be earned, often at one-year or half-year intervals.  For example, a yield curve may use a 2% rate to discount

the payment due in one year and a 5% rate to discount the last payment. One of the most commonly-used sources of yield curves is the FTSE Discount Curve and Liability Index. Every month, the FTSE updates its yield curve. The end-user may choose a composite, or blend, of the entire curve or may select a composite based on the anticipated length of the payout stream. https://www.soa.org/sections/retirement/ftse-pension-discount-curve/

29.    Some actuarial consulting firms calculate their own yield curves based on the expected investment return of the bond portfolios which might be in the pension trust. Under the caption, "Market-Consistent Measurements," ASOP 27 states in paragraph 3.9,

> "In some instances, that discount rate may be approximated by market yields for a hypothetical bond portfolio whose cash flows reasonably match the pattern of benefits expected to be paid in the future. The type and quality of bonds in the hypothetical portfolio may depend on the particular type of market-consistent measurement."

30.    The Internal Revenue Service and the Pension Benefit Guaranty Corporation also publish "segment rates" which divide the stream of payments into periods of 0 to 5 years, 5 to 20 years and beyond 20 years based on market-interest rates for payments with maturities of those durations. In other words, payments for the first 5 years are discounted using one interest rate, payments for next 15 years will be discounted using another rate, and payments after 20 years at a third rate.

31.    For purposes of financial disclosure in audited financial statements such as those filed with the SEC with Form 10-k, companies determine the appropriate rate (or rates) to be used, often in consultation with investment analysts, actuaries and accountants, to discount the future payments expected to be made under a pension plan and compress the future cash flow into a present value. The most common sources of information for determining a discounting pattern for a given year are the FTSE published numbers, an independently derived yield curve based on the

plan sponsor's circumstances or an independently derived hypothetical bond portfolio with bonds whose payment stream (from coupons and maturity) matches when the future payments are due. Pension consultants often use the discount rates of high-grade corporate bonds to determine the present value of future pension payments. Bonds with durations that match (or closely track) the timing of projected future pension payments are used to calculate the present value of those future payments. For example, the interest rate for a bond with a 20-year maturity may be used to calculate the value of a pension payment expected to be made in 20 years. All are recognized by ASOP 27 as "market-consistent" and reasonable methods. While the discount rates will vary somewhat based on the selected method, the differences between reasonable rate assumptions are likely to be small.

### B. Mortality tables

32.     Actuaries consider the likelihood of an event happening (or not happening) when they compute the time value of an annuity contract. In the familiar case of life insurance, the actuary considers the likelihood that the named beneficiary would die in order that the estate would collect the payment in the future. In contrast, in the case of a retirement plan annuity, the actuary considers the likelihood that the retiree will still be alive (or did not die) to collect each future payment. The source of information used to calculate the retiree's likelihood of survival is known as a mortality table.

33.     Mortality tables have been in existence for a few hundred years, one even attributable to the British astronomer Edmund Halley (the same gentleman after whom a famous comet was named). Mortality tables have been updated over the centuries to account for improvements in data quality and in statistical modeling. However, changes in sanitation, diet,

13

medicine and general lifestyle for U.S. residents have had an even greater impact on the probabilities contained in mortality tables, especially in the last century.

34.     In order to keep pace with these changes, life insurance companies routinely change their mortality tables. The Retirement Plans Experience Committee ("RPEC") of the Society of Actuaries has, in 2019, taken upon itself to update mortality tables every five years for retirees receiving benefits.  In the past, however, there were larger gaps between updates. When new tables were promulgated, pension plans experienced large upward shifts in their liabilities because the new tables showed that people on average are living longer, and thus a plan could expect to make monthly payments to each retiree for a longer period of time.

35.     The selection of mortality tables are governed by Actuarial Standards of Practice #35 ("ASOP 35"). In particular, paragraph 3.3.5 requires that the actuary select a reasonable actuarial assumption. Similarly, to account for the anticipated improvement in mortality rates between the promulgation of new mortality tables, paragraph 3.5.3 directs the actuary to "reflect the effect of mortality improvement both before and after the measurement date."

36.     Modifications of the most recent RPEC mortality tables, published in 2014 and in 2019, are permitted and encouraged for large plan sponsors that can demonstrate a measurably different likelihood of death for its employees and retirees.  Thus, a very large plan sponsor, whose actuary can meet the criteria of a "credible" population from which to modify a mortality table, can use its own calculated experience differential relative to one of the Society of Actuaries tables.

37.     When ERISA first came into effect in 1976, there were three tables that were commonly used for administering and valuing pension plans:

> 1951 Group Annuity Mortality Table (for males and females, based on data from 1946 to 1950)

> 1971 Group Annuity Mortality Table (for males and females, based on 1964-68 data)

14

1984 Unisex Pension Mortality Table (a table blending male and female rates, based on data from 1965 to 1970)[16]

38.     Since then, a number of new tables have been adopted, including the 1983 Group Annuity Mortality ("GAM") table, the 1994 Group Annuity Reserving ("GAR") table, the RP-2000 table, the RP-2014 table and most recently, the PRI-2012 table, which was released in 2019. The tables subsequent to the UP-84 table were built on statistical surveys that showed pronounced advancements in the longevity of the American populace.  Sources for the surveys included insurance companies, private pension plans, some public pension plans and Social Security Administration.

39.     The Internal Revenue Service has been mandating applicable mortality tables as a response to the Revenue Protection Act of 1994 (Revenue Ruling 95-6) and the introduction of Section 417(e) of the Internal Revenue Code. The IRS has attempted to reflect the improvement in mortality (that is, lower expectation of mortality) as new tables are published. For example, the Secretary designated the 1983 GAM, blended 50% male, 50% female as the Applicable Mortality Table in Revenue Ruling 95-6.  Similarly, he designated the 1994 GAR, blended 50/50 in Revenue Ruling 2001-62. In Revenue Ruling 2007-67, he designated the RP-2000, again blended 50/50, but with a projection to anticipate future mortality improvements. Since 2008, he has issued a new table annually.  Beginning in 2018, the Applicable Mortality Table is based on the RP-2014 base mortality table with an MP mortality improvement scale, blended 50/50 as customary.

40.     The following chart shows the change in life expectancies of a 65-year old over the last 40 years as newer mortality tables have been published.  The mortality tables are blended to represent a group that is 50% male and 50% female.

---

[16] Contrary to what its name suggests, the UP-84 table was published in 1976.

| Mortality table | Life Expectancy of a 65-year old participant |
|---|---|
| 1971 Group Annuity Mortality Table | 16.994019 |
| Applicable mortality table per Revenue Ruling 95-6 | 18.743578 |
| Applicable mortality table per Revenue Ruling 2001-62 | 19.395289 |
| Applicable mortality table per Revenue Ruling 2007-67 | 19.752266 |
| Applicable mortality table 2019 | 21.389950 |

41.     Actuaries employ life expectancy calculations to provide a quick mechanism to compare mortality tables. The table above shows that a 65-year old person can expect to live 4 more years in 2019 than he/she could expect when the 71GAM table was published.  Indeed, as I shall discuss later, corporations are reflecting improvements in mortality when they issue their annual financial statements; Raytheon has not reflected these improvements when making calculations for retirement benefit options.

### C.  Combining Discount Rates and Mortality Rates

42.     Before addressing the impact of the more modern tables published by the RPEC, let us first revisit the previous example of discounting future payment streams.  We now consider the contingency concept, represented by a mortality table, and how the methodology of computing present value had to evolve from simply using discount rates.  To keep this example simple, let us assume a constant discount rate of 5% and a constant likelihood of the retiree dying of 1.00% per year.   (The use of a flat discount rate of 5% to discount payments and the assumption of a constant probability of continued life with no attachment to an age may be simple, but not realistic.)

43.     To illustrate, consider the likelihood that the retiree will be alive after one year, two years, three years and four years and to apply the discount rate for one year, two years, three years

and four years as appropriate. In this example, the likelihood that the contract holder will live one

year is 99%; two years, 98.01%; three years 97.03% and four years, 96.06%.  The following chart

shows how this works:

| (a) | (b) | (c) | (d) = (b) x (c) |
|---|---|---|---|
| Year | 5.00% discount rate | 99% probability of life | Present Value with contingency |
| 0 | $1,000.00 | 1.0000 | $1,000.00 |
| 1 | 952.38 | 0.9900 | 942.86 |
| 2 | 907.03 | 0.9801 | 888.98 |
| 3 | 863.84 | 0.9703 | 838.18 |
| 4 | 822.70 | 0.9606 | 790.28 |
| Total | $4,545.95 | 4.9010 | $4,460.30 |

44.     Column (b) summarizes the effect of the 5% discount rate over 5 annual payments.

Column (c) introduces the contingency of living and the 1% annual probability of death discussed

above. Column (d) shows the interaction of the time value of money in Column (b) and the

probability that the money will not be paid unless a contingency (the 99% probability of continued

life) is met in Column (c).  Column (d) demonstrates the interim steps on how an annuity is

calculated. In our example, we are calculating a "temporary single life annuity for five years."

