## UNITED STATES DISTRICT COURT
## OF MASSACHUSETTS

| | |
|---|---|
| Johnny Cruz, on behalf of himself and all others similarly situated, | Civil Action No.:  1:19-cv-11425 |
| Plaintiff, | |
| vs. | |
| Raytheon Company, Kelly B. Lappin, in her capacity as Plan Administrator for the Raytheon Company Pension Plan for Hourly Employees,  the Raytheon Company Pension Plan for Salaried Employees, the Raytheon Non-Bargaining Retirement Plan, the Raytheon Bargaining Retirement Plan, and the Raytheon Retirement Plan for Engineers & Contractors, Inc. and Aircraft Credit Employees, and John/Jane Does 1-10. | |
| Defendants. | SEPTEMBER 4, 2020 |

# EXHIBIT 11

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| Johnny Cruz, on behalf of himself and all others similarly situated, | Civil Action No.:  1:19-cv-11425 |
| Plaintiff, | |
| v. | |
| Raytheon Company, Kelly B. Lappin, in her capacity as Plan Administrator for the Raytheon Company Pension Plan for Hourly Employees, the Raytheon Company Pension Plan for Salaried Employees, the Raytheon Non-Bargaining Retirement Plan, the Raytheon Bargaining Retirement Plan, and the Raytheon Retirement Plan for Engineers & Contractors, Inc. and Aircraft Credit Employees, and John/Jane Does 1-10, | |
| Defendants. | |

**Declaration of Thomas S. Terry, F.S.A., E.A., M.A.A.A.**

# TABLE OF CONTENTS

Page

I.      QUALIFICATIONS ............................................................................... 1

II.     STATEMENT OF ENGAGEMENT ................................................... 4

III.    STATEMENT OF KEY OPINIONS ................................................... 6

IV.     EXECUTIVE SUMMARY ................................................................... 8

V.      BACKGROUND ................................................................................. 13

        A.      Benefit Forms.......................................................................... 13
                1.      Defined Benefit Plans, Generally ............................... 13
                2.      Alternative Benefit Forms........................................... 14
                3.      Subsidies ...................................................................... 19
        B.      Converting Single Life Annuities to J&S Annuities............... 20
                1.      Overview....................................................................... 20
                2.      J&S Conversion Factors Are Ratios of Present Values ... 21
                3.      Regulatory History ...................................................... 27
        C.      Acceptable Fixed Standards..................................................... 32
                1.      Overview....................................................................... 32
                2.      "Ingredients" Used to Develop J&S Conversion Factors ... 32
                3.      Development of Conversion Factors ............................ 34
                4.      Considerations When Developing and Evaluating Conversion
                        Factors.......................................................................... 37

VI.     ACTUARIAL STANDARDS USED FOR ACCOUNTING PURPOSES ARE
        NOT APPROPRIATE FOR USE IN CALCULATING PLAN BENEFITS. ........ 48

        A.      Overview.................................................................................. 48
        B.      Actuarial Assumptions Used for Accounting Purposes........................ 49
        C.      Problems with Using Actuarial Assumptions that Are Utilized for
                Accounting Purposes to Develop or Assess Tabular Factors for
                Calculating Benefits................................................................ 51

VII.    ACTUARIAL STANDARDS USED FOR LUMP SUM BENEFITS ARE NOT
        REQUIRED TO BE USED FOR CALCULATING ANNUITY BENEFITS. ........ 56

        A.      Background on Lump Sum Benefits........................................... 56
        B.      Risk Allocation for Lump Sums and Annuities......................... 56
        C.      Impact of Variable Rates ......................................................... 57
        D.      Lump Sum Benefits Are Highly Regulated ............................. 58

VIII.   THE CONCEPT OF REASONABLENESS .................................... 61

        A.      Actuarial Custom and Practice................................................. 61
        B.      Applicable Regulatory Guidance.............................................. 62
        C.      Assessing the Reasonableness of Tabular J&S Conversion Factors ... 65

IX.     ASSESSING THE PLAN'S 50% J&S CONVERSION FACTOR................ 71

      A.     Reasonable Range for 50% J&S Conversion Factors Based on Current Conditions .............................................................................................. 71

      B.     Reasonable Range for the Raytheon Plan's 50% J&S Conversion Factor Based on Current Conditions and Reflecting Plan-Specific Information ............ 76

      C.     Alternative Analyses ................................................................................ 80

      D.     "Cruz-only" Analysis .............................................................................. 81

      E.     Retirement-Type Subsidies under the Raytheon Plan .......................... 83

X.    CRITIQUE OF SEROTA ............................................................................................ 86

      A.     Reasonableness Is a Range, Not a Point ............................................... 86

      B.     Pooling by Age ....................................................................................... 87

      C.     Serota's Reasonability Assessment Criteria Regarding Mortality ........................ 88

      D.     Serota Assumes a Gender Mix that Is Inconsistent with Plan Experience ........... 90

      E.     Serota's Interest Rate Assumptions Are Unduly Narrow ..................... 91

      F.     Serota's Speculation about the Origins of the Plan's 0.90 Conversion Factor Is Unfounded and Irrelevant. .................................................... 91

      G.     Serota Is Wrong to Assert that Cruz Is Receiving Less than the Actuarial Equivalent of the Single Life Annuity Benefit to Which He Is Entitled. ............. 92

      H.     Serota Is Wrong about the Applicability of ASOPs 27 and 35 ........................... 93

I.     **QUALIFICATIONS**

1.     I am the Chief Executive Officer and founder of The Terry Group, an actuarial and employee benefits consulting and research firm based in Chicago, Illinois.

2.     I am a fully credentialed actuary and have been a pension actuary for over forty years.  I am a Fellow of the Society of Actuaries, a Member of the American Academy of Actuaries, a Fellow of the Conference of Consulting Actuaries, and an Enrolled Actuary under the Employee Retirement Income Security Act ("ERISA").

3.     I am past president (2014) of the American Academy of Actuaries, the national association for actuaries practicing in the United States.  The academy is the home of the Actuarial Standards Board, which sets standards for actuarial practice in the United States.  I am also past president (2017) of the International Actuarial Association.

4.     I have conducted or overseen the conducting of actuarial valuations for some of the most complex pension plans in the United States.  I have been involved in the strategy, design, pricing, and administration of pension plans and some of their most complex features throughout my career.  I have built actuarial research capabilities in interest rates, mortality, and mortality improvement.

5.     I have been involved, directly and indirectly, in both the formal and informal education and training of actuaries throughout my entire career.  I have been closely involved with the professional environment in which pension actuaries conduct their work—both here in the United States and abroad.  This includes qualification standards, practice standards, and discipline of actuaries.

6.     I served as CEO and the top actuary at a succession of pension consulting firms since 1991: Chicago Consulting Actuaries (later named CCA Strategies); JPMorgan Compensation and Benefits Strategies; and currently, The Terry Group.  I and my firms have

provided actuarial valuation and consulting services to numerous pension plan sponsors, including some of the most complex pension plans in the United States.

7.      I am past vice president for pensions (2007-2009) of the American Academy of Actuaries.  In that role, I also chaired the Pension Practice Council.  The council has responsibility for the academy's pension policy work in the United States, as well as practice advancement for actuaries working in the pension field.

8.      I served for five years (2008-2012) on the board of the Society of Actuaries ("SOA"), an education and research association that credentials actuaries and produces authoritative research on relevant actuarial topics.  For example, the SOA conducts experience studies and publishes mortality tables.  While on the SOA board, I helped launch an important strategic initiative around the study of longevity (how long people can live), a particularly important subject to pension actuaries.

9.      I recently served as a member (2018-2019) of the 2019 Technical Panel on Assumptions and Methods of the Social Security Advisory Board.  The panel is an independent team of experts—including demographers, economists, and actuaries—convened every four years to closely examine assumptions and methods, including U.S. mortality and mortality improvement, used by the actuaries who work for the Social Security Administration to develop the annual report of the Social Security trust funds.

10.     I am past president (2007) of the Conference of Consulting Actuaries, a leading provider of continuing education for pension actuaries in the United States.

11.     I am chair of the Board of Actuaries, which has actuarial oversight responsibility for the U.S. government's Civil Service Retirement System and the Federal Employees

Retirement System.  I also chair the board of the Global Aging Institute, a Washington, D.C.-based research organization.

12.     I have a Bachelor of Science in mathematics from Tufts University, Summa Cum Laude and Phi Beta Kappa, and a Master of Actuarial Science from the Graduate School of Business Administration at the University of Michigan.

13.     I am being compensated for my work on this case at my hourly rate of $900.  I have been assisted on this matter by Terry Group staff members whose hourly rates range from $375 to $600.  My charges are not dependent upon the substance of my opinions or testimony or the outcome of this litigation.

## II.      STATEMENT OF ENGAGEMENT

14.      I have been engaged by legal counsel representing defendants Raytheon Company and Kelly B. Lappin to review the tabular factor of 0.90 used by the portion of the Raytheon Company Pension Plan for Hourly Employees ("Plan" or "Raytheon Plan") in which Mr. Johnny Cruz ("Cruz") participates to convert single life annuity benefits to 50% joint and survivor ("J&S") annuity benefits.  Specifically, I have been asked to assess that factor's reasonableness, from an actuarial perspective, based on relevant, current[1] demographic and economic conditions. Put differently, I have been asked to assess whether or not Cruz's 50% J&S annuity is at least actuarially equivalent to the single life annuity benefit that he (with the consent of his spouse) could have elected to receive under the terms of the Plan.

15.      In addition, I have been asked to examine a hypothetical scenario in which Cruz is the only Plan participant.  More specifically, I have been asked to assess the reasonableness of using a 0.90 factor for converting single life annuity benefits to 50% J&S annuity benefits, based on relevant, current demographic conditions that reflect this hypothetical scenario, as well as current economic conditions.

16.      I have also been asked to compare the value of the 50% J&S annuity that Cruz is receiving from the Plan with the value of his accrued benefit under the Plan.  The purpose of this comparison is to permit an assessment as to whether or not Cruz's 50% J&S annuity is at least the actuarial equivalent of his accrued benefit under the Plan, which is also referred to as the Plan's normal retirement pension.

---

[1] Throughout my report, the term "current conditions" refers to the conditions generally observed over the past decade, as further described in various sections of my report.

17.     I have further been asked to provide background information on actuarial issues relevant to this case, including the concepts of reasonableness and pooling, that may be of assistance to the Court.

18.     Finally, I have been asked to review and comment on the April 24, 2020 Declaration of Mitchell I. Serota ("Serota" and "Serota report") submitted in this case.

19.     In preparing this report, I rely on my own professional experience, professional actuarial standards of practice, industry knowledge gained at professional conferences, published studies and reports, and my considerable experience with pension plans, mortality, and interest rates.

20.     Except as otherwise indicated, all facts set forth in this report are based upon my review of relevant documents, my personal knowledge and experience, and actuarial analyses performed by the Terry Group at my direction.

21.     My report is a Statement of Actuarial Opinion.  I am a member of the American Academy of Actuaries, and I meet the Qualification Standards of the American Academy of Actuaries to render the actuarial opinions contained herein.

22.     If called upon to testify, I would testify competently to the facts and opinions set forth in this report.  I reserve the right to supplement or revise my opinions in light of any additional evidence or information that may subsequently come to light, or if I am asked to perform further research or analysis.

23.     The documents containing the facts or data that I have considered in forming the opinions stated in this report are listed in Appendix I.

24.     A list of all other cases in which, during the previous 5 years, I have testified as an expert at trial or by deposition is detailed in my CV, attached as Appendix A.

### III.   STATEMENT OF KEY OPINIONS

25.   **First opinion:**  The 0.90 conversion factor used by the portion of the Raytheon Plan in which Cruz participates to convert single life annuities to 50% J&S annuities is reasonable in light of relevant, current, Plan-specific demographic experience and economic conditions.

26.   **Second opinion:**  Even if Cruz had been the only participant in the Plan, the tabular factor of 0.90 would be reasonable for converting single life annuity benefits to 50% J&S annuity benefits, based on relevant, current demographic conditions that reflect this hypothetical scenario, as well as current economic conditions.

27.   **Third opinion:**  As of his retirement date, Cruz had earned the right to an accrued benefit (his normal retirement pension) of $1,746.68, payable as a single life annuity commencing at his normal retirement age, age 65.  Cruz elected to retire at age 55 and take his pension as a 50% J&S annuity of $1,021.33 per month, payable for his life (and, upon his death, $510.67 payable for the life of his spouse), as calculated by the Raytheon Plan using the 0.90 conversion factor.[2]  The actuarial present value of the J&S pension he elected was greater than the actuarial present value of his accrued benefit.  In fact, the value of the 50% J&S annuity that Cruz is receiving from the Plan represents approximately a 20% subsidy over the value of his accrued benefit.

28.   **Fourth opinion:**  The methodology used by Serota to evaluate whether the 0.90 conversion factor used by the Plan resulted in an actuarially equivalent benefit was flawed, and

---

[2] The actual plan conversion factor is 0.899584.  This slight difference from the 0.90 factor is explained by the minor difference in age between Cruz and his spouse.  For simplicity, I focus on the 0.90 factor in my report and in my analysis.

his conclusion that 0.90 conversion factor is "too low" is not supported by current economic conditions, Plan-specific demographic factors, and accepted actuarial practice.

## IV.   EXECUTIVE SUMMARY

29.    I have been asked to assess whether the 0.90 conversion factor used by the portion of the Raytheon Plan in which Cruz participates to convert his single life annuity[3] into a 50% J&S annuity[4] (1) is, from an actuarial perspective, reasonable, and (2) results in a 50% J&S annuity that is at least the actuarial equivalent of the single life annuity benefit.  I conclude that the Plan's 0.90 conversion factor fits comfortably within the range of reasonableness and that the value of the J&S annuity benefit Cruz is receiving exceeds the actuarial equivalent of the Plan's accrued benefit (a single life annuity commencing at normal retirement age).  My analysis and conclusions were informed, among other things, by the following:

30.    **Reasonableness is a range**.  In assessing the reasonableness of a J&S conversion factor, it is important to keep in mind that "reasonableness" in the actuarial profession is understood to represent a range, not a fixed point.  This is because actuarial analysis involves assumptions about the future, and there is rarely, if ever, one "correct" set of assumptions about future events.  Indeed, Section 2.10 of the Actuarial Standard of Practice ("ASOP") No. 1 specifies:

> Because actuarial practice commonly involves the estimation of uncertain events, there will often be a range of reasonable methods and assumptions, and two actuaries could follow a particular ASOP, both using reasonable methods and assumptions, and reach different but reasonable results.

---

[3] A single life annuity is a monthly payment stream payable for the duration of the participant's life and ending at the participant's death.

[4] A 50% joint and survivor annuity is a monthly payment stream payable for the duration of the participant's life, and a monthly payment of half that amount for the duration of the life of the participant's beneficiary (typically, his or her spouse), in the event that the beneficiary outlives the participant.

31.    **Pooling**.  Pooling is an actuarial term that refers to the aggregation of risk for common treatment.  The concept recognizes that risk cannot (or should not) always be evaluated on an individualized basis.  Pooling is a fundamental principle underlying pension plans.

32.    Governing regulations expressly permit pension plans to engage in pooling.  For example, in describing how actuarial equivalence is to be determined in calculating J&S annuities, the regulations provide that "actuarial equivalence may be determined, on the basis of consistently applied reasonable actuarial factors, for each participant or *for all participants or reasonable groupings of participants*."

33.    One type of "reasonable grouping" that is especially relevant to this case is age pooling.  As explained below, a factor that is relevant to actuarial equivalence calculations is the age at which a participant retires.  Pension plans are allowed to use factors (or actuarial assumptions) that vary based on the age of the retiree, but they are also permitted to use a single factor that applies equally to all retirees.  In other words, plans are permitted to use fixed conversion factors that pool together retirees of different ages, even though the factor will have a differential impact on individual employees depending on the age at which they retire.

34.    **Adverse Selection**.  "Adverse selection" refers to the observed phenomenon that when members of a population or a sub-population are offered a choice, they will tend to choose the alternative that will favor their circumstances.  For example, it is well-established that men are more likely to select J&S annuities than women because men (on average) die at younger ages than women.

35.    Plan sponsors are permitted to make reasonable actuarial adjustments to take the costs of adverse selection into account when developing and designing pension plans.  Accordingly, I likewise take this phenomenon into account when assessing the reasonableness of

the Plan's 0.90 conversion factor by recognizing the observable gender preferences of those electing J&S annuities.

36.     **Benchmarking Analysis.**  In order to develop or evaluate a J&S conversion factor, five "ingredients" are needed:  (i) participant mortality, (ii) beneficiary mortality, (iii) gender mix, (iv) retirement age, and (v) interest rates.  One commonly accepted way to evaluate a pension plan that uses a fixed conversion factor is to compare that factor to the range of factors that would be generated using a reasonable set of assumptions for those five ingredients.

37.     I benchmarked the Plan's 0.90 conversion factor using a current mortality table, the gender mix of Plan participants who elect to receive J&S annuities, the average age at which participants retire from the Plan, and a range of current interest rates commonly used by pension actuaries for this purpose.  Based on that analysis, I conclude that—for a plan using a single, fixed conversion factor—the range of reasonable conversion factors would be 0.884 to 0.912.  I also conducted a number of other benchmarking analyses that further corroborate my conclusion and confirmed that the Plan's 0.90 conversion factor is reasonable and results in actuarially equivalent benefits.

38.     **"Cruz-only" Analysis**.  I was also asked by counsel to conduct a benchmarking analysis focused solely on Cruz.  Specifically, I benchmarked the Plan's 0.90 conversion factor based on the assumption that all of the Plan's participants were (like Cruz) males who retired at age 55.  That benchmarking exercise resulted in a range of reasonable conversion factors from 0.890 to 0.922—a range that includes the Plan's 0.90 factor.

39.     I performed this analysis because the Serota report evaluates the Plan's 0.90 conversion factor solely by reference to Cruz.  In my opinion, however, this is not the proper way to assess the reasonableness of the Plan's 0.90 conversion factor.  Pension plans routinely

10

and permissibly pool participants across ages, and so, in my opinion, the proper way to assess the

Plan's conversion factor is by reference either to the average age at which participants retire

(here, age 63.8) or the "normal retirement age" defined by the Plan (here, age 65).  While plans

are permitted to vary the applicable conversion factor based on participant age, they are not

required to do so.  And it makes little sense to benchmark a plan's single conversion factor by

reference to an atypical participant who retires at age 55.

40.     This is particularly so where a pension plan provides a substantial subsidy

(meaning additional value) to employees who retire early.  A plan sponsor might reasonably

conclude that use of a flat conversion factor is appropriate in part because the plan sponsor has

also decided to provide a subsidy for early retirees.

41.     Here, the Raytheon Plan provides for substantial retirement-type subsidies to

participants who retire before the normal retirement age.  The value of the 50% J&S annuity that

Cruz is receiving from the Plan represents approximately a 20% subsidy over the value of his

accrued benefit under the terms of the Plan.

42.     **Critique of Serota**.  I have also been asked to review and comment upon the

Serota report.  I conclude that the methodology used by Serota to evaluate whether the 0.90

conversion factor used by the Plan resulted in an actuarially equivalent benefit was flawed, and

his conclusion that 0.90 conversion factor is "too low" is not supported by an assessment that

captures current economic conditions and relevant, Plan-specific, demographic factors.  Several

of the principal bases for this conclusion are set forth below:

43.     *First*, Serota speculates that the Plan's 0.90 factor is based on a mortality table

from 1971, and suggests that the 0.90 factor is therefore out of date.  That suggestion

misapprehends the nature of annuity conversion factors.  While a pension plan's liabilities may

be highly sensitive to changes in mortality, annuity conversion factors are not.  This is because *annuity conversion factors are based on the ratio of one annuity present value to another, and mortality assumptions are included in both the numerator and the denominator.*  Thus, while increases in participant and beneficiary life expectancies will both increase the present value of a participant's benefit (and a plan's liability), the impact of those changes on the conversion factor are likely to cancel each other out.  As I demonstrate in my report, J&S conversion factors are therefore relatively stable over time, even in the face of changing ingredients (including mortality trends since the 1970s).

44.     *Second*, while Serota opines, based on his "preferred inputs," that a conversion factor of 0.939 would provide an actuarially equivalent benefit, he never squarely opines that the Plan's conversion factor of 0.90 is unreasonable.  Accordingly, Serota's apparent belief that a 0.939 conversion factor would be "best" does not establish that the Plan is using an *un*reasonable conversion factor or failing to pay Cruz an actuarially equivalent benefit.

45.     *Third*, Serota ignores important information about the demographics of the Plan. Specifically, he evaluates the 0.90 conversion factor solely by reference to a 55-year-old retiree, even though the typical Plan participant retires nearly a decade later and pooling across different ages is permitted and commonly used by plans.  He likewise ignores the fact that 75% percent of the Plan participants who select J&S annuities are male.

46.     *Fourth*, Serota advocates for calculating J&S conversion factors based on actuarial assumptions used for purposes of financial reporting.  In my experience, such assumptions are *never* used in the development or assessment of J&S conversion factors—and for good reason.

## V.     BACKGROUND

### A.     Benefit Forms

#### 1.     Defined Benefit Plans, Generally

47.     A defined benefit plan is a pension plan that traditionally promises a specified monthly benefit to participants at retirement.  The benefit is often described as a monthly amount paid from the date the participant retires until the participant's death.  The monthly amount is typically determined by multiplying the participant's years of service by either a specified dollar amount or a percentage of the participant's highest average pay over a specified period of years. The higher the participant's highest average pay and/or the more years of service he or she has, the higher the participant's benefit amount will be under the plan's defined benefit formula.[5]

48.     A defined benefit plan not only specifies the benefit *amount* to be received by a participant, but also (i) the form of payment, (ii) when the benefit commences, and (iii) the time period over which the benefit will be paid.  The "normal retirement pension"[6] under a defined benefit plan is typically a "single life annuity" that commences at a participant's "normal retirement age."  A single life annuity is a regular, monthly payment that continues for the life of the participant.  A participant's normal retirement age is defined under the terms of the plan and is typically age 65.  Thus, as a general rule, the normal retirement pension under a defined

---

[5] A defined benefit plan differs from a defined contribution plan (such as a "401(k) plan"), which does *not* promise a specific amount of benefits to a participant at retirement.  Instead, in a defined contribution plan, each participant has an account, and the participant or the employer (or both) contributes funds to the plan, which are allocated to participants' individual accounts. The contributions are invested on the participant's behalf, and at retirement, the participant typically receives the balance of his or her retirement account, reflecting the account's investment gains or losses.

[6] ERISA and related Treasury regulations use the terms "accrued benefit" and "normal retirement benefit" to refer to essentially the same thing.  I will use the term "normal retirement pension" in my report because it is the term used in the Raytheon Plan's document. As the Serota report notes, the Raytheon Plan's "normal retirement pension" is the Plan's "accrued benefit" for ERISA purposes.  *See* Serota, ¶ 16 n.3.

benefit plan is a single life annuity that begins when the participant turns age 65, continues for the life of the participant, and stops when the participant dies.

### 2.    Alternative Benefit Forms

#### a)    Optional Payment Forms

49.    Although the normal retirement pension under a defined benefit plan is typically defined as a single life annuity, plans frequently allow participants to receive their benefits in optional payment forms, *i.e.*, forms of payment other than a single life annuity.  The most common optional forms of payment are J&S annuities.  And it is not uncommon for plans to offer other optional annuity payment forms, or even a lump sum distribution option.

50.    A J&S annuity is a regular monthly payment that continues for the life of the participant and, after the participant dies, for the life of the participant's surviving beneficiary (*e.g.*, the participant's surviving spouse).  There are different types of J&S annuities, which are characterized by the percentage of the participant's monthly annuity payment that his or her beneficiary starts receiving upon the participant's death.  A 100% J&S annuity, for example, pays the participant's surviving beneficiary the same monthly amount as the participant received during the participant's lifetime.  A 50% J&S annuity, in turn, pays the participant's surviving beneficiary 50% of the monthly benefit the participant received while the participant was alive.

51.    Thus, for example, if a participant begins to receive a 50% J&S annuity of $500 per month at age 65 and dies at age 83, the participant's beneficiary (if he or she survives the participant) will, following the participant's death, receive a monthly benefit of $250 per month for the remainder of the beneficiary's  life.

