## UNITED STATES DISTRICT COURT
## OF MASSACHUSETTS

| | |
|---|---|
| Johnny Cruz, on behalf of himself and all others similarly situated,<br><br>Plaintiff,<br><br>       vs.<br><br>Raytheon Company, Kelly B. Lappin, in her capacity as Plan Administrator for the Raytheon Company Pension Plan for Hourly Employees,  the Raytheon Company Pension Plan for Salaried Employees, the Raytheon Non-Bargaining Retirement Plan, the Raytheon Bargaining Retirement Plan, and the Raytheon Retirement Plan for Engineers & Contractors, Inc. and Aircraft Credit Employees, and John/Jane Does 1-10.<br><br>    Defendants. | Civil Action No.:  1:19-cv-11425<br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br>SEPTEMBER 4, 2020 |

# EXHIBIT 12

# UNITED STATES DISTRICT COURT
## OF MASSACHUSETTS

| | |
|---|---|
| Johnny Cruz, on behalf of himself and all others similarly situated,<br><br>Plaintiff,<br><br>vs.<br><br>Raytheon Company, Kelly B. Lappin, in her capacity as Plan Administrator for the Raytheon Company Pension Plan for Hourly Employees, the Raytheon Company Pension Plan for Salaried Employees, the Raytheon Non-Bargaining Retirement Plan, the Raytheon Bargaining Retirement Plan, and the Raytheon Retirement Plan for Engineers & Contractors, Inc. and Aircraft Credit Employees, and John/Jane Does 1-10,<br><br>Defendants. | Case No.: 1:19-cv-11425-PBS<br><br><br><br><br><br><br><br><br><br><br><br>CLASS ACTION |

## REPLY DECLARATION OF MITCHELL I. SEROTA

1.      The Declaration of Thomas S. Terry ("Terry Report") is an elaborate effort to provide a hindsight justification for Raytheon's decision to use a .90 conversion factor to calculate Joint and 50% Survivor Annuities ("50% JSAs") under the Plan.  Terry has no idea where Raytheon got the .90 factor; indeed, Raytheon itself seems to have no idea where the factor came from.  Terry's effort to rationalize the continued use of the same factor for decades, despite substantial changes in mortality and interest rates, is based on unsupportable assumptions and data choices, disingenuous assertions, confusion, deflections and distractions.

2.      In accordance with what I understood to be the Court's request, my initial report focused on analyzing whether the Plaintiff in this lawsuit, Mr. Cruz, was receiving a 50% JSA that

was less than the actuarial equivalent of the single-life annuity that he could have received when he retired in 2015. To make this determination, in accordance with standard actuarial practice, I took into account the information that a reasonable actuary would have considered when Mr. Cruz retired in 2015 – then-current mortality and interest rates, Mr. Cruz's age, and the age of his spouse. This is a straightforward analysis; I expect that any actuary retained to determine appropriate actuarial assumptions to use for actuarially equivalent benefit calculations would follow the same steps. Terry, in sharp contrast, devoted over 93 pages of text and another 37 pages of appendix to justifying an existing conversion factor that no reasonable actuary would have calculated in 2015, based on arguments that are directly contrary to common sense, to say nothing of ERISA.

## I. Overriding Flaws in Terry's Report

3. Terry made certain analytical and methodological errors that affected his entire analysis. The most obvious flaw is that he did not attempt to determine the appropriate conversion factor for a 50% JSA in 2015. Instead, Terry worked backwards from the conclusion that he wanted to reach, attempting to find actuarial assumptions that would justify an .90 conversion factor. He used an incorrect definition of "current" demographic and economic conditions and suggested that Hourly Plan's actuarial assumptions need only fit within overly broad, generic averages. Terry's contentions were often inconsistent with each other, if not diametrically opposed, all clouded by use of imprecise language, jargon, and distractions from this issue in this case.

### A. Terry Used the Wrong Definition of Current Economic and Demographic Conditions

4. To justify the 0.90 conversion factor, Terry looked at a mortality table that was published in 2019, four years after Cruz retired, as well as the high and low interest rates registered on a number of inapplicable indexes over the course of the past decade. This created a massive 350 basis-point range (from 1.5% to 5%) in order to cover a wide range of conversion factors.

2

Terry Report, Figure 4 at ¶ 86.  This is not appropriate.

5.      Terry's insistence that the 0.90 conversion factor is reasonable based on current demographic and economic conditions (Terry Report ¶¶ 25, 26), depends on a flawed definition of "current conditions." Terry Report ¶ 14. According to Terry, "'current conditions'" are "conditions generally observed over the past decade,…" Terry Report, ¶ 14, fn1. This definition has no support under ERISA or common understanding for many reasons.[1]

6.      First, as Terry acknowledged (Terry Report ¶ 64), determining whether two forms of benefit are actuarial equivalent requires comparing their present values.  Consistent with ERISA Section 1002(27), a "present value" calculation requires adjustment to reflect "anticipated events." Actuarial Standards of Practice ("ASOPs") similarly require that the use of assumptions based on conditions that are current and reasonably anticipated as of the measurement date. See ASOP 27, ¶ 3.6; ASOP 35, ¶ 3.3.5. Since Terry did not select actuarial assumptions based on what was reasonable in 2015 on Mr. Cruz's benefit commencement date ("BCD"), but instead used data over a 10-year span, he applied an invalid methodology.

7.      Second, Terry's methodology was invalid because he considered data that ***did not even exist*** in 2015.  Terry attempted to evaluate the reasonableness of Cruz's benefit that was calculated in 2015 based on a 2019 mortality table and an interest rate range that included data from 2016-2020.  The reasonableness of assumptions cannot be based on what happened after BCD although Terry clearly insists it can (Terry Report ¶¶ 292, 293).  For an easy example, imagine that a Plan calculated a JSA using mortality assumptions that were reasonable in 2015 but were completely upended by medical breakthroughs – or, conversely, by unforeseeable pandemics

---

[1] Indeed, even the generic definition in Webster's Dictionary defines current as "occurring or existing in the present time." https://www.merriam-webster.com/dictionary/current.

– a mere five years later.  If an actuary retained in 2020 to review the reasonableness of the 2015 conversion factors used data from 2019, his analysis would indicate that the 2015 conversion factors were not reasonable.  But it would be actuary's analysis, not the original calculation, that would be unreasonable, because it would not be based on conditions that were current and reasonably anticipated as of the measurement date – the participant's BCD. Indeed, Terry essentially admits that his definition of "current" is flawed when he says that he selected generic tables for the 1970s to 1990s "because that was all that was known or available during that period." Terry Report at Appendix B, ¶ 9.

8.       Third, Terry's selection of random data points that were "generally observed" over the course of a decade is meaningless; Terry provides no criteria for the data to be observed or the expertise of the observer or the date of the observation.  That is why Actuarial Standards of Practice encourage selection of interest rates focus on *market* rates– a concept that can be readily evaluated. See ASOP 27, ¶ 3.9.

**B.  Terry's Hypothetical Pension Plan World Demonstrates His Flawed Analysis**

9.       Pages 13 through 70 of Terry's Report describe a hypothetical pension plan environment that has nothing to do with the Cruz's Plan. But Terry attempts to create an impression that the Plan assumptions are reasonable within his world, which they are not.  In considering Terry's hypothetical world, it is useful to consider a number of Terry's arguments together, as they make no sense and, indeed, are diametrically opposed. These start with his discussion of lump sums, ¶¶ 174-188; and include his analyses of ratios, ¶¶ 85-88; pooling, ¶¶ 134-137; and adverse selection, ¶¶ 149-150.

10.       As Terry notes, a plan may offer a lump sum payment at retirement.  (To be clear, the Raytheon plan does not offer a lump sum payment, but Terry's hypothetical world assumes

4

that it could.) Or, a plan can offer various forms of annuities – monthly payments that are fixed as of the BCD so that the retiree and, if a survivor annuity is selected, the beneficiary, will receive a fixed monthly amount over their respective lifetimes. Just like any bond or other fixed income investment, the comparative values of these options are analyzed by reference to their present values. The present values of single life, joint and survivor and other annuities must be reduced to a present value at BCD using conversion factors that are based on reasonable assumptions.

11.     The projected cost to the plan **should** be cost neutral, regardless of whether the hypothetical participant selects a lump sum or an actuarially equivalent annuity benefit option. Similarly, the present value of the lump sum and annuity options should be cost neutral for employees, thereby allowing the participant to select the option that best suits his or her personal circumstances and preferences. At retirement, Terry's hypothetical retiree is essentially making an investment decision. In economic terms, she can theoretically take a lump sum and invest the cash in, for example, long-term bonds which would provide a fixed monthly payment backed by the creditworthiness of the issuer of the bonds or she can select a fixed monthly annuity payment from the plan and employer which would be backed by the creditworthiness of the plan and the employer.

12.     Terry's views concerning the present value analysis for conversion of a single life annuity to a lump sum benefit is correct. He correctly notes that the actuarial assumptions are market-priced at payment date, which is the BCD. Terry Report, ¶ 180. He further notes that assumptions are required to be updated regularly to reflect up to date market conditions, ¶¶ 186-87. As he says, it is critical to use current, market interest rates for lump sums to ensure that the employee receives current value when the benefit is paid. Terry Report, ¶ 14, fn1. But Terry's argument that market-priced assumptions are **not** required for converting a single life annuity to

another type of annuity solely because of **_longevity risk_** makes no sense from either an actuarial or economic perspective.[2] And, Terry cites no authority from any literature anywhere justifying this false construct because there is none.

13.     An annuity represents a stream of income, where the plan is "on the hook" to make the required periodic payments for the life of the annuitant, or the life of the annuitant (for example, $1,000 per month for life) and a beneficiary.  The longevity risk is only marginally higher between a single life annuity and a JSA because the only difference in longevity is the incremental increase in adding payments projected over the second life extended beyond the end of the first.  But the allocation of this marginal increase in "longevity risk" to either the plan or the participant has no bearing on whether reasonable actuarial assumptions should be used to calculate the equivalent benefit.

