## UNITED STATES DISTRICT COURT
## OF MASSACHUSETTS

| | |
|---|---|
| Johnny Cruz, on behalf of himself and all others similarly situated, | Civil Action No.:  1:19-cv-11425 |
| Plaintiff, | |
| vs. | |
| Raytheon Company, Kelly B. Lappin, in her capacity as Plan Administrator for the Raytheon Company Pension Plan for Hourly Employees,  the Raytheon Company Pension Plan for Salaried Employees, the Raytheon Non-Bargaining Retirement Plan, the Raytheon Bargaining Retirement Plan, and the Raytheon Retirement Plan for Engineers & Contractors, Inc. and Aircraft Credit Employees, and John/Jane Does 1-10. | |
| Defendants. | SEPTEMBER 4, 2020 |

# EXHIBIT 13

Page 1

1          IN THE UNITED STATES DISTRICT COURT
            FOR THE DISTRICT OF MASSACHUSETTS
2

   JOHNNY CRUZ, on behalf of          )
3  himself and others similarly       )
   situated,                          )
4                                     )
                   Plaintiff,         )
5                                     )
   vs.                                ) 1:19 cv 11425
6                                     )
   RAYTHEON COMPANY, et al.,          )
7                                     )
                   Defendants.        )
8

9                 The Deposition of THOMAS TERRY,
10  called by the Plaintiff for examination, pursuant to
11  Notice and pursuant to the Federal Rules of Civil
12  Procedure for the United States District Courts,
13  taken before Victoria D. Rocks, CSR, and Notary
14  Public in and for the County of Cook, State of
15  Illinois, commencing at 8:30 o'clock a.m., on the
16  7th day of August 2020, A.D.
17
18
19
20
21
22
23
24
25

```
                                      Page 2
 1    APPEARANCES:
 2
                IZARD KINDALL & RAABE, LLP
 3              MR. MARK KINDALL
                29 South Main Street
 4              Suite 305
                West Hartford, Connecticut  06107
 5              (860) 493-6292
                mkindall@ikrlaw.com
 6
                appeared on behalf of the Plaintiff;
 7
 8              COVINGTON & BURLING, LLP
                MR. CHRISTIAN J. PISTILLI
 9              850 Tenth Street, NW
                Washington, DC  20001
10              (202)  662-5342
                cpistilli@cov.com
11
                appeared on behalf of the Defendants
12              Raytheon Company and Kelly B. Lappin.
13
14              THE VIDEOGRAPHER: JUSTIN BOND
15
16
17
18
19
20
21
22
23
24
25
```

Page 3

1                    I-N-D-E-X

2

3    WITNESS:   THOMAS TERRY

4

     Direct Examination by MR. KINDALL:      5 - 165
5    Cross-Examination by MR. PISTILLI:     166 - 168
     Redirect Examination by MR. KINDALL:  168 - 169

6

7    EXHIBITS                              PAGE
8    Exhibit 1  Thomas Terry report           6
     Exhibit 2  deposition transcript of
9               Thomas Terry                 155
     Exhibit 3  deposition errata sheet      155

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

                                                                Page 4

1                (Witness sworn.)

2            THE VIDEOGRAPHER:  Good morning.  Today is

3     August 7, 2020.  We're on the record at 8:31 a.m. We

4     are taking a videotaped deposition of Thomas Terry

5     in case number 1:19 cv 11425 PPS.

6            MR. KINDALL:  Good morning, Mr. Terry.

7            THE WITNESS:  Good morning.

8            MR. KINDALL:  My name is Mark Kindall.  I

9     represent the plaintiff in the lawsuit.  Have you

10    ever been deposed before?

11           THE WITNESS:  Yes, I have.

12           MR. KINDALL:  So I know you are familiar with

13    the drill.  I am sure that Mr. Pistilli has

14    refreshed your memory, but let me walk through the

15    ground rules so we're clear.

16             This will be a recorded deposition, and the

17    court reporter will take a verbatim transcript.  So

18    it will be important that we not talk over each

19    other, and I will try to make sure that you have a

20    full opportunity to answer all of my questions

21    before I ask the next one.

22             Please try to wait until I have finished

23    asking a question before you jump in so that we

24    don't talk over each other.  Okay?

25           THE WITNESS:  Okay.

1     MR. KINDALL:  If you need to take a break at

2     any time, just let me know.  As usual, I would ask

3     that we not have a pending question before we take a

4     break.  Answer any question that is currently

5     outstanding.  All right?

6         THE WITNESS:  That makes sense.

7         MR. KINDALL:  If you don't understand a

8     question that I ask, feel free to tell me that it

9     doesn't make sense, and I will try to rephrase it.

10        If you don't hear my question for any reason,

11    whether it's a technical reason or because I speak

12    too low, let me know.  I will repeat it or ask the

13    court reporter to repeat it.

14        If I do ask a question and you answer, I will

15    assume that you heard the question and that you

16    understood it.  Does that make sense?

17        THE WITNESS:  Yes.

18             THOMAS TERRY,

19    called as a witness herein, having been first duly

20    sworn, was examined upon oral interrogatories and

21    testified as follows:

22             DIRECT EXAMINATION

23             BY MR. KINDALL:

24    Q.   With that out of the way, is there any

25    reason why you can't give true and accurate

```
                                           Page 6
 1    testimony today?
 2         A.   No.
 3         MR. KINDALL:  Let me mark the Terry report
 4    first.
 5         MR. PISTILLI:  As you know, Mr. Terry has with
 6    him printed clean, unmarked copies of the three
 7    reports that have been submitted in this matter.
 8         MR. KINDALL:  Okay.  Let's get a copy marked
 9    anyway so that we got it on the record.  Is it in
10    the folder?  Let's see how this wonderful system
11    works here.  On the Exhibit Share, we should have a
12    copy of the document.
13    BY MR. KINDALL:
14         Q.   I would like you to take a look at that
15    document and see whether or not you recognize it?
16         A.   I do.
17         Q.   And what is this document?
18         A.   This is my declaration offered in this
19    case.
20         Q.   Is this a complete statement of all
21    opinions that you have been retained to provide in
22    this case?
23         A.   Yes, it is.
24         Q.   Did you write this report?
25         A.   Yes, I did.
```

Page 7

1      Q.   Did anyone assist you in writing it?

2      A.   I had editorial review of the report.

3      Q.   Who did the editorial review?

4      A.   My colleague and counsel at Covington

5   performed review.

6      Q.   Who is your colleague?

7      A.   Elena Black.

8      Q.   Is Elena Black also an actuary?

9      A.   Yes.

10     Q.   Let me ask you to turn to paragraph 19 of

11  your report.  Now, in paragraph 19, you write, "In

12  preparing this report I rely on my own professional

13  experience, professional actuary practice, industry

14  knowledge gained at professional conferences,

15  studies and published reports, and my considerable

16  experience with pension plans and mortality tables."

17            Do you see that?

18     A.   Yes.

19     Q.   Will you identify in your report each of

20  the published studies and reports that you relied

21  on?

22     A.   Well, part of my professional experience

23  and industry knowledge comes from published reports,

24  in addition to those that I specifically mentioned

25  in the materials considered here.

1        Q.   Are there published reports that you

2    relied on that you have not cited?

3        A.   Well, as an actuary -- we as actuaries are

4    scientists, if you will, but we practice in

5    practical industry based areas.

6             And there's a substantial amount of

7    literature generated, be they articles, practice

8    standards, a host of other things that to me as an

9    actuary are part of my professional experience and

10   part of my industry experience.

11            So my professional experience is

12   certainly informed by a whole breadth of materials

13   outside of those that I specifically mention here.

14       Q.   So the answer to the question I just asked

15   you is yes, correct?

16       A.   By the way, there's an enormous amount of

17   static coming across.  I'm not sure whether if it's

18   just me or you.

19            This is not responsive to your question,

20   but it's a little bit of a distraction.

21       MR. PISTILLI:  I hear it as well.

22       MR. KINDALL:  It might be on my end.

23       THE WITNESS:  Mr. Kindall, your voice is kind

24   of getting more and more garbled as time went on.

25       MR. PISTILLI:  I don't hear it when Tom is

Page 9

```
1    talking.  I do hear it when you are speaking.
2         THE VIDEOGRAPHER:  Mark may have to reconnect.
3    Do we want to go off the record?  We'll go off the
4    record at 8:39.
5                   (Recess)
6         THE VIDEOGRAPHER:  Back on the record 8:44.
7                   (Question read)
8    BY MR. KINDALL:
9         Q.   So can you respond to that question,
10   please, Mr. Terry?
11        A.   Yes.  In paragraph 19, I indicate that I
12   do rely on published studies and reports in addition
13   to my professional experience.  So my answer is yes,
14   consistent with paragraph 19.
15        Q.   And you also mention in paragraph 19
16   actuarial standards of practice.  Do you see that?
17        A.   Yes.
18        Q.   Do you cite the actual standards of
19   practice that you rely upon in your report?
20        A.   I cite practice standards that I rely on
21   in my report, and I rely also on the entire body of
22   practice standards as a credentialed qualified
23   actuary practicing in the United States.
24        Q.   If there was a particular standard that
25   you thought was relevant to an opinion that you were
```

Page 10

```
1     giving in this report you would have cited it,

2     correct?

3         A.   Paragraph 19.  In response to that

4     question, paragraph 19 indicates that I am a

5     professional.  We are a learned profession and as

6     such there's a whole body of context for my opinions

7     as an expert.

8                And I identified specific standards from

9     which I may have quoted, but that does not in any

10    way mean that my work or my opinions did not reflect

11    the full body of practice standards promulgated by

12    the ASB, the Actuarial Standards Board.

13        Q.   Let me ask you to look at paragraph six

14    of your report.  Paragraph six, "I and my firm

15    provided actuarial evaluation and consulting

16    services to numerous pension plans officers,

17    including some of the most complete pension plans in

18    the United States."

19               Do you see that?

20        A.   Yes.

21        Q.   Have you ever advised plans about which

22    conversion factors they should adopt or use for

23    joint and survivor annuities?

24        A.   Yes.

25        Q.   Can you tell me which plans you have given
```

Page 11

1    that advice on?

2         A.    The work that I did in this area began in

3    the early 1980s, Mr. Kindall.  And I had a number of

4    clients with whom I worked closely during that

5    period of time.

6              And I likely advised or worked with most

7    or all of them on the matter you suggest.  I don't

8    have any specific recollection of a specific client

9    discussion which would have happened almost 40 years

10   ago.

11        Q.   Do you recall in what period of time year

12   wise if you can was the last time you gave advice to

13   a client concerning which conversion factors they

14   should use for joint and survivor annuities?

15        A.    Well, in my role as a consulting actuary,

16   I really don't tell clients or plan sponsors what

17   they should use.

18              I provide insight and collaborative

19   guidance as the plan sponsor makes their choice.  So

20   I don't necessarily advise or recommend specific

21   factors.

22        Q.   So do you recall the last time that you

23   provided professional services to a client in

24   relation to their selection of actuarial conversion

25   factors for joint and survivor annuities?

```
                                                Page 12
 1        A.    Yes.
 2        Q.    When was that?
 3        A.    Earlier this year in 2020.
 4        Q.    Do you remember the name of that client?
 5        A.    You know, the nature of that assignment
 6    was confidential, and I was engaged on a
 7    confidential basis.
 8              So I would prefer not to disclose as I
 9    would with anybody.  I would prefer not to disclose
10    the name of the client.
11        Q.    We may come back to that.  In the course
12    of that engagement, do you recall whether you
13    discussed the possibility of using tabular factors?
14        A.    I recall.
15        Q.    And did you recommend the use of tabular
16    factors?
17        A.    No.
18        Q.    Do you recall whether you have ever
19    recommended the use of tabular factors for a
20    conversion factor to a joint and survivor annuity to
21    a client?
22        A.    I do recall.
23        Q.    And do you recall when that was?
24        A.    I believe that it was in the 1980s.
25        Q.    You were the head of the Terry Group,
```

```
                                               Page 13
 1    correct?
 2         A.    Yes.
 3         Q.    How many employees does the Terry Group
 4    have?
 5         A.    Approximately 20.
 6         Q.    Of those approximate 20, how many are
 7    enrolled actuaries?
 8         A.    Perhaps eight.
 9         Q.    Are you the named enrolled actuary for any
10    pension plan currently?
11         A.    No, I'm not.
12         Q.    Do you know whether anyone of the Terry
13    Group is the enrolled actuary for a pension plan?
14         A.    I don't believe so.
15         Q.    Are you familiar with the schedule SB
16    that is attached to the form 5500 that is filed for
17    some pension plans?
18         A.    Yes, I am.
19         Q.    And do you recall whether you have ever
20    signed a form SB?
21         A.    Yes, I have.
22         Q.    Do you recall when the last time was that
23    you had signed a schedule SB?
24         A.    I don't recall specifically.
25         Q.    Do you recall when the last time anyone in
```

Page 14

1    the Terry Group signed a schedule SB as an enrolled

2    actuary?

3         A.   I believe -- I don't have a specific

4    knowledge, but I believe one of my actuaries signed

5    schedule Bs, perhaps several of them as recently as

6    2014 or 2015.

7         Q.   You're not an attorney, are you?

8         A.   No, I'm not.

9         Q.   Do you have any legal training?

10        A.   I have no legal training as an attorney.

11        Q.   Do you consider yourself an expert in

12   ARISA law?

13        A.   I am familiar with ARISA law to the extent

14   that it's relevant to the work of an enrolled

15   actuary.

16        Q.   To the extent that there are statements in

17   your report which has been marked as Exhibit 1 that

18   opine upon ARISA requires or does not require, you

19   would agree with me, wouldn't you, that ultimately

20   it's the judge in this case that decides what ARISA

21   requires or doesn't require?

22        A.   Yes, I would with this additional caveat,

23   which is that the work of the actuary is sometimes

24   informed by the law or regulations.

25                So familiarity on some working level as

                                        Page 15

1      an actuary is oftentimes needed in order to conduct

2      the work of the actuary.

3            Q.   Sure.  Let me ask you to look at

4      paragraph 63 of your report.  In paragraph 63, you

5      state that "Actuarially equivalent benefits are

6      benefits that are equal in value to one another

7      under a given set of actuarial assumptions."

8                 Do you see that?

9            A.   Yes.

10           Q.   Let me ask you a couple of questions about

11     that.  What's the source of that definition?

12           A.   Well, as I see from paragraph 63, I am not

13     quoting a particular source.  This is a general

14     understanding that actuaries and others have about

15     the meaning of actuarial equivalent.

16           Q.   So when you say equal in value in

17     paragraph 63, do you mean that the present values of

18     the two benefits that are being compared are the

19     same?

20           A.   That's what that means.

21           Q.   When you say a given set of assumptions,

22     do you mean that you have to compare the two sets of

23     benefits that are being compared using the same

24     actuarial assumptions?

25           A.   This is the technical mathematical meaning

```
                                              Page 16
 1    of that term, yes.
 2         Q.   So if you are using, for example, a
 3    particular mortality table to -- strike.
 4              So in calculating present value of each
 5    benefit, you look to particular actuarial
 6    assumptions, correct?
 7         A.   Generally, yes.
 8         Q.   And is a mortality assumption one of the
 9    assumptions that would be included in that?
10         A.   It may be, yes.
11         Q.   So if you use a particular mortality
12    assumption in calculating the present value of one
13    of the two benefits that you are comparing, you
14    would have to use the same mortality assumption with
15    respect to the other group, right?
16         A.   Well, not necessarily.
17         Q.   Tell me why not.
18         A.   Well, I can think of a situation where a
19    single life annuity benefit might be valued using
20    one mortality table and a joint and survivor annuity
21    might be valued using that same mortality table for
22    the participant, but a different mortality table for
23    the contingent annuitant or the survivor.
24         Q.   Let me walk through the assumptions and
25    see which ones you would agree would have to be the
```

```
 1    same in order to do your actuarial equivalence
 2    analysis.
 3              So let's talk about in the first
 4    instance the base mortality table with respect to
 5    the participant.  Let's say that we're comparing a
 6    single life annuity to a joint and survivor annuity,
 7    just to be clear.  Do you have that straight?
 8              We're trying to see whether a single
 9    life annuity is the actuarial equivalent to a joint
10    survivor annuity, okay?
11         A.   Yes.
12         Q.   So would you need an assumption with
13    respect to the participant's mortality?
14         A.   Yes.
15         Q.   Would that assumption that you used for
16    the single life annuity have to be the same as the
17    assumption for the participant mortality that you
18    would use to calculate the present value of the
19    joint and survivor annuity?
20         A.   Yes.
21         Q.   Would you also use a mortality improvement
22    scale with respect to the mortality for the
23    participant?
24         A.   I might or I might not.
25         Q.   Under what circumstances might you not?
```

Page 18

1      A.   Well, I might not if the context of the

2  calculation didn't call for it.

3      Q.   If you used a mortality improvement scale

4  to calculate the present value of the single life or

5  the participant, would you have to use the same

6  mortality improvement scale to calculate the joint

7  and survivor annuity for the participant?

8      A.   It would make sense to do so.

9      Q.   Is there any circumstance that you can

10  think of where it would not make sense to do so?

11      A.   Not off the top of my head.

12      Q.   Would you need to make an assumption with

13  respect to gender?

14      A.   I don't understand the question.

15      Q.   Let me rephrase.  So you're calculating

16  the present value of the single life annuity.

17           Does it matter what the gender of the

18  participant is?

19      A.   Well, it would be helpful to understand or

20  know the gender of the participant if I were to use

21  a gender distinct mortality assumption.

22      Q.   Can you explain that?

23      A.   Mortality tables are often developed

24  separately for males and females in large part

25  because as a group, males and females tend to

Page 19

1   display different mortality attributes.

2              And so if the context of the calculation

3   of the present value called for recognizing that

4   gender distinction, then that might steer me towards

5   using a particular mortality table.

6       Q.   So let's say that you are calculating

7   actuarial equivalence for purposes of determining

8   the calculation of a joint and survivor.

9              Would you need to take into account,

10  would you need to have a factor in that equation

11  that concerned the gender of the participant?

12      A.   Could you repeat the question, please.

13           (Question read.)

14      MR. KINDALL:  I will ask the court reporter to

15  repeat it.

16      THE WITNESS:  We shifted the conversation now

17  to the development of a conversion factor.  And the

18  reason I am struggling with your question,

19  Mr. Kindall, is that there are many ways to

20  construct a conversion factor.

21        And I could construct a conversion factor

22  without regard to a mortality assumption or without

23  regard to a gender assumption.  So my answer is --

24  well, I forgot exactly what your question was, but

25  that is what causes me to pause with respect to your

```
                                                    Page 20

 1   question.  You have shifted gears now on me.

 2           I'd have to hear the question again because

 3   I think it was a yes or no question.

 4   BY MR. KINDALL:

 5       Q.   All right.  Let me shift gears on you

 6   again.

 7               So let's just go back to this notion of

 8   trying to figure out whether your definition of

 9   actuarial equivalence that you have in paragraph 63,

10   the actuarial factors that you look at that have to

11   be the same because your definition is equal in

12   value to one another under a given set of actuarial

13   assumptions, right?  So I'm trying to figure out

14   what the given set of actuarial assumptions is.

15   That is the background of my question.

16               The question is is one of those

17   assumptions or factors the gender of the

18   participant?

19       A.   Well, there are several factors or

20   ingredients that go into the development of a

21   factor, a conversion factor.  And the development of

22   a factor in the application of the factor are in my

23   experience two different things.

24               Now, I have to go back to your question

25   again.  Could you please repeat it, sorry.
```

1       Q.   Okay.   In determining whether two benefits

2    are equal in value to one another under a given set

3    of actuarial assumptions, is one of the factors that

4    you need to look at the gender of the participant?

5       A.   Well, not necessarily.

6       Q.   You indicated that one of the factors that

7    you would need to look at would be the mortality

8    rate for the participant, correct?

9       A.   Well, the mortality rate would be, I

10   believe, relevant to calculating a present value.

11           Now that we have shifted gears to

12   conversion factors, I think -- either I'm not

13   tracking with your line of questions or you're

14   referring back to something I said a little while

15   ago.  And I think that we're talking about two very

16   different things.

17      Q.   Let me see if I could break it down a

18   little bit more.  So let's say we are calculating

19   the present value of a single life annuity.

20           And I think you agreed earlier that in

21   order to do that, one of the things that you would

22   need to look at is mortality of the participant.

23   Correct?

24      A.   Correct.

25      Q.   And is mortality of the participant

Page 22

1   affected by the gender of the participant?

2        A.   Yes, it is.

3        Q.   So you would either have to choose a

4   gender specific mortality table or and that would

5   be -- strike that.

6             So one of the ways that you could

7   calculate the present value of a single life annuity

8   would be to use a mortality table that was based on

9   the gender of the particular participant that you

10  are looking at, right?

11       A.   Yes.

12       Q.   Another way that that could be done would

13  be to make an assumption about a typical participant

14  with respect to gender and do a blend of the

15  mortality table that reflected that assumption.

16  Would that be fact?

17       A.   Is that fair?

18       Q.   Sorry.  Is that another way to do the same

19  thing?

20       A.   Well, you get a different answer, but it

21  is another form of a present value calculation.

22       Q.   Correct.  So now let me shift the

23  actuarial equivalence issue.

24             If you are trying to determine actuarial

25  equivalence by comparing two present values, and you

Page 23

1   have used a gender specific mortality table to

2   calculate the present value of the single life,

3   would you need to use the same gender specific

4   mortality table with respect to the participant in

5   calculating the joint and survivor annuity?

6       A.   Wow, that is a complicated question,

7   Mr. Kindall.  You asked that in the context of a

8   conversion factor?

9            I think I have responded to the question

10  already about the comparison of present values and

11  the participant's mortality.  By layering in the

12  concept of a conversion factor, you've kind of

13  thrown the question in a different direction because

14  there are many ways to calculate a conversion

15  factor.

16      Q.   I'm not necessarily talking about

17  conversion factors right now, Mr. Terry.  I am

18  simply referring back to your definition of

19  actuarial equivalence.

20           You say benefits are equal in value to

21  one another under a given set of actuarial

22  assumptions.  And I believe you testified, did you

23  not, that that means that they have to be the same

24  set of actuarial assumptions, right?

25      A.   Yes, I did testify to that.  And I agree.

1      Q.   So what I'm trying to do is say all right.

2   So I'm looking at two present value calculations,

3   right?

4              I am looking at a present value

5   calculation first for the single life annuity.  I am

6   saying what factors, actuarial factors do you need

7   to have to calculate the present value of a single

8   life annuity.  Then I am going to compare that and

9   say do you need to use the same factors to calculate

10  the present value of the joint and survivor annuity

11  in order to fulfill your definition in paragraph 63

12  of actuarial equivalence.

13             Do you see the construct that I'm

14  working with here?

15     A.   Yes.

16     Q.   So again, if you have calculated the

17  present value of a single life annuity using a

18  gender specific mortality table, in order to meet

19  your definition of actuarial equivalence in

20  paragraph 63 when you calculate the present value of

21  a joint and survivor annuity, do you need to use the

22  same gender specific mortality table?

23     A.   I think it would make sense to do so.

24     Q.   Is there any circumstance that you can

25  think of where it would not make sense to do so?

```
                                               Page 25
 1        A.    Not off to top of my head.
 2        Q.    Okay.  Is one of the factors that you
 3   would need to take into account in calculating the
 4   present value of the single life annuity the age of
 5   the participant?
 6        A.    Well, I don't understand your question.
 7        Q.    Okay.
 8        A.    It's not a complete question.  I didn't
 9   understand it.
10        Q.    If you are calculating the present value
11   of a single life annuity, is the age of the
12   participant who is going to be receiving that
13   annuity a relevant consideration?
14        A.    Typically, yes.
15        Q.    Why is that?
16        A.    Well, because a present value based on
17   traditional interest in mortality assumptions would
18   vary by age.
19        Q.    Why would it vary by age?
20        A.    Well, it would vary by age because
21   mortality itself, the underlying mortality a proxy
22   for which is the mortality table tends to vary by
23   age.
24        Q.    Isn't it true that the goal in creating a
25   present value calculation is in part to determine
```

Page 26

1    the likelihood that each future benefit payment will

2    be made, right?

3         A.   Well, I would not say that.

4         Q.   Somebody retires at age 55, are they

5    likely to receive more -- I'm sorry, and they take a

6    single life annuity, are they likely to receive more

7    months of payments on average than someone who

8    retires at age 65?

9         A.   Everything else being equal, I would say

10   yes.

11        Q.   And that would increase the present value

12   of the annuity, would it not?

13        A.   If what you're referring to is a lifetime

14   annuity commencing from age 55 versus age 65, yes.

15   Everything else being equal.

16        Q.   Everything else being equal.  Just as

17   everything else being equal, a woman retiring at age

18   65 is likely to receive more months of benefit than

19   a man retiring at age 65, correct?

20        A.   Given the well observed differential in

21   mortality and life expectancy between males and

22   females, that's correct.

23        Q.   So if you use a participant's age in your

24   calculation of the present value of a single life

25   annuity, in order to meet your paragraph 63

1    definition of actuarial equivalence, you would have

2    to use the same age in your calculation of the joint

3    and survivor annuity, would you not?

4         A.   Yes.

5         Q.   Now, with respect to the calculation of

6    the joint and survivor annuity you would have an

7    additional set of factors, annuity factors that are

8    not present in the calculation of a present value

9    for a single life annuity, right?

10        A.   Well, it's an awkwardly worded question.

11        Q.   Let me rephrase.  When you are calculating

12   a joint and survivor annuity, you also have to make

13   assumptions with respect to the mortality of the

14   beneficiary, isn't that right?

15        A.   Yes.

16        Q.   And those assumptions would involve a

17   mortality table, correct?

18        A.   Yes.

19        Q.   And it might involve a mortality

20   improvement scale, right?

21        A.   It depends completely on the purpose of

22   the calculation.

23        Q.   But it might, right?

24        A.   It might, yes.

25        Q.   Would it be important to make an

```
                                            Page 28
 1   assumption with respect to that beneficiary's

 2   gender?

 3        A.   Well, because mortality tables tend to be

 4   gender distinct, yes, it would help to make an

 5   assumption about the contingent annuitant's gender.

 6        Q.   And how about the age of the contingent

 7   annuitant?

 8        A.   What about it?

 9        Q.   Would you need to make an assumption about

10   the age of the contingent annuitant or use the age

11   of the contingent annuitant in the calculation?

12        A.   Depending upon the purpose of the

13   calculation, yes, I would want to make an assumption

14   about the age of the contingent annuitant.

15        Q.   Can you calculate the present value of a

16   joint and survivor annuity without making an

17   assumption about the age of the contingent

18   annuitant?

19        A.   I'm sorry, could you try that one more

20   time.

21        Q.   Sure.  Can you calculate the present value

22   of a joint and survivor annuity without making an

23   assumption about the age of the contingent annuitant

24   or, in the alternative, using the age of the

25   contingent annuitant in the calculation?
```

```
 1        A.    I could, but I think it's an important
 2   factor.
 3        Q.    How could you do it?
 4        A.    Well, I suppose I could apply an
 5   adjustment factor to the mortality of the
 6   participant that reflected the joint life expectancy
 7   of the combined participant contingent annuitant.
 8        Q.    But that itself would be an assumption
 9   about the age of the contingent annuitant, wouldn't
10   it?
11        A.    Well, if done properly I suppose it would.
12   It would have in some fashion an expectation of the
13   joint life.
14        Q.    In other words, if you assume that --
15        A.    Mr. Kindall, your sound is going bad
16   again.
17        MR. KINDALL:  Off the record a second.
18        THE VIDEOGRAPHER:  Off the record at 9:26.
19        MR. KINDALL:  Back on record.
20        THE VIDEOGRAPHER:  Back on the record at 9:29.
21        MR. PISTILLI:  Mark, for the record, I want to
22   note that on the record that I was having an audio
23   issue for some portion of the prior questioning.
24           I thought that I had put a number of form and
25   other objections on the record that were not put on
```

                                                        Page 30

1   the record because my microphone was somehow muted.

2   And I just want to make it clear on the record.

3        MR. KINDALL:   Okay.   Could I ask for a repeat

4   on the last question.

5             (Question read.)

6   BY MR. KINDALL:

7        Q.   So, for example, if you assumed that the

8   contingent annuitant was three years younger than

9   the participant, you would be able to make a

10   calculation that said well, if the participant is

11   age 55, the contingent annuitant is age 52, right?

12       A.   Correct.

13       Q.   The last question on this trange.   When

14   you're calculating a single life annuity, do you

15   need to make an assumption about a discount or an

16   interest rate?

17       A.   Well, as with any actuarial calculation,

18   the purpose of the calculation is important to

19   understand.

20             But with that caveat, I would say

21   generally yes, an interest discount is typically a

22   component of the present value calculation.

23       Q.   And for purposes of your definition of

24   actuarial equivalence in paragraph 63, if you

25   calculated a single life annuity present value using

Page 31

1   a particular discount rate, you would need to use

2   the same discount rate in your calculation of the

3   present value of the joint and survivor annuity,

4   right?

5        A.   It would make sense to do so.

6        Q.   As you sit here today, can you think of

7   any circumstance in which it would not make sense to

8   do so?

9        A.   Not off the top of my head.

10       Q.   Are benefits actuarially equivalent so

11  long as they are equal in value using the same

12  actuarial assumptions regardless of what those

13  assumptions might be?

14       A.   You know, as a general matter, yes.  But I

15  want to withhold an absolute answer to that because

16  there may be circumstances under which actuarial

17  equivalence could be defined differently.

18       Q.   So if you were determining whether two

19  benefits were actuarially equivalent today in the

20  sense that you have defined that in paragraph 63,

21  would it be appropriate to use mortality assumptions

22  from the 1860s and an interest rate assumption based

23  on prevailing mortgage rates in 1980?

24       MR. PISTILLI:  Objection, vague and compound.

25       THE WITNESS:  I need to break that apart.

```
 1    Could you read that back, please.
 2              (Question read)
 3         THE WITNESS:  Well, was the question about is
 4    it appropriate?
 5    BY MR. KINDALL:
 6         Q.   Yes.
 7         A.   Well, actuarial equivalence is agnostic
 8    with respect to -- I think I get what you're getting
 9    at with this question, Mr. Kindall.
10              It's an interesting question.  Would I
11    use those assumptions is a different question, but
12    that calculation could be done.
13         Q.   You are familiar with the fact that ARISA
14    requires actuarial equivalence in determining a
15    joint and survivor annuity, right?
16         A.   You know, generally I understand that
17    there are actuarial equivalence requirements in
18    ARISA, yes.
19         Q.   And I believe you testified earlier that
20    you have provided advice to clients concerning the
21    factors that they could use in their plans with
22    respect to converting single life annuities to joint
23    and survivor annuities, right?
24         MR. PISTILLI:  Objection, misstates prior
25    testimony.
```

```
                                              Page 33
 1    BY MR. KINDALL:
 2         Q.   Is that correct?
 3         A.   I believe I generally said something like
 4    that or I generally agreed to something like that.
 5         Q.   So you are familiar with the concept of
 6    actuarial equivalence with respect to calculating
 7    joint and survivor annuities under ARISA, right?
 8         A.   Yes.
 9         Q.   Is it your understanding that actuarial
10    equivalence for purposes of calculating joint and
11    survivor annuities is agnostic with respect to which
12    actuarial assumptions are used?
13         A.   Could you repeat the question, please.
14              (Question read)
15         A.   I don't understand the question.  There's
16    a lot in there, I'm sorry.  There's a lot in there.
17         Q.   Do you need to use reasonable actuarial
18    assumptions in order to calculate actuarial
19    equivalence for purposes of ARISA's joint and
20    survivor annuity requirement?
21         A.   What's important in calculating ARISA, in
22    my view, what's important is the conversion factor
23    be reasonable.
24         Q.   In order to determine whether the
25    conversion factor -- strike.
```

Page 34

```
 1              Let me ask you to look at paragraph 66
 2   of your report.  In paragraph 66, you write
 3   actuarial equivalence benefits may not have equal
 4   present values under different sets of actuarial
 5   assumptions.
 6              In other words, if actuary number one
 7   selects one set of reasonable assumptions to perform
 8   an actuarial equivalence calculation and actuary
 9   number two selects a different set of reasonable
10   assumptions, the actuaries would have used the same
11   mathematical process, but will not necessarily
12   compute the exact actuarial benefit.
13              Do you see that?
14       A.   Yes.
15       Q.   So your report there indicates that you
16   could get two different answers using reasonable
17   actuarial assumptions -- strike.
18              Your report indicates that you could get
19   a different answer from two actuaries, both of whom
20   are using reasonable actuarial assumptions, but not
21   the same actuarial assumptions, right?
22       A.   Correct.
23       Q.   But is it your testimony that the
24   actuaries are required to use reasonable assumptions
25   or can they use any assumptions they want?
```

Page 35

1          MR. PISTILLI:  Objection, vague.

2          THE WITNESS:  Did you make reference to a

3     requirement in that question?  Could you repeat the

4     question.

5               (Question read).

6          THE WITNESS:  Well, I'm not sure what

7     requirement you're referring to, Mr. Kindall.

8     BY MR. KINDALL:

9          Q.   So let me go back to the beginning of

10    paragraph 66.  You say, "In assessing actuarially

11    equivalent benefits it is important to keep in mind

12    that actuarial equivalent benefits are ones that are

13    equal to one another under a given set of actuarial

14    assumptions."  Right?

15         A.   Yes.

16         Q.   And is it your testimony that so long as

17    you use the same assumptions, it doesn't matter what

18    those assumptions are?

19         A.   I don't understand your question.  Are you

20    saying -- I don't understand your question.

21         Q.   In paragraph 66, you use the phrase

22    reasonable assumptions.  Right?

23         A.   Yes.

24         Q.   What's the purpose of that modifier if

25    actuaries aren't required to use reasonable

Page 36

1    assumptions?

2         A.   You just asked a different question from

3    the one I asked you to kind of modify, is that

4    right?

5         Q.   Yes.

6         A.   Okay.  Thank you.  So this is a brand new

7    question.  What's the purpose of using the word

8    reasonable in the modifier here?

9         Q.   Yes.

10        A.   As a modifier.  Well, I guess that is

11   supportive of the fact that the results of an

12   actuarial calculation, that there's a range of

13   reasonable results of any actuarial calculation and

14   that different reasonable inputs or ingredients or

15   assumptions to the extent that they could differ

16   themselves can lead to different results and yield

17   reasonable results.

18              That is the premise upon which I

19   conclude that reasonable falls into the range for

20   actuarial calculations.

21        Q.   Why does reasonableness matter if

22   actuarial equivalence is agnostic as to the inputs,

23   the assumptions that are input into the equation?

24        A.   Well, this sentence is not written to

25   preclude unreasonable inputs also yielding a

Page 37

1   reasonable result.

2       Q.   How would you know whether a result was
3   reasonable without looking at the reasonableness of
4   the inputs?

5       A.   Well, I think in that question you put
6   your finger on the essence of performing an
7   evaluation or an assessment about reasonableness.

8            And in my view, you would go about
9   assessing the reasonableness of the results of the
10  calculation by starting with looking at an array of
11  reasonable inputs.

12      Q.   Let me ask you to look at paragraph 85 of
13  your report.  In paragraph 85 you write "Because
14  mortality is included in both the numerator and the
15  denominator of the conversion factor calculation,
16  changes in mortality tend to have only a munitive
17  impact on conversion factor, and improvements in
18  mortality do not themselves imply any change to the
19  conversion factor."

20           Do you see that?

21      A.   Yes, I do.

22      Q.   So let me give you a hypothetical
23  scenario.  Let's assume a plan has a 50/50 male to
24  female gender mix for both retirees and
25  beneficiaries.

                                                        Page 38

1              Let's assume a constant in their

2    interest rate.  Will improvements in mortality cause

3    the conversion factor from a single life annuity to

4    a joint and survivor annuity to increase or

5    decrease?

6         MR. PISTILLI:  Objection, vague.

7         THE WITNESS:  Well, there's a presumption about

8    the nature of the conversion factor.  Conversion

9    factors are plan provisions, whether those plan

10   provisions are tabular factors or whether the plan

11   provisions specify an underlying interest in

12   mortality basis and changes in conversion factors

13   that are fixed either because they're tabular or

14   that they point to interest rate, an underlying

15   interest assumption and underlying mortality

16   assumption, those factors change by plan amendment,

17   not by external environmental changes.

18        Q.   So let me ask you this.  Let's assume for

19   the sake of argument that over time a conversion

20   factor no longer produces a benefit that is

21   actuarially equivalent.

22              Is the plan required to make an

23   amendment?

24        MR. PISTILLI:  Objection, outside the scope and

25   calls for a legal conclusion.

Page 39

1          THE WITNESS:  The requirement of plan amendment

2     is beyond the scope of my actuarial expertise.

3     BY MR. KINDALL:

4          Q.   Okay.  Well, I'm trying to stay within the

5     scope of your expertise.

6               In paragraph 85, you say that

7     improvements in mortality do not themselves imply

8     any change to the conversion factor.  When I asked

9     you a question about that, you said that the

10    conversion factor only changes by plan.

11              So what I'm trying to do is figure out

12    in the context of what you wrote in paragraph 85, if

13    you can imply a change to the conversion factor that

14    results from an improvement in mortality, if you

15    hold interest rates constant and if the plan uses a

16    50/50 gender blend for both participants and

17    beneficiaries.  That is my hypothetical.

18         A.   Well, I think part of your hypothetical is

19    that we suspend this question about amending the

20    plan and that we're talking in some generic sense

21    about conversion factors.  Is that right?

