# UNITED STATES DISTRICT COURT
# OF MASSACHUSETTS

| | |
|---|---|
| Johnny Cruz, on behalf of himself and all others similarly situated,<br><br>Plaintiff,<br><br>vs.<br><br>Raytheon Company, Kelly B. Lappin, in her capacity as Plan Administrator for the Raytheon Company Pension Plan for Hourly Employees, the Raytheon Company Pension Plan for Salaried Employees, the Raytheon Non-Bargaining Retirement Plan, the Raytheon Bargaining Retirement Plan, and the Raytheon Retirement Plan for Engineers & Contractors, Inc. and Aircraft Credit Employees, and John/Jane Does 1-10,<br><br>Defendants. | **Case No.: 1:19-cv-11425-PBS**<br><br><br><br><br><br><br><br><br><br><br><br><br><br>CLASS ACTION |

## PLAINTIFF'S CORRECTED* OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

* Plaintiff's Opposition to Defendants' Motion for Summary Judgment (ECF No. 64) inadvertently exceeded the page limits set by this Court's Order (ECF No. 48).

# TABLE OF CONTENTS

INTRODUCTION ........................................................................................................... 1

RELEVANT BACKGROUND ..................................................................................... 1

    Procedural History ..................................................................................................... 1

    Key Facts Precluding Summary Judgment for Defendants ................................. 2

LEGAL STANDARD.................................................................................................... 5

ARGUMENT .................................................................................................................. 5

    I.       PLAINTIFF IS ENTITLED TO RECEIVE A JSA THAT IS AT LEAST THE ACTUARIAL EQUIVALENT OF THE SLA HE COULD HAVE RECEIVED WHEN HE RETIRED ........................................................................................... 5

    II.     DEFENDANTS HAD AN OBLIGATION TO UPDATE THE CONVERSION FACTORS IN THE HOURLY PLAN WHEN THEY NO LONGER GENERATED ACTUARIALLY EQUIVALENT BENEFITS ............................ 8

    III.   THE PLAN'S .90 CONVERSION FACTOR DOES NOT GENERATE ACTUARIALLY EQUIVALENT BENEFITS ..................................................... 9

           1.     A. Actuarial Equivalence Can Only Be Determined Using Reasonable Assumptions................................................................................................. 9

           2.     The Experts Disagree on Which Actuarial Assumptions Are Reasonable 11

CONCLUSION............................................................................................................ 20

# TABLE OF AUTHORITIES

**Cases**

*Arizona Governing Committee v. Norris,* 463 U.S. 1073 (1983) .................................................... 3

*Arlington Central School Dist. Bd. of Ed. v. Murphy,* 548 U.S. 291 (2006) .................................. 7

*Cortés–Irizarry v. Corporación Insular de Seguros,* 111 F.3d 184 (1st Cir. 1997) ...................... 5

*DuBuske v. PepsiCo, Inc.,* No. 18 CV 11618 (VB), 2019 WL 4688706
    (S.D.N.Y. Sept. 25, 2019) ................................................................................................... 6

*Duffy v. Anheuser-Busch Companies, LLC,* 449 F. Supp. 3d 882 (E.D. Mo. 2020) ...................... 9

*Esden v. Bank of Bos.,* 229 F.3d 154 (2d Cir. 2000) ...................................................................... 7

*Fifth Third Bancorp v. Dudenhoeffer*, 573 U.S. 409 (2014) .......................................................... 7

*Figa v. Apple Inc.,* No. CV 08-10304-NG, 2009 WL 10693914 (D. Mass. July 2, 2009) ............. 5

*Harvest Techs. Corp. v. Cytomedix, Inc.,* No. CIV.A. 02-12077-PBS, 2004 WL 2009253
    (D. Mass. Sept. 9, 2004) ...................................................................................................... 5

*HipSaver Co. v. J.T. Posey Co.,* 490 F. Supp. 2d 55 (D. Mass. 2007) .......................................... 5

*Jones v. City of Boston,* 845 F.3d 28 (1st Cir. 2016) ...................................................................... 5

*McCarthy v. Dun & Bradstreet Corp.,* 482 F.3d 184 (2d Cir. 2007) ......................................... 8, 9

*Natchitoches Par. Hosp. Serv. Dist. v. Tyco Int'l, Ltd.,* No. 1:05-CV-12024PBS,
    2009 WL 4061631 (D. Mass. Nov. 20, 2009) ..................................................................... 5

*Rybarcyck v. TRW, Inc.,* 235 F.3d 975 (6th Cir. 2000).................................................................. 8

*Tracey v. Massachusetts Inst. of Tech.,* 404 F. Supp. 3d 356 (D. Mass. 2019) ............................. 5

*Trustees of Bos. Univ. v. Everlight Elecs. Co.,* 105 F. Supp. 3d 116 (D. Mass. 2015).................. 5

*Zucker v. Rodriguez,* 919 F.3d 649 (1st Cir. 2019)...................................................................... 15

**Statutes**

26 U.S.C. 411(c) ........................................................................................................................... 11

26 U.S.C. 417(c)(3)........................................................................................................................ 11

ERISA § 1053(a), 29 U.S.C. 203(a) ............................................................................................... 1

ERISA § 1054, 29 U.S.C. 204 ........................................................................................................ 1

ERISA § 1055(a)(1), 29 U.S.C. 205(a)(1) ...................................................................... 6

ERISA § 1055(c)(1), 29 U.S.C. 205(c)(1) ...................................................................... 6

ERISA § 1055(c)(2), 29 U.S.C. 205(c)(2) ...................................................................... 6

ERISA § 1055(c)(5)(B), 29 U.S.C. 205(c)(5)(B) .......................................................... 14

ERISA § 1055(c), 29 U.S.C. 205(c) ............................................................................... 6

ERISA § 1055(d)(1)(B), 29 U.S.C. 205(d)(1)(B) ........................................................... 6

ERISA § 1055(d), 29 U.S.C. 205(d) ............................................................................... 6

ERISA § 1055(g)(1), 29 U.S.C. 205(g)(1) ..................................................................... 8

ERISA § 1055(h)(2), 29 U.S.C. 205(h)(2) ..................................................................... 6

ERISA § 1055(i), 29 U.S.C. 205(i) ............................................................................... 14

ERISA § 1055, 29 U.S.C. 205 ........................................................................................ 1

**Court Rules**

Federal Rule of Evidence 702 ........................................................................................ 1

Federal Rules of Civil Procedure 56 ............................................................................. 1

**Regulations**

26 C.F.R. § 1.401(a)-11 ............................................................................................... 16