45.     The sum of column (c) is in effect a calculation of a life expectancy, within the

restriction of a five-year period.  However, the use of "life expectancies" for these computations

is expressly forbidden by ASOP  34[17] because life expectancies imply is that a person will

invariably live to the age of the life expectancy and then certainly die the next day. There is no

interplay between a life expectancy and a discount rate the way there is between a mortality table

and a discount rate pursuant to accepted actuarial standards. As shown in the table, life

---

[17] Actuarial Standard of Practice 34, §3.3.5. "The actuary should not determine a life expectancy from the chosen mortality table and then compute the value of an annuity certain for a term equal to that life expectancy, as it may produce materially inaccurate results."

expectancies are calculated by discounting with a mortality table and a 0% discount rate.  In the above example, using a "life expectancy" of 4.9010 years, the value of the contract would be $4,460.30 at 5%.  Under some circumstances, it may be used as an approximation of present value, but by ignoring the interplay between the mortality and discount rates, it is simply inexact, which is why the Academy eschews using life expectancies in conjunction with discount rates.

46.     To recap, a present value is a discounted cash flow.  A pension annuity value is a discounted cash flow which incorporates the likelihood of payments being made over the course of a person's life.  Annuities can begin to be paid immediately, such as those offered at retirement or they can be deferred into the future (e.g., payments would not begin until a person reaches a given age).  They can be paid for the duration of someone's life or only for a limited time.  They can be paid over the course of a single person's life or over multiple people's lives.  They can be designed to change the monthly payment at the time of someone's death.  In the situation at hand, we are comparing an annuity that would be payable over one person's life, a single life annuity (SLA), with an annuity that reduces its value by half at the time of the death of the retiree if the spouse is still alive, a joint and 50% survivor annuity (JSA).  To be actuarially equivalent, the discounted value of the SLA is equal to the discounted value of the JSA.  But the discounting mechanism varies not only by interest rate, but also by the mortality table.  Using an antiquated mortality table for determining actuarial equivalence of optional payment forms is a distortion of the market place.  As such, a retiree who selects a JSA under the impression that the benefits he is to receive are actuarially equivalent to the benefits payable as an SLA suffers damages.

47.     An annuity value for an SLA is a number meant to show the discounted value of $1 per year, payable over the life of a retiree. To be precise, the retiree is receiving 1/12 of the $1 each month at the beginning of the month. The following chart shows how the use of the different

mortality tables shown in paragraph 40 above changes the annuity values for a 65-year-old, assuming a constant 5% discount rate:

| Mortality table | Annuity value of a 65-year old participant, @ 5.0% |
|---|---|
| 1971 Group Annuity Mortality Table | 10.790101 |
| Applicable mortality table per Revenue Ruling 95-6 | 11.533987 |
| Applicable mortality table per Revenue Ruling 2001-62 | 11.794088 |
| Applicable mortality table per Revenue Ruling 2007-67 | 11.979399 |
| Applicable mortality table 2019 | 12.600373 |

48.     As the chart demonstrates, the increase in life expectancy for a 65-year-old reflected in the updates to mortality tables from the year that the 1971 GAM was introduced means that use of more recent mortality tables causes annuity values to increase 16.7 percent (with discount rates held constant).  I will focus in on this increase in annuity values because it drives the damages from using antiquated mortality tables when the Plan Administrator converts from an SLA to an optional form of benefit.

**D.  Relevance of Discount Rates and Mortality Tables to this Complaint**

49.     When participants in a defined benefit plan retire, they can receive their pension in a variety of forms.  But, to be actuarially equivalent, the present value of each option must be equal to the value of the normal form of benefit at the Benefit Commencement Date. The condition that must be met is that, no matter which optional form is selected, the present value of the optional form, when the life contingency is factored in, is equal to the present value of the Normal Form of benefit promised in the Plan Document.  In the simple example above with the 5 annual payments of $1,000, the contract was valued at $4,460.30 to provide $5,000.00 to the recipient over five

years.  Any adjustment of the amounts that might be paid at an earlier or later date (e.g., making a $2,000 payment in Year 2) would be considered equivalent as long as the sum of the present values of the payments equals $4,460.30.  The same is true in the retirement plan context.  Each participant's pension has a present value.  While a plan may provide participants different ways to receive their pension, the payment stream under every option should have the same present value.

50.     In a nutshell, at retirement, the Plan Administrator computes the present value of the promised benefit, using the Normal Form of payment.  The Plan Administrator then offers the prospective retiree a variety of options that allow him or her to choose a different monthly payment amount with a form of payout pattern different from the SLA, the form in which the participant earned his pension.

51.     All of the optional forms mitigate the risk of the retiree receiving his or her benefit over his or her life alone.  By spreading the risk, the retiree is in effect paying for the reduction in risk by having a reduced monthly benefit.  The risk mitigation is built into the payout pattern, the "cost" of which reduces the monthly benefits that a participant receives. The most consequential optional form is a Qualified Joint and Survivor Annuity ("QJSA"), which is offered to any married participant in order to protect the interest of the spouse.

52.     A joint and survivor annuity allows the participant to select a survivor, usually the spouse, to continue to receive a portion of the monthly benefit in the event that the retiree dies before the beneficiary.  The Hourly Plan provides choices of providing the survivor with 50%, 66-2/3%, 75% or 100% of the amount the retiree had been receiving before death.  For the joint and survivor options, the retiree is extending the duration of their payments across a second life (e.g., the spouse) in case the retiree dies first.  To pay for the mitigation of risk in the form of extended

payments, the monthly amount of the participant's Joint and Survivor Annuity is lower than the Single Life Annuity the participant could have received instead.

53.     No matter what assumptions are used, the following relationships exist between all options.  First, in computing the present value of a Single Life Annuity at age x, payable annually at the beginning of the year, we use the following formula:

$$\ddot{a}_x \ = \ \sum_{t=0}^{\omega-x} v^t \ _tp_x$$

Where $\ddot{a}_x$ is an annuity payable at the beginning at the Benefit Commencement Date

$i$ is the discount rate,

v is the reciprocal of 1 plus the discount rate:

$$v = 1/(1+i)$$

$v^t$ is the value of \$1 discounted t years into the future

$_tp_x$ is the probability that the person aged x will live t years into the future

ω is the maximum age on the mortality table, that is, where the probability of death is certainty.

54.     These benefits are payable monthly, at the beginning of each month.  The formula is adjusted to take account that benefits are being paid monthly rather than annually.  Next, we multiply that factor by the benefit in order to arrive at the present value of the liability of the benefit.

55.     The basic concept for computing an actuarial equivalent is that the present value of the Normal Form be equal to the present value of the optional form of benefit.  If the Normal Form is a Single Life Annuity, with the symbol $\ddot{a}_x$ as above, then the formula is:

Benefit$_{Normal\ Form}$ * $\ddot{a}_x$ = Benefit$_{Optional\ Form}$ * $\ddot{a}_{Optional Form}$

56.     The Conversion Factor (CF) is the ratio of the present value of the Normal Form of annuity to the present value of the Optional Form of annuity.  For example, a Conversion Factor of .90 would mean that Optional Form's monthly payment would be 90% of the Normal Form's monthly payment.  The Plan Administrator multiplies the monthly dollar amount of the Normal Form of benefit by the Conversion Factor to arrive at the monthly dollar amount of the optional form.

57.     The formulae for computing Conversion Factors for a specific option do not change, irrespective of the discount rate or the mortality table.   For example, to compute, say, a joint and 100% survivor benefit, we use the following ratio:

$$CF = \frac{\ddot{a}_x}{\ddot{a}_x + \ddot{a}_y - \ddot{a}_{xy}}$$

Where $\ddot{a}_x$ is the present value of a Single Life Annuity at age x, the age of the retiree

$\ddot{a}_y$ is the present value of a Single Life Annuity at age y, the age of the beneficiary

$\ddot{a}_{xy}$ is the present value of a two-life annuity at age x for the retiree and y for the beneficiary.