52.    Under ERISA, defined benefit plans must offer a certain number of J&S annuities to married plan participants.  At a minimum, plans must offer married participants: (i) a "qualified joint and survivor annuity" ("QJSA"), which is typically a 50% J&S annuity with the

14

participant's spouse as beneficiary, and (ii) a "qualified optional survivor annuity" ("QOSA"), which is typically a 75% J&S annuity with the participant's spouse as beneficiary.[7]  A plan may specify any number of other J&S annuity options.

53.     A plan may also allow a participant to take his or her benefit in the form of a lump sum distribution.  A lump sum distribution is a one-time payment of the participant's entire pension benefit (in place of monthly payments that the participant would receive under a single life or J&S annuity).  A lump sum distribution typically equals the actuarial present value of the participant's normal retirement pension, discounted to the participant's retirement date.  For purposes of calculating a lump sum distribution amount, ERISA and the Internal Revenue Code specify the actuarial assumptions that must be used to determine the present value of the participant's normal retirement pension, which set a minimum lump sum payment amount.  A plan may, however, pay a lump sum in a greater amount—perhaps, for example, by using more generous actuarial assumptions.

### b)      Early Retirement Benefits

54.     In addition to offering a payment at normal retirement age, pension plans typically allow participants to commence benefits at ages earlier than their normal retirement age.

55.     For example, plans typically allow participants to retire early and commence receiving pension benefits before age 65.  Early retirement benefits are governed by the terms of the plan, but it is typical for plans to allow participants to take early retirement as early as age 55.

---

[7] A married participant in a defined benefit plan may elect a form of payment other than a QJSA or a QOSA, but only with the consent of the spouse.

### c) Late Retirement Benefits

56. Pension plans often defer payment when an employee continues to work past normal retirement age so that benefits begin to be paid when the employee eventually terminates employment at "late retirement." When benefit commencement is deferred past an employee's normal retirement age, the employee does not receive the pension payments that would otherwise be made between the employee's normal retirement age and the date of his or her termination of employment. Pension plans sometimes actuarially increase the employee's monthly pension benefit that he or she receives after termination of employment to reflect the value of the pension payments that were not made during the period from normal retirement age to termination of employment. In certain cases, the law requires this actuarial increase.

### d) Adjustments to the Normal Retirement Pension When Calculating Alternative Benefits

57. Absent adjustment to a participant's monthly benefit amount, certain alternative benefit forms are typically more valuable to a participant than a plan's normal retirement pension, *i.e.*, a single life annuity commencing at age 65.

58. For example, a J&S annuity is more valuable to the participant than a single life annuity of the same monthly amount because a J&S annuity is expected to be paid over a longer period of time. As explained above, a J&S annuity pays out over the lifetimes of both the participant and his beneficiary, while a single life annuity pays out over the lifetime of the participant only. So long as the beneficiary outlives the participant, the participant and his or her beneficiary will receive a greater total number of monthly pension payments under the J&S annuity as compared to the single life annuity, thereby increasing the total value received from the plan.

59.     For similar reasons, absent adjustment to the participant's monthly benefit amount, an early retirement benefit is more valuable than a normal retirement pension.  This is because the participant who takes early retirement will begin receiving benefit payments at an earlier age as compared to a participant who waits until age 65 to retire.  Assuming that an early retiree and a retiree commencing his or her pension at normal retirement age both live to be the same age, the early retiree will receive a greater total number of pension payments as compared to the participant who commences at the normal retirement age.  Everything else being equal, the early retiree will receive more value from the plan.

60.     When alternative benefit forms are more valuable to participants than the normal benefit form, plans will typically adjust the monthly benefit amount payable as an alternative monthly benefit *downward* to account for the additional value.  A participant who elects to receive his benefit as a J&S annuity, for example, will typically receive a *lower* monthly benefit amount as compared to a similarly situated participant who elects to take his benefit as a single life annuity.  Similarly, it is common for a plan to adjust the early retirement benefit so that a participant who retires (and commences his or her pension) early will receive a *lower* monthly benefit amount as compared to a similarly situated participant who retires at normal retirement age.

61.     In contrast, when a late retirement benefit is paid, the participant does not receive monthly pension payments between normal retirement age and his or her termination from employment.  Plans sometimes actuarially increase the monthly benefit amount the participant receives following his or her termination of employment at late retirement to reflect the value of the monthly pension payments the participant did not receive from his or her normal retirement age to termination of employment.

e)        **Actuarial Equivalence**

62.        The concept of actuarial equivalence is fundamental to calculating benefits that

are an alternative to a plan's normal retirement pension.

63.         "Actuarially equivalent" benefits are benefits that are equal in value to one

another under a given set of actuarial assumptions.

64.        For example, assume that the present value of a participant's single life annuity—

*i.e.*, the present value of the annuity payments that the participant can expect to receive over his

or her lifetime—is determined to be $100,000 under a given set of actuarial assumptions.  A J&S

annuity will be "actuarially equivalent" to that single life annuity if, under that same set of

actuarial assumptions, the present value of the J&S annuity—*i.e.*, the value of the annuity

payments that the participant and his beneficiary can expect to receive over their combined

lifetimes—is *also* $100,000.

65.        Actuarial equivalence also applies to early retirement benefits.  Assume that the

present value of a participant's normal retirement pension—*i.e.*, the present value (as of the date

for which the determination is being made) of the annuity payments that the participant can

expect to receive over his lifetime, beginning at age 65—is $100,000 under a given set of

actuarial assumptions.  An early retirement benefit will be "actuarial equivalent" to the normal

retirement pension if, under the same set of actuarial assumptions (and determined as of the same

date), the present value of the early retirement benefit—*i.e.*, the present value of the annuity

payments that the participant can expect to receive over his lifetime, beginning at, say, age 55—

is *also* determined to be $100,000.

66.        In assessing actuarially equivalent benefits, it is important to keep in mind that

actuarially equivalent benefits are ones that are equal to one another *under a given set of*

*actuarial assumptions*.  Actuarially equivalent benefits may not have equal present values under

18

*different* sets of actuarial assumptions.  In other words, if Actuary #1 selects one set of

reasonable assumptions to perform an actuarial equivalence calculation, and Actuary #2 selects a

different set of reasonable assumptions, the actuaries will have used the same mathematical

process, but will not necessarily compute the exact same actuarially equivalent benefit.

67.     This does not mean that only one of the two actuaries performed the calculation

correctly or that only one of the two actuaries calculated an actuarially equivalent benefit.

Except in situations where actuarial assumptions are prescribed (*e.g.*, prescribed by law or a third

party), there is no one set of "correct" actuarial assumptions that an actuary must use when

performing actuarial equivalence calculations.  Actuarial equivalence defines a mathematical

process, and both actuaries in the above example followed the specified process but used

professional judgment in selecting reasonable inputs into the process.

### 3.     Subsidies

68.     Before turning to a discussion of how single life annuities are converted into their

"actuarially equivalent" J&S annuities, it is important to pause briefly to consider the concept of

"subsidized" benefits.

69.     Although plans often convert the normal retirement pension into its actuarially

equivalent alternative benefit, plans can and do elect to pay participants subsidized benefits.

70.     Treasury regulations define a subsidy as follows:

> Retirement-type subsidy.  The term retirement-type subsidy means the
> excess, if any, of the actuarial present value of a retirement-type benefit
> over the actuarial present value of the accrued benefit commencing at
> normal retirement age.[8]

---

[8] 26 C.F.R. § 1.411(d)-3(g)(6)(iv).

Stated simply, a subsidized pension is a pension payable in an alternative form that has an actuarial present value that is *greater* than the actuarial present value of the plan's normal retirement pension.  For example, if the normal retirement pension has a present value of $100,000 and a J&S annuity has a present value of $120,000, the J&S annuity would be considered a subsidized benefit, where the subsidy is valued at $20,000.

71.     There may be any number of reasons why a plan would want to provide participants with a subsidized benefit.  Most commonly, a plan sponsor may want to encourage selection of a benefit alternative other than the normal retirement pension.

B.     **Converting Single Life Annuities to J&S Annuities**

1.     **Overview**

72.     As explained above, a pension benefit payable in the form of a J&S annuity is typically more valuable than the same benefit payable in the form of a single life annuity because the J&S annuity is expected to be paid over a longer period of time.  For this reason, a plan will typically adjust the monthly benefit amount payable as a J&S annuity *downward* so that the J&S annuity is "actuarially equivalent" to the plan's single life annuity option.

73.     To calculate an actuarially equivalent J&S annuity, a plan will use what is called a "J&S conversion factor."

74.     A J&S conversion factor is the ratio of two present values: (1) the present value of $1 per month payable as a single life annuity, and (2) the present value of $1 per month payable as a J&S annuity.

75.     Here is a simplified example of how a J&S conversion factor might be calculated.

A = the present value of $1 per month payable as a single life annuity = $144

B = the present value of $1 per month payable as a J&S annuity = $160

The J&S conversion factor is equal to A divided by B = $144/$160 = **0.90**

76.     Using this J&S conversion factor of 0.90, one can now determine the amount of the J&S annuity that is actuarially equivalent to a single life annuity of any amount.  For example, for a single life annuity of $1,000 per month:

J&S benefit = single life annuity x J&S conversion factor = $1,000 x 0.90 = $900

77.     Comparing present values of $1,000 payable as a single life annuity and $900 as a 50% J&S annuity, one can see that the present values are equal:

Present value of single life annuity = $1,000 x 144 = $144,000

Present value of 50% J&S annuity = $900 x 160 = $144,000

## 2.     J&S Conversion Factors Are Ratios of Present Values

78.     Although present value factors and J&S conversion factors are developed using similar ingredients—mortality and interest rate assumptions—changes in each of these ingredients have different impacts on present value factors and J&S conversion factors.  This is because J&S conversion factors are ratios of present values, and not present value factors themselves.  Figure 1 illustrates this distinction by showing the effect of a change in one ingredient, assuming each of the other ingredients remains the same.

**Figure 1:  Disparate impact of changes in ingredients**

| | Change in present value factor | Change in J&S conversion factor |
|---|---|---|
| Increase in average retiree life expectancy | Increase | Increase |
| Increase in average beneficiary life expectancy | Increase | Decrease |
| Decrease in interest rate | Increase | Decrease |

Figure 1 underscores that:

- An increase in the assumed life expectancy of retirees will generally cause J&S conversion factors to increase.

- An increase in the assumed life expectancy of beneficiaries will generally cause J&S conversion factors to decrease.

- A decrease in the interest rate will cause J&S conversion factors to decrease.[9]

79.    These directional impacts assume that we change the single indicated ingredient only, while holding all other ingredients constant.  However, if more than one ingredient is changed simultaneously, the impact is difficult to generalize about, even directionally, because various impacts may (and are likely to) offset one another.  For example, if both retiree life expectancy and beneficiary life expectancy increase, then the J&S conversion factor could go up or down, depending on which ingredient had the bigger impact.  Similarly, if retiree life

---

[9] In contrast, actuarial adjustments for late retirement (described above) work differently.  In particular, the impact of changes in interest rate or life expectancy assumptions on late retirement adjustments is the opposite, directionally, of the impact of those changes on the present value factor.  For example, a decrease in the interest rate assumption decreases the adjustment for late retirement (and therefore reduces the actuarial increase to the monthly benefit amount that begins to be paid after termination of employment at late retirement).  In addition, an increase in life expectancy decreases the adjustment for late retirement (and therefore reduces the actuarial increase to the monthly benefit amount that begins to be paid after termination of employment at late retirement).  To illustrate with a simplified example:  If a 71-year-old participant is expected to live 10 years and forgoes one year of payments by working another year, the adjustment for a later retirement would make up for the loss of 1/10 of the participant's payments, and would be paid over less than 10 years.  If, on the other hand, life expectancy improves to 15 years for a 71-year-old, then the participant has lost only 1/15 of his expected payments, and any adjustment would be paid over less than 15 years; therefore, the adjustment would be smaller.

expectancy increases and the interest rate decreases, the J&S conversion factor could go up or down depending on which ingredient has the greater impact.

80.     Consider this illustration.  From 2019 to 2020, I looked at changes in 30-year Treasury rates as well as changes in observed U.S. mortality as reported by the Social Security Administration.  These assumptions are summarized here in Figure 2.

**Figure 2:  Interest and mortality from 2010 and 2020**

| Current interest and mortality assumptions | 2019 | 2020 |
|---|---|---|
| 30-year Treasury rate for October 31 of preceding year | 3.39% | 2.17% |
| Most recently available U.S. mortality table (80%/20% male/female blend for retirees) | SSA 2015 | SSA 2016 |

81.     Next, I calculated present values factors for both a single life annuity and a 50% J&S annuity for a 65-year old (with spouse of the same age) in both 2019 and 2020.  In both cases, the present value of the single life annuity increased due to the changes in both interest and mortality.  As shown in Figure 3 below, the single life annuity value increased by 12.7% and the J&S annuity value increased by 13.9%.  And, the resulting actuarially equivalent J&S conversion factor decreased by 1%.

**Figure 3:  Changes in key factors based on changes in ingredients**

| | 2019 | 2020 | Percentage change |
|---|---|---|---|
| Present value of SLA | 13.02 | 14.67 | 12.7% |
| Present value of 50% J&S annuity | 14.61 | 16.64 | 13.9% |
| 50% conversion factor | 0.891 | 0.882 | -1.0% |

82.     An important corollary to this is that, in the context of J&S conversion factors, examining any one actuarial ingredient on its own is inappropriate.  It is the interaction between and among the various ingredients, and their combined effects, that is important.

83.     In addition, because J&S conversion factors are ratios of present values—not present values themselves—conversion factors tend to remain stable over time.  An example from a different context helps to illustrate this principle.

84.     Since the 1980s, residential home prices have increased dramatically in the United States.  The price of a three-bedroom home today is higher than the price of a three-bedroom home in the 1980s.  Relative home prices, however, have not changed as significantly.  Although the price of a three-bedroom home today is higher than what it was in the 1980s, the price of a three-bedroom home *relative to the price of a two-bedroom home* is not necessarily higher.  To the contrary, if the prices of both two- and three-bedroom homes have increased at roughly the same rate, the *ratio* of home prices will remain the same, even as the prices themselves have changed.  Only if the price of a three-bedroom home has increased or decreased *relative the price of a two-bedroom home* is there reason to believe that the ratio has changed.

85.     The same is true of J&S conversion factors.  Since the 1980s, the general trend has been toward improved expected mortality and longer life expectancy.  This has meant that the typical participant in a defined benefit plan is paid more monthly annuity payments, and pension plan sponsors have incurred increased pension-related costs.  However, only if the present value of a single life annuity has increased or decreased *relative to the present value of a J&S annuity* would the conversion factor be affected.  In other words, because mortality is included in both the numerator and the denominator of the conversion factor calculation, changes in mortality tend to have only a muted impact on conversion factors, and improvements in mortality do not themselves imply any change to the conversion factor.

86.     To illustrate this, I analyzed the possible range of tabular 50% J&S conversion factors for 65-year-old retirees, with a spouse of the same age, considering known, illustrative

mortality tables as well as prevalent interest rates from the time period typically used by

actuaries and plan sponsors.  All other actuarial ingredients are held constant over the span of

decades.  My analysis is summarized in Figure 4.

**Figure 4:  Range of 50% J&S conversion factors based on illustrative actuarial ingredients since the 1970s[10]**

| Period | Mortality Table | Range of reasonable interest rates | Range of Resulting 50% J&S Conversion Factors |
|---|---|---|---|
| 1970s | GAM-71 | 5.0% - 8.0% | 0.879 - 0.920 |
| 1970s - 80s | UP-84 | 5.0% - 8.0% | 0.877 - 0.913 |
| 1990s | UP-94 | 3.0% - 7.0% | 0.881 - 0.924 |
| 2000s | RP-2000 | 3.0% - 7.0% | 0.882 - 0.921 |
| 2010s | RP-2006 | 1.5% - 5.0% | 0.872 - 0.912 |
| 2020s | Pri-2012 | 1.5% - 5.0% | 0.878 - 0.915 |
| U.S. most recent | CDC – 2017 | 1.5% - 5.0% | 0.878 - 0.917 |

87.     Note that, while present value calculations have changed considerably over this

period of several decades, the range of possible tabular factors has not.  Figure 5, below,

demonstrates this point.  Focusing only on the lower end of the interest rate range (and assuming

for consistency an 80%/20% male/female gender mix for each calculation), over the span of

several decades since the 1970s, the present values have risen substantially for both the single

life annuity as well as the 50% J&S annuity.  Yet, the ratio of the two, which is the related 50%

J&S conversion factor, remains stable over this same span of decades.

---

[10] The other key actuarial ingredients, used consistently for the calculations across all time periods, are the gender mix (50% male to 80% male) and the retirement age (age 65).  See Appendix B for additional detail about the underlying assumptions.

**Figure 5:  Comparison of change in annuity present values versus change in related 50% J&S conversion factors based on illustrative ingredients since the 1970s**

| Period | Mortality Table | Interest Rate | Illustrative values associated with the low end of the range of reasonable interest rates | | |
|---|---|---|---|---|---|
| | | | Present value of SLA | Present value of 50% J&S annuity | 50% J&S conversion factor |
| 1970s | GAM-71 | 5.00% | 10.266 | 11.678 | 0.879 |
| 1970s - 80s | UP-84 | 5.00% | 9.994 | 11.400 | 0.877 |
| 1990s | UP-94 | 3.00% | 13.251 | 15.046 | 0.881 |
| 2000s | RP-2000 | 3.00% | 12.928 | 14.656 | 0.882 |
| 2010s | RP-2006 | 1.50% | 15.132 | 17.356 | 0.872 |
| 2020s | Pri-2012 | 1.50% | 15.617 | 17.790 | 0.878 |
| U.S. most recent | CDC - 2017 | 1.50% | 15.770 | 17.957 | 0.878 |

88.      This helps demonstrate that changes in life expectancy and changes in interest rates that we have seen over the last 35 years have had a significant impact on plan liabilities, but a negligible impact on J&S conversion factors.  Thus, it is no surprise that conversion factors that may have been established decades ago may still be reasonable today, even as plan liabilities have risen dramatically.

89.      These same reasonable ranges are depicted in Figure 6, where, for reference purposes, the Raytheon Plan's 0.90 factor is shown in conjunction with each reasonable range.

**Figure 6:  Range of reasonable tabular 50% J&S conversion factors considering relevant, reasonable actuarial ingredients since the 1970s; including Raytheon 0.90 factor as a reference point**



### 3.    Regulatory History

90.    A variety of regulations govern the calculation of J&S conversion factors.  The following section provides a brief history of these regulations.

91.    Before the 1980s, plan documents were often silent regarding how single life annuities would be converted into other optional forms.  Instead, it was not uncommon for such conversions to be performed as part of the plan's normal administrative process, with plan sponsors exercising discretion as to how to convert a single life annuity into other payment forms, including J&S annuities.

92.     This changed when the Internal Revenue Service ("IRS") issued Revenue Ruling 79-90 in 1979.[11]  That revenue ruling cabined plan sponsors' discretion to convert normal retirement pensions into alternative benefits by requiring that plans specify the basis for converting participants' accrued benefits into other payment forms.

93.     Revenue Ruling 79-90 imposed two requirements on plan sponsors.  First, plan sponsors were required to adopt a specific process for converting the accrued benefit into alternative payment forms in a way that "precludes employer discretion."  Second, plan sponsors were required to specify that process in the plan document itself.  By requiring plans sponsors to set forth the conversion process in the plan document itself—and to adopt a process that prevents employers from performing benefit conversions arbitrarily—Revenue Ruling 79-90 sought to introduce transparency and predictability into the benefit conversion process.

94.     Although Revenue Ruling 79-90 removed employers' discretion as to how to perform benefit conversions, it allowed discretion with respect to the choice of compliance alternatives.  Revenue Ruling 79-90 defined four acceptable standards for devising optional form conversion factors: two fixed standards and two variable standards for conversion.  These are depicted in Figure 7.

---

[11] Revenue Ruling 79-90 is applicable today.  It has never been replaced or rescinded.  Some of the concepts have actually been codified in amendments to the Internal Revenue Code.  The ruling is referred to in the IRS's current examination process.

**Figure 7:  Acceptable standards for optional form conversion factors under Rev. Rul. 79-90**



95.     As reflected in Figure 7, Revenue Ruling 79-90 permits defined benefit plans to calculate benefit conversion factors pursuant to "Acceptable Fixed Standards" and "Acceptable Variable Standards."

96.     An "Acceptable Fixed Standard" is one that is specified in the plan document and remains constant over time.  Revenue Ruling 79-90 lists two permissible approaches for setting Acceptable Fixed Standards.

97.     *First*, the plan can specify the actuarial assumptions used to calculate benefit conversion factors, including interest rate and mortality assumptions (the "Interest Rate and Mortality Approach").  A plan, for example, might specify that a 50% J&S conversion factor is to be calculated using a 5% interest rate and the 1983 Group Annuity Mortality table, adjusted for a 80% male/20% female population for participants and a 20% male/80% female population for beneficiaries.  This specification provides sufficient information to calculate a 50% J&S conversion factor that is uniquely determined by these inputs.

98.     *Second*, the plan can specify a table of factors for converting single life annuities into alternative payment forms (the "Tabular Factor Approach").  In contrast to the Interest Rate

and Mortality Approach, a plan that adopts the Tabular Factor Approach does not specify the various assumptions and processes by which tabular factors are developed.  Instead, the factors themselves are spelled out explicitly in the plan document in a manner that facilitates a more straightforward understanding of the conversion process.  In other words, while the "Interest Rate and Mortality Approach" specifies a set of ingredients that together produce a conversion factor, the "Tabular Factor Approach" sets forth the conversion factor itself.

99.     A plan may also adopt "Acceptable Variable Standards" to calculate benefit conversion factors.  Unlike Acceptable Fixed Standards, Acceptable Variable Standards do not produce conversion factors that remain constant over time.  Rather, an Acceptable Variable Standard provides for self-adjusting changes to conversion factors, in ways that are independent of employer discretion.  Revenue Ruling 79-90 describes two types of Acceptable Variable Standards.

100.     *First*, the plan can make reference to the annuity purchase rates of a specified insurance company—essentially the single premium rates for individual annuity contracts.  Some plans have adopted a variation of this variable basis which relies on the so-called "PBGC basis,"[12] which is a government-developed proxy for annuity purchase rates.

101.     *Second*, the plan can adopt an interest rate assumption that is a specified percentage (*e.g.*, 50%) of the prime lending rate of a designated bank.  A mortality assumption would also be specified in conjunction with this variable interest rate assumption.  The IRS

---

[12] The PBGC is the "Pension Benefit Guaranty Corporation," a government agency that serves as an insurer for certain benefits under terminated pension plans.  The PBGC closely monitors the single premium annuity market and regularly publishes a composite annuity purchase rate basis. References to the "PBGC basis" or the "PBGC rate" refer to the PBGC's regularly published composite annuity purchase rate or to the published interest rate underlying their published composite annuity purchase rate.

examination process,[13] while referring to Revenue Ruling 79-90 when describing acceptable approaches, also expands the "prime rate" example to other publicly available rates, such as Treasury rates or PBGC rates.

102.     There are pros and cons associated with using Acceptable Fixed Standards versus Acceptable Variable Standards and vice versa.  For example, Acceptable Fixed Standards have the advantage that benefit amounts calculated pursuant to fixed standards are known, predictable, and stable.  Plan participants frequently request estimates of their benefits before they retire, and using Acceptable Fixed Standards allows a plan to more accurately model participants' benefit options years in advance of their retirement.  Acceptable Variable Standards, by contrast, are tied to the market conditions prevailing when the participant retires.  The fact that Acceptable Variable Standards are tied to market conditions makes it impossible for the plan to forecast participants' benefit amounts with a high degree of certainty.

103.     Notwithstanding the pros and cons of these approaches, it bears emphasis that either set of standards is an acceptable choice for plan sponsors.  Neither the IRS nor Congress has expressed a preference for converting single life annuities to alternative benefit forms using Acceptable Fixed Standards versus Acceptable Variable Standards.  Indeed, I am unaware of *any* law or regulation that requires a plan sponsor to choose an Acceptable Fixed Standard over an Acceptable Variable Standard or vice versa.

---

[13] Internal Revenue Manuals, Part 4.72.10, *available at* https://www.irs.gov/irm/part4/irm_04-072-010.

C.      **Acceptable Fixed Standards**

1.      **Overview**

104.    As explained above, Revenue Rule 79-90 specifies two forms of Acceptable

Fixed Standards: (1) the Interest Rate and Mortality Approach, and (2) the Tabular Factor

Approach.