14.     Investment assumptions are not driven by which party bears longevity risk from the perspective of either the sponsor or the retiree. Like any life insurance company, sophisticated sponsors "match" assets to liabilities, meaning that they construct what is known as a hypothetical portfolio of bonds with maturity dates that match the projected payment dates of retirement benefits or payments under annuities. Indeed, as discussed below, a company's audited financial statements prepared under ASC 715 use this very approach.  Similarly, a retiree who selects a lump-sum payment can manage Terry's longevity risk by purchasing a long-term payment stream such as a thirty-year bond.  These options would allow a participant to avoid longevity risk just as thoroughly as she would by selecting an annuity option from the sponsor. Indeed, if the retiree wants the same credit risk as with the plan annuity, she could buy a long-term corporate bond

---

[2] While the interest rates required to be used to calculate lump sum benefits are not required to be used for calculation of other benefit types, they are market-based rates and will be close to other market-based rates that a reasonable actuary should select.

issued by the sponsor.  Accordingly, a typical rational sophisticated employee will select the option with the highest present value, subject to any concerns regarding relative credit risk, regardless of "longevity risk."[3]

15.      Terry's argument about what he calls "adverse selection" was based on the view that actuarial assumptions should take into account the benefit selection choices that a rational plan participant would make.[4] But a "rational actor" would not select a plan annuity that is less valuable than the market value. If the plan used sub-market based conversion factors for annuities while offering lump-sums that were based on current market conditions, the retiree would select the market valued lump sum.  Terry argued that a plan could "reasonably" use an interest rate assumption for annuities that ranged from 1.5% to 5%, a difference of a whopping 350 bps (Terry Report, Figure 4 at ¶ 87), based on "observations" of interest rates in the decade that "includes" 2015. Under Terry's hypothetical, if the present value of a plan annuity is calculated using a rate which is at the low end of Terry's absurdly broad 350 bps range and is below the market rate, then a rational retiree in Terry's hypothetical pension plan world will reject the plan annuity and select a lump sum to be invested in a market rate investment such as a sponsor's corporate bond or even an insurance company annuity which would charge substantial transaction costs. Conversely, if a plan uses an above-market rate at the top of Terry's 350 bps range to calculate the present value of its annuities, then rational retiree will select the plan annuity because he will be receiving greater benefits than he would receive in the market. When the plan's assumed interest rate is above the market rate, rational retirees will only select plan annuities – causing the plan to bear the longevity

---

[3] There could be rare exceptions such as, for example, where a retiree had an imminent and unavoidable fatal illness.
[4] Terry Report, ¶ 150 (arguing that plans can take into account the hypothesis that male participants are more likely to select JSAs because they know that their spouse is more likely to survive them).

risk. Moreover, the plan would end up paying more overall benefits because more retirees would be selecting annuities that were calculated using above market interest rates. This would make no economic sense from the perspective of the plan or the sponsor. The only way to avoid Terry's version of adverse selection is for a plan to use a market-based assumption, which would make the costs and benefits of the selection cost neutral as to both the retiree and plan. To put it in Terry's language, if it is appropriate for a sponsor to anticipate adverse selection in developing conversion factors to account for costs to the plan (¶ 151), then the sponsor should use market rates. Thus, if plan sponsors consider the likely behavior of rational plan participants when the sponsors are selecting actuarial assumptions, they should select contemporaneous market interest and mortality rates for both annuities and lump sum payments.

16.     Moreover, the concept of adverse selection undercuts Terry's "average age" justification for his factor analysis in his hypothetical plan world. If the sponsor uses average ages of 63 or 65 as Terry submits, a sophisticated hourly employee retiring at age 55 would not take the plan's JSA. Instead, he would, in Terry's hypothetical pension plan world, take a lump sum which would have a higher present value for a 55 year-old and invest it in a market annuity. Conversely, a 70-year-old retiree would receive a subsidy from a plan annuity based on age 63 or 65 compared to a lump sum and would take the plan annuity rather than a lump sum invested in a market annuity. Accordingly, in Terry's hypothetical world, the mix of retirees taking the plan annuities would skew towards late retirees, because rational late retirees would select annuities whereas early retirees would take lump sums and invest them at market rates. Like the situation with the plan's use of above- or below- market interest rates, the end result would have more late retirees taking above-market annuities and have the plan paying more than the present value of market annuities on a plan-wide basis This would again drive the sponsor's costs up and be the opposite of the cost

management technique Terry proposes for setting conversion factors. ¶ 152.

17.     Of course, Cruz did not have the benefit of Terry's hypothetical world because the Plan did not offer lump sum benefits. Accordingly, to his personal detriment, Cruz had no opportunity to avoid the unreasonably low conversion factor used for his JSA by selecting a market rate lump sum which he could invest in the market. Instead, he was stuck subsidizing Raytheon's costs and thereby incurring damages to himself and his wife.

## II.     Specific Flaws in Terry's Report

### A.  The Use of Tabular Factors

18.     I agree with Terry that under Revenue Ruling 79-90, plan documents must specify the methodology for calculating alternative forms of benefits like JSAs (¶ 93), and that one of the ways that plans may do this is by listing a "table of factors" for converting single life annuities to other benefit forms.  ¶ 98.  I disagree with Terry's assertion that this method is "widely used" (¶ 105) – at least, I disagree that it *remains* widely used.

19.     A fixed, tabular conversion factor does not adjust based on when the participant retires.  Thus, participants receive the same percentage of their single life annuity (*e.g*. .90 for the 50% JSA) whether they retire at ages 55, 65 or 70.

20.     It is important to note that ERISA does not apply only to billion-dollar plans with thousands of participants. It also applies to very small plans that can have as few as one participant. The reasonableness of using a single factor must be considered in the context of the plan in which it is being used. So, a single factor might often make sense in a law firm with one participant, or two participants who are roughly the same age and both retire at age 65. But that approach is unreasonable for a plan with more than a few of participants, much less with a large plan like Raytheon's Hourly Plan with a large number of participants of different ages and different ages at

retirement.

21.     Additionally, in my experience, tabular factors were used in the 1970s before computers and actuarial computer programs became commonplace.  Before that time, an actuary would have to manually calculate each retiree's benefits using punch-cards.  Tabular factors are a quicker, less onerous way to calculate benefits whose need has essentially been rendered obsolete by technological innovations over the past 40-50 years.  But, with advances in technology and, in particular, the availability of interactive internet programs to calculate the actuarial equivalence of various benefit options instantaneously, tabular factors are not reasonable except for very small plans.

22.     For example, there are several enterprises that have published Adoption Agreements over the years to be used with a standardized plan document.  These standardized documents were pre-approved by the Internal Revenue Service to enable smaller plans to have a presumed valid plan instead of paying a large fee to a law firm who would issue a customized plan document.

23.     In particular, I attach as Exhibits the pages from providers of Adoption Agreements that provide the practitioner with choices for Actuarial Equivalence.  One is from Datair, last year; the second from Ft. Williams, last year; the third from Corbel circa 1999.

24.     None of these standardized document makers even considers using a tabular factor any longer.  It is simply not one of the numerous choices that is offered the practitioner.  One could always check the "Other" box and insert it, but the point is that tabular factors are considered archaic even by companies that cater to small plans.  I do not believe it is remotely accurate to say, as Terry does, that the use of such tabular factors remains common, especially in the large plan market.

25.     The primary problem with using a tabular factor approach today is illustrated by this very case:  it is very difficult to ensure that benefits calculated with a single factor will satisfy actuarial equivalence.  The Retirement Equity Act of 1984 amended ERISA to require that plans offer actuarially equivalent Qualified Joint and Survivor Annuities ("QJSAs") at the earliest permissible retirement date in the plan, such as an age 55 early retirement date.  Regulations implementing the Retirement Equity Act specified that the QJSA "must be at least as valuable as any other optional form of benefit payable under the plan at the same time."  26 C.F.R. § 1.401(a)-20 Q&A 16.  This regulation requires a comparison of the values of the QJSA at BCD with the values of the other options at BCD, such as a single life annuity or a certain and life annuity. While it is possible to create a tabular factor that ensures that the QJSA is the most valuable of these options at BCD regardless of the age at which participants retire, in practice that would create an economic disadvantage for a plan because the plan benefits would have to be subsidized by a substantial amount depending on the retirement age.

26.     When a plan uses traditional actuarial assumptions to calculate retirement benefits (*e.g.*, a mortality table and an interest rate(s)), the conversion factor automatically adjusts depending on the participant's age at retirement.  This is because mortality rates – under all mortality tables – increase by age.  Simply stated, 55-year-olds have a lower mortality rate than 65-year-olds.  The conversion factor accounts for the likelihood and amount of benefits that will be paid if the participant dies before the beneficiary.  Because a 55-year-old has a lower mortality rate than a 65-year-old retiree, the conversion factor used to calculate the 55-year-old's benefits will be significantly higher than for a 65-year-old.   This progression of conversion factors based on age is shown in the chart below, with ages 55 and 65 highlighted:

**Serota Rebuttal Figure 1**

| Age | 50/50 Mortality | 80/20 Mortality |
|---|---|---|
| | Conversion Factor | |
| 55 | 0.93938 | 0.93186 |
| 56 | 0.93753 | 0.92987 |
| 57 | 0.93561 | 0.92780 |
| 58 | 0.93363 | 0.92565 |
| 59 | 0.93157 | 0.92342 |
| 60 | 0.92944 | 0.92110 |
| 61 | 0.92724 | 0.91869 |
| 62 | 0.92498 | 0.91619 |
| 63 | 0.92265 | 0.91361 |
| 64 | 0.92025 | 0.91094 |
| 65 | 0.91780 | 0.90818 |

- RP-2006 mortality table (all lives; no white or blue collar adjustments)
- 50/50 blend between male and female (second column shows an 80/20 blend)
- Mortality improvement projected using the Mercer MMP2007 improvement scale
- 4.05% interest (the FTSE above median rate as of 12/31/2014)
- Beneficiary is the same age as the participant (the precise factor we used for Cruz was 0.938847, which is based on the beneficiary's actual age of 2 months younger than Cruz)

27.    Using a traditional mortality table analysis, the value of the QJSA would be compared to the values of the other options at BCD based on assumptions that projected the mortality of the retiree and beneficiary based on their ages at retirement. Since the resulting conversion factor is based on the exact age of the retiree and beneficiary, it does not need to account for the impact of ***differences*** in age as is specified in Raytheon's current approach (which modifies the otherwise one-size-fits-all .90 conversion factor to account for differences between the age of the participant and the age of the beneficiary).

28.    A fixed conversion factor that applies to all ages such as ages 55-70 would have to account for differences in projected mortality at different ages. And, it would necessarily have to subsidize older retirees whereas a factor based on a mortality table would not. Thus, a conversion factor that generated an actuarially equivalent benefit compared to a single life annuity for

12

someone who took a QJSA at age 55 would generally produce a benefit that was **greater** than the actuarially equivalent of a single life annuity for someone who took the same QJSA at age 70. Plans are allowed to subsidize QJSAs compared to SLAs and some do, but a plan that did not want to pay extra for QJSAs would want to avoid using a tabular factor. This may account for why it is not common to see plans using a single conversion factor for QJSA conversions today.

29.     Of course, a plan can use tabular **factors** that ensure that an alternative benefit form is actuarially equivalent to the SLA regardless of the age at which a participant retires. For example, Raytheon adjusts the conversion factors for Hourly Plan participants who choose the "Ten-Year Certain and Continuous Option" ("10YCCO") based on **age at retirement**, rather than using a single conversion factor **for all retirement ages** like it does for the QJSA. The 10YCCO is an SLA with a guaranteed payment period of 10 years. Participants who select this option receive a benefit that is a higher percentage of their SLA the earlier they retire. Below are the tabular factors that Raytheon uses for the 10YCCO, copied from Section 7.1 of the Plan Document:

| Age at Annuity Starting Date [1] | Percentage of Benefit Otherwise Payable |
|---|---|
| 65 or older | 91.0% |
| 64 | 92.0% |
| 63 | 93.0% |
| 62 | 94.0% |
| 61 | 95.0% |
| 60 | 95.5% |
| 59 | 96.0% |
| 58 | 96.3% |
| 57 | 96.6% |
| 56 | 96.9% |
| 55 | 97.2% |

30.     While Raytheon could have used a similar approach to generate tabular factors that ensured that the Hourly Plan's QJSA was at least actuarially equivalent to the SLA the participant

could receive at the same age, it chose not to do so.