22         Q.   Yes.  I think if I am not mistaken you

23    were attempting to make a point in paragraph 85

24    about conversion factors being stable over time.

25    Right?

                                                    Page 40

1        A.    It's a series of paragraphs that commence

2    around paragraph 85.  Paragraph 85 is one of the

3    paragraphs in a series of paragraphs.

4        Q.    And those paragraphs are exploring this

5    idea of stability in conversion factors, right?

6        A.    That's correct.

7        Q.    And that is independent of whether or not

8    conversion factors have to be modified by plan or

9    not, right?

10       A.    That's right.

11       Q.    So within that context here let's look at

12   my hypothetical.

13       A.    Okay.

14       Q.    You've got a plan that uses a 50/50 or

15   gender blend for both males and females.  And if you

16   hold the interest rate constant and there are

17   mortality improvements over time, should the

18   conversion factor increase or decrease?

19       A.    Well, this paragraph -- you're trying to

20   relate that to the sentence that you just read.

21            But this sentence is a different

22   sentence from the question you've just asked, but

23   I'll answer your question.  The question is is that

24   everything else being equal, the factor would

25   probably increase factor?

Page 41

```
 1        Q.   Since the mid 1970s, do you know whether
 2   mortality has improved more for men or for women?
 3        A.   Yes.
 4        Q.   What's the answer?
 5        A.   Mortality has tended to improve more for
 6   men, I believe.
 7        Q.   So if a plan has more male retirees and
 8   more female beneficiaries, assuming that interest
 9   rates are held constant, would you expect the
10   conversion factors would generally increase since
11   the mid 1970s?
12        A.   I didn't understand the premise of the
13   question.  You premised it on some mix of people.
14             I'm trying to connect that to the
15   question because it sounded like the same question
16   you asked previously.
17        Q.   A little bit different.  Let me assume
18   that you've got a plan now that has an 80/20 male to
19   female gender mix for participants, and the opposite
20   for beneficiaries.
21             Again, assuming interest rates are held
22   constant from the mid-'70s to the present, would you
23   expect based on improvements in mortality since the
24   mid 1970s that the conversion factor would increase
25   or decrease?
```

Page 42

```
 1       A.    I don't see any distinction between this
 2   question and your previous question.  And I think my
 3   answer would be the same, probably increase,
 4   although my caveat that you pointed me to so
 5   helpfully suggests it would be a muted impact.
 6       Q.    Compared to the 50/50 gender blend, if you
 7   had an 80/20 gender blend in my hypothetical
 8   wouldn't the increase in the conversion factor tend
 9   to be greater?
10       A.    Well, you know, where my thinking goes in
11   response to that very good question is that there
12   are mortality tables that I would think of as
13   reference mortality tables that may skew the answer
14   in unexpected directions.
15             But setting that aside and answering
16   your hypothetical in a theoretical way I would say
17   yes.  But again, the result would be muted.
18       Q.    What do you mean by muted in that context?
19       A.    Well, as is documented in my report and as
20   Mr. Serota refers to in his report, conversion
21   factors can be thought of as ratios.
22             A ratio represents something we
23   mathematicians refers to as an enumerator and a
24   denominator of a fraction.  And the analogy would be
25   that when you change an ingredient in the numerator
```

Page 43

1    of a fraction and have a similar change to the

2    denominator of the fraction, while the numerator

3    could change and the denominator could change, the

4    fraction itself or the ratio either doesn't change

5    at all or it changes in a very minimal way.

6              And so the example that you have given

7    of improving mortality is relevant there because

8    improving mortality in this analogous construct of a

9    ratio of two amounts, improving mortality would

10   increase both the numerator and the denominator of

11   the fraction, which is why it's oftentimes difficult

12   to jump to a conclusion about why changing any one

13   ingredient either has an effect or has any kind of

14   significant effect.

15        Q.   In your description there you use

16   numerator and denominator.  Is the numerator in your

17   description the participant?

18        A.   Well, no.

19        Q.   So what are the numerators and

20   denominators in the description you just gave?

21        A.   I could refer to my report and go into

22   this and point you to where I talk about this in my

23   report, but forgive me if I don't repeat exactly

24   what's in my written testimony.

25              But a conversion factor and the dynamics

Page 44

1  of the change of it can be thought of as a ratio of

2  two present value calculations.  And a present value

3  calculation is not the same thing as a participant,

4  which is why I answered no to your question.

5      Q.   Let me ask you to look at paragraph 86 of

6  your report and in particular your figure four

7  table, which is on page 85.

8           Do you see that?

9      A.   Yes.

10     Q.   So among the tables that you list there

11 are the 71, the UP 84 and the UP 94, right?

12     A.   Correct.

13     Q.   Do you know when the UP 84 was published?

14     A.   You know, off the top of my head, I

15 couldn't tell you the answer to that, although I may

16 have that documented in the appendix to this report.

17           If you like, I could turn to the

18 appendix and refresh my memory if it's there.

19     Q.   I don't think that is necessary.  Do you

20 recall if you used head count weighted versions of

21 the 71, UP 84 or the UP 94?

22     A.   I believe those tables were benefit

23 weighted tables.

24     Q.   With respect to those three tables, did

25 you use a blue collar version?

```
                                            Page 45
```

 1       A.   I don't believe a blue collar version was
 2   available in any of those tables.
 3       Q.   How about a white collar version?
 4       A.   I don't believe a white collar version was
 5   available either.
 6       Q.   All else being equal, does a head count
 7   waiting tend to produce a higher or lower conversion
 8   factor compared to no weighting at all?
 9       A.   Well, I want to think about it.  You said
10   something -- could you repeat the question, please.
11       Q.   Sure.  Let me do it.  All else being
12   equal, does a head count weighted game tend to
13   produce a higher or lower conversion factor tend to
14   produce a higher compared to no weighting at all?
15       A.   I don't understand the question.  What do
16   you mean by no weighting at all?
17       Q.   Let me try a different question.  All else
18   being equal does a head count weighting tend to
19   produce a higher or lower conversion factor compared
20   to benefit weighting?
21       A.   I would have to sit down and look at
22   exactly what the weightings are, but you're asking
23   me to go through some mental gymnastics in order to
24   somehow answer that question.
25            And it has to do with the fact that

Page 46

```
 1    larger benefit amounts tend to be associated with
 2    higher socioeconomic individuals in an experience
 3    pool who tend to have better mortality.  And
 4    relative to the average participant in a pension
 5    plan using benefit weighted mortality could tend to
 6    understate the mortality of the population of the
 7    pension plan as a whole.
 8              Given that mortality would be
 9    understated, that understatement might, everything
10    else being equal, push the factor higher.
11        Q.  All else being equal, does the use of a
12    blue collar table tend to increase or decrease joint
13    and survivor annuity conversion factors?
14        A.  I know that in my analysis, Mr. Kindall,
15    that I explored the potential impact of using a blue
16    collar mortality table.
17              And I believe it altered my reasonable
18    range slightly, and I believe that all else being
19    equal it would have shifted the range downward.
20    But it's in my report, and we could refer to that if
21    you like.
22        Q.  One of the charts that you list is the
23    RP 2000, and this is again figure 4 on page 25 of
24    your report.
25              You used a blue collar version of this
```

Page 47

1    table in your chart, right?

2         A.   I'd be happy to refer to the appendix

3    where I put a little bit more granular detail.  I

4    would rather do that if you have a specific question

5    about it.

6         Q.   Can you point me where in your appendix

7    this information would be?

8         A.   I believe it's going to be appendix B on

9    page seven of the appendix in paragraph 12.  It does

10   indicate that I used a version of the RP 2000 tables

11   that represented mortality rates for hourly or

12   unionized pension plan participants.

13        Q.   Is that a blue collar table?

14        A.   I don't know if the label was blue collar.

15   I don't recall whether the label is specifically

16   blue collar, but I think you and I are speaking the

17   same language when you use that term.  I will stick

18   with unionized for now.

19        Q.   Do you recall whether you used a head

20   count weighted table for the RP 2000?  I don't see a

21   reference in paragraph 12.

22        A.   No, I don't either.  I believe that

23   RP 2000 may have been the first introduction of head

24   count weighted tables into the family of mortality

25   tables, generated by the Society of Actuaries for

Page 48

1    pension applications.

2               It may have been the first time that

3    head count weighted tables were specifically

4    developed, in which case my inclination would always

5    be to go to a head count weighted table.  So if that

6    is where the introduction was, yes, I used a head

7    count weighted table there.

8         Q.   And then you indicate that you used a blue

9    collar and head count weighted table with respect to

10   the RP 2014, the PRI table, right?

11        A.   Yes.

12        Q.   Going back to figure 4 on page 25, do you

13   have an opinion as to whether your chart would show

14   increasing or decreasing conversion factors if you

15   held interest rates constant?

16        A.   By the way, your sound is starting to get

17   crinkled again.  It's okay for the time being.

18               That premise of interest rates being

19   kept constant over the last 40 or 50 years, of

20   course, is an unrealistic premise.  And that said,

21   while I didn't test it I think it would be fair to

22   say that everything else being equal in accepting

23   that unrealistic premise, the range or the factors

24   would rise over that period of time.

25        Q.   Interest rates can go up or down, right?

Page 49

1        A.   Your sound is worsening.

2        MR. KINDALL:  Let's go off the record.  Take a

3   ten minute break.

4        THE VIDEOGRAPHER:  Off the record at 10:10.

5             (Recess)

6        THE VIDEOGRAPHER:  We're back on the record at

7   10:21.

8        MR. KINDALL:  I'm missing a piece of paper.

9   Let me go off the record a moment.

10       THE VIDEOGRAPHER:  Off the record at 10:21.

11            (Off record)

12       THE VIDEOGRAPHER:  Back on the record at 10:22.

13  BY MR. KINDALL:

14       Q.   So you would agree with me, Mr. Terry,

15  wouldn't you, that interest rates over time both go

16  up and go down?

17       A.   I would agree with that.

18       Q.   And in any given time you don't really

19  know whether they're going to go one way or the

20  other, right?

21       A.   That's right.

22       Q.   So if interest rates had gone up in the

23  decades shown in your chart rather than going down,

24  would the conversion factors that are also shown in

25  your chart be stable or not stable?

```
                                              Page 50
 1        A.   You're referring to the range of rates in

 2   that far right column in figure four?

 3        Q.   Yes.

 4        A.   If interest rates had gone up rather than

 5   down, the ranges would have gone up.

 6        Q.   I will turn your attention to paragraph

 7   102 of your report.

 8             In paragraph 102 you write plan

 9   participants frequently request estimates of their

10   benefits before they retire.  In using acceptable

11   fixed standards allows a plan to more accurately

12   model participant benefit options years in advance

13   of their retirement.

14             Do you see that?

15        A.   Yes.

16        Q.   So if you are ten years out from

17   retirement, do you know what your normal retirement

18   benefit is going to be?

19        MR. PISTILLI:  Objection, vague.

20        THE WITNESS:  If I am ten years out, do I know

21   what my normal retirement benefit is going to be?

22             Well, I could see a situation where I

23   would, and I could see other situations where I

24   wouldn't.

25
```

Page 51

1    BY MR. KINDALL:

2         Q.    What are the situations where you would

3    know?

4         A.    Well, if I were retiring ten years out

5    from normal retirement and I requested a calculation

6    of my normal retirement pension, presumably all of

7    the ingredients to that calculation would be known,

8    and I would know my normal retirement benefit.  Was

9    your question -- I'm sorry, I want to make sure.

10        Q.    My question was poorly phrased.  I think I

11   can fix it.

12              So let's assume that you are planning on

13   retiring in ten years.  Do you know what your

14   retirement, what your normal form of benefit is

15   going to be when you retire in ten years?

16        A.    If the plan doesn't change I would know,

17   yes.

18        Q.    So let's say that we're dealing with an

19   old school defined benefit plan where your normal

20   form of benefit is based off of some percentage of

21   your top three years of earnings.

22              Are you familiar with plans like that?

23        A.    I'm very confused by your premise,

24   Mr. Kindall.  The normal form of benefit refers to

25   the type of annuity and now you're confusing

```
                                        Page 52
 1    attributes of a benefit formula.  So I'm not
 2    tracking with you.
 3         Q.   Let's put aside my prior questions.  Let's
 4    focus on starting from here.
 5              Are you familiar with a type of defined
 6    benefit plan that bases your benefits at retirement
 7    on some percentage of your top three or five years
 8    of salary?
 9         A.   Yes.
10         Q.   If you were ten years away from
11    retirement, do you know what your top three or five
12    years of salary are going to be?
13         A.   No.
14         Q.   So if you are ten years out from
15    retirement in that kind of a plan, do you know what
16    your monthly benefit will be under the plan's normal
17    form of benefit at the time of your retirement in
18    ten years?
19         A.   Not precisely.
20         Q.   Now, there's another type of standard
21    defined benefit plan that is called a cash balance
22    plan.
23              Are you familiar with those?
24         A.   Yes.
25         Q.   And in a cash balance plan you have some
```

Page 53

1    sort of an notional account that increases,

2    hopefully increases in value over the course of your

3    employment based on contributions, but also

4    appreciation of assets.  Right?

5         A.    No.

6         Q.    How would you define a cash balance

7    defined benefit plan?

8         A.    Well, a cash balance plan typically does

9    provide for a notional account balance that grows by

10   virtue of credits that are awarded to the

11   participants, if you will, by the terms of the plan.

12              And the notional account balance would

13   grow not by investment returns as you suggested, but

14   rather by some notional prescribed crediting factor.

15        Q.    So it's a little like a stable value

16   account, right?

17        A.    No.

18        Q.    No, okay.  All right.  So the amount that

19   gets credited to the account annually, is that

20   amount known in advance?

21        A.    If it's prescribed by the plan, yes.

22        Q.    Go ahead.

23        A.    The nature of defined benefit plans is to

24   attempt to define what the benefit is.  That is in

25   sharp contrast to a defined contribution plan whose

Page 54

1    benefit values grow by virtue of an investment
2    account growth.
3         Q.   So in a cash balance account with a
4    defined benefit plan, the investment risk is borne
5    by the plan and not by the participant, right?
6         A.   That's right.
7         Q.   So if you were in a cash benefit or cash
8    balance type defined benefit plan you are ten years
9    out from retirement, do you know how much money is
10   going to be in your cash balance account after
11   retirement?
12        A.   Well, you're using terminology that is
13   typically reserved for defined benefit plans where
14   there is money in an account.
15             If by your question you are referring to
16   the notional account, and you're referring to the
17   size of the notional account, then I can answer your
18   question, but I need the question again.  I am
19   confused by your confusion between defined benefit
20   and defined contribution plans.
21        Q.   So you have a cash balance plan.  Do you
22   know the rate at which the account will appreciate?
23        A.   You have some sense as to what it will
24   appreciate at, yes.
25        Q.   So if you are ten years out from

Page 55

1    retirement and you're defined benefit plan is a cash

2    balance type plan, do you know how much you will get

3    when you retire if you take a single life annuity?

4         A.   You will be able to estimate it, but you

5    will likely not be able to know that precisely.

6         Q.   Now, let's talk about if a plan adopts a

7    fixed conversion factor of some sort, the plan can

8    amend that at a later date, right?

9         A.   Yes.

10        Q.   There is no restriction on that, right?

11        A.   That's my understanding as an actuary.

12   You asked a question.  Then you asked a follow-up

13   question.

14             Maybe you need to repeat the follow-up

15   question, please.

16        Q.   Okay.  So if you are ten years out from

17   retirement, you don't know whether or not the plan,

18   the conversion factor that is in the plan will still

19   be the same conversion factor when you retire, do

20   you?

21        A.   I'm still hung up on the follow-up

22   question from before.  I'm sorry.  I want to make

23   sure.

24        Q.   Focus on this question, if you would.  If

25   you are ten years away from retirement and the plan

Page 56

1   has a conversion factor in it, you don't know that

2   the same conversion factor will be in it in ten

3   years, do you?

4        A.   Well, defined benefit plans are intended

5   to be permanent plans.  And that said, my

6   understanding is that plan sponsors have the right

7   to amend plans at any time.

8              So I think the answer to your question

9   is there is no certainty with respect to whether or

10  not a plan amendment might occur between now and ten

11  years from now.

12       Q.   If a plan uses a conversion factor that

13  ceases to be actuarially equivalent, doesn't it have

14  to amend the plan?

15       MR. PISTILLI:  Objection, calls for a legal

16  conclusion.  Outside the scope.

17       THE WITNESS:  The requirement of when and how a

18  plan should be amended in the context in which you

19  asked is a legal question.

20  BY MR. KINDALL:

21       Q.   Let me ask you to take a look at paragraph

22  105 of your report.

23              You write in my experience both

24  approaches -- and you are referring to tabular

25  factor or interest rate and mortality approaches --

Page 57

```
 1   are widely used by plans that adopt an acceptable
 2   fixed standard.
 3              Do you see that?
 4        A.   Yes.
 5        Q.   Now, what do you mean by the tabular
 6   factor approach?
 7        A.   Well, I may define it more precisely here
 8   in my report.  But off the top of my head, and
 9   forgive me if I don't use the precise same words,
10   but the tabular factor approach means to me a fixed
11   factor that would define actuarial equivalence for
12   purposes of converting one benefit form to another
13   where the factor itself, whether it's a single
14   factor or a series of factors would be hard coated,
15   if you will, into the plan document.
16        Q.   So you gave two options there.  You said a
17   single factor or a series of factors, right?
18        A.   Yes.
19        Q.   So you can construct them both ways,
20   correct?
21        A.   Yes.
22        Q.   And would one of the ways that you could
23   construct a tabular factor for joint and survivor
24   annuities use a different factor for each age of the
25   participant?
```

Page 58

```
 1        A.    You're asking if it's possible to define a
 2   factor, a fixed tabular factor that varies by age,
 3   is that right?
 4        Q.    Yes.  Have you seen that done?
 5        A.    I have.
 6        Q.    Have you cited any plans in your report
 7   other than obviously the Raytheon plan that we're
 8   talking about here that have adopted a single factor
 9   for converting single life annuities to joint and
10   survivor annuities?
11        A.    Have I identified such plans in my report?
12        Q.    Yes.
13        A.    I don't believe I have.
14        Q.    Have you cited any literature in your
15   report that states that the use of a single factor
16   for converting single life annuities to joint and
17   survivor annuities is common?
18        A.    Have I cited sources in my report?  If you
19   are referring to the materials considered, I am
20   scanning.
21              In my mind I don't think there is
22   anything there.  However, going back to the first
23   paragraph that you directed me towards, Mr. Kindall,
24   I, of course, base my expert opinions upon all kinds
25   of reports and materials that I have gathered and
```

```
                                            Page 59
 1    I'm aware of over the course of my professional

 2    career.

 3         Q.   Let me direct your attention to paragraph

 4    120, where you write plans that select the tabular

 5    factor approach will typically consider assumptions

 6    for participant mortality, beneficiary mortality,

 7    gender mix, retirement age and the interest rate

 8    when setting the plan's tabular factors.

 9              Do you see that?

10         A.   Yes.

11         Q.   Have you cited any plans in your report

12    that have considered these elements when selecting a

13    tabular factor?

14         A.   That was not my goal in the report, and I

15    have not done so.

16         Q.   Have you cited any literature in your

17    report that supports this statement?

18         A.   I'm scanning, and I don't believe I have

19    specifically.

20         Q.   How about any studies?

21         A.   The question being?

22         Q.   Have you cited any studies in your report

23    that support the statement that I read from

24    paragraph 120?

25         A.   Now, this is in my experience.
```

```
                                              Page 60
 1        Q.    So you haven't cited any studies that you
 2   can think of?
 3        A.    I have not.
 4        Q.    Did you cite any evidence that Raytheon
 5   considered these elements when selecting the tabular
 6   factor used in the plan?
 7        A.    No.
 8        Q.    Has Raytheon provided you with any
 9   information or data that suggests they considered
10   these factors when selecting the conversion factor
11   in the plan?
12        A.    My understanding is that this factor was
13   established some years ago, and I'm not aware of any
14   documentation of the basis upon which the factor was
15   originally developed.
16        Q.    Let me direct your attention to
17   paragraph 123, where you write plans that select the
18   tabular factor approach often selected a single
19   factor for all ages based on the age at which an
20   average or typical participant retires or is
21   expected to retire.
22              Do you see that?
23        A.    Yes.
24        Q.    Have you cited any plans in your report
25   that select a singular tabular factor for all ages
```

```
                                            Page 61
 1    based on when an average or typical participant

 2    retires or is expected to retire?

 3         A.   I have not cited any other plans in my

 4    report.

 5         Q.   Have you cited any literature in your

 6    report that supports the statement I just read in

 7    paragraph 123?

 8         A.   No.  That statement is based on my own

 9    personal experience.

10         Q.   Have you cited any studies in your report

11    that support the statement that I read from

12    paragraph 123?

13         A.   I have not specifically cited any reports

14    that provide a formula for how a tabular factor has

15    been calculated by any particular company.

16         Q.   You don't have any reason to believe that

17    Raytheon took this into account in setting its

18    tabular factor, do you?

19         A.   The relevance of that to my report -- that

20    is irrelevant to my report.

21              My report documents my assessment about

22    the reasonableness of the factor, and the

23    ingredients in how it was calculated or how it might

24    have been calculated some years ago are not relevant

25    to my assessment about its reasonableness.
```

```
                                              Page 62
```

1          MR. KINDALL:  Could I ask the reporter to read

2     my last question.

3               (Question read)

4     BY MR. KINDALL:

5          Q.   Do you cite any evidence in your report

6     that Raytheon considered these elements from what I

7     read from paragraph 123, when it set its conversion

8     factor for joint and survivor rates?

9          A.   I have no indication, nor have I seen any

10    about exactly how they calculated their factor when

11    they originally put it in the plan.

12         Q.   Let's take a look at paragraph 39.  In

13    paragraph 39, you write pension plans routinely and

14    permissibly pool participants across ages.

15               Do you see that?

16         A.   Yes.

17         Q.   When you say permissibly, is that an

18    opinion as to what's legal under ARISA?

19         A.   That is an understanding that I have as an

20    actuary that pooling across ages is not just a

21    actuarially valid approach, but it's a compliant

22    approach in a general sense without identifying a

23    specific code section or regulation, but the pooling

24    across ages is a standard and acceptable approach.

25         Q.   Have you cited any examples in your report

Page 63

1    of plans that have pooled participants across ages

2    other than the Raytheon plan at issue here?

3         A.   My report was not a survey of practices by

4    other companies.  My report was focused on one plan

5    in particular and that is the Raytheon hourly plan.

6    So my report is focused on that plan.

7         Q.   Let me ask the question again.  Have you

8    cited any examples in your report of plans that have

9    pooled participants across ages?

10        A.   I have cited the Raytheon hourly plan.

11        Q.   Do you know that the Raytheon hourly plan

12   is based on a pooling across all ages?

13        A.   I note, and I observe that the point 90

14   factor applies equally to all participants who

15   choose to elect the 50 percent joint and survivor

16   option regardless of their age.

17        Q.   Who chooses?

18        A.   The effect of that being that all

19   participants regardless of the age at which they

20   retire or elect are effectively pooled.

21        Q.   But you don't know whether Raytheon took

22   pooling into account when it set that conversion

23   factor, do you?

24        A.   By definition, they had to.

25        Q.   Do you know what the average retirement

Page 64

1    age was when Raytheon set this factor?

2         A.   I do not.

3         Q.   Other than the Raytheon plan, have you

4    cited any example in your report of other plans that

5    have pooled participants across all ages?

6         A.   The purpose of my report was not to report

7    on other employers.  The purpose of my report was to

8    focus solely on the Raytheon hourly plan and as

9    such, I have cited no other companies or plans that

10   pool across ages.

11        Q.   Have you cited any literature or studies

12   in your report that support the idea that plans

13   often pool across ages in setting conversion factors

14   for joint and survivor plans?

15        A.   The support for my comment is not

16   extracted from any formal report, but rather is

17   based on my own experience as well as informal

18   surveying across publicly available information

19   where such factors are common.

20        Q.   Let me ask you to look at paragraph 136 of

21   your report.  You cite a quotation from a

22   Representative Perkins from the Congressional record

23   on February 25, 1974.  Do you see that?

24        A.   Yes.

25        Q.   When is the first time you ran across this

Page 65

1    quotation?

2         A.   Well, I may have run across it back in the

3    early '80s.  I may have run across it at the time

4    ARISA was passed.  I don't recall.

5              I did extensive study at the time that

6    ARISA was passed and extensive reading.  And I was

7    kind of at the forefront of early ARISA research for

8    the firm I was with at the time.

9              That said, my colleagues stumbled across

10   this quote much more recently in the context of

11   scanning for evidence of Congressional intent with

12   respect to pooling across average participants.

13        Q.   Did you review other elements of the

14   legislative history of ARISA in the course of

15   preparing this report?

16        A.   I don't know that I have cited any others.

17   I'm not sure.  One has to do some reading in order

18   to be able to arrive at this, and I have read other

19   extracts, if you will, having to do with

20   Congressional intent.

21        Q.   Are you familiar with the Retirement

22   Equity Act of 1984?

23        A.   I am generally familiar.

24        Q.   In the course of preparing your report in

25   this matter, did you review any legislative history

```
                                            Page 66

 1    for the Retirement Equity Act of 1984?

 2         A.   I don't believe so.

 3         Q.   Let me ask you to look at paragraph 144 of

 4    your report.  In paragraph 144 you write, "Likewise,

 5    pension plans are required under ARISA to specify a,

 6    quote, normal retirement age for the plan typically

 7    age 65.

 8              Plan sponsors therefore might reasonably

 9    use the quote, unquote normal retirement age under

10    the plan for purposes of developing or evaluating

11    conversion factors, even though the use of the

12    plan's normal retirement age will result in a

13    comparatively smaller benefit for those who elect to

14    retire early."

15              Do you see that quote?

16         A.   I do.

17         Q.   So if the average age for retirement for

18    plan participants in a particular plan, let's say

19    it's 62, and the plan's stated normal age is 65,

20    isn't it true that using mortality rates for a 65

21    year old will create a conversion factor to a joint

22    and survivor annuity would not be reflective of plan

23    relevant experience in the aggregate?

24         A.   Not necessarily.

25         Q.   Why?
```

Page 67

1      A.   Well, because it would really depend on

2   the materiality of any difference.  And it may well

3   be that there's no material difference.

4      Q.   If there were a material difference would

5   you agree that the use of the age 65 for the basis

6   of the conversion factor would not be reflective of

7   plan relevant experience in the aggregate?

8      A.   If there were a material difference, I

9   think that would be an important consideration as to

10  whether a plan sponsor might reasonably choose to

11  focus its conversion factor on the normal retirement

12  age.

13     Q.   In the circumstance that I described where

14  you have a plan that has an average retirement age

15  of 62, but a nominal normal retirement age under the

16  plan of 65, wouldn't the plan save money by using

17  the normal retirement age as the basis for its

18  conversion factor?

19     A.   As an actuary, I don't like to generalize

20  about what does or does not save a plan money.

21          I am reminded in particular of a phrase

22  in Mr. Serota's original declaration where he made

23  reference to saving money in a situation where, in

24  fact, Mr. Cruz's retirement, for example, resulted

25  in what I would consider to be an actuarial loss to

```
                                        Page 68
 1    the plan.  So saving money and losing money is a
 2    complex proposition.
 3         Q.   Okay.  Let's do it a different way.  Would
 4    you agree that if you based your joint and survivor
 5    annuity factor on the average age of plan retirees,
 6    that that would be cost neutral for the plan
 7    relative to using conversion factors for each age
 8    that were tailored to that age?
 9         MR. PISTILLI:  Object to form.
10         THE WITNESS:  Could you repeat the question,
11    please.
12    BY MR. KINDALL:
13         Q.   Sure.  So you agreed earlier that it would
14    be possible to use a tabular factor that was age
15    specific, right?
16         A.   Yes, I believe that is possible.
17         Q.   So you would have one factor for age 55
18    and another for age 56 and another for age 65.  You
19    could do that?
20         A.   Yes.
21         Q.   And if you did it that way and if the
22    actuarial conversion factors produced equivalence at
23    each age, that would cost the plan a certain amount
24    of money, right?
25              Presumably it would be the same as if
```

Page 69

```
 1    everybody selected the single life annuity.  That
 2    would be the goal, right?
 3         MR. PISTILLI:  Object to form.
 4         THE WITNESS:  It's hard to follow what you're
 5    saying there.  I'm sorry, Mr. Kindall.
 6         MR. KINDALL:  All right.  It was a poor
 7    question.  Let me break it up.
 8    BY MR. KINDALL:
 9         Q.   Let's say that you offer a single life
10    annuity at all ages, okay, and you have a tabular
11    factor that is specified by age for your joint and
12    survivor annuity, okay.
13              Are we good so far?
14         A.   A tabular factor that is specified by age.
15         Q.   To convert to a joint and survivor
16    annuity, right?
17         A.   Okay.
18         Q.   Now, let's say that the plan has done its
19    homework and creates a tabular factor at each age
20    that produces an actuarially equivalent benefit for
21    people who retire at that age.  Good so far?
22         A.   Where the input into the factors is age
23    specific?
24         Q.   Correct.
25         A.   Okay.
```

1        Q.   Now, let's compare that to a plan that has

2   a single life annuity at all ages and uses a single

3   tabular factor that is based on the average age of

4   all of the plan's participant retirees.

5        MR. PISTILLI:  Sorry to interrupt.  You may

6   want to do your microphone switching trick as we're

7   starting to get the crinkles.

8        MR. KINDALL:  How about now?

9        MR. PISTILLI:  Seems like it worked.

10       MR. KINDALL:  All right.  We're on to

11  something.

12  BY MR. KINDALL:

13       Q.   So let's say that you are comparing your

14  system to a plan that rather than having a tabular

15  factor that is calculated for each age, calculates a

16  tabular factor, a singular tabular factor that is

17  based on the average age of all plan participants,

18  assuming that the plan has done its homework just as

19  well as the other plan.

20            So the plan is creating a tabular factor

21  that is on average producing actuarial equivalence.

22  The cost of the plan as between those two options

23  shouldn't be exactly the same, right?

24       A.   Well, if I've got a participant group

25  whose average age is 45, it's hard for me to do an

 1    actuarial valuation on the spot with respect to your

 2    scenario.

 3              Your scenario doesn't make sense to me.

 4    You referred to the average age of the participants.

 5    I'm guessing a population average age might be 45.

 6       Q.   Okay.  So how about you use the same --

 7    strike that.

 8              Let's go back to my comparison.  This

 9    one has a tabular factor that is age specific.  In

10    doing that analysis, they use a particular set of

11    mortality assumptions.  Now you're comparing it to a

12    plan that is going to use an average, and they use

13    an average age of retirees in the plan, people who

14    have retired.

15              At what age do they retire.  So not all

16    participants in the plan, not even all of the

17    retirees in the plan, but what is the average age of

18    people at retirement.  So that is our comparator.

19    We have one plan that uses an age specific tabular

20    factor, and we have got another plan that is based

21    on the average age of people who retire in that

22    plan.

23              Assuming that the factors that in each

24    case they have created a factor that is actuarially

25    equivalent, should the choice between those two

1    options be cost neutral for the plan?

2        A.   I guess I don't like your premise just

3    yet.  I'm trying to see if I want to repair your

4    premise so I could give you an answer or whether I

5    should just allow you to sort of bumble along the

6    road here.

7        Q.   What's wrong with the premise?

8        A.   Well, what I am really interested in is

9    when you say the cost of the plan, you know, the

10   ultimate cost of the plan is going to be a function

11   of who lives, who dies and all the rest of it and

12   that could only be known years from now.

13              You might be referring to what the

14   actuary might measure as a cost from an accounting

15   or funding basis or some other comparative basis.

16   So maybe what I need to do is sort of jump over that

17   hurdle and suggest that given a whole bunch of

18   caveats, I think I understand your question.  You're

19   trying to paint a picture of an apple equals an

20   apple, and I guess with a whole bunch of caveats I

21   would agree with you.

22       Q.   Let's say instead of doing that, instead

23   of basing it on an average of the age of plan

24   participants at retirement, the plan decides it's

25   going to base it on the age of, the typical age of

```
                                        Page 73
```

1    plan participants at retirement plus two years.

2              Would doing that relative to basing it

3    on the average age of plan participants tend to save

4    the plan money?

5         A.   Well, I would say it differently.  I would

6    say that everything else being equal, you're talking

7    about -- if what you're driving at is if the plan

8    were to increase its factor, its conversion factor,

9    would increasing the conversion factor result in

10   higher benefits and, therefore, be more costly to

11   the plan.

12             Then that set of facts is yes.  What I

13   don't know, though, is whether there's any material

14   difference between a factor based on an average age

15   of X versus a factor based on an average age of X

16   plus two.

17             The reason I say that is because there

18   is not a great deal of difference spanning across

19   ages.  And if you are going to move the needle by

20   two years, it may be barely noticeable.

21        Q.   Is there a reason why, if you know, the

22   plan's relevant experience in the aggregate that you

23   wouldn't use that relevant experience, but would

24   rather use something else to set your conversion

25   factor?

Page 74

1      A.   Well, as an actuary, I would orient
2    towards the average age, if that's what you're
3    asking me.
4      Q.   Let's take a look at paragraph 145 of your
5    report, switching gears a little bit here.  In
6    paragraph 145, you write adverse selection refers to
7    the observed phenomenon that when members of a
8    population or a subpopulation are offered a choice,
9    they will tend to choose the alternative that will
10   favor their circumstances.
11            Do you see that?
12     A.   Yes.
13     Q.   I am speaking in hypotheticals.  Let's
14   assume two plan participants retire on the same
15   date.  One is male, one is female.
16            They have each married a spouse of the
17   opposite gender.  Both couples are average age and
18   have no reason to believe that they will live any
19   longer or shorter than the average person of their
20   age and gender.
21            They're retirees, and the beneficiaries
22   are all age 56.  The plan uses a unisex table that
23   is blended 50/50 to male female to both retirees and
24   beneficiaries in calculating actuarial equivalence
25   of the single life annuity and the joint and

Page 75

```
 1    survivor annuity available to both couples at the
 2    time that they retire.
 3              So let's say that each of these couples
 4    comes to you as an actuary, and they say look, I
 5    want to know which of these options is likely to
 6    yield me the most benefits in the aggregate.
 7              Is the answer the same for the male
 8    participant and the female participant or is it
 9    different?
10       MR. PISTILLI:  Object to the form.
11       THE WITNESS:  Who is asking the question and
12    coming to me as an actuary?  You put a lot into that
13    hypothetical.
14    BY MR. KINDALL:
15       Q.   The planned participant.
16       A.   But there's two plan participants.
17       Q.   Let's say the first one comes to you, and
18    it's the plan participant who is male.
19              He says should I take the SLA or should
20    I take the JSA.  And the only thing I want to know
21    is which one is going to be worth the most to me in
22    terms of actual dollars received based on what you
23    know.
24              I could die of a heart attack tomorrow,
25    but assuming that all we know is that I and my
```

1   spouse are of average health, and you have no reason

2   to believe that we're going to live longer or

3   shorter than the average person in the United

4   States.  Should I take the SLA or should I take the

5   JSA?

6          MR. PISTILLI:  Object to form, vague.

7          THE WITNESS:  You know, I will tell you the

8   question you ask is outside the scope of my

9   expertise and certainly outside the scope of my

10  experience.

11          I have never been asked a question like that

12  by anybody.  And the answer to that question is so

13  much a function of so many factors.  For any one

14  individual mortality table, a mortality table is

15  pure guesswork.

16          One of the things that actuaries understand

17  is that mortality involves an extraordinary amount

18  of uncertainty.  And while actuaries that orient

19  towards standard life expectancies, you know, make

20  the mistake or nonactuaries make the mistake that

21  somehow life expectancy are the driver here, they

22  fail to understand the extraordinary standard

23  deviation of life expectancy on an individual basis

24  that the uncertainty overwhelms any averaging

25  consideration.  So that is why I find it difficult

Page 77

1    to ponder your hypothetical.

2    BY MR. KINDALL:

3        Q.   Let me ask you to look at paragraph 150 of

4    your report.  In paragraph 150 you write as another

5    example it is common knowledge that women tend to

6    outlive men.

7              For this reason among others, men are

8    more likely to select a JLS annuity selection upon

9    retirement, and women are more likely to select the

10   single life annuity.  Based on your response to the

11   last question, why is that true?

12       A.   Well, let me connect it to the last

13   response.  You know, I cite a study that was done by

14   the Urban Institute in 2003, which identifies

15   empirical observation that men, everything else

16   being equal, men tend to select a joint survivor

17   option at a greater rate, if you will, than

18   similarly situated women.

19             And there are several considerations

20   that might be thought of to explain that phenomenon.

21   And your question speaks to the possible

22   explanations, but I want to make clear though that

23   the distinction that I want to make is that this

24   study as well as other analyses that I have

25   performed establishes in my mind empirical evidence

```
 1    of that gender preference for joint and survivor

 2    elections by males, which is substantial.

 3              And I've seen it in several instances

 4    including in the Raytheon hourly plan.  Now that is

 5    context for the empirical nature of this

 6    observation.  The Urban Institute study makes

 7    reference to -- well, they may touch on longevity or

 8    life expectancy differences.

 9              They also speak to societal differences

10    other sense of responsibility of the male in a two

11    married couple household.  A whole host of social

12    factors that may contribute to that observed

13    phenomenon.

14        Q.   One of the factors that you cite here is

15    that it's common knowledge that women tend to live

16    longer than men.

17              How does that affect the value of the

18    benefit?

19        A.   You are misunderstanding my point,

20    Mr. Kindall.  The point is that the preferences with

21    respect to selecting joint and survivor go way

22    beyond the value of the benefit.

23              They speak to the value to the

24    participants regardless of the dollar amount.  It's

25    the nature of protection that we're speaking to
```

Page 79

1    here, not some fine tuned actuarial calculation that

2    suggests that a retiree pulls out a calculator to

3    attempt to determine based on mortality tables

4    whether they're getting a good deal or a bad one.