26 C.F.R. § 1.401(a)-11(b)(2) ......................................................................... 15, 16, 17

26 C.F.R. § 1.401(a)-11(g)(2)(ii) ................................................................................ 16

26 C.F.R. § 1.401(a)-20 ........................................................................................... 7, 16

26 C.F.R. § 1.411(d)-3 ................................................................................................. 14

26 C.F.R. § 1.417(a)(3)-1 (c)(2)(iv)(B) ......................................................................... 4

26 C.F.R. Sec. 1.401(a)-11(b)(2) .................................................................................. 9

26 C.F.R. Sec.1.411(a)-11(a)(2) ................................................................................... 8

**Other Authorities**

53 Fed. Reg. 31837-03, 1088 WL 1017169 (Aug. 22, 1988) ........................................ 7

Committee on Finance, Proceedings and Debates of the 98th Congress, Cong. Record
(Senate), S9674 (Aug. 2, 1984) ....................................................................................... 8

FTSE Above-Mean Index ....................................................................................................... 4, 18

Proceedings and Debates of the 98th Congress, Cong. Record (House), H8758
(Aug. 9, 1984) .............................................................................................................. 7, 11

Retirement Equity Act of 1984 ............................................................................. 7, 8, 11, 14, 16

Rev. Rule 76-47 ................................................................................................................... 11

RP-2014 Mortality Table with the Mercer MMP-2007 Mortality Improvement Scale ................ 12

## INTRODUCTION

Defendants' summary judgment motion is without merit. Contrary to Defendants' argument, Section 205 of ERISA and its implementing regulations require that a Qualified Joint and Survivor Annuity (a "QJSA") be the most valuable form of benefit available to each pension plan participant at the time that they retire, ***regardless*** of whether the participant retires before, after, or on the plan's "normal retirement date." The report by Plaintiff's expert showing that the QJSA that Plaintiff Johnny Cruz is receiving has a lower value than the single-life annuity ("SLA") that Cruz could have selected when he retired, is sufficient to defeat summary judgment.

## RELEVANT BACKGROUND

### Procedural History

The threshold issue on the pending Motions is whether the 0.90 conversion factor used by the portion of the Raytheon Hourly Plan in which Mr. Cruz participates to convert his single life annuity ('SLA') into a 50% joint and survivor annuity ('JSA') violates 29 U.S.C. Sec. 1053(a), Section 1054, or Section 1055." ECF Nos. 33 and 34. Plaintiff served the report of his expert, Mitchell I. Serota on April 24, 2020.[1] Defendants disclosed their expert witness, Thomas S. Terry, on May 29, 2020. Needham Decl., Exh. 11 (ECF No. 56-11). Plaintiffs submitted a Reply Declaration by Serota responding to Terry's Declaration on June 30, 2020 (ECF No. 56-12). Defendants deposed Serota on July 23, 2020,[2] and Plaintiff deposed Terry on August 7, 2020. ECF No. 56-13. On September 9, 2020, Plaintiff filed a motion to exclude Terry's testimony under Federal Rule of Evidence 702, and for summary judgment on liability under Fed. R. Civ. P. 56.

---

[1] The Serota Report is attached as Exhibit 10 (ECF No. 56-10) to the Declaration of Douglas P. Needham ("Needham Decl.") (ECF No. 56) supporting Plaintiff's Motion to Exclude the Testimony of Thomas S. Terry and Motion for Summary Judgment (ECF No. 53).

[2] The transcript of Serota' deposition testimony is attached as Exhibit 2 (ECF No. 56-2) to the Declaration of Christian J. Pistilli ("Pistilli Decl.") (ECF No. 56) supporting Defendants' Motion for Judgment (ECF No. 49).

ECF No. 53. Defendants filed a Motion for Judgment (ECF No. 49) but made no effort to exclude the testimony of Plaintiff's expert.[3]

**Key Facts Precluding Summary Judgment for Defendants**

The Hourly Plan's normal form of benefit is an SLA at age 65, but participants can retire as early as 55. SUMF at ¶ 33.[4] When a participant retires early, the Plan reduces the amount of the SLA the participant would be entitled to receive at age 65 according to the participant's actual age, with "[i]nterpolations . . . made for months between stated ages." SUMF at ¶ 34.

Cruz retired from Raytheon on November 1, 2015, when he was 55. SUMF at ¶¶ 30-31. He elected to receive his benefits in the form of a 50% JSA, which was the Plan's default option for married participants (the "Qualified Joint & Survivor Annuity," or "QJSA"). SUMF at ¶¶ 4, 38. Cruz receives $1,021.33 each month. SUMF at ¶ 40. This was calculated by reducing the amount of the SLA he was entitled to receive at retirement (which would have paid him $1,135.34 each month) by multiplying the amount of that SLA by the Conversion Factor. SUMF at ¶¶ 4, 37. The Hourly Plan applies an "Adjustment Factor" which increases or decreases the .90 Conversion Factor for each month that the retiree's spouse is younger or older than the retiree. SUMF at ¶ 39.

---

[3] Given that Defendants rightly determined that Serota's testimony was sufficiently reliable and relevant to withstand a *Daubert* challenge, their attempts to undermine his credibility make no sense. Such attacks are not appropriate on summary judgment. The Court should accordingly disregard Defendant's assertion that Serota is a "de facto business partner with Plaintiff's lawyers" simply because he was retained as a consulting expert as well as a testifying expert (Def. Br. at 6-7), or lacks sufficient expertise in large plan administration. Similarly, the Court should ignore Defendant's claim that Serota does not apply his recommended approach outside the litigation context. Def. Br. at 16, n.14. As Serota explained, the small plans Defendants point to were not updated either because no-one in the plan had ever retired or because ***everyone*** in the plan had retired (Serota Reply at ¶ 132).

[4] The key facts that preclude summary judgment for Defendants are highlighted in the Statement of Undisputed Material Facts ("SUMF") that Plaintiff submitted in support of his Motion for Summary Judgment.

Because Cruz's wife is slightly younger, Cruz's QJSA was calculated by multiplying the value of the SLA he could have taken by a Conversion Factor of 899584. SUMF at ¶ 40.

Defendants have not produced any facts concerning the actuarial assumptions originally used as the basis for the .90 Conversion Factor. SUMF at ¶ 39.[5] Accordingly, neither expert could evaluate whether the original actuarial assumptions, if there were any, were reasonable. Therefore, Serota compared the .90 conversion factor to the conversion factors that could be generated by using actuarial assumptions that *were* reasonable in November of 2015. Serota Report at ¶¶ 8, 23.