These formulae may be modified as needed to calculate other optional forms.   For instance, the computation of a Conversion Factor (CF) for a joint and 50% survivor benefit would be:

$$CF = \frac{\ddot{a}_x}{\ddot{a}_x + .5 * (\ddot{a}_y - \ddot{a}_{xy})}$$

58.     These formulae drive the determination of the values of the benefit options for the plan participants when they retire.  The change of mortality table, as we have established, recognizes the increase in life expectancy or longevity and increases the annuity values to account for the increased longevity of the population.  Thus, every annuity value in the formulae above

22

increases. Ultimately it is the change in the ratios above that determine the changes in the values of the benefit options, not just that the annuity values are increasing.

59.     The crucial concept underpinning Mr. Cruz's claim is the effect that changing mortality rates should have had on the Conversion Factors (CF) used to calculate his JSA.  As we showed in the table which compared the increase in longevity reflected in mortality tables from 1976 to 2019, the present value of a Single Life Annuity, expressed as an "annuity value," has increased significantly over time.  As a result, a fixed conversion factor that might have reflected actuarial equivalence decades ago is unlikely to generate actuarially equivalent benefits today.

60.     We see that here.  The Hourly Plan's .90 Conversion Factor might have generated benefit calculations for JSAs that were actuarially equivalent if it had been used back in the 1970s, when life expectancy was lower and discount rates were higher.  Indeed, as discussed above, it appears likely that the 0.9 conversion factor was based on the 1971 GAM with a 5% discount rate – a set of actuarial assumptions that were not uncommon a few decades ago.  However, when Mr. Cruz retired in 2015, the .90 Conversion Factor was inconsistent with mortality and discount rate assumptions that an actuary would have considered to be reasonable, and as a result, the .90 Conversion Factor generated benefit payments that were less than the actuarial equivalent of the SLA at Benefit Commencement Date.

## V.    HOW CHANGING ASSUMPTIONS CHANGE CONVERSION FACTORS

61.     As discussed in the previous section, when the retiree elects a benefit option different from a Single Life Annuity, the amount of the benefit is modified by the Conversion Factor to account for the mitigation of the risk of extending the benefit payments beyond what would be the case for a Single Life Annuity.

62.     JSA conversion factors require consideration of the mortality of both the plan participant/retiree and his or her beneficiary.  Generally speaking, if discount rates and beneficiary mortality rates are held constant and mortality rates for retirees decline – that is, if retirees live longer – the conversion factor would increase and the monthly benefit under the JSA would increase.  This is because, if the participant is expected to live longer, the expectation of the survivor beginning to receive a benefit upon the death of the principal is pushed further into the future. As payments are pushed further into the future, the present value of the survivor payments is reduced. If the present value of the survivor payments is reduced, then the cost to extend the benefit payments of the annuity over two lives is reduced.  If the risk of the participant dying is reduced, the cost of mitigating that risk by extending the payment to a second life is also reduced, and therefore the Conversion Factor, which reflects the ratio of the Single Life annuity to the Joint and Survivor annuity, increases.  And, as the Conversion Factor increases, the amount of the monthly Joint and Survivor annuity payment increases compared to the amount of the Single Life Annuity alone.

63.     Conversely, if discount rates and *retiree* mortality rates are held constant and beneficiary mortality rates improve (reflecting greater life expectancy among the beneficiary population), the conversion factor would go down.  This is because the value of the survivor benefit would go up to reflect the longevity of the beneficiary.  As a result the present value of the income stream of the joint and survivor annuity increases and the conversion factor decreases.  Generally speaking, the effect on the conversion factor of changing the mortality table for the retiree is more pronounced that that for the beneficiary.

64.     In practice, the only difference between the mortality tables used for retirees and beneficiaries when calculating the present value of a JSA relates to gender.  As will be discussed

24

below, conversion factors must be calculated using unisex mortality tables.  That is, plans do not calculate the benefits of male retirees using a male mortality table and calculate the benefits of female retirees using a female mortality table.  Instead, plans must use the same mortality table for all retirees regardless of gender.  While most standard unisex tables assume an even blend of male and female retirees, however, plans can use different gender blends that reflect their retiree population.

65.     Interest rates, of course, have not remained static over time and assumptions about discount rates also impact present value calculations and Conversion Factors.  Interest rates have been lower over the past decade than they were 40 or 50 years ago.  In looking at discount rates, the salient feature is the value of payments into the future.  The further the payment is in the future, the less its value.   Joint and Survivor Annuity payments are made over two lives and therefore have a higher likelihood of extending further into the future than they would if just one life was under consideration.  Higher discount rates cause these payments to be more heavily discounted (less valuable) and therefore the risk mitigation charge is lower. Put in a different way, if we hold mortality rates constant, a higher discount rate increases the Conversion Factor and, thus, the monthly benefit payments under a JSA.   Conversely, lower discount rates mean the payments are not discounted as much, so the cost of mitigating the risk of extended benefits from adding the second life is greater, which would decrease the Conversion Factor and lower the JSA monthly benefit payment.

66.     In the case where the change of an assumption is causing the conversion factors to increase while another assumption change is causing them to decrease, the Conversion Factor will rise or fall depending on which ingredient has the more important impact.  As noted in paragraph 54, it is the combined effect that we need to examine rather than the individual effects.

67.     Here, then, is the crux of the complaint. The impact of the improvement of life expectancy since the advent of ERISA should be driving Conversion Factors higher to account for the change in actuarial equivalence. Yet the Hourly Plan's Conversion Factors have remained static while remaining consistent with actuarial assumptions from 1976 when ERISA was adopted.

## VI.     THE HOURLY PLAN'S STATIC CONVERSION FACTORS DID NOT PRODUCE ACTUARIALLY EQUIVALENT BENEFITS

68.     Throughout the 2013-2020 period, the Hourly Plan offered JSAs with survivor benefits of 50%, 66-2/3%, 75% and 100%.  The Joint and 50% Survivor Annuity was the Hourly Plan's Qualified Joint and Survivor Annuity ("QJSA"), meaning it was the default form of benefit for married participants.  Monthly benefit payments for all retirees, like Mr. Cruz, who selected the QJSA, were calculated based on the .90 Conversion Factor set out in the Hourly Plan.

69.     In this section, I analyze whether the Hourly Plan's .90 Conversion Factor for the QJSA was consistent with reasonable assumptions when Mr. Cruz retired in 2015.  A Conversion Factor is just a number – in this case, .90 for the 50% JSA.  The only way to determine whether a Conversion Factor generates an actuarially equivalent benefit is to compare it to conversion factors that would be generated by reasonable mortality and discount rate assumptions an actuary might have used to calculate the present value of pension benefits during the same period.

70.     As discussed above in paragraph 11,  the .90 Conversion Factor appears to be consistent with a conversion factor that would have been produced by using the 1971 GAM, with an all-male table for participants and an all-female table for beneficiaries, coupled with a 5% discount rate.   This combination of assumptions would not have been out of the ordinary in 1976.

Over the course of decades, committees for the Society of Actuaries have developed replacement tables.[18]

71.     The 1971 GAM table was published in 1971.  It was based on the "intercompany" mortality experience during the period 1964-1968.  Group annuity data came from "four large deferred annuity contracts and one large municipal employee group, excluding persons engaged in hazardous occupations."[19]

72.     The use of the 1971 GAM table is no longer approved by the Internal Revenue Service as an appropriate mortality assumption for determining pension liabilities for purposes of ERISA's funding requirements.  It is also no longer sanctioned by the AICPA as an appropriate mortality assumption for disclosing pension liabilities under ASC 715-30.  Accordingly, the mortality rates shown in the 1971 GAM cannot be used to determine whether the .90 Conversion Factor in the Hourly Plan could generate an actuarially equivalent 50% JSA in 2015 when Mr. Cruz retired.  To determine that, we must look at mortality tables that practicing actuaries *were using* in 2015 for purposes of calculating pension liabilities and benefits.

### 1.     *Financial Accounting of Pension Obligations*

73.     In its audited annual financial statements, a company must disclose its pension plan liabilities. This amount is the present value of the future liabilities owed to retirees and beneficiaries (both current and future) under the plans. While the payor – Raytheon and the Plan – value these future payments as liabilities, the same amounts are benefits from the perspective of

---

[18] Emily K. Kessler, "Turning the Tables:  Mortality Tables Should Reflect Improving Mortality," SOA, Pension Section News (Jan. 2006, Issue 60), available at https://www.soa.org/globalassets/ assets/library/newsletters/pension-section-news/2006/january/psn-2006-iss60-kessler.pdf.