105.    In my experience, both approaches are widely used by plans that adopt an

Acceptable Fixed Standard.  The two approaches have the same objective, *i.e.*, to convert the

single life annuity benefit under the pension plan to its actuarially equivalent alternative benefit,

but they accomplish this objective in different ways.  Each approach is addressed in turn.

2.      **"Ingredients" Used to Develop J&S Conversion Factors**

106.    There are five ingredients of a J&S conversion factor: four demographic

assumptions and one economic assumption.  The four demographic ingredients include the

selection of (1) a baseline gender-distinct mortality table for retirees, (2) a baseline gender-

distinct mortality table for beneficiaries, (3) an appropriate gender mix for retirees and typically

the mirror image of such mix for beneficiaries, and (4) the retirement age of the average or

typical participant for the relevant population.  The economic assumption is an interest rate,

which accounts for the time value of money.  These ingredients may be either explicit or

implicit, depending on the type of fixed approach selected.

107.    I briefly describe each of these ingredients below.

108.    **Retiree baseline mortality.** A baseline table is needed as part of the creation of a

"unisex" mortality table for retirees for direct use in the development or assessment of a J&S

conversion factor.  Actuarial considerations for selecting a baseline table will typically include

identifying an existing standardized mortality table, which may then potentially be customized

by available, credible plan-specific mortality experience or other actuarial considerations relevant to the plan's population, such as the occupation of plan participants.

109.    **Beneficiary baseline mortality.** A baseline table is also needed for the creation of a "unisex" mortality table for beneficiaries for direct use in the development or assessment of a J&S conversion factor.  Actuarial considerations for selecting a baseline table for beneficiaries may also include an existing standardized mortality table, but it need not be from the same study or family of tables as for retiree mortality. For example, to the extent that there is no particular knowledge with regard to beneficiaries' expected life span, one may reasonably consider using available, general U.S. population mortality tables.

110.    **Gender mix.** Under the Supreme Court's 1983 decision in *Arizona Governing Committee v. Norris*, ERISA plans may not use gender-specific conversion factors—*i.e.*, a plan cannot determine benefits payable using one conversion factor that is applicable to male participants and a different conversion factor that is applicable to female participants.  Yet it is well established by demographers and actuaries that male and female mortality is very different for otherwise similar populations (*i.e.*, females live longer).  Accordingly, ERISA plans typically develop "unisex" mortality tables by blending the male and female mortality rates of the baseline tables.  An assumption regarding the gender mix of the relevant population is therefore necessary in order to develop the required unisex mortality table.  It is common practice to reflect the reverse gender mix for beneficiary mortality, on the assumption that married couples are typically of opposite sex.

111.    **Average or typical retirement age.** This is a necessary ingredient for development of tabular J&S conversion factors.  When comparing the value of two cash flows,

we need to establish an age-based starting point from which present values can be calculated. The J&S conversion factor is then the ratio of these two present value calculations.

112.    **Interest rate.** This assumption is needed to account for the time value of money (*i.e.*, the idea that a dollar today is typically more valuable than a dollar in the future). Discounting projected pension payments using the interest rate is an essential step in calculating a present value, and thus the ratio of present values.

### 3.    Development of Conversion Factors

113.    As discussed above, the two Acceptable Fixed Standards under Revenue Ruling 79-90 are the Interest Rate and Mortality Approach and the Tabular Factor Approach. Each approach is addressed in turn.

#### a)    Interest and Mortality Approach

114.    Plans that adopt the Interest Rate and Mortality Approach for developing conversion factors specify the various ingredients used to calculate benefit conversion factors in the plan document. That is, the plan specifies relevant assumptions for: (1) retiree mortality, (2) beneficiary mortality, (3) gender mix, (4) retirement age, and (5) the interest rate.

115.    When selecting the ingredients used to calculate conversion factors, a plan sponsor will typically look to plan-specific demographic and economic conditions to help craft the specific ingredients.

116.    For example, to establish an assumption for participant mortality, a plan will want to consider a mortality table that is relevant to the participant population. This may be a standardized or customized mortality table. Because ERISA requires the application of the same mortality assumption for both male and female participants—and because both standard and customized mortality tables are typically gender-specific—the plan sponsor will blend relevant male and female mortality tables to create a unisex table that can be applied uniformly to men

34

and women.  In creating a unisex table, plan sponsors may reasonably choose to apply a gender

mix that reflects the observed gender mix of plan participants or plan participants who select the

particular payment option (*e.g.*, a J&S annuity).  A similar process is followed for beneficiary

mortality.  The selection of a gender mix that reflects actual plan experience is an example of the

adverse selection concept discussed below.

117.    To set the plan's interest rate assumption, plan sponsors typically select an

interest rate that is reflective of the general level of prevailing interest rates over a period of

several years.  The types of rates that plan sponsors consider when selecting an interest rate

assumption include U.S. Treasury rates, PBGC rates, and high-quality corporate bond yields.

### b)    Tabular Factor Approach

118.    Plans that adopt the Tabular Factor Approach do *not* specify the ingredients used

to calculate J&S conversion factors.  Instead, plans using the Tabular Factor Approach to set

benefit conversion factors will simply specify the conversion factors themselves.

119.    There are many reasons why a plan might select the Tabular Factor Approach

over the Interest Rate and Mortality Approach, which is why, in my experience, use of tabular

factors is not uncommon.  Chief among them is simplicity of communication and administration.

It is much easier for plans to communicate to participants—and for participants to understand—

how single life annuities are converted into J&S annuities if there is a fixed numerical factor in

the plan by which a single life annuity amount can be multiplied to generate a J&S annuity

amount.  For example, if a participant knows that, under her pension plan's benefit formula, she

has accrued a pension benefit of $1,000 per month beginning at age 65 and payable for her life,

and she is told that the 50% J&S conversion factor is 0.90, the participant can easily understand

that, if she elects a 50% J&S annuity, the benefit would be $900 per month for her life and $450

per month for her surviving spouse.  In contrast, unless the participant is an actuary, she would

not likely be able to calculate her J&S annuity amount if she is merely given a mortality table and interest rate.

120.    Even though plans that adopt the Tabular Factor Approach do not specify the ingredients used to calculate conversion factors in the plan itself, plan sponsors nonetheless consider such ingredients when setting or evaluating the plan's tabular factors.  In other words, plans that select the Tabular Factor Approach will typically consider assumptions for participant mortality, beneficiary mortality, gender mix, retirement age, and the interest rate when setting the plan's tabular factors.

121.    That said, there are important differences between the selection of ingredients under the Interest Rate and Mortality Approach and the selection of conversion factors under the Tabular Factor Approach.

122.    First, because plans that adopt the Tabular Factor Approach are not required to define the specific ingredients used to calculate benefit conversion factors, plans that adopt the Tabular Factor Approach may consider—and blend—multiple assumptions when setting a conversion factor.  For example, a plan sponsor may determine that more than one mortality table is relevant to participants' mortality experience.  A plan that adopts the Interest Rate and Mortality Approach would ordinarily feel compelled to select one mortality table or the other to calculate conversion factors.  A plan that adopts the Tabular Factor Approach, by contrast, could incorporate aspects of both mortality tables into its selection of a numerical factor for converting benefits into different payment forms.  For example, if one mortality table produced a factor of 0.89 and another produced a factor of 0.91, the plan may decide to split the difference and select a benefit conversion factor of 0.90.

123.     Second, in keeping with the goal of simplifying plan administration, plan sponsors that adopt the Tabular Factor Approach frequently establish a tabular factor based on the "typical" or "average" participant that elects a particular payment option.  For example, if the average participant who selects a 50% J&S annuity retires at age 64, a plan sponsor may select a tabular factor that is weighted toward an age 64 retirement age.  In other words, plans that select the Tabular Factor Approach often select a single factor for all ages, based on the age at which an "average" or "typical" participant retires or is expected to retire.[14]  This is one example of the pooling concept discussed below.

### 4.     Considerations When Developing and Evaluating Conversion Factors

124.     When developing and evaluating conversion factors, two fundamental actuarial principles inform the analysis: (1) pooling, and (2) adverse selection.  Each concept is addressed in turn below.

### a)     Pooling

125.     Pooling is a well-established concept and is deeply rooted in actuarial science.  It is a fundamental principle underlying pension plans.

126.     Pooling refers to the aggregation of risk for common treatment.  The concept recognizes that risk cannot (or should not) always be evaluated on an individualized basis and therefore looks for ways to account for risk in relation to a broader frame of reference.

127.     The concept of pooling may be illustrated with an example from the context of life insurance.  In setting the cost of a life insurance policy, an insurance company may require

---

[14] By contrast, plans that adopt the Interest Rate and Mortality Approach typically allow conversion factors to vary across ages.  Both approaches are permitted under ERISA and the relevant Treasury regulations.

an applicant to submit to a full medical exam in order to tailor the price to the risk associated with insuring that particular applicant.

128.    Alternatively, the insurance company may decide to offer life insurance to a large group of individuals (such as everyone employed by a particular company) and price the policy based on more general information about the risks of insuring employees of the same company and/or members of the same profession.  By pooling across the entire company, the insurance company's risk is spread.  In other words, while some of the company's employees will likely be less healthy than others (and thus the insurance will be a better "deal" for some employees than others), the goal of the insurance company is to price the policy appropriately based on the average or typical employee who elects to obtain coverage.

129.    As a third option, the insurance company may set the cost of a policy based on national or state-wide demographic information.  For example, an insurance policy may be offered to all residents of a particular state based only on factors such as age, gender, and smoking status.

130.    There is no right or wrong way to set the cost of the insurance policy.  Moreover, some degree of pooling is almost always necessary.  For example, even where an insurance company obtains detailed health information about an applicant and uses that information to price the policy, the insurance company is still effectively pooling risk across the many policyholders with similar health profiles.

131.    Pooling is also a fundamental concept for defined benefit pension plans. Actuarial assumptions are used in many ways, including the calculation of a benefit, adjusting the benefit to be paid earlier or later, or, as relevant in this case, converting one form of benefit into another.  In each case, mortality assumptions are not individualized based on the

participant's health or other characteristics.  Instead, mortality assumptions are based on averages for a given relevant population, which may include, for example, the population of participants in the plan or subplan, all of the employees at the company that sponsors the plan, all of the employees in a given industry, or the U.S. population as a whole.

132.    Pooling of disparate risks inevitably leads to some individuals doing comparatively better than others.  For example, a participant who elects to take his or her pension as a single life annuity, and then lives to be 100, comes out "ahead" of the average plan participant because the individual participant's benefit was calculated on the assumption that he or she would die sometime before reaching 100.  By contrast, a participant who elects to take his or her benefit as a single life annuity only to die a year later comes out "behind" the average plan participant because the individual participant's benefit was set assuming that he or she would receive benefits under the plan for many years after his or her retirement date.

133.    The example I just described is illustrative of events or circumstances that occur following a pension election and can be determined only in retrospect.  A different sort of pooling analysis, however, can also be done in advance.  For example, consider a pension plan with a lump sum payment option.  By law, the lump sum conversion factors must be the same for otherwise similarly situated males and females, even though (on average) it is understood that females will live longer.  In this situation, males will (on average) receive a benefit of greater value than otherwise similarly situated females.[15]

---

[15] All else equal, the assumption that a participant will live longer will result in a greater lump sum benefit.  Accordingly, by using mortality assumptions that assume that males will live longer than they do on average, a lump sum conversion factor based on a unisex mortality table will provide a relatively greater benefit to men.

134.    It is important to note that such analyses are based only on averages, and not the actual experience of any particular participant.  There is enormous uncertainty associated with any single individual's lifetime that cannot possibly be predicted on an individual basis in advance.  Thus, for example, while lump sum conversion factors are relatively unfavorable to females as a group, a female who dies very shortly after taking a lump sum has received a benefit that is substantially greater than the value of the single life annuity that she might have elected instead.

135.    Pooling is expressly permitted by ERISA and related regulations.  For example, in describing how actuarial equivalence is to be determined in calculating QJSA benefits, the regulations provide:

> Equivalence may be determined, on the basis of consistently applied reasonable actuarial factors, for each participant or *for all participants or reasonable groupings of participants*, if such determination does not result in discrimination in favor of employees who are officers, shareholders, or highly compensated.[16]

The reference to "reasonable actuarial factors for each participant or for all participants or reasonable groupings of participants" is a reference to pooling.  Under the regulation, unique conversion factors need not be calculated "for each participant," but rather can be calculated "for all participants" or for "reasonable groupings of participants."  In other words, plan sponsors may look to demographic information for the entire plan—or a reasonable subset of the plan—and construct a QJSA conversion factor that is reasonable for the "average" or "typical" participant in the grouping.

136.    This common actuarial concept is not new.  Indeed, I understand this concept was recognized in the legislative process as Congress was enacting ERISA in 1974:

---

[16] 26 C.F.R. § 1.401(a)-11 (emphasis added).

> The reduction permitted on the basis of actuarial equivalence [in calculating QJSAs] need not involve a variety of reductions dependent on the life expectancy of each participant and of the participant's spouse. *A uniform reduction or a simplified schedule of reductions will fulfill the intent of this provision if it can be established to provide actuarial equivalence in the case of the average participant.*[17]

137.    In calculating conversion factors, plan sponsors typically engage in at least two types of pooling: (1) gender pooling, and (2) age pooling.

138.    **Gender Pooling.**  As discussed above, pension benefits are required to be gender neutral, which means that plans may not pay different pension amounts to male and female participants based solely on their gender, even though male mortality differs from female mortality.  Accordingly, although actuaries typically use gender-specific mortality tables, a plan cannot apply a "male table" to calculate benefit conversion factors for male participants and a "female table" to calculate conversion factors for female participants.

139.    This, however, does not mean that plans cannot consider the gender mix of the relevant group of plan participants when calculating conversion factors.  Indeed, although plans cannot apply a male table to male participants and a female table to female participants, plans *can* apply a "unisex" table to *all* participants based on the gender mix of a pooled population. For example, if 60% of pool participants are male and 40% of pool participants are female, a plan could create a unisex table weighted 60% toward the male table and 40% toward the female table.  The resulting mortality table is considered "unisex" because the same table is then applied to both male and female participants, and thus participants are not receiving different benefits on account of their gender.

---

[17] 120 Cong. Rec. 3977 (Feb. 25, 1974) (statement of Rep. Perkins) (providing House members with "material in the nature of a committee report" from the Committee on Education and Labor in advance of floor debate on ERISA) (emphasis added).

140.     Because the unisex mortality table—as well as the conversion factors derived from it—is tailored to the relevant plan's demographics, the plan's unisex mortality assumption is likely to reflect its gender-distinct mortality experience *in the aggregate*.  Plans may pool for gender across the plan's entire population or a relevant subset of the population, including participants who select a particular payment forms (as discussed more fully below).

141.     **Retirement Age.**  As discussed above, the age at which a participant retires affects the value of his or her pension benefit.  All else being equal, the earlier a participant retires, the greater the aggregate benefit he or she will receive over the course of his or her lifetime.  For this reason, plans account for retirement ages when selecting benefit conversion factors.

142.     Plans may create age-specific conversion factors—*e.g.*, one conversion factor that applies to participants who retire at age 55, another conversion factor that applies to participants who retire at age 56, and so on.  Alternatively, plans may create conversion factors with reference to the expected "typical" or "average" age of the participant.  This expectation may be based on experience, presuming there is no reason to believe that future retirement experience will deviate significantly from the past.

143.     For example, if participants under a plan retire, on average, at age 64, the plan may adopt a benefit conversion factor that assumes an age 64 retirement age.  In this way, the benefit conversion factor will reflect plan-relevant experience in the aggregate.  This approach is consistent with the "average participant" paradigm and is widely used by plans with the full understanding that it will, on average, result in participants who retire at an atypically early (or late) age to receive a comparatively lower (or higher) benefit.

144.    Likewise, pension plans are required under ERISA to specify a "normal" retirement age for the plan—typically age 65.  Plan sponsors therefore might reasonably use the "normal" retirement age under the plan for purposes of developing or evaluating conversion factors, even though use of the plan's normal retirement age will result in a comparatively smaller benefit for those who elect to retire early.  This choice may make particular sense, as a matter of plan design, where other features of the plan provide subsidized benefits for participants who retire early.

### b)    Adverse Selection

145.    Adverse selection refers to the observed phenomenon that when members of a population or a sub-population are offered a choice, they will tend to choose the alternative that will favor their circumstances.  This phenomenon means that averages may be skewed when individuals are free to select a particular option according to their circumstances.  For example, if, on average, one out of 1,000 people in the U.S. have a car accident each year, and a car insurance company decides to allow people to sign up for auto insurance *retroactively* after having an accident, it would likely find that close to 100% of its insureds have accidents each year because only an individual who has experienced an accident would sign up.  The difference between the U.S. average (1/1,000) and the insurer's experience (almost 100%) would be based on *adverse selection*.

146.    Another example, in this instance based on *prospective* decision making, further illustrates the concept of adverse selection.  Imagine that an insurance company is seeking to price a group term life insurance policy that will be made available, on a voluntary basis, to all employees of a given firm.  If the insurance company prices the policy based on average mortality of the population of the firm's employees as a whole, the price will likely be too low.  This is because not every employee will elect to purchase life insurance, and employees who are

either older or who have higher risks of death will be more likely to decide to purchase coverage. Accordingly, unless the insurance company takes adverse selection into account, it will not properly price the policy.

147.    Adverse selection plays an important role in both the design and evaluation of pension plans.

148.    For example, the J&S annuity option pays a death benefit in the form of a survivor annuity upon the death of the participant.  In a world in which participants lacked the ability to make predictions about the future, one would expect the J&S annuity option to be equally enticing to all married participants.  In other words, there would be no reason to think that any particular "type" or "category" of married participant would select the J&S annuity option with a higher frequency than any other type or category of married participant.

149.    Participants, however, do have the ability to make predictions about the future based on relevant personal information.  In particular, participants in a pension plan must be given the opportunity to select their form of benefit shortly (typically within 90 days) before retiring.  Thus, a pension plan is not permitted to require a participant to make his or her J&S election years in advance.  This is where adverse selection comes into play.  For example, a married participant who knows that he is in poor health—but his beneficiary is in good health— is more likely to select a J&S annuity option because he knows that he and his surviving beneficiary will likely receive a greater aggregate benefit under the J&S annuity as opposed to the single life annuity, which stops upon the participant's death.  Conversely, a married participant who knows that he is in good health—but his beneficiary is in poor health—is more likely to select a single life annuity because if the participant outlives his beneficiary, he will receive a greater aggregate benefit under the single life annuity option as compared to the J&S

annuity option.  Just as it is reasonable for a life insurance company to take into account the fact

that people with a greater mortality risk are more likely to purchase optional coverage when

setting premiums, it is reasonable for a plan sponsor to take into account the fact that less healthy

participants are more likely to elect J&S annuity benefits when calculating J&S annuity

conversion factors.

150.    As another example, it is common knowledge that women tend to outlive men.

For this reason, among others, men are more likely to select a J&S annuity option upon

retirement and women are more likely to select a single life annuity.  Indeed, a 2003 study from

the Urban Institute found that "overall, 28 percent of married men and 69 percent of married

women opt for single life annuities instead of joint and survivor annuities."[18]  This is consistent

with my experience in analyzing the gender composition of J&S recipient subpopulations.

151.    Because "adverse selection" affects, among other things, the payment options that

participants select under a plan, it is appropriate to anticipate adverse selection when developing

conversion factors.  As with pooling, the concept of adverse selection is not new.  Indeed, I

understand that, when enacting ERISA, Congress understood that, when setting J&S conversion

factors in determining actuarial equivalence, a plan could consider how adverse selection affects

the benefit options that participants choose.  Specifically, a Congressional conference report

stated:

> The bill does not require the plan to "subsidize" the joint and survivor
> feature (although the plan is permitted to do so) and that *plans may make
> reasonable actuarial adjustments to take account of the possibility that*

---

[18] See "Single Life vs. Joint and Survivor Pension Payout Options - How Do Married Retirees Choose?," Urban Institute, 2003, available at http://webarchive.urban.org/publications/410877.html; a version of this paper was also published in 2005 in The Gerontologist, available at https://academic.oup.com/gerontologist/article/45/1/26/631683.

> *total costs of the plan otherwise might be increased because of adverse selection.*[19]

152.   In other words, to help ensure that plans do not experience undue costs when offering the J&S annuity option, plans are not required to ignore the fact that participants who select the J&S annuity option frequently do so based on personal information they have about their health, their beneficiary's health, and the likelihood that their beneficiary will outlive them. Instead, consistent with established actuarial principles, plans are allowed to account for the fact that participants who select J&S annuities frequently do so because they view the J&S annuity option to be more advantageous to them than the single life annuity option.

153.   This ability for plans to address the costs of J&S annuities through reasonable actuarial adjustments is confirmed by an IRS regulation explaining the statutory QJSA provisions:

> *Costs of providing qualified joint and survivor annuity form or early survivor annuity form.* A plan may take into account in any equitable manner consistent with generally accepted actuarial principles applied on a consistent basis any increased costs resulting from providing qualified joint and survivor annuity and early survivor annuity benefits.[20]

154.   One way to take into account adverse selection with respect to the evaluation of a J&S conversion factor is to take into account the gender mix of the participants who actually elect that form of benefit.  Because men, on average, have shorter life spans than women, the actual gender mix of the participants electing a J&S annuity is likely to better reflect the effect of adverse selection on the value of the J&S annuity than the gender mix of the plan population as a

---

[19] H.R. 93-1280, at 280 (1974) (Conf. Rep.) (emphasis added).  See also ERISA § 205(i), 29 U.S.C. § 1055(i) (authorizing the Secretary of Treasury to determine how "a plan may take into account in any equitable manner . . . any increased costs resulting from providing a qualified joint and survivor annuity . . . .").

[20] 26 C.F.R. § 1.401(a)-11(e).

whole.  In my experience, actuaries commonly take into account the gender mix of participants who select the J&S annuity option when developing or assessing the reasonableness of a J&S conversion factor.

VI.   **ACTUARIAL STANDARDS USED FOR ACCOUNTING PURPOSES ARE NOT APPROPRIATE FOR USE IN CALCULATING PLAN BENEFITS.**

A.   **Overview**

155.   U.S. companies that prepare GAAP[21] financial statements report their pension liabilities according to the rules outlined by the Financial Accounting Standards Board ("FASB")[22] in ASC[23] 715, as well as additional SEC guidance.  The reported pension liability represents an estimate of the company's aggregate future financial obligation.

156.   Pension plans themselves also report on their liabilities.  Similar to the requirements for company reporting, the liability that plans report represents an estimate of the plan's aggregate future financial obligation.  However, the rules for plan reporting are different.  Plans are required to report their liabilities under the FASB's accounting standard ASC 960.

157.   Why are there different accounting rules for reporting on what appear to be the same liability?  The answer is that the FASB has different objectives for the two different types of accounting numbers.  The FASB's objective for company accounting is for companies to calculate and report pension liabilities in a way that is "mark to market" as of the precise "as of" day in the financial report.  The FASB, moreover, wants companies to calculate those liabilities on a common basis in order to promote comparability of reporting from one company to another.  The FASB's objective for plan accounting under ASC 960, by contrast, is for plans to provide information to participants that is useful in assessing the plan's present and future ability to pay

---

[21] Generally Accepted Accounting Principles.

[22] The FASB is the independent, private-sector, not-for-profit organization based in Norwalk, Connecticut, that establishes financial accounting and reporting standards for public and private companies and not-for-profit organizations that follow GAAP.

[23] Accounting Standards Codification

benefits when due.  Concerns about "marking to market" and promoting comparability across companies do not apply with equal force in the plan accounting context.

### B.    Actuarial Assumptions Used for Accounting Purposes

158.    The FASB does not give companies or plans free rein to select actuarial assumptions.  To the contrary, the FASB prescribes assumption setting that reflects its objectives for the two different accounting liabilities.  Setting the interest rate assumption is a good example.

159.    For ASC 715 liabilities, the FASB's objective is to have companies report a single amount that, if invested at the precise measurement date in a portfolio of high-quality debt instruments, would provide the necessary future cash flows to pay the estimated benefits when due.  Thus, the interest rate under this "settlement" approach is selected by reflecting actual bond market yields—on the precise measurement day—of a narrow universe of U.S. high-quality AA corporate bonds.[24]  Although companies have some discretion in exactly what bonds they observe, as a practical matter, the discretion is within a very narrow margin.[25]  When a company says that its FASB interest rate is a "best estimate," what it means is that it is a best estimate of high-quality corporate bond yields subject to the narrow constraints prescribed by the FASB.