### B.  Using An "Average" Age to Justify a Single Tabular Factor Is Improper

31.     Terry's answer to this fundamental problem with using a single tabular factor is to argue that plans can base their tabular factor on either the "average" age the participants retire, or the "normal retirement age" under the plan.  Terry asserts that using an average age is a common practice when setting a single tabular factor.  Terry Report, ¶ 123.  Given that the use of a single tabular factor has itself become quite rare, Terry's lack of examples for this supposedly "common" practice is not surprising.  Certainly, there is no evidence that Raytheon employed such an analysis when it set its 50% QJSA conversion factor at 0.90.

32.     Terry attempts to justify the use of an average age by the concept of "pooling." Terry Report, ¶¶ 125-137; 141-144.  Terry explains that pooling is the aggregation of risk for common treatment.  Terry Report, ¶ 126.  It is a standard actuarial technique in property and casualty insurance, group health insurance and life insurance to create a larger numerical base upon which to spread risk among separate entities with similar risk.[5]  When risks are "pooled," the experience of the risk pool is assessed constantly over time and adjusted periodically to the degree that the actual experience of the risk pool diverges from the assumptions used at the outset.  Not only is there no evidence that Raytheon ever considered creating a "pool" based on the "average" or "normal" retirement age of its plan participants, there is no evidence that it ever evaluated the risk experience of the pool over time or made appropriate adjustments to it.  Terry's effort is, instead, an attempt to create a post-hoc rationalization for Raytheon's .90 conversion factor.

33.     More importantly, "pooling" simply can't justify a conversion factor that does not produce a QJSA that is the actuarial equivalent of the SLA or other option that a participant could

---

[5] https://www.definitions.net/definition/pooling

receive at whatever age he or she chose to retire.  As Terry acknowledges, pooling creates winners and losers. While Terry is correct that there will always be participants who come out "ahead" in a pension plan, *e.g.*, those who live to 100 and outlive their expected mortality, and those who come out "behind," *e.g.*, those who die right after they retire short of their expected mortality (Terry Report, ¶ 132), ERISA imposes rules that must be followed that set the guardrails for differences between "Winners and Losers." In particular, plans can't be designed so that people who take a QJSA at early retirement "lose" by getting less than the actuarial equivalent of the SLA available at the same time.  ERISA's actuarial equivalence rule for QJSAs apply at the "earliest retirement age."  26 C.F.R. § 1.401(a)-20 Q&A 17.  For the Hourly Plan, this is age 55 – the age that Cruz retired. Under this rule, Cruz's QJSA at age 55 had to be at least as valuable as the actuarial equivalent of his SLA at age 55. While Terry's version of "pooling" could be reasonable for a plan with just one participant, or handful of participants, all of whom are retiring at age 65, it is certainly not reasonable for a plan like Raytheon's.

34.     Terry's opinion that "[p]ooling is expressly permitted by ERISA and related regulations" is misleading generally and wrong in the specific way he applies it.  Terry Report, ¶ 135.  The regulation that Terry relies on, 26 C.F.R. § 1.401(a)-11(b)(2), was promulgated in 1978 – before plans had to use unisex mortality tables under the Supreme Court's 1983 decision in *Arizona v. Norris*, 463 U.S. 1073 (1983).  The regulation also predates the 1984 amendments to ERISA discussed above, which significantly changed ERISA's QJSA requirement.  This change was recognized by the addition of subsection (g) to 26 C.F.R. § 1.401(a)-11 in 1988, which stated that the REA "significantly changed the qualified joint and survivor annuities rules," and noted that new QJSA rules adopted after the REA were promulgated in 26 C.F.R. § 1.401(a)-20, and indicated that the new rules governed to the extent of any inconsistency.  26 C.F.R. § 1.401(a)-

11(g)(2). Among those new rules, as stated above, were the requirements in Q&A 16 that QJSAs be "as least as valuable as any other optional form of benefit payable under the plan at the same time" and in Q&A 17 that plans offer QJSAs "when the participant attains the earliest retirement age under the plan." 26 C.F.R. § 1.401(a)-20, Q&A 16 and Q&A 17. After 1984, and certainly after 1988, it was not permissible for a plan that permitted early retirement at age 55 to offer a QJSA that was only as valuable as an SLA once a plan participant reached age 63 or 65.

35.     I disagree with Terry's opinion that a plan sponsor "might reasonably conclude" that a fixed, tabular conversion factor that pays QJSAs that are less than the actuarial equivalence of certain retirees' SLAs is appropriate if the plan subsidizes early retirement. Terry Report, ¶ 40. Plan sponsors can, and often do, subsidize early retirement. But whether an early retirement SLA is subsidized completely, partly, or not at all, the plan *must* provide a QJSA that is at least as valuable as the early retirement SLA. If a sponsor wants to subsidize early retirement, it must subsidize both the SLA and the QJSA such that the QJSA is at least the actuarial equivalent of the subsidized SLA.

36.     Nor is Terry accurate when he suggests that all participants are part of a "reasonable grouping" that supports Raytheon's use of a fixed, tabular conversion factor. Terry Report, ¶ 135. Raytheon uses the same .90 Conversion Factor to calculate a participant's QJSA between ages 55 and 70½.[6] Participants 15½ years apart are *not* part of a "reasonable grouping." As referenced above, a 55-year-old has a much lower mortality rate than a 70-year-old which causes a significant difference in the conversion factor that will provide each of them with an actuarially equivalent QJSA. In my experience, plan sponsors do not group participants together whose ages are years apart when performing actuarial equivalence calculations.

---

[6] Hourly Plan Document at §§ 6.5, 7.3 and 9.10, RTN-Cruz-00001032, 1040 and 1048.

37.     In fact, Raytheon itself uses tabular reductions for the Hourly Plan to calculate early retirement benefits that vary based on the participant's age at retirement, with "interpolations" to account for "months between ages."[7]  Raytheon uses the same method to calculate the 10YCCO, adjusting the conversion factor "for the month or months by which the Participant's age exceeds the most recent age" between 55 and 65.[8]   This procedure easily could have been followed for Cruz's QJSA, but Raytheon chose not to.

38.     Raytheon also uses a one-month grouping to account for the age difference between the participant and beneficiary when calculating the QJSA.  The Hourly Plan decreases the .90 Conversion Factor by $1/24^{th}$ of 1% for each month by which the participant's age exceeds the beneficiary's age to account for increased likelihood that the participant will die before the beneficiary.  The Hourly Plan Document even states that "16 days or more in a partial month shall be construed as one month."[9]  So Raytheon separates Hourly Plan participants into different groups if their spouses are as few as 16 days apart. The notion that retirees from ages 55-70½, 15½ years, constitute any sort of "reasonable grouping" for purposes of a benefit calculation is nonsensical when the same Plan for the same benefits groups spouses in 16-day increments.

39.     The Hourly Plan's modification of the conversion factor by the difference in ages between the retiree and spouse at BCD thoroughly undermines Terry's pooling argument. On the one hand, a single tabular number is supposed to work for all retirees, no matter what their ages; its advantage is simplicity.  On the other hand, Raytheon adjusts this number, not for the age of the participant or the age of the spouse, but for the difference in their ages, down to the month. Such a precise adjustment is totally antithetical to the notion of pooling. If an adjustment is to be

---

[7] Hourly Plan Document at § 6.2(b), RTN-Cruz-00001031.
[8] Hourly Plan Document at § 7.1, RTN-Cruz-00001039.
[9] Hourly Plan Document at § 6.5, RTN-Cruz-00001033.

made, it should be based on the age of the retiree, where the difference from the tabular number might be significant. Even if, as Terry argues, it was permissible to determine actuarial equivalence for a group of all plan participants based on their average age, the use of these individualized monthly adjustments demonstrates that *this* plan doesn't work as a pool. The only reasonable conclusion that can be drawn is that Raytheon set the .90 conversion factor decades ago and forgot about it.

40.     In this regard, Terry misreads the Regulation he cites. Terry Report, ¶ 135.  It states that equivalence may be determined for each participant, all participants, or a reasonable grouping of participants, "on the basis of consistently applied reasonable factors." In other words, grouping is permissible only to the extent that consistently applied actuarial factors are reasonable for every participant in the group. If the factors are not reasonable for every member of the group, then the plan needs to come up with different groups. While Raytheon clearly knows how to establish proper groupings consistent with this regulation, it hasn't done so for Mr. Cruz.

## C. Tabular Factors Also Require Updating

41.     Terry suggests that there is no need to update a fixed conversion factor, such as the .90 conversion factor in the Hourly Plan, because the ratio between the present value of a single life annuity and a joint and survivor annuity is stable over time as the result of the interplay of numerous actuarial factors.  Terry's "mathematics of ratios" is high school algebra.  But, although the impact of declining mortality on conversion factors would not be difficult to predict, there is no reason to engage in prediction when the data is available.

42.     Figure 4 in Terry's report is designed to demonstrate the stability of the ratio between the present value of SLAs and JSAs over four decades.  But the chart only achieves its desired result by improperly manipulating inputs.

43.     Terry lists seven different mortality tables, published between the early 1970s and the late 2010s.  But he uses an 80/20 gender blend for some of the tables, and a 50/50 gender blend for others.  Further, he uses the "headcount" versions of the RP-2000, the RP-2006, the PRI-2012 and the CDC-2017 mortality tables, as well as the blue-collar versions of the RP-2000 and the RP-2006. He cherry picks different versions of mortality tables to artificially drive down the conversion factors for his chart. Had he made "apples to apples" comparisons, his chart would have looked very different.

44.     Moreover, Terry did not use the projection tables that were designed to accompany the RP-2000, the RP-2006 and the PRI-2012 tables when they were released by the Society of Actuaries. A projection table updates a mortality table in the years after the table is published. So, for example, if an RP-2000 table is to be used in 2010, projected mortality in that table should be projected to 2010 using the appropriate projection table. Terry completely ignored projection tables, even though Cruz did not retire until 2015.

45.      The most significant data manipulation in Terry's Figure 4 involves interest rates. Conversion factors are, of course, impacted by changes in interest rates, but Terry's choice of interest rates was designed to produce a result that matched his theory.