5                    The whole point of this study and the

6    whole point of making careful observation of actual

7    election patterns, is what I am speaking to in my

8    report here.

9         Q.   But your report singles out as a reason

10   why men might tend to select joint and survivor

11   annuities more often than women.

12        A.   It does not single it --

13        Q.   The fact that it is common knowledge that

14   women tend to outlive men?

15        A.    It does not single that out.  I disagree

16   with you.

17        Q.   Let me reread the sentence.  Another

18   example of this, it is common knowledge that women

19   tend to outlive men.

20                    For this reason among others, men are

21   more likely to select a J and S annuity option upon

22   retirement, and women are more likely to select a

23   single life annuity.

24                    So you would agree, would you not, that

25   one of the reasons why men tend to select joint and

Page 80

1    survivor annuities more often is that it is common

2    knowledge that women tend to outlive men, right?

3        A.   There are several reasons.  I have

4    identified in the report that that is a contextual

5    understanding that is broadly understood in society,

6    but it's one of the reasons that is mentioned and

7    commonly thought of to explain the often observed

8    phenomenon.

9             But I want to be clear that it's the

10   observed phenomenon regardless of the reason that is

11   behind my analysis that is in my report.

12       Q.   If you used an actuarial -- strike that.

13   If you use a mortality table that is 100 percent

14   male for participants and 100 percent female for

15   beneficiaries, will that generate a conversion

16   factor that is higher or lower than using a

17   conversion factor that is based on a mortality table

18   that is weighted 100 percent female for participants

19   and 100 percent male for beneficiaries?

20       A.   Everything else being equal and in this

21   hypothetical conscript you are talking about where

22   we have the ability to generate factors without

23   regard to plan amendments and other sort of things,

24   it would be lower.

25       Q.   So the conversion factor is lower if you

Page 81

1    have a male weighted beneficiary or participant

2    table and a female weighted beneficiary table,

3    right?

4        A.   Correct.

5        Q.   So if you happen to be male and a

6    participant and you take your joint and survivor

7    annuity and the table is weighted 100 percent male,

8    from an actuarial standpoint you should get

9    something that is actuarially equivalent to your

10   single life annuity, right?

11       MR. PISTILLI:  Objection, vague.

12       THE WITNESS:  I'm not sure I follow the

13   question.

14   BY MR. KINDALL:

15       Q.   I am a 55 year old man, well, I wish I

16   were.

17            I'm a 55 year old man who is retiring in

18   the plan.  And my spouse is female, and the plan is

19   designed to use a conversion factor that is based on

20   a male mortality table for participants, and a

21   female mortality table for beneficiaries.

22            Should I get an actuarially equivalent

23   benefit as between the single life annuity and the

24   joint and survivor annuity?

25       MR. PISTILLI:  Object to form.

```
                                                    Page 82
 1           THE WITNESS:  You know, there's so many other
 2      variables in this.  There's so many unspecified
 3      variables in that hypothetical, Mr. Kindall.  I'm
 4      sorry.
 5      BY MR. KINDALL:
 6           Q.   So let's assume that the plan otherwise
 7      has the actuarial assumptions that are in the plan
 8      otherwise are all good and reasonable.  Okay.
 9                Every single one of them good reasonable
10      actuarial assumptions, and the only question we've
11      got now is the gender mix.  And this particular plan
12      happens to assume that the mortality for
13      participants is based on a male mortality table, and
14      the mortality for beneficiaries is based on the
15      female mortality table.
16                I am male, my spouse is female.  So from
17      my perspective, the benefit that I will get as
18      between the single life annuity and the joint and
19      survivor annuity is the same, right?
20           A.   Well, the benefit will never be the same
21      if you are going to apply a factor to it.
22           Q.   Sure.  Okay.  So the present value of
23      those two benefits, they would be the same from an
24      actuarial perspective, right?
25           A.   In your example, there's a paradigm that I
```

1    don't quite understand.  I believe the paradigm that

2    you are describing, let me make sure I understand.

3              The paradigm you're describing is that

4    either a male or a female participant in the plan at

5    age 55 would get the same factor applied to them

6    because that's the paradigm that the plan sponsor

7    has adopted.  And if that's the case, then if that

8    is the actuarial equivalence paradigm, then

9    presumably regardless of the gender of the 55 year

10   old they would be getting an actuarially equivalent

11   benefit in that paradigm.

12        Q.   It's actuarially equivalent because that

13   is how the plans have defined it?

14        A.   That's right.

15        Q.   Now let's take the plan definition out of

16   that equation for a moment.  You are an actuary.

17              Would you say that my benefit is equal

18   in present value whether I take the single life

19   annuity or the joint and survivor annuity under the

20   hypothetical that I have constructed?

21        A.   You know, you said take the paradigm out

22   of it?

23        Q.   Take the plan construct out of it.  Let's

24   just assume that I am an individual, and I have

25   asked you okay, I want to know whether my benefit is

Page 84

1    worth the same regardless of whether I take the

2    single life annuity or the joint and survivor

3    annuity.

4                Is the present value of those two

5    things the same?

6         MR. PISTILLI:  Object to form and also scope.

7         THE WITNESS:  I made a comment just a minute

8    ago, which I guess I shouldn't build on that

9    comment.

10                I made a comment on males and females, and

11   you want to undo that construct.  I guess the answer

12   would be that they are equivalent, yes.

13   BY MR. KINDALL:

14        Q.   Now, let's assume that my wife is the plan

15   participant, and I am the beneficiary.  The plan is

16   still built around a gender mix where 100 percent of

17   the participants are deemed to be male and

18   100 percent of the beneficiaries are deemed to be

19   female.

20                Obviously, the benefit is the same

21   because that's the way the plan is constructed,

22   right?

23        A.   Yes.

24        Q.   But from an actuary standpoint, this is

25   not as good a deal for her as it is for me, is it?

Page 85

```
 1        A.   There is a differential that you are
 2   pointing out, yes, in theory.
 3        Q.   Right.  And that's because again women
 4   tend to live longer than men, right?
 5        A.   Well, what you're saying is that it's akin
 6   to referring to the life expectancy of the male and
 7   the life expectancy of the female at the same age.
 8             And the females as a class are expected
 9   to live longer.  And so everything else being equal
10   there is a differential.  There's a gender
11   differential there, yes.
12        Q.   Now, you weren't allowed to use a
13   different mortality table or male retirees and for
14   female retirees for purposes of calculating joint
15   and survivor?
16        A.   The requirement is that similarly situated
17   males and females should get the same benefit.
18        Q.   Right.  So if you used a female mortality
19   table for female retirees and a male mortality table
20   for male retirees, it would violate that
21   prescription, right?
22        A.   Yes.
23        Q.   And that is the Norris decision, right?
24        A.   Yes.
25        Q.   So would it be fair to say that the more
```

Page 86

1    the mortality table is weighted towards the male

2    mortality table for participants, the less good a

3    deal it will be for female participants in the plan?

4         MR. PISTILLI:  Object to the form.

5         THE WITNESS:  On your premise, yes, which is

6    why, by the way in my report I focus on observed

7    rather than speculative gender selection.

8    BY MR. KINDALL:

9         Q.   Let's take a look at paragraph 153 of your

10   report.  You've got a citation to a House report

11   from 1974.

12              Do you see that?

13        A.   We're looking at paragraph 153, is that

14   right?

15        Q.   Yes.

16        A.   And what was the next thing you said?

17        Q.   Just directing you to that citation.  I

18   apologize.

19              You have a citation to a cite from the

20   Code of Federal Register.  Do you see that?

21        A.   Yes.

22        Q.   Is this a regulation that you are familiar

23   with in the course of your business?

24        A.   Yes.

25        Q.   Is it your opinion that this regulation

Page 87

```
 1   permits plans to increase the cost of taking the
 2   joint and survivor annuity relative to its
 3   actuarially equivalent of single life annuity?
 4        MR. PISTILLI:  Object to form.  That is a legal
 5   conclusion.
 6        THE WITNESS:  I actually don't understand what
 7   you said.
 8   BY MR. KINDALL:
 9        Q.   Paragraph 154.  You write in my experience
10   actuaries commonly take into account the gender mix
11   of participants who select the J and S annuity
12   option when developing or assessing the
13   reasonableness of a J and S conversion factor.
14             Do you see that?
15        A.   Yes.
16        Q.   In your report have you cited any plans
17   which place that JSA conversion factors in part on
18   the gender mix of participants who select the JSAs?
19        A.   It's a very narrow question.  I cited no
20   other plans in my report whatsoever, as I stated
21   earlier.
22        Q.   Do you cite any evidence in your report
23   that Raytheon based its point 90 conversion factor
24   on the gender mix of participants who select JSAs?
25        A.   My report summarizes the analysis that I
```

Page 88

```
 1    did in assessing the reasonableness of the J and S,
 2    the 50 percent J and S conversion factor for the
 3    Raytheon hourly plan.
 4             It did not attempt to discern the
 5    process by which that factor was developed.
 6         Q.   And you don't have any knowledge of how
 7    that process was developed, right?
 8         A.   Well, the process of how it was developed
 9    is irrelevant to the reasonableness of the factor
10    itself.
11             And, therefore, my study was focused on
12    the reasonableness of the factor and not an audit of
13    the process by which it was calculated.
14         Q.   So the answer to my question is that you
15    don't have any information about how the factor was
16    created, right?
17         MR. PISTILLI:  Objection, asked and answered.
18         THE WITNESS:  The process by which it was
19    developed was irrelevant to my assessment or
20    valuation of the reasonableness of the factor
21    itself.
22    BY MR. KINDALL:
23         Q.   Let's try it again.  So you don't have any
24    evidence that Raytheon based its point 90 conversion
25    factor on the gender mix of participants who
```

Page 89

```
 1    selected, right?
 2         MR. PISTILLI:  Objection, asked and answered.
 3         THE WITNESS:  The process by which Raytheon
 4    developed their factor was irrelevant to my report
 5    and my analysis, which focused on the reasonableness
 6    of the factor itself.
 7    BY MR. KINDALL:
 8         Q.   Mr. Terry, it's a yes or no question.  I
 9    understand you don't think it's relevant.  I just
10    need to determine whether or not you have any
11    evidence on this point.  So I'll ask it again.
12              Do you have any evidence that Raytheon
13    based its point 90 conversion factor on the gender
14    mix of participants who selected the joint and
15    survivor annuity option?
16         MR. PISTILLI:  Objection, asked and answered
17    and outside the scope.
18         THE WITNESS:  I think I have testified
19    previously, and I say it in my report that I did not
20    consider, nor do I have access to, nor am I aware of
21    information as to how the Raytheon hourly plan's
22    conversion factor was developed.
23         MR. KINDALL:  I am about to switch subjects.
24    It's only 11:30 where Mr. Terry is.  What time were
25    you thinking for lunch?  Off the record.
```

```
                                              Page 90
 1          THE VIDEOGRAPHER:  Off the record at 11:38.
 2               (Recess)
 3          THE VIDEOGRAPHER:  We're back on the record at
 4     12:21.
 5     BY MR. KINDALL:
 6          Q.   Mr. Terry, let me ask you to look at
 7     paragraph 106 of your report.
 8               When you state in this paragraph that
 9     there are four demographic assumptions and one
10     economic assumption that go into a J and S
11     conversion factor, do you see that?
12          A.   Yes.
13          Q.   One of the factors that you list is the
14     retirement age of the average or typical retiree.
15     Do you see that?
16          A.   Yes.
17          Q.   But you don't actually have to make an
18     assumption about the age of the retiree, do you?
19               I mean when someone retires you know
20     what their age is, don't you?
21          A.   Well, you know what their gender is as
22     well.  I'm not sure what you're asking me.
23     Everybody knows what their age and gender is.
24          Q.   Are you allowed to use the gender specific
25     mortality table when you are calculating joint and
```

Page 91

1    survivor under ARISA?

2         A.    You asked me that already, and my answer

3    is it's the benefit amount that really should be the

4    same for males and females, everything else being

5    equal.

6         Q.    And that means that you can't use a female

7    mortality table for females and a male mortality

8    table for males, right?

9         A.    Well, there's a context for your question

10   that is missing.  I assume you mean for purposes of

11   constructing theoretical conversion factor for joint

12   and survivor annuities.

13        Q.    Right.

14        A.    All right.  Let me consider your question

15   again in the context.  What was your question again?

16        Q.    So my question is with respect to gender,

17   you can't simply say we're going to calculate a

18   joint and survivor annuity for female plan

19   participants based on a 100 percent female mortality

20   table, and convert male participants single life

21   annuity to a joint survivor annuity benefit using a

22   100 percent male mortality table, right?

23        A.    That's correct.

24        Q.    Is there any similar restriction with

25   respect to age?

```
                                              Page 92
 1          A.    No, there is no restriction.  A plan
 2    sponsor has latitude with respect to reflecting age
 3    and a factor such as the joint survivor factor.
 4          Q.    So for gender when it comes to creating a
 5    conversion factor because of the Norris decision,
 6    you have to make an assumption, right?
 7          A.    Well, in your paradigm, yes.
 8          Q.    But with respect to age, you don't have to
 9    make an assumption, you could simply use the fact of
10    the participant's age at retirement?
11          A.    You know, I have already said I think that
12    the plan sponsor choosing to distinguish age or
13    differentiate age can do so if they choose to.
14          Q.    So you only have to make an assumption
15    about age if you want to use a conversion factor
16    that is based on some sort of an average, right?
17          A.    Correct.
18          Q.    Let's take a look at paragraph 115.  You
19    write when selecting the ingredients used to
20    calculate conversion factors, a plan sponsor will
21    typically look to plan specific demographic and
22    economic conditions to help craft the specific
23    ingredients.
24                Do you see that?
25          A.    Yes.
```

Page 93

1        Q.    Why did they do that?

2        A.    Well, I suppose what's obvious to an

3    actuary may not be obvious to someone else, but I

4    would say that it's an attempt to sort of fine tune

5    the actuarial equivalence of the resulting factors.

6        Q.    So, for example, if you had credible, good

7    quality data that the average age of the plan

8    participants was 64, it would be better to use that

9    than data from a study of all retirees in the United

10   States?

11       A.    Please share the context of your question.

12       Q.    Well, it's the same context we were just

13   discussing.

14            So when selecting the ingredients used

15   to calculate conversion factor, a plan sponsor will

16   typically look to plan specific demographic and

17   economic conditions to help craft the specific

18   ingredients.

19            So taking that context, would you say

20   that if a plan sponsor had credible good quality

21   data with respect to the average age of the plan's

22   own participants at retirement, it would be better

23   to use that data than to use data that was simply

24   based on the average age of retirement for the

25   entire United States population?

Page 94

1          A.    I would agree.

2          Q.    So look at paragraph 117.  You write to

3     set the plan's interest rate assumption, plan

4     sponsors typically select an interest rate that is

5     reflective of the general level of prevailing

6     interest rates over a period of several years.

7                The types of rates that plan sponsors

8     consider when selecting an interest rate assumption

9     include U.S. treasury rates, PBGC rates and high

10    quality corporate bound yields.

11                Do you see that?

12         A.    I do.

13         Q.    In your report do you cite any tables or

14    plans that use treasury bond rates as a factor in

15    calculating survivor benefits?

16         A.    I have responded to similar questions

17    before, and I will give the same response, which is

18    the focus of my report was to analyze the

19    reasonableness of the conversion factor in the

20    Raytheon hourly plan.

21                And this was not intended to be a

22    general survey of plan design practices across the

23    United States.  So I have not chosen to.  Had I

24    chose to, I could have cited examples, but I chose

25    not to because I chose to focus on the purpose of

Page 95

1    the report.

2         Q.   I apologize.  I know that some of these

3    questions sound repetitive, but they are with

4    respect to different statements in your report, and

5    I do get to try to make a record with respect to

6    each of these statements.

7                   I realize it could be exasperating for a

8    witness, but I gotta do what I gotta do.  In your

9    report do you cite any articles or studies that

10   discuss plans using treasury bond rates as a factor

11   in calculating joint and survivor annuities?

12        A.   In my report, I focused on the

13   reasonableness of the conversion factor used in the

14   Raytheon hourly plan.

15                  This report was never intended as a

16   general survey of plan design characteristics or

17   features of defined benefit pension plans in the

18   United States.  And so I did not conduct such a

19   survey and report such a survey.

20        Q.   Then the same question with respect to

21   PBGC rates.  In your report, do you cite any

22   examples of plans or any articles or any studies

23   that used PBGC rates as a factor in calculating

24   joint and survivor ratios?

25        A.   The purpose of my analysis was to, as I

1    said many, many times, was to assess the

2    reasonableness of the joint and survivor conversion

3    factor in the Raytheon hourly plan.

4              The purpose was not to provide survey

5    data or information on plan design practices across

6    the United States.  And I might add that my response

7    to this question as well as any other questions

8    about common practices are based upon my experience

9    as a 40 year consulting actuary who has had his

10   fingertips on the pulse of the pension consulting

11   field over a full career.

12             And I have extensive knowledge and

13   understanding about common practices deployed by

14   actuaries in support of defined benefit plans in the

15   United States.

16       MR. KINDALL:  Before I go on to the next

17   question, I am hearing a little bit of an echo.  Is

18   anyone else?

19       MR. PISTILLI:   I don't know that I'm hearing

20   an echo.  There's a little bit of background noise.

21   BY MR. KINDALL:

22       Q.   Let's look at paragraph 173 of your

23   report.  You write I am unaware of any plan sponsor

24   that uses ASC 17 rate for purposes of calculating or

25   assessing community conversion factors.

```
                                               Page 97
 1            Do you see that?
 2       A.   Yes.
 3       Q.   Have you ever seen plans that state the
 4   conversion factors will employ a particular interest
 5   rate assumption just stated as a number, 5 percent,
 6   6 percent?
 7       A.   Yes, I have.
 8       Q.   Have you ever reviewed forms 5500 that
 9   list such fixed actuarial assumptions as the basis
10   for joint and survivor annuity conversion factors?
11       A.   Yes, I have.
12       Q.   So unless you've been involved in the
13   process of developing a plan's interest rate
14   assumptions, do you know where those single interest
15   rate factors that you have seen on forms 5500 come
16   from?
17       A.   The range of practice over the years has
18   been to look at prevailing interest rates that guide
19   the value of benefits by looking at the prevailing
20   interest rates in the over extended period of time
21   in the marketplace.
22            Those prevailing rates have
23   traditionally come from treasury rates and PBGC
24   rates.  And they occasionally come from expected
25   return on a portfolio of assets perspective.
```

Page 98

1            So that is why, by the way, for the last

2    40 years that I have witnessed practice actuaries

3    have looked to a variety of different interest rates

4    as being relevant for purposes of pension

5    measurements.

6        Q.   But if you see a form 5500, and it lists

7    6 percent as the interest rate assumption on a plan,

8    do you know, if that is all the information that you

9    are provided do you know how that interest rate

10   assumption was derived?

11       A.   I do not.

12       Q.   Do you have any evidence concerning

13   whether Raytheon considered particular types of

14   interest rates in setting its point nine conversion

15   factor?

16       MR. PISTILLI:  Objection, outside the scope.

17       THE WITNESS:  This is a question you've asked

18   before.  And my answer is the same, which is that

19   the scope of my analysis was to focus on the

20   reasonableness of the point 9 joint survivor

21   conversion factor.

22            And the relevance of how the factor was

23   developed is irrelevant to my analysis and to the

24   analysis of reasonableness as a factor.

25

Page 99

```
 1   BY MR. KINDALL:
 2        Q.   So you felt it was irrelevant, and you
 3   don't have any evidence concerning it, right?
 4        A.   I have no evidence.  Mr. Serota had no
 5   evidence.  I don't know that anybody has any
 6   evidence about how that factor was developed.
 7        Q.   Let me ask you to look at paragraph 160 of
 8   your report.  And you discuss in that paragraph plan
 9   liabilities reported on a form ASC 960.
10             Do you recall that?
11        A.   Yes.
12        Q.   Did you consider the interest rates
13   reported in the plan's ASC 960 report in developing
14   the interest rates that you use in your analysis?
15        A.   I did not.  Let me hesitate.  I was
16   absolutely aware of the interest rates, if that's
17   what you're asking.  So in that sense I did consider
18   them.
19        Q.   So you would say that to be aware of them
20   is sufficient to have considered them.  Right?
21        MR. PISTILLI:  Objection, misstates prior
22   testimony.
23        THE WITNESS:  I was aware of those factors.  I
24   looked at them, and they were part of the thought
25   process, yes.
```

Page 100

1    BY MR. KINDALL:

2        Q.    But they didn't inform the range of

3    interest rates that are listed in your report, did

4    they?

5        A.    I described pretty carefully I think the

6    range of interest rates included in my report.  And

7    what I opted to do for purposes of a reasonableness

8    assessment was to look externally for my range of

9    prevailing interest rates.

10       Q.    Externally, meaning not plan specific

11   data?

12       A.    With respect to interest rates which tend

13   to be a phenomenon that is observed in the economy,

14   I view interest rates as being a system wide

15   phenomenon.  And thus I look to prevailing interest

16   rates outside any one particular entity.

17       Q.    Are the interest rates that are set out in

18   form ASC 960 connected in any way to an expected

19   return on investment performance?

20       A.    Typically, yes.

21       Q.    Would it be unreasonable for an actuary to

22   use the ASC 960 analysis for developing an interest

23   rate for use in a conversion factor?

24       A.    It might well be reasonable.  I can see an

25   actuary stepping forward and making a case for using

1    an expected return assumption for such an analysis.

2         Q.   Let's take a look at paragraph 170 for a

3    moment.  Paragraph 170 you write, the accounting

4    interest rate therefore will typically be based on

5    bound yields relevant to cash yields over a long

6    time.

7              By contrast, because the conversion

8    factors calculation applies to only employees at

9    retirement age, the relevant time horizon for

10   purposes of J and S annuity conversions is much

11   shorter.

12             Do you see that?

13        A.   I do.

14        Q.   In your opinion, what is the relevant time

15   horizon for purposes of J and S conversion factors?

16        A.   Well, I typically think of J and S

17   conversion factors, I think your question is a

18   general question.

19             And I think of J and S conversion

20   factors as being established over the long run.

21   They're intended to function over a long period of

22   time.  And so I might think a decade is a reasonable

23   period of time over which one could observe interest

24   rates for purposes of conversion factors.

25        Q.   Is that the time horizon that you are

                                        Page 102

1    talking about in the language of paragraph 170 that

2    I just discussed?

3         A.   I thought you asked a different question.

4    I may be mistaken.  I just thought you asked a

5    different question.

6         Q.   In paragraph 170 you write the relevant

7    time horizon for purposes of J and S annuity

8    conversions is much shorter.

9              In your opinion, what is the relevant

10   time horizon for purposes of J and S annuity

11   conversions?

12        A.   So you're connecting the two halves of

13   that.  I think I understand your question now.

14              If I were to follow the paradigm of

15   selecting a rate using this accounting paradigm, and

16   I wouldn't necessarily pursue this paradigm, by the

17   way, but if I were to I would seek to match the

18   duration of the analysis to the duration of the

19   liability associated with retiring employees,

20   retiring participants.

21              The ASC 715 rate used by companies

22   sponsoring ongoing pension plans typically reflect a

23   longer duration because the projected cash flows in

24   that plan include deferred cash flows associated

25   with active employees who are not yet eligible to

Page 103

1    retire.  So it reflects a longer duration.

2        Q.   So what is the relevant time horizon for

3    purposes of J and S annuity conversion?  Can you

4    give me within five years?

5        A.   I have not analyzed the duration of

6    Raytheon's retiree liabilities.  I will tell you

7    that based upon my experience, the duration of the

8    liabilities associated with retirees or newly

9    retiring participants is shorter than the duration

10   of the liabilities that might include active

11   participants.

12       Q.   Would it be on the nature of 15 years?

13       A.   I am not going to speculate.

14       Q.   Would 50 years be too long?

15       A.   Well, I'm not sure what years you're

16   referring to, Mr. Kindall.  There's a concept called

17   duration, which is frequently misunderstood.

18            Sometimes people associate that with

19   life expectancy, and it's not an appropriate

20   comparison.  Actuaries and others refer to this

21   concept of duration and so when you speculate about

22   50, I will tell you I cannot imagine any pension

23   plan having a duration of 50.  So yes, 50 would be

24   too long.

25       Q.   How about 30?

1      A.   I'm unwilling to speculate.

2      Q.   Let's look at paragraph 180 of your

3  report.  You write even before the law required lump

4  sum pension calculations to use variable actuarial

5  assumptions that would be updated regularly, plan

6  sponsors commonly updated lump sum assumptions while

7  maintaining fixed assumptions for annuity

8  conversions.

9           Do you see that?

10     A.   Yes.

11     Q.   What time period are you talking about

12  here?

13     A.   This goes back to the 1980s.

14     Q.   Would it be after the passage of ARISA?

15     A.   Well, yes, after the passage of ARISA.

16  That is the era that I am most familiar with, yes.

17     Q.   Do you recall in general whether interest

18  rates were rising or falling during the second half

19  of the 1970s?

20     A.   Well, I don't recall specifically.  We

21  could put some charts in front of us, and we could

22  answer that question.

23           Rates have been volatile.  In general

24  over a period of several decades, rates have fallen.

25     Q.   But you don't remember the interest rate

Page 105

1  trajectory of the Carter administration, for

2  example?

3       A.   I remember that there were high interest

4  rates.  What the specific trajectory from one month

5  to the next, I couldn't speculate on.

6       Q.   All other things being equal, if assumed

7  interest rates increased, do lump sum payments

8  increase or decrease?

9       A.   If interest rates increase, is that your

10 question?

11      Q.   Yes.  If interest rates increase, do lump

12 sum benefits go up or go down?

13      A.   Everything else being equal, they would go

14 down.

15      Q.   So you talk a bit in your report about

16 this concept of longevity risk.  Do you recall that?

17      A.   Yes.

18      Q.   Who bears the longevity risk if the

19 annuity to annuity conversion is from an age 65

20 single life annuity to an early retirement single

21 life?

22      A.   It sounded like a non sequitor.  Could you

23 repeat that question.

24      Q.   Let me ask it a different way then.  Is a

25 longevity risk for an annuity always on the plan?

1      A.    I don't know what you mean by that.

2      Q.    Who bears the longevity risk if a

3  participant elects a lump sum?

4      A.    When a participant elects a lump sum, they

5  take a single sum payment from the plan, and the

6  participant from that point on steps into the role

7  of assuming the longevity risk.

8      Q.    And if the participant selects a single

9  life annuity at age 65, the plan bears the longevity

10  risk, right?

11      A.    That's correct.

12      Q.    And if the participant selects an early

13  retirement single life annuity, the plan still bears

14  the longevity risk, right?

15      A.    That's correct.

16      Q.    And if the participant selects a joint and

17  survivor annuity, the plan bears the longevity risk,

18  right?

19      A.    That's correct.

20      Q.    So if the plan is using fixed actuarial

21  assumptions it should use the same interest rate to

22  calculate early retirement annuities as it uses to

23  convert single life annuities to joint and survivor

24  annuities, right?

25      MR. PISTILLI:  Misstates prior testimony.

```
 1          THE WITNESS:  I'm not sure I follow the
 2     question.
 3     BY MR. KINDALL:
 4          Q.   So you indicate in your report that the
 5     reason why it doesn't make sense to use the same
 6     interest rate assumption for joint and survivor
 7     annuity conversions as you use for a lump sum is
 8     because with a lump sum, the individual participant
 9     bears the longevity risk, right?
10          A.   I think you're misquoting my testimony in
11     my report.
12          Q.   I'm not quoting it.  I'm attempting to
13     understand it.  So if I have that wrong, let me know
14     how?
15          A.   So let's talk about that then.  The
16     individual who takes a lump sum assumes not only
17     longevity risk, but also investment risk.
18               It's the investment risk that creates a
19     significant difference between the individual who
20     takes an annuity versus the individual who takes a
21     lump sum.  The presumption is that when someone
22     takes a lump sum, they have responsibility for
23     taking that lump sum and unless they're going to
24     spend it right away, they are going to have to
25     invest it responsibly, appropriately.
```

Page 108

1        And presumably as dividends are paid and

2   so forth, they have got reininvestment risk as well,

3   but the individual bears investment risk.  The point

4   in time at which they take that lump sum is the

5   point in time at which they will deploy that money

6   into the market.

7        So the market conditions at the point in

8   time of a lump sum distribution is incredibly

9   relevant to the participant who takes a lump sum.

10  Because the participant who takes an annuity never

11  has to worry about investment risk or reinvestment

12  risk because that is solely the responsibility of

13  the plan sponsor.

14       The participant who elects an annuity,

15  whether it's a life annuity, a single life annuity

16  or a joint and survivor annuity bears no investment

17  risk.  And the point of all of this is that there is

18  a distinction, an important distinction between the

19  need to be sensitive to current markets at the point

20  in time a plan distributes a lump sum distribution

21  versus the plan sponsor's need to be sensitive to

22  the market for a participant who elects an annuity.

23       There is basically no market

24  transaction for the participant electing annuity.

25       Q.   To go back to my earlier question, though,

1    whether a participant selects an early retirement

2    SLA or an SLA at normal retirement, the plan in both

3    of those instances bears both the longevity risk and

4    the investment risk.  Right?

5        A.   The plan for a participant who elects an

6    annuity regardless of the form or regardless of the

7    timing, the plan will continue to bear both

8    investment risk as well as longevity risk.

9        Q.   So that is not a distinguishing factor.

10   Neither of those things is a distinguishing factor,

11   a longevity risk or investment risk is the

12   distinguishing factor as between any type of annuity

13   that a participant might take in the plan?

14       A.   I think I agree with that.  I make this

15   point, however, in contrast to the lump sum which

16   has an entirely different dynamic and takes it

17   outside the pension realm and turns it into a

18   transaction that occurs at a point in time and

19   which, therefore, represents a transfer of both

20   investment risk as well as longevity risk.

21       Q.   Right.  But since there is no difference

22   with respect to longevity risk or investment risk

23   regardless of which type of annuity you take, to go

24   back to my earlier question, the interest rate that

25   the plan selects should be the same with respect to

Page 110

1    all of those types of annuities, right?

2         MR. PISTILLI:  Objection, misstates prior

3    testimony.

4         THE WITNESS:  That's a big leap, a very big

5    leap.  It doesn't necessarily follow.  And you've

6    just taken this into a whole other realm that is

7    outside the scope of anything we did in this

8    analysis.

9    BY MR. KINDALL:

10        Q.   Sure, but I am trying to explore this

11   concept that you add in your report of why it makes

12   sense to use different interest rates.

13             I'm trying to figure out whether that

14   same concept would drive you towards a single

15   interest rate for annuities?

16        A.   I have raised this point in the report

17   here for a very specific purpose and that purpose is

18   to suggest that the drivers of the selection of

19   underlying actuarial assumptions associated with a

20   lump sum distribution have a distinct nature about

21   them that has traditionally caused employers to look

22   to outside market measures and has in more recent

23   years gotten Congress to, in fact, legislate more

24   immediate market measures for purposes of lump sum

25   conversions.

```
                                              Page 111
```

1          Q.   In your analysis with respect to the plan,

2     when you looked at interest rates, you developed a

3     range from 1.5 percent to 5 percent.

4                    Do you recall that?

5          A.   Yes.

6          Q.   And that is 350 basis points.  Right?

7          A.   It's a range from 1.5 percent to

8     5 percent.

9          Q.   And is it your testimony that a reasonable

10    actuary could have selected any number within that

11    range?

12         A.   I am suggesting something slightly

13    different.  I am suggesting that there are actuaries

14    out there that would reasonably select something

15    within that range.

16         Q.   So do you think that it would be

17    reasonable based on the range for a plan to select

18    today in 2020 a 1.5 percent interest rate for

19    converting from a single life annuity to a joint

20    survivor annuity and at the same time selecting a

21    5 percent interest rate for converting from a normal

22    retirement single life annuity to an early

23    retirement single life annuity?

24         MR. PISTILLI:  Object to form.

25         THE WITNESS:  You know, you're asking whether

Page 112

1    it's reasonable.  I can't speak to the reasonability

2    of that unless I speak to the actuary's thinking

3    that would bring an actuary to that sort of basis.

4           I can imagine why an actuary might think

5    about that, but the actuary's thinking in the

6    context of setting those assumptions certainly has

7    the bearing on the selection of reasonable

8    assumptions for a variety of purposes.

9    BY MR. KINDALL:

10       Q.   So what would you imagine could be a

11   rationale for selecting the 5 percent interest rate

12   for converting from a normal form benefit at age 65

13   to a normal benefit at earlier retirement, while at

14   the same time using a 1.5 percent interest rate to

15   convert from a single life annuity to a joint and

16   survivor annuity?

17       MR. PISTILLI:  I object to form.  Also I think

18   it's time to switch the microphone.

19   BY MR. KINDALL:

20       Q.   You could go ahead and answer.

21       A.   The question was what might be the

22   thinking?

23       Q.   Yes.  You said you could imagine a

24   rationale.  So I want to hear what that might be.

25       A.   Well, a plan looking to commence, looking

Page 113

```
1    at the financial impact of a participant commencing
2    benefits ten years earlier, for example, than the
3    normal retirement age might look to foregone
4    earnings of the trust to provide a context for an
5    interest rate.
6                On the other hand, if I were looking --
7    and the same actuary might look at the conversion
8    between two annuities that essentially pay out
9    benefits over the same period of time, there's no
10   arbitrage between the two that would suggest that
11   foregone investment earnings when comparing one
12   benefit to another is a significant driver.
13        Q.   But in your own analysis of interest rates
14   you preferred to use ones that were not specific to
15   the plan, right?
16        A.   I would want to look.  I believe I used a
17   rate that was in the middle of my reasonable range
18   for purposes of examining comparisons between an
19   annuity payable at an early retirement age versus an
20   annuity payable at normal retirement age.
21        Q.   Let's take a look at paragraph 182 of your
22   report.  You write the annuity to lump sum
23   conversion basis are much more sensitive to interest
24   rate movements than mortality improvements because
25   the conversion is a single present value
```

Page 114

1    calculation.

2             Do you see that?

3        A.   Yes.

4        Q.   When do plan participants make an election

5    of benefits?

6        A.   Well, the general plan participants make

7    election of benefits close in time to when they

8    intend to commence payment of those benefits.

9        Q.   In fact, there's a set period that you are

10   supposed to make those benefit calculations, right?

11       A.   Well, if you are telling me there is, I'll

12   accept that.  You may be speaking to some of the

13   unique plan features of any particular pension plan

14   and/or their administrative practices.

15       Q.   After a participant makes his or her

16   election of benefits, how often is that benefit

17   recalculated?

18       A.   I'm not sure I understand what you're

19   referring to.  If you're referring to an estimated

20   pension, I could envision a situation where it could

21   be recalculated frequently over a period of many

22   years prior to commencement of the payment.

23       Q.   Lee me ask a different question.  If

24   conditions change after a participant begins taking

25   benefits, for example, the interest rates change or

Page 115

1   mortality improves are the benefits recalculated to

2   reflect those changes?

3       A.   I assume you're talking about an annuity

4   benefit.

5       Q.   Correct.

6       A.   Not a lump sum.  What happens when

7   interest rates change is that the pension continues

8   to be paid in the manner in which it was paid.

9            One of the features of a defined benefit

10  plan which we've been talking about over the past

11  several minutes is that that pension will be paid

12  regardless of what happens to interest rates.

13           The pension will be paid regardless of

14  what happens to investment returns.  But more

15  importantly, that pension will continue to be paid

16  for over a longer life span if, in fact, mortality

17  does improve.  Those observed phenomenon are related

18  to what we spoke about earlier, that the plan

19  continues to hold the investment risk and the

20  longevity risk.

21      Q.   So if someone retires in say 2015 and

22  their benefit is calculated on the basis of then

23  current actuarial assumptions and in 2019 a new

24  mortality table and a new mortality improvement

25  table is published, and the interest rates have

1    changed, can the beneficiary of that or the

2    participant come back to the plan and say I want my

3    benefits recalculated because there's new

4    information?

5         A.   One of the beautiful things about a

6    defined benefit plan from the participant's

7    standpoint is that if, in fact, it turns out that

8    mortality improves and, of course, what is most

9    relevant here is mortality for the individual

10   participant in question, the plan is obligated to

11   continue to pay that benefit for the additional

12   years that are reflected by that mortality

13   improvement.

14             The recalculation of the pension

15   isn't -- the continued payment of the benefit beyond

16   the original life expectancy is not dependent upon

17   the plan's recalculation of the benefit.

18             In other words, the value of that

19   pension is automatically expanded and that is the

20   nature of a defined benefit plan.  Payments continue

21   through that extended life expectancy.

22        Q.   So a plan, meaning that request from a

23   beneficiary of the plan said my benefit would have

24   been larger in 2015, if you knew then what you know

25   now, right?

Page 117

1          A.    You're making a big presumption, which I

2     disagree with, which is that somehow or another

3     mortality improvement would have any noticeable

4     effect whatsoever on a joint and survivor

5     conversion.

6               I think that's what you're driving at,

7     and I would just beg to differ with you.