To form his opinion about the mortality assumption, Serota considered Raytheon's "best estimate" mortality assumption for valuing the plan's liabilities in its financial reports. Serota Report at ¶¶ 76-78 and Exhibit B. He used the Raytheon mortality table for the year before Cruz retired, which was based on a mortality table and improvement scale that the Society of Actuaries ("SOA") had released the year before. Serota Report at ¶ 103.[6] Serota also considered the mortality table the Treasury Department designated as the "Applicable Mortality Table" for calculating lump sum benefits during the relevant period in 2015. *Id.* at ¶¶ 81-82. Although this mortality table is not required to be used for calculating other forms of benefits, plans do use both the Applicable Mortality Table and its accompanying interest rate (the "Applicable Interest Rate," discussed below) to calculate other benefit forms such as JSAs. Terry Tr. at 119:19 – 120:9; Serota Report, at ¶ 99. The Treasury Assumptions are *per se* reasonable when used to calculate actuarial

---

[5] While Serota opined that the .90 conversion factor appeared to generate results that were consistent with actuarial assumptions from 40 years ago (Serota Report at ¶ 12), it is not possible to know how Raytheon arrived at that number.

[6] Serota's only modification was to use a unisex version of the mortality table in order to comply with the Supreme Court's decision in *Arizona Governing Committee v. Norris,* 463 U.S. 1073,1084-1086 (1983). Serota Report at ¶¶ 79 & 104. Because he had no credible data showing that a different gender blend was warranted, the unisex version of the mortality table that he used assumed that the gender blend of plan participants was 50/50 male-to-female. *Id.*

equivalence for purposes of disclosing the relative value of **all** different forms of benefits, including JSAs.  26 C.F.R. § 1.417(a)(3)-1 (c)(2)(iv)(B).

For interest rate assumptions that an actuary would have considered reasonable in November of 2015, Serota considered the Treasury Department's designated "Applicable Interest Rate" for the period when Cruz retired.  *Id.* at ¶¶ 98-99 & 111.[7]  This rate uses a one-month average of corporate bond yields in the top three investment quality levels available.  *Id.*  Serota also used the actual rate interest rate that the Raytheon chose each year as its "best estimate," as well as another corporate bond index (the FTSE Above-Mean Index), because it closely tracked Raytheon's internal "best estimate" rate.  Serota Report at ¶¶ 86-97 and 105.

Serota determined that Cruz's benefits would increase by more than 4%, or $44 dollars a month, if Raytheon used the combination of mortality and interest rate assumptions that he identified as being the most plausible when Cruz retired.  Serota Report at ¶¶ 109-110.  He also calculated Cruz's monthly benefits using other mortality and interest rate assumptions a reasonable actuary would have selected in 2015,[8] as shown in paragraph 111 of his Report:

| | 417(e) Applicable Interest Rate (1.24%/3.86%/4.96%) | Raytheon 715-30 Interest Rate (4.15%) | FTSE Above Mean Index Rate (4.05%) |
|---|---|---|---|
| 2015 417(e) Applicable Mortality Table | $1,079.95 | $1,072.59 | $1,071.88 |
| Raytheon 715 Mortality Table (RP-2014 Mortality with Mercer MMP-2007 Mortality Improvement) | $1,074.29 | $1,066.66 | $1,065.91 |

[7] The Applicable Interest Rate is a actually a set of three discount rates (called "segment rates"), the first of which is used to discount the first 5 years following the measurement date (here, the date the Cruz began receiving benefits), the second of which is used to discount years 6-20, and third of which is used to discount years after 20.  *Id.* at ¶ 98.

[8] Expressed another way, Serota determined that the conversion factor used to calculate Cruz's 50% JSA should have been between .93884651 and .95121285 if the plan  used reasonable assumptions. This range is narrow — less than .0125. Moreover, **all** of the calculations that Serota performed using reasonable assumptions were well above the .90 conversion factor that Raytheon used, and substantially increase the monthly benefits that Cruz receives each month.

## LEGAL STANDARD

Summary judgment cannot be used to resolve a battle of experts. A court must assume that "all disputes of material fact – *including conflicting opinions offered by competent experts*" could be resolved at trial in favor of the non-moving party. *Jones v. City of Boston,* 845 F.3d 28, 32 (1st Cir. 2016) (citing *Cortés–Irizarry v. Corporación Insular de Seguros,* 111 F.3d 184, 191 (1st Cir. 1997)). Thus, "[o]n summary judgment, it is not the court's role to assess the credibility of the parties' experts or resolve factual disputes raised by their testimony." *Figa v. Apple Inc.,* No. CV 08-10304-NG, 2009 WL 10693914, at *10 (D. Mass. July 2, 2009).[9]

## ARGUMENT

### I. PLAINTIFF IS ENTITLED TO RECEIVE A JSA THAT IS AT LEAST THE ACTUARIAL EQUIVALENT OF THE SLA HE COULD HAVE RECEIVED WHEN HE RETIRED

Defendants wrongly argue that Plaintiff is only entitled to receive a JSA that is actuarially equivalent to the unsubsidized SLA that he was entitled to receive at age 65, rather than the one that he could have taken at the time of his retirement in 2015, when he was only 55. Defendants' Memorandum in Support of Motion for Judgment ("Def. Br."), ECF No. 50, at 31-34. While ERISA does not require plans that offer early retirement subsidies to provide equal subsidies for

---

[9] *Accord, Tracey v. Massachusetts Inst. of Tech.,* 404 F. Supp. 3d 356, 362 (D. Mass. 2019) (dispute between experts as to the prudence of particular funds in a defined contribution plan precluded summary judgment); *Trustees of Bos. Univ. v. Everlight Elecs. Co.,* 105 F. Supp. 3d 116, 118 (D. Mass. 2015) (summary judgment inappropriate where parties' experts disputed material issue); *Natchitoches Par. Hosp. Serv. Dist. v. Tyco Int'l, Ltd.,* No. 1:05-CV-12024PBS, 2009 WL 4061631, at *8 (D. Mass. Nov. 20, 2009) (conflicting expert opinions on market power precluding summary judgment); *HipSaver Co. v. J.T. Posey Co.,* 490 F. Supp. 2d 55, 68–69 (D. Mass. 2007) (disagreement between experts in false advertising case precluded summary judgment); *Harvest Techs. Corp. v. Cytomedix, Inc.,* No. CIV.A. 02-12077-PBS, 2004 WL 2009253, at *10 (D. Mass. Sept. 9, 2004) (summary judgment denied where the parties' competing experts were both "highly qualified and disagree on the factual issues involved").

*all* benefit forms (*e.g.,* lump sums), ERISA *does* require plans that subsidize early retirement benefits in *any* form to subsidize JSAs by at least the same amount.