[19] "Harold R. Greenlee, Jr and Alfonso D. Keh, "The 1971Group Annuity Mortality Table, *Transactions of the Society of Actuaries*, 1971 vol. 23, page 574.

the payees, such as Class Members like Mr. Cruz.  Thus, it makes sense to look at the actuarial assumptions Raytheon uses when it values these future payments.

74.    The value of pension liabilities must be reported under Generally Accepted Account Principles (GAAP) pursuant to the Accounting Standard known as ASC 715-30.  Under this standard, the actuary calculates a company's pension liability using the actuary's "best estimate" of both market interest rates and mortality tables at the time of disclosure. The mortality tables represent the actuary's "best estimate" of the projected mortality of the participants and beneficiaries receiving benefits. Because of the importance of accounting for plan liabilities as accurately and timely as possible, the independent accountant will question the actuary to make certain that the assumptions are reasonable and justified "best estimates." Accordingly, these assumptions represent at any given time the best estimate of actuarial assumptions that should be used to calculate the amount of the liability to participants and beneficiaries.

75.    ASOP 35 provides guidance to actuaries on the selection of mortality tables for measuring pension obligations, consistent with ASC 715-30.  Paragraph 3.5.3 of ASOP 35 states, "The actuary should reflect the effect of mortality improvement both before and after the measurement date."   For example, the American Institute of Certified Public Accountants (AICPA) currently suggests the use of the PRI-2012 mortality table projected forward using a "generational" projection scale that builds in future advances in longevity.  This table, or a variance thereof, is also used by insurance companies when they price out annuities for sale.  In effect, the advance in longevity manifests itself in the market by the use of the PRI-2012 table with generational projections. The company's actuary should base his "best estimate" of the pension liability from this table for purposes of the audited financial statements.

76.     Raytheon calculates its liabilities for its pension plans that are stated in its audited financial statements based on the advice of its actuary, Mercer.  Each year, Mercer prepares a report under ASC 715-30 covering all of Raytheon's defined benefit pension plans, including the Hourly Plan, which Raytheon provides its auditor, PriceWaterhouseCoopers.[20]   Each 715-30 Report contains an assumption about the expected mortality of participants in each of Raytheon's pension plans so that Raytheon can accurately disclose its expected pension liabilities.  While Raytheon is ultimately responsible for choosing the mortality assumption used in the 715-30 Reports, Mercer's actuaries certify that the assumption is "reasonable" based on participant data and that the report has been prepared in accordance with ASOP 35.[21]   Raytheon's Senior Director of Compensation & Benefits and Accounting Analysis and one of Mercer's actuaries also certify that the assumptions in the 715-30 Report "have been reviewed and confirmed by Raytheon."[22]

77.     Mercer and Raytheon determined that an updated, modern mortality table most accurately reflected the mortality experience of the Hourly Plan's participants and beneficiaries in each 715-30 Report since 2011.  For example, in the 715-30 Report for the year ending December 31, 2014, the year preceding Mr. Cruz's retirement and, therefore, the mortality experience most relevant to the calculation of Cruz's benefits, Raytheon used the RP-2014 mortality table that Society of Actuaries released in October 2014 as the base table for the Hourly Plan, determining that Raytheon's "historical experience has been generally consistent with that observed by the

---

[20] RTN-Cruz-00000001 (YE Dec. 31, 2011); RTN-00000125 (YE Dec. 31, 2012); RTN-Cruz-00000254 (YE Dec. 31, 2013); RTN-Cruz-00000380 (YE Dec. 31, 2014); RTN-Cruz-00000481 (YE Dec. 31, 2015); RTN-Cruz-00000582 (YE Dec. 31, 2016); RTN-Cruz-00000674 (YE Dec. 31, 2017); RTN-Cruz-00000767 (YE Dec. 31, 2018); RTN-Cruz-00000860 (YE Dec. 31, 2019).

[21] *See*, *e.g.*, RTN-Cruz-00000380 (YE Dec. 31, 2014) at 402.

[22] *See*, *e.g.*, RTN-Cruz-0000380 (YE Dec. 31, 2014).

SOA.[23]   Raytheon then selected a mortality improvement scale, MMP-2007, that Mercer developed that Raytheon determined most closely aligned with its "actual experience."[24]

78.     Raytheon, its accountants and its actuaries are comfortable that the mortality table described in the previous paragraph complies with the requirements of ASC 715-30 and ASOP 35. For purposes of financial accounting, companies complying with ASC 715-30 and ASOP 35 use modern male mortality tables for male plan participants and modern female mortality tables for female employees.  As we discuss in the next paragraph, these tables are not suitable for use in calculating conversion factors unless they are modified.

79.     The reason this presents a problem is that the Equal Employment Opportunity Commission ("EEOC") determined in 1972 that the use of actuarial equivalents should not discriminate against women, who had always exhibited a lower probability of death after childbearing age.  The EEOC observed that for early retirement calculations, the reductions for women were less than those for men and that there was no justification from an employment perspective for this treatment to continue.[25]  The U.S. Supreme Court, in *Arizona v Norris,*[26] held that the application of sex-distinct actuarial tables to employees based on their gender in calculating the amount of retirement benefits violates Title VII of the Civil Rights Act of 1964. Therefore, for all computations of benefit options, the sex of the participant must be irrelevant.

---

[23] RTN-Cruz-00000386.

[24] RTN-Cruz-00001635.

[25]  Paul H. Jackson and William W. Fellers, "The UP-1984—A 'Unisex' Mortality Table for Non-Insured Pension Plans (1976) available at http://www.actuaries.org/IACA/Colloquia/Sydney1976/Vol_1/Jackson_Fellers.pdf

[26] 463 U.S. 1073,1084-1086 (1983).

80.     Accordingly, a reasonable, up-to-date mortality table that a company uses for its 715-30 Reports might not be useable, at least without modification, for purposes of calculating actuarial equivalence.

### 2.     *Lump Sum Equivalence*

81.     A logical initial choice of mortality table for plans to use to calculate actuarial equivalence is the table they are mandated to use for purposes of calculating lump sum benefits, since plans are familiar with it and it is regularly updated.

82.     ERISA mandates that companies use the "Applicable Mortality Table" and "Applicable Interest Rates" specified by Internal Revenue Code §417(e)(3) and §1.417(e)-1(d) of the Regulations to calculate the present value of a lump sum equivalent to a retiree's accrued pension benefit.  The applicable mortality table changes annually and is a "unisex" table.  This table, accordingly, can be used without modification for purposes of calculating actuarially equivalent pension benefits for JSAs and CLAs.

83.     In 2015, when Mr. Cruz retired, the IRS had not yet adopted the RP-2014 table that Raytheon used in its 715-30 Report.  Instead, the "Applicable Mortality Table" was the RP-2000, with projection scale AA.  The projection scale was designed to reflect improvements in mortality since the RP-2000 was introduced.  Unlike the version of the RP-2014 table used for Raytheon's financial statement disclosures, the Applicable Mortality Table is unisex.  Accordingly, use of the applicable mortality table as the basis of an actuarial equivalence will keep any plan sponsor in compliance with *Norris* and IRS regulations. For this reason, some plans expressly provide that actuarial equivalence will be calculated using the applicable mortality table published by the IRS.

### A.  Discount Rate Assumptions

84.     The other component of present value for actuarial equivalence is the discount rate. Discount rates have fluctuated in the course of the last 40 years.

85.     To determine the conversion factor that would result from using actuarial assumptions that were reasonable when Mr. Cruz retired, I will next consider sources of discount rates that actuaries were using in relation to pension plan liabilities and benefits in 2015.

### 1.     The Hourly Plan's ASC 715-30 Discount Rates

86.     Selection of a discount rate for valuing pension liabilities in a company's 715-30 Report are governed by ASOP 27's requirement that the assumptions be "reasonable" and account for "historical and current economic data that is relevant as of the measurement date."  *See* ASOP 27, § 3.6.