160.    For ASC 960 liabilities, the FASB's objective is to have plans report a liability using an interest rate that is consistent with the expected returns realistically achievable on the

---

[24] ASC 715-30-35-43 states that in estimating the "rates at which the pension benefits could be effectively settled . . . employers may also look to rates of return on high-quality fixed-income investments currently available and expected to be available during the period to maturity of the pension benefits."  ASC 715-20-S99-1 further states that the SEC staff "suggests that fixed-income debt securities that receive one of the two highest ratings given by a recognized ratings agency be considered high quality (for example, a fixed-income security that receives a rating of Aa or higher from Moody's Investors Service, Inc.)."

[25] In times of market turmoil and significant volatility, the range of rates can actually be wider than in more normal times.

types of investments held by the plan and described in the plan's investment policy.  Thus, the

interest rate used for plan accounting is often very different from the interest rate used for

company accounting.

161.    These two accounting interest rate examples help illustrate two points about

actuarial assumptions.  First, in selecting actuarial assumptions, there is almost always judgment

involved.  And second, the exercise of judgment may be subject to external constraints.  In some

cases, the external constraints will significantly narrow the range of possible acceptable

assumptions.  In fact, with respect to interest rates used for ASC 715 accounting, the constraints

imposed by the FASB are intentionally very tight—and for good reason.  While there may be

many possible reasonable alternatives for accounting interest rates, the FASB has decided to

significantly narrow the range of rates selected by companies for ASC 715 compliance, thereby

helping achieve greater comparability of financial reporting from company to company.[26]

162.    More generally, interest rate assumptions are used for several different pension

applications.  And oftentimes, external regulators impose constraints on the range of possible

rates for a given purpose.  Thus, the use of a given rate for a given purpose does not necessarily

imply that that rate can or should be used for a different purpose, especially where the rate is

constrained by regulatory guidance that does not apply outside the context of the guidance in

question.

---

[26] Another example of the FASB pursuing comparability of financial reporting is with respect to accounting for inventory.  There are several well-known, reasonable means by which a company can account for inventory.  These include first-in-first-out (FIFO), last-in-first-out (LIFO), and average cost accounting.  The FASB requires that companies report inventory on a LIFO basis. This does not mean that FIFO and average cost are not reasonable methods; it means that the FASB requires LIFO reporting because, among other things, this helps achieve their goal of comparability in reporting across different companies.

C.   **Problems with Using Actuarial Assumptions that Are Utilized for Accounting Purposes to Develop or Assess Tabular Factors for Calculating Benefits**

163.   For at least two reasons, companies are not permitted to refer to their ASC 715 accounting assumptions for purposes of developing conversion factors used to determine benefit amounts under their pension plans.  First, ASC 715 accounting assumptions are set at the discretion of the company.  While it is true that the FASB defines a narrow range for the accounting interest assumption, it is still something the company decides each year.  Thus, using a company's ASC 715 accounting assumptions for J&S conversion factor purposes violates the IRS requirement that "the assumptions to be used must be specified within the plan in a manner which precludes employer discretion."[27]

164.   Second, ASC 715 accounting assumptions ordinarily include a mortality assumption that is gender-distinct.  In other words, because gender differences in mortality are well documented and also because virtually all standardized and customized mortality tables reflect different mortality for males and females, companies typically use those gender-distinct tables for accounting purposes.  However, ERISA plans are effectively prohibited from using gender-distinct conversion factors in calculating benefits, and so the accounting mortality is simply impermissible as the basis for benefit conversion factors.  Indeed, Serota concedes that it would be impermissible for Raytheon to use the same mortality tables used to calculate its pension liabilities for accounting purposes in order to calculate participants' pension benefits under the Raytheon Plan.[28]

---

[27] Rev. Rul. 79-90 (codified in 26 U.S.C. § 401(a)(25)).

[28] Serota, ¶ 78.

165.     Recognizing that pension plans cannot use the actual assumptions set forth in their sponsors' SEC filings, Serota instead asserts that sponsors should use "an independently derived yield" that closely tracks the interest rate assumptions used for purposes of ASC 715 financial reporting.  The accounting assumptions prescribed by ASC 715, however, are not required to be used in the development or assessment of J&S conversion factors.  Nor, in my experience, are those assumptions actually ever used in the development or assessment of J&S conversion factors.

166.     Indeed, the use of ASC 715 accounting assumptions, or proxies therefor, for purposes of calculating a J&S conversion factor is likely to be problematic and impractical. There are several reasons why.

167.     First, ASC 715 mandates a "mark-to-market" approach to setting the interest rate. This approach makes sense for GAAP accounting and provides a measure which is similar to a "buy-out" value for the plan that reflects market conditions on a particular day.  However, interest rate assumptions determined under ASC 715 can be extremely volatile, which is one of the reasons why plans rarely if ever consider such rates for use is setting or assessing conversion factors.

168.     Indeed, using rates determined under ASC 715 to set conversion factors can produce different benefits for two otherwise similarly situated participants solely because they may have retired a few months apart.  This is problematic for a couple of reasons.  First, using accounting assumptions could unfairly result in otherwise similarly situated employees (same years of service, salary, etc.) receiving different benefits based only on minor differences in retirement dates.  Second, using accounting assumptions to calculate benefits would result in participants not being able to rely on the estimates of their retirement benefit routinely requested

by participants in preparation for retirement.[29]  For these reasons, plan sponsors often—and reasonably— prefer a more balanced, longer-term approach that smooths or averages interest rates across periods of time.

169.    Second, ASC 715 directs companies to set their interest rates based on the yields of a narrow set of high-quality corporate bonds.  This narrow constraint promotes comparability in accounting from company to company.  In developing or assessing J&S conversion factors, however, plan sponsors do not face such artificial constraints and, so, will typically consider a much wider range of interest rates.  For example, it is not uncommon for plan sponsors to use Treasury bond yields or PBGC rates for this purpose. All of these may be appropriate rates to consider as reasonable interest rates in setting or assessing J&S conversion factors.

170.    Third, ASC 715 accounting measures the aggregate pension liability of an entire pension plan, and so all of the plan's participants are reflected in this measurement.  The accounting interest rate, therefore, will typically be based on bond yields that are relevant to cash flows over a very long time horizon.  By contrast, because the conversion factors' calculation applies only to employees at retirement age, the relevant time horizon for purposes of J&S annuity conversions is much shorter.  Because bond rates with shorter durations are typically lower than bond rates with longer durations, the longer-term bond rates, typically used for purposes of ASC 715 accounting, are less relevant for use in performing a J&S conversion assessment.

171.    Fourth, ASC 715 accounting compliance can be (and typically is) achieved by using the same mortality assumptions, that are appropriate in the aggregate, to calculate

---

[29] Cruz requested and received a pension estimate fully a year before his actual retirement. Because the Plan uses a fixed conversion factor, that early estimate proved to be an accurate portrayal of the J&S annuity he ultimately received when he retired a year later.

liabilities across all of company's pension plans.  By contrast, the company, as plan sponsor, may deem it more appropriate to use plan-specific factors for purposes of developing J&S conversion factors under its various plans.  For example, companies often maintain separate pension plans for unionized and non-unionized workers.  If the plan for unionized workers is comprised primarily of blue collar workers, the plan sponsor may reasonably choose to use a blue-collar mortality table in developing or assessing that plan's conversion factors.  Similarly, if experience shows that 75% of a plan's retirees elect a J&S benefit, the plan sponsor may reasonably choose to use a 75% male/25% female mortality blend in developing or assessing that plan's conversion factors.

172.    Finally, ASC 715 accounting is designed on a variable basis—that is, it explicitly reflects changes in interest rates from year to year.  Plan sponsors that adopt an Acceptable Fixed Standard[30] would have to amend their plan each and every year if they were to decide to conform their J&S conversion factors to annual changes in interest rates.  And, in addition, because plan amendments are constrained by ERISA's anti-cutback rules,[31] if interest rates drop, the plan sponsor would be faced with the need to amend the plan in a manner that would comply with ERISA's anti-cutback rule.  The required "work-around" in order to avoid such a violation introduces a degree of administrative complexity that plan sponsors would reasonably prefer to avoid.

173.    In sum, there is no requirement that plans use the narrow band of rates prescribed for purposes of ASC 715 reporting for the very different purpose of calculating annuity conversion factors.  Indeed, pension plans are not permitted to refer to a plan sponsor's ASC 715

---

[30] Two different Acceptable Fixed Standards for conversion factors are described in Revenue Ruling 79-90.

[31] ERISA § 204(g), 29 U.S.C. § 1054(g).

assumptions for calculating annuity conversions.  Moreover, I am unaware of any plan sponsor that uses ASC 715 rates, or proxies therefor, for purposes of calculating or assessing annuity conversion factors, which is not surprising given the array of inherent problems that render the use of such assumptions impractical.

## VII.   ACTUARIAL STANDARDS USED FOR LUMP SUM BENEFITS ARE NOT REQUIRED TO BE USED FOR CALCULATING ANNUITY BENEFITS.

### A.   Background on Lump Sum Benefits

174.   As discussed above, participants may elect to take their pension benefits under a defined benefit pension plan in a variety of payment forms.  In some plans, one such payment form is a lump sum distribution.  A lump sum distribution is a one-time payment of the participant's entire pension benefit, in contrast to the monthly annuity payments participants typically receive.

175.   Lump sum benefits are typically calculated as the present value of the annuity benefit—usually the single life annuity benefit—that the retiree would otherwise receive. Essentially, the single life annuity benefit needs to be converted into a lump sum benefit of equal actuarial value.

176.   The actuarial considerations involved in an "annuity to lump sum" conversion are in some respects similar to those in more typical "annuity to annuity" conversions (such as the conversion of a single life annuity to a 50% J&S annuity).  Actuarial assumptions associated with both mortality and interest rates are needed for such conversions.

177.   However, some of the actuarial considerations are very different.  Understanding these differences is important to understanding why actuarial assumptions appropriately may differ between "annuity to lump sum" conversions and "annuity to annuity" conversions.  These differences include a different risk allocation, a different impact of variable rates, and a different regulatory environment.

### B.   Risk Allocation for Lump Sums and Annuities

178.   One way to think about the difference between a plan's annuity options and a plan's lump sum option (assuming one is offered) is to consider who bears the longevity risk and

who bears the investment risk.  If the retiring participant elects an annuity, the plan will continue to bear these risks.  In other words, the plan will be "on the hook" for making annuity payments for as long as the retiree (and, potentially, a surviving beneficiary) lives, and the plan also will be "on the hook" for the swings in the investment markets.  Effectively, the retiree electing an annuity payout is fully protected from both of those risks: longevity risk and investment risk.

179.    The situation is completely the opposite for the retiree electing a lump sum payment. Once the payout is made, the plan's payment obligation is finished, regardless of how long the retiree lives and regardless of what happens to the retiree's investments as he or she puts the lump sum proceeds to work in the market.  Effectively, all of the longevity risk and all of the investment risk is transferred to the participant.

180.    In light of the fact that lump sum conversions transfer longevity and investment risk to the participant at a single point in time, it makes sense to use actuarial assumptions that are market-priced at the time of payment to determine the present value of the benefit being paid out.  Even before the law required lump sum pension calculations to use variable actuarial assumptions that would be updated regularly, plan sponsors commonly updated lump sum assumptions while maintaining fixed assumptions for annuity conversions because of the different risk allocations between lump sums and annuities.  In fact, the "Acceptable Variable Standards" described in Revenue Ruling 79-90 were largely used by plan sponsors to "peg" their lump sum conversion factors to more current market conditions, even as they tended to adopt "annuity to annuity" conversions reflecting a more long-term approach under one of the "Acceptable Fixed Standards."

### C.    Impact of Variable Rates

181.    Pensions, by definition, are long-term promises made to employees while they work to pay benefits during retirement.  The benefit is typically stated in such a way that, at any

point during an employee's career, the employee knows the dollar amount of the benefit he or she earned as a monthly amount beginning at normal retirement age.  Likewise, plans often provide a fixed annuity conversion so that the dollar amount of that promised pension is also knowable even if the annuity is paid in a different form.

182.    In contrast, the present value of the benefit at the point in time when the employee receives a lump sum distribution could vary greatly from year to year and certainly over decades of time when the employee is working.  The "annuity to lump sum" conversion bases are much more sensitive to interest rate movements and mortality improvements because the conversion is a single present value calculation.

183.    As described elsewhere in my report, the J&S conversion is based on the ratio of one annuity present value to another annuity present value and is therefore relatively stable over time, even in the face of changing ingredients.  This is because the mathematics of ratios has the effect of cancelling out interest rate and mortality changes.

184.    Accordingly, it is critical to use variable rates to calculate lump sums—to ensure the employee receives a current value at the point in time when the entire benefit is paid— whereas using variable rates for annuity conversions forces a point-in-time determination that runs counter to the fact that the sponsor continues to bear all long-term investment and longevity risk.  In addition, using variable rates to perform "annuity to annuity" conversions undermines the advantage of the certainty that is typically provided with respect to the promise of an annuity benefit under defined benefit pension plans.

**D.    Lump Sum Benefits Are Highly Regulated**

185.    Because participants electing lump sum benefits take on both longevity risk and investment risk, and because the amount of lump sum distributions are uniquely sensitive to changes in the underlying interest rate and mortality assumptions, Congress has stepped in to

regulate the conversion factors a plan can use to pay the lump sum benefits, as a way of protecting participants against unfavorable movements in the actuarial ingredients. Effectively, Congress has directed the IRS to issue market interest rate assumptions and mortality assumptions that plans must use to calculate minimum lump sum benefits.[32] These interest rate and mortality assumptions are updated regularly to reflect up-to-date market conditions.

186.    Congress amended ERISA and the Internal Revenue Code to prescribe the "Applicable Interest Rate" and the "Applicable Mortality Table" to be used when calculating a participant's lump sum distribution. Reflecting the unique considerations applicable to lump sum conversions (and in particular the sensitivity of lump sum calculations to interest rates), the Applicable Interest Rate and the Applicable Mortality Table are both updated regularly.

187.    Importantly, no statute, regulation, or other governmental authority or guidance similarly prescribes the use of any specific interest rate or mortality assumptions for purposes of performing "annuity to annuity calculations," such as the conversion of a single life annuity to a J&S annuity. Rather, plan sponsors continue to retain discretion to set the interest rate and mortality assumptions (including fixed interest rates)—or to use fixed, "tabular" factors—to perform their "annuity to annuity" conversions, so long as the resulting factors are reasonable.

188.    In short, lump sum conversions are very different from annuity-to-annuity conversions (like the conversion of a single life annuity to a J&S annuity), principally because a lump sum conversion transfers all investment and mortality risk from the plan to the participant. While a plan sponsor may choose to use lump sum conversion rates for other purposes, and that may make sense where the plan offers a lump sum benefit option (which the Raytheon Plan does

---

[32] The minimum lump sum is calculated as the actuarial present value of the normal retirement pension.

not), plan sponsors are not required to do so.  In particular, pension plans may, and often do, establish a fixed factor or fixed set of assumptions, which (unlike the prescribed assumptions for lump sums) do not vary based on the age of the participant.

## VIII.   THE CONCEPT OF REASONABLENESS

189.    The concept of reasonableness is informed by both actuarial professional tradition as well as applicable compliance guidance.  I discuss each in turn.

### A.      Actuarial Custom and Practice

190.    Within the actuarial profession, "reasonableness" is generally understood to represent a range, not a fixed point.  This is because actuarial analysis involves assumptions about uncertain future events, and there is rarely, if ever, one "correct" set of assumptions about the future.

191.    Guidance for appropriate actuarial practice in the U.S. is provided by the Actuarial Standards of Practice ("ASOPs").[33]  The "range of reasonableness" concept is codified in the ASOPs as follows:

> Because actuarial practice commonly involves the estimation of uncertain events, there will often be a range of reasonable methods and assumptions, and two actuaries could follow a particular ASOP, both using reasonable methods and assumptions, and reach different but reasonable results.[34]

192.    As a general matter, because actuaries deal with projections and/or forecasts in the context of significant uncertainty, they often think and communicate in terms of the reasonableness of an assumption or a method as falling in a range.  This is particularly relevant when considering the actuarial assumptions that are the key ingredients of J&S conversion factors.  Given that, for example, there may be a range of reasonable mortality assumptions as well as a range of reasonable interest rates, it follows that, for any given pension plan, there will

---

[33] ASOPs are issued by the Actuarial Standards Board ("ASB"), which sets standards for appropriate actuarial practice in the United States through the development and promulgation of ASOPs.  ASOPs provide guidance on the techniques, applications, procedures, and methods that reflect appropriate actuarial practice in the United States.

[34] ASOP No. 1, Section 2.10.

very likely be a range of reasonable J&S conversion factors. "Plus or minus 5%" is a common standard among actuaries when considering a range of reasonableness for a calculated value premised on assumptions about uncertain future events.

193.     This common standard among actuaries is reflected in IRS regulations that govern plan communications to plan participants about the relative value of different optional payment forms. These regulations state that benefits that are valued to be within 5% of the value of the single life annuity are deemed to be "approximately equal," where "approximately equal" is used in the context of allowing participants *to make informed choices about their benefits payment options*.[35] By specifying that plans may inform participants that a single life annuity is "approximately equal" to a J&S annuity where they are within 5% of each other under a given set of actuarial assumptions, the regulations are reflective of the custom and practice of the actuarial profession in evaluating assumptions about uncertain future events.

### B.     Applicable Regulatory Guidance

194.     Under ERISA, a pension plan's "accrued benefit" is the benefit payable beginning at normal retirement age (typically, age 65) and expressed as an annuity (typically, for the life of the participant).[36] If the benefit is paid out in a different form, ERISA imposes different sets of requirements to calculate the benefit, depending on the type of form.

195.     **Treasury Regulations.** ERISA and related regulations require actuarial equivalence in two situations—for purposes of assuring compliance with nonforfeiture requirements, and also for purposes of appropriate conversions to QJSAs. Unlike for lump sum conversions, however, neither ERISA nor related Treasury regulations specify the actuarial

---

[35] 26 C.F.R. § 1.417(a)(3)-1(c)(2)(iii)(C)
[36] ERISA § 3(23), 29 U.S.C. § 1002(23).

assumptions to be used to determine actuarial equivalence.  Instead, relevant Treasury

regulations provide only that actuarial equivalence be based on reasonable actuarial adjustments.

196.    In the case of the nonforfeiture requirements, Treasury regulations provide only

that actuarial equivalence must be determined based on reasonable actuarial factors:

> "Certain adjustments to plan benefits such as adjustments in excess of *reasonable actuarial reductions*, can result in rights being forfeitable."[37]

197.    Similarly, guidance governing the calculation of actuarial equivalence for the

QJSA provides that:

> Equivalence may be determined, on the basis of consistently applied *reasonable actuarial factors*, for each participant or for all participants or reasonable groupings of participants, if such determination does not result in discrimination in favor of employees who are officers, shareholders, or highly compensated.[38]

198.    These regulations make two things clear with respect to how an actuary would

evaluate "reasonableness."

199.    First, for purposes of converting a single life annuity into a QJSA,

"reasonableness" relates to the conversion factors used in the calculation, not the process by

which the conversion factors were developed.  Accordingly, when assessing the reasonableness

of a conversion factor, the concern is whether the *factor* is reasonable, not whether the

"ingredients" used to create the factor are reasonable.

200.    Second, actuarial equivalence may be determined at the individual participant

level, at the plan level, or at the level of a reasonable sub-population of the plan.  This means that

when calculating a J&S conversion factor, a plan may select actuarial assumptions that are

---

[37] 26 C.F.R. § 1.411(a)-4(a) (emphasis added).

[38] 26 C.F.R. § 1.401(a)-11 (emphasis added).

reasonable for the individual participant, for the plan as a whole, or for a relevant subset of the plan.  A conversion factor that is reasonable in the context of plan-wide demographics is necessarily reasonable when applied to specific individuals, even if those individuals have unique characteristics that differ from the average plan participant.

201.   **Gray Book Guidance.**  The American Academy of Actuaries and the Conference of Consulting Actuaries jointly host an annual conference for Enrolled Actuaries ("EAs") in Washington, D.C.  For many years, a very valuable and highly anticipated part of that conference was the publication and presentation of what came to be called the "Gray Book."

202.   Each year, several prominent leaders in the pension actuarial community would compile a list of questions they would pose to a committee of government officials, including officials responsible for pensions at the Department of Treasury and the IRS.  The officials would meet among themselves, discuss the questions, and provide answers to the EA conference's organizing committee.  The organizing committee would then compile the answers provided by the government officials and publish them in the "Gray Book" for release at the annual EA conference.  At the conference itself, IRS representatives and leading actuaries would conduct a joint panel discussion that would provide highlights from that year's Gray Book.

203.   Although the Gray Book is not an official statement of any government agency, the Gray Book informs pension actuaries' views regarding best actuarial practices and actuarial matters where formal guidance is not available. The Gray Book continues to serve as an important resource to practicing actuaries.[39]

204.   In the 2013 Gray Book, Question 39 asked for guidance on how the "reasonableness" of actuarial equivalence factors should be evaluated with respect to the non-

---

[39] The IRS and Treasury Departments stopped publishing the Gray Book in 2015.

forfeiture requirement.  The answer in the Gray Book explains that reasonableness is determined without regard to the circumstances of the individual participant.  Furthermore, the following methods are all "acceptable" in this context:

> i.    Setting the actuarial conversions in accordance with data reflecting the general U.S. population, the active plan population as a whole, or a population expected to elect certain payment options (*e.g.*, for a largely male population, determining the J&S conversion factors in such a way that the J&S form is cost-neutral to the plan compared to the single life annuity);
>
> ii.    For a population with substandard expected longevity, reflecting such substandard longevity in setting optional form conversion factors; and
>
> iii.    Using flat factors that are reasonable for the average plan participant expected to elect the particular option.

205.    Additionally, the answer explained that the principles set forth in the relative value regulations (discussed above) apply to an assessment of the reasonableness of conversion factors.  The Gray Book therefore confirmed that there are many ways to evaluate the reasonableness of actuarial adjustments.  In addition, reasonableness is determined by reference to an average participant and is not a separate determination for each participant.

## C.    Assessing the Reasonableness of Tabular J&S Conversion Factors

206.    The reasonableness considerations discussed above are all relevant to an assessment of J&S conversion factors, including tabular factors like the ones included in the Raytheon Plan.

207.    As explained above, tabular J&S conversion factors are factors for converting a single life annuity into a J&S annuity, without reference to any identified interest rate or

mortality assumptions.  There are two general approaches for assessing the reasonableness of
tabular J&S conversion factors included in a plan document.

208.    **Comparisons to Factors Developed by Authoritative Bodies.**  One can assess
the reasonableness of a tabular with reference to similar factors developed by authoritative
bodies.

209.    For example, the PBGC is a federal agency that insures individuals' pension
benefits up to a maximum guaranteed amount.  The maximum amount is set each year by the
PBGC and expressed in the form of a single life annuity.  PBGC regulations explain how to
calculate the limit when the benefit is paid in a different form.  When converting the maximum
guaranteed amount from a single life annuity to a 50% J&S annuity, the PBGC uses a conversion
factor of 0.90.[40]

210.    As another example, some pension plans have both employer and employee
contributions.  If an employee terminates employment before vesting in his or her benefit, the
employee must receive at least the accrued benefit attributable to employee contributions (while
forfeiting the remaining portion because it was not vested).  An actuary must therefore calculate
the portion of an employee's accrued benefit—*i.e.*, a single life annuity beginning at normal
retirement age—that is funded by the employee's contributions (plus interest).  Furthermore, if
the benefit is paid in a form other than a single life annuity, the actuary must convert the accrued
benefit attributable to employee contributions into that other form of payment to be sure that the
employee does not forfeit the portion of the benefit that the employee funded.  The IRS, in
Revenue Ruling 76-47, sets forth the precise calculation that must be performed to avoid this

---

[40] 29 C.F.R. § 4022.23(d)(2) (a single life annuity is reduced by 10% when paid in the form of a
50% J&S annuity).

forfeiture.  Under that ruling, when a single life annuity is converted to a 50% J&S annuity, the actuary must use (at a minimum) a factor of 0.88.  (Certain adjustments apply if the beneficiary's age is more than 4 years different from the employee.)

211.    As these examples demonstrate, a 0.90 conversion factor is in line with factors developed and used by pension regulators.  This is a strong indicator that a 0.90 factor is reasonable.