46.     To convert Terry's analysis to an "apples to apples" conversion and provide a clearer picture of conversion factors over time, the following chart shows the Conversion Factors using a 50/50 male/female blend for each mortality table, isolating the impact of mortality improvements from the effect of interest rates. The conversion factors are based on the retiree and beneficiary both age 65.  In Serota Rebuttal Figure 2, below, I highlight the numbers Terry actually inserted in his Figure 4:

**Serota Rebuttal Figure 2**

|  | 1.50% | 2.00% | 3.00% | 4.00% | 5.00% | 6.00% | 7.00% | 8.00% |
|---|---|---|---|---|---|---|---|---|
| **GAM_71** | 0.885 | 0.888 | 0.895 | 0.900 | 0.906 | 0.911 | 0.916 | **0.920** |
| **UP_84** | 0.878 | 0.881 | 0.887 | 0.893 | 0.899 | 0.904 | 0.908 | **0.913** |
| **UP_94** | 0.893 | 0.896 | 0.903 | 0.909 | 0.914 | 0.919 | **0.924** | 0.929 |
| **RP_2000** | 0.890 | 0.894 | 0.900 | 0.906 | 0.911 | 0.917 | **0.921** | 0.926 |
| **RP_2006** | 0.891 | 0.894 | 0.901 | 0.907 | **0.912** | 0.917 | 0.922 | 0.926 |
| **Pri_2012** | 0.894 | 0.898 | 0.904 | 0.910 | **0.915** | 0.920 | 0.925 | 0.930 |
| **CDC_2017** | 0.896 | 0.899 | 0.905 | 0.911 | **0.917** | 0.922 | 0.926 | 0.931 |

47.     Next, in Serota Rebuttal Figure 3, below, I show the same chart, except that I use a consistent 80/20 gender blend for each mortality table.   Again, I highlight the numbers Terry actually inserted in his Figure 4:

**Serota Rebuttal Figure 3**

|  | 1.50% | 2.00% | 3.00% | 4.00% | 5.00% | 6.00% | 7.00% | 8.00% |
|---|---|---|---|---|---|---|---|---|
| **GAM_71** | 0.851 | 0.855 | 0.864 | 0.872 | **0.879** | 0.886 | 0.892 | 0.898 |
| **UP_84** | 0.849 | 0.853 | 0.862 | 0.869 | **0.877** | 0.883 | 0.890 | 0.895 |
| **UP_94** | 0.868 | 0.873 | **0.881** | 0.888 | 0.895 | 0.902 | 0.908 | 0.914 |
| **RP_2000** | 0.870 | 0.874 | **0.882** | 0.889 | 0.896 | 0.903 | 0.908 | 0.914 |
| **RP_2006** | **0.872** | 0.876 | 0.884 | 0.891 | 0.898 | 0.904 | 0.910 | 0.915 |
| **Pri_2012** | **0.878** | 0.882 | 0.890 | 0.897 | 0.903 | 0.909 | 0.915 | 0.920 |
| **CDC_2017** | **0.878** | 0.882 | 0.890 | 0.896 | 0.903 | 0.909 | 0.914 | 0.920 |

48.     By glancing down the columns of Serota Rebuttal Figure 2 or Serota Rebuttal Figure 3, one clearly sees that the conversion factors from 1971 have increased over time when the interest rate is held constant.  The apparent anomalies are the UP-84 mortality table, which shows slight decreases from the GAM-71, and the CDC-2017, which shows slightly lower conversion factors at some interest rates compared to the PRI-2012 when the gender blend for both tables is 80/20.  These "anomalies" are easily explained because, despite its name, the UP-84 was published in the 1970s and based on data from the mid-to-late 1960s, just like the GAM-71.  Accordingly, the UP-1984 is not more current that the GAM-71.  Similarly, the PRI-2012 and the CDC-2017 were both published in 2019 (which also means that they are irrelevant because they could not possibly have been used to calculate Cruz's benefits when he retired in 2015).

49.     Terry asserts one cannot predict the effect of the variance of changing mortality tables on Conversion Factors because the numerator and denominator rise and fall in tandem. Terry Report, ¶ 226.  But as shown in Serota Rebuttal Figure 2 and Serota Rebuttal Figure 3 above, there is no need to predict anything; just compute. The same effect can be shown on a more granular level by comparing the present value of each dollar of an annuity benefit (called an "annuity factor") using an older mortality table, such as the 1971 GAM and a more recent table, such as the RP 2006 with the Mercer MMP2007 improvement scale.

50.     Serota Rebuttal Figure 4, below, shows two tables.  For each, column (a) represents the present value of a Single Life Annuity at age x, the age of the retiree, Column (b) is the present value of a Single Life Annuity at age y, the age of the beneficiary,  Column (c) is the present value of a two-life annuity at age x for the retiree and y for the beneficiary, and Column (d) is the present value of the Joint and 50% Survivor annuity, and  Column (e) is the ratio of the Single Life Annuity to the Joint and 50% Survivor Annuity, which we refer to as the Conversion Factor.  The first table uses a 50% male-to-female blend and the second table shows an 80/20 male-to-female blend.  For purposes of showing the effect of the decrease in mortality for both participants and beneficiaries between the two mortality tables, I have used a constant interest rate of 4.05% for all calculations in the charts, and I have assumed that the beneficiary and the participant are both age 55.

**Serota Rebuttal Figure 4**

| | Retiree (50% male/ 50% female) (a) | Spouse (50% male/ 50% female) (b) | Joint Life (c) | Joint & 50% annuity (d)= (a) + 50% x ((b)-(c)) | Conversion Factor (e)= (a) / (d) |
|---|---|---|---|---|---|
| **GAM_71** | 15.109692 | 15.109692 | 12.770193 | 16.279441 | 0.928146 |
| **RP_2006 \*** | 16.921138 | 16.921138 | 14.737195 | 18.013110 | 0.939379 |

| | Retiree (80% male/ 20% female) | Spouse (20% male/ 80% female) | Joint Life | 50% J&S | Conversion Factor |
|---|---|---|---|---|---|
| **GAM_71** | 14.516686 | 15.767043 | 12.768528 | 16.015943 | 0.906390 |
| **RP_2006\*** | 16.677855 | 17.175750 | 14.736956 | 17.897252 | 0.931867 |

51.     The charts in Serota Rebuttal Figure 4 demonstrate that the annuity values grew dramatically over the last 40 years as a result of declines in mortality rates.  If we keep the blend of male to female (for example, 50/50 in the first chart, or 80/20 in the second), as well as the interest rates, fixed, the Conversion Factors have increased substantially.  For example, with the 80/20 male female split, the annuity factor for the retiree has increased from 14.516686 to 16.677855, an increase of about 15%. This pattern is unsurprising because – as explained in my initial report – as the mortality rates decline, the retiree is expected to live longer.  By living longer, the retiree has pushed back the time when the beneficiary might expect to begin receiving income after the retiree's death.  Even if we assume that the beneficiary will live longer as well, the start date for monthly payments to the beneficiary would also be pushed back, and thus the discounted value of those benefits is lower.  That means that the retiree is taking less risk by selecting a joint and survivor option and thus the conversion factor, which is an inverse measurement of risk, increases.  Over the course of 40 years, the conversion factor has increased considerably.

52.     Thus, I disagree with Terry's suggestion that it is "difficult to generalize about" the impact that changes in actuarial inputs will have on conversion factors.  Patterns are clear enough over time. Comparing one year to the next, as Terry does in paragraph 81 of his Report, ignores

the larger pattern – 40 years of mortality rate decreases.  While it is true, as Terry asserts in paragraph 85, that "improvements in mortality do not themselves imply any change to the conversion factor," the changes that have ***actually*** occurred over the past 40 years are sufficiently large to overwhelm fluctuations in interest rates.

### D.  Reasonable Actuarial Assumptions

53.  I agree with Terry that ERISA requires actuarial equivalence to be determined on the basis of ***actuarial factors*** that are reasonable and consistently applied.  Terry Report, ¶¶ 197-199.  But, I disagree with Terry's notions of what that standard means.

54.  First, I disagree with Terry's assertion that reasonableness applies to "conversion factors."  Terry Report, ¶¶ 197-199.  A conversion factor is not an actuarial factor. It is – as Terry himself acknowledges – simply a ratio between two present values.  A conversion factor is derived from actuarial factors, but it is not itself an actuarial factor.  Since reasonableness applies to actuarial factors, Terry's analysis has a fundamental flaw.

55.  A conversion factor is only as reasonable as the actuarial assumptions going into it. If the actuarial assumptions are reasonable, the Conversion Factor is reasonable.  The basis for an actuarial assumption being reasonable is spelled out in Actuarial Standards of Practice ("ASOP") 27 and 35. Those ASOPs refer to the lives being analyzed and market conditions as of the measurement date (here, BCD).  There is no basis for declaring a Conversion Factor to be reasonable in and of itself, because there is no underlying foundation for comparison – it is just a number divorced from any standard.

56.  I likewise disagree with Terry's assertion that the standard for whether two defined benefit plan options are actuarially equivalent is plus or minus 5% for a total range of 10%. Terry Report, ¶ 192. Contrary to Mr. Terry's suggestion, this is not a "common standard among

actuaries," because it makes no economic sense. A defined benefit is an annuity, a stream of cash payments. It is much like a fixed income investment, e.g., a bond that makes periodic interest payments. While reasonableness is a range, the range is a few basis points, not *1,000*.   I do not know of any actuaries that would describe two present value calculations that were separated by 1,000 basis points as being "equal." If a retiree's benefit had been reduced by 500 bps over his entire lifetime in retirement, that could be a tremendous loss of income that could impact lifestyle or standard of living.   Conversely, understating the present value of a plan sponsor's benefit obligations by 500 bps could be a difference of tens – if not hundreds – of millions of dollars.  For example, the present value of Raytheon's liabilities for all of its pension plans is $41.8 billion, so a 5% difference would be about $2 billion.

57.     As a former member of the Actuarial Standards Board Pension Committee ("ASB-PC"), I have no memory of any member suggesting that two results within 1000 bps of each other were equivalent. And, I have never seen that standard applied in my 42 years of practice.

58.     Terry suggests in paragraph 193 of his Report that a 10% differential between the relative value of two optional forms of benefit is regarded as "approximately equal," based on the Treasury Regulation governing disclosure of benefit options, §1.417(a)(3)-1(c)(2)(iii)(C). The regulation doesn't apply to the calculation of benefits.  From an actuarial or economic standpoint, "approximately equal" is not the same thing as "equal" or "actuarially equivalent."

59.     I also disagree with Terry's assertion that the reasonableness of particular conversion factors can be determined by comparisons to other conversion factors used in other circumstances and subject to different requirements.  Terry notes that the PBGC uses conversion factors that match those that Raytheon employs.  Terry Report, ¶ 209.  But these PBGC Conversion Factors are not used for Benefit Calculations at retirement.  They are not designed to comply with

Section 205 of ERISA or the Treasury Regulations that implement it. Instead, they apply only in the case of a Distress Termination, when the Plan sponsor can no longer pay the required minimum contributions to maintain the pension plan.  They are used to limit the benefits of the most highly paid retirees in the plan, quite possibly several years after their BCDs.