8          Q.    For the sake of my analysis --

9          A.    Let me finish my answer.  The overriding

10    by far impact of mortality improvement on the

11    participant is that their benefit everything else

12    being equal can be expected to be paid out over a

13    greater number of years.

14         Q.    But let's assume that there's a change in

15    both mortality and interest rates.  If the

16    participant went back to the plan and said if you

17    knew back in 2015 what you know now about mortality

18    rates and interest rates, my benefit would be larger

19    every month.

20               The plan would say the benefit stays

21    what it was calculated in 2015 when you retired,

22    right?

23         MR. PISTILLI:  Objection, outside the scope and

24    also asked and answered.  Hopelessly speculative.

25         THE WITNESS:  I will come back at you this way.

Page 118

1   That the nature of a defined benefit plan is exactly

2   that.

3          It defines the benefit and creates a promise

4   that the pensioner can count on and that same

5   pensioner that you just described could also be

6   subject to changes in interest rates and/or

7   mortality that could under your scenario drive

8   benefits down.

9          And the beautiful thing with a defined

10  benefit plan is that once that calculation is done

11  and the benefits commence, the participant has

12  regardless of what happens in the interest rate

13  environment and regardless what happens with

14  pandemics or anything else the participant can be

15  assured they're going to continue to get their

16  pension until they pass.

17  BY MR. KINDALL:

18      Q.   Right.  I think we're agreeing, Mr. Terry.

19  I am just asking.

20              So regardless of what happens with

21  interest rates and mortality, from the time that my

22  nominal retiree retired in 2015, whether they would

23  drive towards the higher or lower conversion factor,

24  it doesn't change the benefit.  The benefit is set

25  as of the date of his retirement?

 1            MR. PISTILLI:  Objection, asked and answered.
 2            THE WITNESS:  Yes.
 3      BY MR. KINDALL:
 4            Q.   So he can't ask for more, and the plan
 5      can't come back and ask to have his monthly benefit
 6      reduced, right?
 7            A.   That is the nature of a defined benefit
 8      protection.  And the assurance that a defined
 9      benefit plan sponsor makes to a retiree, which is an
10      important distinction between a defined benefit
11      pension plan and any other kind of pension plan
12      where the retiree is exposed to all kinds of risks.
13            Q.   Let me ask you to look at paragraph 188 of
14      your report.  In this paragraph, you write that a
15      plan sponsor may choose to use lump sum conversion
16      rates for other purposes.
17                 Do you see that?
18            A.   I do.
19            Q.   Is one of the other purposes that a plan
20      sponsor may choose to use lump sum conversion rates,
21      the conversion of a single life annuity to a joint
22      and survivor annuity?
23            A.   It is possible, yes.
24            Q.   Have you seen plans that do that?
25            A.   Yes.  I have seen very few who have opted

Page 120

1   for that.

2        Q.   You don't think it's common?

3        A.   I don't think it's common.

4        Q.   Would it surprise you to see large

5   sophisticated companies doing exactly that?

6        A.   No.  The kinds of companies that would do

7   that in particular are companies that have in their

8   benefit composition account balance related types of

9   benefits.

10            And in particular, you're more likely,

11  much more likely to see the so called 417E, the lump

12  sum conversion bases being used across the plan in

13  pension plans that are cash balance plans or what's

14  often called pension equity plans.  And there are

15  some practical logistical reasons why plan sponsors

16  that sponsor cash balance plans, for example, would

17  go that route.

18            And the reason it wouldn't surprise me to

19  see large companies adopt the 417E basis, the lump

20  sum conversion basis far more broadly for use, more

21  broadly than just lump sum distributions is because

22  a great number of pension plans over the last

23  several years have converted from what one might

24  call a traditional annuity plan to a cash balance

25  plan.

1           Even if the plan has just a couple of
2     features of cash balance elements in it, it will
3     find that using that 417E basis despite its
4     shortcomings in the eyes of a plan sponsor
5     potentially they may still choose to adopt it for
6     purposes more broadly than lump sum conversions.
7          Q.   You don't think it is unreasonable for
8     companies to use the lump sum conversion rates for
9     ASC conversions, do you?
10         MR. PISTILLI:  Objection vague.
11         THE WITNESS:  You know, not necessarily.  It
12    might make sense.  It might not make sense.  I just
13    described to you a broad category of situations
14    where I could understand why a plan sponsor would
15    want to do it.
16         And in this case reasonability is more a plan
17    design consideration.  It's reasonable from a plan
18    design standpoint might be the way I would look at
19    it.  And if it makes sense for a plan sponsor to do
20    so, I can understand that.
21    BY MR. KINDALL:
22         Q.   Do you think that there is anything
23    objectionable about the practice from the standpoint
24    of actuarial science?
25         A.   You know, actuarial science is a practical

Page 122

1    science.  On a dimension of objectionable or

2    unobjectionable, that sounds like a style question.

3    I'm not sure how to answer objectionable.

4              If you are asking me a different

5    question, which is is it acceptable, the answer to

6    that is I believe it is acceptable for a plan to

7    adopt 417E basis for use broader than simply lump

8    sum conversions.

9    Q.   Would that apply to both the interest rate

10   and the mortality rate assumptions in the 417E

11   factors?

12   A.   That would apply to both.

13   Q.   Let's take a look at paragraph 192 of your

14   report.  In paragraph 192, you write plus or minus

15   5 percent is a common standard among actuaries when

16   considering a range of reasonableness for a

17   calculated value premised on assumptions about

18   uncertain future events.

19             Do you see that?

20   A.   Yes.

21   Q.   Now, in paragraph 193 of your report you

22   cite the Treasury department's disclosure

23   regulations as an example of this plus or minus five

24   percent approach, don't you?

25   A.   I do.

1        Q.   Do you cite in your report any other
2    evidence of this plus or minus five percent approach
3    as a common standard for actuaries in considering a
4    range of reasonableness for calculated value
5    premised on assumptions about uncertain future
6    events?
7        A.   I don't believe -- well, I may mention it
8    elsewhere.  You're asking about a mention or a
9    citation?
10       Q.   Do you cite anything in your report?
11       A.   The only citation as relates to the plus
12   or minus 5 percent is the one mentioned in paragraph
13   193.
14       Q.   So does plus or minus 5 percent, does it
15   apply only to the results of a calculation or does
16   it apply to the assumptions that are used in the
17   calculation?
18       A.   You know, an actuarial calculation
19   particularly the results of an actuarial model may
20   have several assumptions that go into it.
21            Actuarial assumptions by their nature
22   are assumptions about things that are not known, and
23   actuaries have a long tradition of establishing
24   assumptions on the basis of kind of looking over
25   their shoulder and then looking ahead.

Page 124

1           The looking over their shoulder
2    referring to experience and looking ahead referring
3    to expectations.  It's the expectations part that
4    actuaries face that makes the selection of actuarial
5    assumptions a challenge because typically the
6    expectations are about things about which we just
7    don't know.

8           There's tremendous uncertainty.  It's
9    often said you'll hear actuaries say this and that
10   is this, that one thing I can tell you about my
11   assumption is that I can guarantee you it will be
12   wrong.  Now that is said tongue in cheek, but the
13   point of that is that there will always be
14   experience will emerge that is different from the
15   assumption and that's really the source of the plus
16   or minus 5 percent.

17          Because of the nature of actuarial
18   calculations we simply don't know the results that
19   will actually emerge.  And your question about
20   whether it's about the ingredients of the inputs or
21   whether it's the result of each of the assumptions
22   themselves has uncertainty associated with it.

23          And so naturally the result is also
24   going to be uncertain, which is why actuaries
25   gravitate towards a paradigm that suggests that the

1  actuarial model, the actuarial calculation is not a

2  precise prediction of what will happen, but rather

3  an indication directionally oftentimes of what may

4  happen, which is why there's a range around it.

5       Q.   Let me try to get a little more specific

6  on this.  So in a present value calculation, that

7  would be a calculated value, right?

8       A.   That's right.

9       Q.   And one of the assumptions that goes into

10  that calculated value that we talked about is an

11  interest rate assumption, right?

12       A.   That's right.

13       Q.   So from the perspective of an actuary, do

14  you need to get your interest rate plus or minus

15  5 percent or do you only do that plus or minus

16  5 percent when you're looking at the end result of

17  the calculation?

18       A.   I think you're making one of the mistakes

19  that people often make about the nature of actuarial

20  work.

21            You're attempting to nuance something

22  that defies nuance.  The point of my remarks just

23  now in response to your question right here is that

24  there is uncertainty associated with the actuarial

25  process.

Page 126

1         When an actuary looks at the result of

2    an actuarial calculation, be it present value

3    calculation or any other calculation, they might

4    reasonably expect that the value itself that

5    ultimately emerges would be within 5 percent plus or

6    minus of that calculation.

7         But please understand with something as

8    wildly uncertain as mortality, deviations of plus or

9    minus 5 percent are relatively insignificant

10   relative to the deviation that an individual

11   participant would experience in terms of the value

12   that they will ultimately extract from a plan simply

13   because the unexpected nature of their own life

14   expectancy on an individual basis can be so

15   dramatically different.

16        Q.   So let's say that you have been retained

17   to advise a client, a plan on the selection of

18   actuarial assumptions that you're going to put into

19   their plan.  One of those assumptions has to be an

20   interest rate unless they're using a tabular factor,

21   right?

22        A.   Correct.

23        Q.   And would you say in that circumstance if

24   you had done an analysis and your best estimate as

25   an actuary is that a good interest rate was, say,

1    five percent, you wouldn't suggest to the client

2    that an interest rate that they put in the plan

3    could be anywhere from 0 percent to 10 percent,

4    right?

5        A.    You know, you're making a common mistake.

6        Q.    I like to do that.

7        A.    In understanding and appreciating this

8    conversation.  One can observe just over the past

9    ten years, for example, the volatility of interest

10   rates.

11            And I think it's clear just from the

12   last decade, pick any interest rate, that you would

13   not see a plus or minus 5 percent in the way you

14   described it with respect to that interest rate.

15   But I don't want you to misunderstand my point about

16   the plus or minus 5 percent.  It speaks to the

17   collective uncertainty associated with various

18   actuarial assumptions that go into an end product

19   actuarial calculation.

20       Q.    So here's what I'm trying to get at is

21   when you're creating the actuarial assumptions that

22   go into the calculation, do you have a built in

23   range plus or minus 5 percent or do you attempt to

24   make the most reasonable assumption that you can

25   based on the evidence that you have?

1      A.   Well, plan sponsors are not permitted, I

2   don't believe, plan sponsors are not permitted to

3   put a range of assumptions into the plan document if

4   they're going to go around specifying assumptions

5   that goes into development of conversion factors.

6            And so a plan sponsor would select an

7   assumption, not a range of assumptions that goes

8   into a plan, but that selection does not mean that

9   they don't inherently understand -- I'm now putting

10   myself into the shoes of a plan sponsor advised by

11   an actuary.

12            That doesn't mean the plan sponsor

13   don't inherently understand that there's some

14   variability around the selection of that assumption.

15   Inherently because interest rates move, they're not

16   just absolutely straight line over time.

17      Q.   But as an actuary, if you were giving

18   advice with respect to an interest rate assumption

19   today that you would use in a plan for conversion

20   factors, would you say to a plan sponsor I've got a

21   range between 1.5 and 5 percent that could be

22   justified and anything you do within that range we

23   can write you a letter on it?

24      MR. PISTILLI:  Object to the form.

25      THE WITNESS:  I want to be clear about what my

1    range is all about.  If I go out to ten actuaries,

2    ten qualified actuaries that are all good actuaries,

3    they might each have a range.

4          And that range, if you lay them all down side

5    by side that may extend to as low as 1.5 to as high

6    as five or potentially higher depending upon the

7    basis upon which the actuary thinks about interest

8    rates and thinks about their range.

9          My 1.5 to 5 percent range, it's not like

10   shooting a paint spray gun at the wall attempting to

11   cover all the bases.  It's intended to represent the

12   way in which actuaries think about interest rates

13   within a band over the last decade.

14         And that range goes from one and a half to

15   five and a half.  That doesn't mean that any one

16   particular actuary is going to randomly select

17   anything within that range.  So please understand

18   that my purpose for that range is to establish what

19   is reasonable for actuaries to assume for purposes

20   of evaluating or assessing interest rates baked into

21   or evaluating conversion factors.

22   BY MR. KINDALL:

23         Q.   With respect to getting to the conclusion

24   where you have run your equation and you have a

25   calculation that you apply your plus or minus

Page 130

```
 1   5 percent reasonableness to, built into that is an

 2   assumption that the actuarial assumptions that you

 3   were using in the calculation are themselves

 4   reasonable, right?

 5        MR. PISTILLI:  Object to the form.  Also

 6   misstates prior testimony.

 7        THE WITNESS:  I'm not sure what you just said.

 8   BY MR. KINDALL:

 9        Q.   In order for a conversion factor to fall

10   within a range of reasonableness -- strike that.

11             In order to determine that a conversion

12   factor has fallen within a range of reasonableness,

13   if you are comparing it to conversion factors that

14   might result from the use of different actuarial

15   assumptions, don't those assumptions have to be

16   reasonable?

17        A.   My evaluation in this report spoke first

18   to the question if I were to stumble upon some

19   random plan somewhere in the United States, what

20   might I expect to see.

21             And my first cut at it that is depicted

22   in paragraph 192 is if something is presented to me,

23   and it comes within 5 percent of what I think about

24   might be reasonable I'm not going to immediately

25   discard it.
```

1          My analysis, if I could speak to that

2     for a second, sought to narrow that range based on

3     more and more knowledge about and in particular the

4     plan specifics in the Raytheon plan.  So I

5     ultimately took into account what I believe to be

6     relevant plan specific information to tighten the

7     range down to what is depicted somewhere here, which

8     is certainly much smaller than plus or minus

9     5 percent.

10         Q.   Let me try to get at this a different way.

11    If you were evaluating a conversion factor, and you

12    determined that you can recreate something that was

13    within plus or minus five percentage points of that

14    conversion factor, but only by using unreasonable

15    actuarial assumptions, would you consider that the

16    conversion factor that you were evaluating had

17    fallen within what you would call a range of

18    reasonableness?

19         MR. PISTILLI:  Object to the form.

20         THE WITNESS:  I want to be very careful about

21    answering this question because of something that

22    you said.

23              You refer to a conversion factor that

24    would be evaluated or developed on the basis of

25    unreasonable assumptions.

Page 132

1      BY MR. KINDALL:

2          Q.   No, I didn't say that.

3          A.   Well, then let's go further.  Could you

4      repeat it then.

5          Q.   Sure.  Let's say that you have got a

6      conversion factor, and you've been asked to evaluate

7      it.  And this conversion factor is point 88.

8               And so in your view if I understand your

9      testimony correctly, if using another set of

10     actuarial assumptions you can generate a conversion

11     factor that is somewhere between point 83 and

12     point 93, you would think that that was sufficient.

13     Right?

14         MR. PISTILLI:  Object to the form and also

15     misstates prior testimony.

16         THE WITNESS:  I don't think I ever said that.

17     Furthermore, if I haven't made it clear in my

18     report, let me be clear right now.

19              I've gone through an extensive process by

20     which in the Raytheon hourly plan instance, I

21     carefully considered relevant information to

22     evaluate the reasonableness of that factor.  I did

23     not assume that somehow or another any evaluation

24     that would have resulted in something between

25     point 85 or point 95 would automatically be

Page 133

1    reasonable.  Just be very clear about my testimony.

2         Q.   I apologize for that implication.  Let me

3    try this a slightly different way, as I am having

4    trouble getting to the point I think.

5              If you were comparing an interest rate,

6    a conversion factor that is in the plan again, let's

7    say it's point 88.  And you find that you can come

8    very close to that conversion factor by using an

9    1860 mortality table and a 15 percent interest rate

10   that you drew from something back in the 1980s.

11             You wouldn't consider the fact that you

12   had gotten to within a very small percentage of the

13   conversion factor to be sufficient to say this

14   conversion factor is within a range of

15   reasonableness, right?

16        A.   Hard for me to unwind that question.  I

17   thought a minute ago that we weren't talking about

18   unreasonable inputs.  But you've given me --

19        Q.   That is exactly what I am talking about.

20        A.   Now, you've changed your question then.

21   So I'm now thrown off.  It was a complex question.

22   I am still not sure exactly what you're asking me.

23        Q.   If a conversion factor is within plus or

24   minus 5 percent of a conversion factor that you

25   could get by using unreasonable actuarial

1    assumptions, is it within the range of

2    reasonableness if that is all that you know?

3         MR. PISTILLI:  Object to the form.

4         THE WITNESS:  I don't know how to answer that.

5    I don't know how to answer that.

6    BY MR. KINDALL:

7         Q.   Why not?

8         A.   Because I don't understand it.  I don't

9    understand it, I'm sorry.  I think you must be

10   misinterpreting what I wrote in my paragraph 192.

11        Q.   I hope not.  I am trying to get at a very

12   simple idea, which is that you say that a common

13   standard for determining the range of reasonableness

14   is plus or minus 5 percent and that is an output.

15   We talked about that before.

16             You're talking about the output of the

17   calculation is plus or minus 5 percent, right?

18        A.   That is what I've said.  And you've now

19   taken it to some context which I just don't

20   understand.

21        Q.   The only thing I am trying to ask --

22        A.   Your sound.

23        Q.   How about now?

24        A.   Good.

25        Q.   The only thing I am trying to ask you is

Page 135

1   whether you get a meaningful result with respect to

2   your range of reasonableness if you were comparing

3   it to something that doesn't use reasonable

4   actuarial inputs?

5        A.   I guess I am pretty dense.  I just don't

6   understand the question.  I'm sorry, Mr. Kindall.  I

7   think I could speak to what the plus and minus

8   5 percent refers to, but you're trying to benchmark

9   it around an unreasonable result.  I don't

10  understand.

11       Q.   Is it sufficient to be within a range of

12  reasonableness as you defined in paragraph 192 if a

13  conversion factor is plus or minus 5 percent of a

14  conversion factor that you could get using

15  unreasonable actuarial assumptions?

16       A.   I am just being very dense.  I don't get

17  that.  I think you're misinterpreting what I'm

18  saying about plus or minus 5 percent.

19            And please understand that is a first

20  cut analysis that precedes digging in and doing any

21  kind of a detailed analysis.  If in any way you are

22  attempting to somehow say that in my analysis I

23  rested on a plus or minus 5 percent standard for

24  purposes of assessing reasonableness of the Raytheon

25  hourly plan factor, that is not what I'm saying.

1       Q.    That isn't what I asked.

2       A.    That's my response, and I guess I can't

3  unravel your question.  I apologize.

4       Q.    So under the Treasury regulations for

5  disclosures, you first have to calculate the present

6  value of each benefit option using reasonable

7  actuarial assumptions, right?

8       A.    That's right.

9       Q.    And then you compare each of those present

10  values to determine which ones are within 5 percent

11  of the qualified joint and survivor annuity, right?

12       A.    That's right.

13       Q.    So to try to go back to my earlier

14  question, would that assumption be meaningful if you

15  didn't use reasonable actuarial assumptions in the

16  first instance to calculate the present values of

17  the different benefit options that you are

18  comparing?

19       A.    You mean if I were to use unreasonable

20  assumptions for purposes of doing the comparison?

21       Q.    Correct.

22       A.    Would it be meaningful.  I don't know if

23  it would be meaningful.  It may or may not be

24  meaningful.

25                It may inadvertently be meaningful.

```
 1    It wouldn't necessarily follow the instructions for
 2    use of reasonable assumptions.
 3          Q.   Flip on back to paragraph 41 of your
 4    report.
 5               In paragraph 41 you write the value of
 6    the 50 percent J and S annuity that Cruz is
 7    receiving from the plan represents approximately a
 8    20 percent subsidy over the value of his accrued
 9    benefit under the terms of the plan.  Do you see
10    that?
11          A.   I do.
12          Q.   Is the calculation that you use for this
13    what's shown on the chart on page 34 of your
14    appendix?
15          A.   Well, I address this sort of calculation
16    in more than one place in my report.  What I would
17    like to do is to examine the report.
18          Q.   Sure.
19          A.   If I could.
20          Q.   Absolutely.  Take your time.
21          MR. PISTILLI:  How much time is left on the
22    tape?
23          THE VIDEOGRAPHER:  I don't have any time
24    limits.
25          MR. PISTILLI:  Okay.
```

1        MR. KINDALL:  Off the record a moment.  Let's

2   take a break.

3        THE VIDEOGRAPHER:  Off the record at 1:52.

4        MR. KINDALL:  We'll take ten minutes.

5              (Recess)

6        THE VIDEOGRAPHER:  Standby.  We're back on the

7   record at 2:01.

8   BY MR. KINDALL:

9        Q.   Mr. Terry, let me reorient you.  I had

10  started off asking you about paragraph 41, where you

11  say the value of the 50 percent J and S annuity that

12  Cruz is receiving from the plan represents

13  approximately a 20 percent subsidy over the value of

14  his accrued benefit under the terms of the plan.

15              I had asked you whether that is the

16  calculation that is shown on page 34 of your

17  appendix.  Is that correct?

18       A.   And I was then going to because I know

19  that that was a calculation based on -- what was the

20  page?

21       Q.   Thirty-four.

22       A.   Thanks.  These were Serota, the array of

23  of Serota preferred assumptions.  But I believe I

24  also have in here, and I was going to look.  So I

25  took a break.  I didn't go looking.

1            Let me see if I could --  Yes.  I am

2    also referring to page 84 where in figure 14 I

3    calculate a subsidy for at each of the ages, and

4    it's consistent.  So I will say yes, I did calculate

5    at least a roughly 20 percent subsidy.

6         Q.   Did you also calculate how much of a

7    subsidy Mr. Cruz would have received over his

8    accrued benefit if he had taken the single life

9    annuity at the same age as he retired?

10        A.   I don't believe I calculated that.

11        Q.   So if you look back at page 34 of your

12   appendix, for example, you've got a column for the

13   early J and S annuity.

14            You've got a column for the normal

15   retirement pension and then you've got the

16   difference in dollar value, right?

17        A.   That's right.

18        Q.   And that normal retirement pension, how

19   did you calculate that?

20        A.   Well, the normal retirement pension I

21   calculated as the present value as of age 55 of a

22   deferred single life annuity benefit commencing at

23   age 65 of what, roughly $1700.

24            I can't recall the exact benefit accrued

25   amount, but it would be the actual present value of

Page 140

1    the deferred annuity.

2         Q.   But it's not the single life annuity that

3    he could have taken at age 55 under the terms of the

4    plan, right?

5         A.   No.  That's the accrued benefit under the

6    plan, as defined by the plan, which is a single life

7    annuity.

8         Q.   Let's take a look at paragraphs 39 and 40

9    of your report.  You write that Serota erred by

10   evaluating the plan's conversion factor in relation

11   to Cruz because he retired early, and the plan

12   subsidizes early retirement, right?

13        A.   I got 8 or so lines of text in the

14   paragraph 39.  Either you were reading or

15   paraphrasing.  Were you reading?

16        Q.   Paraphrasing.

17        A.   Because there are eight lines, I'm not

18   sure what you're paraphrasing.  So I would be happy

19   to -- you have to steer me either to the parts of

20   this paragraph you were trying to paraphrase or

21   you're going to have to give me some time.

22        Q.   Let me ask some different questions.  Does

23   ARISA have different rules for converting single

24   life annuity to joint and survivor annuities based

25   on whether you retire at normal retirement age or

Page 141

1    early retirement?

2         A.   Well, as an actuary I deal with actuarial

3    equivalence as a matter of how to construct or

4    evaluate conversion factors.

5              ARISA is a complex piece of legislation

6    with regulations and all kinds of things associated

7    with it, which is why a whole cottage industry of

8    ARISA lawyers sprang up to interpret and understand

9    that.  So it's within that lens I'm listening to the

10   question.  You're saying does ARISA require what

11   now?

12        Q.   Does ARISA have different rules for

13   converting single life annuities to joint and

14   survivor annuities depending on the age at which you

15   retire?

16        A.   Depending on the age at which you retire,

17   I don't think so.

18        Q.   Does ARISA have different rules for

19   converting subsidized earlier retirement single life

20   annuities to joint and survivor annuities?

21        A.   Does ARISA have rules and -- say that

22   again, please.

23        Q.   Does ARISA have different rules for

24   converting subsidized early retirement SLAs to JSAs

25   than the rules it has for otherwise converting

Page 142

1  single life annuities to joint and survivor
2  annuities?
3       A.   Well, I'm not sure I know the answer to
4  that.
5       Q.   Do you know whether a plan can offer a
6  qualified joint and survivor annuity for early
7  retirees that is worth less than the actuarial
8  equivalent of the single life annuity available on
9  the same date?
10      A.   Try me again on that.  Could you read that
11  back.
12            (Question read.)
13      Q.   It might be easier if I reask it because
14  it was the question that was after that.
15            Do you know whether a plan can offer a
16  qualified joint and survivor annuity for early
17  retirees that is worth less than the single life
18  annuity that they are entitled to take at the same
19  time?
20      A.   Well, the actuarial equivalence or I as an
21  actuary, I'm not going to comment on the legalities
22  of what is or is not compliant with ARISA.
23            I'll leave that for the lawyers and/or
24  the judge.  But I will say that the concept of
25  actuarial equivalence if asked, and I frequently am

Page 143

1    asked, if I am asked to equate the value of two

2    annuities that is within the scope and realm.

3              And I do know that there's a regulation

4    that suggests that I might want to make that

5    comparison.  But in response to a comparison between

6    an SLA and a qualified joint survivor annuity, yes,

7    I can do a calculation like that as any actuary

8    could.

9         Q.   You can do the analysis, but you have no

10   opinion as to whether or not it is permissible under

11   ARISA to offer a qualified joint and survivor

12   annuity to early retirees that is not worth the

13   actuarial equivalent of the single life annuity

14   offered at the same time?

15        A.   You know, the moment you speak about early

16   retirees, I will defer to legal counsel always on a

17   matter like this about what is or is not ARISA

18   compliant.

19              As an actuary, I can compare the value

20   of two benefits, and I am frequently asked to do so.

21   And, in fact, in the context of this report I've

22   been asked to compare the value of as part of the

23   assessment or evaluation of Raytheon's joint and

24   survivor conversion factor.

25              Implicit in that assignment is the

                                            Page 144

1    comparison of the value of the single life annuity

2    to the joint and survivor annuity.

3         Q.   Let's take a look at paragraph 273 of your

4    report, and this is figure 14.  Your chart on

5    figure 14, paragraph 273 doesn't have a column

6    showing the value of a single life annuity available

7    at each of the ages, does it?

8         A.   No, it does not.

9         Q.   And if your chart had such a column, would

10   the numbers in that column be the same as the

11   numbers in the column labeled the early J and S

12   annuity?

13        A.   If there were a column, no.  I believe

14   that's a different column.

15        Q.   Yes.  My question is if you had a column

16   that was showing the value of the single life

17   annuity available at each of these ages, 55 to 64,

18   would the numbers in that column be the same as or

19   different from the column labeled -- the numbers in

20   the column labeled the early J and S?

21        A.   They would be different.

22        Q.   Let's have a look at paragraph 259.

23   You've got a figure 11 there, right?

24        A.   Yes.

25        Q.   And this lists the actuarial assumptions

Page 145

1   that you used in your benchmarking analysis.  Right?

2        A.   Correct.

3        Q.   So in this analysis did you rely on any

4   plan specific information in selecting the retiree

5   baseline mortality?

6        A.   The retiree baseline mortality selection

7   is of a table that as I think I have described

8   either here or elsewhere is reflective of U.S.

9   pension and mortality experience, which I believe to

10  be reasonably representative of mortality experience

11  of participants, retired participants in the

12  Raytheon hourly plan.

13       Q.   Is that the same answer with respect to

14  the beneficiary mortality assumption?

15       A.   Yes, it is, although I know less about the

16  nature of the beneficiaries than I know about the

17  pensioners.  So it is an assumption, but I believe

18  it's a reasonable assumption.

19       Q.   But it's not an assumption that is based

20  on information that you obtained about the plan?

21       A.   No, it is not.  Not specifically.

22       Q.   And the interest rate that you have

23  selected in your figure 11 chart, that is also not

24  specific to the plan, right?

25       A.   That's right.

1      Q.   So in this chart the factors that you did

2   rely on plan specific information were clearly the

3   gender blend and the retirement age, right?

4      A.   That's correct.

5      Q.   And then also you said that you compared

6   in some measure the participant mortality rate to

7   the PRI 2012 table?

8      A.   I don't think I said that.

9      Q.   In what sense did the plan specific

10  information inform your choice of the PRI 2012

11  mortality table for participant baseline mortality?

12     A.   The PRI 2012 table captures mortality

13  experience over the last decade for an array of

14  pensioners from U.S. pension plans.

15          And that's the basis upon which I

16  believe it is a reasonable proxy of what I might

17  expect to see as mortality experience if it were to

18  be tabulated and explicitly analyzed from the

19  Raytheon plan.

20     Q.   So I mean the Raytheon plan retirees are

21  are a subset of U.S. pensioners, right?

22     A.   Yes.

23     Q.   So it's reasonable to assume in the

24  absence of any contrary information that a study of

25  U.S. pensioners would be reflective of Raytheon's

Page 147

1    retirees, right?

2         A.    That's correct.

3         Q.    Are the mortality assumptions that you use

4    for your benchmarking analysis head count weighted

5    or benefits weighted?

6         A.    This is head count based.

7         Q.    The only factor in your analysis in your

8    assumptions that is a range is the interest rates,

9    right?

10        A.    Well, actually not.  The retirement age

11   has a small range in it as well.

12        Q.    It's a binary, though, right?  It's either

13   63.8 or it's 65, right?

14        A.    Well, it is just as the interest rate is a

15   binary.  It's either 1.5 or five.  The purpose was

16   to establish range.

17        Q.    So looking at paragraph 260, it shows a

18   range of conversion factors from point 884 to

19   point 912, right?

20        A.    Correct.

21        Q.    If you had used a single interest rate

22   rather than addressing the entire range you would

23   have been able to calculate a factor for age 63.8

24   and a factor for age 65, is that right?

25        A.    There's a variety of means by which

Page 148

1    benchmarking parameters could be tested and that is

2    one scenario that could be viewed, yes.

3         Q.   Let's look at paragraph 263.  In paragraph

4    263, you write "Based on my understanding of the

5    demographics the participants in the Raytheon plan,

6    an actuary could reasonably conclude that it would

7    be appropriate to use a blue collar mortality table

8    in assessing reasonableness of the plan's 0.90

9    tabular factor."

10             Do you see that?

11        A.   Yes.

12        Q.   What information do you cite in your

13   report that would support the conclusion that it

14   would be appropriate for an actuary to use a blue

15   collar mortality table?

16        A.   Your sound is going out again, by the way.

17        Q.   Were you able to hear my question?

18        A.   Yes.  I would like to examine if I could

19   the appendix.  I don't know that I have anything in

20   the appendix that further describes that, but I'll

21   tell you what I know that we did and why we did it.

22             The Society of Actuaries Committee, the

23   retirement plan experience committee, also known as

24   RPEC, gathers data and categorizes that data into

25   subgroups.  One of the subgroups is for whatever

Page 149

1    reason called the blue collar group.

2              There's a white collar subgroup and then

3    there's a combined collar, if you will.  When RPEC

4    ingests experience data from an array of pension

5    plans that it examines, whose experience they

6    examine, they seek to identify the group as blue

7    collar or white collar.

8              Or if they don't know, everything else

9    is slotted into this general bucket.  The group that

10   is described as an hourly group.  In other words, if

11   the employees, a certain percentage of the employees

12   covered by that group are hourly paid employees,

13   they are to be designated as blue collar.

14             So the Society of Actuaries creates a

15   special blue collar experience analysis and thus

16   mortality tables that is comprised of the experience

17   from plans that meet that prescribed definition.

18             And my assessment is that the Raytheon

19   hourly plan meets that description such that the

20   participants in the hourly, the Raytheon hourly plan

21   would be similar to the experience pool that is

22   described as blue collar according to the

23   prescription of the Society of Actuaries Experience

24   Committee.

25        Q.   Is there any plan specific fact that you

                                          Page 150

1     rely on other than the fact that the plan is

2     designated as being for hourly employees?

3          A.   No.

4          Q.   Let's take a look at paragraph 265 of your

5     report.  We have an analysis here, an alternative

6     analysis that uses Dr. Serota's choice in the

7     mortality table and mortality group table.

8               Do you see that?

9          A.   Yes.

10         Q.   Now, in your run of this alternative

11    analysis, did you use a head count weighted

12    mortality table or a benefit weighted table?

13         A.   Well, you're asking a question to which

14    there is an absolute answer.  And it's either yes or

15    no.

16              And as you know from this report, there

17    have been a number of runs, number of scenarios that

18    have been run.  I believe that I used in this

19    instance Serota's mortality assumptions, which I

20    believe were benefit weighted.

21         Q.   Okay.  But you didn't use the same gender

22    blend as Dr. Serota used in his report, correct?

23         A.   No, that's a different assumption.

24         Q.   Did you assume that the age of the retiree

25    was either 63.8 or 65?

1       A.   Yes.   I assumed that same range of

2    retirement ages.

3       Q.   And you used your 350 basis point interest

4    rate range, right?

5       A.   I used an interest rate range of 1.5

6    percent to 5 percent.

7       Q.   Am I incorrect in calculating that as a

8    350 basis point range?

9       A.   That's terminology that actuaries don't

10   use and because you're speaking to an actuary, I

11   translate it into something that actuaries use in

12   speaking to one another --

13      Q.   So a three and a half percent interest

14   rate range, does that sound better to you?

15      A.   Yes.

16      Q.   Let's take a look at paragraph 267.  This

17   is your alternative what you have labeled as a Cruz

18   only scenario.  Do you see that?

19      A.   Yes.

20      Q.   And did you use a mortality improvement

21   scale with a PRI 2012 mortality table that you used

22   there?

23      A.   I don't believe so, no.

24      Q.   Do you recall whether this analysis used a

25   head count or a benefits weighted mortality table?

1        A.    This would be head count.

2        Q.    Let's take a look at paragraph 295.  In

3    paragraph 295 you write first, actual gender mix of

4    the plan's overall retiree population since 2011 is

5    58 percent male and 42 percent female.  Do you see

6    that?

7        A.    Yes.

8        Q.    When you say the plan's overall retiree

9    population, what do you mean by that?

10        A.    It's the population of those who retired

11    from the plan since 2011.

12        Q.    So between the years of 2011 and 2019?

13        A.    Yes.

14        Q.    So this wouldn't include people who

15    retired before 2011, but were still in the plan,

16    right?

17        A.    It includes neither the people who retired

18    before 2011 and who were still in the plan, nor the

19    people who retired before 2011 and who are no longer

20    in the plan by virtue of death.

21             And I add that, Mr. Kindall, because

22    it's an important group, and this came up in

23    Mr. Serota's rebuttal report where he mistakenly

24    used valuation data as if it was experience analysis

25    data without adjusting for that very important

1    distinction, which I just said.  The importance of

2    which --

3         Q.    There's no question pending, Mr. Terry.

4         A.    The importance of which -- I am still

5    finishing my answer.  The importance of which is

6    that Mr. Serota's contention that there's a 50/50

7    male female split of those retiring from the plan is

8    mistaken.

9         Q.    Mr. Terry, have I asked you any questions

10   about Dr. Serota's rebuttal report today?

11        A.    You asked me a question about a topic that

12   was commented on, and I chose to set the record -- I

13   chose to comment on it because I did read

14   Mr. Serota's comment on my report.  And I chose to

15   elaborate to make a point about what the data

16   actually are and how they should be properly used.

17        Q.    I will ask the question again because it's

18   important that I get an answer on this.

19              Have I asked you any questions about

20   Dr. Serota's rebuttal report today?

21        A.    You're asking me right now, sir.

22        Q.    I am not.  I am asking you whether I have

23   asked any questions on this topic?

24        A.    You've asked me a question about the topic

25   of the gender mix of the retiree population since

Page 154

1  2011 and because as an expert I am expected to

2  convey context and understanding that may not be

3  clear with respect to a subtle point that nonexperts

4  may not appreciate, I chose to elaborate on the

5  answer in a fashion that was an attempt to clean up

6  any misunderstanding.

7       Q.   Mr. Terry, I am not asking you to explain

8  why you gave the answer that you gave.  I am simply

9  asking whether to your recollection I have

10 specifically asked you any questions today about

11 Dr. Serota's rebuttal report?  It's a yes or no

12 question.

13      A.   Other than the questions you're asking me

14 right now, no.

15      MR. KINDALL:  We're loading up a document.  It

16 will take a second.

17 BY MR. KINDALL:

18      Q.   Can you see document number 2 on the

19 document share system?

20      A.   Yes.

21      Q.   Can I ask you to take a look at that and

22 tell me whether or not you recognize it?

23      A.    It appears to be a transcript of a

24 deposition in the Huntington matter, my deposition.

25      Q.    And have you reviewed this transcript

Page 155

```
 1   before?
 2        A.   Yes.
 3        Q.   Let me ask you to take a look at Exhibit
 4   number 3 that is in the folder.
 5             Do you have that document?
 6        A.   Yes.
 7        Q.   Do you recognize that document?
 8        A.   This is the errata associated with the
 9   same transcript.
10        Q.   Is that your signature at the bottom of
11   it?
12        A.   Yes.
13        Q.   So that testimony was taken last January,
14   right?
15        A.   Yes.
16        Q.   And counsel for Austin and Berg were
17   defending that deposition, right?
18        A.   Yes.
19        Q.   Your testimony was under oath?
20        A.   Correct.
21        Q.   And the court reporter made a verbatim
22   transcript, and this is the transcript, right?
23        A.   That's right.
24        Q.   And you had an opportunity to review it
25   for accuracy, right?
```

Page 156

1        A.    Yes.

2        Q.    And that's what is reflected in your

3    errata report, right?