Section 205 requires that "a vested participant who does not die before the annuity start date" must receive a "qualified joint and survivor annuity" (29 USC Sec. 1055(a)(1)), unless the participant waives the benefit (29 U.S.C. Sec. 1055(c)(1) and (2)). The "annuity start date" is "the first day of the first period for which an amount is payable as an annuity," (29 U.S.C. Sec. 1055(h)(2)), and includes early retirement for those who select it. The statute also requires that qualified joint and survivor annuities be "the actuarial equivalent of a single life annuity for the life of a participant." 29 U.S.C. Sec. 1055(d)(1)(B).[10]

Defendants wrongly argue that this language only requires that a JSA be actuarially equivalent to the SLA that the participant could have received at normal retirement age (here, 65). Def. Br. at 34. This ignores Section 1055's specific language, which measures the QJSA as of the participant's "annuity starting date," "the first day of the first period for which an amount is payable as an annuity." 29 U.S.C. Sec. 1055(a)(1) and (c). Section 205(d) then requires the participant's QJSA be actuarially equivalent "a single life annuity for the life of a participant." 29 U.S.C. Sec. 1055(d)(1)(B).

Section 1055(d)(1)(B)'s actuarial equivalence requirement would be completely redundant if it was referring to "annual benefit commencing at normal retirement age" because Section 1054(c)(3) *already* requires that JSAs be no less than the actuarial equivalent of the annual benefit

---

[10] *DuBuske v. PepsiCo, Inc.,* No. 18 CV 11618 (VB), 2019 WL 4688706, at *4 (S.D.N.Y. Sept. 25, 2019), vacated, No. 18 CV 11618 (VB), 2019 WL 5864995 (S.D.N.Y. Nov. 8, 2019), cited by Defendants, declined to analyze claims under any provision of ERISA other than the anti-forfeiture provisions of Section 203. Since Plaintiff here has squarely raised a Section 205 claim, *DuBuske* provides no help to Defendants.

commencing at normal retirement age.[11]  Since "'[i]t is generally presumed that statutes do not contain surplusage,'" Defendants' interpretation of Section 1055 makes no sense. *Fifth Third Bancorp v. Dudenhoeffer*, 573 U.S. 409, 421 (2014) (interpreting ERISA, and quoting *Arlington Central School Dist. Bd. of Ed. v. Murphy,* 548 U.S. 291, 299, n. 1 (2006)).

Defendants ignore the specific language of the regulations implementing Section 1055.  26 C.F.R. § 1.401(a)-20 provides that "[i]n the case of married participant, the QJSA must be at least as valuable as any other optional form of benefit payable under the plan ***at the same time***."  *Id.,* Q&A 16 (emphasis added).  Furthermore, "[a] plan must permit a participant to receive a distribution in the form of a QJSA when the participant attains the ***earliest retirement age*** under the plan."  *Id.,* Q&A 17 (emphasis added).  When adopting these regulations, the Secretary explained that "[t]he QJSA for a married participant must be at least equal to ***the most valuable*** optional form of benefit payable to the participant ***at the time of the election,***" which is at retirement. 53 Fed. Reg. 31837-03, 1088 WL 1017169 (Aug. 22, 1988). (emphasis added).

26 C.F.R. § 1.401(a)-20 implements the Retirement Equity Act of 1984 (the "REA").  The REA amended ERISA to require that benefits be paid in the form of a JSA for most plans unless that participant, ***with spousal consent,*** elected a benefit form other than the joint and survivor annuity.  Senate Amendment to H.R. 4280 (Retirement Equity Act of 1984), Proceedings and Debates of the 98th Congress, Cong. Record (House), H8758 (Aug. 9, 1984).  The REA required that the JSA be the most valuable available option – "at least the actuarial equivalent of the normal

---

[11] As explained in *Esden v. Bank of Bos.,* 229 F.3d 154, 163 (2d Cir. 2000):

> What these provisions mean in less technical language is that: (1) the accrued benefit under a defined benefit plan must be valued in terms of the annuity that it will yield at normal retirement age; and (2) if the benefit is paid at any other time (e.g., on termination rather than retirement) or in any other form (e.g., a lump sum distribution, instead of annuity) it must be worth at least as much as that annuity.

form of life annuity or, ***if greater, any optional form of life annuity,***" including an early retirement SLA.[12] Thus, plans that subsidize early retirement SLAs must also subsidized JSAs available at the same time.[13]

## II. DEFENDANTS HAD AN OBLIGATION TO UPDATE THE CONVERSION FACTORS IN THE HOURLY PLAN WHEN THEY NO LONGER GENERATED ACTUARIALLY EQUIVALENT BENEFITS

Defendants argument that "ERISA does not require pension plans to revise a conversion factor each time a participant retires" (Def. Br. at 34), depends on the same misreading of *McCarthy v. Dun & Bradstreet Corp.,* 482 F.3d 184 (2d Cir. 2007) that they advanced in their Motion to Dismiss.  *Compare* Def. Br. at 35 with ECF No. 14, at 7, 9 and 14.  Plaintiffs in *McCarthy* argued that the interest rate used to calculate early retirement benefits, while reasonable when enacted, had ceased to be reasonable by the time of their retirement.  482 F.3d at 206.  The Court noted that ERISA does not "specifically require that retirement plans periodically adjust their actuarial interest rates."  *Id.*  However, the *McCarthy* court went on to analyze whether the plan's interest rate ***was*** unreasonable and determined that plaintiff had failed to make that case

---

[12] H.R. Rep. 98-655, at 12 (98th Cong. 2d Sess.) (emphasis added); Technical Explanation of H.R. 4280, the Retirement Equity Act of 1984, as Amended by the Committee on Finance, Proceedings and Debates of the 98th Congress, Cong. Record (Senate), S9674 (Aug. 2, 1984) (same).