87.     As noted in ¶ 76 above, Mercer prepares a 715-30 Report each year to calculate Raytheon's liabilities for its pension plans, including the Hourly Plan, for use in Raytheon's audited financial statements.  Each 715-30 Report contains a discount rate for each of Raytheon's pension plans that Mercer certifies is calculated in accordance with ASOP 27.[27]

88.     The 715-30 Reports describe how Raytheon has sets the discount rate for each plan since 2013:[28]

> Raytheon will set the ASC 715-30 discount rate based on the results of a
> bond model consisting of a theoretical bond portfolio, developed as of the
> measurement date, which matches Raytheon's pension liability duration.
> The results will be rounded up or down to the nearest 5 or 10 basis points,
> with plans with similar profiles grouped together. The basis of rounding
> and combining plans will be set to minimize the variability compared to

---

[27] *See*, *e.g.*, RTN-Cruz-00000380 (YE Dec. 31, 2014) at 402.

[28] Raytheon used an identical bond model in 2011 and 2012, but then rounded the results "up or down to the nearest 25 basis points to determine the discount rate to be used."

> results if plans were treated separately and rounded individually to the
> nearest 5 basis points.
>
> If rate movements resulting from this policy are outside of market norms,
> consideration will be given to existing factors, as appropriate.[29]

89.     Raytheon's bond model "only includes bonds that are rated that are rated AA or better by Moody's" and excludes "any bonds that are placed on a watch list for potential downgrade."[30]   A separate analysis is performed for each pension plan based on the plan's anticipated payments.[31]  The discount rate that Raytheon used in the 715 Report for the year ending December 31, 2014, which is the rate that would be relevant to the calculation of Cruz's benefits when he retired in 2015, was 4.15%.[32]

90.     To calculate the discount rate disclosed in its audited financial statements, Raytheon uses a liability-weighted average of each pension plan's discount rate.[33]  In the 2014 10-K Report, the liability-weighted average discount rate for Raytheon's domestic pension plans was 4.08%.[34]

91.     The advantage of relying on the discount rate in the Company's most recent 715-30 report is that it represents the plan actuary's "best estimate" of an appropriate discount rate based on plan-specific information.   Thus, by its nature it is more tailored to the particular

---

[29] RTN-Cruz-00000386 and -00001363.  For the years ending December 31, 2011 and December 31, 2012, Raytheon's methodology was to use a weighted average of the individual bond model results for each of its pension plans and then rounded the number "up or down to the nearest 25 basis points to determine the discount rate to be used" in the 715-30 Report.  *See*, *e.g.*, RTN-Cruz-00001381.

[30] RTN-Cruz-00001364.

[31] RTN-Cruz-00001364.

[32] RTN-Cruz-00000390.  As just described, this number was generated by rounding down the 4.178% result from Raytheon's bond model to the nearest 5 basis points.  RTN-Cruz-00001343.

[33] RTN-Cruz-00001793.

[34] RTN-Cruz-00001793.

circumstances of the plan and its participants than the weighted-average discount rate in Raytheon's 10-K Report.

92.     As shown in ¶ 88 above, the discount rate that Raytheon used for the Hourly Plan in the 715-30 Reports is the result of minor rounding.  Raytheon's methodology was consistent with ASC 715-30.

93.     A possible downside to using the discount rate used in a 715-30 Report is that it cannot be incorporated into a plan prospectively.  That is, plans cannot adopt a variable discount rate standard that depends on future determinations that are made by the company's own employees.  IRC § 401(a)(25) requires plans to specify the actuarial assumptions used to calculate benefits in a way that precludes employer discretion.  While plans could be amended whenever a review of the most recent 715-30 report indicated that reasonable discount rates were no longer in line with the discount rates specified in the plan, some plan sponsors might find that process cumbersome.

## 2.     *Common Bond Rate Indexes*

94.     Plans that want the benefit of using a discount rate that has a good "fit" to their own liabilities, and that comply with the "definitely determinable" requirement of IRC § 401(a)(25) without the need for regular plan amendments, can incorporate by reference a third-party bond index that is a good fit for the plan's liabilities.  Revenue Ruling 79-90 allows plans to use a variable standard for discount rates that "provides for self-adjusting changes" so long as the standard is "independent of employer discretion."

95.     ASC 715-30 requires the discount rate to reflect rates at which the defined benefit obligation could be effectively settled.

> "In the estimation of those rates, it would be appropriate for an entity to use information about rates implicit in current prices of annuity contracts that

could be used to settle the obligation. Alternatively, employers may look to rates of return on high-quality fixed-income investments that are currently available and expected to be available during the benefits' period to maturity. One acceptable method of deriving the discount rate would be to use a model that reflects rates of zero-coupon, high-quality corporate bonds with maturity dates and amounts that match the timing and amount of the expected future benefit payments. Since there are a limited number of zero-coupon corporate bonds in the market, models are constructed with coupon-paying bonds whose yields are adjusted to approximate results that would have been obtained through the use of the zero-coupon bonds. Constructing a hypothetical portfolio of high-quality instruments with maturities that mirror the benefit obligation is one method that can be used to achieve this objective. Other methods that can be expected to produce results that are not materially different would also be acceptable — for example, use of a yield curve constructed by a third party such as an actuarial firm. The use of indexes may also be acceptable."[35]

96.    There are several indexes that plan sponsors frequently use to determine a discount rate for their 715-30 reports, including the Mercer Yield Curve, the FTSE Above Mean Double-A Index, and the "segment" interest rates prescribed by ERISA § 205(g)(3), 29 U.S.C. § 1055(g)(3) and Section 417(e)(3) of the Internal Revenue Code, 26 U.S.C. § 417(e)(3) (which are discussed in more detail below).  All of these indexes are based on high-quality corporate bond rates. Generally speaking, it would be reasonable for a plan sponsored by Raytheon to use one of these standard bond indexes.  It would be most reasonable to use the index that most closely tracked the discount rates in the Company's last few 715-30 reports, to ensure closeness of "fit" with a plan's liabilities

97.    It is important to note, however, that while reasonable actuaries might select one or another of these interest rates for purposes of determining Conversion Factors, discount rates that are based on the yields of high-quality corporate bonds rate will not be wildly dissimilar.   The following chart compares the discount rate from the Hourly Plan's most recent years' 715-30

---

[35]   Deloitte, "Financial Reporting Considerations Related to Pension and Other Postretirement Benefits," November 16, 2018, pp 3,4.

Report to the Mercer Above Mean Curve and the FTSE Above Mean Double-A Index for the same period.

| Year Ended | Hourly Plan's 715-30 Rate | Mercer Above Mean | FTSE Above Mean |
|---|---|---|---|
| 12/2012 | 4.25% | 4.35% | 4.18% |
| 12/2013 | 5.20% | 5.12% | 5.06% |
| 12/2014 | 4.15% | 4.29% | 4.05% |
| 12/2015 | 4.55% | 4.71% | 4.47% |
| 12/2016 | 4.45% | 4.55% | 4.26% |
| 12/2017 | 3.75% | 3.81% | 3.68% |
| 12/2018 | 4.35% | 4.49% | 4.33% |
| 12/2019 | 3.30% | 3.59% | 3.38% |

### 3.    *The Applicable Interest Rate*

98.    As discussed above, ERISA mandates that companies use the "Applicable Mortality Table" and "Applicable Interest Rates" specified by Internal Revenue Code §417(e)(3) and §1.417(e)-1(d) of the Regulations to calculate the present value of a lump sum equivalent to a retiree's accrued pension benefit.  The "Applicable Interest Rate" is in reality a set of 3 discount rates referred to as "segment rates." The first segment rate is used for discounting for the first 5 years following the measurement date; the second segment rate for years 6 through 20, and the third rate for any period beyond that.  The segment rates are a one-month average of bond investment rate corporate bond yields, that are in the top three quality levels available.[36]

---

[36] IRS Notice 2007-81

99.     Because plans must use the Applicable Interest Rate ("AIR"), along with the Applicable Mortality Table, to compute lump sum benefits, plans can incorporate these assumptions into the plan document for purposes of actuarial equivalence calculations as well. Doing so complies with the "definitely determinable" requirement, while ensuring that actuarial assumptions remain up-to-date without the need for frequent plan amendments.  As a practical matter, using the AIR to compute lump sums is not as cumbersome as using the AIR for computing Conversion Factors.  Using segment rates to discount the value of a single life annuity requires applying the applicable segment rate for only the participant.  In contrast, converting a single-life annuity into a joint and survivor annuity requires using segment rates for the participant, for the beneficiary and for the joint life.