212.    **Post-hoc assessment.**  Although tabular factors are defined without reference to specific "ingredients," one can assess the reasonableness of a tabular factor by comparing it to factors generated pursuant to reasonable sets of assumptions.  For example, one could create a factor (or a range of factors) based on reasonable combinations of the key ingredients, *e.g.*, mortality tables, gender mix, interest rates, etc.  After creating these hypothetical factors, one could compare the hypothetical factors to the plan's specified factor to assess whether the plan's factor falls within the same range of reasonableness.

213.    When assessing the reasonableness of a J&S conversion factor—whether with reference to other authorities' factors or factors generated pursuant to reasonable assumptions—it is important to keep a few things in mind.

214.    First, J&S conversion factors are most appropriately assessed in the context of a "range of reasonableness."  As discussed above, the calculation of conversion factors involves assumptions about the future, and there is never one "correct" assumption about future events.  Because reasonableness in the actuarial profession is a range—not a fixed point—a J&S conversion factor will be considered reasonable if it falls within a range.  Broadly speaking, this range could be as large as plus or minus 5%.

215.     Second, the benchmarking assessment must be made against the backdrop of the structure of the plan being evaluated.  In particular, plan sponsors are permitted to use fixed, tabular factors that apply to all participants equally when converting from single life annuities to J&S annuities.  The focus of an evaluation of such a factor, then, should be on whether the factor is reasonable as applied to the plan's population as a whole.

216.     Third, as discussed above, plans are permitted to provide optional forms of benefits whose actuarial value exceed that of a participant's accrued benefit under the terms of the plan.  For instance, a plan could use a 1.0 factor to convert single life annuities to J&S annuities.  But that does not mean that a different plan that uses a lower factor is failing to provide actuarially equivalent benefits.

217.     Fourth, in keeping with the IRS and Treasury regulations discussed above, any assessment of a J&S conversion factor should focus on the reasonableness of the factor itself, not the ingredients used to create it.  Indeed, any other approach would yield absurd results.  For example, it would be illogical to contend that a J&S conversion factor is *unreasonable* because it was developed using purportedly "outdated" ingredients, when the use of "current" ingredients would produce a factor with the same (or a very similar) value.  A single factor cannot be both reasonable and unreasonable at the same time.

218.     Fifth, when considering the reasonableness of a factor used to calculate a pension benefit paid in the form of an annuity, it is important to keep in mind that pensions are long-term promises, based on benefits that are earned throughout a career and then paid for many years (even decades) in retirement.  Accordingly, a benchmark of reasonableness is not necessarily determined based on any single point in time.  For example, if one wanted to assess the reasonableness of a J&S annuity factor applied to participants who retired in 2015, an actuary

could reasonably consider interest rates and mortality in the general timeframe of 2015, *e.g.*, the last decade encompassing 2015.

219.     Sixth, in assessing the reasonableness of a conversion factor, it is customary and appropriate to consider all relevant, available information.  Responsible actuarial practice is premised on using objective, fact-based analysis to inform an opinion.  The reliability of any actuarial assessment or opinion can only be enhanced by the inclusion of as much relevant information as possible.  Thus, a conversion factor's reasonableness is not dependent on *when* data becomes available.

220.     Seventh, the age of a tabular factor is not relevant to whether a tabular conversion factor is reasonable.

221.     Consistent with the "definitely determinable" requirement applicable to pension plans under the tax law, tabular factors are permanent features of a pension plan, and as a result, they are typically designed to avoid the need for frequent amendment.  Although conditions related to mortality, interest rates, and retirement trends change over time, plan sponsors make efforts to select fixed conversion factors that "hold up" over many years.[41]

222.     Indeed, there is often little reason to change conversion factors in light of changes in mortality, interest rate, and retirement conditions.  This is because, as explained above, J&S conversion factors are not *present value* factors, but rather *ratios* of present values.  Although changing interest rates, mortality, and retirement conditions may significantly affect the *present values* of single life and J&S annuities, such changes do not necessarily affect the *ratio* of these present values in a significant way, for the reasons discussed above.

---

[41] This point is reinforced by the fact that a number of pension plans for which Serota is the actuary of record use the very mortality tables that he suggests in his report are "outdated."  *See* Appendix C.

223.     Eighth, the age of the ingredients used to calculate J&S conversion factors is also irrelevant to assessing the reasonableness of those factors.

224.     To be sure, the ingredients used to calculate J&S conversion factors—including mortality and interest rates—fluctuate over time.  Those fluctuations, however, do not necessarily have predictable impacts on J&S conversion factors.

225.     For example, as *participant* mortality improves, J&S conversion factors will increase, but as *beneficiary* mortality improves, J&S conversion factors will decrease.  If mortality improves for both participants and their beneficiaries, the effect of these improvements on conversion factors is unclear, even directionally, and will often be muted.

226.     Also, as mortality improves, it is reasonable to expect that, with longer life expectancies and better health, participants may retire later in life.  However, improved participant mortality—but later retirement dates—impact J&S conversion factors in opposite directions.  How these different directional impacts affect the ultimate factor is hard to predict.

227.     Conversion factors established in the 1970s and 1980s were set in an environment with higher interest rates and higher mortality.  Since then, there have been improvements in participant mortality—which push the value of conversion factors upward—but also increases in beneficiary mortality and decreases in interest rates—both of which pull the value of conversion factors downward.  The ultimate effect of these changes in mortality and interest rates cannot be easily predicted, even directionally.

IX.     **ASSESSING THE PLAN'S 50% J&S CONVERSION FACTOR**

228.     I have been asked by counsel to assess the reasonableness of the 0.90 tabular

factor used by the Raytheon Plan to convert single life annuities to 50% J&S annuities.

229.     As described above, one methodology for assessing the reasonableness of a

tabular conversion factor that is defined without reference to specific ingredients is to compare it

to factors generated pursuant to reasonable sets of assumptions.  In this section, I describe the

results of my reasonableness assessment of the Plan's 0.90 factor reflecting relevant, current,

Plan-specific demographic experience and economic conditions.  I also describe the results of my

analysis of the subsidies paid by the Plan to participants who retire early and elect a 50% J&S

annuity.

A.     **Reasonable Range for 50% J&S Conversion Factors Based on Current**
       **Conditions**

230.     First, I will demonstrate the development of a reasonable range for a 50% J&S

conversion factor based on current conditions.  For purposes of establishing this reasonable

range, I will (for the moment) set aside considerations of relevant, Plan-specific demographic

experience and instead consider benchmarking key demographic ingredients to presumed

"average" ingredients for a broad array of plan sponsors and plans.  Thus, my "current

conditions" reasonable range is based on the following benchmarks for the various ingredients.[42]

231.     **Benchmarking participant mortality:**  Looking broadly at recent mortality

experience, it is reasonable to consider standard mortality tables representing U.S. pensioner

mortality experience published by the Society of Actuaries in the last decade.  Thus, I have

---

[42] I have generally considered the period from 2011 to the present to be representative of current
conditions, unless otherwise indicated.

considered the families of tables generally referred to as RP-2006 and Pri-2012, with and without mortality improvement scales MMP-2007 and MMP-2016.

232. **Benchmarking beneficiary mortality:** I considered the same array of mortality tables for beneficiary mortality. This is a customary approach, although another actuary might reasonably consider using general population mortality experience, such as U.S. population mortality experience, for this purpose.

233. **Benchmarking gender mix:** Based on nationwide workforce participation data, the gender mix of participants in the vast majority of pension plans is likely to range from approximately one-third/two-thirds male/female to approximately two-thirds/one-third male/female.

234. As discussed previously in this report, adverse selection is a relevant and permissible consideration in developing or assessing J&S conversion factors. Nationwide data show that men are approximately 2.5 times more likely than women to select joint and survivor annuities. Indeed, this ratio is demonstrated in the Urban Institute study previously cited in the Background where 72% of married males and 31% of married females elected J&S annuities over single life annuities.

235. Thus, the reasonable range of participant gender mix would be expected to result in a subpopulation of retirees electing J&S annuities that ranges from approximately 50%/50% male/female to 80%/20% male/female.

236. **Benchmarking retirement age:** Average retirement ages can vary significantly from company to company and from plan to plan. A 2015 Boston College study of average retirement age trends, as cited in Appendix D, revealed that, in the 2010s, average retirement

ages were 64 for males and 62 for females.  Thus, based on this nationwide data, I have selected a range of *average* retirement ages of from 60 to 65.

237.    **Benchmarking interest rates:**  Finally, I identified a range of current interest rates:  1.5% to 5.0%.

238.    In my experience, when U.S. pension actuaries consider current interest rates, they frequently look to the rates on publicly issued and market-traded high-quality U.S. bonds, including both credit/corporate bonds and Treasury bonds.  See Figure 8, which shows the yields of such bonds over approximately the last eight years for both credit/corporate and Treasury bonds of different maturities.  Further details on these rates are shown in Appendix D.

**Figure 8:  Recent interest rates relevant to pension plans**



239.    Figure 8 demonstrates three things.  First, interest rates are volatile; over time, they go up and they go down.  Second, at any given point in time, yields on different *types* of

bonds will differ.  For example, corporate bond rates are generally higher than Treasury bond rates, of similar maturity, during this time period.  Third, longer duration bond yields are generally higher than shorter duration bond yields for bonds of similar type and investment quality.

240.    These various yields range from approximately 1.5% to 5.0% over the most recent eight-plus-year period.  In my opinion, a range of interest rate assumptions from 1.5% to 5.0% is both current and reasonable.  The range is current because it reflects the array of observable interest rates over the last eight-plus years.  The range is reasonable because it reflects the array of interest rates associated with investment-grade bonds of varying rating quality over the recent past, and actuaries typically look to such interest rates to perform actuarial calculations of different types.

241.    That said, there are other interest rates that might be considered "current"—for example, recent PBGC rates.  As discussed above, there is no single, "correct" reasonable interest rate. For purposes of this analysis, however, I have selected the range of rates for investment grade bonds:  1.5% to 5.0%.

242.    **Summary of benchmarking assumptions:**   A summary of my benchmarking assumptions for developing a reasonable range for a 50% J&S conversion factor based on current conditions is shown in Figure 9.

**Figure 9:  Benchmarking assumptions for developing a reasonable range of 50% J&S conversion factors based on current conditions.**

| Ingredient | Observation period representing current conditions | Reasonable range for benchmarking current conditions |
|---|---|---|
| Retiree baseline mortality | Recent standard U.S. pensioner mortality tables | Families of tables:  RP-2006 and Pri-2012 |
| Beneficiary baseline mortality | Recent standard U.S. pensioner mortality tables | Families of tables:  RP-2006 and Pri-2012 |
| Gender mix | Potential gender mix of J&S recipients (beneficiaries assumed opposite gender) | 50% male to 80% male |
| Retirement age | Potential average retirement ages | Age 60 to age 65 |
| Interest rate | Publicly traded U.S. investment grade bonds yields: December 2011 to present | 1.5% to 5.0% |

243.    **Reasonable range based on benchmarking current conditions:**  Applying these reasonable benchmarking assumptions in various combinations results in a range of reasonable 50% J&S conversion factors of from 0.872 to 0.935.  See Appendix D for more details.  Before describing the next stage of my analysis, which was to additionally reflect Plan-specific data relevant to the Raytheon Plan, I have several observations about this first "current conditions" range of 0.872 to 0.935.

244.    *First,* the Plan's 0.90 factor is squarely in the middle of this range.

245.    *Second,* the breadth of the range is well within what I earlier referred to as a reasonable expectation for a measure based on substantial actuarial uncertainty:  plus or minus 5%.

246.    *Third,* the factor developed by Serota using his "preferred assumptions" falls just outside this range.  This is no surprise given that Serota's preferred assumptions include the assumption that the average plan participant retires at age 55.  It would be an extraordinarily unusual plan with such a young average retirement age.

B. **Reasonable Range for the Raytheon Plan's 50% J&S Conversion Factor Based on Current Conditions and Reflecting Plan-Specific Information**

247.     As you will see below, incorporating Plan-specific information into my analysis has the effect of "tightening" the range of reasonableness applicable to assessing the 0.90 factor for 50% J&S conversions in the Raytheon Plan.  I developed my reasonable range for the Plan's factor based on the following benchmarks for the various ingredients.

248.     **Benchmarking participant mortality:**  For benchmarking purposes, I have selected a participant mortality table, the SOA Pri-2012[43] table.  This table is constructed from U.S. pensioner experience for the years 2010 to 2014, with a central year of 2012.  I selected this table because it represents the most recently measured actual experience of U.S. corporate plans' pensioner mortality.  As discussed earlier, when evaluating the reasonableness of a tabular conversion factor, it is appropriate to consider relevant, current information, regardless of when that information first became available.

249.     Like most other mortality tables published by the SOA, the Pri-2012 table is published as a gender-distinct pair, meaning that it consists of separate mortality rates for males and females.  This is considered by actuaries and demographers to be the most appropriate methodology, because males and females from similar populations experience significantly different mortality.

250.     **Benchmarking beneficiary mortality:**  I have selected the same mortality table to be used for beneficiary mortality. This is a customary approach, although another actuary

---

[43] Pri-2012 is the name of a family of tables reflecting experience of private-sector pension plans' mortality.  The year 2012 refers to the central year of the mortality experience period.  As is typical with mortality table construction, the analysis and table development occurred some years after the experience period.  The Pri-2012 family of tables was published in 2019.  I used the headcount-weighted version of the "total dataset" table and will refer to that table as simply Pri-2012 for purposes of my report.

might reasonably consider using general population mortality experience, such as U.S. population mortality experience, for this purpose.

251.    **Benchmarking gender mix:**  Because pension plans are not permitted to pay different pensions to males and females based solely on gender, as is customary for this purpose, I developed a unisex mortality table to be used regardless of the retiree's gender.  Figure 10 depicts the gender characteristics of the Plan's participant workforce as well as the retirees who elect J&S annuities. Details are included in Appendix E.

**Figure 10:  Gender breakdown of Raytheon Plan workforce and retirees who select J&S benefits[44]**



252.    In developing a Plan-relevant unisex retiree mortality table, I used the demographic profile of recent (since 2011) retirees who elected J&S benefits from the plan.  This gender mix was 75%/25% male/female.  I similarly developed a unisex mortality table for

[44] Source: Raytheon Plan annuitant valuation data 2013-2019; see Appendix E and accompanying work papers for details.

spouses/beneficiaries based on an expected 25%/75% male/female blend, assuming

spouses/beneficiaries are of the opposite gender.[45]  As discussed earlier in my report, adverse

selection is a relevant and permissible consideration in developing a J&S conversion factor and

so is also relevant and permissible in assessing the reasonableness of a pension's plan's tabular

conversion factor.

253.    I am naming this customized SOA table, with distinct unisex mortality for retirees

and beneficiaries, the "Current Mortality Table."

254.    In my opinion, the Current Mortality Table is both current and reasonable for my

assessment.  It is current in that it reflects U.S. pensioner mortality experience measured over a

five-year period in the most recent decade.  It is reasonable because it not only represents U.S.

pensioner mortality experience, but it reflects the demographic profile of Raytheon Plan retirees

who actually elected J&S annuities upon commencement in the Raytheon Plan in recent years.

255.    **Benchmarking retirement ages:**  For this benchmarking analysis, I am

considering two scenarios: (1) all participants retire at the Plan's normal retirement age, 65, and

(2) all participants retire at the age 63.8, the average retirement age for the Plan.

256.    In my view, it is entirely reasonable to design a pension plan (including relevant

conversions to alternative benefit forms) based on the assumption that all participants will work

until they achieve the normal retirement age specified in the plan.[46]  This is especially true

---

[45] Of 1,062 J&S annuity recipients commencing benefits in 2011 or later, 15 (or, 1.4%) of them
had beneficiaries of the same gender.

[46] In my experience, plan sponsors design their pension plans around a given, or expected, or
targeted retirement age.  Although ERISA uses the term "Normal Retirement Age" extensively
in outlining the current pension compliance environment, the terms "normal retirement" and
"normal retirement age" in fact had their genesis pre-ERISA with plan sponsors who, in fact,
focused the design details of their pension formulas on individuals whom they considered to be
"normal."  Given that conversion factors are an important plan design feature, it is reasonable to

where, as with the Raytheon Plan, the plan separately provides substantial subsidies for participants who retire early under any payment form.

257.    It is also reasonable to consider Plan-specific experience with regard to the average or typical retirement age of the relevant population electing J&S annuities.  Since 2011, this average age is 63.8.

258.    **Benchmarking interest rates:**  Finally, for this Plan-specific analysis I again used the range of current interest rates, 1.5% to 5.0%, for purposes of establishing a reasonable range of J&S conversion factors.

259.    **Summary of benchmarking assumptions:**   A summary of my benchmarking assumptions for developing a reasonable range for a 50% J&S conversion factor based on current conditions and Plan-specific information is shown in Figure 11.

**Figure 11:  Benchmarking assumptions for developing reasonable range of 50% J&S conversion factors based on current conditions and Plan-specific information.**

| Ingredient | Observation period representing current conditions | Reasonable range for benchmarking current conditions and Plan-specific information |
|---|---|---|
| Retiree baseline mortality | Recent standard U.S. pensioner mortality tables | Pri-2012 |
| Beneficiary baseline mortality | Recent standard U.S. pensioner mortality tables | Pri-2012 |
| Gender mix | Potential gender mix of J&S recipients (beneficiaries assumed opposite gender) | 75%/25% male/female mix (opposite for beneficiaries) |
| Retirement age | Potential average retirement ages | Age 63.8 and Age 65 |
| Interest rate | Publicly traded U.S. investment grade bonds yields: December 2011 to present | 1.5% to 5.0% |

consider that a plan sponsor would design their conversion factors to "work" for those retiring at the normal retirement age.

260.    **Reasonable range based on benchmarking current conditions and Plan-specific information:**  Applying these reasonable benchmarking assumptions in various combinations results in a range of reasonable 50% J&S conversion factors of from 0.884 to 0.912.  This range is visually depicted in Figure 12 below.

**Figure 12:  Raytheon Plan's 50% J&S conversion factor falls within my reasonable range**



261.    The Plan's 0.90 50% J&S conversion factor falls within this reasonable range.

**C.     Alternative Analyses**

262.    Actuarial analysis involves professional judgment, and there is more than one reasonable assumption that can be used in developing or assessing the reasonableness of a plan's tabular factors.  For example, there is no single, "correct" mortality table that all actuaries would use in developing or assessing the reasonableness of a tabular factor.  In Appendix F to this report, I consider a number of other possible benchmarking scenarios, which are summarized below:

263.    **Blue collar mortality.**  The actuarial community has developed separate "blue collar" and "white collar" mortality tables, reflecting the significant differences in mortality between white collar and blue collar workers.  Based on my understanding of the demographics of the participants in the Raytheon Plan, an actuary could reasonably conclude that it would be appropriate to use a blue collar mortality table when assessing the reasonableness of the Plan's 0.90 tabular factor.  Using the same assumptions as those in my benchmarking analysis (Figure 11 above), except substituting a blue collar version of the same mortality tables, this

benchmarking exercise developed a reasonable range from 0.881 to 0.909.  Because the Plan's 50% J&S conversion factor of 0.90 is within this range, this analysis is corroborative of my conclusion that the Plan's 50% J&S conversion factor of 0.90 is reasonable.

264.     **PBGC Interest Rates.**  As described above, an actuary might reasonably use current PBGC interest rates for purposes of developing or assessing the reasonableness of a tabular conversion factor.  Using the same assumptions as those in my benchmarking analysis (Figure 11 above), except substituting an average PBGC interest rates of 2.71% for the period from December of 2011 through early 2020, this benchmarking exercise developed conversion factors of 0.894 for age 65 and 0.897 for age 63.8.  Both factors are within the reasonable range that I developed above, and thus are corroborative of that range.  They are also lower than the 0.90 tabular factor used by the Raytheon Plan.

265.     **Serota Mortality Assumptions.**  In his report, Serota opines that the "RP-2014 Mortality Table with Mercer MMP-2007 Mortality Improvement Scale" is the "most reasonable actuarial assumptions to use."[47]  I have been asked by counsel to develop a benchmarking analysis using Serota's preferred mortality table.  Using the same assumptions as those in my benchmarking analysis (Figure 11 above), except substituting Serota's preferred mortality table, this benchmarking exercise developed a reasonable range from 0.891 to 0.919.  The Plan's 50% J&S conversion factor of 0.90 is within this range.

**D.      "Cruz-only" Analysis**

266.     I was asked by counsel to examine a hypothetical scenario in which Cruz is the only Raytheon Plan participant.  In other words, I was asked to determine what would be the

---

[47] Despite Serota's disclosure that he used RP-2014 and scale MMP 2007, his work papers show that he used RP-2006 and scale MMP 2007.  Raytheon actually used the RP-2007 version of the table in conjunction with the MMP-2007 scale for financial reporting purposes.

reasonable range for a 50% J&S conversion factor assuming no pooling across gender or age, and instead calculating a range of reasonable conversion factors using Cruz's age and gender.

267.     Figure 13 is a depiction of the benchmarking ingredients needed to tailor an assessment for Cruz.

**Figure 13:  Basis for assessing the 0.90 50% J&S conversion factor in the "Cruz-only" scenario.**

| Ingredient | Basis for "Cruz-only" analysis |
|---|---|
| Retiree baseline mortality | Pri-2012 |
| Beneficiary baseline mortality | Pri-2012 |
| Gender mix | 100% male (beneficiary 100% female) |
| Retirement age | 100% retire at age 55 |
| Interest rate | 1.5% to 5.0% |

268.     Using the Current Mortality Table and the gender and retirement age relevant to Cruz, all of which are reasonable assumptions for this "Cruz-only" scenario, I have determined that a reasonable range for a 50% J&S conversion factor tailored specifically to Cruz's gender and age is 0.890 to 0.922.  The plan's factor of 0.90 falls within this range.

269.     I was asked by counsel to develop this approach because Serota, in his report, evaluates the reasonableness of the assumptions underlying the Plan's 0.90 conversion factor only by reference to Cruz's age at retirement—age 55.

270.     I do not believe that this is the best or only way to evaluate the reasonableness of the Plan's tabular J&S conversion factor.  Nor do I believe that this approach would be common within the actuarial community.  The attributes of any single participant who does not exhibit demographic characteristics close to the average, relevant participant profile are not especially relevant for purposes of assessing the reasonableness of a tabular factor that is often a simplified

single factor designed to apply to a range of participants. As described earlier, the pooling of plan participants for purposes of setting reasonable actuarial assumptions and adjustments is customary, appropriate, and permissible under applicable guidance.

271.     If the Raytheon Plan was consistently to use a J&S conversion factor calculated not based on normal or average retirement age, but on age 55 (*i.e.*, the lowest possible retirement age under the Plan), it would result in a subsidized J&S benefit for the vast majority of participants, who retire (on average) nearly nine years later than did Cruz. There is no requirement that plan sponsors offer such subsidies. While there are approaches that a plan sponsor might use to calculate different conversion factors depending on the precise age of individual retirees, a plan is also permitted to provide a conversion factor applicable to groupings of participants or the average participant.

### E.    Retirement-Type Subsidies under the Raytheon Plan

272.     I have been asked to evaluate the degree of subsidy, if any, given to Plan participants who elect early retirement and take their benefit in a 50% J&S annuity form. In particular, I have been asked to evaluate the degree of the early retirement subsidy, if any, received by Cruz. I have determined that every early retiree electing a 50% J&S annuity receives a subsidy from the Raytheon Plan.

273.     The determination of the retirement-type subsidy associated with early retirees electing 50% J&S annuities, as shown in Figure 14, requires the calculation and comparison of these two amounts, both to be calculated on the basis of "reasonable actuarial assumptions":[48]

---

[48] The actuarial present value calculations shown are based on the Current Mortality Table and 3.25% interest, which is in the middle of my reasonable range of interest rates, 1.5% to 5.0%. The spousal age is presumed to be equal to the participant age.

- the actuarial present value of the normal retirement pension (the accrued benefit commencing at normal retirement age), and

- the actuarial present value of the 50% J&S annuity commencing at the early retirement age.