60.     For example, consider the case of a plan taken over by the PBGC because the plan sponsor could no longer support the plan financially, and someone is receiving a benefit of $55,000 per year, payable as a joint and 50% survivor annuity.  The maximum the PBGC would pay is $60,136 as a straight life annuity for a 65-year old for a plan taken over in 2015. https://www.pbgc.gov/news/press/releases/pr14-12  According to the Regulation Terry quotes, the PBGC administrator will multiply $60,136 by 90% to arrive at the maximum the Agency will pay a retiree as a joint and 50% survivor annuity, namely $54,122.  So our sample individual's benefit will be reduced from $55,000 to $54,122.

61.     The PBGC is trying to protect its solvency. If it cuts the benefit of someone receiving above the maximum it allows, it will save itself money, presumably from the pocket of a relatively well-to-do individual.  The PBGC has always been using cost cutting measures, wherever it can find them to stay afloat.  But it uses this Conversion Factor to take from the well-to-do, not from the common worker.  In contrast, Mr. Cruz receives less than half the maximum PBGC benefit, yet Raytheon would use the PBGC rate as a basis for having Mr. Cruz subsidize the Plan. The PBGC Conversion Factor has nothing to do with whether a QJSA is at least as valuable as an SLA at age 55.

62.     Terry wrongly relies on Revenue Ruling 76-47 to try to justify the Hourly Plan's fixed, tabular conversion factors.  Terry Report, ¶ 210.  Some pension plans require employees to make contributions even though the employees accrue benefits under the plan's formula that the

employer funds.  Employees in those plans receive a benefit that is the greater of their accumulated contributions or what they earned under their plan's formula.  26 U.S.C. § 411(c) originally provided that defined benefit plans had to convert an employee's contributions to an age-65 SLA by dividing the contributions by 10 (e.g., an employee with $100,000 in contributions would receive $10,000 a year at age 65).  Revenue Ruling 76-47 set forth the "actuarial adjustments required when the normal form of benefit is other than a single life annuity…" for "contributory defined benefit plans…when the normal retirement age is not age 65."  Accordingly, Revenue Ruling does not apply because the Hourly Plan does not have mandatory employee contributions,[10] its normal retirement age is 65 and participants earn their pension as an SLA.[11]

63.     But more importantly, the basis for Revenue Ruling 76-47 became obsolete when 26 U.S.C. § 411(c) was amended in 1989.  Under the new version of 26 U.S.C. § 411(c) that was adopted in 1989 (which remains in effect today), employees' contributions are converted to an age-65 SLA using the same assumptions used to calculate a participant's benefit when he takes a lump sum under 26 U.S.C. § 417(c)(3).  After the 1989 changes to 26 U.S.C. 411(c), the Commissioner of Internal Revenue even stated that "tabular form conversion factors" in Revenue Ruling 76-47 did not "conform to common actuarial practice…"[12]  Thus, Revenue Ruling is no longer valid and the fixed, tabular factors that it describes are seldom used.  Moreover, in the same vein, the "tabular form conversion factors" do not "conform to common actuarial practice…" with respect to Mr. Cruz.

### E.  General Methodology for Calculating Actuarial Equivalence

64.     I agree with Terry that "one can assess the reasonableness of a tabular factor by

---

[10] Hourly Plan Document at § 11.2, RTN-Cruz-00001051.
[11] Hourly Plan Document at §§ 1.30 and 6.1, RTN-Cruz-00001017 and 1030
[12] 60 FR 66532-01, * 33.

comparing it to factors generated pursuant to reasonable sets of assumptions." Terry Report, ¶ 212. Several of the points that Terry makes regarding the methodology for doing so, however, are either overstated or incorrect.

65.     As noted above, I agree that there is a "range of reasonableness" (Terry Report, ¶ 214), but the suggestion that the range is 1000 basis points is unsupportable.

66.     I disagree that adoption of a single conversion factor for all QJSAs relieves a plan of the obligation, under Section 205 of ERISA, to provide a QJSA that is at least the actuarial equivalent of the SLA that is available whenever a participant retires.  Terry Report, ¶¶ 123, 215. A plan that fails to provide a 55-year-old with a QJSA that it actuarially equivalent to the SLA she could have selected at age 55 violates ERISA, and that remains true even if it gives people QJSAs that are actuarially equivalent to SLAs when they retire at age 63, or if it gives people QJSAs that are worth more than the actuarially equivalent SLA if they retire at age 70.

67.     It is theoretically possible, as Terry suggests in paragraph 216 of his Report, that using multiple unreasonable actuarial assumptions might generate a benefit – for a particular individual – that was at or near the same amount that would be achieved by using reasonable actuarial assumptions.  For example, using the 1971 GAM and an 8 percent interest rate might yield results that came close to the results that would be generated by reasonable actuarial assumptions based on the age of the retiree, the age of the beneficiary, and the year of retirement. It is far-fetched to imagine that this coincidence would work for all participants over any length of time.  And, even if it were possible, Terry hasn't done so here. Furthermore, it has no bearing on how to conduct a proper *post-hoc* analysis.  The point isn't to see whether some combination of actuarial assumptions can generate the same conversion factor.  The point is to determine whether the conversion factor is consistent with ***reasonable*** actuarial assumptions.

27

68.     I completely disagree with Terry's assertion that the "benchmark of reasonableness is not necessarily determined based on any single point in time" and that it is reasonable to consider interest rates and mortality five years before and five years *after* a calculation was performed to determine whether the calculation was reasonable.   A benchmark is, after all, a point that can be determined; it is not a range. Similarly, I disagree that an actuary tasked in 2020 with determining the reasonableness of conversion factors applied in 2015 would look to data that was *not even available* at the time the calculation was performed.   Terry Report, ¶¶ 218-19.

69.     Under ERISA, participants are entitled to a QJSA that is the actuarial equivalent of the SLA that they could select when they retire or, to be more precise, benefit commencement date or BCD.   Contrary to Terry's argument, that is very much a "point in time."   Section 3.2.5(c) of ASOP 35 describes "reasonable" assumptions as ones that consider historical and current data that is relevant as of the date of measurement; similarly, ASOP 27, which considers interest rates, states that "[a]ssumptions based on observations of financial markets are considered reasonable if they fairly reflect the financial markets as of the measurement date."   The "measurement date," for purposes of determining actuarial equivalence, is BCD.   It is not "some time during the decade in which the benefits are calculated" and it is certainly not after BCD.

70.     As a simple matter of logic, if the task is to determine whether the conversion factor used to determine a participant's QJSA was consistent with reasonable actuarial *assumptions,* it makes no sense to justify – or attack – the assumptions on the basis of what happened later.   A participant who retired in 2015 can't demand to have his benefits increased because the Society of Actuaries released a new mortality table in 2019, or because interest rates dramatically increased in 2022.   Rather, the amount of her monthly benefit is fixed as of BCD. Raytheon likewise cannot justify the conversion factors that it used in 2015 based on data that did not exist at that time.

71.     I disagree with Terry's assertion that a plan can simply put a fixed conversion factor in place and ignore it for decades on the theory that changes in the different factors that are used to calculate present values for SLAs and JSAs will somehow always balance each other out.  Terry Report, ¶¶ 220-27.  As demonstrated above, changes in mortality rates and interest rates do cause the ratios between the present values of SLAs and JSAs to change, and plans are responsible for monitoring those changes and making adjustments as required.  The *age* of a conversion factor is not important as such; rather, what matters is the change in the data used to determine reasonable mortality and interest rates that interact to produce the conversion factor.

72.     It bears repeating that plans do not need to *predict* how changes in mortality and interest rates will affect the reasonableness of their conversion factors.  Terry Report, ¶¶ 224-227.  All they have to do is *compare* their conversion factor to a conversion factor that would result from using *actual, current* interest rate and mortality assumptions, just as I did in my Initial Report.  So long as that exercise demonstrates that the existing conversion factor produces a QJSA that is actuarially equivalent for all participants in the Plan, there is no need to change it.

73.     This is not hard. Raytheon runs numerous calculations for numerous of its plans whenever an employee retires, because a retiree is entitled to see what her benefit options are. A computer or third-party administrator can run these calculations routinely.

74.     As a final note, Terry's analysis of the reasonableness of the Hourly Plan's actuarial factors is based on several "models."  The first includes no plan-specific information but is instead based on what Terry describes as "presumed 'average' ingredients for a broad array of plan sponsors and plans."  Terry Report, ¶ 230.  This exercise is not reasonable.  Raytheon's actuary made a careful study of applicable mortality and interest rates in the course of preparing the Company's financial statements.  Where company-specific data exist, and the data base is large

enough to be credible, it is not reasonable to reject it in favor of "presumed 'average' ingredients for a broad array of plan sponsors."  Oddly enough, when Terry moved to his second model, which was supposed to be based on "plan specific" data, he generally rejected plan-specific information unless it generated a lower conversion factor.  I will refer to these two models below as Terry's "Generic" Model and his "Raytheon" Model.

### F.  Disagreements With Specific Actuarial Assumptions

75.     Although both Terry and I assessed whether the .90 conversion factor was consistent with reasonable actuarial factors, we disagree with respect to what those factors should be – essentially, the inputs into the actuarial equivalence ratio.

76.     I have already discussed one of the most significant flaws in Terry's analysis – his assumption that it is proper to determine whether Mr. Cruz received an actuarially equivalent QJSA when he retired at age 55 based not on his age and the age of his wife, but rather, on the "average" or "normal" retirement age of plan participants.   I will now go through my disagreements with the rest of the Terry's actuarial assumptions.

#### *Interest Rates*

77.     In my Initial Report, I stated that an appropriate interest rate range would be between 4.05 and 4.29% for the year ending December 31, 2014 using several common indices. In contrast, Terry assumes that any interest rate between 1.5 percent and 5 percent would have been "reasonable" in 2015.  Terry Report at ¶ 240.  This unreasonable 350-basis point "range of reasonableness" for interest rates is critical to Terry's analysis, because it generates an unreasonably wide range of conversion factors.  However, Terry's broad range of interest rates is inconsistent with a reasonable analysis that any actuary would have performed in 2015, as evidenced by the analyses of Raytheon's own actuaries.

78.     First, Terry relies on data from December 2011 to March 2020 to construct his "range of current interest rates."  Terry Report, ¶ 237.  Like Terry's use of mortality tables developed after Cruz retired, interest rates from after Cruz retired are irrelevant to whether he is receiving an actuarially equivalent benefit.  In other words, Terry cannot use interest rates from after 2015 to try to justify a present value calculation that was done in 2015.

79.     Second, Terry uses "various indices" to try to justify his claim that a reasonable range of interest rates to calculate Cruz's benefits was between 1.5 and 5%.  Terry Report, ¶ 240. Even the indices Terry uses, however, do not drop to 1.5% at or around the time Cruz retired. Terry Report, Figure 8.  Terry uses rates from after Cruz retired to try to retroactively justify a conversion factor that Raytheon cannot explain.