4        A.    That's right.

5        Q.    When you provided testimony in the

6    Huntington case in January of this year, was that

7    testimony true and accurate to the best of your

8    ability and belief?

9        A.    I believe so.

10       Q.    Do you stand by that testimony today?

11       A.    I do.

12       Q.    And as you sit here today, do you believe

13   that the testimony that you gave on that occasion is

14   correct?

15       A.    I believe so.

16       Q.    Are there any answers that you recall that

17   you think were not correct?

18       A.    I don't recall.

19       Q.    Let me direct your attention to page 83

20   of the transcript and ask you to take a look at

21   lines 1 through 15 of that transcript.

22       MR. PISTILLI:  Page 83?

23       MR. KINDALL:  Correct.

24   BY MR. KINDALL:

25       Q.    Let me know when you've had a chance to

Page 157

1    review that testimony.

2         A.   Okay.

3         Q.   So in that testimony you indicated that

4    there are ASOPs that informed the thinking of the

5    actuary with respect to the development of the three

6    ingredients that go into the calculation of

7    conversion factors.

8              Do you recall that testimony?

9         A.   I do.

10        Q.   And you testified at the time that you

11   could think that ASOP 27 and 35 are two examples of

12   that.  Do you recall that?

13        A.   I do.

14        Q.   Do you still agree that ASOP 27 and 35

15   informed the thinking of actuaries with respect to

16   the ingredients of the calculation of conversion

17   factors?

18        A.   I agree that they informed the thinking of

19   actuaries, yes.

20        Q.   And you developed those same ingredients

21   with respect to what you refer to as your post hoc

22   analysis of the conversion factor in this case,

23   didn't you?

24        MR. PISTILLI:  Objection, misstates prior

25   testimony.

1          THE WITNESS:  I don't think I said that, no.

2     Could you restate the question or just replay it, I

3     guess.

4               (Question read)

5          THE WITNESS:  Could you read the whole question

6     again.  I'm sorry, I missed the first part.  Maybe

7     you could restate it.

8     BY MR. KINDALL:

9          Q.   Do you recall what the three ingredients

10    are that you were referring to in your answer on

11    page 83, lines 8 to 12 of that transcript?

12         A.   I'd like to be more specific about which

13    three ingredients I'm referring to here.  I don't

14    recall which three ingredients I am referring to in

15    this question and answer exchange.

16         Q.   Would it sound correct to you if you were

17    referring to the participant mortality table, the

18    beneficiary mortality table and the interest rate?

19         A.   Yes.

20         Q.   In your post hoc analysis that you

21    performed with respect to the conversion factor in

22    this case, did you make a determination with respect

23    to an appropriate mortality table for participants?

24         A.   I did.

25         Q.   And did you make a determination with

Page 159

1    respect to an appropriate mortality table for

2    beneficiaries?

3         A.   I did.

4         Q.   And did you make a determination with

5    respect to a reasonable range of interest rates?

6         A.   I did.

7         Q.   And in this case did you -- strike.  Did

8    ASOPs 27 and 35 inform your thinking with respect to

9    the development of those three ingredients?

10        A.   They did.

11        Q.   Let's go back to your report.  Appendix A,

12   page five, paragraph four specifically on that page.

13             In that paragraph you indicate that the

14   measurement of plans -- strike that.  In that

15   paragraph you indicate that the measurement of

16   private sector pension plan participants mortality

17   experience has evolved over the years as more types

18   of data have become available and as analysis

19   methods have become more sophisticated.

20             Do you see that?

21        A.   I do.

22        Q.   And when you say analysis methods have

23   become more sophisticated, what do you mean?

24        A.   Well, the capacity to -- I'll use a

25   technical word juggle large data sets and manage and

Page 160

1    manipulate them and slice and dice them, another

2    technical term, in different ways has improved.

3              The transfer of data has improved.  More

4    data is available as more sponsors have been able to

5    access and pass along data and also techniques for

6    what I'll call smoothing.  And I'll call graduating

7    the data, another actuarial technical term, have

8    been used.

9        Q.   So an actuary functioning today would do a

10   more sophisticated analysis than one that was

11   operating 50 years ago?

12       A.   That's right.

13       MR. KINDALL:  Let's go off the record.

14       THE VIDEOGRAPHER:  Off the record at 2:50.

15              (Recess)

16       THE VIDEOGRAPHER:  Back on the record at 3:11.

17   BY MR. KINDALL:

18       Q.   Mr. Terry, during your prior testimony you

19   talked a little about the idea of doing a gender

20   weighted mortality table based on the percentage of

21   people who take a particular form of benefit.

22              Do you recall that?

23       A.   Are you referring to my testimony today or

24   are you referring to my written testimony?

25       Q.   It's both in your report and --

Page 161

```
 1      A.   I know it's in both.  I just wonder
 2   whether you're getting specific.  But yes, I do
 3   recall testifying to that.
 4      Q.   So if I understand your report and your
 5   testimony correctly, you think that it is
 6   appropriate for a plan to use a gender weighted
 7   mortality table for calculating a particular form of
 8   benefit that is based on the gender, on the plan's
 9   experience of who takes that particular type of
10   benefit.  Is that fair?
11      MR. PISTILLI:  Objection, misstates prior
12   testimony.
13      THE WITNESS:  I think that it's fair to look to
14   the experience as an indicator of what might be
15   expected going forward.
16        And so whether I am looking backwards or
17   forwards, the experience will be a good indicator of
18   the selection patterns.
19   BY MR. KINDALL:
20      Q.   When you did the gender weighting for your
21   benchmark model, looking at the plan specific data,
22   you looked at the percentage of people who took
23   joint and survivor annuities, right?
24            Sorry.  You looked at the gender blend
25   of people who took the joint and survivor annuities?
```

Page 162

1        A.    That's correct.

2        Q.    Did you break that down by the percentage

3    of people who took the qualified joint and survivor

4    annuity versus other joint and survivor annuity

5    options?

6        A.    No, I did not.

7        Q.    Why not?

8        A.    The population of retirees is not an

9    enormous population.  You know, it's not a huge

10   group and as a result the finer and finer

11   distinctions in my mind lose credibility.

12              So the tendency to orient towards the

13   joint survivor annuity, I chose to blend all of the

14   different arrays of them into a single category.

15       Q.    Is there a particular number that you look

16   to with respect to a credible number of participants

17   in order for you to make that kind of a

18   determination?

19       A.    Well, this is a credibility as it relates

20   to an assumption like a mortality table, of course,

21   is an important consideration.

22              There's always judgment associated with

23   mathematical, with credibility.  With respect to

24   mortality there are some very rigorous mathematical

25   credibility standards that actuaries and others

1    orient to.  With respect to this particular

2    assumption, I am not aware of any documented

3    credibility threshold.  But the reason I aggregated

4    all of those joint and survivor recipients is

5    because the behavior patterns of plan participants

6    who orient toward a survivor benefit regardless of

7    its size, those behavior patterns are indicative of

8    a trend or an orientation towards that type of

9    benefit.

10        Q.   If you used a gender weight that was based

11   on the preferences of plan participants for a

12   particular type of benefit, would you use that same

13   methodology with respect to each benefit option that

14   participants could select?

15        A.   Well, I would have to give that some

16   thought.  I may use that same methodology.

17        Q.   So, for example, if you decided to do a

18   75/25 male to female gender blend for participants

19   for people who took the joint and survivor annuity

20   you want to take the plan's actual experience with

21   respect to participants who took, for example, a ten

22   year life annuity, is that correct?

23        A.   I might choose to if my job were to

24   evaluate or assess that conversion factor.

25        Q.   Do you know what the percentage of

Page 164

```
1    participants in the plan was who took the single

2    life annuity?  Strike that.

3                Do you know the gender blend of the

4    participants in the plan who selected the single

5    life annuity during the same years that you studied

6    with respect to developing your gender blend for the

7    joint and survivor?

8         A.   Off the top of my head I don't know, but

9    that is information, the answer to that question is

10   readily available from the data.

11        Q.   But in the course of your analysis you

12   didn't look at that?

13        A.   That was not part of our analysis.  By the

14   way, I would like to go back and amend an answer to

15   a question from a couple of questions ago if I

16   could.

17        Q.   Sure.

18        A.   When you asked about using gender blend

19   with respect to a certain life annuity, it's

20   possible to look at a gender blend with respect to

21   any option, but single life annuity may show similar

22   attributes, but not identical attributes.

23                So it is a worthwhile exercise.  I want

24   to underscore the fact that I don't want to suggest

25   that it's not, and it would be -- to evaluate any
```

1    option or form, it would be appropriate to consider

2    gender blend.  I want to make sure that I didn't

3    leave the impression that it's not appropriate.

4         Q.   Okay.  In the data that you reviewed did

5    you have data that broke down the gender

6    participants by the types of joint survivor annuity

7    that they might have selected?  Or sorry, that they

8    did select?

9         A.   I think that was in the raw data, but we

10   chose to aggregate it.

11        Q.   Have you ever advised plans to use

12   different gender blends with respect to each benefit

13   option that they provide?

14        A.   You know, I have advised so many plans on

15   so many things.  I don't recall.  I just don't

16   recall.

17        Q.   During our breaks today, have you had an

18   opportunity to talk with anybody?

19        A.   Since 8:30 this morning central time the

20   only person I have spoken with is you, Mr. Kindall.

21        Q.   I apologize for that.  That makes for a

22   bad day.

23        MR. KINDALL:  That is all I've got.  Your

24   witness, Mr. Pistilli.

25        MR. PISTILLI:  Sure.  Just a few questions,

```
                                         Page 166
 1    Mr. Terry.
 2                  CROSS-EXAMINATION
 3                  BY MR. PISTILLI:
 4
 5         Q.   First, do you recall discussing with
 6    Mr. Kindall today the need to make solutions about
 7    gender in light of the Norris decision?
 8         A.   Yes.
 9         Q.   When an actuary assesses the
10    reasonableness of a tabular factor, does he also
11    have to make an assumption about age, such as
12    rounding assumptions?
13         A.   Yes.
14         Q.   So does an actuary need to make an
15    assumption about whether to treat a person born on
16    January 1 of a particular year the same as a person
17    born on December 31 of that year?
18         A.   Yes.
19         Q.   Do you recall discussing or Mr. Kindall
20    asking you earlier today whether you specifically
21    cited by name plans that used mixed tabular factors
22    in your report?
23         A.   Yes, I recall that.
24         Q.   Do you also recall testifying that in the
25    course of forming your opinions you relied on your
```

1    general experience as an actuary over a 40 year

2    period?

3         A.   Yes.

4         Q.   Are you aware in your career as an actuary

5    of plans that have used fixed tabular factors to

6    confer single life annuities to joint and survivor

7    annuities?

8         A.   Yes.

9         Q.   Are you aware of plans that continue to do

10   so today?

11        A.   Absolutely.

12        Q.   You also recall Mr. Kindall asking you

13   whether you specifically cited by name other pension

14   plans that use U.S. treasury rates for purposes of

15   calculating joint and survivor conversion factors?

16        A.   Yes.

17        Q.   And stepping back from whether you

18   specifically cited them by name, are you aware of

19   plans that use treasury rates for purposes of

20   calculating joint and survivor conversion factors?

21        A.   Yes.  Not only that, but the IRS

22   examination procedures explicitly endorse, if you

23   will, or provide for the fact that the treasury

24   rates check the box.

25             If you see treasury rates in that

Page 168

1    category, bingo, you're good kind of thing.  So

2    they're clearly well established.

3           MR. PISTILLI:  No further questions.

4           MR. KINDALL:  A couple of quick followups on

5    that.

6                     REDIRECT EXAMINATION

7                     BY MR. KINDALL:

8           Q.   Mr. Terry, you indicated in your testimony

9    just now that you were aware of plans that used

10   fixed tabular factors that are still in used today,

11   correct?

12          A.   Yes.

13          Q.   Do you know when those tabular factors

14   were established with respect to the plans you're

15   referring to?

16          A.   I don't know.

17          Q.   Do you know whether they have been

18   established within the last 20 years?

19          A.   I don't know.   No, I don't know.

20          Q.   With respect to the use of treasury rates

21   are you familiar with -- you indicated that you are

22   familiar with plans that use the treasury interest

23   rates as the interest rate assumption for

24   calculation of annuities in the plan.

25                Do you recall that testimony?

Page 169

1        A.   Yes.

2        Q.   Do you know when those rates were put into

3    the plan document?

4        A.   I don't know.

5        MR. KINDALL:   That is all I've got.

6        THE VIDEOGRAPHER:   Off the record at 3:45.

7        MR. PISTILLI:   We'll review and sign.

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 170

```
 1    STATE OF ILLINOIS    )
 2                         ) ss:
 3    COUNTY OF C O O K    )
 4
 5                 I, VICTORIA D. ROCKS, C.S.R., Notary
 6    Public, within and for the County of Cook, State of
 7    Illinois, a Certified Shorthand Reporter of said
 8    state, do hereby certify:
 9                 That previous the commencement of the
10    examination of the witness, THOMAS TERRY, was first
11    duly sworn to testify to the whole truth concerning
12    the matters herein;
13                 That the foregoing deposition
14    transcript was reported stenographically by me and
15    was thereafter reduced to typewriting via
16    computer-aided transcription under my personal
17    direction, and constitutes a true record of the
18    testimony given and the proceedings had;
19                 That the said deposition was taken
20    before me at the time and place specified;
21                 That the reading and signing by the
22    witness of the deposition transcript was not waived;
23                 That I am not a relative or employee of
24    attorney or counsel, nor a relative or employee of
25    such attorney or counsel for any of the parties
```

Page 171

1   hereto, nor interested directly or indirectly in the

2   outcome of this action.

3               IN WITNESS WHEREOF, I do hereunto set

4   my hand and affix my seal of office at Chicago,

5   Illinois this 19th day of August, 2020.

6

7   _Victoria Rocks_

8               VICTORIA D. ROCKS, C.S.R.

    License No. 084-002692

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 172

1   CHRISTIAN J. PISTILLI

2   cpistilli@cov.com

3                        August 19, 2020

4   RE: Cruz v. Raytheon Company, Et Al.

5       8/7/2020, Thomas Terry (#4194805)

6       The above-referenced transcript is available for

7   review.

8       Within the applicable timeframe, the witness should

9   read the testimony to verify its accuracy. If there are

10  any changes, the witness should note those with the

11  reason, on the attached Errata Sheet.

12      The witness should sign the Acknowledgment of

13  Deponent and Errata and return to the deposing attorney.

14  Copies should be sent to all counsel, and to Veritext at

15  cs-ny@veritext.com.

16

17      Return completed errata within 30 days from

18  receipt of testimony.

19      If the witness fails to do so within the time

20  allotted, the transcript may be used as if signed.

21

22                  Yours,

23                  Veritext Legal Solutions

24

25

Page 173

1   Cruz v. Raytheon Company, Et Al.

2   Thomas Terry (#4194805)

3                    E R R A T A   S H E E T

4   PAGE_____ LINE_____ CHANGE_____

5   _____

6   REASON_____

7   PAGE_____ LINE_____ CHANGE_____

8   _____

9   REASON_____

10  PAGE_____ LINE_____ CHANGE_____

11  _____

12  REASON_____

13  PAGE_____ LINE_____ CHANGE_____

14  _____

15  REASON_____

16  PAGE_____ LINE_____ CHANGE_____

17  _____

18  REASON_____

19  PAGE_____ LINE_____ CHANGE_____

20  _____

21  REASON_____

22

23  _____   _____

24  Thomas Terry                          Date

25

Page 174

1     Cruz v. Raytheon Company, Et Al.

2     Thomas Terry (#4194805)

3                    ACKNOWLEDGEMENT OF DEPONENT

4        I, Thomas Terry, do hereby declare that I

5     have read the foregoing transcript, I have made any

6     corrections, additions, or changes I deemed necessary as

7     noted above to be appended hereto, and that the same is

8     a true, correct and complete transcript of the testimony

9     given by me.

10

11    _____  _____

12    Thomas Terry                      Date

13    *If notary is required

14                        SUBSCRIBED AND SWORN TO BEFORE ME THIS

15                        _____ DAY OF _____, 20____.

16

17

18                        _____

19                        NOTARY PUBLIC

20

21

22

23

24

25

| & |
| --- |
| **&**   2:2,8 |

| 0 |
| --- |
| **0**   127:3 |
| **0.90**   148:8 |
| **06107**   2:4 |
| **084-002692**   171:8 |

| 1 |
| --- |
| **1**   3:8 14:17 156:21 166:16 |
| **1.5**   111:3,7,18 112:14 128:21 129:5,9 147:15 151:5 |
| **10**   127:3 |
| **100**   80:13,14,18,19 81:7 84:16,18 91:19,22 |
| **102**   50:7,8 |
| **105**   56:22 |
| **106**   90:7 |
| **10:10**   49:4 |
| **10:21**   49:7,10 |
| **10:22**   49:12 |
| **11**   144:23 145:23 |
| **11425**   1:5 4:5 |
| **115**   92:18 |
| **117**   94:2 |
| **11:30**   89:24 |
| **11:38**   90:1 |
| **12**   47:9,21 158:11 |
| **120**   59:4,24 |
| **123**   60:17 61:7,12 62:7 |
| **12754**   171:7 |
| **12:21**   90:4 |
| **136**   64:20 |
| **14**   139:2 144:4,5 |
| **144**   66:3,4 |

**145**   74:4,6
**15**   103:12 133:9 156:21
**150**   77:4
**153**   86:9,13
**154**   87:9
**155**   3:9,9
**15o**   77:3
**160**   99:7
**165**   3:4
**166**   3:5
**168**   3:5,5
**169**   3:5
**17**   96:24
**170**   101:2,3 102:1 102:6
**1700**   139:23
**173**   96:22
**180**   104:2
**182**   113:21
**1860**   133:9
**1860s**   31:22
**188**   119:13
**19**   7:10,11 9:11,14 9:15 10:3,4 172:3
**192**   122:13,14 130:22 134:10 135:12
**193**   122:21 123:13
**1974**   64:23 86:11
**197os**   41:1,11,24 104:19
**1980**   31:23
**1980s**   11:3 12:24 104:13 133:10
**1984**   65:22 66:1
**19th**   171:5
**1:19**   1:5 4:5
**1:52**   138:3

| 2 |
| --- |
| **2**   3:8 154:18 |
| **20**   13:5,6 137:8 138:13 139:5 168:18 174:15 |
| **2000**   46:23 47:10 47:20,23 |
| **20001**   2:9 |
| **2003**   77:14 |
| **2011**   152:4,11,12 152:15,18,19 154:1 |
| **2012**   146:7,10,12 151:21 |
| **2014**   14:6 48:10 |
| **2015**   14:6 116:24 117:17,21 118:22 |
| **2019**   115:23 152:12 |
| **2020**   1:16 12:3 111:18 171:5 172:3 |
| **202o**   4:3 |
| **25**   46:23 48:12 64:23 |
| **259**   144:22 |
| **260**   147:17 |
| **263**   148:3,4 |
| **265**   150:4 |
| **267**   151:16 |
| **27**   157:11,14 159:8 |
| **273**   144:3,5 |
| **29**   2:3 |
| **295**   152:2,3 |
| **2:01**   138:7 |
| **2:5o**   160:14 |
| **2o15**   115:21 |

| 3 |
| --- |
| **3**   3:9 155:4 |
| **30**   103:25 172:17 |
| **305**   2:4 |
| **31**   166:17 |
| **34**   137:13 138:16 139:11 |
| **35**   157:11,14 159:8 |
| **35o**   111:6 151:3,8 |
| **39**   62:12,13 140:8 140:14 |
| **3:11**   160:16 |
| **3:45**   169:6 |

| 4 |
| --- |
| **4**   46:23 48:12 |
| **40**   11:9 48:19 96:9 98:2 140:8 167:1 |
| **41**   137:3,5 138:10 |
| **417e**   120:11,19 121:3 122:7,10 |
| **4194805**   172:5 173:2 174:2 |
| **42**   152:5 |
| **45**   70:25 71:5 |
| **493-6292**   2:5 |

| 5 |
| --- |
| **5**   3:4 97:5 111:3,8 111:21 112:11 122:15 123:12,14 124:16 125:15,16 126:5,9 127:13,16 127:23 128:21 129:9 130:1,23 131:9 133:24 134:14,17 135:8 135:13,18,23 136:10 151:6 |
| **50**   48:19 63:15 137:6 |

**[50/50 - actuaries]**

**50/50** 37:23 39:16
153:6
**52** 30:11
**55** 26:4,14 30:11
68:17 81:15,17
83:5,9 139:21
140:3 144:17
**5500** 13:16 97:8,15
98:6
**56** 68:18 74:22
**58** 152:5
**5o** 40:14,14 42:6,6
74:23,23 88:2
103:14,22,23,23
138:11 160:11

**6**

**6** 3:8 97:6 98:7
**62** 66:19 67:15
**63** 15:4,4,12,17
20:9 24:11,20
26:25 30:24 31:20
**63.8** 147:13,23
150:25
**64** 93:8 144:17
**65** 26:8,14,18,19
66:7,19,20 67:5,16
68:18 105:19
106:9 112:12
139:23 147:13,24
150:25
**66** 34:1,2 35:10,21
**662-5342** 2:10

**7**

**7** 4:3
**70s** 41:22
**71** 44:11,21
**715** 102:21
**75/25** 163:18
**7th** 1:16

**8**

**8** 140:13 158:11
**8/7/2020** 172:5
**80/20** 41:18 42:7
**80s** 65:3
**83** 132:11 156:19
156:22 158:11
**84** 44:11,13,21
139:2
**85** 37:12,13 39:6
39:12,23 40:2,2
44:7 132:25
**850** 2:9
**86** 44:5
**860** 2:5
**88** 132:7 133:7
**884** 147:18
**8:30** 1:15 165:19
**8:31** 4:3
**8:39** 9:4
**8:44** 9:6

**9**

**9** 98:20
**90** 63:13 87:23
88:24 89:13
**912** 147:19
**93** 132:12
**94** 44:11,21
**95** 132:25
**960** 99:9,13 100:18
100:22
**9:26** 29:18
**9:29** 29:20

**a**

**a.d.** 1:16
**a.m.** 1:15 4:3
**ability** 80:22 156:8
**able** 30:9 55:4,5
65:18 147:23
148:17 160:4

**absence** 146:24
**absolute** 31:15
150:14
**absolutely** 99:16
128:16 137:20
167:11
**accept** 114:12
**acceptable** 50:10
57:1 62:24 122:5
122:6
**accepting** 48:22
**access** 89:20 160:5
**account** 19:9 25:3
53:1,9,12,16,19
54:2,3,10,14,16,17
54:22 61:17 63:22
87:10 120:8 131:5
**accounting** 72:14
101:3 102:15
**accrued** 137:8
138:14 139:8,24
140:5
**accuracy** 155:25
172:9
**accurate** 5:25
156:7
**accurately** 50:11
**acknowledgement**
174:3
**acknowledgment**
172:12
**act** 65:22 66:1
**action** 171:2
**active** 102:25
103:10
**actual** 9:18 75:22
79:6 139:25 152:3
163:20
**actuarial** 9:16
10:12,15 11:24
15:7,15,24 16:5

17:1,9 19:7 20:9
20:10,12,14 21:3
22:23,24 23:19,21
23:24 24:6,12,19
27:1 30:17,24
31:12,16 32:7,14
32:17 33:6,9,12,17
33:18 34:3,4,8,12
34:17,20,21 35:12
35:13 36:12,13,20
36:22 39:2 57:11
67:25 68:22 70:21
71:1 74:24 79:1
80:12 81:8 82:7
82:10,24 83:8
93:5 97:9 104:4
106:20 110:19
115:23 121:24,25
123:18,19,21
124:4,17 125:1,1
125:19,24 126:2
126:18 127:18,19
127:21 130:2,14
131:15 132:10
133:25 135:4,15
136:7,15 141:2
142:7,20,25
143:13 144:25
160:7
**actuarially** 15:5
31:10,19 35:10
38:21 56:13 62:21
69:20 71:24 81:9
81:22 83:10,12
87:3
**actuaries** 8:3 13:7
14:4 15:14 34:10
34:19,24 35:25
47:25 76:16,18
87:10 96:14 98:2
103:20 111:13

122:15 123:3,23
124:4,9,24 129:1,2
129:2,12,19
148:22 149:14,23
151:9,11 157:15
157:19 162:25
**actuary** 7:8,13 8:3
8:9 9:23 11:15
13:9,13 14:2,15,23
15:1,2 34:6,8
55:11 62:20 67:19
72:14 74:1 75:4
75:12 83:16 84:24
93:3 96:9 100:21
100:25 111:10
112:3,4 113:7
125:13 126:1,25
128:11,17 129:7
129:16 141:2
142:21 143:7,19
148:6,14 151:10
157:5 160:9 166:9
166:14 167:1,4
**actuary's** 112:2,5
**add** 96:6 110:11
152:21
**addition** 7:24 9:12
**additional** 14:22
27:7 116:11
**additions** 174:6
**address** 137:15
**addressing** 147:22
**adjusting** 152:25
**adjustment** 29:5
**administration**
105:1
**administrative**
114:14
**adopt** 10:22 57:1
120:19 121:5
122:7

**adopted** 58:8 83:7
**adopts** 55:6
**advance** 50:12
53:20
**adverse** 74:6
**advice** 11:1,12
32:20 128:18
**advise** 11:20
126:17
**advised** 10:21 11:6
128:10 165:11,14
**affect** 78:17
**affix** 171:4
**age** 25:4,11,18,19
25:20,23 26:4,8,14
26:14,17,19,23
27:2 28:6,10,10,14
28:17,23,24 29:9
30:11,11 57:24
58:2 59:7 60:19
63:16,19 64:1
66:6,7,9,12,17,19
67:5,12,14,15,17
68:5,7,8,14,17,18
68:18,23 69:11,14
69:19,21,22 70:3
70:15,17,25 71:4,5
71:9,13,15,17,19
71:21 72:23,25,25
73:3,14,15 74:2,17
74:20,22 83:5
85:7 90:14,18,20
90:23 91:25 92:2
92:8,10,12,13,15
93:7,21,24 101:9
105:19 106:9
112:12 113:3,19
113:20 139:9,21
139:23 140:3,25
141:14,16 146:3
147:10,23,24

150:24 166:11
**ages** 60:19,25
62:14,20,24 63:1,9
63:12 64:5,10,13
69:10 70:2 73:19
139:3 144:7,17
151:2
**aggregate** 66:23
67:7 73:22 75:6
165:10
**aggregated** 163:3
**agnostic** 32:7
33:11 36:22
**ago** 11:10 21:15
60:13 61:24 84:8
133:17 160:11
164:15
**agree** 14:19 16:25
23:25 49:14,17
67:5 68:4 72:21
79:24 94:1 109:14
157:14,18
**agreed** 21:20 33:4
68:13
**agreeing** 118:18
**ahead** 53:22
112:20 123:25
124:2
**aided** 170:16
**akin** 85:5
**al** 1:6 172:4 173:1
174:1
**allotted** 172:20
**allow** 72:5
**allowed** 85:12
90:24
**allows** 50:11
**altered** 46:17
**alternative** 28:24
74:9 150:5,10
151:17

**amend** 55:8 56:7
56:14 164:14
**amended** 56:18
**amending** 39:19
**amendment** 38:16
38:23 39:1 56:10
**amendments**
80:23
**amount** 8:6,16
53:18,20 68:23
76:17 78:24 91:3
139:25
**amounts** 43:9 46:1
**analogous** 43:8
**analogy** 42:24
**analyses** 77:24
**analysis** 17:2
46:14 71:10 80:11
87:25 89:5 95:25
98:19,23,24 99:14
100:22 101:1
102:18 110:8
111:1 113:13
117:8 126:24
131:1 135:20,21
135:22 143:9
145:1,3 147:4,7
149:15 150:5,6,11
151:24 152:24
157:22 158:20
159:18,22 160:10
164:11,13
**analyze** 94:18
**analyzed** 103:5
146:18
**annually** 53:19
**annuitant** 16:23
28:7,10,11,14,18
28:23,25 29:7,9
30:8,11

**annuitant's** 28:5
**annuities** 10:23
11:14,25 32:22,23
33:7,11 57:24
58:9,10,16,17
79:11 80:1 91:12
95:11 106:22,23
106:24 110:1,15
113:8 140:24
141:13,14,20,20
142:1,2 143:2
161:23,25 167:6,7
168:24
**annuity** 12:20
16:19,20 17:6,6,9
17:10,16,19 18:7
18:16 21:19 22:7
23:5 24:5,8,10,17
24:21 25:4,11,13
26:6,12,14,25 27:3
27:6,7,9,12 28:16
28:22 30:14,25
31:3 32:15 33:20
38:3,4 46:13
51:25 55:3 66:22
68:5 69:1,10,12,16
70:2 74:25 75:1
77:8,10 79:21,23
81:7,10,23,24
82:18,19 83:19,19
84:2,3 87:2,3,11
89:15 91:18,21,21
97:10 101:10
102:7,10 103:3
104:7 105:19,19
105:20,25 106:9
106:13,17 107:7
107:20 108:10,14
108:15,15,16,22
108:24 109:6,12
109:23 111:19,20

111:22,23 112:15
112:16 113:19,20
113:22 115:3
119:21,22 120:24
136:11 137:6
138:11 139:9,13
139:22 140:1,2,7
140:24 142:6,8,16
142:18 143:6,12
143:13 144:1,2,6
144:12,17 162:4,4
162:13 163:19,22
164:2,5,19,21
165:6
**answer** 4:20 5:4
5:14 8:14 9:13
19:23 22:20 31:15
34:19 40:23 41:4
42:3,13 44:15
45:24 54:17 56:8
72:4 75:7 76:12
84:11 88:14 91:2
98:18 104:22
112:20 117:9
122:3,5 134:4,5
142:3 145:13
150:14 153:5,18
154:5,8 158:10,15
164:9,14
**answered** 44:4
88:17 89:2,16
117:24 119:1
**answering** 42:15
131:21
**answers** 34:16
156:16
**anybody** 12:9
76:12 99:5 165:18
**anyway** 6:9
**apart** 31:25

**apologize** 86:18
95:2 133:2 136:3
165:21
**appearances** 2:1
**appeared** 2:6,11
**appears** 154:23
**appended** 174:7
**appendix** 44:16,18
47:2,6,8,9 137:14
138:17 139:12
148:19,20 159:11
**apple** 72:19,20
**applicable** 172:8
**application** 20:22
**applications** 48:1
**applied** 83:5
**applies** 63:14
101:8
**apply** 29:4 82:21
122:9,12 123:15
123:16 129:25
**appreciate** 54:22
54:24 154:4
**appreciating**
127:7
**appreciation** 53:4
**approach** 57:6,10
59:5 60:18 62:21
62:22,24 122:24
123:2
**approaches** 56:24
56:25
**appropriate** 31:21
32:4 103:19 148:7
148:14 158:23
159:1 161:6 165:1
165:3
**appropriately**
107:25
**approximate** 13:6

**approximately**
13:5 137:7 138:13
**arbitrage** 113:10
**area** 11:2
**areas** 8:5
**argument** 38:19
**arisa** 14:12,13,18
14:20 32:13,18
33:7,21 62:18
65:4,6,7,14 66:5
91:1 104:14,15
140:23 141:5,8,10
141:12,18,21,23
142:22 143:11,17
**arisa's** 33:19
**array** 37:10
138:22 146:13
149:4
**arrays** 162:14
**arrive** 65:18
**articles** 8:7 95:9
95:22
**asb** 10:12
**asc** 96:24 99:9,13
100:18,22 102:21
121:9
**aside** 42:15 52:3
**asked** 8:14 23:7
36:2,3 39:8 40:22
41:16 55:12,12
56:19 76:11 83:25
88:17 89:2,16
91:2 98:17 102:3
102:4 117:24
119:1 132:6 136:1
138:15 142:25
143:1,1,20,22
153:9,11,19,23,24
154:10 164:18
**asking** 4:23 45:22
58:1 74:3 75:11

90:22 99:17
111:25 118:19
122:4 123:8
133:22 138:10
150:13 153:21,22
154:7,9,13 166:20
167:12
**asop** 157:11,14
**asops** 157:4 159:8
**assess** 96:1 163:24
**assesses** 166:9
**assessing** 35:10
37:9 87:12 88:1
96:25 129:20
135:24 148:8
**assessment** 37:7
61:21,25 88:19
100:8 143:23
149:18
**assets** 53:4 97:25
**assignment** 12:5
143:25
**assist** 7:1
**associate** 103:18
**associated** 46:1
102:19,24 103:8
110:19 124:22
125:24 127:17
141:6 155:8
162:22
**assume** 5:15 29:14
37:23 38:1,18
41:17 51:12 74:14
82:6,12 83:24
84:14 91:10 115:3
117:14 129:19
132:23 146:23
150:24
**assumed** 30:7
105:6 151:1

**assumes** 107:16
**assuming** 41:8,21
70:18 71:23 75:25
106:7
**assumption** 16:8
16:12,14 17:12,15
17:17 18:12,21
19:22,23 22:13,15
28:1,5,9,13,17,23
29:8 30:15 31:22
38:15,16 90:10,18
92:6,9,14 94:3,8
97:5 98:7,10
101:1 107:6
124:11,15 125:11
127:24 128:7,14
128:18 130:2
136:14 145:14,17
145:18,19 150:23
162:20 163:2
166:11,15 168:23
**assumptions** 15:7
15:21,24 16:6,9,24
20:13,14,17 21:3
23:22,24 25:17
27:13,16 31:12,13
31:21 32:11 33:12
33:18 34:5,7,10,17
34:20,21,24,25
35:14,17,18,22
36:1,15,23 59:5
71:11 82:7,10
90:9 97:9,14
104:5,6,7 106:21
110:19 112:6,8
115:23 122:10,17
123:5,16,20,21,22
123:24 124:5,21
125:9 126:18,19
127:18,21 128:3,4
128:7 130:2,15,15

131:15,25 132:10
134:1 135:15
136:7,15,20 137:2
138:23 144:25
147:3,8 150:19
166:12
**assurance** 119:8
**assured** 118:15
**attached** 13:16
172:11
**attack** 75:24
**attempt** 53:24
79:3 88:4 93:4
127:23 154:5
**attempting** 39:23
107:12 125:21
129:10 135:22
**attention** 50:6
59:3 60:16 156:19
**attorney** 14:7,10
170:24,25 172:13
**attributes** 19:1
52:1 164:22,22
**audio** 29:22
**audit** 88:12
**august** 1:16 4:3
171:5 172:3
**austin** 155:16
**automatically**
116:19 132:25
**available** 45:2,5
64:18 75:1 142:8
144:6,17 159:18
160:4 164:10
172:6
**average** 26:7 46:4
60:20 61:1 63:25
65:12 66:17 67:14
68:5 70:3,17,21,25
71:4,5,12,13,17,21
72:23 73:3,14,15

74:2,17,19 76:1,3
90:14 92:16 93:7
93:21,24
**averaging** 76:24
**awarded** 53:10
**aware** 59:1 60:13
89:20 99:16,19,23
163:2 167:4,9,18
168:9
**awkwardly** 27:10

**b**

**b** 2:12 47:8
**back** 9:6 12:11
20:7,24 21:14
23:18 29:19,20
32:1 35:9 48:12
49:6,12 58:22
65:2 71:8 90:3
104:13 108:25
109:24 116:2
117:16,17,25
119:5 133:10
136:13 137:3
138:6 139:11
142:11 159:11
160:16 164:14
167:17
**background** 20:15
96:20
**backwards** 161:16
**bad** 29:15 79:4
165:22
**baked** 129:20
**balance** 52:21,25
53:6,8,9,12 54:3,8
54:10,21 55:2
120:8,13,16,24
121:2
**band** 129:13
**barely** 73:20

**base** 17:4 58:24
72:25
**based** 8:5 22:8
25:16 31:22 41:23
51:20 53:3 60:19
61:1,8 63:12
64:17 68:4 70:3
70:17 71:20 73:14
73:15 75:22 77:10
79:3 80:17 81:19
82:13,14 87:23
88:24 89:13 91:19
92:16 93:24 96:8
101:4 103:7
111:17 127:25
131:2 138:19
140:24 145:19
147:6 148:4
160:20 161:8
163:10
**baseline** 145:5,6
146:11
**bases** 52:6 120:12
129:11
**basically** 108:23
**basing** 72:23 73:2
**basis** 12:7 38:12
60:14 67:5,17
72:15,15 76:23
97:9 111:6 112:3
113:23 115:22
120:19,20 121:3
122:7 123:24
126:14 129:7
131:24 146:15
151:3,8
**bear** 109:7
**bearing** 112:7
**bears** 105:18
106:2,9,13,17
107:9 108:3,16

109:3
**beautiful** 116:5
118:9
**beg** 117:7
**began** 11:2
**beginning** 35:9
**begins** 114:24
**behalf** 1:2 2:6,11
**behavior** 163:5,7
**belief** 156:8
**believe** 12:24
13:14 14:3,4
21:10 23:22 32:19
33:3 41:6 44:22
45:1,4 46:17,18
47:8,22 58:13
59:18 61:16 66:2
68:16 74:18 76:2
83:1 113:16 122:6
123:7 128:2 131:5
138:23 139:10
144:13 145:9,17
146:16 150:18,20
151:23 156:9,12
156:15
**benchmark** 135:8
161:21
**benchmarking**
145:1 147:4 148:1
**beneficiaries**
37:25 39:17 41:8
41:20 74:21,24
80:15,19 81:21
82:14 84:18
145:16 159:2
**beneficiary** 27:14
59:6 81:1,2 84:15
116:1,23 145:14
158:18
**beneficiary's** 28:1