[13] Section 205(g)(1) provides no support for Defendants' argument (Def. Br. at 34, n. 24), that JSAs need not be the actuarial equivalent of an early retirement SLA.  Section 205(g)(1) permits plans to distribute a QJSA in the form of a lump sum if the present value of the QJSA is less than $5,000, but plans taking advantage of this provision must provide a lump sum that is the actuarial equivalent of the QJSA.  29 U.S.C. § 205(g)(1).  The regulations and the case that Defendants cite (26 C.F.R. Sec.1.411(a)-11(a)(2) and *Rybarcyck v. TRW, Inc.,* 235 F.3d 975, 983 (6th Cir. 2000)), involve the completely separate question of whether a plan can provide an unsubsidized lump sum as an optional form of benefit, which it can.  However, if the plan forces a participant who elected a subsidized QJSA to take a lump sum because the present value of the benefit is less than $5000, Section 205(g)(1) requires that the lump sum ***in that circumstance*** must be actuarially equivalent to the subsidized QJSA.

because it was not even alleged in the plaintiff's operative complaint. As the court noted, plaintiff's expert **did not testify** that the plan's interest rate was unreasonable. *Id.*

This Court rightly held that, notwithstanding *McCarthy,* "assessing the 'reasonableness' of actuarial assumptions could plausibly include consideration of the age of those assumptions." ECF No. 28, at 8; *accord, Duffy v. Anheuser-Busch Companies, LLC,* 449 F. Supp. 3d 882, 892 (E.D. Mo. 2020); *Smith v. Rockwell Automation, Inc.,* 438 F. Supp. 3d 912, 922 (E.D. Wis. 2020). This is especially true here, since Raytheon, unlike the defendant in *McCarthy,* has **no idea** why the Plan selected its current conversion factors or whether they were **ever** based on an analysis of reasonable actuarial assumptions of any kind.

## III. THE PLAN'S .90 CONVERSION FACTOR DOES NOT GENERATE ACTUARIALLY EQUIVALENT BENEFITS

Defendants' argument that the plans' 0.90 conversion factor generates JSA benefits that are "actuarially equivalent" to SLAs available at the same time (Def. Br. at 10-30) misstates the applicable standards and improperly relies upon contested expert testimony.

### 1. A. Actuarial Equivalence Can Only Be Determined Using Reasonable Assumptions

Defendants argument that the question before the Court is whether the 0.90 conversion factor is "reasonable" (Def. Br. at 10, citing 26 C.F.R. Sec. 1.401(a)-11(b)(2)), is s not correct. A a "**conversion** factor" isn't an "**actuarial** factor;" it is the **product** of actuarial factors. As Terry acknowledged, a conversion factor is just a number. Terry Report, ¶ 21 ("J&S conversion factors are ratios of present values, and not present value factors themselves"). There is no way to determine whether any conversion factor – .90, .95 or .50 – is "reasonable" in the abstract. The reasonableness of actuarial factors can only be assessed by comparing them to a mortality table that is consistent with the current expected mortality for a plan's retirees and an interest rate that is consistent with the market. Indeed, Raytheon does these things each year to accurately disclose

its liabilities to its shareholders. *See*, *e.g.*, ECF No. 56-4 at RTN-Cruz-00000390 (showing the mortality and discount rate assumptions for the Hourly Plan as of December 31, 2014).

As Serota testified, "the ***only*** way to determine whether the Hourly Plan's Conversion Factor generates actuarially equivalent benefits is compare the monthly benefits that result for the Hourly Plan's Conversion Factors to monthly benefits that would be generated if the Plan had used reasonable actuarial assumptions." Serota Report ¶ 101 (emphasis added). While a conversion factor that is the product of wildly unreasonable assumptions would not violate ERISA so long as it ***happened*** to generate a JSA benefit that was actuarially equivalent to an SLA, this argument is akin to a stopped clock being right twice a day. The only way to determine whether this unlikely combination had achieved this result ***would be to compare it to a conversion factor that was based on reasonable assumptions.***

Defendants' argument that Serota made no effort to develop a range of reasonableness or determine the lower bound of the range (Def. Br. at 16) fails for precisely this reason. The "range of reasonableness" is not some arbitrary number like "within five percent," it is the range of conversion factors that could be generated through application of reasonable actuarial assumptions. Serota analyzed several different, reasonable, mortality and interest rate assumptions, and found that different combinations generated a range of conversion factors, all of which were significantly above the 0.90 conversion factor in the Plan. Serota Report, ¶¶ 111-12.

Interestingly, while Defendants present arguments for the "range of reasonableness" being some sort of fudge factor, that is not what their own expert ***did.*** Terry "calculated a range of reasonable conversion factors for the Hourly Plan" by using "reasonable ***assumptions.***" Def. Br. at 15 (emphasis added); *see also* Terry Tr. at 37:2-11 ("in my view, you would go about assessing the reasonableness of the results of the calculation by starting with looking at an array of

***reasonable inputs*.**" (emphasis added). The question is not whether the Hourly Plan's conversion

factor is "reasonable" in the abstract, but whether it is greater than or equal to conversion factors

that could be generated through use of reasonable actuarial assumptions.[14]

### 2. The Experts Disagree on Which Actuarial Assumptions Are Reasonable

The experts do not disagree about the factors that go into a present value calculation, they

disagree about the inputs. These disputes cannot be resolved at summary judgment.[15]

---

[14] Defendants also argue, in a footnote, that the .90 conversion factor is "consistent with conversion factors used by other authoritative bodies." Def. Br. at 15 n.13. As Serota notes, however, the PBGC rate referenced by Defendants are "used to limit the benefits of the most highly paid retirees in the plan, quite possibly several years after their" benefit commencement dates, during a distress termination of the Plan. Serota Rebuttal, at ¶ 59. And, contrary to Terry's view, the IRS has not directed plans to use a .88 conversion factor to convert a participant's accrued benefits attributable to employee contributions to a 50% JSA. Terry relies on a 1976 Revenue Ruling (Rev. Rule 76-47) on a different subject – determining the portion of an employee's accrued benefit that is derived from employee contributions (rather than employer contributions) to the plan – that is almost entirely obsolete. The Revenue Ruling required that, with respect to plans that require employee contributions and calculate benefit accruals based on an SLA at age 65, ten percent of the accrued benefit would be considered to be based on the employee contributions. For plans with employee contributions that did ***not*** calculate benefit accruals based on the age 65 SLA, the ruling used a table of reduction factors. Rev. Ruling 76-47. However, the REA made benefit accrual in the form of an SLA at normal retirement age the standard for almost all qualified plans. Comparison of H.R. 4280 and H.R. 2769, and Senate Amendment to H.R. 4280 (Retirement Equity Act of 1984), Proceedings and Debates of the 98th Congress, Cong. Record (House), H8758 (Aug. 9, 1984). A subsequent amendment to ERISA in 1989 eliminated the flat 10 percent assumption for allocating accrued benefits between employee and employer contributions and replaced it with the same actuarial assumptions used to calculate lump sum benefits under 26 U.S.C. 417(c)(3). Serota Rebuttal, ¶ 63 (citing 26 U.S.C. 411(c)). That Terry would suggest that the Plan's conversion factors were "reasonable" because they were in line with a 44-year-old revenue ruling, despite the existence of a later statutory enactment that adopted Treasury Assumptions (which are updated regularly) is incredible.