### VIII.   COMPARING THE HOURLY PLAN'S CONVERSION FACTORS TO FACTORS THAT ARE THE PRODUCT OF REASONABLE ACTUARIAL ASSUMPTIONS

100.     The Hourly Plan calculated Mr. Cruz's 50% JSA using a .90 Conversion Factor.  I conclude that this Conversion Factor provided Mr. Cruz with a lower monthly benefit than he would have received if the Conversion Factor had been based on reasonable actuarial assumptions.

101.     As noted above, the only way to determine whether the Hourly Plan's Conversion Factor generates actuarially equivalent benefits is to compare the monthly benefits that result from the Hourly Plan's Conversion Factors to monthly benefits that would be generated if the Plan had used reasonable actuarial assumptions when Cruz retired.  To make this comparison, I built a model that employs reasonable assumptions, based on data that was available to (and even used by) Raytheon and its actuaries when Mr. Cruz retired.  The model is designed to run on a spreadsheet that permits me to compare benefit amounts Mr. Cruz is receiving based on the Hourly Plan's Conversion Factor to the benefits he would receive based on different, reasonable,

assumptions.  My preferred inputs for the model are discussed below, but it can be run with alternative inputs, so long as those inputs are reasonable based on then-available information.

102.    Based on my review of data *provided in discovery to date*, as well as my experience as an actuary and my understanding of the standard set out in ASOPs 27 and 35, I believe that the most reasonable actuarial assumptions to use for Mr. Cruz, an  Hourly Plan retiree who began receiving benefits in 2015, are the RP-2014 Mortality Table with Mercer MMP-2007 Mortality Improvement Scale, blended 50% male, 50% female, coupled with the FTSE Above Mean Index Rate.

103.    The primary reason for selecting the RP-2014 Mortality Table with Mercer MMP-2007 Mortality Improvement is that this was the mortality table used by Raytheon in its 715 Report and then the 10-K report for the year ending December 31, 2014.  As such, it was the best estimate of the corporation's actuarial consulting firm, audit firm and the CFO.  At the time, it was based on a mortality table that had been published by the Society of Actuaries, using the most recent data available.  Although the Society of Actuaries was recommending the MP-2014 improvement scale, Raytheon's actuary believed that the MMP-2007 improvement scale was a better predictor for the population under study.  I consider that this table met the criteria of being up to date and reasonable at the time of the calculation.

104.    To comply with the requirement that the mortality table must be unisex (see paragraph 79), I amended the table to incorporate a 50/50 gender blend  – that is, I assume that the retiree population is composed of 50% males and females.  This is the default blend that is properly used in the absence of any data, and I have not seen any data that would support a different gender mix.  In the event that credible data exist from which a different assumption may be drawn, I can easily change this input to the model.

105.    For purposes of my model's discount rate assumption for the year in which Mr. Cruz began receiving benefits, I selected the FTSE Above Mean Index, a third-party index that closely tracked the plan actuary's own "best estimate" discount rate, as shown in Raytheon's 715-30 Reports for the previous year.   The advantage of the FTSE Above Mean Index is that its selection complies with the IRC 401(a)(25) requirement that the definition of Actuarial Equivalence be definitely determinable and outside the purview of the Plan Sponsor.   However, I have run the model using other alternative, reasonable discount rate assumptions, as discussed above, as inputs to the model as well.

106.    Using my preferred inputs to the Model, I found that Mr. Cruz would be receiving higher monthly benefits today if the Plans had used reasonable actuarial assumptions to calculate the value of his benefits.

## VIII.   IMPACT ON THE PLAINTIFF

107.    Johnny Cruz retired and began receiving a Joint and 50% Survivor Annuity benefit starting November 1, 2015.

108.    Mr. Cruz is receiving a Joint and 50% Survivor Annuity benefit of $1,021.33 per month.  The Single Life Annuity that would have been payable under the Plan assumptions to Mr. Cruz at November 1, 2015 (an Early Retirement Date) would have been $1,135.34.

109.    The market-based actuarial assumptions for November 1, 2015 would be the RP-2014 Mortality Table with Mercer MMP-2007 Mortality Improvement Scale, blended 50% male, 50% female, coupled with the FTSE Above Mean Index Rate of 4.05%. For Mr. Cruz, these assumptions result in a conversion factor of 0.938847, which is significantly higher than the .90 Conversion Factor in the Plan.

110.    If the calculations had been done using the reasonable assumptions set forth above, we would start with the Single Life Annuity value as of November 1, 2015.  We then apply the Joint and 50% Survivor Annuity factor of 0.938847 to arrive at a monthly benefit of $1,065.91. The shortfall for Mr. Cruz is more than 4%. The following chart summarizes the differences in calculation:

|  | The Hourly Plan's Conversion Factor | Reasonable Assumptions |
|---|---|---|
| Single Life Annuity at Benefit Commencement Date, payable monthly | $1,135.34 | $1,135.34 |
| Conversion factor | 0.899583 | 0.938847 |
| Joint and 50% survivor annuity benefit payable monthly at Benefit Commencement Date | $1,021.33 | $1,065.91 |
| Monthly Survivor benefit (50% of above) | $510.67 | $532.96 |

111.    For comparative purposes, I have also calculated Mr. Cruz' benefits using other reasonable mortality assumptions and discount rates.  In particular, I have used the Applicable Mortality Table as an obvious alternative to the unisex version of the table used for the 715-30 Report. For alternative discount rates, I used the Applicable Interest Rates as of August 2014 and the discount rate for the Plan in Raytheon's ASC 715-30 report at the end of 2014, 4.15%. The monthly benefits for Mr. Cruz using the recommended coupling shown above and the alternative couplings described in this paragraph are shown in the following chart:

|  | 417(e) Applicable Interest Rate (1.24%/3.86%/4.96%) | Raytheon 715-30 Interest Rate (4.15%) | FTSE Above Mean Index Rate (4.05%) |
|---|---|---|---|
| 2015 417(e) Applicable Mortality Table | $1,079.95 | $1,072.59 | $1,071.88 |
| Raytheon 715 Mortality Table (RP-2014 Mortality with Mercer MMP-2007 Mortality Improvement) | $1,074.29 | $1,066.66 | $1,065.91 |

112.    As the chart demonstrates, while the amount of the benefit changes depending on the discount rate, so long as reasonable discount rates are used as inputs, the $1,021.33 Mr. Cruz is currently receiving would be substantially increased under any reasonable scenario.  The harm, in this case, is driven by woefully unreasonable mortality assumptions, not by discount rates.

## X.    CALCULATION OF DAMAGES

113.    Damages up until the date of payment equal the difference between the amount of benefits paid using the antiquated assumptions and the amount that should have been paid using the reasonable assumptions times the number of months since Mr. Cruz began receiving benefits. For Mr. Cruz, damages equal $44.58 ($1,065.91- $1,021.33) per month until the date of payment.

114.    To calculate the damages of not receiving enough benefit payments in the future, in the event Defendants do not increase the monthly benefit to the appropriate amount, I would multiply the difference per month by the value of an annuity from the payment date forward. For example, for Mr. Cruz, the monthly shortfall is of $44.58. The value of an annuity would be determined using the prevailing FTSE Above Mean interest rate of 3.38% and the most recent unisex version of the disclosure table used in Raytheon's 715-30 Report.  (This figure would, of necessity, change if the payment does not take place until after 2020.)

$44.58 month x 12 months/year x 17.944048 = $9,599.35.

41

I declare under penalty of perjury that the foregoing is true to the best of my knowledge information and belief.

Executed this 24th day of April, 2020 in Skokie, IL.


*/s/ Mitchell I. Serota*
Mitchell I. Serota

## UNITED STATES DISTRICT COURT
## OF MASSACHUSETTS

JOHNNY CRUZ,

     Plaintiff,

v.

RAYTHEON COMPANY, KELLY B. LAPPIN, in her capacity as Plan Administrator for the Raytheon Company Pension Plan for Hourly Employees,  the Raytheon Company Pension Plan for Salaried Employees, the Raytheon Non-Bargaining Retirement Plan, the Raytheon Bargaining Retirement Plan, and the Raytheon Retirement Plan for Engineers & Contractors, Inc. and Aircraft Credit Employees, AND JOHN/JANE DOES 1-10,

     Defendants.

Case No.: 1:19-cv-11425-PBS

## SEROTA DECLARATION

# EXHIBIT A

## MITCHELL I. SEROTA CV

**VITA**
**MITCHELL I. SEROTA**



*Professional Credentials*

Fellow, Society of Actuaries, 1983
Member, American Academy of Actuaries, 1980
Enrolled Actuary, 1983

Founding Member (1988) of Retirement Income Planners, a Chicago discussion group of 16 Employee Benefit Plan attorneys and one actuary, who meet monthly to discuss interpretation of law, anticipation of legislation, coordination with government agencies, etc.