**Figure 14: Retirement-type subsidy, by age, of an early retiree electing a 50% J&S annuity in the Raytheon Plan, with an accrued benefit of $1,000 per month**

| Early Retirement Age | Early Retirement Factor | 50% J&S Plan Factor | 50% J&S Annuity | Actuarial Present Value (Measured at the Early Retirement Date) of: | | Subsidy | Subsidy % |
|---|---|---|---|---|---|---|---|
| | | | | The Early J&S Annuity | The SLA Commencing at Normal Retirement | | |
| 64 | 1.00 | 0.90 | $900 | $167,987 | $156,233 | $11,754 | 8% |
| 63 | 1.00 | 0.90 | $900 | $172,236 | $149,680 | $22,556 | 15% |
| 62 | 1.00 | 0.90 | $900 | $176,378 | $143,466 | $32,911 | 23% |
| 61 | 1.00 | 0.90 | $900 | $180,412 | $137,565 | $42,847 | 31% |
| 60 | 1.00 | 0.90 | $900 | $184,344 | $131,958 | $52,386 | 40% |
| 59 | 0.93 | 0.90 | $837 | $175,008 | $126,633 | $48,375 | 38% |
| 58 | 0.86 | 0.90 | $774 | $165,062 | $121,580 | $43,483 | 36% |
| 57 | 0.79 | 0.90 | $711 | $154,529 | $116,785 | $37,744 | 32% |
| 56 | 0.72 | 0.90 | $648 | $143,428 | $112,235 | $31,193 | 28% |
| 55 | 0.65 | 0.90 | $585 | $131,777 | $107,913 | $23,864 | 22% |

274.    As Figure 14 shows, regardless of the age of early retirement, a Raytheon Plan participant who is paid his or her early retirement benefit as a 50% J&S annuity receives a large subsidy from the Plan.  In other words, the value of the 50% J&S annuity is substantially greater than the value of the Plan's accrued benefit (the normal retirement pension—a single life annuity commencing at normal retirement age).

275.    I performed a similar calculation for Cruz and determined that, by retiring at age 55 and electing a 50% J&S annuity, as he did, the Plan provided him with a subsidy of over

$35,000 as compared to the value of his accrued benefit (his normal retirement pension—the single life annuity payable from his normal retirement date that he earned under the terms of the Plan).

276.    In performing this calculation, I used the interest rate and mortality assumptions identified in the Serota report as his "preferred inputs."  I used these inputs to demonstrate that, even using Serota's preferred assumptions, the value of the benefit that Cruz is receiving is greater by 19% than the value of the single life annuity payable at normal retirement that he accrued under the terms of the Raytheon Plan.[49]

277.    The details of Cruz's subsidized early retirement J&S annuity calculations are shown below in Figure 15.

**Figure 15:  Retirement-type subsidy for Cruz**

| Early Retirement Age | 50% J&S annuity | Accrued benefit at normal retirement age | The Early J&S Annuity | The SLA Commencing at Normal Retirement | Subsidy |
|---|---|---|---|---|---|
| 55 | $1,021.33 | $1,746.68 | $220,892 | $185,704 | $35,188 |

Actuarial Present Value (measured at age 55) of:

As Figure 15 shows, Cruz is receiving a large subsidy from the Plan.  In other words, the value of his 50% J&S annuity is substantially greater than the value of his accrued benefit under the terms of the Plan.[50]

---

[49] No matter which of the assumptions presented in Paragraph 111 of Serota's report are used, Cruz's benefit is substantially subsidized.  See Appendix G.

[50] Had I instead used the reasonable assumptions set forth in footnote 48, above, the amount of the net subsidy that Cruz is receiving would be even greater.

## X.        CRITIQUE OF SEROTA

278.     According to his report, Serota was asked to "conduct a review and analysis" of the Raytheon Plan's "benefit calculation practices" and, in particular, to "focus on the pension benefit that was calculated for [Cruz]."[51]  Specifically, he was asked to analyze whether Cruz's J&S annuity benefit "is 'actuarially equivalent to the single-life annuity … that he could have chosen when he retired."[52]

279.     Using his "preferred inputs" for mortality and interest rate assumptions, Serota concludes that Cruz would have received a somewhat higher (about 4% higher) monthly benefit than the one that he is receiving using the Plan-specified conversion factor.[53]  On that basis, he concludes that "the Conversion Factor specified in the Plan Document for the 50% JSA was too low."[54]

280.     Tellingly, while Serota calculates that Cruz would have received a higher benefit using his "preferred" interest rate and mortality assumptions, at no point in his report does he squarely opine that there are no reasonable sets of assumptions that could lead to a conversion factor of 0.90 or lower.

281.     My principal points of disagreement with Serota's conclusions and methodology are (to the extent not already covered in the preceding sections) set forth below.

### A.        Reasonableness Is a Range, Not a Point

282.     In his report, Serota identifies a single set of "preferred" actuarial assumptions, applies them to Cruz's unique circumstances, and concludes that Cruz's J&S annuity benefit is

---

[51] Serota, ¶ 7.
[52] Serota, ¶ 8.
[53] Serota, ¶¶ 10, 14, 106.
[54] Serota, ¶ 10.

not actually equivalent to his single life annuity benefit because (using Serota's preferred assumptions) the value of the single life annuity that would have been paid to Cruz commencing at age 55 is greater than the value of the J&S annuity that he is receiving.

283.    This methodology is flawed because it fails to recognize that there is an array of reasonable interest rates and mortality assumptions that actuaries typically look to in developing and assessing conversion factors.  Serota effectively concludes that Cruz's J&S benefit is not actually equivalent to his single life annuity merely because the two do not have the same actuarial present value using his preferred assumptions or assumptions within a very tight range of those assumptions.

284.    As explained in detail in my report, however, Cruz's J&S benefit is (at least) actuarially equivalent to his single life annuity benefit under a range of reasonable, current assumptions.  In other words, even assuming that the 0.939 conversion factor implied by Serota's preferred inputs is reasonable, that does nothing to establish that the Plan's 0.90 conversion factor is *un*reasonable or outside the range of reasonableness.

285.    Furthermore, as explained above in Section IX, the value of Cruz's benefit far exceeded the value of his accrued benefit, even under Serota's preferred assumptions.

### B.    Pooling by Age

286.    The Raytheon Plan's 50% J&S conversion factor is 0.90, regardless of the retiree's gender or age.  In other words, the Plan effectively pools all participants across both gender and age for purposes of calculating J&S annuities.

287.    As described in detail in my report, pooling is a commonly applied actuarial principle in both the insurance and defined benefit pension worlds, and is explicitly permitted with respect to J&S conversion factors by applicable Treasury regulations.  This is so despite the

fact that, under any sort of pooling arrangement, some individual participants may be disadvantaged (and others advantaged) relative to the average or typical participant.

288.    In my analysis, I evaluate the reasonableness and appropriateness of the Plan's 0.90 conversion factor by reference to the entire relevant population, focusing on (among other things) the average age at which J&S participants actually retire from the Plan.  All else equal, a fixed conversion factor will always be relatively disadvantageous to participants who retire at relatively early ages—yet both pooling and the use of fixed factors are permissible.  Nevertheless, it is also important to note that early retirees from the Raytheon Plan benefit from substantial subsidies, so any potential disadvantage associated with age pooling is more than offset by highly subsidized early retirement factors.

289.    By myopically focusing only on the 0.90 conversion factor's impact on Cruz, Serota effectively ignores the fact that pooling is both common and permissible.  Rather than evaluate the reasonableness of the 0.90 conversion factor by reference to an average participant who retires at age 63.8, Serota's analysis evaluates the reasonableness of the 0.90 conversion factor solely by reference to an atypical Plan participant (*i.e.*, Cruz) who retired at age 55.[55]

### C.    Serota's Reasonability Assessment Criteria Regarding Mortality

290.    Serota selected a set of mortality tables used by Raytheon for GAAP financial reporting purposes under ASC 715 for its 2014 financial statements.  He emphasizes that this is important because this table *was available* as of the date of Cruz's retirement.

291.    This distinction—between what was available as of Cruz's retirement date and information that becomes available later—is irrelevant and illogical.  The assessment of whether

---

[55] Serota reviewed experience studies by Mercer, which clearly indicate that very few Plan participants retire at age 55.  My analysis of the Plan's data demonstrates that only 5% of all Plan retirees since 2011 commenced benefits at 55.

a Plan's conversion factor is reasonable may take into account relevant, available information about trends in mortality—even if that information is accumulated after the moment in time at which a particular participant happened to retire.  The mere publication date of data does not make an assumption reasonable or unreasonable; even if reasonableness must be determined based on the circumstances at a point in time (which it does not), one can evaluate that point in time based on analysis of that instance that occurs after that point.  Furthermore, because pensions are long-term promises, there is no need to focus on a point in time and, instead, data both before and after can provide meaningful context.

292.    I have selected a table that was published in 2019.  The table is called Pri-2012, and it is constructed from U.S. pensioner mortality experience from the years 2010 through 2014, and as such it is clearly indicative of relevant, current mortality experience.  Its publication date in no way undermines its obvious relevance in assessing the reasonableness of the conversion factor that was used to calculate Cruz's J&S annuity when he retired in 2015.

293.    Serota's suggestion that information regarding mortality made available after 2015 is irrelevant is especially ironic, given his claim that the supposed unreasonableness of the 0.90 conversion is driven largely by the Plan's use of an outdated, non-"modern" mortality table.[56]  My assessment based on a table reflecting broad pension plan participant experience from 2010 to 2014 certainly addresses what Serota claims to be his primary concern.

---

[56] Serota, ¶¶ 13, 42.

### D.     Serota Assumes a Gender Mix that Is Inconsistent with Plan Experience

294.     Serota has based his analysis on an assumed gender mix of 50%/50% male/female for both retiree and beneficiary mortality.[57]  For two reasons, I do not believe that that is an appropriate assumption.

295.     First, the actual gender mix of the Plan's overall retiree population since 2011 is 58% male/42% female.

296.     Second, the gender mix of the Plan participants who actually select the J&S annuity option is even more heavily weighted toward males—*i.e.*, 75% male/25% female since 2011.  In light of this fact, in my reasonableness assessment, I blend the gender-distinct mortality tables of Pri-2012 75%/25% male/female for retirees and 25%/75% male/female for beneficiaries.

297.     As described in greater detail in my Background section, it is both customary and appropriate to take "adverse selection" into account when setting or evaluating actuarial conversion factors.[58]  In particular, it is reasonable to take into account the gender mix of the population that actually selects an optional form of benefit in developing or assessing the conversion factor to be used in converting an single life annuity to that optional form.

---

[57] Serota acknowledges that 50%/50% gender weighting is a "default" assumption and that the unisex requirement does not automatically imply using this 50%/50% assumption.  He acknowledges that it may be appropriate to instead reflect a relevant, Plan-specific gender mix. Serota, ¶ 104.

[58] In addition to the clearly observable gender selection criterion, there are other "adverse selection" criteria that could be taken into account that I did not reflect.  Everything else being equal, a participant in poor health would be more likely than a participant in good health to elect an option with a death benefit attached to it, such as a J&S annuity.  Similarly, everything else being equal, a participant with a healthy spouse/beneficiary would be more likely to elect an option with a survivor annuity attached to it—such as a J&S annuity—than a participant with a spouse/beneficiary in poor health.  Incorporating these additional adverse selection criteria would have resulted in an even lower end of the reasonable range for a tabular, fixed 50% J&S conversion factor.

298.     Thus, my gender mix assumption is based on sound actuarial principles.  Serota's gender mix assumption, by contrast, is inconsistent with relevant data regarding the Plan participant population and thereby does not adequately define the range of reasonableness.

E.     **Serota's Interest Rate Assumptions Are Unduly Narrow**

299.     Mr. Serota has selected an interest rate for his evaluation of 4.05%.  While I do not endorse his tortured justification for using rates determined under ASC 715 for this purpose, the interest rate he has used is within what I consider to be a reasonable range of rates for this purpose considering the general level of interest rates over the past eight-plus years.

300.     However, I disagree with Serota's conclusion that the reasonable range of interest rates is limited to the tight corridor of rates used by companies for financial reporting purposes. As described in detail in my report, (1) the use of rates determined under ASC 715 for purposes of J&S conversion factor calculations is neither typical nor especially sensible, and (2) other sources of rate assumptions customarily relied upon by pension actuaries suggest a considerably wider range of reasonable rate assumptions.

F.     **Serota's Speculation about the Origins of the Plan's 0.90 Conversion Factor Is Unfounded and Irrelevant.**

301.     Serota asserts that the Plan's 0.90 conversion factor "appears to be the product of (or at least consistent with) … the 1971 Group Annuity Mortality Table [assuming 100% male mortality for retirees and 100% female mortality for beneficiaries] . . . . , coupled with the discount rate of 5%."[59]  This assertion is both unfounded and irrelevant.

302.     First, this conclusion is pure speculation.  As I have demonstrated elsewhere in this report, there are multiple different ways to arrive at a 0.90 conversion factor—both today

---

[59] Serota, ¶ 12.

and in the 1970s and 1980s.[60]  Furthermore, the conversion factor could have been more generous than mere actuarial equivalence when it was established.  For example, as discussed earlier, the IRS set forth a 50% J&S conversion factor of 0.88 to satisfy ERISA's anti-forfeiture rules in a 1976 Revenue Ruling (which factor is still applicable today).  The 0.90 factor could therefore have been established with room to allow for changes in actuarial equivalence.

303.    Second, and more importantly, this speculation is irrelevant.  As I have demonstrated above, a 0.90 conversion factor is well within the range of reasonableness for the Plan based on *current* economic and demographic conditions, including current mortality assumptions.  Given that fact, the exact provenance of the 0.90 conversion factor is, from an actuarial perspective, entirely irrelevant.

### G.    Serota Is Wrong to Assert that Cruz Is Receiving Less than the Actuarial Equivalent of the Single Life Annuity Benefit to Which He Is Entitled.

304.    Serota asserts that "[i]f Mr. Cruz were receiving the actuarial equivalent of the SLA . . .  he would be receiving an additional $44.58 each month."  I disagree.  My analysis, as described in this report, shows that Cruz's J&S annuity is at least the actuarial equivalent of his single life annuity.

305.    First, as demonstrated above, my analysis shows that, under a range of reasonable, current assumptions, the J&S annuity that Cruz is receiving is, indeed, at least the actuarial equivalent of the single life annuity benefit that he could have selected at the time of his retirement.

---

[60] Furthermore, Serota's "reverse engineering" is slipshod.  For example, he ignores the fact that the Plan adopted a conversion factor that applies equally regardless of the age, he ignores completely the potential for a gender mix other than 100% male, he ignores the possibility of other mortality tables commonly used back in the 1970s and the 1980s, and he ignores the possibility of other interest rates commonly used back in the 1970s and 1980s.

306.     Second, Cruz's pension is in fact highly subsidized.  By retiring at age 55 and electing a 50% J&S annuity, the value of his benefit is about 19% greater than the value of his normal retirement pension *even using Serota's own "preferred" interest rate and mortality assumptions*—the actuarial assumptions endorsed by Serota as "best."[61]

### H.     Serota Is Wrong about the Applicability of ASOPs 27 and 35.

307.     Serota's report includes repeated insinuations about the applicability of ASOP Nos. 27 and 35 to the selection of actuarial assumptions for calculating a pension plan's actuarial equivalence factors.  He is wrong.

308.     These two ASOPs apply to actuaries when performing aggregate calculations of pension obligations for such purposes as plan funding or plan sponsor accounting.  The scope statements in each of the ASOPs state explicitly that individual benefit calculations are not included in the relevant "measurements of pension obligations" covered by these ASOPs.

---

[61] See Section IX.E of this report for my analysis of Cruz's subsidy.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge, information, and belief.

Executed on May 29, 2020 in Chicago, Illinois.

    */s/ Thomas S. Terry*
Thomas S. Terry, F.S.A., E.A., M.A.A.A.

# TABLE OF CONTENTS

Page

I.    APPENDICES ............................................................................................... 1

   A.    Thomas S. Terry CV ......................................................................... 1

   B.    Illustrative Actuarial Ingredients for 50% J&S Conversion Factors Since
        the 1970s ........................................................................................... 5

   C.    Actuarial Assumptions for Conversion Factors Used by Plans Served by
        Serota or Serota and Associates ...................................................... 11

   D.    Reasonable Range for 50% J&S Conversion Factors Based on Current
        Conditions ........................................................................................ 12

   E.    Demographic Profile of the Plan's Recent Retirees ........................... 24

   F.    Alternative Benchmarking Analysis Scenarios .................................. 27

   G.    Cruz's Subsidy Using Serota's Assumptions ..................................... 33

   H.    Alternative Actuarial Bases from the 1970s and 1980s...................... 35

   I.    Materials Considered in the Preparation of This Report .................... 38

I.    **APPENDICES**

A.    **Thomas S. Terry CV**

Thomas S. Terry, MAAA, FSA, FCA, EA
CEO
The Terry Group
130 E. Randolph Street, Suite 2810
Chicago, IL  60601

Cell:        +1-312-543-5206
E-mail:tom.terry@terrygroup.com

**Education**

Masters of Actuarial Science, Graduate School of Business Administration, University of Michigan, 1975

Bachelor of Science, Tufts University, 1973
- Summa Cum Laude
- Double major in math and physics
- Phi Beta Kappa
- Winner, N. Hobbs Knight Prize Scholarship for excellence in theoretical and practical physics

**Professional Experience**

The Terry Group, 2010 to present
- Founder and CEO

J.P. Morgan Compensation and Benefit Strategies, 2006 to 2010
- CEO of J.P. Morgan Compensation and Benefit Strategies
- J.P. Morgan acquired CCA Strategies in October 2006

CCA Strategies LLC, 1991 to 2006
- Co-founder and President
- Firm of approximately 200 professionals in ten offices across the U.S.

Towers Perrin, 1975 to 1991
- Principal and Vice President
- More than two thousand actuaries and employee benefits professionals world-wide
- Retirement Plan Practice Leader in Chicago office

**Professional Associations and Research Organizations:  Roles and Memberships**

International Actuarial Association (association of world-wide actuarial associations):
- President, 2017
- Chair, Pensions and Employee Benefits Committee, 2015

Global Aging Institute (Washington DC based research organization):
- Board Chair, 2014 to present

American Academy of Actuaries (national professional association for US practicing actuaries):
- President, 2014
- Board of Directors, 2005 to 2009, 2013 to 2015
- Chair of Public Interest Committee, 2009 to 2012
- Member, Strategic Planning Committee, 2010
- Vice President for Pensions, 2007 to 2009
- Chair of Stock Options Task Force, 2004 to 2008
- Chair of Defined Benefit Revitalization Task Force, 2002 to 2004
- MAAA, since 1981

Board of Actuaries (oversight responsibility for the U.S. government's Civil Service Retirement System and the Federal Employees Retirement System):
- Board chairman, since 2013
- Board member, since 2010

Social Security Advisory Board Technical Panel:
- Member, 2018-2019

Society of Actuaries (education and research):
- Vice President and board member, 2010 to 2012
- Board member, 2007 to 2010
- FSA, since 1976

Conference of Consulting Actuaries (continuing education):
- President-elect, President, 2006 to 2007
- Treasurer, 2003 to 2005
- Vice President, Pensions, 2001 to 2003
- Board member, 2001 to 2009
- Member, since 1982, FCA, since 2001

**Publications**

*Communicating Longevity Risk – More Things to Think About*
Co-authored with Liaw Huang; Contingencies Magazine, November-December 2015

*Communicating Longevity Risk – Beyond the Definitions*
Co-authored with Liaw Huang; Contingencies Magazine, September-October 2015

*Uncertain Times, Plural Rationalities and the Pension Fiduciary* in *Handbook of Institutional Investment and Fiduciary Duty* (edited by James P. Hawley, et al, 239-253) Liaw Huang, David Ingram, Thomas Terry, and Michael Thompson – Cambridge University Press, 2014

*Public Interest – Preserving the Trust*
President's Message, Contingencies Magazine, November-December 2014

*The Aging of America*
President's Message, Contingencies Magazine, September-October 2014

*A New Retirement Paradigm*
President's Message, Contingencies Magazine, July-August 2014

*Public Confidence – What Does It Take?*
President's Message, Contingencies Magazine, May-June 2014

*Promoting Objective Public Policy in a Partisan World*
President's Message, Contingencies Magazine, March-April 2014

*Keeping Up with the Brits*
President's Message, Contingencies Magazine, January-February 2014

*A Year Well Spent*
President's Message, Contingencies Magazine, November-December 2013

*Communicating Longevity Risk – Beyond the Definitions*
Co-authored with Liaw Huang; presented in Beijing at Longevity 9 Conference, 2013

*Interview as part of report on Increasing Social Security Retirement Age*
CNN, 2010

*Fix Social Security by Increasing the Retirement Age*
US News and World Report, 2010

**Congressional Testimony**

*Testimony on Social Security's Current Benefit Expenditures, Proposed Changes to Future Benefits and the Impact Those Changes would Have on the Program, Future Beneficiaries, Workers, and the Economy*
U.S. House of Representatives Ways and Means Committee Subcommittee on Social Security, July 2011

**Expert Testimony – Legal**

In 2019, Mr. Terry prepared a report and was deposed (in 2020) as an expert in *Herndon v. Huntington Ingalls Industries* in the Federal District Court for the Eastern District of Virginia Norfolk Division.  The case involves actuarial equivalence associated with an optional benefit form under one of the company's pension plans.  The case is ongoing.

In 2017, Mr. Terry prepared a report and was deposed as an expert in *City of Houston v. Towers Watson & Co.* in the Southern District of Texas Houston Division of the Federal District Court. The case involved actuarial practice associated with valuations of the Houston Fire pension plan. The matter was settled in 2018.

In 2015, Mr. Terry prepared a report and was deposed as an expert in *Johnston v. Dow Employees' Pension Plan* in the Eastern District of Michigan Federal District Court.  The case involved pension benefit rights in the context of a corporate transaction.  The matter was settled in 2016.

**B.      Illustrative Actuarial Ingredients for 50% J&S Conversion Factors Since the 1970s**

1.      The following appendix provides additional detail for my analysis of reasonable 50% J&S conversion factors based on illustrative actuarial ingredients since the 1970s, as discussed in Section V.B.2. of the report.

**Mortality experience since the 1970s**

2.      The methodologies for construction of mortality tables specific to uninsured pension plan participants have evolved over time.  It is common knowledge that overall life expectancy in the U.S. has improved over the last century, including since the 1970s.  Nevertheless, mortality tables, and especially the tables used by actuaries for various pension purposes, do not neatly line up so as to display a constant, steady decline in mortality rates from year to year.

3.      There are a number of explanations for this phenomenon.

4.      First, the measurement of private-sector pension plan participants' mortality experience has evolved over the years as more types of data have become available and as analysis methods have become more sophisticated.  In the 1970s and 1980s, a single table may have been put to use for a variety of different pension applications.  It was often "loaded" for use in evaluating pension liabilities to introduce "conservatism" to mitigate against adverse fluctuation or to anticipate future improvements.

5.      For example, the 1983 Group Annuity Mortality Table ("GAM-83") published in the early 1980s produced a life expectancy measure for a 65-year-old female, that has not yet been observed by the average female in the U.S., according to the most recent life tables published by the CDC.  GAM-83 produces a life expectancy of 21.3 years while the CDC 2017 table produces a life expectancy of 20.6 years.

5

6.      Second, pension mortality experience studies and mortality tables have increasingly recognized differential mortality among sub-populations.  In addition to gender differences, for example, mortality differences by occupation have garnered more attention in recent years.  As another example, the last decennial mortality tables published by the CDC for 1999-2001 show a huge variation in life expectancy for 65 year olds across the U.S.—ranging from 16.6 to 20.4 based just on geography.

7.      With each subsequent study, the Society of Actuaries' Retirement Plans Experience Committee ("RPEC") continues to investigate, through its multivariate analysis, statistically significant drivers of mortality.  At the same time, more data is available and deriving tables for different sub-populations has become more achievable from the standpoint of statistical credibility.  The availability of U.S. population-wide mortality data has also contributed to a more refined understanding of potential disparities in mortality rates across various sub-populations.

**Mortality tables since the 1970s**

8.      For purposes of analyzing reasonable ranges of tabular 50% J&S conversion factors since the 1970s, I used a number of different mortality tables.

9.      For the periods from the 1970s to the 1990s, I selected generic tables available at that time, because that was all that was known or available during that period.  In the more recent decades, more refined choices became available, and so I tailored my selections to potentially more relevant tables considering the Plan's population.

10.     At the time that Revenue Ruling 79-90 required plans to specify either a factor or the ingredients in the plan (under the Acceptable Fixed Standards approach), the tables widely used by pension actuaries were GAM-71, UP-84, GAM-83, and earlier tables such as GAM-51,

6

with many available ways to adjust for mortality improvements if so desired.  I used GAM-71 and UP-84 (modified to represent male and female mortality as suggested by the actuaries who developed it).