80.     Third, Terry agrees that investment-grade bonds should be used in actuarial equivalence calculations but uses several low-rate indices such as ones for 10-year and 30-Year Treasuries to artificially widen the "range" that he believes is reasonable.  Terry Report at ¶¶ 237-38. The proper focus is on high grade corporate bonds at the time of the transaction because that is what pension actuaries and life insurance company actuaries would be considering for annuities issued by a company with credit similar to Raytheon at the time. Including government rates in the indices is unreasonable because Raytheon, the credit behind Mr. Cruz's annuity, does not have the same credit of a U.S. government risk free rate. Indeed, the only apparent purpose for including the two Treasury indices in the chart is to artificially drive down the low end of the range, which in turn lowers the range of "reasonable" conversion factors.

81.     It is similarly unreasonable to use the PBGC rates.  According to the PBGC web site, its interest rates are specifically designed for use in "determining the present value of annuities in involuntary and distress terminations of single-employer plans, as discussed in 29 CFR 4044.

They are also used to value benefits and certain assets under multiemployer plans following mass withdrawal as discussed in 29 CFR 4281."  In short, these are rates that are designed for purposes of minimizing the PBGC's liabilities and protecting its assets.  They are not appropriate for plans to use in calculating actuarially equivalent JSAs.

82.     Terry argues that the IRS allows plans that adopt variable actuarial assumptions to use Treasury bond rates or PBGC rates as interest rate assumptions (Terry Report, ¶ 101), but the cited provision of IRS manual only addresses whether a plan is providing benefits that are "definitely determinable" under the Tax Code, not whether benefits are "actuarially equivalent." Moreover, the cited provision doesn't say that Plans can ***adopt*** Treasury or PBGC rates; only that they can adopt a variable rate that references such public rates.  But just as Revenue Ruling 79-90 permits plans to adopt rates that are ***indexed*** to a particular prime rate, a plan could adopt a rate that was indexed to a Treasury or PBGC rate, so long as the indexing properly reflected the material difference between those rates and the rates that reflected corporate credit risks.  Terry does not do so; instead, he simply uses these low rates to create an artificially low range for his interest rate assumptions.

83.     Terry not only uses his 1.5-5% interest rate assumption for his Generic Model, he retains it for his Raytheon model.  This makes no sense.  Since Terry's Raytheon model is supposed to take company-specific information into account, Terry should have relied upon Raytheon-specific data at least with respect to this model.  Tellingly, Terry does not point to any place where Raytheon relies upon Treasury and PBGC rates with respect to its pension liabilities.

84.     Specifically, Raytheon used a 5% interest rate in the Relative Value Disclosure it sent Cruz.[13]   26 C.F.R. § 1.417(a)(3)-1(c)(2)(iv)(B) requires plan sponsors to use reasonable

---

[13] RTN-Cruz-00001363.

assumptions in these disclosures to participants like Cruz.  While 5% is higher than I would use, Raytheon determined this rate was reasonable when it sent Cruz the Relative Value Disclosure in 2015 before he retired.  5% is the very top number in Terry's range – and it is far removed from the artificially low interest rates Terry relies upon. One question to ask is, if Raytheon is basing its disclosures to Mr. Cruz on a 5% interest rate, how can it secretly justify its benefit to Mr. Cruz using rates that are 350 bps below that rate. Terry has no answer.

85.     Terry's reliance of the lower three of his indexes to create a 350-basis point interest rate range for purposes of this litigation also bears no resemblance to the methodology Raytheon uses to calculate the value of its pension liabilities for business purposes.  Raytheon uses the "Mercer Bond Model," a hypothetical portfolio that "only includes bonds that are rate AA or better by Moody's…,"[14] and listing the specific bonds used to ensure the "reasonability of a discount rate prepared using the Mercer Bond Model."[15]  Raytheon then reviews the result to ensure it is not "outside market norms…"[16]  Raytheon's methodology is consistent with ones I propose in my Initial Report.

86.     Raytheon did not use the 10-year Treasuries or 30-year Treasuries that Terry suggests without support that "U.S. pension actuaries…frequently look to…"  Terry Report, ¶ 238. Nor did Raytheon consider the PBGC rates that Terry suggests are "current."  Terry Report, ¶ 241. In fact, Raytheon mentions the PBGC rates in its 715 reports but *still* uses AA rated corporate bonds to calculate the present value of its benefit obligations.[17]

87.     From paragraph 151 to 173 in his Report, Terry criticizes the notion of using

---

[14] RTN-Cruz-00001364.
[15] RTN-Cruz-00001343.
[16] RTN-Cruz-00001363.
[17] RTN-Cruz-00000386.

assumptions specified for accounting disclosure as a basis for actuarial equivalents.  Accounting disclosures are annual exercises where the plan sponsor presents the assets and liabilities of their pension plans. The actuarial assumptions are discussed among the actuary, the auditor and the CFO, but ultimately, the CFO has to approve the set of assumptions used.  The American Institute of CPAs (AICPA) issues directives on the proper selection of assumptions.  After years of debate, they settled on the notion of "marking to market," meaning that the current market situation should have a prominent role in the actuarial assumptions to be used.  Ultimately, the plan's actuary will take each retiree's benefit form selection and run it through valuation software to determine the market liability to disclose on the corporate books.  If, at retirement, the present market value of a single life annuity exceeds the present market value of the JSA chosen by the retiree, the plan enjoys an "actuarial gain," meaning the retiree has subsidized the plan.

88.    Terry's arguments for disregarding the market-based estimates carefully analyzed by the Plan's actuary and the CFO make little sense.  He argues that the "mark-to-market" approach to determining interest rates assumptions for the company's financial statements results in "volatility."  Terry Report, ¶ 167.  But any interest rate that takes market conditions on the date of the benefit calculation, as required by ASOP 27, will have more "volatility" than a conversion factor that depends upon interest rate assumptions being somewhere within a 350 basis point range. That is no reason to find it "unreasonable."

89.    Terry also argues that the ASC 715 rate is based on the value of pensions for all participants, not just participants who are at or past retirement age, and that shorter term bonds which would track the life expectancies of retired plan participants would have lower rates.  Terry Report, ¶ 170.  This is a strange objection from Terry, who thought it was appropriate to include a 30-year Treasury Bond index in his analysis.  It simply can't be the case that it is appropriate to

include very-long term debt obligations only when they carry extremely low rates.

90. Moreover, the problem Terry identifies appears to be more theoretical than real. For example, the Treasury Department's Applicable Interest Rate for calculating lump sum benefits under Section 417(e) of the Tax Code uses segment rates that, when applied to an individual, result in different aggregate rates depending on the age of the participant. Contrary to Terry's hypothesis, which suggests that these shorter term interest rates would be lower (and thus would generate a lower conversion factor), my Initial Report shows in paragraph 111 that using the 417(e) segment rates to calculate Cruz's QJSA, rather than the interest rate from Raytheon's previous ASC 715 Report, resulted in a slightly **higher** benefit. (Of course, Terry also argues that the 417(e) rates should not be used to calculate annuity interest rates, because the plan bears "longevity risk" when participants select an annuity. For the reasons discussed above, this rationale for ignoring the lump sum Treasury rates from Section 417(e) doesn't hold up).

91. Terry further argues that the ASC 715 rate may be based on **all** of a plan's pension liabilities, blending and aggregating different plans. Terry Report, ¶ 171. But Terry ignores the fact, discussed in paragraph 88 of my initial report, that Raytheon's methodology for calculating the interest rates for its ASC 715 reports ensured that the plan-specific interest rates were very close to the aggregate rate for all plans as shown in the report. And, as discussed above, Raytheon stands behind the benefit payments for all is plans, not just the Hourly Plan.

92. Terry's final criticism is that using an interest rate from the ASC 715 report would be administratively burdensome. Terry Report, ¶ 172. First, it would be **less** burdensome than using the 417(e) interest rates for lump sum payments, which companies do all the time. Indeed, in Terry's hypothetical pension plan world, an employer must perform these lump sum calculations separately for each and every retiree on each and every BCD. Second, it does not explain why the

rates carefully selected by Raytheon are not **reasonable.**  And indeed, since all of these rates fit within Terry's incredibly broad 350 bps range, he clearly must concede that they **are** reasonable. The only question is why rates that are so much **lower** than any that Raytheon considered would be considered reasonable. They can't be.

93.    The only interest rate analysis by Raytheon's actuaries that Terry cites with approval are the plans' financial statements calculated under ASC 960 (as opposed to the Company's financial statements calculated under ASC 715).  Terry claims that the ASC 960 report provides "useful" information to participants in assessing the plan's ability to pay benefits.  Terry Report, ¶ 157.  However, Terry clearly did not take this "useful" information into account in determining that the reasonable range of interest rates in 2015 was between 1.5 and 5 percent, because the Hourly Plan used a 8.75 discount rate in its 960 Report for the year ending 2014.[18] Had Terry used the 8.75 percent interest rate from the 960 report, the resulting conversion factor for Mr. Cruz would have been substantially higher.

94.    While two actuaries can and do disagree about which discount rate is correct, to even have such a debate assumes that both actuaries used a reasonable method when selecting their respective rates.  Terry's opinion that an actuary could have used any one of an "array of observable interest rates" over an eight-year period, some of which did not even exist at the time of the analysis, is not a reasonable method. Moreover, Terry does not actually offer an opinion about which rate he would have chosen, he just offers his 350 bps range.  Terry Report, ¶ 240.

95.    Contrary to Terry's suggestion, actuaries do not just pick a rate, any rate.  They select rates based on detailed analysis, much like Raytheon did when it decided to use 4.15% for the Hourly Plan in the year before Cruz's retirement.   Terry's "rate" is an after-the-fact

---

[18] Hourly Plan's Form 5500, Schedule SB Audit Report, page 8.

rationalization that no reasonable actuary would have employed in 2015.