**benefit** 16:5,19
26:1,18 34:12
38:20 44:22 45:20
46:1,5 50:12,18,21
51:8,14,19,20,24
52:1,6,16,17,21
53:7,23,24 54:1,4
54:7,8,13,19 55:1
56:4 57:12 66:13
69:20 78:18,22
81:23 82:17,20
83:11,17,25 84:20
85:17 91:3,21
95:17 96:14
112:12,13 113:12
114:10,16 115:4,9
115:22 116:6,11
116:15,17,20,23
117:11,18,20
118:1,3,10,24,24
119:5,7,9,10 120:8
136:6,17 137:9
138:14 139:8,22
139:24 140:5
150:12,20 160:21
161:8,10 163:6,9
163:12,13 165:12
**benefits** 15:5,6,18
15:23 16:13 21:1
23:20 31:10,19
34:3 35:11,12
50:10 52:6 73:10
75:6 82:23 94:15
97:19 105:12
113:2,9 114:5,7,8
114:16,25 115:1
116:3 118:8,11
120:9 143:20
147:5 151:25
**berg** 155:16

**best** 126:24 156:7
**better** 46:3 93:8
93:22 151:14
**beyond** 39:2 78:22
116:15
**big** 110:4,4 117:1
**binary** 147:12,15
**bingo** 168:1
**bit** 8:20 21:18
41:17 47:3 74:5
96:17,20 105:15
**black** 7:7,8
**blend** 22:14 39:16
40:15 42:6,7
146:3 150:22
161:24 162:13
163:18 164:3,6,18
164:20 165:2
**blended** 74:23
**blends** 165:12
**blue** 44:25 45:1
46:12,15,25 47:13
47:14,16 48:8
148:7,14 149:1,6
149:13,15,22
**board** 10:12
**body** 9:21 10:6,11
**bond** 2:14 94:14
95:10
**born** 166:15,17
**borne** 54:4
**bottom** 155:10
**bound** 94:10 101:5
**box** 167:24
**brand** 36:6
**breadth** 8:12
**break** 5:1,4 21:17
31:25 49:3 69:7
138:2,25 162:2
**breaks** 165:17

| | | | |
|---|---|---|---|
| **bring** 112:3 | 96:24 151:7 161:7 | 121:16 156:6 | 172:10 174:6 |
| **broad** 121:13 | 167:15,20 | 157:22 158:22 | **changing** 43:12 |
| **broader** 122:7 | **calculation** 18:2 | 159:7 | **characteristics** |
| **broadly** 80:5 | 19:2,8 22:21 24:5 | **cash** 52:21,25 53:6 | 95:16 |
| 120:20,21 121:6 | 25:25 26:24 27:2 | 53:8 54:3,7,7,10 | **chart** 47:1 48:13 |
| **broke** 165:5 | 27:5,8,22 28:11,13 | 54:21 55:1 101:5 | 49:23,25 137:13 |
| **bs** 14:5 | 28:25 30:10,17,18 | 102:23,24 120:13 | 144:4,9 145:23 |
| **bucket** 149:9 | 30:22 31:2 32:12 | 120:16,24 121:2 | 146:1 |
| **build** 84:8 | 34:8 36:12,13 | **categorizes** 148:24 | **charts** 46:22 |
| **built** 84:16 127:22 | 37:10,15 44:3 | **category** 121:13 | 104:21 |
| 130:1 | 51:5,7 79:1 101:8 | 162:14 168:1 | **check** 167:24 |
| **bumble** 72:5 | 114:1 118:10 | **cause** 38:2 | **cheek** 124:12 |
| **bunch** 72:17,20 | 123:15,17,18 | **caused** 110:21 | **chicago** 171:4 |
| **burling** 2:8 | 125:1,6,17 126:2,3 | **causes** 19:25 | **choice** 11:19 71:25 |
| **business** 86:23 | 126:3,6 127:19,22 | **caveat** 14:22 30:20 | 74:8 146:10 150:6 |
| **c** | 129:25 130:3 | 42:4 | **choose** 22:3 63:15 |
| **c** 170:3 | 134:17 137:12,15 | **caveats** 72:18,20 | 67:10 74:9 92:13 |
| **c.s.r.** 170:5 171:8 | 138:16,19 143:7 | **ceases** 56:13 | 119:15,20 121:5 |
| **calculate** 17:18 | 157:6,16 168:24 | **central** 165:19 | 163:23 |
| 18:4,6 22:7 23:2 | **calculations** 24:2 | **certain** 68:23 | **chooses** 63:17 |
| 23:14 24:7,9,20 | 36:20 44:2 104:4 | 149:11 164:19 | **choosing** 92:12 |
| 28:15,21 33:18 | 114:10 124:18 | **certainly** 8:12 | **chose** 94:24,24,25 |
| 91:17 92:20 93:15 | **calculator** 79:2 | 76:9 112:6 131:8 | 153:12,13,14 |
| 106:22 136:5,16 | **call** 18:2 120:24 | **certainty** 56:9 | 154:4 162:13 |
| 139:3,4,6,19 | 131:17 160:6,6 | **certified** 170:7 | 165:10 |
| 147:23 | **called** 1:10 5:19 | **certify** 170:8 | **chosen** 94:23 |
| **calculated** 24:16 | 19:3 52:21 103:16 | **challenge** 124:5 | **christian** 2:8 |
| 30:25 61:15,23,24 | 120:11,14 149:1 | **chance** 156:25 | 172:1 |
| 62:10 70:15 88:13 | **calls** 38:25 56:15 | **change** 37:18 | **circumstance** 18:9 |
| 115:22 117:21 | **capacity** 159:24 | 38:16 39:8,13 | 24:24 31:7 67:13 |
| 122:17 123:4 | **captures** 146:12 | 42:25 43:1,3,3,4 | 126:23 |
| 125:7,10 139:10 | **career** 59:2 96:11 | 44:1 51:16 114:24 | **circumstances** |
| 139:21 | 167:4 | 114:25 115:7 | 17:25 31:16 74:10 |
| **calculates** 70:15 | **careful** 79:6 | 117:14 118:24 | **citation** 86:10,17 |
| **calculating** 16:4 | 131:20 | 173:4,7,10,13,16 | 86:19 123:9,11 |
| 16:12 18:15 19:6 | **carefully** 100:5 | 173:19 | **cite** 9:18,20 60:4 |
| 21:10,18 23:5 | 132:21 | **changed** 116:1 | 62:5 64:21 77:13 |
| 25:3,10 27:11 | **carter** 105:1 | 133:20 | 78:14 86:19 87:22 |
| 30:14 33:6,10,21 | **case** 4:5 6:19,22 | **changes** 37:16 | 94:13 95:9,21 |
| 74:24 85:14 90:25 | 14:20 48:4 71:24 | 38:12,17 39:10 | 122:22 123:1,10 |
| 94:15 95:11,23 | 83:7 100:25 | 43:5 115:2 118:6 | 148:12 |

cited 8:2 10:1 58:6
58:14,18 59:11,16
59:22 60:1,24
61:3,5,10,13 62:25
63:8,10 64:4,9,11
65:16 87:16,19
94:24 166:21
167:13,18
civil 1:11
class 85:8
clean 6:6 154:5
clear 4:15 17:7
30:2 77:22 80:9
127:11 128:25
132:17,18 133:1
154:3
clearly 146:2
168:2
client 11:8,13,23
12:4,10,21 126:17
127:1
clients 11:4,16
32:20
close 114:7 133:8
closely 11:4
coated 57:14
code 62:23 86:20
collaborative
11:18
collar 44:25 45:1,3
45:4 46:12,16,25
47:13,14,16 48:9
148:7,15 149:1,2,3
149:7,7,13,15,22
colleague 7:4,6
colleagues 65:9
collective 127:17
column 50:2
139:12,14 144:5,9
144:10,11,13,14
144:15,18,19,20

combined 29:7
149:3
come 12:11 97:15
97:23,24 116:2
117:25 119:5
133:7
comes 7:23 75:4
75:17 92:4 130:23
coming 8:17 75:12
commence 40:1
112:25 114:8
118:11
commencement
114:22 170:9
commencing 1:15
26:14 113:1
139:22
comment 64:15
84:7,9,10 142:21
153:13,14
commented
153:12
committee 148:22
148:23 149:24
common 58:17
64:19 77:5 78:15
79:13,18 80:1
96:8,13 120:2,3
122:15 123:3
127:5 134:12
commonly 80:7
87:10 104:6
community 96:25
companies 63:4
64:9 102:21 120:5
120:6,7,19 121:8
company 1:6 2:12
61:15 172:4 173:1
174:1
comparative
72:15

comparatively
66:13
comparator 71:18
compare 15:22
24:8 70:1 136:9
143:19,22
compared 15:18
15:23 42:6 45:8
45:14,19 146:5
comparing 16:13
17:5 22:25 70:13
71:11 113:11
130:13 133:5
135:2 136:18
comparison 23:10
71:8 103:20
136:20 143:5,5
144:1
comparisons
113:18
complete 6:20
10:17 25:8 174:8
completed 172:17
completely 27:21
complex 68:2
133:21 141:5
compliant 62:21
142:22 143:18
complicated 23:6
component 30:22
composition 120:8
compound 31:24
comprised 149:16
compute 34:12
computer 170:16
concept 23:12
33:5 103:16,21
105:16 110:11,14
142:24
concerned 19:11

concerning 11:13
32:20 98:12 99:3
170:11
conclude 36:19
148:6
conclusion 38:25
43:12 56:16 87:5
129:23 148:13
conditions 92:22
93:17 108:7
114:24
conduct 15:1
95:18
confer 167:6
conferences 7:14
confidential 12:6
12:7
confused 51:23
54:19
confusing 51:25
confusion 54:19
congress 110:23
congressional
64:22 65:11,20
connect 41:14
77:12
connected 100:18
connecticut 2:4
connecting 102:12
conscript 80:21
consider 14:11
59:5 67:25 89:20
91:14 94:8 99:12
99:17 131:15
133:11 165:1
considerable 7:15
consideration
25:13 67:9 76:25
121:17 162:21
considerations
77:19

considered 7:25 58:19 59:12 60:5 60:9 62:6 98:13 99:20 132:21
considering 122:16 123:3
consistent 9:14 139:4
constant 38:1 39:15 40:16 41:9 41:22 48:15,19
constitutes 170:17
construct 19:20,21 24:13 43:8 57:19 57:23 83:23 84:11 141:3
constructed 83:20 84:21
constructing 91:11
consulting 10:15 11:15 96:9,10
contention 153:6
context 10:6 18:1 19:2 23:7 39:12 40:11 42:18 56:18 65:10 78:5 91:9 91:15 93:11,12,19 112:6 113:4 134:19 143:21 154:2
contextual 80:4
contingent 16:23 28:5,6,10,11,14,17 28:23,25 29:7,9 30:8,11
continue 109:7 115:15 116:11,20 118:15 167:9
continued 116:15

continues 115:7 115:19
contrary 146:24
contrast 53:25 101:7 109:15
contribute 78:12
contribution 53:25 54:20
contributions 53:3
conversation 19:16 127:8
conversion 10:22 11:13,24 12:20 19:17,20,21 20:21 21:12 23:8,12,14 23:17 33:22,25 37:15,17,19 38:3,8 38:8,12,19 39:8,10 39:13,21,24 40:5,8 40:18 41:10,24 42:8,20 43:25 45:7,13,19 46:13 48:14 49:24 55:7 55:18,19 56:1,2,12 60:10 62:7 63:22 64:13 66:11,21 67:6,11,18 68:7,22 73:8,9,24 80:15,17 80:25 81:19 87:13 87:17,23 88:2,24 89:13,22 90:11 91:11 92:5,15,20 93:15 94:19 95:13 96:2,25 97:4,10 98:14,21 100:23 101:7,15,17,19,24 103:3 105:19 113:7,23,25 117:5 118:23 119:15,20 119:21 120:12,20 121:8 128:5,19

129:21 130:9,11 130:13 131:11,14 131:16,23 132:6,7 132:10 133:6,8,13 133:14,23,24 135:13,14 140:10 141:4 143:24 147:18 157:7,16 157:22 158:21 163:24 167:15,20
conversions 101:10 102:8,11 104:8 107:7 110:25 121:6,9 122:8
convert 69:15 91:20 106:23 112:15
converted 120:23
converting 32:22 57:12 58:9,16 111:19,21 112:12 140:23 141:13,19 141:24,25
convey 154:2
cook 1:14 170:6
copies 6:6 172:14
copy 6:8,12
corporate 94:10
correct 8:15 10:2 13:1 16:6 21:8,23 21:24 22:22 26:19 26:22 27:17 30:12 33:2 34:22 40:6 44:12 57:20 69:24 81:4 91:23 92:17 106:11,15,19 115:5 126:22 136:21 138:17 145:2 146:4 147:2 147:20 150:22

155:20 156:14,17 156:23 158:16 162:1 163:22 168:11 174:8
corrections 174:6
correctly 132:9 161:5
cost 68:6,23 70:22 72:1,9,10,14 87:1
costly 73:10
cottage 141:7
counsel 7:4 143:16 155:16 170:24,25 172:14
count 44:20 45:6 45:12,18 47:20,24 48:3,5,7,9 118:4 147:4,6 150:11 151:25 152:1
county 1:14 170:3 170:6
couple 15:10 78:11 121:1 164:15 168:4
couples 74:17 75:1 75:3
course 12:11 48:20 53:2 58:24 59:1 65:14,24 86:23 116:8 162:20 164:11 166:25
court 1:1 4:17 5:13 19:14 155:21
courts 1:12
cov.com 2:10 172:2
cover 129:11
covered 149:12
covington 2:8 7:4

cpistilli 2:10 172:2
craft 92:22 93:17
create 66:21
created 71:24
88:16
creates 69:19
107:18 118:3
149:14
creating 25:24
70:20 92:4 127:21
credentialed 9:22
credibility 162:11
162:19,23,25
163:3
credible 93:6,20
162:16
credited 53:19
crediting 53:14
credits 53:10
crinkled 48:17
crinkles 70:7
cross 3:5 166:2
cruz 1:2 137:6
138:12 139:7
140:11 151:17
172:4 173:1 174:1
cruz's 67:24
cs 172:15
csr 1:13
current 108:19
115:23
currently 5:4
13:10
cut 130:21 135:20
cv 1:5 4:5

**d**

d 1:13 3:1 170:5
171:8
data 60:9 93:7,9
93:21,23,23 96:5
100:11 148:24,24

149:4 152:24,25
153:15 159:18,25
160:3,4,5,7 161:21
164:10 165:4,5,9
date 55:8 74:15
118:25 142:9
173:24 174:12
day 1:16 165:22
171:5 174:15
days 172:17
dc 2:9
deal 73:18 79:4
84:25 86:3 141:2
dealing 51:18
death 152:20
decade 101:22
127:12 129:13
146:13
decades 49:23
104:24
december 166:17
decided 163:17
decides 14:20
72:24
decision 85:23
92:5 166:7
declaration 6:18
67:22
declare 174:4
decrease 38:5
40:18 41:25 46:12
105:8
decreasing 48:14
deemed 84:17,18
174:6
defendants 1:7
2:11
defending 155:17
defer 143:16
deferred 102:24
139:22 140:1

defies 125:22
define 53:6,24
57:7,11 58:1
defined 31:17,20
51:19 52:5,21
53:7,23,25 54:4,8
54:13,19,20 55:1
56:4 83:13 95:17
96:14 115:9 116:6
116:20 118:1,9
119:7,8,10 135:12
140:6
defines 118:3
definition 15:11
20:8,11 23:18
24:11,19 27:1
30:23 63:24 83:15
149:17
demographic 90:9
92:21 93:16
demographics
148:5
denominator
37:15 42:24 43:2
43:3,10,16
denominators
43:20
dense 135:5,16
department's
122:22
depend 67:1
dependent 116:16
depending 28:12
129:6 141:14,16
depends 27:21
depicted 130:21
131:7
deploy 108:5
deployed 96:13
deponent 172:13
174:3

deposed 4:10
deposing 172:13
deposition 1:9 3:8
3:9 4:4,16 154:24
154:24 155:17
170:13,19,22
derived 98:10
described 67:13
100:5 118:5
121:13 127:14
145:7 149:10,22
describes 148:20
describing 83:2,3
description 43:15
43:17,20 149:19
design 94:22 95:16
96:5 121:17,18
designated 149:13
150:2
designed 81:19
despite 121:3
detail 47:3
detailed 135:21
determination
158:22,25 159:4
162:18
determine 22:24
25:25 33:24 79:3
89:10 130:11
136:10
determined
131:12
determining 19:7
21:1 31:18 32:14
134:13
developed 18:23
48:4 60:15 88:5,7
88:8,19 89:4,22
98:23 99:6 111:2
131:24 157:20

**developing**  66:10
  87:12 97:13 99:13
  100:22 164:6
**development**
  19:17 20:20,21
  128:5 157:5 159:9
**deviation**  76:23
  126:10
**deviations**  126:8
**dice**  160:1
**die**  75:24
**dies**  72:11
**differ**  36:15 117:7
**difference**  67:2,3,4
  67:8 73:14,18
  107:19 109:21
  139:16
**differences**  78:8,9
**different**  16:22
  19:1 20:23 21:16
  22:20 23:13 32:11
  34:4,9,16,19 36:2
  36:14,16 40:21
  41:17 45:17 57:24
  68:3 75:9 85:13
  95:4 98:3 102:3,5
  105:24 109:16
  110:12 111:13
  114:23 122:4
  124:14 126:15
  130:14 131:10
  133:3 136:17
  140:22,23 141:12
  141:18,23 144:14
  144:19,21 150:23
  160:2 162:14
  165:12
**differential**  26:20
  85:1,10,11
**differentiate**  92:13

**differently**  31:17
  73:5
**difficult**  43:11
  76:25
**digging**  135:20
**dimension**  122:1
**direct**  3:4 5:22
  59:3 60:16 156:19
**directed**  58:23
**directing**  86:17
**direction**  23:13
  170:17
**directionally**
  125:3
**directions**  42:14
**directly**  171:1
**disagree**  79:15
  117:2
**discard**  130:25
**discern**  88:4
**disclose**  12:8,9
**disclosure**  122:22
**disclosures**  136:5
**discount**  30:15,21
  31:1,2
**discuss**  95:10 99:8
**discussed**  12:13
  102:2
**discussing**  93:13
  166:5,19
**discussion**  11:9
**display**  19:1
**distinct**  18:21 28:4
  110:20
**distinction**  19:4
  42:1 77:23 108:18
  108:18 119:10
  153:1
**distinctions**
  162:11

**distinguish**  92:12
**distinguishing**
  109:9,10,12
**distraction**  8:20
**distributes**  108:20
**distribution**  108:8
  108:20 110:20
**distributions**
  120:21
**district**  1:1,1,12
**dividends**  108:1
**document**  6:12,15
  6:17 57:15 128:3
  154:15,18,19
  155:5,7 169:3
**documentation**
  60:14
**documented**  42:19
  44:16 163:2
**documents**  61:21
**doing**  71:10 72:22
  73:2 120:5 135:20
  136:20 160:19
**dollar**  78:24
  139:16
**dollars**  75:22
**downward**  46:19
**dr**  150:6,22 153:10
  153:20 154:11
**dramatically**
  126:15
**drew**  133:10
**drill**  4:13
**drive**  110:14 118:7
  118:23
**driver**  76:21
  113:12
**drivers**  110:18
**driving**  73:7 117:6
**duly**  5:19 170:11

**duration**  102:18
  102:18,23 103:1,5
  103:7,9,17,21,23
**dynamic**  109:16
**dynamics**  43:25

**e**

**e**  3:1 173:3,3,3
**earlier**  12:3 21:20
  32:19 68:13 87:21
  108:25 109:24
  112:13 113:2
  115:18 136:13
  141:19 166:20
**early**  11:3 65:3,7
  66:14 105:20
  106:12,22 109:1
  111:22 113:19
  139:13 140:11,12
  141:1,24 142:6,16
  143:12,15 144:11
  144:20
**earnings**  51:21
  113:4,11
**easier**  142:13
**echo**  96:17,20
**economic**  90:10
  92:22 93:17
**economy**  100:13
**editorial**  7:2,3
**effect**  43:13,14
  63:18 117:4
**effectively**  63:20
**eight**  13:8 140:17
**either**  21:12 22:3
  38:13 43:4,13
  45:5 47:22 83:4
  140:14,19 145:8
  147:12,15 150:14
  150:25
**elaborate**  153:15
  154:4

elect 63:15,20
66:13
electing 108:24
election 79:7
114:4,7,16
elections 78:2
elects 106:3,4
108:14,22 109:5
elements 59:12
60:5 62:6 65:13
121:2
elena 7:7,8
eligible 102:25
emerge 124:14,19
emerges 126:5
empirical 77:15
77:25 78:5
employ 97:4
employee 170:23
170:24
employees 13:3
101:8 102:19,25
149:11,11,12
150:2
employers 64:7
110:21
employment 53:3
endorse 167:22
engaged 12:6
engagement 12:12
enormous 8:16
162:9
enrolled 13:7,9,13
14:1,14
entire 9:21 93:25
147:22
entirely 109:16
entitled 142:18
entity 100:16
enumerator 42:23

environment
118:13
environmental
38:17
envision 114:20
equal 15:6,16
20:11 21:2 23:20
26:9,15,16,17
31:11 34:3 35:13
40:24 45:6,12,18
46:10,11,19 48:22
73:6 77:16 80:20
83:17 85:9 91:5
105:6,13 117:12
equally 63:14
equals 72:19
equate 143:1
equation 19:10
36:23 83:16
129:24
equity 65:22 66:1
120:14
equivalence 17:1
19:7 20:9 22:23
22:25 23:19 24:12
24:19 27:1 30:24
31:17 32:7,14,17
33:6,10,19 34:3,8
36:22 57:11 68:22
70:21 74:24 83:8
93:5 141:3 142:20
142:25
equivalent 15:5,15
17:9 31:10,19
35:11,12 38:21
56:13 69:20 71:25
81:9,22 83:10,12
84:12 87:3 142:8
143:13
era 104:16

errata 3:9 155:8
156:3 172:11,13
172:17
erred 140:9
essence 37:6
essentially 113:8
establish 129:18
147:16
established 60:13
101:20 168:2,14
168:18
establishes 77:25
establishing
123:23
estimate 55:4
126:24
estimated 114:19
estimates 50:9
et 1:6 172:4 173:1
174:1
evaluate 132:6,22
141:4 163:24
164:25
evaluated 131:24
evaluating 66:10
129:20,21 131:11
131:16 140:10
evaluation 10:15
37:7 130:17
132:23 143:23
events 122:18
123:6
everybody 69:1
90:23
evidence 60:4 62:5
65:11 77:25 87:22
88:24 89:11,12
98:12 99:3,4,5,6
123:2 127:25
evolved 159:17

exact 34:12 139:24
exactly 19:24
43:23 45:22 62:10
70:23 118:1 120:5
133:19,22
examination 1:10
3:4,5,5 5:22 166:2
167:22 168:6
170:10
examine 137:17
148:18 149:6
examined 5:20
examines 149:5
examining 113:18
example 16:2 30:7
43:6 64:4 67:24
77:5 79:18 82:25
93:6 105:2 113:2
114:25 120:16
122:23 127:9
139:12 163:17,21
examples 62:25
63:8 94:24 95:22
157:11
exasperating 95:7
exchange 158:15
exercise 164:23
exhibit 3:8,8,9
6:11 14:17 155:3
exhibits 3:7
expanded 116:19
expect 41:9,23
126:4 130:20
146:17
expectancies
76:19
expectancy 26:21
29:6 76:21,23
78:8 85:6,7
103:19 116:16,21
126:14

**expectation**  29:12
**expectations**
  124:3,3,6
**expected**  60:21
  61:2 85:8 97:24
  100:18 101:1
  117:12 154:1
  161:15
**experience**  7:13
  7:16,22 8:9,10,11
  9:13 20:23 46:2
  56:23 59:25 61:9
  64:17 66:23 67:7
  73:22,23 76:10
  87:9 96:8 103:7
  124:2,14 126:11
  145:9,10 146:13
  146:17 148:23
  149:4,5,15,16,21
  149:23 152:24
  159:17 161:9,14
  161:17 163:20
  167:1
**expert**  10:7 14:11
  58:24 154:1
**expertise**  39:2,5
  76:9
**explain**  18:22
  77:20 80:7 154:7
**explanations**
  77:22
**explicitly**  146:18
  167:22
**explore**  110:10
**explored**  46:15
**exploring**  40:4
**exposed**  119:12
**extend**  129:5
**extended**  97:20
  116:21

**extensive**  65:5,6
  96:12 132:19
**extent**  14:13,16
  36:15
**external**  38:17
**externally**  100:8
  100:10
**extract**  126:12
**extracted**  64:16
**extracts**  65:19
**extraordinary**
  76:17,22
**eyes**  121:4

**f**

**face**  124:4
**fact**  22:16 32:13
  36:11 45:25 67:24
  79:13 92:9 110:23
  114:9 115:16
  116:7 133:11
  143:21 149:25
  150:1 164:24
  167:23
**factor**  12:20 19:10
  19:17,20,21 20:21
  20:21,22,22 23:8
  23:12,15 29:2,5
  33:22,25 37:15,17
  37:19 38:3,8,20
  39:8,10,13 40:18
  40:24,25 41:24
  42:8 43:25 45:8
  45:13,19 46:10
  53:14 55:7,18,19
  56:1,2,12,25 57:6
  57:10,11,13,14,17
  57:23,24 58:2,2,8
  58:15 59:5,13
  60:6,10,12,14,18
  60:19,25 61:14,18
  61:22 62:8,10

  63:14,23 64:1
  66:21 67:6,11,18
  68:5,14,17 69:11
  69:14,19 70:3,15
  70:16,16,20 71:9
  71:20,24 73:8,8,9
  73:14,15,25 80:16
  80:17,25 81:19
  82:21 83:5 87:13
  87:23 88:2,5,9,12
  88:15,20,25 89:4,6
  89:13,22 90:11
  91:11 92:3,3,5,15
  93:15 94:14,19
  95:10,13,23 96:3
  98:15,21,22,24
  99:6 100:23 109:9
  109:10,12 118:23
  126:20 130:9,12
  131:11,14,16,23
  132:6,7,11,22
  133:6,8,13,14,23
  133:24 135:13,14
  135:25 140:10
  143:24 147:7,23
  147:24 148:9
  157:22 158:21
  163:24 166:10
**factors**  10:22
  11:13,21,25 12:13
  12:16,19 20:10,17
  20:19 21:3,6,12
  23:17 24:6,6,9
  25:2 27:7,7 32:21
  38:9,10,12,16
  39:21,24 40:5,8
  41:10 42:21 46:13
  48:14,23 49:24
  57:14,17 59:8
  60:10 64:13,19
  66:11 68:7,22

  69:22 71:23 76:13
  78:12,14 80:22
  87:17 90:13 92:20
  93:5 96:25 97:4
  97:10,15 99:23
  101:8,15,17,20,24
  122:11 128:5,20
  129:21 130:13
  141:4 146:1
  147:18 157:7,17
  166:21 167:5,15
  167:20 168:10,13
**facts**  73:12
**fail**  76:22
**fails**  172:19
**fair**  22:17 48:21
  85:25 161:10,13
**fall**  130:9
**fallen**  104:24
  130:12 131:17
**falling**  104:18
**falls**  36:19
**familiar**  4:12
  13:15 14:13 32:13
  33:5 51:22 52:5
  52:23 65:21,23
  86:22 104:16
  168:21,22
**familiarity**  14:25
**family**  47:24
**far**  50:2 69:13,21
  117:10 120:20
**fashion**  29:12
  154:5
**favor**  74:10
**features**  95:17
  114:13 115:9
  121:2
**february**  64:23
**federal**  1:11 86:20

feel 5:8
felt 99:2
female 37:24 41:8
  41:19 74:15,23
  75:8 80:14,18
  81:2,18,21 82:15
  82:16 83:4 84:19
  85:7,14,18,19 86:3
  91:6,18,19 152:5
  153:7 163:18
females 18:24,25
  26:22 40:15 84:10
  85:8,17 91:4,7
field 96:11
figure 20:8,13
  39:11 44:6 46:23
  48:12 50:2 110:13
  139:2 144:4,5,23
  145:23
filed 13:16
financial 113:1
find 76:25 121:3
  133:7
fine 79:1 93:4
finer 162:10,10
finger 37:6
fingertips 96:10
finish 117:9
finished 4:22
finishing 153:5
firm 10:14 65:8
first 5:19 6:4 17:3
  24:5 47:23 48:2
  58:22 64:25 75:17
  130:17,21 135:19
  136:5,16 152:3
  158:6 166:5
  170:10
five 52:7,11 103:4
  122:23 123:2
  127:1 129:6,15

131:13 147:15
  159:12
fix 51:11
fixed 38:13 50:11
  55:7 57:2,10 58:2
  97:9 104:7 106:20
  167:5 168:10
flip 137:3
flows 102:23,24
focus 52:4 55:24
  64:8 67:11 86:6
  94:18,25 98:19
focused 63:4,6
  88:11 89:5 95:12
folder 6:10 155:4
follow 55:12,14,21
  69:4 81:12 102:14
  107:1 110:5 137:1
follows 5:21
followups 168:4
forefront 65:7
foregoing 170:13
  174:5
foregone 113:3,11
forgive 43:23 57:9
forgot 19:24
form 13:16,20
  22:21 29:24 51:14
  51:20,24 52:17
  57:12 68:9 69:3
  75:10 76:6 81:25
  84:6 86:4 87:4
  98:6 99:9 100:18
  109:6 111:24
  112:12,17 128:24
  130:5 131:19
  132:14 134:3
  160:21 161:7
  165:1
formal 64:16

forming 166:25
forms 97:8,15
formula 52:1
  61:14
forth 108:2
forward 100:25
  161:15
forwards 161:17
four 44:6 50:2
  90:9 138:21
  159:12
fraction 42:24
  43:1,2,4,11
free 5:8
frequently 50:9
  103:17 114:21
  142:25 143:20
front 104:21
fulfill 24:11
full 4:20 10:11
  96:11
function 72:10
  76:13 101:21
functioning 160:9
funding 72:15
further 132:3
  148:20 168:3
furthermore
  132:17
future 26:1 122:18
  123:5

**g**

gained 7:14
game 45:12
garbled 8:24
gathered 58:25
gathers 148:24
gears 20:1,5 21:11
  74:5
gender 18:13,17
  18:20,21 19:4,11

19:23 20:17 21:4
  22:1,4,9,14 23:1,3
  24:18,22 28:2,4,5
  37:24 39:16 40:15
  41:19 42:6,7 59:7
  74:17,20 78:1
  82:11 83:9 84:16
  85:10 86:7 87:10
  87:18,24 88:25
  89:13 90:21,23,24
  91:16 92:4 146:3
  150:21 152:3
  153:25 160:19
  161:6,8,20,24
  163:10,18 164:3,6
  164:18,20 165:2,5
  165:12 166:7
general 15:13
  31:14 62:22 94:5
  94:22 95:16
  101:18 104:17,23
  114:6 149:9 167:1
generalize 67:19
generally 16:7
  30:21 32:16 33:3
  33:4 41:10 65:23
generate 80:15,22
  132:10
generated 8:7
  47:25
generic 39:20
getting 8:24 32:8
  79:4 83:10 129:23
  133:4 161:2
give 5:25 37:22
  72:4 94:17 103:4
  140:21 163:15
given 10:25 15:7
  15:21 20:12,14
  21:2 23:21 26:20
  35:13 43:6 46:8

49:18 72:17
133:18 170:18
174:9
**giving** 10:1 128:17
**go** 9:3,3 20:7,20,24
35:9 37:8 43:21
45:23 48:5,25
49:2,9,15,16,19
53:22 71:8 78:21
90:10 96:16
105:12,12,13
108:25 109:23
112:20 120:17
123:20 127:18,22
128:4 129:1 132:3
136:13 138:25
157:6 159:11
160:13 164:14
**goal** 25:24 59:14
69:2
**goes** 42:10 104:13
125:9 128:5,7
129:14
**going** 24:8 25:12
29:15 47:8 48:12
49:19,23 50:18,21
51:15 52:12 54:10
58:22 71:12 72:10
72:25 73:19 75:21
76:2 82:21 91:17
103:13 107:23,24
118:15 124:24
126:18 128:4
129:16 130:24
138:18,24 140:21
142:21 148:16
161:15
**good** 4:2,6,7 42:11
69:13,21 79:4
82:8,9 84:25 86:2
93:6,20 126:25

129:2 134:24
161:17 168:1
**gotta** 95:8,8
**gotten** 110:23
133:12
**graduating** 160:6
**granular** 47:3
**gravitate** 124:25
**great** 73:18 120:22
**greater** 42:9 77:17
117:13
**ground** 4:15
**group** 12:25 13:3
13:13 14:1 16:15
18:25 70:24 149:1
149:6,9,10,12
150:7 152:22
162:10
**grow** 53:13 54:1
**grows** 53:9
**growth** 54:2
**guarantee** 124:11
**guess** 36:10 72:2
72:20 84:8,11
135:5 136:2 158:3
**guessing** 71:5
**guesswork** 76:15
**guidance** 11:19
**guide** 97:18
**gun** 129:10
**gymnastics** 45:23

**h**

**h** 173:3
**half** 104:18 129:14
129:15 151:13
**halves** 102:12
**hand** 113:6 171:4
**happen** 81:5 125:2
125:4
**happened** 11:9

**happens** 82:12
115:6,12,14
118:12,13,20
**happy** 47:2 140:18
**hard** 57:14 69:4
70:25 133:16
**hartford** 2:4
**head** 12:25 18:11
25:1 31:9 44:14
44:20 45:6,12,18
47:19,23 48:3,5,6
48:9 57:8 147:4,6
150:11 151:25
152:1 164:8
**health** 76:1
**hear** 5:10 8:21,25
9:1 20:2 112:24
124:9 148:17
**heard** 5:15
**hearing** 96:17,19
**heart** 75:24
**held** 41:9,21 48:15
**help** 28:4 92:22
93:17
**helpful** 18:19
**helpfully** 42:5
**hereto** 171:1 174:7
**hereunto** 171:3
**hesitate** 99:15
**high** 94:9 105:3
129:5
**higher** 45:7,13,14
45:19 46:2,10
73:10 80:16
118:23 129:6
**history** 65:14,25
**hoc** 157:21 158:20
**hold** 39:15 40:16
115:19
**homework** 69:19
70:18

**hope** 134:11
**hopefully** 53:2
**hopelessly** 117:24
**horizon** 101:9,15
101:25 102:7,10
103:2
**host** 8:8 78:11
**hourly** 47:11 63:5
63:10,11 64:8
78:4 88:3 89:21
94:20 95:14 96:3
132:20 135:25
145:12 149:10,12
149:19,20,20
150:2
**house** 86:10
**household** 78:11
**huge** 162:9
**hung** 55:21
**huntington** 154:24
156:6
**hurdle** 72:17
**hypothetical**
37:22 39:17,18
40:12 42:7,16
75:13 77:1 80:21
82:3 83:20
**hypotheticals**
74:13

**i**

**idea** 40:5 64:12
134:12 160:19
**identical** 164:22
**identified** 10:8
58:11 80:4
**identifies** 77:14
**identify** 7:19
149:6
**identifying** 62:22
**ikrlaw.com** 2:5

**illinois** 1:15 170:1
170:7 171:5
**imagine** 103:22
112:4,10,23
**immediate** 110:24
**immediately**
130:24
**impact** 37:17 42:5
46:15 113:1
117:10
**implication** 133:2
**implicit** 143:25
**imply** 37:18 39:7
39:13
**importance** 153:1
153:4,5
**important** 4:18
27:25 29:1 30:18
33:21,22 35:11
67:9 108:18
119:10 152:22,25
153:18 162:21
**importantly**
115:15
**impression** 165:3
**improve** 41:5
115:17
**improved** 41:2
160:2,3
**improvement**
17:21 18:3,6
27:20 39:14
115:24 116:13
117:3,10 151:20
**improvements**
37:17 38:2 39:7
40:17 41:23
113:24
**improves** 115:1
116:8

**improving** 43:7,8
43:9
**inadvertently**
136:25
**inclination** 48:4
**include** 94:9
102:24 103:10
152:14
**included** 16:9
37:14 100:6
**includes** 152:17
**including** 10:17
78:4
**incorrect** 151:7
**increase** 26:11
38:4 40:18,25
41:10,24 42:3,8
43:10 46:12 73:8
87:1 105:8,9,11
**increased** 105:7
**increases** 53:1,2
**increasing** 48:14
73:9
**incredibly** 108:8
**independent** 40:7
**indicate** 9:11
47:10 48:8 107:4
159:13,15
**indicated** 21:6
157:3 168:8,21
**indicates** 10:4
34:15,18
**indication** 62:9
125:3
**indicative** 163:7
**indicator** 161:14
161:17
**indirectly** 171:1
**individual** 76:14
76:23 83:24 107:8
107:16,19,20