[15] Defendants also argue that they are entitled to summary judgment because Terry performed an alternative calculation in which he changed his age assumption to 55 (which matched Serota's assumption, based on Plaintiff's age at retirement). Def. Br. at 30. Terry also used a gender blend that assumed 100% male participants and 100% female beneficiaries, based on the gender of Cruz and his spouse. *Id.* However, Terry did not change any of the ***other*** assumptions in his model – assumptions which Serota objected to, including the PRI-2012 mortality table with no improvement scale and Terry's implausible 350-basis point interest rate range. Serota Rebuttal, ¶ 128. Furthermore, Terry's use of a 100% male mortality table is unsupportable. Actuarial

***Mortality Assumption:***  Serota used the same mortality table that Defendants used in their annual financial reporting to determine the value of the plan's benefit liabilities (the RP-2014 Mortality Table with the Mercer MMP-2007 Mortality Improvement Scale).  Serota Report, ¶ 103. Terry used a mortality table that was published in 2019, called the Pri-2012.  Def. Br. at 13.  Terry also did not use a mortality improvement scale with the Pri-2012.  Terry Report at Appendix D, ¶ 8.  Serota argued that Terry's use of the Pri-2012 mortality table was improper because (1) it did not exist at the time that Cruz retired; and (2) Terry failed to use a mortality improvement scale. Serota Rebuttal, ¶¶ 7, 98 and 99; *see also* Pl. *Daubert* and SJ Br. at 3-5 and 13-14.  As Serota explained, the relevant actuarial standards of practice ("ASOPs") require that actuaries select assumptions that are reasonable on the date of measurement, which in this case is the date when Cruz's benefit was calculated.  Serota Rebuttal, ¶¶ 68-69.[16]

***Gender Blend:***  As both experts recognize, gender-specific mortality tables may not be used to calculate the benefits of their male and female retirees.  Terry Report, ¶ 110; Serota Report,

---

equivalence requires the use of ***reasonable*** assumptions, and there is no factual basis for using a 100% male table with respect to the Hourly Plan to drive down the conversion factor, because not all plan participants are male.  Serota Rebuttal Report, ¶¶ 128.

[16] While Defendants argue that ASOPs 27 and 35 do not apply to benefits calculations (Def. Br. at 34-35, n. 25), Serota disagreed:

> [S]ection 1.2 of these ASOPs state only that "[m]easurements of pension obligations do not ***generally*** include ***individual*** benefit calculations, ***individual*** benefit statement estimates, or nondiscrimination testing."  (emphasis added). . . . [A]n actuary is not supposed to create individualized assumptions for a single participant that are contrary to the plan terms depending on, for example, whether the participant has a healthy lifestyle. However, when the actuary is asked to assist in amending the Plan Document to select new actuarial assumptions that will be used to calculate Plan-wide benefits, these ASOPs absolutely must be followed.

Serota Reply, ¶ 131.  Moreover, even Terry testified that ASOPs 27 and 35 "inform[ ] the thinking of actuaries with respect to the ingredients of the calculation of actuarial factors." Terry Tr. at 157:3-19.  Indeed, Terry testified that ASOPs 27 and 35 informed his own consideration of appropriate actuarial assumptions for use in his analysis of the Hourly Plan.  *Id.* at 157:20 – 159:10.

¶ 79 (citing *Arizona Governing Committee v. Norris,* 463 U.S. 1073,1084-1086 (1983)). As Serota testified, the default gender blend for a unisex table is 50/50, but if plans have credible data to support a different gender blend, that can be used instead. Serota Report ¶ 104. Serota used a 50/50 gender blend for both participants and beneficiaries. Serota Report, ¶ 104. Terry used a 75/25 male-to-female gender blend based on plan data suggesting that approximately 75 percent of participants who took JSA benefits between 2011 and 2019 were male. Terry Report, ¶¶ 109-10. Serota disagreed with Terry's assumptions because they relied upon data that did not exist when Cruz retired (Serota Rebuttal, ¶ 120) and because "[u]sing gender weighting to lower the conversion factor for persons selecting the QJSA would impermissibly result in a scenario where the QJSA is ***not*** the most valuable option available at the same time." Serota Rebuttal, ¶ 118. Serota determined that the Plan data supported his earlier use of a 50/50 gender blend because close to half of the retirees in the 2013-2015 period were male. *Id.* at ¶ 120.

Terry's approach is inconsistent with the requirement that the QJSA be the most valuable benefit from an actuarial standpoint. *Id.* at 118. Terry's approach lowers the present value of the QJSA benefit by increasing the ratio of participants who are male, and beneficiaries who are female, by looking only at the demographic profile of people who have selected that benefit form. That means that other forms of benefit, which are selected by a higher percentage of female retirees, will have a correspondingly ***higher*** present value. As a result, the actuarial value of the QJSA will be less than that of the alternative form of benefit when the two forms are compared using the ***same actuarial assumptions*** – including the gender blend assumption. *Id.*[17]

---

[17] Even Terry and Defendants agree that actuarial equivalence can ***only*** be determined by comparing the present values of two benefits that have been calculated using the same actuarial assumptions. Def. Br. at 9; Terry Report, ¶ 64; Terry Tr. at 23:16 – 25:1.

Defendants argument that 29 U.S.C. § 1055(i) permits plans to take into account increased costs resulting from providing joint and survivor annuities (Def. Br. at 22) misread the statute. As noted in the Conference Committee report, plans are not required to subsidize joint and survivor annuities (i.e., pay a benefit that exceeds what would be calculated using reasonable actuarial assumptions). Def. Br. at 22 (citing H.R. 93-1280, at 280 (1974)). This means that plans can provide a lower monthly benefit to participants who select a JSA to take into account the actuarial value of providing a benefit over two lives rather than one.[18] But, the JSA can only be reduced in an amount that accounts for the extra payments over the projected duration of the second life, it cannot be decreased to make it *less* than the actuarial equivalent of an SLA, either by manipulating the gender blend applied to the Plan's mortality assumptions or through other means.[19]

- ***Retirement Age:*** A key element of any present value calculation involving a pension benefit is the age of the person who will be receiving the benefit. Because the "threshold issue" is "whether the 0.90 conversion factor used by the portion of the Raytheon Hourly Plan in which Mr. Cruz participates to convert ***his*** single life annuity ('SLA') into a 50% joint and survivor annuity ('JSA') violates" ERISA (emphasis added), Serota evaluated Cruz's JSA using Cruz's age, and the age of his wife, as of the date that he began receiving benefits. Serota Report, at 107-08.[20] Terry, in contrast, used "the average age of Hourly Plan participants who select JSAs at

---

[18] A participant is said to receive a "fully subsidized" benefit if selecting that benefit "would not result in a decrease in any plan benefits with respect to such participant and would not result in increased contributions from such participant." 29 U.S.C. Sec. 1055(c)(5)(B); *see also* 26 C.F.R. § 1.411(d)-3 (defining retirement-type subsidies).