*Professional Service*

*Actuarial Committee Membership*
Member, Pension Committee of American Academy of Actuaries, 2009-2018
Member, Pension Committee of Actuarial Standards Board, 2011-2017
Vice-chair, Entrepreneurial Actuaries Section of Society of Actuaries, 2002-05
Founding Member, Entrepreneurial Actuaries Section, 2002
Liaison between EAS for SOA and Smaller Consulting Group for Conference of Consulting
    Actuaries, 2003-05
Member, SOA Task Force on the Personal Actuary, 2005-07
Illinois Assn of School Business Officials, Financial Reporting Section, 2019-20

*Educational*
Society of Actuaries Examination Committee Member, Pension Plan Design and Funding, 1984-
    87
Society of Actuaries Education Coordinator, Pension Plan Design and Funding, 1986-87

*Speaking*
Windy City Summit, 2019 "When Your DB Frozen Plan has Freezer Burn"
Illinois Government Finance Officers Assn., 2017, (funding problems of Illinois municipalities)
Illinois Municipal League, 2014 (funding problems of Illinois municipalities)
Enrolled Actuaries Meeting, 2014 (Actuarial Standards of Practice)
Society of Actuaries Speaker, 1983, 2000, 2004, 2005, 2008, 2017, 2019 (3)
Society of Actuaries Lead Workshop Co-Chairperson, 1989
Conference of Consulting Actuaries, Program Committee and Moderator

*Publications*
"Searching for Revenue in a Very Wrong Place," *Pension Section News*, March 2014, #83, p.
1. "QDROs with Fewer Hassles," *Pension Section News,* June 2001, #46, pp. 6-7.
"Lump sum distributions for QDROs," speech at Society of Actuaries, October 16, 2000.
"Effect of the Social Security Act of 1983 on the Funding of Pension Plans," *Record of the
Society of Actuaries,* IX, 521ff.
"Government Health and Welfare Programs in the United States and West Germany,"
*Benefits International,* December, 1979, pp. 15-18.



**VITA (cont.)**
**MITCHELL I. SEROTA**

*Professional Experience*

Mitchell I. Serota & Associates, Inc. (April, 1988 to present), President
Serota & Associates is a corporation dedicated to general Employee Benefit Consulting
- Pension Design and Funding
  - Assisting consulting firms and law firms for independent actuarial review
  - Mergers and acquisition support
  - Writing actuarial valuation reports
  - Writing analysis of impact of law on a given situation
  - Analyzing potential (or imminent) impact of change in law
  - Dealing with government agencies regarding compliance
  - Negotiating with government agencies regarding non-compliance
  - Presenting expense figures to auditors based on
    - *ASC 715-30*
    - Cost Accounting Standards (Federal Government)
    - *IAS-19* (International)
    - *GASB 67/68* (Government entities)
  - Projecting costs using deterministic and stochastic modeling
  - Optimizing benefit design of plan, given a budget
  - Comparing advantages and disadvantages of hybrid designs

- Group Health and Post-Retirement Medical
  - Calculating Incurred But Not Reported Reserves
  - Trending claims cost levels
  - Calculating COBRA rates for self-funded plans
  - Optimizing Stop-Loss levels for group health programs
  - Presenting expense figures to auditors based on
    - *ASC 715-60*
    - Cost Accounting Standards (Federal Government)
    - *IAS-19* (International)
    - *GASB 43/45, 74/75* (Government entities)
  - Projecting costs using deterministic and stochastic modeling
- Actuarial testimony
  - Providing review, analysis and testimony concerning the actuarial assumptions used for benefit calculations of optional forms of pension benefits for participants in defined benefit plans sponsored by Huntington Ingalls Industries, Inc.
  - Preparation of reports and testimony before the State of New Jersey Board of Public Utilities to reduce proposed rate increases successfully (8 times)
  - Consulting and writing actuarial opinions for Delta Air Lines Retirement Committee during Bankruptcy ("1114 Committee") which led to the successful award to the retirees of $70 million
  - Providing analysis and testimony for divorce cases, including drafting QDROs and QILDROs
  - Providing analysis and testimony for wrongful death and dismissal cases
  - Calculating contingencies for estate planning attorneys

**VITA (cont.)**
**MITCHELL I. SEROTA**



*Professional Experience (cont.)*

Alexander & Alexander Consulting Group, Inc. (April, 1987 to April, 1988)
Vice President
Consulting Actuary responsibilities included marketing prospects, meeting with clients, understanding their Human Resource needs and their financial goals, and tailoring employee benefits programs to fit their specific circumstances.

Johnson & Higgins of Illinois, Inc. (October, 1978 to April, 1987)
Vice President, 1986
Assistant Vice President, 1982
Consulting Actuary responsibilities included performing pension valuations for United States corporations with domestic or foreign pension plans; analyzing and immunizing investment portfolios, researching markets for asset management; analyzing self-funded group medical and long-term disability programs; valuing liabilities for post-retirement medical plans; training employees.

CNA Insurance (July, 1976 to October, 1978)
Actuarial Assistant responsibilities included organizing, writing, and revising the Major Group Claims Cost Manual; researching the utilization and cost of non-standard group health benefits; determining the fluctuation of utilization and prices of group health and dental care across the country.

*Academics*

Adjunct Professor of History and Business, Carthage College, Kenosha, WI, 2010-13
Adjunct Professor, Columbia College Chicago, Dept. of Liberal Education, 2003

University of Chicago, Ph.D., History, March, 1976
University of Paris-I (1973-74)
University of Chicago, M.A., History, June, 1972
Massachusetts Institute of Technology, S.B., Mathematics, June, 1971
Massachusetts Institute of Technology, S.B., History, June, 1971

*Personal Data*
Born January 24, 1950 in Chicago, Illinois

*Community service*
Glenview School District 34 Caucus, 1994-2002
        Chairman, 2000-2002
Northfield School District 225 Caucus, 2000-2004
Substitute Teacher at Glenbrook South H.S.: History, Mathematics, French
Surrey Lane Civic Association, President 1999-2005
Educational Counselor for M.I.T. applicants, 1998-2010

## UNITED STATES DISTRICT COURT
## OF MASSACHUSETTS

JOHNNY CRUZ,

     Plaintiff,

v.

RAYTHEON COMPANY, KELLY B. LAPPIN, in her capacity as Plan Administrator for the Raytheon Company Pension Plan for Hourly Employees, the Raytheon Company Pension Plan for Salaried Employees, the Raytheon Non-Bargaining Retirement Plan, the Raytheon Bargaining Retirement Plan, and the Raytheon Retirement Plan for Engineers & Contractors, Inc. and Aircraft Credit Employees, AND JOHN/JANE DOES 1-10,

     Defendants.

Case No.: 1:19-cv-11425-PBS

## SEROTA DECLARATION
# EXHIBIT B
## MATERIALS REVIEWED BY MITCHELL I. SEROTA

## MATERIALS REVIEWED

1.    715 Report for 2011, RTN-Cruz-00000001;

2.    715 Report for 2012, RTN-Cruz-00000125;

3.    715 Report for 2013, RTN-Cruz-00000254;

4.    715 Report for 2014, RTN-Cruz-00000380;

5.    715 Report for 2015, RTN-Cruz-00000481;

6.    715 Report for 2016, RTN-Cruz-00000582;

7.    715 Report for 2017, RTN-Cruz-00000674;

8.    715 Report for 2018, RTN-Cruz-00000767;

9.    715 Report for 2019, RTN-Cruz-00000860;

10.   Cruz Johnny - Raytheon Plan Docs;

11.   Cruz Benefits Documents, RTN-Cruz-00000959;

12.   2011 Bond Model w PBO, RTN-Cruz-00001768;

13.   2012 Bond Model w PBO, RTN-Cruz-00001769;

14.   2013 Bond Model w PBO, RTN-Cruz-00001765;

15.   2013 Bond Model w PBO, RTN-Cruz-00001766;

16.   2014 Bond Model w PBO, RTN-Cruz-00001767;

17.   2014 Bond Model w PBO, RTN-Cruz-00001832;

18.   2015 Bond Model w PBO, RTN-Cruz-00001785;

19.   2015 Bond Model w PBO, RTN-Cruz-00001837;