11.     By the 1990s, a variety of pension mortality tables had been published including GAM-94, GAR-94, and UP-94.  I selected UP-94 to represent that era.

12.     By 2000, RPEC had published RP-2000.  Shortly thereafter, tables related to occupations, such as blue collar or white collar were made available.  I selected a version of RP-2000 that represented mortality rates for hourly or unionized pension plan participants.

13.     In 2014, RPEC published a family of tables under the name RP-2014. The actual mortality experience in that study reflected the years 2004 to 2008, and so the study was considered to represent mortality as of the central year of 2006.  RPEC published rates on an amount-weighted as well as a headcount-weighted basis.  They also published tables by "collar," by amount-based quartile, by male and female, and by non-annuitant and annuitant.  I selected a headcount-weighted blue collar version of this table for my illustration.

14.     In 2019, RPEC published a new study reflecting U.S. private-sector pension plan mortality experience based on the years 2010 to 2014. The family of tables was called Pri-2012, and I selected a headcount-based, blue collar table from this family to represent Pri-2012.

15.     Finally, the last available U.S. population mortality study for 2017 was published by CDC in 2019, and I used this table (gender distinct as published by CDC but blended as I indicate below) as well.

**Gender mix and retirement age for illustration purposes**

16.     For purposes of assessing or developing 50% J&S conversion factors, the same table must be used for all participants, regardless of gender. The same is true for the beneficiary,

although retiree and beneficiary tables may be different. Unisex tables are typically created by blending gender distinct tables to an appropriate, relevant gender mix. That is what I did for each of the tables considered in this particular analysis.

17.    For each of the mortality tables selected, I assumed that the gender mix of those electing J&S annuities will vary in a range from approximately 50% male to 80% male.  This assumed range is built on top of an assumed underlying participant population that ranges from approximately one-third/two-thirds male/female to approximately two-thirds/one-third male/female.

18.    The development of this gender mix range for those assumed to elect J&S annuities reflects the widely understood phenomenon that males are more likely than females to elect J&S annuities over single life annuities.  This phenomenon is an example of adverse selection and is discussed in greater detail in the Background section of my report.  The details behind the calculation of the 50% to 80% range (specifically, how I developed this range from an assumed one-third male to two-thirds male gender composition range for the underlying participant population) are identical to the details of the assumed gender mix range shown in Appendix D.  I also assumed that the beneficiary gender would be the "mirror" image of the participant gender.

19.    For my illustrations, I selected a typical normal retirement age of 65 and assumed the spouse is also 65 years old.

**Interest rates since the 1970s**

20.    In addition to mortality tables and gender mixes, for purposes of analyzing reasonable ranges of tabular 50% J&S conversion factors since the 1970s, I used a number of interest rate assumptions.

21.     As discussed in my report, interest rate levels have declined over the past 30 to 40 years. This is true with respect to any particular type of rate, such as Treasury rates of a specified maturity.  But it is also true overall for a broader selection of reference interest rates.  Orienting to a long-term view and averages of rates that plan sponsors may have considered for purposes of J&S conversion factors in various decades, I have selected ranges of 5.0% to 8.0% for the 1970s and 1980s, 3.0% to 7.0% for the 1990s and 2000s, and 1.5% to 5% from the 2010s to today.

22.     This is based on consideration of the relevant indices and averaging relevant rates for the various decades.  For example, in the 1970s, both 30-year and 10-year Treasury rates averaged approximately 8%, while 50% of the prime rate through the 1980s was, on average, around 5%.  Since Revenue Ruling 79-90 specifically referred to 50% of the prime rate as an example of an acceptable interest rate assumption, it is likely that plan sponsors could have considered similar rates.

23.     In the 1990s and 2000s, 30-year Treasuries averaged from 5.0% to 7.0%, while 10-year Treasuries averaged from 4.5% to 6.6%, with 50% of the prime rate, on average, between 3.0% to 4.0%.  I selected the range of 3.0% to 7.0% for these two decades based on these benchmarks.

24.     Finally, elsewhere in my report, I describe in detail why I selected the range of 1.5% to 5.0% for 2010s.

**Actuarial ingredients for illustrating range of 50% J&S conversion factors since the 1970s**

25.     For this illustration, I calculated the 50% J&S conversion factor ranges for the retiree who commences the benefit at normal retirement age with the spouse of the same age. The tables and ranges of rates are reproduced below, with slightly more detail as to the specific mortality table family member.

26.     As mentioned earlier, the ranges include not only interest rate variability and levels appropriate to the period, but also gender mixes for the unisex tables as discussed in this appendix, above.

| Period | Mortality Table | Rate ranges |
|---|---|---|
| 1970s | **GAM-71** (male/female as modified by gender mixes) | 5.0% - 8.0% |
| 1970s - 80s | **UP-84** (adjusted to reflect male/female by set forward 1 year for male, and set back 4 years for female, and further modified by gender mixes) | 5.0% - 8.0% |
| 1990s | **UP-94** (male/female, as modified by gender mixes) | 3.0% - 7.0% |
| 2000s | **RP-2000** (RP-2000 BC male/female as modified by gender mixes) | 3.0% - 7.0% |
| 2010s | **RP-2006** (RPH-2006 BC male/female as modified by gender mixes) | 1.5% - 5.0% |
| 2020s | **Pri-2012** (Pri.H-2012 BC male/female as modified by gender mixes) | 1.5% - 5.0% |
| US most recent | **CDC-2017** (male/female for total US, as modified by gender mixes) | 1.5% - 5.0% |

**C.    Actuarial Assumptions for Conversion Factors Used by Plans Served by Serota or Serota and Associates**

| Pension Plan | Mortality Table | Interest Rate | Source[1] |
|---|---|---|---|
| Serota and Associates | UP-94 | 6.5% | Pages 94, 161 |
| Mickey Kupperman Consulting | GAM-94, post-retirement | 5% | Pages 97, 162 |
| Zale | IAM-71 for males | 6% | Pages 101, 163 |
| Borg Indak | UP-84, set back 3 years | 7.5% | Pages 103, 163 |

---

[1] Deposition of Mitchell Serota in Herndon v. Huntington Ingalls Industries (January 14, 2020)

**D.     Reasonable Range for 50% J&S Conversion Factors Based on Current Conditions**

1.      Section IX.A. includes a discussion of a reasonable range for a 50% J&S conversion factor based on current conditions (and, for the moment, setting aside considerations of relevant, Plan-specific demographic experience).  This appendix includes additional detail on the ingredients used for developing this reasonable range as well as additional detail on the impact of varying different combinations of ingredients, all of which support the conclusion that, based on current conditions, a reasonable range for a 50% J&S conversion factor, without regard to Plan-specific information, is 0.872 to 0.935.

2.      Throughout this report, I use the term "current conditions" to represent relevant observable economic and demographic conditions generally since 2011 to early 2020. Demographic ingredients are used to develop mortality assumptions for retirees and beneficiaries for assessment of a 50% J&S conversion factor, as well as the age at which a tabular J&S conversion factor is evaluated.

3.      The range of benchmarking assumptions I used for developing this reasonable range is summarized here:

| Ingredient | Observation period representing current conditions | Reasonable range for benchmarking current conditions |
|---|---|---|
| Retiree baseline mortality | Recent standard U.S. pensioner mortality tables | Families of tables:  RP-2006 and Pri-2012 |
| Beneficiary baseline mortality | Recent standard U.S. pensioner mortality tables | Families of tables:  RP-2006 and Pri-2012 |
| Gender mix | Potential gender mix of J&S recipients (beneficiaries assumed opposite gender) | 50% male to 80% male |
| Retirement age | Potential average retirement ages | Age 60 to age 65 |
| Interest rate | Publicly traded U.S. investment grade bonds yields: December 2011 to present | 1.5% to 5.0% |

**Benchmarking participant and beneficiary mortality**

4.      For mortality benchmarking purposes, I have considered the most recently

published standard industry mortality tables based on U.S. private sector pension mortality

experience.

5.      There were two such studies published by RPEC since 2000.  The first study was

published in October 2014 in a report entitled RP-2014.  The second study was published in

October 2019 in a report entitled Pri-2012.  Both reports represented detailed experience studies

based on U.S. private pension plan data, collected by RPEC and published as families of baseline

mortality tables.  Each of the reports represented mortality experience over five year periods.  I

describe each of them below.

6.      **RP-2014 study.** The mortality rates in this family of tables are based on U.S.

private-sector pension plan mortality experience data spanning the period 2004 through 2008.

The baseline year for the rates is the central year of the data, 2006.

7.      At the time of this study's publication in 2014, RPEC also set out to produce a

new mortality improvement projection methodology.  Thus, the first two-dimensional mortality

improvement scale based on this new methodology  was published at the same time as RP-2014.[2]

This mortality improvement scale was called MP-2014.  MP-2014 was used by RPEC to project

the baseline 2006 mortality rates to 2014.  The resulting family of tables was, thus, deemed to be

"as of" 2014, and thus was called RP-2014.

8.      It is worth noting that the MP-2014 mortality improvement scale later proved to

be overly optimistic.  Already by the time RP-2014 was published, several actuarial consulting

firms had recognized these flaws and had, as a result, advised "backing out" the improvements

---

[2] Mortality improvement scales are discussed in more detail below.

13

associated with MP-2014 in order to reconstruct the 2006 baseline table (later referred to as RP-2006) that was based on actual mortality experience.  Many companies, including Raytheon, did just that. Thus, it was very common for actuaries and plan sponsors to rely on the RP-2006 tables,  potentially adjusted by their own assumed mortality improvement scales, for a variety of pension obligation measurement purposes.  In 2018, RPEC finally officially published RP-2006 tables based on the mortality experience data underlying construction of RP-2014, with mortality rates as of the central year of the study period of 2006.

9.      Within this family of tables, there are amount-weighted and headcount-weighted versions.  Tables are also differentiated by collar (blue collar, white collar, and total population), amount (top and bottom quartiles), and status (active versus retired participants of the same ages).  Finally, there are gender-distinct tables for all of the categories mentioned above.

10.      **Pri-2012 study.**  In October 2019, RPEC published a family of tables called Pri-2012. ("Pri" stands for Private Pension Plans, while 2012 denotes the central year of the mortality experience data underlying the construction of these tables).

11.      The year in the name represented a departure from a previous convention that linked the year in the title of the table to the year of its publication.  (UP-84 was another example of a departure from that more typical naming convention.)  The experience data always lags the creation of the table, because it takes time to collect and analyze the data.

12.      The final dataset contained approximately 16 million life-years of exposure and 343,000 deaths from private-sector pension plans across the U.S. for the years 2010 through 2014.  Data was gathered from 18 different entities that submitted information from 402 plans. The final data validation process included all but about 8% of all data processed.

13.     As before, separate tables were developed by gender, by health status (healthy versus disabled), by collar (total, blue collar, and white collar), by amount (top quartile and bottom quartile), and by status (employee, primary retirees, and contingent beneficiary). In addition, each table was developed on both headcount weighted and amount-weighted bases.

14.     **Mortality improvement ("MI") scales.**  MI scales represent demographic assumptions intended to project mortality rates forward from a baseline year to a measurement date and/or into the future.  MI scales anticipate improvements in mortality rates based on past experience and a judgment about the future.

15.     For example, assume that it is expected that mortality rates for a 65 year old is 1.2% today and that will improve by 1% per year.  Then, an actuary would project that someone 65 years old 20 years from now would be subject to a mortality rate of about 0.98% (an improvement of about 20%).

16.     In the past, actuaries have anticipated mortality improvement using a variety of methodologies.  Some adjusted the mortality rates with margins, such as a 10% reduction in all rates that were measured through tabulating actual mortality experience.  GAM-71 and GAM-83 both contain such margins in addition to other adjustment to the observed experience rates.

17.     Another way to adjust an experience mortality table is to use a technique known as an age set-back.  An actuary might adjust all mortality rates by a specified number of years. For example, a three-year set back would involve setting the mortality rate for a 68 year old to be the rate of someone three years younger—a 65 year old.  This, then, is another methodology for anticipating mortality improvements:  by increasing life expectancy from that based on experience by approximately the number of years "set back."

18.     Recently, mortality improvement methodologies have been refined from relatively simple techniques to more complex approaches that involve varying assumptions by age and future years.  The first two-dimensional mortality improvement scale was fashioned by RPEC to use a methodology introduced in the U.K. and published in 2012 ("Scale BB").  Since 2014, RPEC has published new two-dimensional mortality improvement scales every year, updating for new and emerging U.S. mortality experience and refining the methodology.

19.     Many companies develop their own mortality improvement scales.  For example, the scale MMP-2007 was developed by Mercer, a major actuarial firm, in 2014 to reflect its view of mortality improvement starting in 2007.  In 2016, Mercer refined their assumptions and methodology and created MMP-2016, used by Raytheon in conjunctions with the RP-2006 table for their accounting pension obligation measurements starting in 2017.

20.     **Range of baseline mortality tables**.  I varied the baseline mortality table for retirees and beneficiaries across the family of Pri-2012 tables, as well as RP-2006 tables, with and without mortality improvement scales to reflect potential changes in mortality from 2006 to 2015, and in some cases beyond.  I used the MMP-2007 and MMP-2016 scales created by Mercer and used by Raytheon for purposes of GAAP accounting liabilities for their financial disclosure.

21.     **Illustrative baseline tables:**  As discussed in my report, for my Plan-specific benchmarking purposes, I selected a table I called the "Current Mortality Table."  For purposes of this variability demonstration, however, I considered the range of tables from the RP-2014 and Pri-2012 studies.  To illustrate the range of reasonable mortality baseline, I selected Table 1 and Table 2.  Table 1 is the same table as selected by Serota, namely RP-2006, projected from 2006 to 2015 with MMP-2007, and applied as a generational mortality improvement projection to all

future years.  Table 2 uses two other tables from the Pri-2012 family, namely the Pri.H-2006 blue collar table for the participant and the Pri.H-2012 table for the beneficiary.  (There are tables in both families as well as other projection methodologies that, if used, would actually further broaden the ranges on both ends.)

**Benchmarking gender mix**

22.     For purposes of assessing or developing 50% J&S conversion factors, the same table must be used for all participants, regardless of gender. The same is true for the beneficiary, although retiree and beneficiary tables may be different. The unisex tables are typically created by blending gender distinct tables to an appropriate gender mix.

23.     For benchmarking a reasonable range for the gender mix of retirees electing J&S annuities, I started with a reasonable range for the gender mix of employees of plan sponsors. The U.S, population as a whole is approximately 50% male and 50% female.  Thus, without regard to Plan-specific data, I started with the gender mix of participants in a typical pension plan that might reasonably range from approximately one-third/two-thirds male/female to approximately two-thirds/one-third male/female.

24.     It is widely understood that males are more likely than females to elect J&S annuities over SLAs.   An Urban Institute study[3] found that, all things being equal, males elect J&S annuities over single life annuities at a rate of 2.5 times the rate that females elect such annuities.  More specifically, the study found that 72% of married males will select J&S annuities, while only 31% of females will do so.  I discuss this study in the Background section

---

[3] See "Single Life vs. Joint and Survivor Pension Payout Options - How Do Married Retirees Choose?," Urban Institute, 2003. Available at
http://webarchive.urban.org/publications/410877.html; a version of this paper was also published in 2005 in The Gerontologist, https://academic.oup.com/gerontologist/article/45/1/26/631683

of my report where I also mention that my experience with pension plan retiree data is consistent with the findings.  The Raytheon Plan data is also consistent with the Urban Institute findings.

25.     Returning to my "current conditions" analysis that sets aside (for the time being) Plan-specific data, and assuming that the gender mix of participants in a typical pension plan in the U.S. might reasonably range from approximately one-third/two-thirds male/female to approximately two-thirds/one-third male/female, I estimate that among those retiring, the gender mix of those electing J&S annuities will vary from approximately 50% male to 80% male. The two tables below detail the development of this range:

Scenario 1:  Assuming an illustrative population of 1,000 that is 1/3 male and 2/3 female

| | Total population | Presumed J&S election | J&S Population | Percentage | Rounded Percentage |
|---|---|---|---|---|---|
| Males | 333 | 72% | 240 | 54% | 50% |
| Females | 667 | 31% | 207 | 46% | |
| Total | 1,000 | | 447 | | |

Scenario 2:  Assuming an illustrative population of 1,000 that is 2/3 male and 1/3 female

| | Total population | Presumed J&S election | J&S Population | Percentage | Rounded Percentage |
|---|---|---|---|---|---|
| Males | 667 | 72% | 480 | 82% | 80% |
| Females | 333 | 31% | 103 | 18% | |
| Total | 1,000 | | 583 | | |

26.     For this purpose, I also assumed that the beneficiary gender would be the "mirror" image of the participant gender.

**Benchmarking retirement age**

27.     Most defined benefit plans allow early retirement as early as age 55 (often with conditions on service), and there is no limit on how late one can retire. There are rules governing actuarial increases for late retirement as well as setting the minimum distribution age at 70 ½. However, these rules do not prevent plan participants from working past normal retirement and well into their 70s.

28.     A recent research study found that, "[a]s recently as the mid-1990s, the average American man retired by age 62 and the average woman retired by age 59. By 2010, the average retirement ages had increased to 64 and 62 for men and women, respectively."[4]

---

[4] Matthew S. Rutledge, Christopher M. Gillis, & Anthony Webb, *Will the Average Retirement Age Continue to Increase?* (Ctr. for Ret. Research at Boston College, Working Paper No. 2015-16, 2015.

29.     While a big proportion of the Raytheon Plan's participants retire around age 65 (around 40%), retirement age distribution patterns can vary dramatically across different plans, depending on a variety of factors, including industry, economic conditions, provisions of the plan, and many other factors.  For this reason, for my reasonable range assessment, I considered a range of from 60 to 65 for *average retirements*.

**Benchmarking interest rates**

30.     My range of current interest rates is 1.5% to 5.0%.

31.     In my experience, when U.S. pension actuaries consider current interest rates, they frequently look to the rates on publicly issued and market-traded high-quality U.S. bonds, including both credit/corporate bonds and Treasury bonds.  Figure 8 in my report is a graphic display of yields associated with representative bond indices over approximately the last eight years for both credit/corporate and Treasury bonds of different maturities.

32.     The information on 10-year and 30-year Treasury yields is publicly available from the Treasury's website.  These yields are relevant benchmarks of risk-free U.S. bond rates.

33.     The data on corporate bond yields and indices is available through market data depositaries such as FACTSET and Bloomberg Terminal.

34.     I considered a variety of U.S. investment quality corporate bond rates that varied by type and duration, from the end of 2011 to early 2020.  More specifically, for high-quality U.S. corporate or credit bonds, I considered Bloomberg Barclays indices, both intermediate and long, for which I obtained the yield data from FACTSET.[5]  The FTSE pension liability indices

---

[5] Indices include Bloomberg Barclays US Aggregate Credit-Long (LHMN0152), Bloomberg Barclays US Aggregate – Intermediate (LHMN0151), Bloomberg Barclays US Aggregate Corporate – Long (AA or >) (LHMN0175), and Bloomberg Barclays US Aggregate Corporate – Long (A) (LHMN0178)).

that some pension actuaries use for liability measurement purposes track very closely to the Bloomberg Barclays long indices because all of these benchmarks are constructed from a narrow universe of bonds.

35.     I note that, despite the period to period volatility, this particular period was relatively stable for all of these rates, and I anticipate that further into 2020 and 2021 the rate trend will be downward, although I do not reflect this recent downward trend in my analysis.

36.     The PBGC rates, publicly available from the PBGC website, that I also considered are generally derived by the PBGC using annuity provider quotes.  Generally, these rates would be somewhere between the risk-free Treasury rates and high-quality corporate rates of similar maturity.  As such, they fall in the range I already considered.  I speak in more detail to PBGC rates in a separate Appendix E on my "alternative scenarios" analysis.

**Ranges of reasonable assumptions and the resulting impact on 50% J&S conversion factors**

37.     Reasonable variations of the different ingredients will result in variations in the resulting 50% J&S conversion factors derived from those ingredients.  The graphic below illustrates the range of 50% J&S conversion factors resulting from varying different combinations of ingredients.



38.     The data points for the scenarios depicted in the graphic above are summarized

here:

| Scenario | Brief description | Range of 50% J&S factors developed based on the different ingredient scenarios | | |
|---|---|---|---|---|
| | | Low | High | Difference |
| A | Vary all five ingredients | 0.872 | 0.935 | 0.063 |
| B | Fix rate at 3.25%, vary all else | 0.886 | 0.924 | 0.038 |
| C | Fix average age 64, vary all else | 0.874 | 0.926 | 0.052 |
| D | Fix gender mix 75M/25F, vary all else | 0.875 | 0.929 | 0.054 |
| E | Fix baseline mortality, vary all else | 0.884 | 0.921 | 0.037 |
| F | Fix benchmarking targets, except for interest rates | 0.887 | 0.912 | 0.025 |

**Conclusions**

39.     Applying these reasonable benchmarking assumptions in various combinations results in a range of reasonable 50% J&S conversion factors of from 0.872 to 0.935, without regard to Plan-specific information. This is Scenario A, above.

40.     As the additional scenarios show, the introduction of Plan-specific information has the effect of narrowing the range of reasonable 50% J&S conversion factors.  Insights into the sensitivity of a reasonable range to specific ingredients can be gleaned from this analysis. For example:

- All else being equal, as compared with varying all ingredients, fixing the interest rate narrows the range from about 6% to about 4% (see scenario B).

- All else being equal, as compared with varying all ingredients, fixing the average retirement age at age 64 narrows the range from about 6% to about 5% (see scenario C).

- All else being equal, as compared with varying all ingredients, fixing the gender mix at 75%/25% male/female narrows the range from about 6% to about 5% (see scenario D).

- All else being equal, as compared with varying all ingredients, fixing the baseline mortality table narrows the range from about 6% to about 4% (see scenario E).

- All else being equal, fixing all the benchmark targets except for interest rates narrows the range from about 6% to about 2.5% (see scenario F).

E.      **Demographic Profile of the Plan's Recent Retirees**

**Valuation data for annuitants: 2013 to 2019**

1.      I analyzed the Raytheon Plan's valuation data for retired Plan participants and their beneficiaries or survivors for valuation years 2013 through 2019.

2.      This valuation data provided me with relevant information for each primary retiree (the original participant in the Plan), regardless of whether or not the retiree is still alive. For survivor records, the data included original information on the primary retiree, including gender and date of birth. I extracted unique records from all the sets of valuation data. The valuation data carries the record for a participant throughout multiple valuation cycles, as long as the participant or his or her beneficiary is receiving an annuity from the Plan. (A snapshot analysis of valuation data for purposes of identifying the demographic profile of a recent average retiree is not appropriate because of the inherent survivorship bias.)

3.      My goal was to develop a demographic profile of the average retiree that selects a J&S annuity option upon retirement. More specifically, for purposes of assessing the Plan's tabular factor, I consider it relevant to identify both the gender mix and the average retirement age of those electing J&S annuities in recent years. Because the first set of valuation data was as of 2013, I believe that starting with retirees who commenced in 2011 or later sufficiently minimized any survivorship bias that would inevitably be present if I considered those retiring in much earlier years.

4.      It is also consistent with my analysis of current conditions, including economic conditions, that I focus particularly on data from 2011 and later. I will note that, because the most recent valuation data was as of January 2019, this group did not include many 2019 or later retirements (just a few who retired in January 2019). I also removed QDRO recipients from this analysis (there were 44 in the group with benefit commencement dates of 2011 or later).

24

**Gender mix of retirees electing J&S annuities**

5.      The gender mix of all recent retirees (2011 and later) is 58% male and 42% female.  This gender mix reflects the mix of the entire group of those retiring from the Plan since 2011, regardless of the payment form elected.

6.      When considering only those who elected J&S annuities, the gender mix shifts, as expected, to 75% male and 25% female. This is consistent with the gender election trends reported in the Urban Institute study and also with my experience—that male retirees are almost 2.5 times more likely than females to select J&S annuities over single life annuities.  I presented a graphic depicting this in my report, and for completeness I show it again here:

**Gender mix for Plan's recent retirees and J&S recipients.**



**Average retirement age of retirees electing J&S annuities**

7.      For purposes of establishing a Plan-specific average retirement age, I analyzed the distribution of retirement ages for the Plan's participants commencing their benefits in 2011 or later.  This distribution of ages is presented below:



Retirement ages distribution for participants retiring 2011 or later

8.      It is worth commenting on several items evident from this graph.  First, the normal retirement age of 65 is the most likely age at which a participant is expected to commence his/her benefits (about 40% of all recent retirees retired at their normal retirement age).  Second, there are many participants who commence benefits after their normal retirement age.  And, in fact, the number of participants choosing to retire at age 69 or older, is about the same as the number of participants retiring at the earliest possible retirement age, age 55.  For example, among those electing J&S forms, 6.3% retire at age 55, and 6.8% retire at age 69 or older.  For all retirees since 2011, the two percentages are about the same at around 5%.