### Selecting a Mortality Table

96.     For my analysis of the reasonableness of the 0.90 conversion factor applied to calculate Mr. Cruz's QJSA in 2015, I used the RP-2014 Mortality Table with Mercer MMP-2007 Mortality Improvement Scale.  My rationale for the selection was simple:  Raytheon's actuaries determined that Raytheon's "historical experience has been generally consistent with that observed by the" Society of Actuaries in the RP-2014 table, and that the MMP-2007 Mortality Improvement Scale most closely aligned with the Company's "actual experience."   Initial Report, ¶ 77. Accordingly, that reflects the best evidence for the appropriate mortality assumptions for the Raytheon Plan population.[19]

97.     For his generic model, Terry indicates that it would be appropriate to use either the

---

[19] Terry offers two false criticisms in ¶ 265, fn. 47 of his Report.  He first wrongly suggests I used a different mortality table in my workpapers than the one I identified in my Initial Report.  The term "RP-2014," standing alone, references the mortality table published by the Society of Actuaries, which includes mortality improvement to 2014 using mortality improvement table MP-2014.  However, the RP-2014 is sometimes called the "RP-2006," a reference to the central year of the dataset used to construct the RP-2014, when another improvement scale is used, which is what I did by specifying I used the MMP-2007 improvement scale.  Thus, Terry's first criticism amounts to his offering a different way of saying what I stated in my Initial Report.  Terry's second criticism is that I did not use same mortality table as Raytheon, since it used the "RP-2007 version" of the RP-2014.   Terry Report, ¶ 265 fn. 47.   Raytheon used an improvement scale that Mercer developed, the "MMP-2007," which uses improvement rates beginning in 2007.  When a plan uses this specific improvement scale, Mercer apparently calls the base mortality table the "RP-2007" instead of the RP-2014 or RP-2006, although a Raytheon memo suggests that Mercer also calls it the "MRP-2007."  Since this table is specific to Mercer clients, I did not believe the term would be commonly known so I used a more general, but still accurate, description in my Initial Report. The Raytheon memorandum describing their mortality table selection states that " , , because the published RP-2014 table includes projections of mortality improvements based on MP-2014 (discussed in more  detail below) to adjust the data from 2006 (the base year of the underlying mortality study) to the publication year, these projections through 2014 were backed out to arrive at a base table that reflects the observed data prior to any future mortality improvement projections."   I used the exact mortality described by Raytheon and the exact mortality improvement rates that are in the Mercer-specific table to perform my calculations, as Raytheon produced the table in discovery.  RTN-Cruz-00001537.

same table that the Plan used (the RP 2014 table, which is also, somewhat confusingly, referred to as the RP 2006 table) *or* the PRI-2012 Table, with and without mortality improvement scales MMP-2007 and MMP-2016.  Terry Report, ¶ 231.  His rationale for these choices was that these options were standard tables published by the Society of Actuaries "in the last decade."

98.     The PRI-2012 table was not published until 2019 and did not exist in 2015 when Mr. Cruz retired.  For the reasons discussed above, therefore, both the table and its improvement scale are irrelevant for purposes of analyzing whether the conversion factor used to calculate Mr. Cruz' benefits in 2015 was consistent with then-reasonable actuarial assumptions.

99.     Terry's decision to use a mortality table without an associated mortality improvement scale is also unreasonable.  ASOP 35, section 3.5.3 provides that actuaries should "include an assumption as to expected mortality improvement after the ***measurement date***." (emphasis in original).  While I concur that the MP-2014 improvement scale "proved to be overly optimistic," Terry Report at Appendix D, ¶ 8, the fact that one improvement scale turned out to be slightly inaccurate is no excuse not to use any improvement scale at all.  Thus, there was no reason to test the RP-2006 without the MMP-2007 Scale.

100.    Terry's Raytheon Model, which supposedly takes Plan-specific information into account, relies on only one of the two mortality tables he included in his Generic Model. Inexplicably, however, he selected the PRI-2012 rather than the mortality table that the Plan actually ***used*** in 2015.  His explanation for this methodological choice had nothing to do with any Raytheon-specific data; instead, Terry explained that he chose the PRI-2012 because it was the most recent one.  Terry Report, ¶ 248.  Terry also failed to use an improvement scale in connection with the mortality table.

101.    Terry's selection of a mortality table is thus deeply flawed.  Raytheon's actuary

determined that the Hourly Plan's actual experience closely corresponded to the RP-2014 table, projected forward with MMP-2007 Scale. Terry does not suggest, much less show, that he made an independent assessment of plan-specific mortality data from the period prior to 2015 to determine whether Raytheon's actuary had made a mistake. Instead, Terry rejected Raytheon's actuary's work out of hand because a generic table was published later – even though there was no way an actuary could have used the 2019 table to calculate Cruz's retirement benefits in 2015.

### *Headcount Weighting the Selected Mortality Table*

102.    Mortality tables are generally weighted either by headcount or by benefit amount. A headcount-weighted table only considers the number of bodies in the sample. In contrast, a "benefit-weighted" table also considers the value of the retirement benefits as well.

103.    The Society of Actuaries, when publishing the RP-2006, determined that the standard, "benefits-weighted" version of the table was "more suitable" for pension plans whereas "headcount weighted" tables can be could be, in the right circumstances, used for other benefits like retirees' healthcare.[20] Headcount tables are used when retirees receive the same benefit, such as for post-retirement health care plans; in contrast, benefits-weighted tables are used for pension plans where retirees receive different amounts of benefits. Using the "benefits-weighted" version of a table creates lower mortality rates and yields higher Conversion Factors.

104.    The benefit calculation in my initial report used a benefit-weighted table, while Terry used a headcount-weighted table for his Generic Model and his Raytheon Model. Terry Report, ¶ 248 fn. 43. Terry does not explain his basis for ignoring the SOA's guidance on the appropriate uses of the benefits-weighted and headcount-weighted tables.

105.    Terry's use of a headcount-weighted table in his Raytheon Model is particularly

---

[20] Section 13.05 of the SOA's RP-2014 Mortality Tables Report from November 2014.

odd, because again it is the opposite of the choice that Raytheon made.  Raytheon used a "benefits weighted" version of the RP-2006 as its "best estimate" of its liabilities for *both* the Hourly Plan's pension benefits *and* the retiree healthcare provided by Raytheon's welfare plans.  In February 2015, Raytheon decided to use the "benefits" version of the RP-2006 to calculate the present values of the benefits it owed for both its "pension and other post-retirement benefit plans."[21]  Thus Raytheon's actuaries expressly declined to use the headcount-weighted table *even where it might have been preferred.*  Terry provides no explanation for disregarding this decision by Raytheon's actuary.

### *Gender Blend*

106.   I agree with Terry's statement that it is necessary to use a unisex version of a mortality table to calculate benefits because Plans are not permitted to use separate mortality tables for each gender.  Terry Report, ¶ 251.

107.   I further agree with Terry's opinion that a plan sponsor can use a mortality table with a male/female blend to match its participant population.  Terry Report, ¶ 139.  As I stated in my Initial Report, "[w]hile most standard unisex tables assume an even blend of male and female retirees, plans can use different gender blends that reflect their retiree population."  Initial Report, ¶ 64.  I assumed the Hourly Plan's retiree population was 50% male in my Initial Report because I was not provided "any data that would support a different gender mix."  Initial Report, ¶ 104.

### (i)    Gender Blend – Generic Model

108.   For his Generic Model, Terry relied upon "national workforce participation data" to conclude that the ratio of men to women in retirement plans ranges from 2/3-1/3 to 1/3-2/3. Terry also opined, based on the same generic data, that men are approximately 2.5 times more

---

[21] RTN-Cruz-00001636.

likely to take their benefit in the form of a JSA than women are.  Combing these generic statistics, Terry assumes that a "reasonable" gender mix would be somewhere between 50/50 and 80/20 male to female.  Terry Report, ¶¶ 233-235.  I disagree with this analysis for two reasons.

109.    First, I disagree that it is appropriate to use a gender blend other than 50/50 male to female based on "national workforce participation data."  It is ***certainly*** not appropriate to use such generic sources when actual plan data exists.

110.    Second, I disagree with Terry's conclusion that it is proper to base the gender blend based on an assumption about the gender mix of participants who are likely to select a particular benefit option.

111.    Terry bases his argument for using the gender mix of people who select a particular benefit type on what he calls "adverse selection."  Terry opines that a higher percentage of males choose a joint and survivor annuity, rather than a straight life annuity, because these male participants know that their wives will live longer than they do. Terry Report, ¶ 152.  Terry's presumption fails for many reasons.

112.    The Corporate Finance Institute defines adverse selection as an imbalance "when one party in a transaction possesses more accurate information compared to the other party. The other party, with less accurate information, is usually at a disadvantage since the party with more information stands to gain more from that transaction." https://corporatefinanceinstitute.com/resources/knowledge/other/adverse-selection/.  But Terry's suggestion that the participant has more accurate information is on seriously shaky ground.  While a participant may know something about her medical history and her spouse's medical history, the likelihood that they can ascertain which benefit form is more likely to generate a higher dollar value over the lifespan of the benefit in most circumstances is remote.  While Terry is wrong to suggest, as noted above, that actuaries

have difficulty determining how various actuarial factors interact, it is probably fair to say that lay people **would** have difficulty.

113.   Indeed, if Terry were correct and the participant had better data, the participant would readily be able to determine that the Plan's conversion factor penalized people who took a QJSA prior to some point in their mid-60s and adjust their selection accordingly, taking the SLA when that option provided the greater benefit, and taking the QJSA only when it was subsidized.

114.   The more obvious problem with Terry's adverse selection argument is that there are plenty of reasons why men might by more likely to select the QJSA than the SLA that have nothing to do with whether they believe their wives will outlive them.  For example, and most regrettably, women on average make less money than men do, which could affect selection decisions.

115.   Terry claims that plans are able to use a gender mix based on participants who select a QJSA because Section 26 C.F.R. § 1.401(a)-11(e) permits plans to  "take into account in any equitable manner consistent with generally accepted actuarial principles applied on a consistent basis any increased costs resulting from providing qualified joint and survivor annuity and early survivor annuity benefits." Terry Report, ¶ 135.[22]  But the 1988 addition of Section 1.401(a)-11(g) specifically recognized that this provision of the regulations was inconsistent with the Retirement Equity Act of 1984 and inapplicable to any plan year after 1984. It is important to remember that the QJSA is required by law to be the default option for married participants, and that the participant's spouse must sign a waiver if the participant selects a different benefit option.[23]  Terry

---

[22] Terry also quotes a 1974 conference committee report with language similar to the regulatory language that he relies upon. Terry Report, ¶ 151.

[23] A participant's spouse does not need to sign a waiver, however, if the participant selects another joint and survivor annuity under the plan that is actuarially equivalent to the QJSA.  26 C.F.R. § 1.401(a)-20 Q&A 16.

is arguing that Plans are allowed to penalize participants for taking the option that the law was specifically designed to promote.

116.    Terry also argues that his gender blend methodology is supported by "guidance" in the "Gray Book." Terry Report, ¶¶ 201-205. I would not use the term "guidance" to describe the Gray Book as Terry does. The Gray Book not a law or regulation, the IRS and Treasury stopped publishing responses to technical questions in the Gray Book in July of 2015 specifically because "the government is concerned over the reliance placed on the answers the IRS was providing in the Gray Book." Terry is quoting analysis that should not be relied upon even though he proclaims it is an important resource.   https://www.asppa.org/news-resources/browse-topics/irs-qa-compendium-actuaries-no-longer-produced.

117.    Terry recognizes that actuarial equivalence means that two benefit forms have the same present values under the ***same*** set of assumptions. Terry Report, ¶ 64. If a plan calculates the present value of a QJSA using the gender mix of persons of persons who select JSAs, and compares it to the present value of the SLA available at the same time using the gender mix of persons who select the SLA, the methodology would be faulty, because the plan would not be basing its present value calculation on the same actuarial assumptions. If, on the other hand, the Plan calculates the present value of the QJSA and SLA using the gender blend applicable only to those persons who take a QJSA, that gender blend assumption will not likely be reasonable with respect to the population that took the SLA. Indeed, the chance that the gender mix of retirees taking completely different options would be highly unlikely to say the least. Even Terry acknowledges that the actuarial assumptions must be reasonable. Terry Report, ¶ 64.