108:3 116:9
126:10,14
**individuals** 46:2
**industry** 7:13,23
8:5,10 141:7
**inform** 100:2
146:10 159:8
**informal** 64:17
**information** 47:7
60:9 64:18 88:15
89:21 96:5 98:8
116:4 131:6
132:21 145:4,20
146:2,10,24
148:12 164:9
**informed** 8:12
14:24 157:4,15,18
**ingests** 149:4
**ingredient** 42:25
43:13
**ingredients** 20:20
36:14 51:7 61:23
92:19,23 93:14,18
124:20 157:6,16
157:20 158:9,13
158:14 159:9
**inherently** 128:9
128:13,15
**input** 36:23 69:22
**inputs** 36:14,22,25
37:4,11 124:20
133:18 135:4
**insight** 11:18
**insignificant** 126:9
**instance** 17:4
132:20 136:16
150:19
**instances** 78:3
109:3
**institute** 77:14
78:6

**instructions** 137:1
**intend** 114:8
**intended** 56:4
94:21 95:15
101:21 129:11
**intent** 65:11,20
**interest** 25:17
30:16,21 31:22
38:2,11,14,15
39:15 40:16 41:8
41:21 48:15,18,25
49:15,22 50:4
56:25 59:7 94:3,4
94:6,8 97:4,13,14
97:18,20 98:3,7,9
98:14 99:12,14,16
100:3,6,9,12,14,15
100:17,22 101:4
101:23 104:17,25
105:3,7,9,11
106:21 107:6
109:24 110:12,15
111:2,18,21
112:11,14 113:5
113:13,23 114:25
115:7,12,25
117:15,18 118:6
118:12,21 122:9
125:11,14 126:20
126:25 127:2,9,12
127:14 128:15,18
129:7,12,20 133:5
133:9 145:22
147:8,14,21 151:3
151:5,13 158:18
159:5 168:22,23
**interested** 72:8
171:1
**interesting** 32:10
**interpret** 141:8

interrogatories
 5:20
interrupt 70:5
introduction
 47:23 48:6
invest 107:25
investment 53:13
 54:1,4 100:19
 107:17,18 108:3
 108:11,16 109:4,8
 109:11,20,22
 113:11 115:14,19
involve 27:16,19
involved 97:12
involves 76:17
irrelevant 61:20
 88:9,19 89:4
 98:23 99:2
irs 167:21
issue 22:23 29:23
 63:2
izard 2:2

        j

j 2:8 79:21 87:11
 87:13 88:1,2
 90:10 101:10,15
 101:16,19 102:7
 102:10 103:3
 137:6 138:11
 139:13 144:11,20
 172:1
january 155:13
 156:6 166:16
jls 77:8
job 163:23
johnny 1:2
joint 10:23 11:14
 11:25 12:20 16:20
 17:6,9,19 18:6
 19:8 23:5 24:10
 24:21 27:2,6,12

28:16,22 29:6,13
31:3 32:15,22
33:7,10,19 38:4
46:12 57:23 58:9
58:16 62:8 63:15
64:14 66:21 68:4
69:11,15 74:25
77:16 78:1,21
79:10,25 81:6,24
82:18 83:19 84:2
85:14 87:2 89:14
90:25 91:11,18,21
92:3 95:11,24
96:2 97:10 98:20
106:16,23 107:6
108:16 111:19
112:15 117:4
119:21 136:11
140:24 141:13,20
142:1,6,16 143:6
143:11,23 144:2
161:23,25 162:3,4
162:13 163:4,19
164:7 165:6 167:6
167:15,20
jsa 75:20 76:5
 87:17
jsas 87:18,24
 141:24
judge 14:20
 142:24
judgment 162:22
juggle 159:25
jump 4:23 43:12
 72:16
justified 128:22
justin 2:14

        k

k 170:3
keep 35:11

kelly 2:12
kept 48:19
kind 8:23 23:12
 36:3 43:13 52:15
 65:7 119:11
 123:24 135:21
 162:17 168:1
kindall 2:2,3 3:4,5
 4:6,8,8,12 5:1,7,23
 6:3,8,13 8:22,23
 9:8 11:3 19:14,19
 20:4 23:7 29:15
 29:17,19 30:3,6
 32:5,9 33:1 35:7,8
 39:3 46:14 49:2,8
 49:13 51:1,24
 56:20 58:23 62:1
 62:4 68:12 69:5,6
 69:8 70:8,10,12
 75:14 77:2 78:20
 81:14 82:3,5
 84:13 86:8 87:8
 88:22 89:7,23
 90:5 96:16,21
 99:1 100:1 103:16
 107:3 110:9 112:9
 112:19 118:17
 119:3 121:21
 129:22 130:8
 132:1 134:6 135:6
 138:1,4,8 152:21
 154:15,17 156:23
 156:24 158:8
 160:13,17 161:19
 165:20,23 166:6
 166:19 167:12
 168:4,7 169:5
kinds 58:24
 119:12 120:6
 141:6

knew 116:24
 117:17
know 4:12 5:2,12
 6:5 12:5 13:12
 18:20 31:14 32:16
 37:2 41:1 42:10
 44:13,14 46:14
 47:14 49:19 50:17
 50:20 51:3,8,13,16
 52:11,15 54:9,22
 55:2,5,17 56:1
 63:11,21,25 65:16
 72:9 73:13,21
 75:5,20,23,25 76:7
 76:19 77:13 82:1
 83:21,25 90:19,21
 92:11 95:2 96:19
 97:14 98:8,9 99:5
 106:1 107:13
 111:25 116:24
 117:17 121:11,25
 123:18 124:7,18
 127:5 134:2,4,5
 136:22 138:18
 142:3,5,15 143:3
 143:15 145:15,16
 148:19,21 149:8
 150:16 156:25
 161:1 162:9
 163:25 164:3,8
 165:14 168:13,16
 168:17,19,19
 169:2,4
knowledge 7:14
 7:23 14:4 77:5
 78:15 79:13,18
 80:2 88:6 96:12
 131:3
known 51:7 53:20
 72:12 123:22
 148:23

**knows** 90:23

**l**

**label** 47:14,15
**labeled** 144:11,19
144:20 151:17
**language** 47:17
102:1
**lappin** 2:12
**large** 18:24 120:4
120:19 159:25
**larger** 46:1 116:24
117:18
**latitude** 92:2
**law** 14:12,13,24
104:3
**lawsuit** 4:9
**lawyers** 141:8
142:23
**lay** 129:4
**layering** 23:11
**lead** 36:16
**leap** 110:4,5
**learned** 10:5
**leave** 142:23 165:3
**lee** 114:23
**left** 137:21
**legal** 14:9,10 38:25
56:15,19 62:18
87:4 143:16
172:23
**legalities** 142:21
**legislate** 110:23
**legislation** 141:5
**legislative** 65:14
65:25
**lens** 141:9
**letter** 128:23
**level** 14:25 94:5
**liabilities** 99:9
103:6,8,10

**liability** 102:19
**license** 171:8
**life** 16:19 17:6,9
17:16 18:4,16
21:19 22:7 23:2
24:5,8,17 25:4,11
26:6,21,24 27:9
29:6,13 30:14,25
32:22 38:3 55:3
58:9,16 69:1,9
70:2 74:25 76:19
76:21,23 77:10
78:8 79:23 81:10
81:23 82:18 83:18
84:2 85:6,7 87:3
91:20 103:19
105:20,21 106:9
106:13,23 108:15
108:15 111:19,22
111:23 112:15
115:16 116:16,21
119:21 126:13
139:8,22 140:2,6
140:24 141:13,19
142:1,8,17 143:13
144:1,6,16 163:22
164:2,5,19,21
167:6
**lifetime** 26:13
**light** 166:7
**likelihood** 26:1
**likewise** 66:4
**limits** 137:24
**line** 21:13 128:16
173:4,7,10,13,16
173:19
**lines** 140:13,17
156:21 158:11
**list** 44:10 46:22
90:13 97:9

**listed** 100:3
**listening** 141:9
**lists** 98:6 144:25
**literature** 8:7
58:14 59:16 61:5
64:11
**little** 8:20 21:14,18
41:17 47:3 53:15
74:5 96:17,20
125:5 160:19
**live** 74:18 76:2
78:15 85:4,9
**lives** 72:11
**llp** 2:2,8
**loading** 154:15
**logistical** 120:15
**long** 31:11 35:16
101:5,20,21
103:14,24 123:23
**longer** 38:20 74:19
76:2 78:16 85:4,9
102:23 103:1
115:16 152:19
**longevity** 78:7
105:16,18,25
106:2,7,9,14,17
107:9,17 109:3,8
109:11,20,22
115:20
**look** 6:14 10:13
15:3 16:5 20:10
21:4,7,22 34:1
37:12 40:11 44:5
45:21 56:21 62:12
64:20 66:3 74:4
75:4 77:3 86:9
90:6 92:18,21
93:16 94:2 96:22
97:18 99:7 100:8
100:15 101:2
104:2 110:21

113:3,7,16,21
119:13 121:18
122:13 138:24
139:11 140:8
144:3,22 148:3
150:4 151:16
152:2 154:21
155:3 156:20
161:13 162:15
164:12,20
**looked** 98:3 99:24
111:2 161:22,24
**looking** 22:10 24:2
24:4 37:3,10
86:13 97:19
112:25,25 113:6
123:24,25 124:1,2
125:16 138:25
147:17 161:16,21
**looks** 126:1
**lose** 162:11
**losing** 68:1
**loss** 67:25
**lot** 33:16,16 75:12
**low** 5:12 129:5
**lower** 45:7,13,19
80:16,24,25
118:23
**lump** 104:3,6
105:7,11 106:3,4
107:7,8,16,21,22
107:23 108:4,8,9
108:20 109:15
110:20,24 113:22
115:6 119:15,20
120:11,19,21
121:6,8 122:7
**lunch** 89:25

**m**

**main** 2:3
**maintaining** 104:7
**making** 28:16,22
  79:6 100:25 117:1
  125:18 127:5
**male** 37:23 41:7
  41:18 74:15,23
  75:7,18 78:10
  80:14,19 81:1,5,7
  81:20 82:13,16
  83:4 84:17 85:6
  85:13,19,20 86:1
  91:7,20,22 152:5
  153:7 163:18
**males** 18:24,25
  26:21 40:15 78:2
  84:10 85:17 91:4
  91:8
**man** 26:19 81:15
  81:17
**manage** 159:25
**manipulate** 160:1
**manner** 115:8
**mark** 2:3 4:8 6:3
  9:2 29:21
**marked** 6:8 14:17
**market** 108:6,7,22
  108:23 110:22,24
**marketplace**
  97:21
**markets** 108:19
**married** 74:16
  78:11
**massachusetts** 1:1
**match** 102:17
**material** 67:3,4,8
  73:13
**materiality** 67:2
**materials** 7:25
  8:12 58:19,25

**mathematical**
  15:25 34:11
  162:23,24
**mathematicians**
  42:23
**matter** 6:7 11:7
  18:17 31:14 35:17
  36:21 65:25 141:3
  143:17 154:24
**matters** 170:12
**mean** 10:10 15:17
  15:22 42:18 45:16
  57:5 90:19 91:10
  106:1 128:8,12
  129:15 136:19
  146:20 152:9
  159:23
**meaning** 15:15,25
  100:10 116:22
**meaningful** 135:1
  136:14,22,23,24
  136:25
**means** 15:20 23:23
  57:10 91:6 147:25
**measure** 72:14
  146:6
**measurement**
  159:14,15
**measurements**
  98:5
**measures** 110:22
  110:24
**meet** 24:18 26:25
  149:17
**meets** 149:19
**members** 74:7
**memory** 4:14
  44:18
**men** 41:2,6 77:6,7
  77:15,16 78:16
  79:10,14,19,20,25

  80:2 85:4
**mental** 45:23
**mention** 8:13 9:15
  123:7,8
**mentioned** 7:24
  80:6 123:12
**methodology**
  163:13,16
**methods** 159:19
  159:22
**microphone** 30:1
  70:6 112:18
**mid** 41:1,11,22,24
**middle** 113:17
**mind** 35:11 58:21
  77:25 162:11
**minimal** 43:5
**minus** 122:14,23
  123:2,12,14
  124:16 125:14,15
  126:6,9 127:13,16
  127:23 129:25
  131:8,13 133:24
  134:14,17 135:7
  135:13,18,23
**minute** 49:3 84:7
  133:17
**minutes** 115:11
  138:4
**misinterpreting**
  134:10 135:17
**misquoting** 107:10
**missed** 158:6
**missing** 49:8 91:10
**misstates** 32:24
  99:21 106:25
  110:2 130:6
  132:15 157:24
  161:11
**mistake** 76:20,20
  127:5

**mistaken** 39:22
  102:4 153:8
**mistakenly** 152:23
**mistakes** 125:18
**misunderstand**
  127:15
**misunderstanding**
  78:19 154:6
**misunderstood**
  103:17
**mix** 37:24 41:13
  41:19 59:7 82:11
  84:16 87:10,18,24
  88:25 89:14 152:3
  153:25
**mixed** 166:21
**mkindall** 2:5
**model** 50:12
  123:19 125:1
  161:21
**modified** 40:8
**modifier** 35:24
  36:8,10
**modify** 36:3
**moment** 49:9
  83:16 101:3 138:1
  143:15
**money** 54:9,14
  67:16,20,23 68:1,1
  68:24 73:4 108:5
**month** 105:4
  117:19
**monthly** 52:16
  119:5
**months** 26:7,18
**morning** 4:2,6,7
  165:19
**mortality** 7:16
  16:3,8,11,14,20,21
  16:22 17:4,13,17
  17:21,22 18:3,6,21

18:23 19:1,5,22
21:7,9,22,25 22:4
22:8,15 23:1,4,11
24:18,22 25:17,21
25:21,22 26:21
27:13,17,19 28:3
29:5 31:21 37:14
37:16,18 38:2,12
38:15 39:7,14
40:17 41:2,5,23
42:12,13 43:7,8,9
46:3,5,6,8,16
47:11,24 56:25
59:6,6 66:20
71:11 76:14,14,17
79:3 80:13,17
81:20,21 82:12,13
82:14,15 85:13,18
85:19 86:1,2
90:25 91:7,7,19,22
113:24 115:1,16
115:24,24 116:8,9
116:12 117:3,10
117:15,17 118:7
118:21 122:10
126:8 133:9 145:5
145:6,9,10,14
146:6,11,11,12,17
147:3 148:7,15
149:16 150:7,7,12
150:19 151:20,21
151:25 158:17,18
158:23 159:1,16
160:20 161:7
162:20,24
**mortgage** 31:23
**move** 73:19
128:15
**movements**
113:24

**munitive** 37:16
**muted** 30:1 42:5
42:17,18

**n**

**n** 3:1
**name** 4:8 12:4,10
166:21 167:13,18
**named** 13:9
**narrow** 87:19
131:2
**naturally** 124:23
**nature** 12:5 38:8
53:23 78:5,25
103:12 110:20
116:20 118:1
119:7 123:21
124:17 125:19
126:13 145:16
**necessarily** 11:20
16:16 21:5 23:16
34:11 66:24
102:16 110:5
121:11 137:1
**necessary** 44:19
174:6
**need** 5:1 17:12
18:12 19:9,10
21:4,7,22 23:3
24:6,9,21 25:3
28:9 30:15 31:1
31:25 33:17 54:18
55:14 72:16 89:10
108:19,21 125:14
166:6,14
**needed** 15:1
**needle** 73:19
**neither** 109:10
152:17
**neutral** 68:6 72:1
**never** 76:11 82:20
95:15 108:10

**new** 36:6 115:23
115:24 116:3
**newly** 103:8
**nine** 98:14
**noise** 96:20
**nominal** 67:15
118:22
**non** 105:22
**nonactuaries**
76:20
**nonexperts** 154:3
**normal** 50:17,21
51:5,6,8,14,19,24
52:16 66:6,9,12,19
67:11,15,17 109:2
111:21 112:12,13
113:3,20 139:14
139:18,20 140:25
**norris** 85:23 92:5
166:7
**notary** 1:13 170:5
174:13,19
**note** 29:22 63:13
172:10
**noted** 174:7
**notice** 1:11
**noticeable** 73:20
117:3
**notion** 20:7
**notional** 53:1,9,12
53:14 54:16,17
**nuance** 125:21,22
**number** 4:5 11:3
29:24 34:6,9 97:5
111:10 117:13
120:22 150:17,17
154:18 155:4
162:15,16
**numbers** 144:10
144:11,18,19

**numerator** 37:14
42:25 43:2,10,16
43:16
**numerators** 43:19
**numerous** 10:16
**nw** 2:9
**ny** 172:15

**o**

**o** 170:3,3
**o'clock** 1:15
**oath** 155:19
**object** 68:9 69:3
75:10 76:6 81:25
84:6 86:4 87:4
111:24 112:17
128:24 130:5
131:19 132:14
134:3
**objection** 31:24
32:24 35:1 38:6
38:24 50:19 56:15
81:11 88:17 89:2
89:16 98:16 99:21
110:2 117:23
119:1 121:10
157:24 161:11
**objectionable**
121:23 122:1,3
**objections** 29:25
**obligated** 116:10
**observation** 77:15
78:6 79:6
**observe** 63:13
101:23 127:8
**observed** 26:20
74:7 78:12 80:7
80:10 86:6 100:13
115:17
**obtained** 145:20
**obvious** 93:2,3

**obviously** 58:7
84:20
**occasion** 156:13
**occasionally** 97:24
**occur** 56:10
**occurs** 109:18
**offer** 69:9 142:5
142:15 143:11
**offered** 6:18 74:8
143:14
**office** 171:4
**officers** 10:16
**oftentimes** 15:1
43:11 125:3
**okay** 4:24,25 6:8
17:10 21:1 25:2,7
30:3 36:6 39:4
40:13 48:17 53:18
55:16 68:3 69:10
69:12,17,25 71:6
82:8,22 83:25
137:25 150:21
157:2 165:4
**old** 51:19 66:21
81:15,17 83:10
**once** 118:10
**ones** 16:25 35:12
113:14 136:10
**ongoing** 102:22
**operating** 160:11
**opine** 14:18
**opinion** 9:25 48:13
62:18 86:25
101:14 102:9
143:10
**opinions** 6:21 10:6
10:10 58:24
166:25
**opportunity** 4:20
155:24 165:18

**opposite** 41:19
74:17
**opted** 100:7
119:25
**option** 63:16 77:17
79:21 87:12 89:15
136:6 163:13
164:21 165:1,13
**options** 50:12
57:16 70:22 72:1
75:5 136:17 162:5
**oral** 5:20
**order** 15:1 17:1
21:21 24:11,18
26:25 33:18,24
45:23 65:17 130:9
130:11 162:17
**orient** 74:1 76:18
162:12 163:1,6
**orientation** 163:8
**original** 67:22
116:16
**originally** 60:15
62:11
**outcome** 171:2
**outlive** 77:6 79:14
79:19 80:2
**output** 134:14,16
**outside** 8:13 38:24
56:16 76:8,9
89:17 98:16
100:16 109:17
110:7,22 117:23
**outstanding** 5:5
**overall** 152:4,8
**overriding** 117:9
**overwhelms** 76:24

**p**

**page** 3:7 44:7
46:23 47:9 48:12
137:13 138:16,20

139:2,11 156:19
156:22 158:11
159:12,12 173:4,7
173:10,13,16,19
**paid** 108:1 115:8,8
115:11,13,15
117:12 149:12
**paint** 72:19 129:10
**pandemics** 118:14
**paper** 49:8
**paradigm** 82:25
83:1,3,6,8,11,21
92:7 102:14,15,16
124:25
**paragraph** 7:10
7:11 9:11,14,15
10:3,4,13,14 15:4
15:4,12,17 20:9
24:11,20 26:25
30:24 31:20 34:1
34:2 35:10,21
37:12,13 39:6,12
39:23 40:2,2,19
44:5 47:9,21 50:6
50:8 56:21 58:23
59:3,24 60:17
61:7,12 62:7,12,13
64:20 66:3,4 74:4
74:6 77:3,4 86:9
86:13 87:9 90:7,8
92:18 94:2 96:22
99:7,8 101:2,3
102:1,6 104:2
113:21 119:13,14
122:13,14,21
123:12 130:22
134:10 135:12
137:3,5 138:10
140:14,20 144:3,5
144:22 147:17
148:3,3 150:4

151:16 152:2,3
159:12,13,15
**paragraphs** 40:1,3
40:3,4 140:8
**parameters** 148:1
**paraphrase**
140:20
**paraphrasing**
140:15,16,18
**part** 7:22 8:9,10
18:24 25:25 39:18
87:17 99:24 124:3
143:22 158:6
164:13
**participant** 16:22
17:5,17,23 18:5,7
18:18,20 19:11
20:18 21:4,8,22,25
22:1,9,13 23:4
25:5,12 29:6,7
30:9,10 43:17
44:3 46:4 50:12
54:5 57:25 59:6
60:20 61:1 70:4
70:24 75:8,8,15,18
81:1,6 83:4 84:15
106:3,4,6,8,12,16
107:8 108:9,10,14
108:22,24 109:1,5
109:13 113:1
114:15,24 116:2
116:10 117:11,16
118:11,14 126:11
146:6,11 158:17
**participant's**
17:13 23:11 26:23
92:10 116:6
**participants** 39:16
41:19 47:12 50:9
53:11 62:14 63:1
63:9,14,19 64:5

65:12 66:18 70:17
71:4,16 72:24
73:1,3 74:14
75:16 78:24 80:14
80:18 81:20 82:13
84:17 86:2,3
87:11,18,24 88:25
89:14 91:19,20
93:8,22 102:20
103:9,11 114:4,6
145:11,11 148:5
149:20 158:23
159:16 162:16
163:5,11,14,18,21
164:1,4 165:6
**particular** 9:24
15:13 16:3,5,11
19:5 22:9 31:1
44:6 61:15 63:5
66:18 67:21 71:10
82:11 97:4 98:13
100:16 114:13
120:7,10 129:16
131:3 160:21
161:7,9 162:15
163:1,12 166:16
**particularly**
123:19
**parties** 170:25
**parts** 140:19
**pass** 118:16 160:5
**passage** 104:14,15
**passed** 65:4,6
**patterns** 79:7
161:18 163:5,7
**pause** 19:25
**pay** 113:8 116:11
**payable** 113:19,20
**payment** 26:1
106:5 114:8,22
116:15

**payments** 26:7
105:7 116:20
**pbgc** 94:9 95:21
95:23 97:23
**pending** 5:3 153:3
**pension** 7:16
10:16,17 13:10,13
13:17 46:4,7
47:12 48:1 51:6
62:13 66:5 95:17
96:10 98:4 102:22
103:22 104:4
109:17 114:13,20
115:7,11,13,15
116:14,19 118:16
119:11,11 120:13
120:14,22 139:15
139:18,20 145:9
146:14 149:4
159:16 167:13
**pensioner** 118:4,5
**pensioners** 145:17
146:14,21,25
**people** 41:13
69:21 71:13,18,21
103:18 125:19
152:14,17,19
160:21 161:22,25
162:3 163:19
**percent** 63:15
80:13,14,18,19
81:7 84:16,18
88:2 91:19,22
97:5,6 98:7 111:3
111:3,7,8,18,21
112:11,14 122:15
122:24 123:2,12
123:14 124:16
125:15,16 126:5,9
127:1,3,3,13,16,23
128:21 129:9

130:1,23 131:9
133:9,24 134:14
134:17 135:8,13
135:18,23 136:10
137:6,8 138:11,13
139:5 151:6,6,13
152:5,5
**percentage** 51:20
52:7 131:13
133:12 149:11
160:20 161:22
162:2 163:25
**perform** 34:7
**performance**
100:19
**performed** 7:5
77:25 158:21
**performing** 37:6
**period** 11:5,11
48:24 94:6 97:20
101:21,23 104:11
104:24 113:9
114:9,21 167:2
**perkins** 64:22
**permanent** 56:5
**permissible**
143:10
**permissibly** 62:14
62:17
**permits** 87:1
**permitted** 128:1,2
**person** 74:19 76:3
165:20 166:15,16
**personal** 61:9
170:16
**perspective** 82:17
82:24 97:25
125:13
**phenomenon** 74:7
77:20 78:13 80:8
80:10 100:13,15

115:17
**phrase** 35:21
67:21
**phrased** 51:10
**pick** 127:12
**picture** 72:19
**piece** 49:8 141:5
**pistilli** 2:8 3:5 4:13
6:5 8:21,25 29:21
31:24 32:24 35:1
38:6,24 50:19
56:15 68:9 69:3
70:5,9 75:10 76:6
81:11,25 84:6
86:4 87:4 88:17
89:2,16 96:19
98:16 99:21
106:25 110:2
111:24 112:17
117:23 119:1
121:10 128:24
130:5 131:19
132:14 134:3
137:21,25 156:22
157:24 161:11
165:24,25 166:3
168:3 169:7 172:1
**place** 87:17 137:16
170:20
**plaintiff** 1:4,10 2:6
4:9
**plan** 11:16,19
13:10,13 37:23
38:9,9,10,16,22
39:1,10,15,20 40:8
40:14 41:7,18
46:5,7 47:12 50:8
50:11 51:16,19
52:6,15,21,22,25
53:7,8,11,21,25
54:4,5,8,21 55:1,2

55:6,7,17,18,25
56:6,10,12,14,18
57:15 58:7 60:6
60:11 62:11 63:2
63:4,5,6,10,11
64:3,8 66:6,8,10
66:18,18,22 67:7
67:10,14,16,16,20
68:1,5,6,23 69:18
70:1,14,17,18,19
70:20,22 71:12,13
71:16,17,19,20,22
72:1,9,10,23,24
73:1,3,4,7,11
74:14,22 75:16,18
78:4 80:23 81:18
81:18 82:6,7,11
83:4,6,15,23 84:14
84:15,21 86:3
88:3 91:18 92:1
92:12,20,21 93:7
93:15,16,20 94:3,7
94:20,22 95:14,16
96:3,5,23 98:7
99:8 100:10
102:24 103:23
104:5 105:25
106:5,9,13,17,20
108:13,20,21
109:2,5,7,13,25
111:1,17 112:25
113:15 114:4,6,13
114:13 115:10,18
116:2,6,10,20,22
116:23 117:16,20
118:1,10 119:4,9
119:11,11,15,19
120:12,15,24,25
121:1,4,14,16,17
121:19 122:6
126:12,17,19

127:2 128:1,2,3,6
128:8,10,12,19,20
130:19 131:4,4,6
132:20 133:6
135:25 137:7,9
138:12,14 140:4,6
140:6,11 142:5,15
145:4,12,20,24
146:2,9,19,20
148:5,23 149:19
149:20,25 150:1
152:11,15,18,20
153:7 159:16
161:6,21 163:5,11
164:1,4 168:24
169:3
**plan's** 52:16 59:8
66:12,19 70:4
73:22 89:21 93:21
94:3 97:13 99:13
116:17 140:10
148:8 152:4,8
161:8 163:20
**planned** 75:15
**planning** 51:12
**plans** 7:16 10:16
10:17,21,25 13:17
32:21 51:22 53:23
54:13,20 56:4,5,7
57:1 58:6,11 59:4
59:11 60:17,24
61:3 62:13 63:1,8
64:4,9,12,14 66:5
83:13 87:1,16,20
94:14 95:10,17,22
96:14 97:3 102:22
119:24 120:13,13
120:14,16,22
146:14 149:5,17
159:14 165:11,14
166:21 167:5,9,14

167:19 168:9,14
168:22
**please** 4:22 9:10
19:12 20:25 32:1
33:13 45:10 55:15
68:11 93:11 126:7
129:17 135:19
141:22
**plus** 73:1,16
122:14,23 123:2
123:11,14 124:15
125:14,15 126:5,8
127:13,16,23
129:25 131:8,13
133:23 134:14,17
135:7,13,18,23
**point** 38:14 39:23
43:22 47:6 63:13
78:19,20 79:5,6
87:23 88:24 89:11
89:13 98:14,20
106:6 108:3,5,7,17
108:19 109:15,18
110:16 124:13
125:22 127:15
132:7,11,12,25,25
133:4,7 147:18,19
151:3,8 153:15
154:3
**pointed** 42:4
**pointing** 85:2
**points** 111:6
131:13
**ponder** 77:1
**pool** 46:3 62:14
64:10,13 149:21
**pooled** 63:1,9,20
64:5
**pooling** 62:20,23
63:12,22 65:12

**poor** 69:6
**poorly** 51:10
**population** 46:6
71:5 74:8 93:25
152:4,9,10 153:25
162:8,9
**portfolio** 97:25
**portion** 29:23
**possibility** 12:13
**possible** 58:1
68:14,16 77:21
119:23 164:20
**post** 157:21
158:20
**potential** 46:15
**potentially** 121:5
129:6
**pps** 4:5
**practical** 8:5
120:15 121:25
**practice** 7:13 8:4,7
9:16,19,20,22
10:11 97:17 98:2
121:23
**practices** 63:3
94:22 96:5,8,13
114:14
**practicing** 9:23
**precedes** 135:20
**precise** 57:9 125:2
**precisely** 52:19
55:5 57:7
**preclude** 36:25
**prediction** 125:2
**prefer** 12:8,9
**preference** 78:1
**preferences** 78:20
163:11
**preferred** 113:14
138:23

**premise** 36:18
41:12 48:18,20,23
51:23 72:2,4,7
86:5
**premised** 41:13
122:17 123:5
**preparing** 7:12
65:15,24
**prescribed** 53:14
53:21 149:17
**prescription** 85:21
149:23
**present** 15:17 16:4
16:12 17:18 18:4
18:16 19:3 21:10
21:19 22:7,21,25
23:2,10 24:2,4,7
24:10,17,20 25:4
25:10,16,25 26:11
26:24 27:8,8
28:15,21 30:22,25
31:3 34:4 41:22
44:2,2 82:22
83:18 84:4 113:25
125:6 126:2 136:5
136:9,16 139:21
139:25
**presented** 130:22
**presumably** 51:6
68:25 83:9 108:1
**presumption** 38:7
107:21 117:1
**pretty** 100:5 135:5
**prevailing** 31:23
94:5 97:18,19,22
100:9,15
**previous** 42:2
170:9
**previously** 41:16
89:19

**pri** 48:10 146:7,10
146:12 151:21
**printed** 6:6
**prior** 29:23 32:24
52:3 99:21 106:25
110:2 114:22
130:6 132:15
157:24 160:18
161:11
**private** 159:16
**probably** 40:25
42:3
**procedure** 1:12
**procedures** 167:22
**proceedings**
170:18
**process** 34:11 88:5
88:7,8,13,18 89:3
97:13 99:25
125:25 132:19
**produce** 45:7,13
45:14,19
**produced** 68:22
**produces** 38:20
69:20
**producing** 70:21
**product** 127:18
**profession** 10:5
**professional** 7:12
7:13,14,22 8:9,11
9:13 10:5 11:23
59:1
**projected** 102:23
**promise** 118:3
**promulgated**
10:11
**properly** 29:11
153:16
**proposition** 68:2
**protection** 78:25
119:8

**provide** 6:21
11:18 53:9 61:14
96:4 113:4 165:13
167:23
**provided** 10:15
11:23 32:20 60:8
98:9 156:5
**provisions** 38:9,10
38:11
**proxy** 25:21
146:16
**public** 1:14 170:6
174:19
**publicly** 64:18
**published** 7:15,20
7:23 8:1 9:12
44:13 115:25
**pulls** 79:2
**pulse** 96:10
**pure** 76:15
**purpose** 27:21
28:12 30:18 35:24
36:7 64:6,7 94:25
95:25 96:4 110:17
110:17 129:18
147:15
**purposes** 19:7
30:23 33:10,19
57:12 66:10 85:14
91:10 96:24 98:4
100:7 101:10,15
101:24 102:7,10
103:3 110:24
112:8 113:18
119:16,19 121:6
129:19 135:24
136:20 167:14,19
**pursuant** 1:10,11
**pursue** 102:16
**push** 46:10

**put** 29:24,25 37:5
47:3 52:3 62:11
75:12 104:21
126:18 127:2
128:3 169:2
**putting** 128:9

**q**

**qualified** 9:22
129:2 136:11
142:6,16 143:6,11
162:3
**quality** 93:7,20
94:10
**question** 4:23 5:3
5:4,8,10,14,15
8:14,19 9:7,9 10:4
18:14 19:12,13,18
19:24 20:1,2,3,15
20:16,24 23:6,9,13
25:6,8 27:10 30:4
30:5,13 32:2,3,9
32:10,11 33:13,14
33:15 35:3,4,5,19
35:20 36:2,7 37:5
39:9,19 40:22,23
40:23 41:13,15,15
42:2,2,11 44:4
45:10,15,17,24
47:4 51:9,10
54:15,18,18 55:12
55:13,15,22,24
56:8,19 59:21
62:2,3 63:7 68:10
69:7 72:18 75:11
76:8,11,12 77:11
77:21 81:13 82:10
87:19 88:14 89:8
91:9,14,15,16
93:11 95:20 96:7
96:17 98:17
101:17,18 102:3,5

102:13 104:22 105:10,23 107:2 108:25 109:24 112:21 114:23 116:10 122:2,5 124:19 125:23 130:18 131:21 133:16,20,21 135:6 136:3,14 141:10 142:12,14 144:15 148:17 150:13 153:3,11 153:17,24 154:12 158:2,4,5,15 164:9 164:15

**questioning** 29:23

**questions** 4:20 15:10 21:13 52:3 94:16 95:3 96:7 140:22 153:9,19 153:23 154:10,13 164:15 165:25 168:3

**quick** 168:4

**quite** 83:1

**quotation** 64:21 65:1

**quote** 65:10 66:6,9 66:15

**quoted** 10:9

**quoting** 15:13 107:12

**r**

**r** 173:3,3

**raabe** 2:2

**raised** 110:16

**ran** 64:25

**random** 130:19

**randomly** 129:16

**range** 36:12,19 46:18,19 48:23

50:1 97:17 100:2 100:6,8 111:3,7,11 111:15,17 113:17 122:16 123:4 125:4 127:23 128:3,7,21,22 129:1,3,4,8,9,14 129:17,18 130:10 130:12 131:2,7,17 133:14 134:1,13 135:2,11 147:8,11 147:16,18,22 151:1,4,5,8,14 159:5

**ranges** 50:5

**rate** 21:8,9 30:16 31:1,2,22 38:2,14 40:16 54:22 56:25 59:7 77:17 94:3,4 94:8 96:24 97:5 97:13,15 98:7,9 100:23 101:4 102:15,21 104:25 106:21 107:6 109:24 110:15 111:18,21 112:11 112:14 113:5,17 113:24 118:12 122:9,10 125:11 125:14 126:20,25 127:2,12,14 128:18 133:5,9 145:22 146:6 147:14,21 151:4,5 151:14 158:18 168:23

**rates** 31:23 39:15 41:9,21 47:11 48:15,18,25 49:15 49:22 50:1,4 62:8 66:20 94:6,7,9,9

94:14 95:10,21,23 97:18,20,22,23,24 98:3,14 99:12,14 99:16 100:3,6,9,12 100:14,16,17 101:24 104:18,23 104:24 105:4,7,9 105:11 110:12 111:2 113:13 114:25 115:7,12 115:25 117:15,18 117:18 118:6,21 119:16,20 121:8 127:10 128:15 129:8,12,20 147:8 159:5 167:14,19 167:24,25 168:20 168:23 169:2

**ratio** 42:22 43:4,9 44:1

**rationale** 112:11 112:24

**ratios** 42:21 95:24

**raw** 165:9

**raytheon** 1:6 2:12 58:7 60:4,8 61:17 62:6 63:2,5,10,11 63:21 64:1,3,8 78:4 87:23 88:3 88:24 89:3,12,21 94:20 95:14 96:3 98:13 131:4 132:20 135:24 145:12 146:19,20 148:5 149:18,20 172:4 173:1 174:1

**raytheon's** 103:6 143:23 146:25

**read** 9:7 19:13 30:5 32:1,2 33:14 35:5 40:20 59:23

61:6,11 62:1,3,7 65:18 142:10,12 153:13 158:4,5 172:9 174:5

**readily** 164:10

**reading** 65:6,17 140:14,15 170:21

**realize** 95:7

**really** 11:16 49:18 67:1 72:8 91:3 124:15

**realm** 109:17 110:6 143:2

**reask** 142:13

**reason** 5:10,11,25 19:18 61:16 73:17 73:21 74:18 76:1 77:7 79:9,20 80:10 107:5 120:18 149:1 163:3 172:11 173:6,9,12,15,18 173:21

**reasonability** 112:1 121:16

**reasonable** 33:17 33:23 34:7,9,16,20 34:24 35:22,25 36:8,13,14,17,19 37:1,3,11 46:17 82:8,9 100:24 101:22 111:9,17 112:1,7 113:17 121:17 127:24 129:19 130:4,16 130:24 133:1 135:3 136:6,15 137:2 145:18 146:16,23 159:5

**reasonableness** 36:21 37:3,7,9

61:22,25 87:13
88:1,9,12,20 89:5
94:19 95:13 96:2
98:20,24 100:7
122:16 123:4
130:1,10,12
131:18 132:22
133:15 134:2,13
135:2,12,24 148:8
166:10
**reasonably** 66:8
67:10 111:14
126:4 145:10
148:6
**reasons** 79:25 80:3
80:6 120:15
**rebuttal** 152:23
153:10,20 154:11
**recalculated**
114:17,21 115:1
116:3
**recalculation**
116:14,17
**recall** 11:11,22
12:12,14,18,22,23
13:19,22,24,25
44:20 47:15,19
65:4 99:10 104:17
104:20 105:16
111:4 139:24
151:24 156:16,18
157:8,12 158:9,14
160:22 161:3
165:15,16 166:5
166:19,23,24
167:12 168:25
**receipt** 172:18
**receive** 26:5,6,18
**received** 75:22
139:7