[19] Defendants' reliance on the individual views of Representative Perkins (Def. Br. at 22) are misplaced. The concept of "adverse selection" was not adopted in the statutory text.

[20] Contrary to Defendants' claim, however, Serota ***also*** calculated conversion factors for persons who retired at each age between 55 and 65. Serota Reply, at ¶ 26.

retirement," as well as the "normal retirement age" specified in the Plan. Def. Br. at 14. Terry's approach is incorrect, as set out at pages 6-9 of Plaintiff's *Daubert* brief, ECF No. 60. Defendants argue that Terry's approach is correct, stating – wrongly – that "[a] plan that uses fixed [conversion] factors, by definition, applies the same factor to all participants regardless of their age (or gender)." Def. Br. at 14. However, Terry testified that a plan can use a table of fixed conversion factors that vary by the age of the participant at retirement. Terry Tr. at 57:22 – 58:5. Indeed, Terry identifies *no* plan, other than the Hourly Plan, that use a single conversion factor to calculate JSAs for all plan participants. *Id.* at 58:6 – 59:2.

Defendants argue that it is permissible to use a single age assumption to calculate JSAs based on the remarks of a single legislator in 1974 and early regulations on actuarial equivalence. Def. Br. at 18.[21] "Courts do not attribute to Congress as a whole the views expressed in individual legislators' floor statements." *Zucker v. Rodriguez,* 919 F.3d 649, 660 (1st Cir. 2019). And, while the cited regulation indicates that actuarial equivalence "may be determined on the basis of consistently applied reasonable actuarial factors, for each participant or for all participants or for reasonable groups of participants" (26 C.F.R. § 1.401(a)-11(b)(2)), it is not "reasonable" to use an assumption about age *when the plan has the actual data.* Even Terry acknowledged that there is no need to make an "assumption" about age. Terry Tr. at 92:8-17.

Defendants present several arguments as to why it is perfectly appropriate to have people who retire younger subsidize the benefits of people who retire later, none of which withstand

---

[21] Defendants further argue that using a single "average" age is supported by the same "Gray Book" response that they cite with respect to the gender blend issue. Def. Br. at 18. The cited provision of the Gray Book does not say anything about basing actuarial equivalence on average ages. Moreover, the Gray Book is in no way authoritative, and "the IRS and Treasury stopped publishing responses to technical questions in the Gray Book in July of 2015 specifically because 'the government [was] concerned over the reliance placed on the answers the IRS was providing in the Gray Book.'" Serota Rebuttal, ¶ 116.

scrutiny. Plans cannot base their mortality assumptions on the health of individual plan participants, and thus must use mortality tables. Similarly, as discussed above, plans are not permitted to base their mortality assumptions on the gender of individual plan participants but must use a unisex table for all participants regardless of their gender. But nothing requires (or allows) plans to create "winners and losers" with respect to the age that they retire. Terry Tr. at 91:16 – 92:1.

Moreover, the REA and its regulations clearly state that the QJSA must be the most valuable option available at retirement, whether retirement comes early, late or at the "normal" age. As discussed at length above, the REA amended ERISA to make the QJSA the default benefit for married participants beginning at the earliest permissible retirement age under the plan, and to ensure that the QJSA was the most valuable benefit offered at whatever age the participant retired. *See supra* pp. 5-8. Thus, even if Terry's (and Defendants') interpretation of 26 C.F.R. § 1.401(a)-11(b)(2) were correct, and it is not, it would conflict with – and thus be superseded by – the regulations adopted in conjunction with the REA.[22] The use of an "average" age would mean that all plan participants who retired early would be subsidizing the benefits of those who retired later. Serota Rebuttal, ¶ 25.[23]

---

[22] The REA regulations, codified at 26 C.F.R. § 1.401(a)-20, superseded the prior regulations at Section 1.401(a)-11 to the extent of any inconsistency, as specifically recognized in 26 C.F.R. § 1.401(a)-11(g)(2)(ii) ("The rules in this section shall not apply [for years to which the REA applies] to the extent that they are inconsistent with REA 1984 and the regulations thereunder."). Contrary to Defendant's argument (Def. Br. at 19, n. 16), this regulation did not "call out" the regulation that they are relying on as "an example of a pre-REA regulation that is 'the same as or consistent with REA.'" Section 1.401(a)-11(g)(2)(ii) only cites the portion of the earlier regulation that is "defining a life annuity" as continuing to apply post-REA.

[23] Unsurprisingly, in light of the changes made to ERISA by the REA, the use of *any* sort of "fixed factor" approach has waned. Serota testified that the tabular factors, while common in the 1970s when actuaries had to manually calculate each retiree's benefits using punch cards, are no longer common. Serota Rebuttal, ¶ 21. Even Terry did not know whether any plans using fixed tabular factors had been established at any time in the past 20 years. Terry Tr. at 168:8-19.

Defendants also argue that Serota's model effectively "pools" all people who retire at the same age, even though this treats "as equivalent people who were born on January 1 and December 31 of a given year." Def. Br. at 20. The argument absurdly assumes "pooling" is all or nothing and that there is no limit on gradation. Assumptions "may be determined on the basis of consistently applied *reasonable* actuarial factors, for each participant or for all participants or for reasonable groups of participants" (26 C.F.R. § 1.401(a)-11(b)(2) (emphasis added). If reasonable actuarial factors that can be consistently applied across the whole group do not exist, then the grouping must be changed. As Serota testified at paragraph 36 of his Rebuttal Report:

> Raytheon uses the same .90 Conversion Factor to calculate a participant's QJSA between ages 55 and 70½. Participants 15½ years apart are not part of a "reasonable grouping." As referenced above, a 55-year-old has a much lower mortality rate than a 70-year-old which causes a significant difference in the conversion factor that will provide each of them with an actuarially equivalent QJSA. In my experience, plan sponsors do not group participants together whose ages are years apart when performing actuarial equivalence calculations.

Indeed, as Serota notes, the conversion factors that the Raytheon Hourly Plan uses to calculate SLAs taken by participants who take early retirement, as well as the conversion factors that the Hourly Plan uses to calculate 10-year certain and life annuities, "vary based on the participant's age at retirement, with 'interpolations' to account for 'months between ages.'" *Id.* at ¶ 37. Importantly, the Hourly Plan itself adjusts the .90 Conversion Factor if there is as little as a *16-day age difference* between the retiree and spouse to account for the changed likelihood that the retiree will die before the spouse. Serota Reply Report at ¶ 38. Accordingly, the way Raytheon operates the Hourly Plan suggests a belief that retirees with more than a *half-month age difference* cannot be considered part of the same reasonable grouping for actuarial equivalence purposes. Accordingly, using an average age covering people who retire as young as 55 and as old as 70 is not a "reasonable actuarial assumption."