20.   2016 Bond Model w PBO, RTN-Cruz-00001786;

21.   2016 Bond Model w PBO, RTN-Cruz-00001833;

22.   2017 Bond Model w PBO, RTN-Cruz-00001787;

23.    2017 Bond Model w PBO, RTN-Cruz-00001834;

24.    2018 Bond Model w PBO, RTN-Cruz-00001789;

25.    2018 Bond Model w PBO, RTN-Cruz-00001835;

26.    2019 Bond Model w PBO, RTN-Cruz-00001836;

27.    Raytheon Hourly Plan Bond Model for YE 2011, RTN-Cruz-00001724;

28.    Raytheon Hourly Plan Bond Model for YE 2012, RTN-Cruz-00001294;

29.    Raytheon Hourly Plan Bond Model for YE 2013, RTN-Cruz-00001318;

30.    Raytheon Hourly Plan Bond Model for YE 2014, RTN-Cruz-00001343;

31.    Raytheon Hourly Plan Bond Model for YE 2015, RTN-Cruz-00001729;

32.    Raytheon Hourly Plan Bond Model for YE 2016, RTN-Cruz-00001734;

33.    Raytheon Hourly Plan Bond Model for YE 2017, RTN-Cruz-00001737;

34.    Raytheon Hourly Plan Bond Model for YE 2019, RTN-Cruz-00001808;

35.    2011 Discount Rate Memo, RTN-Cruz-00001381;

36.    2012 Discount Rate Memo, RTN-Cruz-00001382;

37.    2013 Discount Rate Memo, RTN-Cruz-00001384;

38.    2014 Discount Rate Memo, RTN-Cruz-00001363;

39.    2015 Discount Rate Memo, RTN-Cruz-00001366;

40.    2016 Discount Rate Memo, RTN-Cruz-00001369;

41.    2017 Discount Rate Memo, RTN-Cruz-00001372;

42.    2018 Discount Rate Memo, RTN-Cruz-00001375;

43.    2019 Discount Rate Memo, RTN-Cruz-00001378;

44.    Support for Discount Rates in 10Ks from 2011-19, RTN-Cruz-00001793;

45.    Amendments to Hourly Plan Document, RTN-Cruz-00000999;

46.    Hourly Plan Document (eff 2015), RTN-Cruz-00001007;

47.   Hourly Plan's Form 5500 for 2013;

48.   Hourly Plan's Form 5500 for 2014;

49.   Hourly Plan's Form 5500 for 2015;

50.   Hourly Plan's Form 5500 for 2016;

51.   Hourly Plan's Form 5500 for 2017;

52.   Hourly Plan's Form 5500 for 2018;

53.   Experience Data from 2012-15, RTN-Cruz-00001387;

54.   Hourly Plan Experience 2012-14, RTN-Cruz-00001411;

55.   Experience Data from 2014-18, RTN-Cruz-00001412;

56.   Mercer's Experience Report from 2017, RTN-Cruz-00001444;

57.   Mercer's Expected Retirement Age, RTN-Cruz-00001477;

58.   Mercer's Data for Hourly Plan, RTN-Cruz-00001478;

59.   Mercer's 2019 Experience Study, RTN-Cruz-00001482;

60.   Projection Scale Analysis, RTN-Cruz-00001627;

61.   MMP 2007 Mortality Table, RTN-Cruz-00001537;

62.   MMP 2017 Mortality Table, RTN-Cruz-00001578;

63.   MRP-2006-EN Mortality Table, RTN-Cruz-00001657;

64.   MRP-2006-RN Mortality Table, RTN-Cruz-00001666;

65.   MRP-2007-EN Mortality Table, RTN-Cruz-00001675;

66.   MRP-2007-RN Mortality Table, RTN-Cruz-00001684;

67.   Memo on 2013 Mortality Assumption, RTN-Cruz-00001630;

68.   Memo on 2014 Mortality Assumption, RTN-Cruz-00001634;

69.   Memo on 2015 Mortality Assumption, RTN-Cruz-00001637;

70.   Memo on 2016 Mortality Assumption, RTN-Cruz-00001640;

71.     Memo on 2017 Mortality Assumption, RTN-Cruz-00001644;

72.     Memo on 2018 Mortality Assumption, RTN-Cruz-00001648;

73.     Memo on 2019 Mortality Assumption, RTN-Cruz-00001652;

74.     Raytheon's 10-K for YE Dec. 31, 2013;

75.     Raytheon's 10-K for YE Dec. 31, 2014;

76.     Raytheon's 10-K for YE Dec. 31, 2015;

77.     Raytheon's 10-K for YE Dec. 31, 2016;

78.     Raytheon's 10-K for YE Dec. 31, 2017;

79.     Raytheon's 10-K for YE Dec. 31, 2018; and

80.     Email from Christian Pistilli to Robert Izard dated January 17, 2020.

## UNITED STATES DISTRICT COURT
## OF MASSACHUSETTS

JOHNNY CRUZ,

      Plaintiff,

v.

RAYTHEON COMPANY, KELLY B. LAPPIN, in her capacity as Plan Administrator for the Raytheon Company Pension Plan for Hourly Employees, the Raytheon Company Pension Plan for Salaried Employees, the Raytheon Non-Bargaining Retirement Plan, the Raytheon Bargaining Retirement Plan, and the Raytheon Retirement Plan for Engineers & Contractors, Inc. and Aircraft Credit Employees, AND JOHN/JANE DOES 1-10,

      Defendants.

Case No.: 1:19-cv-11425-PBS

## SEROTA DECLARATION
# EXHIBIT C
## TESTIMONY APPEARANCES AND DEPOSITIONS OF
## MITCHELL I. SEROTA

## TESTIMONY APPEARANCES AND DEPOSITIONS
## OF MITCHELL I. SEROTA

I.      September 10, 1993, trial appearance in Chicago, IL

        *Henley v. Henley*
        divorce case

II.     September 23, 1993, trial appearance in Philadelphia, PA (federal court)

        *First Options, Inc. v. M K Investments, Inc.*
        non-compliance of pension plan with E.R.I.S.A. regulations

III.    April 26, 1994, deposition in Chicago, IL
        April 29, 1994, trial appearance in Chicago, IL

        *Ronald J. Dranchak v. AKZO America, Inc.*
        wrongful discharge

IV.     September 19, 1996, deposition in Chicago, IL

        *Stopka v. American Alliance of Insurers*
        wrongful discharge, discrimination

V.      July, 2000, deposition in Skokie, IL

        *Edwards v. Dad Cab Co.*
        Wrongful injury

VI.     November, 2001, deposition in Chicago, IL

        *Garratt v. Knowles Electronics, Inc.*
        Disagreement over terms and payout of Supplemental Executive Retirement
        Plan

VII.    September 15, 2006, trial appearance in Chicago, IL

        *Prieto v. Prieto*
        Divorce case

VIII.   April 13, 2009 trial appearance in Chicago, IL
        June 2, 2009, deposition appearance in Skokie, IL

        *Former Marriage of Gulbrandsen*
        Divorce case settlement of pension distributions

### TESTIMONY APPEARANCES AND DEPOSITIONS
### OF MITCHELL I. SEROTA (cont.)

IX.     February 22, 2010, hearing in Newark, NJ

        In the matter of the Petition of Public Service Electric and Gas Company for
        approval of changes in rates and for other relief

X.      March through October 2010

        In the matter of the Petition of five additional New Jersey public utilities for
        approval of changes in rates and for other relief; submission of testimony and
        appearances via telephone

XI.     October 14, 2010, deposition appearance in Chicago, IL

        *Stephens v. Stephens*
        Divorce case

XII.    March 8, 2012, deposition appearance in Chicago, IL
        March 26, 2012, trial appearance in Chicago, IL

        *Wachowski v. Wachowski*
        Divorce case

XIII.   June 28, 2012, deposition appearance in Skokie, IL
        March 26, 2012, trial appearance in Chicago, IL

        *Phillip Hall v. Sterling Park District*
        Wrongful discharge

XIV.    October 16, 2013 hearing in Newark, NJ

        In the matter of the Petition of Jersey Central Power & Light Company for
        approval of changes in rates and for other relief

XV.     August 16, 2018, trial appearance in Chicago, IL

        *Coyne v. Coyne*
        Divorce case

XVI.    January 14, 2020, deposition appearance in Chicago, IL

        *Herndon v. Huntington Ingalls Industries, Inc. et al.*
        Actuarial equivalence of pension benefits