9.      Using this distribution, I calculated an average retirement age of 63.42 years for all retirees, regardless of the payment form selected, and 63.81 years for those retirees electing J&S annuities.  (I will also note that, although my analysis of retirement age distribution was conducted using rounded ages at the benefit commencement date, using precise ages results in 63.45 for total group, and 63.83 for the J&S recipients.)

10.     The data for this analysis and further details can be found in separate work papers.

F.  **Alternative Benchmarking Analysis Scenarios**

**Alternative Mortality Basis:  Blue Collar Mortality**

1.  Since the publication of RP-2000, RPEC recognized that there are significant differences in mortality rates and trends based on different occupations.  Accordingly, starting with the RP-2000 family of mortality tables, RPEC began publishing separate tables for "blue collar" and "white collar" workers, as well as for the "total" dataset.

2.  Generally, blue collar workers, defined by RPEC as hourly or unionized workers, exhibit shorter life expectancies than the general population.  For example, using the most recently published U.S. pensioner mortality tables from the total population in this study, the life expectancy for a 65-year-old individual is 18.4 years for males and 20.9 for females.  Using the blue collar table, the 65-year-old's life expectancies are 17.9 years for males and 20.3 years for females.

3.  In my Plan-specific benchmarking analysis, I used the most recently measured U.S. private sector pension mortality experience during 2010 to 2014 period for the "total" dataset, which does not distinguish between white and blue collar.  Based on my understanding of the demographics of the participants in the Raytheon Plan, an actuary could reasonably conclude that the blue collar version of the table is appropriate and relevant when assessing the reasonableness of the Plan's tabular 0.90 factor.

4.  Accordingly, using my benchmarking assumptions, but substituting a blue collar version of headcount-weighted Pri-2012 for the baseline mortality, I evaluated a reasonable range to be from 0.881 to 0.909. The summary of the assumptions for this alternative evaluation is shown below:

**Assumptions for Blue Collar Mortality alternative analysis.**

| Ingredient | Observation period representing current conditions | Reasonable range for benchmarking current conditions and Plan-specific information |
|---|---|---|
| Retiree baseline mortality | Recent standard U.S. pensioner mortality tables | Pri-2012 Blue Collar |
| Beneficiary baseline mortality | Recent standard U.S. pensioner mortality tables | Pri-2012 Blue Collar |
| Gender mix | Potential gender mix of J&S recipients (beneficiaries assumed opposite gender) | 75%/25% male/female mix (opposite for beneficiaries) |
| Retirement age | Potential average retirement ages | Age 63.8 and Age 65 |
| Interest rate | Publicly traded U.S. investment grade bonds yields: December 2011 to present | 1.5% to 5.0% |

28

**Alternative Interest Rate Basis:  PBGC Interest Rates**

5.       Another variation of my benchmarking analysis might reasonably reflect PBGC interest rates.  This is an interest rate basis that another actuary might reasonably conclude is appropriate for purposes of developing or assessing the reasonableness of a tabular factor.

6.       PBGC rates are publicly available and published by the PBGC on a quarterly basis.[6] These rates, along with Treasury rates, are in my view appropriate for assessing the reasonableness of J&S conversion factors because the IRS mentions both of these bases in their examination process guidance regarding optional form conversion factors.

7.       The PBGC derives these rates by surveying the existing group annuity market and extracting the rates from insurance companies sample annuity rates.[7]

8.       The PBGC publishes rates in a simplified term structure of two segments.  The first segment is applicable to the first 20 or 25 years, and the second segment is applicable for years beyond that.  The figure below illustrates the first segment rate since December 2011. The average of this rate over this period of time is 2.71%.  This is consistent with averages of Treasury rates over that same period: for 30-year Treasuries, it is 2.90%, and for 10-year Treasuries, it is 2.20%.

---

[6] ERISA 4044 Annuities, PBGC, *available at* https://www.pbgc.gov/prac/interest/ida.

[7] *Annuity Market Pricing Approaches*, SOA, at 8, *available at* https://www.soa.org/globalassets/assets/files/resources/research-report/2019/annuity-market-prices.pdf.

**PBGC first rate from December 2011 to March 2020.**



9.     The summary of the assumptions for this alternative evaluation is shown below:

**Assumptions for PBGC Interest Rates alternative scenario.**

| Ingredient | Observation period representing current conditions | Reasonable range for benchmarking current conditions and Plan-specific information |
|---|---|---|
| Retiree baseline mortality | Recent standard U.S. pensioner mortality tables | Pri-2012 |
| Beneficiary baseline mortality | Recent standard U.S. pensioner mortality tables | Pri-2012 |
| Gender mix | Potential gender mix of J&S recipients (beneficiaries assumed opposite gender) | 75%/25% male/female mix (opposite for beneficiaries) |
| Retirement age | Potential average retirement ages | Age 63.8 and Age 65 |
| Interest rate | PBGC average (first segment) rate: December 2011 to March 2020 | 2.71% |

10.     This scenario developed a 50% J&S conversion factor of 0.894 for age 65, and a

50% J&S conversion factor of 0.897 for age 63.8.

**Alternative Mortality Basis:  Serota's Preferred Mortality Assumption**

11.     I was asked by counsel to modify my Plan-specific benchmarking analysis to reflect Serota's preferred mortality table.

12.     Although Serota referred to his preferred table as "RP-2014 Mortality Table with Mercer MMP-2007 Mortality Improvement Scale," his work papers revealed that he is actually using the RP-2006 table projected by MMP-2007 to 2015, and then further projected using the MMP-2007 to project mortality rates generationally from 2015 into all future years.  This is the table I used for this particular analysis.

13.     I retained all other assumptions from my Plan-specific benchmarking analysis.

14.     The summary of the assumptions for this alternative evaluation is shown below:

**Assumptions for Serota's Preferred Mortality Assumptions Scenario.**

| Ingredient | Observation period representing current conditions | Reasonable range for benchmarking current conditions and Plan-specific information |
|---|---|---|
| Retiree baseline mortality | Recent standard U.S. pensioner mortality tables | RP-2006/MMP-2007 |
| Beneficiary baseline mortality | Recent standard U.S. pensioner mortality tables | RP-2006/MMP-2007 |
| Gender mix | Potential gender mix of J&S recipients (beneficiaries assumed opposite gender) | 75%/25% male/female mix (opposite for beneficiaries) |
| Retirement age | Potential average retirement ages | Age 63.8 and Age 65 |
| Interest rate | Publicly traded U.S. investment grade bonds yields: December 2011 to present | 1.5% to 5.0% |

15.     The range of 50% J&S conversion factors obtained using this scenario is 0.891 to

0.919.

G.      **Cruz's Subsidy Using Serota's Assumptions**

1.      This appendix includes further details on the subsidy that Cruz is receiving as evaluated using all six sets of Serota assumptions8 summarized in paragraph 111 of the April 24, 2020 Serota report.

2.      Cruz earned a normal retirement pension under the Plan of $1,746.68 per month, payable as a single life annuity commencing at his normal retirement age of 65.  Cruz elected to retire at the earliest eligible retirement age of 55 and elected a 50% J&S annuity with his spouse as the beneficiary.  The amount of this 50% J&S annuity commencing at age 55 is $1,021.33.

3.      In the table below, I compare the actuarial present value of Cruz's normal retirement pension under the Plan to the actuarial present value of the benefit he is currently receiving—both present values calculated as of age 55.  I also illustrate the amount of the Plan's subsidy by performing this calculation under each actuarial basis described by Serota.  In the last two columns, I calculate the difference in value in dollar amount and as a percent of the value of Cruz's normal retirement pension (his accrued benefit).

---

[8] Serota's Raytheon 715 Mortality Table denotes RP-2006, projected with MMP-2007 to 2015, which is the measurement date, and further projected generationally for all future years.  I used the same.  Serota uses age 55 for Cruz and 54 years and 10 months for his spouse, and I used the same.  Serota uses 4.049472%, and I used 4.05% as disclosed in his report.

| Actuarial Basis | Actuarial Present Value (measured at 55) of: | | Difference in dollar value | Difference as percent of PV of normal retirement pension |
|---|---|---|---|---|
| | Early J&S annuity | Normal retirement pension | | |
| 2015 417(e) Applicable Mortality Table and 417(e) Applicable Interest Rate (AIR) for August 2014: 1.24%/3.86%/4.96% | $211,244 | $165,670 | $45,574 | 28% |
| 2015 417(e) Applicable Mortality Table and 4.15% | $213,170 | $174,624 | $38,546 | 22% |
| 2015 417(e) Applicable Mortality Table and 4.05% | $215,819 | $177,925 | $37,894 | 21% |
| Serota's Raytheon 715 Mortality table and 417(e) AIR for August 2014 | $214,680 | $171,067 | $43,613 | 25% |
| Serota's Raytheon 715 Mortality table and 4.15% | $218,048 | $182,122 | $35,926 | 20% |
| Serota's Raytheon 715 Mortality table and 4.05% | $220,892 | $185,704 | $35,188 | 19% |

34

### H.     Alternative Actuarial Bases from the 1970s and 1980s

1.      On the presumption that the Plan's 50% J&S conversion factor has been a plan provision since at least the early 1980s, counsel asked that I consider how possible actuarial bases that were common at the time would compare with the Plan's 0.90 tabular factor.

2.      Pension plans were required to comply with Revenue Ruling 79-90 by the end of 1983.  The then-available published tables that were commonly used to reflect pensioner mortality were known as GAM-71, GAM-83, and UP-84.  There were other tables in use, such as GAM-51, potentially modified, as well as tables developed by different actuarial firms such as Buck and TPF&C, but I restricted my analysis of alternative contemporary actuarial bases to the three most common tables mentioned above.

3.      Using each of these three published tables, I developed hypothetical tabular 50% J&S conversion factors using a variety of different actuarial assumptions.  I assumed a unisex version of these tables, reflecting an 80%/20% male/female mix for retirees.  This gender mix is consistent with the UP-84 table, which was developed as a unisex table with a 10% to 30% approximate female mix.  This has been commonly understood to represent an 80%/20% male/female mix for retirees.

4.      Similarly, I developed a 20%/80% male/female mix for beneficiaries for GAM-71 and GAM-83.  For the UP-84 table, I assumed a three-year age setback for females, as was recommended at the time of its development.[9]

---

[9] Paul H. Jackson & William W. Fellers, *The UP-1984 – A "Unisex" Mortality Table for Non-Insured Pension Plans* (1976), *available at*
https://www.actuaries.org/IACA/Colloquia/Sydney1976/Vol_1/Jackson_Fellers.pdf.

5.      I assumed average or typical retirement ages of either 65 or 62.[10]

6.      I assumed an interest rate range of 5% to 7%.  This represents the range of interest assumptions commonly utilized by actuaries and plan sponsors in the early 1980s for similar purposes, including for determining or evaluating actuarial equivalence for optional benefit forms in pension plans.

7.      Tabular 50% J&S conversion factors developed by this array of assumptions is shown below:

---

[10] The average retirement age for those retiring from the plan with J&S benefits since 2011 is age 63.8.  Thus, the ages 65 and 62 span the recent average retirement age experience.  These ages also span the retirement ages embedded in Social Security, which has historically been a key driver of retirement age experience in the U.S.  In addition, age 65 is the normal retirement age under the vast majority of ERISA pension plans.

**Tabular 50% J&S conversion factors using actuarial assumptions common in the 1980s**

| Actuarial basis for tabular 50% J&S factor | Tabular factor based on: | | |
|---|---|---|---|
| | 5% interest | 6% interest | 7% interest |
| GAM-71, unisex as describe below, age 65 | 0.879 | 0.886 | 0.892 |
| GAM-71, unisex as described below age 62 | 0.890 | 0.898 | 0.904 |
| GAM-83, unisex as described below, age 65 | 0.889 | 0.896 | 0.903 |
| GAM-83, unisex as described below, age 62 | 0.901 | 0.908 | 0.915 |
| UP-84, unisex as described below, age 65 | 0.877 | 0.884 | 0.890 |
| UP-84, unisex as described below, age 62 | 0.888 | 0.894 | 0.901 |

8.      In the table above:

GAM-71 refers to the "unisex" version of this table, blended 80%/20% male/female for retiree and 20%/80% male/female for beneficiary.

GAM-83 refers to the "unisex" version of this table, blended 80%/20% male/female for retiree and 20%/80% male/female for beneficiary.

UP-84 refers to the UP-84 table for retirees, and the UP-84 table set back 3 years for beneficiaries.

9.      It is worth noting that the current reasonable range of factors is not too dissimilar to the range I have developed as possible factors based on circumstances from the 1980s.  The Plan's 0.90 tabular factor sits in the middle of both ranges.

37

## I.     Materials Considered in the Preparation of This Report

**Court Filings and Pleadings**

| Document |
| --- |
| Complaint (https-ecf-mad-uscourts-gov-doc1-09519412379.pdf) |

**Expert Reports and Deposition**

| |
| --- |
| Declaration of Mitchell I. Serota (April 24, 2020) (including materials reviewed and cited by Serota) |
| Raytheon - Cruz Calculations.xlsm |
| Deposition of Mitchell Serota in Herndon v. Huntington Ingalls Industries (January 14, 2020) |

**Publicly Available Materials**

| |
| --- |
| Actuarial Standard of Practice No. 1 - Introductory Actuarial Standard of Practice, Actuarial Standards Board |
| Actuarial Standard of Practice No. 27 - Selection of Economic Assumptions for Measuring Pension Obligations |
| Actuarial Standard of Practice No. 35 - Selection of Demographic and Other Noneconomic Assumptions for Measuring Pension Obligations, Actuarial Standards Board |
| "Single Life vs. Joint and Survivor Pension Payout Options - How Do Married Retirees Choose?," Urban Institute, 2003 |
| Rutledge, M., Gillis, C., and Webb, A., "Will the Average Retirement Age Continue to Increase?," Center for Retirement Research at Boston College, Working Paper No. 2015-16, 2015 |
| Modugno, V., "Annuity Market Pricing Approaches," Society of Actuaries, March 2019 |
| Jackson, P. and Fellers, W., "The UP-1984 – A 'Unisex' Mortality Table for Non-Insured Pension Plans," 1976 |
| ERISA 4044 Annuities, Pension Benefit Guaranty Corporation, available at https://www.pbgc.gov/prac/interest/ida |
| Society of Actuaries, Mortality and Other Rate Tables, available at https://mort.soa.org |

**Other Material**s

| Document | Beg Bates (if applicable) | End Bates (if applicable) |
|---|---|---|
| RTN Hrly Plan_With all Appendices_Amended through amendment adopted 4_1_15.pdf | RTN-Cruz-00001007 | RTN-Cruz-00001288 |
| Hourly Pension Plan - 2015-19 Amendments.pdf | RTN-Cruz-00000999 | RTN-Cruz-00001006 |
| J Cruz Retirement Kit.pdf | RTN-Cruz-00000959 | RTN-Cruz-00000998 |
| J Cruz Nov 2014 Estimate Letter.pdf | | |
| J Cruz Nov 2014 Estimate calculation.pdf | | |
| Cruz Chronology.pdf | | |
| J Cruz Retirement Paperwork.pdf | | |
| 12-31-11 Disclosure Results.pdf | RTN-Cruz-00000001 | RTN-Cruz-00000124 |
| 12-31-12 Disclosure Results.pdf | RTN-Cruz-00000125 | RTN-Cruz-00000253 |
| 12-31-13 Disclosure Results.pdf | RTN-Cruz-00000254 | RTN-Cruz-00000379 |
| 12-31-14 Disclosure Results.pdf | RTN-Cruz-00000380 | RTN-Cruz-00000480 |
| 12-31-15 Disclosure Results.pdf | RTN-Cruz-00000481 | RTN-Cruz-00000581 |
| 12-31-16 Disclosure Results.pdf | RTN-Cruz-00000582 | RTN-Cruz-00000673 |
| 12-31-17 Disclosure Reults.pdf | RTN-Cruz-00000674 | RTN-Cruz-00000766 |
| 12-31-18 Disclosure Results.pdf | RTN-Cruz-00000767 | RTN-Cruz-00000859 |
| 12-31-19 Disclosure Results.pdf | RTN-Cruz-00000860 | RTN-Cruz-00000958 |
| ExpStudy Results - Active Decrements - Jan2017.pdf | RTN-Cruz-00001444 | RTN-Cruz-00001476 |
| ExpStudy Results - Inactive Commencements - Jan2017.pdf | RTN-Cruz-00001477 | RTN-Cruz-00001477 |
| ExpStudy Results - Nov2019.pdf | RTN-Cruz-00001412 | RTN-Cruz-00001443 |
| Hourly Data 2013 to 2019.xlsb | | |
| MMP2007.xlsx | RTN-Cruz-00001537 | RTN-Cruz-00001577 |
| MMP2016.xlsx | RTN-Cruz-00001578 | RTN-Cruz-00001626 |
| MRP2006EN.xlsx | RTN-Cruz-00001627 | RTN-Cruz-00001629 |

| Document | Beg Bates (if applicable) | End Bates (if applicable) |
|---|---|---|
| MRP2006RN.xlsx | RTN-Cruz-00001657 | RTN-Cruz-00001665 |
| MRP2007EN.xlsx | RTN-Cruz-00001666 | RTN-Cruz-00001674 |
| MRP2007RN.xlsx | RTN-Cruz-00001684 | RTN-Cruz-00001692 |
| Raytheon 2014 10-k.pdf | | |
| RaytheonCompany_20180214_10-K_16969084.pdf | | |
| RaytheonCompany_20190213_10-K_17613173.pdf | | |
| RaytheonCompany_20120222_10-K_12057811.pdf | | |
| RaytheonCompany_20130213_10-K_12694182.pdf | | |
| RaytheonCompany_20140211_10-K_13433006.pdf | | |
| RaytheonCompany_20150211_10-K_14117215.pdf | | |
| RaytheonCompany_20160210_10-K_14784240.pdf | | |
| RaytheonCompany_20170215_10-K_15461334.pdf | | |
| RaytheonCompany_20200212_10-K_18284066.pdf | | |
| Raytheon_Hourly_20191231_clt.pdf | RTN-Cruz-00001808 | RTN-Cruz-00001810 |
| Raytheon_Merged Hourly_20181231_clt.pdf | RTN-Cruz-00001811 | RTN-Cruz-00001813 |
| Raytheon Merged Hourly_20171231_clt.pdf | RTN-Cruz-00001737 | RTN-Cruz-00001739 |
| Raytheon Merged Hourly_20161231_clt.pdf | RTN-Cruz-00001734 | RTN-Cruz-00001736 |
| Raytheon Hourly_20151231_clt.pdf | RTN-Cruz-0001729 | RTN-Cruz-0001733 |
| 20141231 Raytheon Hourly_clt.pdf | RTN-Cruz-00001343 | RTN-Cruz-00001347 |
| 20131231 Raytheon Hourly Bond Model_clt.pdf | RTN-Cruz-00001318 | RTN-Cruz-00001322 |
| 20121231 Raytheon Hourly Bond Model_clt.pdf | RTN-Cruz-00001294 | RTN-Cruz-00001298 |
| Raytheon Hourly_20111231_clt.pdf | RTN-Cruz-00001724 | RTN-Cruz-00001728 |
| RTN Analysis - 12-31-2015.pdf | RTN-Cruz-00001837 | RTN-Cruz-00001837 |
| RTN Analysis - 12-31-2019.pdf | RTN-Cruz-00001836 | RTN-Cruz-00001836 |
| RTN Analysis - 12-31-2018.pdf | RTN-Cruz-00001835 | RTN-Cruz-00001835 |
| RTN Analysis - 12-31-2017.pdf | RTN-Cruz-00001834 | RTN-Cruz-00001834 |

| Document | Beg Bates (if applicable) | End Bates (if applicable) |
|---|---|---|
| RTN Analysis - 12-31-2016.pdf | RTN-Cruz-00001833 | RTN-Cruz-00001833 |
| RTN Analysis - 12-31-2014.pdf | RTN-Cruz-00001832 | RTN-Cruz-00001832 |
| Raytheon Summary 12.31.2019 results.pdf | RTN-Cruz-00001791 | RTN-Cruz-00001792 |
| Raytheon Summary 12.31.2018 results.pdf | RTN-Cruz-00001789 | RTN-Cruz-00001790 |
| Raytheon Summary 12.31.2017 results.pdf | RTN-Cruz-00001787 | RTN-Cruz-00001788 |
| Raytheon Summary 12.31.2016 results.pdf | RTN-Cruz-00001786 | RTN-Cruz-00001786 |
| Raytheon summary 12 31 2015 results.pdf | RTN-Cruz-00001785 | RTN-Cruz-00001785 |
| Raytheon summary 12-31-2012 results.pdf | RTN-Cruz-00001769 | RTN-Cruz-00001769 |
| Raytheon summary 12-31-2011 results.pdf | RTN-Cruz-00001768 | RTN-Cruz-00001768 |
| Raytheon Summary 12.31.2014 results.pdf | RTN-Cruz-00001767 | RTN-Cruz-00001767 |
| Raytheon 12 31 2013 summary Results.pdf | RTN-Cruz-00001766 | RTN-Cruz-00001766 |
| Raytheon 12.31.2013 Results_analysis.pdf | RTN-Cruz-00001765 | RTN-Cruz-00001765 |
| Mortality Cng_YearEnd2013_final.pdf | RTN-Cruz-00001630 | RTN-Cruz-00001633 |
| Mortality Memo YE 2014 - Final 2.4.15.pdf | RTN-Cruz-00001634 | RTN-Cruz-00001636 |
| Mortality Memo YE 2015 - FINAL 1.26.pdf | RTN-Cruz-00001637 | RTN-Cruz-00001639 |
| Mortality Memo YE 2016 FINAL.pdf | RTN-Cruz-00001640 | RTN-Cruz-00001643 |
| Mortality Memo YE 2017 - FINAL.pdf | RTN-Cruz-00001644 | RTN-Cruz-00001647 |
| Mortality Memo YE 2018.pdf | RTN-Cruz-00001648 | RTN-Cruz-00001651 |
| Mortality Memo YE 2019.pdf | RTN-Cruz-00001652 | RTN-Cruz-00001656 |
| RAYTHEON Suppor DR_3-4-2020_reducted.pdf | RTN-Cruz-00001793 | RTN-Cruz-00001795 |
| DR selection_YearEnd2013_final.pdf | RTN-Cruz-00001383 | RTN-Cruz-00001386 |
| DR selection_YearEnd2012_final.pdf | RTN-Cruz-00001382 | RTN-Cruz-00001383 |

| Document | Beg Bates (if applicable) | End Bates (if applicable) |
|---|---|---|
| DR Memo YE 2015 - FINAL 1.26.pdf | RTN-Cruz-00001366 | RTN-Cruz-00001368 |
| DR Memo YE 2014 - Final 2.4.15.pdf | RTN-Cruz-00001363 | RTN-Cruz-00001365 |
| Discount Rate Memo YE 2016 FINAL.pdf | RTN-Cruz-00001369 | RTN-Cruz-00001371 |
| Discount Rate Memo YE 2017 - FINAL.pdf | RTN-Cruz-00001372 | RTN-Cruz-00001374 |
| Discount Rate Memo YE 2018.pdf | RTN-Cruz-00001375 | RTN-Cruz-00001377 |
| Discount Rate Memo-YE 2019.pdf | RTN-Cruz-00001378 | RTN-Cruz-00001380 |
| discount rate selection- YE 2011.pdf | RTN-Cruz-00001381 | RTN-Cruz-00001381 |
| ExpStudy - Supporting Files - Jan2017.pdf | RTN-Cruz-00001387 | RTN-Cruz-00001410 |
| ExpStudy - Supporting Files - LegHrly - 2015.pdf | RTN-Cruz-00001411 | RTN-Cruz-00001411 |
| ExpStudy - Supporting Files - Nov2019.pdf | RTN-Cruz-00001482 | RTN-Cruz-00001536 |
| ExpStudy Results - LegHrly - 2015.pdf | RTN-Cruz-00001478 | RTN-Cruz-00001481 |