118.    Terry's argument fails to recognize that, however viable his argument might have been prior to 1984, it is incompatible with ERISA as amended by the REA. Using gender

weighting to lower the conversion factor for persons selecting the QJSA would impermissibly result in a scenario where the QJSA is *not* the most valuable option available at the same time. For example, assume that half the participants in a plan are male and half are female and a participant who retires at age 65 may choose an SLA, a 50% QJSA, or a 75% QOSA.  Assume that the gender blend of participants who select the QJSA is 75/25 male to female, the gender blend of participants who select the SLA is 50/50, and the gender blend of the participants who select the QOSA is 25/75.  If the Plan calculated the actuarial equivalence of the QJSA using a 75/25 male to female gender blend, the resulting benefit would be lower than it would be if the QJSA were calculated with the 50/50 gender blend of the plan as a whole and of those persons who took the SLA.  If the Plan, being consistent in calculating the gender blend on an option by option basis, calculated the actuarial equivalence of the QOSA using the 25/75 male to female gender blend applicable to participants who selected that option, the resulting benefit would be higher than it would have been if the QOSA were calculated using the gender blend of the plan as a whole (50/50), those persons who took an SLA (50/50), *and* those who selected the QJSA (75/25).  Accordingly, the QJSA would not be the most valuable benefit available at the same time.

### (ii)      Gender Blend – Raytheon Model

119.    The only place where Terry's Raytheon Model *actually* uses information from Raytheon itself relates to the gender blend assumption.  Rather than use the data Terry used to support his 50/50 – 80/20 range for his Generic Model, Terry relies on internal Raytheon data to provide information concerning the male to female ratio of recent retirees, as well as the male to female ratio of recent retirees who select a JSA.  I received this data for the first time in conjunction with the Terry Report, in the form of an Excel document with the valuation data for the Hourly

Plan's retired participants and beneficiaries between 2013 to 2019.[24]

120.    I disagree with the methodology Terry used to conclude that the retirees in the Hourly Plan's population are 58% male.  Terry Report, ¶ 251.  While the data shows the gender breakdown of all participants and beneficiaries receiving benefits from 2013 to 2019, Terry only used the data for those who retired "from 2011 and later"  -- that is, persons who retired between 2011 and 2019 – because this was "consistent with [his] analysis of current conditions…"  Terry Report at Appendix E, ¶ 4.  At least half the data on which Terry relies, therefore, did not exist prior to 2015 when Cruz retired.  Again, it is not proper to evaluate the reasonableness of conversion factors applied in 2015 by examining data that an actuary could not have possessed at that time. When looking at the valuations in 2013, 2014 and 2015, the percentage of retirees who are male is very close to 50%, consistent with percentage I used in my Original Report.

121.    Consistent with his approach with respect to the Generic Table, Terry uses Plan specific data with respect to the average gender blend of persons taking the QJSA to further skew the gender blend of his Raytheon Model toward male participants.  For the reasons set forth above, I do not believe that this methodology is consistent with ERISA's requirement that the QJSA be the most valuable benefit available at the same time.

### *Terry's Alternative Models*

122.    In addition to his Generic and Raytheon Models, Terry also describes some alternative calculations that he performed.  My comments on each follow.

123.    Terry first runs an alternative model using a blue-collar version of his preferred Mortality Table.  Terry Report, ¶ 263.  The Society of Actuaries has published "collar" versions of some of its tables to reflect that, employees working in different professions, broadly

---

[24] Hourly Data 2013 to 2019 _ Confidential.

characterized as "blue collar" and "white collar," have different mortality rates.  For example, the SOA has stated that a "collar" table is appropriate if a plan's "*experience is significantly different*" than the standard version of the RP-2006.[25]

124.    Terry correctly notes that "blue collar" workers such as those who are commonly paid hourly or in a labor union "[g]enerally…exhibit shorter life expectancies than the general population."  Terry Report at Appendix F, ¶ 2.  Terry's justifies testing the "blue collar" version of the table "based on [his] understanding of the demographics of participants…"  Terry Report, Appendix F, ¶ 3.  But generalizations are not always true.  Plans with participants in traditionally "white collar" jobs can have mortality rates consistent with blue collar occupations and vice versa.  Importantly, on the advice of its actuary, who is far more familiar with the demographics of the Hourly Plan's participants, Raytheon specifically chose *not* to use a "blue collar" version of the RP-2006 mortality table for its financial reports the year before Cruz retired – or in any year since.[26]  Raytheon stated in its 715 Report for the year before Cruz retired:

> In October 2014, the Society of Actuaries (SOA) released a new mortality table and improvement scale based on their most recent analysis. Raytheon reviewed the findings and compared recent mortality experience against the findings, and has updated the mortality assumption to be a modified version of the RP-2014 employee/retiree *no collar tables*…[27]  (Emphasis added)

125.    Thus, Terry once again ignores the contemporaneous work done by Raytheon's actuary, which is the best estimate of the proper table for the population in the Hourly Plan, when doing so supports his effort to justify a low conversion factor.

126.    Terry next tests his model using PBGC interest rates.  Terry Report, ¶ 264.  For the

---

[25] Section 4.1 of the SOA's RP-2014 Mortality Tables Report from November 2014.

[26] RTN-Cruz-00000386 (year ending Dec. 31, 2014); *see also* RTN-Cruz-00000488, RTN-Cruz-00000589, RTN-Cruz-00000687, RTN-Cruz-00000779, RTN-Cruz-00000873 and RTN-Cruz-00001652.

[27] RTN-Cruz-00000386

reasons discussed in paragraph 81 above, it is not reasonable to use PBGC rates for this purpose.

127.    Terry's next "alternative analysis is to substitute the mortality table used in my analysis (that is to say, the mortality table selected by Raytheon's actuaries for the ASC 715 Report prior to Cruz's BCD) rather than his "preferred" mortality table.  Terry Report, ¶ 265.  However, I disagree with this alternative analysis because he continues to use his skewed gender blend, his "average" age and his implausible 350 basis point interest rate range.

128.    Terry's final analysis, which he refers to as a "Cruz Only" alternative, assumes that Cruz is the only participant in the Hourly Plan.  Terry Report, ¶¶ 266-70.  I agree with Terry that this analysis is "not the best way" to evaluate actuarial equivalence; indeed, I would go further and say that it is not a proper way to do it.  First, Cruz is not the only member of the Hourly Plan, and thus using a 100% male gender blend for the mortality table is simply designed to improperly lower the conversion factor.  Additionally, Terry continues to use the PRI-2012 table that did not exist when Cruz retired, and the 350 bps interest rate range.  The result of the analysis is, accordingly, not useful.

### III.    Responses to Incidental Points Raised In Terry's Report

129.    *Subsidies:*  I agree with Terry's opinion that the Hourly Plan subsidizes the single life annuities for certain participants who start receiving their benefits before age 65.  Terry Report, ¶ 277.  However, this is irrelevant to whether Cruz's 50% JSA is actuarially equivalent to the SLA he was offered when he retired because the early retirement QJSA must be actuarially equivalent to the early retirement QJSA. After granting the early retirement subsidy for the SLA, the Conversion Factor for the QJSA subtracts too much from the SLA, rendering the QJSA less valuable than the SLA at early retirement. Mr. Cruz, by taking a QJSA, did not receive a benefit of the same value as he would have had he and his wife elected an SLA.

130.    Terry's request in paragraph 280 of his Report is not difficult.  I hereby state that in my experience and understanding of the Internal Revenue Code, best professional practices and the Actuarial Standards of Practice, there is no legal and supportable combination of reasonable current mortality table, current interest rate and gender mix, which will generate a Conversion Factor of .90 or lower for a participant retiring at age 55.

131.    I disagree with Terry's opinion that Actuarial Standards of Practice ("ASOP") # 27 and 35 (which I helped to write as a member of the Actuarial Standards Board Pension Committee) do not apply to the selection of assumptions used to determine the actuarial equivalence of optional benefits offered by a defined benefit plan. Terry asserts (¶ 308) that Sections 1.2 of ASOPs 27 and 35 relieve the actuary of responsibility for selecting actuarial equivalence assumptions.  To the contrary, section 1.2 of these ASOPs state only that "[m]easurements of pension obligations do not *generally* include *individual* benefit calculations, *individual* benefit statement estimates, or nondiscrimination testing."  (emphasis added).  To be clear, these ASOPs state only that they "generally" do not apply to "individual" benefit calculations. This is because the Standards allow the actuary to follow the directions in the Plan Document, a legal instrument, even if the actuary believes the actuarial assumptions are no longer reasonable.  In other words, an actuary is not supposed to create individualized assumptions for a single participant that are contrary to the plan terms depending on, for example, whether the participant has a healthy lifestyle. However, when the actuary is asked to assist in amending the Plan Document to select new actuarial assumptions that will be used to calculate Plan-wide benefits, these ASOPs absolutely must be followed. Accordingly, ASOPs 27 and 35 do not absolve the Plan actuary from faithfully using Standards of Practice to advise the Plan Administrator or legal counsel to reconsider the reasonable actuarial assumptions which, under ERISA, must be included in the Plan, and revised from time to time as

necessary. Such advice would apply to the entire Plan and inure to the benefit of *all* Plan participants. Since the Serota Report recommends a reconsideration of the *Plan* assumptions which apply to *all* Plan participants and beneficiaries, the ASOP 27 and 35 individual benefit calculation exceptions do not apply.

132.    Terry researched the actuarial assumptions used in some defined benefit plans for which Mitchell I. Serota & Associates, Inc. ("MIS&A") offers actuarial services.  He suggests that the published actuarial assumptions are inconsistent with the analysis made in my report. In all cases, these are very small plans and the preparation of retirement benefit calculations is rare. Small plans need not have their plans reviewed by attorney more often than once every seven years, to avoid the non-trivial expense for the plan sponsor to restate the Plan Document.  In particular, for the first plan, for the employees of MIS&A, nobody has yet retired from the Plan and the actuarial assumptions are moot. When the Plan is next amended, before anyone actually retires, the definition of actuarial equivalence will absolutely be updated. All participants in the second and third plans on his list are older than the Normal Retirement Age of the Plan and all participants have retired, so the actuarial assumptions are also moot.  Here as well, when the Plans are next amended, the definition of actuarial equivalence will be updated, but it will have no effect. The fourth plan is one where we only review the funding calculations of the third-party administrator who hires us for that sole purpose.  We have advised them that their actuarial assumptions are out-of-date and need to be changed.  It is up to them to effect that change.

I declare under penalty of perjury that the foregoing is true to the best of my knowledge, information and belief.

Executed 30th of June, 2020

/s/ *Mitchell I. Serota*
Mitchell I. Serota