**receiving** 25:12
137:7 138:12
**recess** 9:5 49:5
90:2 138:5 160:15
**recipients** 163:4
**recognize** 6:15
154:22 155:7
**recognizing** 19:3
**recollection** 11:8
154:9
**recommend** 11:20
12:15
**recommended**
12:19
**reconnect** 9:2
**record** 4:3 6:9 9:3
9:4,6 29:17,18,19
29:20,21,22,25
30:1,2 49:2,4,6,9
49:10,11,12 64:22
89:25 90:1,3 95:5
138:1,3,7 153:12
160:13,14,16
169:6 170:17
**recorded** 4:16
**recreate** 131:12
**redirect** 3:5 168:6
**reduced** 119:6
170:15
**refer** 43:21 46:20
47:2 103:20
131:23 157:21
**reference** 35:2
42:13 47:21 67:23
78:7
**referenced** 172:6
**referred** 71:4
**referring** 21:14
23:18 26:13 35:7
50:1 54:15,16
56:24 58:19 72:13

85:6 103:16
114:19,19 124:2,2
139:2 158:10,13
158:14,17 160:23
160:24 168:15
**refers** 42:20,23
51:24 74:6 135:8
**reflect** 10:10
102:22 115:2
**reflected** 22:15
29:6 116:12 156:2
**reflecting** 92:2
**reflective** 66:22
67:6 94:5 145:8
146:25
**reflects** 103:1
**refresh** 44:18
**refreshed** 4:14
**regard** 19:22,23
80:23
**regardless** 31:12
63:16,19 78:24
80:10 83:9 84:1
109:6,6,23 115:12
115:13 118:12,13
118:20 163:6
**register** 86:20
**regularly** 104:5
**regulation** 62:23
86:22,25 143:3
**regulations** 14:24
122:23 136:4
141:6
**reininvestment**
108:2
**reinvestment**
108:11
**relate** 40:20
**related** 115:17
120:8

**relates** 123:11
162:19
**relation** 11:24
140:10
**relative** 46:4 68:7
73:2 87:2 126:10
170:23,24
**relatively** 126:9
**relevance** 61:19
98:22
**relevant** 9:25
14:14 21:10 25:13
43:7 61:24 66:23
67:7 73:22,23
89:9 98:4 101:5,9
101:14 102:6,9
103:2 108:9 116:9
131:6 132:21
**relied** 7:20 8:2
166:25
**rely** 7:12 9:12,19
9:20,21 145:3
146:2 150:1
**remarks** 125:22
**remember** 12:4
104:25 105:3
**reminded** 67:21
**reorient** 138:9
**repair** 72:3
**repeat** 5:12,13
19:12,15 20:25
30:3 33:13 35:3
43:23 45:10 55:14
68:10 105:23
132:4
**repetitive** 95:3
**rephrase** 5:9
18:15 27:11
**replay** 158:2
**report** 3:8 6:3,24
7:2,11,12,19 9:19

9:21 10:1,14
14:17 15:4 34:2
34:15,18 37:13
42:19,20 43:21,23
44:6,16 46:20,24
50:7 56:22 57:8
58:6,11,15,18
59:11,14,17,22
60:24 61:4,6,10,19
61:20,21 62:5,25
63:3,4,6,8 64:4,6,6
64:7,12,16,21
65:15,24 66:4
74:5 77:4 79:8,9
80:4,11 86:6,10,10
87:16,20,22,25
89:4,19 90:7
94:13,18 95:1,4,9
95:12,15,19,21
96:23 99:8,13
100:3,6 104:3
105:15 107:4,11
110:11,16 113:22
119:14 122:14,21
123:1,10 130:17
132:18 137:4,16
137:17 140:9
143:21 144:4
148:13 150:5,16
150:22 152:23
153:10,14,20
154:11 156:3
159:11 160:25
161:4 166:22
**reported**   99:9,13
170:14
**reporter**   4:17 5:13
19:14 62:1 155:21
170:7
**reports**   6:7 7:15
7:20,23 8:1 9:12

58:25 61:13
**represent**   4:9
129:11
**representative**
64:22 145:10
**represented**   47:11
**represents**   42:22
109:19 137:7
138:12
**request**   50:9
116:22
**requested**   51:5
**require**   14:18,21
141:10
**required**   34:24
35:25 38:22 66:5
104:3 174:13
**requirement**
33:20 35:3,7 39:1
56:17 85:16
**requirements**
32:17
**requires**   14:18,21
32:14
**reread**   79:17
**research**   65:7
**reserved**   54:13
**respect**   16:15 17:4
17:13,22 18:13
19:25 22:14 23:4
27:5,13 28:1 32:8
32:22 33:6,11
44:24 48:9 56:9
65:12 71:1 78:21
91:16,25 92:2,8
93:21 95:4,5,20
100:12 109:22,25
111:1 127:14
128:18 129:23
135:1 145:13
154:3 157:5,15,21

158:21,22 159:1,5
159:8 162:16,23
163:1,13,21 164:6
164:19,20 165:12
168:14,20
**respond**   9:9
**responded**   23:9
94:16
**response**   10:3
42:11 77:10,13
94:17 96:6 125:23
136:2 143:5
**responsibility**
78:10 107:22
108:12
**responsibly**
107:25
**responsive**   8:19
**rest**   72:11
**restate**   158:2,7
**rested**   135:23
**restriction**   55:10
91:24 92:1
**result**   37:1,2 42:17
66:12 73:9 124:21
124:23 125:16
126:1 130:14
135:1,9 162:10
**resulted**   67:24
132:24
**resulting**   93:5
**results**   36:11,13
36:16,17 37:9
39:14 123:15,19
124:18
**retained**   6:21
126:16
**retire**   50:10 51:15
55:3,19 60:21
61:2 63:20 66:14
69:21 71:15,21

74:14 75:2 103:1
140:25 141:15,16
**retired**   71:14
117:21 118:22
139:9 140:11
145:11 152:10,15
152:17,19
**retiree**   79:2 90:14
90:18 103:6
118:22 119:9,12
145:4,6 150:24
152:4,8 153:25
**retirees**   37:24 41:7
68:5 70:4 71:13
71:17 74:21,23
85:13,14,19,20
93:9 103:8 142:7
142:17 143:12,16
146:20 147:1
162:8
**retirement**   50:13
50:17,17,21 51:5,6
51:8,14 52:6,11,15
52:17 54:9,11
55:1,17,25 59:7
63:25 65:21 66:1
66:6,9,12,17 67:11
67:14,15,17,24
71:18 72:24 73:1
77:9 79:22 90:14
92:10 93:22,24
101:9 105:20
106:13,22 109:1,2
111:22,23 112:13
113:3,19,20
118:25 139:15,18
139:20 140:12,25
141:1,19,24 146:3
147:10 148:23
151:2

retires   26:4,8
60:20 61:2 90:19
115:21
retiring   26:17,19
51:4,13 81:17
102:19,20 103:9
153:7
return   97:25
100:19 101:1
172:13,17
returns   53:13
115:14
review   7:2,3,5
65:13,25 155:24
157:1 169:7 172:7
reviewed   97:8
154:25 165:4
right   5:5 16:15
20:5,13 22:10
23:17,24 24:1,3
26:2 27:9,14,20,23
30:11 31:4 32:15
32:23 33:7 34:21
35:14,22 36:4
39:21,25 40:5,9,10
44:11 47:1 48:10
48:25 49:20,21
50:2 53:4,16,18
54:5,6 55:8,10
56:6 57:17 58:3
68:15,24 69:2,6,16
70:10,23 80:2
81:3,10 82:19,24
83:14 84:22 85:3
85:4,18,21,23
86:14 88:7,16
89:1 91:8,13,14,22
92:6,16 99:3,20
106:10,14,18,24
107:9,24 109:4,21
110:1 111:6

113:15 114:10
116:25 117:22
118:18 119:6
125:7,8,11,12,23
126:21 127:4
130:4 132:13,18
133:15 134:17
136:7,8,11,12
139:16,17 140:4
140:12 144:23
145:1,24,25 146:3
146:21 147:1,9,12
147:13,19,24
151:4 152:16
153:21 154:14
155:14,17,22,23
155:25 156:3,4
160:12 161:23
rigorous   162:24
rise   48:24
rising   104:18
risk   54:4 105:16
105:18,25 106:2,7
106:10,14,17
107:9,17,17,18
108:2,3,11,12,17
109:3,4,8,8,11,11
109:20,20,22,22
115:19,20
risks   119:12
road   72:6
rocks   1:13 170:5
171:8
role   11:15 106:6
roughly   139:5,23
rounding   166:12
route   120:17
routinely   62:13
rp   46:23 47:10,20
47:23 48:10

rpec   148:24 149:3
rules   1:11 4:15
140:23 141:12,18
141:21,23,25
run   65:2,3 101:20
129:24 150:10,18
runs   150:17

**s**

s   79:21 87:11,13
88:1,2 90:10
101:10,15,16,19
102:7,10 103:3
137:6 138:11
139:13 144:11,20
173:3
sake   38:19 117:8
salary   52:8,12
save   67:16,20 73:3
saving   67:23 68:1
saying   24:6 35:20
69:5 85:5 135:18
135:25 141:10
says   75:19
sb   13:15,20,23
14:1
scale   17:22 18:3,6
27:20 151:21
scanning   58:20
59:18 65:11
scenario   37:23
71:2,3 118:7
148:2 151:18
scenarios   150:17
schedule   13:15,23
14:1,5
school   51:19
science   121:24,25
122:1
scientists   8:4
scope   38:24 39:2,5
56:16 76:8,9 84:6

89:17 98:16,19
110:7 117:23
143:2
seal   171:4
second   29:17
104:18 131:2
154:16
section   62:23
sector   159:16
see   6:10,15 7:17
9:16 10:19 15:8
15:12 16:25 17:8
21:17 24:13 34:13
37:20 42:1 44:8
47:20 50:14,22,23
57:3 59:9 60:22
62:15 64:23 66:15
72:3 74:11 86:12
86:20 87:14 90:11
90:15 92:24 94:11
97:1 98:6 100:24
101:12 104:9
114:2 119:17
120:4,11,19
122:19 127:13
130:20 137:9
139:1 146:17
148:10 150:8
151:18 152:5
154:18 159:20
167:25
seek   102:17 149:6
seen   58:4 62:9
78:3 97:3,15
119:24,25
select   59:4 60:17
60:25 77:8,9,16
79:10,21,22,25
87:11,18,24 94:4
111:14,17 128:6
129:16 163:14

165:8
**selected** 60:18
69:1 89:1,14
111:10 145:23
164:4 165:7
**selecting** 59:12
60:5,10 78:21
92:19 93:14 94:8
102:15 111:20
112:11 145:4
**selection** 11:24
74:6 77:8 86:7
110:18 112:7
124:4 126:17
128:8,14 145:6
161:18
**selects** 34:7,9
106:8,12,16 109:1
109:25
**sense** 5:6,9,16 18:8
18:10 24:23,25
31:5,7,20 39:20
54:23 62:22 71:3
78:10 99:17 107:5
110:12 121:12,12
121:19 146:9
**sensitive** 108:19
108:21 113:23
**sent** 172:14
**sentence** 36:24
40:20,21,22 79:17
**separately** 18:24
**sequitor** 105:22
**series** 40:1,3 57:14
57:17
**serota** 42:20 99:4
138:22,23 140:9
150:22
**serota's** 67:22
150:6,19 152:23
153:6,10,14,20

154:11
**services** 10:16
11:23
**set** 15:7,21 20:12
20:14 21:2 23:21
23:24 27:7 34:7,9
35:13 62:7 63:22
64:1 71:10 73:12
73:24 94:3 100:17
114:9 118:24
132:9 153:12
171:3
**sets** 15:22 34:4
159:25
**setting** 42:15 59:8
61:17 64:13 98:14
112:6
**seven** 47:9
**share** 6:11 93:11
154:19
**sharp** 53:25
**sheet** 3:9 172:11
**shift** 20:5 22:22
**shifted** 19:16 20:1
21:11 46:19
**shoes** 128:10
**shooting** 129:10
**shortcomings**
121:4
**shorter** 74:19 76:3
101:11 102:8
103:9
**shorthand** 170:7
**shoulder** 123:25
124:1
**show** 48:13 164:21
**showing** 144:6,16
**shown** 49:23,24
137:13 138:16
**shows** 147:17

**side** 129:4,5
**sign** 169:7 172:12
**signature** 155:10
171:7
**signed** 13:20,23
14:1,4 172:20
**significant** 43:14
107:19 113:12
**signing** 170:21
**similar** 43:1 91:24
94:16 149:21
164:21
**similarly** 1:3
77:18 85:16
**simple** 134:12
**simply** 23:18
91:17 92:9 93:23
122:7 124:18
126:12 154:8
**single** 16:19 17:6,8
17:16 18:4,16
21:19 22:7 23:2
24:5,7,17 25:4,11
26:6,24 27:9
30:14,25 32:22
38:3 55:3 57:13
57:17 58:8,9,15,16
60:18 69:1,9 70:2
70:2 74:25 77:10
79:12,15,23 81:10
81:23 82:9,18
83:18 84:2 87:3
91:20 97:14
105:20,20 106:5,8
106:13,23 108:15
110:14 111:19,22
111:23 112:15
113:25 119:21
139:8,22 140:2,6
140:23 141:13,19
142:1,8,17 143:13

144:1,6,16 147:21
162:14 164:1,4,21
167:6
**singles** 79:9
**singular** 60:25
70:16
**sir** 153:21
**sit** 31:6 45:21
156:12
**situated** 1:3 77:18
85:16
**situation** 16:18
50:22 67:23
114:20
**situations** 50:23
51:2 121:13
**six** 10:13,14
**size** 54:17 163:7
**skew** 42:13
**sla** 75:19 76:4
109:2,2 143:6
**slas** 141:24
**slice** 160:1
**slightly** 46:18
111:12 133:3
**slotted** 149:9
**small** 133:12
147:11
**smaller** 66:13
131:8
**smoothing** 160:6
**social** 78:11
**societal** 78:9
**society** 47:25 80:5
148:22 149:14,23
**socioeconomic**
46:2
**solely** 64:8 108:12
**solutions** 166:6
172:23

somebody   26:4
sophisticated
   120:5 159:19,23
   160:10
sorry   20:25 22:18
   26:5 28:19 33:16
   51:9 55:22 69:5
   70:5 82:4 134:9
   135:6 158:6
   161:24 165:7
sort   53:1 55:7 72:5
   72:16 80:23 92:16
   93:4 112:3 137:15
sought   131:2
sound   29:15 48:16
   49:1 95:3 134:22
   148:16 151:14
   158:16
sounded   41:15
   105:22
sounds   122:2
source   15:11,13
   124:15
sources   58:18
south   2:3
span   115:16
spanning   73:18
speak   5:11 78:9,23
   112:1,2 131:1
   135:7 143:15
speaking   9:1
   47:16 74:13 78:25
   79:7 114:12
   151:10,12
speaks   77:21
   127:16
special   149:15
specific   10:8 11:8
   11:8,20 14:3 22:4
   23:1,3 24:18,22
   47:4 62:23 68:15

69:23 71:9,19
   90:24 92:21,22
   93:16,17 100:10
   105:4 110:17
   113:14 125:5
   131:6 145:4,24
   146:2,9 149:25
   158:12 161:2,21
specifically   7:24
   8:13 13:24 47:15
   48:3 59:19 61:13
   104:20 145:21
   154:10 159:12
   166:20 167:13,18
specifics   131:4
specified   69:11,14
   170:20
specify   38:11 66:5
specifying   128:4
speculate   103:13
   103:21 104:1
   105:5
speculative   86:7
   117:24
spend   107:24
split   153:7
spoke   115:18
   130:17
spoken   165:20
sponsor   11:19
   67:10 83:6 92:2
   92:12,20 93:15,20
   96:23 108:13
   119:9,15,20
   120:16 121:4,14
   121:19 128:6,10
   128:12,20
sponsor's   108:21
sponsoring   102:22
sponsors   11:16
   56:6 66:8 94:4,7

104:6 120:15
   128:1,2 160:4
spot   71:1
spouse   74:16 76:1
   81:18 82:16
sprang   141:8
spray   129:10
ss   170:2
stability   40:5
stable   39:24 49:25
   49:25 53:15
stand   156:10
standard   9:24
   52:20 57:2 62:24
   76:19,22 122:15
   123:3 134:13
   135:23
standards   8:8 9:16
   9:18,20,22 10:8,11
   10:12 50:11
   162:25
standby   138:6
standpoint   81:8
   84:24 116:7
   121:18,23
started   138:10
starting   37:10
   48:16 52:4 70:7
state   1:14 15:5
   90:8 97:3 170:1,6
   170:8
stated   66:19 87:20
   97:5
statement   6:20
   59:17,23 61:6,8,11
statements   14:16
   95:4,6
states   1:1,12 9:23
   10:18 58:15 76:4
   93:10,25 94:23
   95:18 96:6,15

130:19
static   8:17
stay   39:4
stays   117:20
steer   19:4 140:19
stenographically
   170:14
stepping   100:25
   167:17
steps   106:6
stick   47:17
straight   17:7
   128:16
street   2:3,9
strike   16:3 22:5
   33:25 34:17 71:7
   80:12 130:10
   159:7,14 164:2
struggling   19:18
studied   164:5
studies   7:15,20
   9:12 59:20,22
   60:1 61:10 64:11
   95:9,22
study   65:5 77:13
   77:24 78:6 79:5
   88:11 93:9 146:24
stumble   130:18
stumbled   65:9
style   122:2
subgroup   149:2
subgroups   148:25
   148:25
subject   118:6
subjects   89:23
submitted   6:7
subpopulation
   74:8
subscribed   174:14
subset   146:21

**subsidized** 141:19
141:24
**subsidizes** 140:12
**subsidy** 137:8
138:13 139:3,5,7
**substantial** 8:6
78:2
**subtle** 154:3
**sufficient** 99:20
132:12 133:13
135:11
**suggest** 11:7 72:17
110:18 113:10
127:1 164:24
**suggested** 53:13
**suggesting** 111:12
111:13
**suggests** 42:5 60:9
79:2 124:25 143:4
**suite** 2:4
**sum** 104:4,6 105:7
105:12 106:3,4,5
107:7,8,16,21,22
107:23 108:4,8,9
108:20 109:15
110:20,24 113:22
115:6 119:15,20
120:12,20,21
121:6,8 122:8
**summarizes** 87:25
**support** 59:23
61:11 64:12,15
96:14 148:13
**supportive** 36:11
**supports** 59:17
61:6
**suppose** 29:4,11
93:2
**supposed** 114:10
**sure** 4:13,19 8:17
15:3 28:21 35:6

45:11 51:9 55:23
65:17 68:13 81:12
82:22 83:2 90:22
103:15 107:1
110:10 114:18
122:3 130:7 132:5
133:22 137:18
140:18 142:3
164:17 165:2,25
**surprise** 120:4,18
**survey** 63:3 94:22
95:16,19,19 96:4
**surveying** 64:18
**survivor** 10:23
11:14,25 12:20
16:20,23 17:6,10
17:19 18:7 19:8
23:5 24:10,21
27:3,6,12 28:16,22
31:3 32:15,23
33:7,11,20 38:4
46:13 57:23 58:10
58:17 62:8 63:15
64:14 66:22 68:4
69:12,15 75:1
77:16 78:1,21
79:10 80:1 81:6
81:24 82:19 83:19
84:2 85:15 87:2
89:15 91:1,12,18
91:21 92:3 94:15
95:11,24 96:2
97:10 98:20
106:17,23 107:6
108:16 111:20
112:16 117:4
119:22 136:11
140:24 141:14,20
142:1,6,16 143:6
143:11,24 144:2
161:23,25 162:3,4

162:13 163:4,6,19
164:7 165:6 167:6
167:15,20
**suspend** 39:19
**switch** 89:23
112:18
**switching** 70:6
74:5
**sworn** 4:1 5:20
170:11 174:14
**system** 6:10 70:14
100:14 154:19

**t**

**t** 173:3,3
**table** 16:3,20,21
16:22 17:4 19:5
22:4,8,15 23:1,4
24:18,22 25:22
27:17 44:7 46:12
46:16 47:1,13,20
48:5,7,9,10 74:22
76:14,14 80:13,17
81:2,2,7,20,21
82:13,15 85:13,19
85:19 86:1,2
90:25 91:7,8,20,22
115:24,25 133:9
145:7 146:7,11,12
148:7,15 150:7,7
150:12,12 151:21
151:25 158:17,18
158:23 159:1
160:20 161:7
162:20
**tables** 7:16 18:23
28:3 42:12,13
44:10,22,23,24
45:2 47:10,24,25
48:3 79:3 94:13
149:16

**tabular** 12:13,15
12:19 38:10,13
56:24 57:5,10,23
58:2 59:4,8,13
60:5,18,25 61:14
61:18 68:14 69:10
69:14,19 70:3,14
70:16,16,20 71:9
71:19 126:20
148:9 166:10,21
167:5 168:10,13
**tabulated** 146:18
**tailored** 68:8
**take** 4:17 5:1,3
6:14 19:9 25:3
26:5 49:2 55:3
56:21 62:12 74:4
75:19,20 76:4,4
81:6 83:15,18,21
83:23 84:1 86:9
87:10 92:18 101:2
106:5 108:4
109:13,23 113:21
122:13 137:20
138:2,4 140:8
142:18 144:3
150:4 151:16
152:2 154:16,21
155:3 156:20
160:21 163:20
**taken** 1:13 110:6
134:19 139:8
140:3 155:13
170:19
**takes** 107:16,20,20
107:22 108:9,10
109:16 161:9
**talk** 4:18,24 17:3
43:22 55:6 105:15
107:15 165:18

**talked**  125:10
  134:15 160:19
**talking**  9:1 21:15
  23:16 39:20 58:8
  73:6 80:21 102:1
  104:11 115:3,10
  133:17,19 134:16
**tape**  137:22
**technical**  5:11
  15:25 159:25
  160:2,7
**techniques**  160:5
**tell**  5:8 10:25
  11:16 16:17 44:15
  76:7 103:6,22
  124:10 148:21
  154:22
**telling**  114:11
**ten**  49:3 50:16,20
  51:4,13,15 52:10
  52:14,18 54:8,25
  55:16,25 56:2,10
  113:2 127:9 129:1
  129:2 138:4
  163:21
**tend**  18:25 28:3
  37:16 42:8 45:7
  45:12,13,18 46:1,3
  46:5,12 73:3 74:9
  77:5,16 78:15
  79:10,14,19,25
  80:2 85:4 100:12
**tended**  41:5
**tendency**  162:12
**tends**  25:22
**tenth**  2:9
**term**  16:1 47:17
  160:2,7
**terminology**  54:12
  151:9

**terms**  53:11 75:22
  126:11 137:9
  138:14 140:3
**terry**  1:9 3:3,8,9
  4:4,6 5:18 6:3,5
  9:10 12:25 13:3
  13:12 14:1 23:17
  49:14 89:8,24
  90:6 118:18 138:9
  153:3,9 154:7
  160:18 166:1
  168:8 170:10
  172:5 173:2,24
  174:2,4,12
**test**  48:21
**tested**  148:1
**testified**  5:21
  23:22 32:19 89:18
  157:10
**testify**  23:25
  170:11
**testifying**  161:3
  166:24
**testimony**  6:1
  32:25 34:23 35:16
  43:24 99:22
  106:25 107:10
  110:3 111:9 130:6
  132:9,15 133:1
  155:13,19 156:5,7
  156:10,13 157:1,3
  157:8,25 160:18
  160:23,24 161:5
  161:12 168:8,25
  170:18 172:9,18
  174:8
**text**  140:13
**thank**  36:6
**thanks**  138:22
**theoretical**  42:16
  91:11

**theory**  85:2
**thing**  22:19 44:3
  75:20 86:16 118:9
  124:10 134:21,25
  168:1
**things**  8:8 20:23
  21:16,21 76:16
  80:23 84:5 105:6
  109:10 116:5
  123:22 124:6
  141:6 165:15
**think**  16:18 18:10
  20:3 21:12,15,20
  23:9 24:23,25
  29:1 31:6 32:8
  37:5 39:18,22
  42:2,12 44:19
  45:9 47:16 48:21
  51:10 56:8 58:21
  60:2 67:9 72:18
  89:9,18 92:11
  100:5 101:16,17
  101:19,22 102:13
  107:10 109:14
  111:16 112:4,17
  117:6 118:18
  120:2,3 121:7,22
  125:18 127:11
  129:12 130:23
  132:12,16 133:4
  134:9 135:7,17
  141:17 145:7
  146:8 156:17
  157:11 158:1
  161:5,13 165:9
**thinking**  42:10
  89:25 112:2,5,22
  157:4,15,18 159:8
**thinks**  129:7,8
**thirty**  138:21

**thomas**  1:9 3:3,8,9
  4:4 5:18 170:10
  172:5 173:2,24
  174:2,4,12
**thought**  9:25
  29:24 42:21 44:1
  77:20 80:7 99:24
  102:3,4 133:17
  163:16
**three**  6:6 30:8
  44:24 51:21 52:7
  52:11 151:13
  157:5 158:9,13,14
  159:9
**threshold**  163:3
**thrown**  23:13
  133:21
**tighten**  131:6
**time**  5:2 8:24 11:5
  11:11,12,22 13:22
  13:25 28:20 38:19
  39:24 40:17 48:2
  48:17,24 49:15,18
  52:17 56:7 64:25
  65:3,5,8 75:2
  89:24 97:20 101:6
  101:9,14,22,23,25
  102:7,10 103:2
  104:11 108:4,5,8
  108:20 109:18
  111:20 112:14,18
  113:9 114:7
  118:21 128:16
  137:20,21,23
  140:21 142:19
  143:14 157:10
  165:19 170:20
  172:19
**timeframe**  172:8
**times**  96:1

**timing** 109:7
**today** 4:2 6:1 31:6
  31:19 111:18
  128:19 153:10,20
  154:10 156:10,12
  160:9,23 165:17
  166:6,20 167:10
  168:10
**tom** 8:25
**tomorrow** 75:24
**tongue** 124:12
**top** 18:11 25:1
  31:9 44:14 51:21
  52:7,11 57:8
  164:8
**topic** 153:11,23,24
**touch** 78:7
**tracking** 21:13
  52:2
**tradition** 123:23
**traditional** 25:17
  120:24
**traditionally**
  97:23 110:21
**training** 14:9,10
**trajectory** 105:1,4
**trange** 30:13
**transaction**
  108:24 109:18
**transcript** 3:8
  4:17 154:23,25
  155:9,22,22
  156:20,21 158:11
  170:14,22 172:6
  172:20 174:5,8
**transcription**
  170:16
**transfer** 109:19
  160:3
**translate** 151:11

**treasury** 94:9,14
  95:10 97:23
  122:22 136:4
  167:14,19,23,25
  168:20,22
**treat** 166:15
**tremendous** 124:8
**trend** 163:8
**trick** 70:6
**trouble** 133:4
**true** 5:25 25:24
  66:20 77:11 156:7
  170:17 174:8
**trust** 113:4
**truth** 170:11
**try** 4:19,22 5:9
  28:19 45:17 88:23
  95:5 125:5 131:10
  133:3 136:13
  142:10
**trying** 17:8 20:8
  20:13 22:24 24:1
  39:4,11 40:19
  41:14 72:3,19
  110:10,13 127:20
  134:11,21,25
  135:8 140:20
**tune** 93:4
**tuned** 79:1
**turn** 7:10 44:17
  50:6
**turns** 109:17
  116:7
**two** 15:18,22
  16:13 20:23 21:1
  21:15 22:25 24:2
  31:18 34:9,16,19
  43:9 44:2 57:16
  70:22 71:25 73:1
  73:16,20 74:14
  75:16 78:10 82:23

84:4 102:12 113:8
  113:10 143:1,20
  157:11
**type** 51:25 52:5,20
  54:8 55:2 109:12
  109:23 161:9
  163:8,12
**types** 94:7 98:13
  110:1 120:8
  159:17 165:6
**typewriting**
  170:15
**typical** 22:13
  60:20 61:1 72:25
  90:14
**typically** 25:14
  30:21 53:8 54:13
  59:5 66:6 92:21
  93:16 94:4 100:20
  101:4,16 102:22
  124:5

**u**

**u.s.** 94:9 145:8
  146:14,21,25
  167:14
**ultimate** 72:10
**ultimately** 14:19
  126:5,12 131:5
**unaware** 96:23
**uncertain** 122:18
  123:5 124:24
  126:8
**uncertainty** 76:18
  76:24 124:8,22
  125:24 127:17
**underlying** 25:21
  38:11,14,15
  110:19
**underscore** 164:24
**understand** 5:7
  18:14,19 25:6,9

30:19 32:16 33:15
  35:19,20 41:12
  45:15 72:18 76:16
  76:22 83:1,2 87:6
  89:9 102:13
  107:13 114:18
  121:14,20 126:7
  128:9,13 129:17
  132:8 134:8,9,20
  135:6,10,19 141:8
  161:4
**understanding**
  15:14 33:9 55:11
  56:6 60:12 62:19
  80:5 96:13 127:7
  148:4 154:2
**understate** 46:6
**understated** 46:9
**understatement**
  46:9
**understood** 5:16
  80:5
**undo** 84:11
**unexpected** 42:14
  126:13
**unionized** 47:12
  47:18
**unique** 114:13
**unisex** 74:22
**united** 1:1,12 9:23
  10:18 76:3 93:9
  93:25 94:23 95:18
  96:6,15 130:19
**unmarked** 6:6
**unobjectionable**
  122:2
**unquote** 66:9
**unravel** 136:3
**unrealistic** 48:20
  48:23

**unreasonable**
36:25 100:21
121:7 131:14,25
133:18,25 135:9
135:15 136:19
**unspecified** 82:2
**unwilling** 104:1
**unwind** 133:16
**updated** 104:5,6
**urban** 77:14 78:6
**use** 10:22 11:14,17
12:15,19 16:11,14
17:18,21 18:5,20
22:8 23:3 24:9,21
26:23 27:2 28:10
31:1,21 32:11,21
33:17 34:24,25
35:17,21,25 43:15
44:25 46:11 47:17
57:9,24 58:15
66:9,11 67:5
68:14 71:6,10,12
71:12 73:23,24
80:13 81:19 85:12
90:24 91:6 92:9
92:15 93:8,23,23
94:14 99:14
100:22,23 104:4
106:21 107:5,7
110:12 113:14
119:15,20 120:20
121:8 122:7
128:19 130:14
135:3 136:15,19
137:2,12 147:3
148:7,14 150:11
150:21 151:10,11
151:20 159:24
161:6 163:12,16
165:11 167:14,19
168:20,22

**uses** 39:15 40:14
56:12 70:2 71:19
74:22 96:24
106:22 150:6
**usual** 5:2

**v**

**v** 172:4 173:1
174:1
**vague** 31:24 35:1
38:6 50:19 76:6
81:11 121:10
**valid** 62:21
**valuation** 71:1
88:20 152:24
**value** 15:6,16 16:4
16:12 17:18 18:4
18:16 19:3 20:12
21:2,10,19 22:7,21
23:2,20 24:2,4,7
24:10,17,20 25:4
25:10,16,25 26:11
26:24 27:8 28:15
28:21 30:22,25
31:3,11 44:2,2
53:2,15 78:17,22
78:23 82:22 83:18
84:4 97:19 113:25
116:18 122:17
123:4 125:6,7,10
126:2,4,11 136:6
137:5,8 138:11,13
139:16,21,25
143:1,19,22 144:1
144:6,16
**valued** 16:19,21
**values** 15:17 22:25
23:10 34:4 54:1
136:10,16
**variability** 128:14
**variable** 104:4

**variables** 82:2,3
**varies** 58:2
**variety** 98:3 112:8
147:25
**various** 127:17
**vary** 25:18,19,20
25:22
**verbatim** 4:17
155:21
**verify** 172:9
**veritext** 172:14,23
**veritext.com.**
172:15
**version** 44:25 45:1
45:3,4 46:25
47:10
**versions** 44:20
**versus** 26:14 73:15
107:20 108:21
113:19 162:4
**victoria** 1:13
170:5 171:8
**videographer** 2:14
4:2 9:2,6 29:18,20
49:4,6,10,12 90:1
90:3 137:23 138:3
138:6 160:14,16
169:6
**videotaped** 4:4
**view** 33:22 37:8
100:14 132:8
**viewed** 148:2
**violate** 85:20
**virtue** 53:10 54:1
152:20
**voice** 8:23
**volatile** 104:23
**volatility** 127:9
**vs** 1:5

**w**

**wait** 4:22
**waiting** 45:7
**waived** 170:22
**walk** 4:14 16:24
**wall** 129:10
**want** 9:3 28:13
29:21 30:2 31:15
34:25 45:9 51:9
55:22 70:6 72:3
75:5,20 77:22,23
80:9 83:25 84:11
92:15 112:24
113:16 116:2
121:15 127:15
128:25 131:20
143:4 163:20
164:23,24 165:2
**washington** 2:9
**way** 5:24 8:16
10:10 22:12,18
42:16 43:5 48:16
49:19 68:3,21
78:21 84:21 86:6
98:1 100:18
102:17 105:24
117:25 121:18
127:13 129:12
131:10 133:3
135:21 148:16
164:14
**ways** 19:19 22:6
23:14 57:19,22
160:2
**we've** 82:10
115:10
**weight** 163:10
**weighted** 44:20,23
45:12 46:5 47:20
47:24 48:3,5,7,9
80:18 81:1,2,7

86:1 147:4,5
150:11,12,20
151:25 160:20
161:6
**weighting**  45:8,14
45:16,18,20
161:20
**weightings**  45:22
**went**  8:24 117:16
**west**  2:4
**whatsoever**  87:20
117:4
**whereof**  171:3
**white**  45:3,4 149:2
149:7
**wide**  100:14
**widely**  57:1
**wife**  84:14
**wildly**  126:8
**wise**  11:12
**wish**  81:15
**withhold**  31:15
**witness**  3:3 4:1,7
4:11,25 5:6,17,19
8:23 19:16 31:25
32:3 35:2,6 38:7
39:1 50:20 56:17
68:10 69:4 75:11
76:7 81:12 82:1
84:7 86:5 87:6
88:18 89:3,18
95:8 98:17 99:23
107:1 110:4
111:25 117:25
119:2 121:11
128:25 130:7
131:20 132:16
134:4 158:1,5
161:13 165:24
170:10,22 171:3
172:8,10,12,19

**witnessed**  98:2
**woman**  26:17
**women**  41:2 77:5
77:9,18 78:15
79:11,14,18,22
80:2 85:3
**wonder**  161:1
**wonderful**  6:10
**word**  36:7 159:25
**worded**  27:10
**words**  29:14 34:6
57:9 116:18
149:10
**work**  10:10 11:2
14:14,23 15:2
125:20
**worked**  11:4,6
70:9
**working**  14:25
24:14
**works**  6:11
**worry**  108:11
**worsening**  49:1
**worth**  75:21 84:1
142:7,17 143:12
**worthwhile**
164:23
**wow**  23:6
**write**  6:24 7:11
34:2 37:13 50:8
56:23 59:4 60:17
62:13 66:4 74:6
77:4 87:9 92:19
94:2 96:23 101:3
102:6 104:3
113:22 119:14
122:14 128:23
137:5 140:9 148:4
152:3
**writing**  7:1

**written**  36:24
43:24 160:24
**wrong**  72:7 107:13
124:12
**wrote**  39:12
134:10

**x**

**x**  3:1 73:15,15

**y**

**year**  11:11 12:3
66:21 81:15,17
83:9 96:9 156:6
163:22 166:16,17
167:1
**years**  11:9 30:8
48:19 50:12,16,20
51:4,13,15,21 52:7
52:10,12,14,18
54:8,25 55:16,25
56:3,11 60:13
61:24 72:12 73:1
73:20 94:6 97:17
98:2 103:4,12,14
103:15 110:23
113:2 114:22
116:12 117:13
120:23 127:9
152:12 159:17
160:11 164:5
168:18
**yield**  36:16 75:6
**yielding**  36:25
**yields**  94:10 101:5
101:5
**younger**  30:8

Federal Rules of Civil Procedure

Rule 30

(e) Review By the Witness; Changes.

(1) Review; Statement of Changes. On request by the deponent or a party before the deposition is completed, the deponent must be allowed 30 days after being notified by the officer that the transcript or recording is available in which:

(A) to review the transcript or recording; and

(B) if there are changes in form or substance, to sign a statement listing the changes and the reasons for making them.

(2) Changes Indicated in the Officer's Certificate. The officer must note in the certificate prescribed by Rule 30(f)(1) whether a review was requested and, if so, must attach any changes the deponent makes during the 30-day period.

DISCLAIMER:  THE FOREGOING FEDERAL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF APRIL 1, 2019.  PLEASE REFER TO THE APPLICABLE FEDERAL RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS
COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the foregoing transcript is a true, correct and complete transcript of the colloquies, questions and answers as submitted by the court reporter. Veritext Legal Solutions further represents that the attached exhibits, if any, are true, correct and complete documents as submitted by the court reporter and/or attorneys in relation to this deposition and that the documents were processed in accordance with our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining the confidentiality of client and witness information, in accordance with the regulations promulgated under the Health Insurance Portability and Accountability Act (HIPAA), as amended with respect to protected health information and the Gramm-Leach-Bliley Act, as amended, with respect to Personally Identifiable Information (PII). Physical transcripts and exhibits are managed under strict facility and personnel access controls. Electronic files of documents are stored in encrypted form and are transmitted in an encrypted fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.