Similarly, the Treasury Department's Applicable Mortality Tables use mortality assumptions grouped by age at retirement, such that all 55-year-olds would have one mortality assumption, all 56-year-olds would have a second mortality assumption, and so on. Accordingly, these rules contemplate that it is reasonable to group all 55-year-olds together in one group, and all 70-year-old retirees in another group, with each having different mortality assumptions applicable to that age group based on the same mortality table. But, no authority anywhere suggests that it is reasonable to group 55 and 70 year-olds together for the purpose of projecting mortality, since a 55 year-old would be projected to live almost twice as long as a 70 year-old. In that scenario, the benefits of the 70 year- old would be highly subsidized and the benefits of the 55-year-old would be highly penalized. Accordingly, this grouping, like Raytheon's fixed conversion factor, would not be reasonable and is not permissible.[24]

- **_Interest Rates:_** Serota considered the Treasury Department's "Applicable Interest Rate" which is based on a one-month average of corporate bond yields in the top three investment quality levels available when Cruz retired. _Id._ at ¶¶ 98-99 & 111. Serota's preferred interest rate, however, was a different corporate bond index, the FTSE Above-Mean Index. Even though it was lower than the Treasury Rate (and generated lower damages), it was closer to the rate the Plan's actuary chose each year as its "best estimate." Serota Report at ¶¶ 86-97 & 105. Terry, in contrast, used a 350-basis point range derived by choosing the lowest point on an index of Treasury Bonds, and the highest point on an index of corporate bonds, over a nine-year period from 2011 to 2020. Def. Br. at 14-15. As detailed in Plaintiff's _Daubert_ motion, Terry's "pick a rate, any rate" approach is completely unreliable and has little, if any, relevance to Cruz.

---

[24] Of course, ERISA applies equally to large plans and small ones. For a small plan whose participants are all close to the same age, an actuarial assumption based on their average age might be perfectly reasonable. _See_ Serota Reply, at 33.

Contrary to Defendants' argument (Def. Br. at 25-26), there is nothing "novel" about using corporate bond indexes. Terry's "model" included a corporate bond index. Terry Report, ¶ 238. The Treasury Department "Applicable Interest Rate," which Terry agreed some plans use for calculating JSAs (Terry Tr. at 119:19 – 120:9), is based on high-grade corporate bonds. Serota Report, ¶ 98. However, Serota did not simply rely on the Applicable Interest Rate; he also looked at interest rates that were more tailored to the Plan.

Serota determined what contemporaneous interest rate assumptions would have been reasonable when Cruz retired. Instead of pulling an interest rate range out of thin air like Terry, Serota looked to how Raytheon valued its pension liabilities for the Hourly Plan, based the advice of its actuary and an internal policy overseen by its Senior Manager, Benefits Finance (an active member of the Society of Actuaries). Raytheon's interest rate assumption is a logical benchmark for judging whether the plan paid an actuarially equivalent benefit because it was used to value a liability for the Plan that is simply the aggregate of the benefits that it owes to the plan participants. A liability to the Plan is an asset to the participants and their beneficiaries.[25]

Defendants argue, incredibly, that Serota's reliance on a plan's ASC 715-30 report "would imply the perverse result that two participants in plans of different employers who accrued identical SLA benefits might receive different JSA benefit amounts based solely on the creditworthiness of the respective corporations that support their plans." Def. Br. at 27. This is a strange argument given Terry's opinion plan actuaries could "reasonably" select an interest rate as low as 1.5 percent or as high as 8.7 percent, which would lead employees to receive **wildly** different

---

[25] While FASB constrains the interest rate inputs that companies can consider for purposes of an ASC 715-30 report (Def. Br. at 25-30), FASB's mark-to-market assumptions are not "inappropriate" in the context of determining a reasonable interest rate for benefits calculations. Serota Rebuttal, at 34. At the very least, this is a battle of the experts.

benefits based on an actuary's random choice. Serota's approach, in contrast, is based on real-world market data that plan actuaries carefully evaluate each year to determine their plan liabilities.

In summary, Serota provided three different interest rate assumptions that the Plan's actuary could have looked to when Cruz's benefits were calculated. Each uses corporate bonds with maturities that align with anticipated future payments consistent with ASOP 35. Needham Decl. at Ex. 16 at § 3.6.1, titled "Reasonable Assumption Based on Future Experience or Market Data" (discussing approaches of selecting a discount rate based on bond yields). The actuary could have, like other defined benefit plans, simply adopted the Treasury Assumptions, which would have resulted in greatest benefits for Cruz (and the greatest damages). Or, it could have adopted a specific rate or index more narrowly tailored to Raytheon. Any would have been reasonable. Unlike Terry's absurdly broad interest rate range, Serota's approach used market-driven data from the time that Cruz retired, which unsurprisingly yielded similar results across the three methods, together with a much smaller range for an actuarially equivalent JSA benefit (between $1066 - $1075). Serota Report, ¶ 111.

## CONCLUSION

For the reasons set forth above, the Court deny Defendants' motion for summary judgment.

Dated: October 12, 2020                    Respectfully submitted,

*/s/ Douglas P. Needham*
**IZARD, KINDALL & RAABE LLP**
Douglas P. Needham, BBO No. 671018
Robert A. Izard (admitted *pro hac vice*)
Mark P. Kindall (admitted *pro hac vice*)
Oren Faircloth (to be admitted *pro hac vice*)
29 South Main Street, Suite 305
West Hartford, CT 06107
Tel: (860) 493-6292
Fax: (860) 493-6290
Email: dneedham@ikrlaw.com
Email: rizard@ikrlaw.com
Email: mkindall@ikrlaw.com
Email: ofaircloth@ikrlaw.com

Gregory Y. Porter (admitted *pro hac vice*)
Mark G. Boyko (admitted *pro hac vice*)
Alexandra L. Serber (admitted *pro hac vice*)
**BAILEY & GLASSER LLP**
1054 31st Street, NW, Suite 230
Washington, DC 20007
(202) 463-2101
(202) 463-2103 fax
gporter@baileyglasser.com
mboyko@baileyglasser.com
aserber@baileyglasser.com

***Counsel for Plaintiff***

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing document was filed with the Court and electronically served through the CM-ECF system which will send a notification of such filing to all counsel of record.

Dated: October 12, 2020

_/s/ Douglas P. Needham_
Douglas P. Needham
