## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| Johnny Cruz, on behalf of himself and all others similarly situated,<br><br>    Plaintiff,<br><br>v.<br><br>Raytheon Company, Kelly B. Lappin, in her capacity as Plan Administrator for the Raytheon Company Pension Plan for Hourly Employees, the Raytheon Company Pension Plan for Salaried Employees, the Raytheon Non-Bargaining Retirement Plan, the Raytheon Bargaining Retirement Plan, and the Raytheon Retirement Plan for Engineers & Contractors, Inc. and Aircraft Credit Employees, and John/Jane Does 1-10,<br><br>    Defendants. | Case No. 1:19-cv-11425-PBS |

## PLAINTIFF'S MEMORANDUM IN SUPPORT OF UNOPPOSED MOTION FOR PRELIMINARY APPROVAL OF CLASS SETTLEMENT
## [LEAVE TO EXCEED L.R. 7.1(b)(4) PAGE LIMIT GRANTED 2/9/21 (ECF NO. 75)]*

**\*Caption Corrected to Include Reference to ECF No. 75 ORDER Granting
Leave to Exceed L.R. 7.1(b)(4) Page Limit**

# TABLE OF CONTENTS

I.     INTRODUCTION ...................................................................................................... 1

II.    FACTUAL BACKGROUND ..................................................................................... 2

III.   PROCEDURAL BACKGROUND.............................................................................. 4

IV.   THE TERMS OF THE PROPOSED SETTLEMENT ............................................... 6

V.    ARGUMENT ............................................................................................................ 10

     A.    Standard And Process For Approval..................................................................... 10

     B.    The Proposed Settlement Should Be Preliminarily Approved ............................. 12

           1.    The Class Representative and Proposed Class Counsel Have
                  Adequately Represented the Class............................................................ 12

           2.    The Proposed Settlement Was Negotiated at Arm's Length .................... 13

           3.    The Relief Provided for the Class is More Than Adequate ..................... 16

                 a.    The Costs, Risks, and Delay of Trial and Appeal......................... 17

                 b.    The Effectiveness Of Distribution To The Settlement Class........ 19

                 c.    The Terms Of Any Proposed Award Of Attorneys' Fees,
                    Including Timing Of Payment ...................................................... 20

           4.    The Settlement Treats Class Members Equitably Relative to
                 Each Other ............................................................................................... 27

     C.    The Proposed Notice To Class Members Is Adequate ......................................... 28

VI.   THE COURT SHOULD PRELIMINARILY CERTIFY THE CLASS .......................... 28

     A.    Rule 23(A) ............................................................................................................ 29

           1.    Numerosity................................................................................................ 29

           2.    Commonality.............................................................................................. 29

           3.    Typicality .................................................................................................. 30

           4.    Adequacy of Representation ..................................................................... 31

     B.    Rule 23(B)(1) ........................................................................................................ 32

     C.    Rule 23(B)(2) ........................................................................................................ 35

     D.       Rule 23(G) ................................................................................................................... 36

VII.    CONCLUSION ............................................................................................................. 38

# TABLE OF AUTHORITIES

## Other Authorities

*Aetna Health Inc. v. Davila*, 542 U.S. 200 (2004).........................................................33

*Allison v. Citgo Petroleum Corp.*, 151 F.3d 402 (5th Cir.1998)....................................35

*Alves v. Harvard Pilgrim Health Care Inc.*, 204 F. Supp. 2d 198 (D. Mass. 2002)....................32

*Alyeska Pipeline Serv. Co. v. Wilderness Soc'y*, 421 U.S. 240 (1975) ...........................22

*Amara v. Cigna Corp.*, 775 F.3d 510 (2d Cir. 2014)...........................................31, 35

*Amchem Products v. Windsor*, 521 U.S. 591 (1997) ........................................12, 31-33

*Andrews v. Bechtel Power Corp.*, 780 F.2d 124 (1st Cir. 1985) ...........................12, 31

*Baleja v. Northrop Grumman Space & Missions Sys. Corp.*, No. 17-235,
    2020 WL 3213708 (C.D. Cal. Mar. 26, 2020).................................................36

*Barnes v. FleetBoston Fin. Corp.*, No. 01-10395-NG,
    2005 WL 8175898 (D. Mass. Dec. 22, 2005)..................................................14

*Bekker v. Neuberger Berman Group 401(k) Inv. Com.*,
    No. 16-cv-06123-LTS-BCM, 2020 WL 7043869 (S.D.N.Y. Dec. 1, 2020) ..................24

*Belknap v. Partners Healthcare Sys., Inc.*, No. 19-11437-FDS,
    2020 WL 4506162 (D. Mass. Aug. 5, 2020) .................................................13

*Berman v. Narragansett Racing Ass'n, Inc.*, 414 F.2d 311 (1st Cir. 1969)................32

*Bertella v. JetDirect Aviation, Inc.*, No. 09-10527,
    2010 WL 4103664 (D. Mass. Oct. 19, 2010)................................................32

*Bettencourt v. Jeanne D'Arc Credit Union*, No. 17-12548-NMG,
    2020 WL 3316223 (D. Mass. June 17, 2020) ...............................................23

*Bezdek v. Vibram USA Inc.*, 79 F. Supp. 3d 324 (D. Mass.).............................13

*Bezdek v. Vibram USA, Inc.*, 809 F.3d 78 (1st Cir. 2015) .............................17

*Bussie v. Allmerica Fin. Corp.*, 50 F. Supp. 2d 59 (D. Mass. 1999) ................14, 16

*Carter v. Arkema, Inc.*, No. 13-1241, 2018 WL 1613787 (W.D. Ky. Apr. 3, 2018)................36

*Conley v. Sears, Roebuck & Co.*, 222 B.R. 181 (D. Mass.1998)..............................26

*Cunningham v. Wawa, Inc.*, 387 F. Supp. 3d 529 (E.D. Pa. 2019)..............................36

*DaSilva v. Border Transfer of MA, Inc.,* 296 F. Supp. 3d 389 (D. Mass. 2017) ......................... 30

*Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579 (1993) ................................. 15, 25

*Duffy v. Anheuser-Busch Companies, LLC,* 449 F. Supp. 3d 882 (E.D. Mo. 2020).................... 13

*Duhaime v. John Hancock Mutual Life Ins. Co.,* 177 F.R.D. 54 (D. Mass. 1997) .......... 12, 29, 32

*Fallick v. Nationwide Mut. Ins. Co*., 162 F.3d 410 (6th Cir. 1998)............................... 32

*Figas v. Wells Fargo*, No. 08-4546 (D. Minn.) ..................................................... 19

*Garcia v. E.J. Amusements of New Hampshire, Inc.,* 98 F. Supp. 3d 277 (D. Mass. 2015)......... 36

*Garcia–Rubiera v. Calderon,* 570 F.3d 443 (1st Cir. 2009)................................... 29

*Gen. Tel. Co. of Sw. v. Falcon*, 457 U.S. 147 (1982) ..................................... 29

*Gordan v. Mass. Mutual Life Ins. Co.,* No. 13-30184,
2016 WL 11272044 (Nov. 3, 2016).................................................. 24

*Gorsey v. I.M. Simon & Co*., 121 F.R.D. 135 (D. Mass. 1988) ................................. 29

*Harris v. Koenig,* 271 F.R.D. 383 (D.D.C. 2010)................................................ 38

*Herndon v. Huntington Ingalls Indus., Inc.,* No. 19-52,
2020 WL 5809996 (E.D. Va. Sept. 29, 2020)................................................. 13

*Herndon v. Huntington Ingalls Indust. Inc.,* No. 19-52,
2020 WL 5809965 (E.D. Va. Aug. 28, 2020) ................................................. 13

*Hochstadt v. Bos. Sci. Corp.,* 708 F. Supp. 2d 95 (D. Mass. 2010)............................. 11

*In re Citigroup Pension Plan ERISA Litig.,* 241 F.R.D. 172 (S.D.N.Y. 2006) ........................ 34

*In re Glob. Crossing Sec. and ERISA Litig.* 225 F.R.D. 436 (S.D.N.Y. 2004) ..................... 19, 33

*In re IKON Office Solutions, Inc. Sec Litig.*, 194 F.R.D. 166 (E.D. Pa. 2000)........................... 19

*In re J.P. Morgan Stable Value Fund ERISA Litig.,* No. 12-CV-2548 (VSB),
2019 WL 4734396 (S.D.N.Y. Sept. 23, 2019).................................................. 26

*In re Lupron Mktg. & Sales Practices Litig.,* No. MDL 1430, 01–CV–10861–RGS,
2005 WL 2006833 (D. Mass. Aug. 17, 2005) ................................................. 23

*In re Mercy Health ERISA Litig.,* No. 16-441, 2016 WL 8542891 (S.D. Ohio Dec. 2, 2016)..... 37

In re Mercy Health ERISA Litig., No. 16-441, 2017 WL 1078589 (S.D. Ohio Mar. 21, 2017).. 38

*In re Neurontin Mktg. & Sales Practices Litig.,* 58 F. Supp. 3d 167 (D. Mass. 2014)........... 22, 23

*In re Nexium Antitrust Litig.,* 777 F.3d 9 (1st Cir. 2015) ............................................ 31

*In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.,*
    330 F.R.D. 11 (E.D.N.Y. 2019) ................................................................ 12

*In re Prudential Ins. Co. Am. Sales Practice Litig. Agent Actions,*
    148 F.3d 283 (3d Cir. 1998)..................................................................... 30

*In re Puerto Rican Cabotage Antitrust Litig.,* 815 F. Supp. 2d 448 (D.P.R. 2011)..................... 22

*In re Relafen Antitrust Litig.,* 231 F.R.D. 52 (D. Mass. 2005) ...................................... 17

*In re Rite Aid Corp. Sec. Litig.,* 146 F. Supp. 2d 706 (E.D. Pa. 2001) ......................................... 26

*In re Thirteen Appeals,* 56 F.3d 295 (1st Cir.1995).................................................... 22

*In re Tyco Int'l, Ltd. Multidistrict Litig.,* 535 F. Supp. 2d 249 (D.N.H. 2007) ................ 12, 18, 25

*In re Volkswagen & Audi Warranty Extension Litig.,* 692 F.3d 4 (1st Cir. 2012)....................... 22

*In re: Pharm. Indus. Average Wholesale Price Litig.,* No. 01-12257-PBS,
    2008 WL 11389264 (D. Mass. Oct. 2, 2008)................................................... 22

*Johnson v. Meriter Health Servs. Emp. Ret. Plan,* 702 F.3d 364 (7th Cir. 2012) ................. 35, 36

*Jones v. NovaStar Fin., Inc.,* 257 F.R.D. 181 (W.D. Mo. 2009) ............................................. 34, 35

*Kaminiski v. Shawmut Credit Union,* 416 F. Supp. 1119 (D. Mass. 1976) ................................. 29

*Krueger v. Ameriprise Fin., Inc.,* 304 F.R.D. 559 (D. Minn. 2014) ......................................... 35

*Latorraca v. Centennial Techs. Inc.,* 834 F. Supp. 2d 25 (D. Mass. 2011) .................................. 23

*Leber v. Citigroup 401(k) Plan Inv. Comm.,* 323 F.R.D. 145 (S.D.N.Y. 2017) ........................... 37

*Medoff v. CVS Caremark Corp.,* No. 09-554, 2016 WL 632238 (D.R.I. Feb. 17, 2016)............ 12

*Meidl v. Aetna, Inc.,* No. 15-1319, 2017 WL 1831916 (D. Conn. May 4, 2017) ........................ 34

*Messner v. Northshore Univ. HealthSystem,* 669 F.3d 802 (7th Cir. 2012) ................................. 31

*Mezyk v. U.S. Bank Pension Plan,* No. 3:09-384,
    2012 WL 2913213 (S.D. Ill. July 16, 2012) ................................................... 34

*Mezyk v. U.S. Bank Pension Plan,* Nos. 09–384 and 10–696,
    2011 WL 6729570 (S.D. Ill. Dec. 21, 2011)................................................... 36

*Miller v. Carrington Mortg. Servs., LLC,* No. 19-16, 2020 WL 2898837 (D. Me. June 3, 2020) 11

Miller v. Carrington Mortg. Servs., LLC, No. 19-16,
2020 WL 3643125 (D. Me. July 6, 2020) ........................................................................ 11

*Nat'l Ass'n of Chain Drug Stores v. New England Carpenters Health Benefits Fun*d,
582 F.3d 30 (1st Cir. 2009) ........................................................................................ 11

*Nat'l Ass'n of Chain Drug Stores v. New England Carpenters Health Benefits Fund,*
582 F.3d 30 (1st Cir. 2009) ........................................................................................ 17

*Nat'l Ass'n of Deaf v. Massachusetts Inst. of Tech.*, No. 15-30024-KAR,
2020 WL 1495903 (D. Mass. Mar. 27, 2020) ................................... 11, 12, 18, 21, 24, 28

*New England Carpenters Health Benefits Fund v. First Databank, Inc.,*
No. 05-11148-PBS, 2009 WL 2408560 (D. Mass. Aug. 3, 2009) ........................... 25, 26

*Nistra v. Reliance Tr. Co.,* No. 16-4773, 2018 WL 835341 (N.D. Ill. Feb. 13, 2018) ............... 37

*Ouadani v. Dynamex Operations E., LLC,* 405 F. Supp. 3d 149 (D. Mass. 2019) ................ 30, 31

*P.R. Dairy Farmers Ass'n v. Pagan,* 748 F.3d 13 (1st Cir. 2014) ................................. 12

*Pender v. Bank of Am. Corp.,* 269 F.R.D. 589 (W.D.N.C. 2010) ........................................ 34, 36

*Phillips Petroleum Co. v. Shutts*, 472 U.S. 797 (1985) ...................................................... 28

*Prince v. Eaton Vance Corp.*, No. 18-12098, Dkt. 57 (D. Mass Sept. 24, 2019) ........................ 19

*Rapuano v. Trustees of Dartmouth Coll.,* 334 F.R.D. 637 (D.N.H. 2020) .................................. 11

*Richards-Donald v. Teachers Insurance and Annuity Ass'n of Amer.,*
No. 15-8040 (S.D.N.Y.) ...................................................................................... 19

*Rolland v. Cellucci*, 191 F.R.D. 3 (D. Mass. 2000) ........................................................ 14

*Rozo v. Principal Life Ins. Co.,* No. 14-463, 2017 WL 2292834 (S.D. Iowa May 12, 2017) ...... 36

*Scott v. First Am. Title Ins. Co.,* No. 06-286, 2008 WL 4820498 (D.N.H. Nov. 5, 2008) ........... 37

*Sesto v. Prospect CharterCARE, LLC,* No. 18-328 ,
2019 WL 4758161 (D.R.I. Sept. 30, 2019) ...................................................................... 14

*Sims v. BB&T Corp.*, No. 15-732, 2019 WL 1993519 (M.D.N.C. May 6, 2019) ........................ 19

*Smith v. Rockwell Automation, Inc.,* 438 F. Supp. 3d 912 (E.D. Wis. 2020) .............................. 13

*Smith v. U.S. Bancorp,* No. 18-3405, 2019 WL 2644204 (D. Minn. June 27, 2019) .................. 13

*Southern States Police Benevolent Ass'n v. First Choice Armor & Equip., Inc.,*
    241 F.R.D. 85 (D. Mass. 2007) ........................................................................ 29

*Staton v. Boeing Co.,* 327 F.3d 938 (9th Cir. 2003) ................................................ 22

*Torres v. Am. Airlines, Inc.,* 416 F. Supp. 3d 640 (N.D. Tex. 2019) ......................... 13

*Tussey v. ABB, Inc.*, 850 F.3d 951 (8th Cir. 2017) ................................................ 17

*Tussey v. ABB, Inc.*, No. 06-4305, Dkt. 869 (W.D. Mo. Aug. 16, 2019) ................... 18

*Urakhchin v. Allianz Asset Mgmt. of Amer., L.P.*, No. 15-1614,
    2018 WL 8334858 (C.D. Cal. July 30, 2018) ................................................... 19

*Velazquez v. Massachusetts Fin. Services Co.*,
    No. 17-11249 Dkt. 108 (D. Mass Dec. 5, 2019) ............................................... 19

*Walker v. Osterman Propane LLC,* 411 F. Supp. 3d 100 (D. Mass. 2019) ................. 30

*Wal-Mart Stores, Inc. v. Dukes*, 131 S. Ct. 2541 (2011) ......................................... 29

*West v. Cont'l Auto., Inc.,* No. 3:16-502, 2017 WL 2470633 (W.D.N.C. June 7, 2017) ............. 33

*Z.D. ex rel. J.D. v. Grp. Health Co-op.,* No. 11-1119,
    2012 WL 1977962 (W.D. Wash. June 1, 2012) ................................................. 33

*Zilhaver v. UnitedHealth Grp., Inc.*, 646 F. Supp. 2d 1075 (D. Minn. 2009) ............. 35

**Statutes**

Class Action Fairness Act ("CAFA") ..................................................................... 9

ERISA § 205(d), 29 U.S.C. § 1055(d) ................................................................... 2

ERISA § 205(e), 29 U.S.C. § 1055(e) ................................................................... 3

ERISA § 205, 29 U.S.C. § 1055 ........................................................................... 34

ERISA § 404(a)(1)(D), 29 U.S.C. § 1104(a)(1)(D) ............................................... 33

Retirement Equity Act ................................................................................... 24, 37

The Employee Retirement Income Security Act of 1974 ("ERISA") ..................... 1, 37

**Federal Rules**

Fed. R. Civ. P. 23 .................................................................................................... 30

Fed. R. Civ. P. 23(a) ...................................................................................... 28, 29, 30

Fed. R. Civ. P. 23(a)(3) ......................................................................................... 30

Fed. R. Civ. P. 23(a)(4) ..................................................................................... 12, 31

Fed. R. Civ. P. 23(a)(i)-(iv) ................................................................................... 32

Fed. R. Civ. P. 23(b) .............................................................................................. 32

Fed. R. Civ. P. 23(b)(1) ........................................................................ 28, 32, 33, 34

Fed. R. Civ. P. 23(b)(1)(A) ............................................................................... 33, 34

Fed. R. Civ. P. 23(b)(1)(B) ............................................................................... 33, 34

Fed. R. Civ. P. 23(b)(2) ....................................................................... 28, 35, 36

Fed. R. Civ. P. 23(c)(1)(B) ................................................................................... 36

Fed. R. Civ. P. 23(c)(2) ........................................................................................ 28

Fed. R. Civ. P. 23(e) ............................................................................................. 10

Fed. R. Civ. P. 23(e)(1)(B) ............................................................................. 11, 28

Fed. R. Civ. P. 23(e)(1)(B)(i) ............................................................................... 11

Fed. R. Civ. P. 23(e)(2) ................................................................................... 11, 12

Fed. R. Civ. P. 23(e)(2)(A) ............................................................................. 12, 13

Fed. R. Civ. P. 23(e)(2)(B) ................................................................................... 13

Fed. R. Civ. P. 23(e)(2)(C) ............................................................................. 16, 19

Fed. R. Civ. P. 23(e)(2)(C)(i) ............................................................................... 17

Fed. R. Civ. P. 23(e)(2)(C)(iii) ............................................................................ 20

Fed. R. Civ. P. 23(e)(3) ........................................................................................ 16

Fed. R. Civ. P. 23(g) .............................................................................. 32, 36, 37, 38

Fed. R. Civ. P. 23(h) ............................................................................................... 20

**Regulations**

29 C.F.R. § 2560.503–1(b)(5) .................................................................................. 33

29 C.F.R. § 2560.503-1(b)(5) .................................................................................. 33

**Other Authorities**

Advisory Committee's Notes on the 2018 Amendment ............................................ 20

Alba Conte, 1 Attorney Fee Awards (3d ed. 2019) ................................................. 23

*Attorneys' Fees in Class Actions, 2009-2013,* ("Eisenberg Study"), Law & Econ. Research Paper
    Series (Dec. 2016) ............................................................................................. 23

Court. Manual for Complex Litig. (Fourth) ............................................................ 28

Dan B. Dobbs, *Law of Remedies* (2d ed.1993) ...................................................... 36

John Norton Pomeroy, *Equity Jurisprudence and Equitable Remedies* (1905) ........................ 36

Manual for Complex Litigation (Fourth) § 13.14 ................................................... 11

Newberg on Class Actions (3d ed. 1992) ............................................................... 30

Newberg on Class Actions (4th ed. 2008) .............................................................. 30

*Newberg on Class Actions (5th ed.)* ..................................................................... 30

x

Plaintiff Johnny Cruz, individually and as Class Representative, moves for an order approving a class action settlement agreement between Plaintiff and Defendants (collectively "Raytheon"), approving notice to the Class, and setting a date for a fairness hearing.[1] Specifically, Plaintiff asks the Court to: (1) preliminarily certify a settlement class; (2) preliminarily appoint Plaintiff's counsel as Class Counsel; (3) preliminarily approve the proposed Settlement; (4) approve the proposed form and method of notice to the Class; and (5) schedule a hearing at which the Court will consider final approval of the Settlement.

## I.    INTRODUCTION

The proposed Settlement is an excellent result for the Class.  It will increase Class Members' monthly pension benefits by 40 percent of their damages (less attorneys' fees, costs and expenses), based on the damage methodology set out in the litigation report of Plaintiff's actuarial expert.  The present value of the proposed Settlement is $59.17 million.

The Employee Retirement Income Security Act of 1974 ("ERISA") requires that pension benefits in the form of a Joint and Survivor Annuity ("JSA"), which provides benefits for the life of the participant and beneficiary, be "actuarially equivalent" to the retiree's single-life annuity ("SLA").  ERISA similarly requires that pension benefits in the form of a Pre-Retirement Survivor Annuity ("PSA"), which provides survivor benefits to a plan participant's beneficiary, equal the survivorship portion of a hypothetical JSA that is "actuarially equivalent" to the SLA the participant could have selected had the participant lived.  This case is about whether the Raytheon retirement plans at issue in this case (the "Covered Plans")[2] complied with these requirement.

---

[1] Unless otherwise defined, all capitalized terms herein shall have the same meaning as set forth in the Parties' Settlement Agreement.

[2] The Covered Plans are the Raytheon Retirement Plan for Engineers & Contractors, Inc. and Aircraft Credit Employees ("RE&C Plan"); the Raytheon Bargaining Retirement Plan ("Bargaining Plan"); the Raytheon Company Pension Plan for Hourly Employees ("Hourly Plan");

Plaintiff contends that Raytheon's calculation formulas shortchanged retirees and beneficiaries receiving JSAs and PSAs and that retiree and beneficiary monthly pension checks should be higher.

The groundbreaking settlement is outstanding in light of the substantial litigation risks in the case. Plaintiff's legal theory is both cutting-edge and complex. It has not been litigated through trial in any case and there are no appellate decisions on point. Only one case has proceeded through summary judgment. Moreover, Defendants vigorously disputed the actuarial assumptions selected by Plaintiff's expert through their own expert witness, who opined that Plaintiff's monthly benefits were entirely appropriate. Accordingly, success at trial would depend on Plaintiff winning a battle of experts in a highly technical field. For these reasons, and others discussed in more detail below, the Settlement satisfies the criteria for preliminary approval, and Plaintiff requests that the Court grant this motion.

## II.    FACTUAL BACKGROUND

Plaintiff filed this proposed class action on June 27, 2019 on behalf of participants and beneficiaries receiving pension benefits in the form of a JSA or PSA from the Covered Plans. Dkt. 1, generally. As Plaintiff alleged in the Complaint, ERISA requires that JSAs be at least the "actuarial equivalent" of the SLA that the participant could have taken when he or she began to receive benefits (and that PSAs be equal to the survivorship portion of a hypothetical JSA that is actuarially equivalent to an SLA).[3]  *Id.* at ¶¶ 19–22 (citing ERISA Section 205(d) and (e), 29

---

the Raytheon Company Pension Plan for Salaried Employees ("Salaried Plan"); and the Raytheon Non-Bargaining Retirement Plan ("Non-Bargaining Plan").

[3] The annuities that must be actuarially equivalent to the SLA are the plan's "Qualified Joint and Survivor Annuity" (the "QJSA"), Qualified Optional Survivor Annuities ("QOSAs") and Qualified Pre-Retirement Survivor Annuities ("QPSAs").  *See* ERISA §205(d) and (e), 29 U.S.C. § 1055(d) and (e).

U.S.C. §§ 1055(d) and (e)).  Two benefit forms are "actuarially equivalent" when they have the same present value, so long as the present values of both benefits are calculated using the same, reasonable actuarial assumptions.  Dkt. 1 at ¶¶ 27–30.

The actuarial assumptions that are used to calculate present values for purposes of determining actuarial equivalence involve mortality and interest rates.  Mortality assumptions, which are generally based on a mortality table, estimate how many benefit payments will be made, based on the ages of the participant and (in the case of JSAs), the beneficiary.  Interest rate assumptions discount the value of expected future payments to present value.  When payments under one benefit option are likely to extend longer than those under another option, the monthly payments under the first option will be lower to account for the likelihood that more payments will be made.  For example, the monthly benefit payments for a JSA will be lower than an SLA because of the possibility that the beneficiary will receive benefits after the participant's death. But, the present values of those two streams of benefits must be the same to satisfy actuarial equivalence.

The Complaint alleges that Raytheon calculated Plaintiff's JSA benefit (and the JSAs and PSA benefits of other Class Members) using outdated mortality and interest rate assumptions (or conversion factors based on outdated mortality and interest rate assumptions), which caused benefit payments to be less than an "actuarially equivalent" amount. Dkt. 1, ¶¶ 1, 84, 89.[4]  In other

---

[4] Plans can convert the monthly amount of SLAs to alternative forms of benefits by (1) specifying the actuarial assumptions that will be used (e.g., "the RP-2014 Mortality Table and a 3% interest rate"), (2) designating external sources for these assumptions that change over time (e.g., "the Mortality Table and interest rate designated by the Secretary of the Treasury to calculate lump-sum benefits when the participant retires"), or (3) specifying the "conversion factors" that are to be used to calculate alternative forms of benefits.  For example, the Hourly Plan in which Cruz participated used a 0.9 conversion factor to calculate Cruz's JSA, meaning that his monthly JSA benefit was 90% of what he would have received if he had selected an SLA.  Critically, regardless of the methodology set forth in a plan, ERISA requires that alternative forms of benefits satisfy the statutory scheme's actuarial equivalence requirements.

words, the present values of Class Members' JSA and PSA benefits generally were less than what they were entitled to pursuant to ERISA's actuarial equivalence requirements.

## III.    PROCEDURAL BACKGROUND

On September 9, 2019, Defendants filed a Motion to Dismiss the Complaint.  Dkt. 7.  On September 30, 2019, Plaintiff filed a memorandum in opposition to Defendants' motion (Dkt. 19). Defendants filed a reply memorandum on October 18, 2019 (Dkt. 22).  On December 9, 2019, the Court held a hearing on Defendants' motion to dismiss (Dkt. 26) and, on January 17, 2020, issued a written decision denying the motion. Dkt. 28.

On February 3, 2020, the Court entered a Scheduling Order which identified as a "threshold issue. . . . the question of whether the .90 conversion factor used" to calculate Mr. Cruz's JSA violated ERISA's actuarial equivalence requirement.  Dkt. 34.  Under the Scheduling Order, the Parties engaged in document discovery and exchanged expert reports.  *Id*.  Defendants produced thousands of pages of documents. Between March 6 and August 7, 2020, the Parties engaged in fact and expert discovery, including the exchange of expert reports and depositions of the Parties' respective actuarial experts. Dkt. 34. Plaintiff's expert, Dr. Mitchell I. Serota, opined that the applicable conversion factor for each plan participant should have reflected reasonable mortality and interest rate assumptions as of the date of that participant's retirement. He further opined that the .90 conversion factor used to convert Mr. Cruz's benefits was not reasonable.

After the completion of expert discovery, the Parties moved for summary judgment and filed supporting and opposition briefs. Dkts. 49, 54, 62 & 64.  On the same date (September 9, 2020), Plaintiff moved to exclude the testimony of Defendants' expert, Thomas Terry.  Dkt. 53. Plaintiff filed Dr. Serota's report (the "Serota Report") in support of his Motion for Summary Judgment and his Motion to Exclude Testimony.  Dkt. 61-8.

While the motions were pending, the parties engaged in arms-length settlement

4

negotiations. Declaration of Douglas P. Needham ("Needham Decl."), at ¶ 11.  Initial discussions began in September of 2020 and continued over a period of months.  The negotiations included multiple teleconferences, conference calls, and written communications, during which the Parties thoroughly discussed their evaluations of the strengths and weaknesses of the case and exchanged multiple settlement proposals.  *Id.*

The Parties reached agreement in principle on November 16, 2020 that Class Members would recover 40% of total calculated benefit shortfall both for past and future benefit payments, less any amounts awarded by the Court for attorneys' fees and expenses, as well as any case contribution award for the lead plaintiff.  *Id.* at ¶ 12.  This allowed the Parties to inform the Court, during a November 19, 2020 conference, that the Parties had reached an agreement in principle. The Court set a January 27, 2021 hearing date to consider a Motion for Preliminary Approval. Dkt. 69.

The parties next negotiated a Term Sheet that reduced to writing the essential terms of the proposed Settlement, the Parties signed on November 23, 2020.  *Id.* at ¶ 13.  In the Term Sheet, the Defendants agreed to provide data necessary for Plaintiff's actuarial expert to review and opine on the damages calculations generated by applying the terms of the Settlement to the information maintained by the Covered Plans for each individual Class Member.  *Id.*

Plaintiff's experts reviewed and analyzed the data provided by Defendants in accordance with the Term Sheet, and the Parties engaged in several rounds of communications to refine the data to ensure that the Parties' respective experts agreed on the calculations.  *Id.* at ¶ 14.  The Parties also began to negotiate the text of the detailed Settlement Agreement.  *Id.* at ¶ 15.  The Settlement Agreement was finalized and executed on February 12, 2021; a copy is attached to the Needham Declaration as Exhibit A.

## IV.    THE TERMS OF THE PROPOSED SETTLEMENT

The material terms of the Agreement are summarized below:

(1)    **Settlement Class**: The Settlement Class is a non-opt out class defined as:

(1) each participant in a Covered Plan who began receiving a JSA from such Covered Plan as of June 27, 2013 or later, and who received a monthly payment of that JSA benefit from such Covered Plan in December 2020 ("Participant Class Members"); (2) each beneficiary of a participant in a Covered Plan, where such participant began receiving a JSA from such Covered Plan as of June 27, 2013 or later and such beneficiary received a monthly payment of the survivor component of such JSA from such Covered Plan in December 2020 ("Beneficiary Class Members"); and (3) each surviving spouse of a participant in a Covered Plan, where such participant died on or after June 27, 2013, before the participant began to receive benefits from such Covered Plan, and such surviving spouse received a monthly payment of a PSA from such Covered Plan in December 2020 ("Surviving Spouse Class Members").

Settlement Agreement, § I.M. The Covered Plans are the Hourly Plan, the Salaried Plan, the Bargaining Plan, the Non-Bargaining Plan, and the RE&C Plan.

(2)    **Increased Benefit Payments**. The Plans will be amended and the benefits of participants or beneficiaries who were injured under Plaintiff's theory of the case will receive an increase to their future benefit payments.  Settlement Agreement, § III.B.   The amendment is intended to provide Class Members with an increase in their benefit payments equal to 40 percent of the calculated shortfall in their past and future benefit payments, less any amounts awarded by the Court for attorneys' fees and expenses, as well as any case contribution award for the lead plaintiff.  *Id.,* § III.A. The shortfall calculation uses the methodology for selecting actuarial assumptions set out in the Serota Report (the "Serota Assumptions").[5] The steps required for this calculation are as follows:

---

[5] Serota's preferred actuarial assumptions, as set forth in his Report, were: (a) the mortality table in Raytheon's 715 Report (blended 50% male and 50% female) for the year ending before the Class Member retired; and (b) the discount rate on the December 31 before the Class Member retired based on the FTSE Above-Median Index (which closely tracks the rates in Raytheon's 715 reports for the Class Member's plan).  Serota Report, Dkt. 61-8, at ¶ 102.

(a) ***Calculating the Monthly Benefit Shortfall:***  Defendants' database shows the amount that each Class Member is receiving in benefits each month, and the form of benefit (JSA or PSA) that each Class Member is receiving.  Based on that data, and on the terms of each of the Covered Plans related to the calculation of this form of benefit, Defendants have determined the amount of the SLA that Class Members (or, as relevant, the deceased plan participant associated with the Class Member) would have been entitled to at the time that they began to receive benefits.  In the first step of the Settlement calculation, the amount of the SLA calculated by Defendants is converted to the form of benefit that each Class Member is receiving using the Serota Assumptions.  If the JSA or PSA calculated with the Serota Assumptions is greater than the Class Members' current monthly benefit, the difference between the two amounts — the "Monthly Shortfall" — is used as the first input in the calculation of additional benefits under the Settlement.  Settlement Agreement, §§ III.D.1.a.2, III.D.2.a.3 and III.D.3.a.1.[6]

(b) ***Calculating the Adjustment for Past Benefit Shortfalls:***  Although the Settlement Agreement only affects monthly benefit payments that will be made in the future, it ensures that Class Members are treated fairly regardless of whether they retired at the beginning or the end of the Class Period.  This is done by aggregating each Class Member's Monthly Shortfall prior to December 31, 2020, with interest to December 31, 2020. The total amount of this past shortfall is then annuitized into monthly payments for the projected period of the JSA and PSA benefits using the Serota Assumptions.[7] In other words, the past shortfall amount is converted into future monthly payments using the actuarial assumptions that Plaintiffs' expert considers reasonable. The amount of these monthly payments, the "Additional Prospective Increase," is added to each Class Member's Monthly Shortfall.  *Id.,* § III.D.4.

(c) ***Applying the Percentage Reduction:***  The Monthly Shortfall and the Additional Prospective Increase are both multiplied by 0.40 to reflect litigation risk, uncertainty and delay (the "Reduction Factor").  The result is the Gross Benefit Increase ("GBI"). Settlement Agreement, §§ III.D.1-4.

(d) ***Adjust for Court Award of Attorneys' Fees, Costs and Expenses and the Case Contribution Award:***  The final step in the calculation is to apply a percentage

---

[6] For a variety of reasons related to the interplay of the actuarial assumptions and the fact that some of the Plans, like Plaintiff's, used the same conversion factors regardless of the age at which participants retired, some Class Members are currently receiving more than what would be considered an actuarial equivalent benefit.  This could happen, for example, where employees retired late and/or their beneficiaries were significantly younger.  Under the Settlement Agreement, Class Members will receive the ***greater*** of their current benefit amount or the amount recalculated in accordance with the Settlement Agreement. No Class Member will suffer a reduction in benefits.

[7] The Serota Assumptions applicable to this step were based on the calculations done at the time that the Settlement was negotiated:  the FTSE Above-Median Index rate of 2.82 percent coupled with the mortality rate assumptions in Raytheon's 715 Report for the year ending December 31, 2019, using a 50/50 gender blend.

adjustment to each Class Member's GBI that is equal to the percentage of the Settlement's present value that the Court awards as attorneys' fees, costs and expenses and case contribution award to Lead Plaintiff, if any.  The GBI less this adjustment represents each Class Member's Net Benefit Increase ("NBI") — that is, the amount that their monthly benefits checks will increase.  Settlement Agreement, §§ III.D.5.

**Example**:  Plaintiff Cruz retired on November 1, 2015 and began receiving his pension benefits in the form of a 50% JSA that pays $1,021.33 each month.  *See* Declaration of Mitchel I. Serota, attached to the Needham Declaration as Exhibit B, at ¶ 24.  The SLA that he could have selected when he retired would have paid $1,135.82 each month.  Using the Serota Assumptions to convert the $1,135.34 SLA, the 50% JSA would pay $1,066.31 each month.  *Id.*  Cruz's ***Monthly Shortfall*** — the difference between the 1,066.31 JSA calculated with the Serota Assumptions and the 1,021.33 JSA Cruz is currently receiving — is $44.98.  *Id*.

With respect to the adjustment for past benefit payments, as of December 31, 2020, Cruz had received 62 benefit payments; the total shortfall over that period ($44.98 x 62 months) was $2,788.76.  *Id.,* ¶ 25. Adding interest of 2.82%, Cruz's Past Shortfall Amount as of January 1, 2021 was $3,005.42.  *Id*. Based on the current ages of Cruz and his wife and using the Serota Assumptions to annuitize the $3,005.42 Past Shortfall Amount, Cruz's ***Additional Prospective Increase*** to future benefit payments is $13.00. *Id*.

The sum of Cruz's ***Monthly Shortall*** and his ***Additional Prospective Increase*** is $57.98.  Applying the ***Reduction Factor*** of 40%, Cruz's ***GBI*** would be $23.19. *Id.*  The present value of Cruz's GBI is $13,012.   If the Court were to award the maximum amount that Plaintiffs may request, under the terms of the Settlement, for Attorneys' fees, costs, expenses, and the Case Contribution Award, which is approximately 15.04% of the present value of the Settlement, Cruz's benefit would be decreased by the same percentage.  Plaintiff's NBI would be $19.70 ($23.19 x

84.96%), and his monthly benefits check would be increased by this amount.[8]

The ***average*** benefit increase under the Settlement, assuming the Court granted the request for fees, costs and expenses, is $21.40 each month.  Needham Decl. ¶ 18.  The present value of the average Class Member's net benefit under the Settlement is $4,737.  *Id.*

(3)    **Release**: Plaintiff and Class Members shall provide Defendants (and related parties) with a release of all claims arising on or before December 31, 2020 (1) that were brought, or could have been brought, arising out of or relating to the allegations in the Complaint, or (2) relating to the actuarial assumptions or factors used by the Covered Plans to calculate benefits. Notwithstanding the foregoing, the Settlement will not release individual claims by absent Class Members that are not related to conversion of a single-life annuity to a joint and survivor annuity or a preretirement survivor annuity. Settlement Agreement, § IV.A.

(4)    **Identification of Class Members**: Class Members can be identified using the Plans' records. Based on the Plans' records, there are over 10,000 Class Members. Settlement Agreement, Appendix 1.

(5)    **Notice and Administration**: Defendants agree to pay for and provide notice to the Class and to governmental entities required under the Class Action Fairness Act ("CAFA"). Settlement Agreement, § II.B.1. Subject to Court approval of the Agreement, the parties agree that Notice will be transmitted to Class Members by first class mail to the address that is maintained in Raytheon's records. *Id.,* § II.B.2.  Because all Class Members are currently receiving benefits, the

---

[8] The Settlement uses January 1, 2021 as the calculation date but recognizes that the additional amounts cannot be added to Class Members' monthly checks until the Settlement is finally approved.  The Settlement provides that Class Members will receive a lump-sum payment equal to the total amount of their net monthly benefit increase multiplied by the number of benefit payments they received from January 1, 2021 until the date that the begin receiving their new benefit amounts.  Settlement Agreement, §§ III.D.

parties expect no difficulty in locating Class Members for purposes of notice or distribution of the re-calculated benefits.

The proposed Class Notice, Settlement Agreement, Exhibit 2, provides all information necessary to inform Class Members about the nature of the Action, the terms of the Settlement and the procedures for entering an appearance to be heard or to object to the Settlement. In addition, key court documents, including the Complaint, the Settlement Agreement, preliminary approval papers, Plaintiffs' Motion for Award of Attorneys' Fees, Plaintiffs' Motion for Final Approval, and pertinent Court Orders will be posted on the settlement website. For notices that are returned as undeliverable, Defendants will engage in standardized processes to locate Class Members using identifying information maintained by the Plan and industry sources and databases. *Id.,* § II.B.2.

(6)   **Attorneys' Fees and Expenses**: The Settlement Agreement provides that proposed Class Counsel Izard, Kindall & Raabe, LLP ("IKR") and Bailey & Glasser, LLP ("B&G") will request that this Court award attorneys' fees, plus expert and other litigation expenses and costs in an amount not to exceed $8.9 million. Settlement Agreement, § II.B.2.  The Settlement expressly provides that the Settlement is not conditioned upon the Court approving the requested amounts for fees, expenses or the Case Contribution Award.  *Id.,* § II.B.3.

(7)   **Case Contribution Award**: The Settlement Agreement provides that proposed Class Counsel intends to request that this Court award a case contribution award to Mr. Cruz of up to $10,000, subject to Court approval. *Id.,* § II.F.  That amount would reduce the amount awarded for attorney's fees, costs and expenses.  *Id.*

## V.   ARGUMENT

### A.   Standard And Process For Approval

Fed. R. Civ. P. 23(e) requires court approval of a class action settlement. Approval involves a "two-stage procedure. First, the judge reviews the proposal preliminarily to determine whether

it is sufficient to warrant notice and a hearing. If so, the final decision on approval is made after

the hearing." *Hochstadt v. Bos. Sci. Corp.,* 708 F. Supp. 2d 95, 106–07 (D. Mass. 2010). "[B]efore

making a final decision on the 'approval' of a settlement, a court must first make a 'preliminary

determination on the fairness, reasonableness, and adequacy of the settlement terms.'" *Id*. (citing

*Nat'l Ass'n of Chain Drug Stores v. New England Carpenters Health Benefits Fun*d, 582 F.3d 30,

44 (1st Cir. 2009), and Manual for Complex Litigation (Fourth) § 13.14).

　　　Under Rule 23(e)(1)(B), a court should grant preliminary approval if it determines that it

"will likely be able to" certify the class for settlement purposes and approve the settlement. *Miller*

*v. Carrington Mortg. Servs., LLC,* No. 19-16, 2020 WL 2898837, at *4 (D. Me. June 3, 2020),

*report and recommendation adopted,* No. 19-16, 2020 WL 3643125 (D. Me. July 6, 2020).

Determining whether the court will "likely" be able to approve the Settlement requires a

preliminary consideration of the final approval factors set out in Rule 23(e)(2).  *See* Fed. R. Civ.

P. 23(e)(1)(B)(i).[9]  As this Court recently summarized,

> The factors by which a proposed settlement is judged are whether: (i) the class
> representatives and class counsel adequately represented the class; (ii) the proposed
> settlement was negotiated at arm's length; (iii) the relief obtained for the class is
> adequate; and (iv) the proposed settlement treats class members equitably relative
> to each other.

*Nat'l Ass'n of Deaf v. Massachusetts Inst. of Tech*., No. 15-30024-KAR, 2020 WL 1495903, at *3

(D. Mass. Mar. 27, 2020) (citing Fed. R. Civ. P. 23(e)(2)).  "The court performs this analysis in

---

[9] Although factors used to analyze whether a settlement is fair, reasonable and adequate are the
same at preliminary and final approval, in the first case the "determination remains preliminary in
the sense that it is subject to any additional information—including further factual development or
objections by class members—that may come to light prior to or during the fairness hearing."
*Rapuano v. Trustees of Dartmouth Coll.,* 334 F.R.D. 637, 643 (D.N.H. 2020)

the shadow of the 'strong public policy in favor of settlements,' *P.R. Dairy Farmers Ass'n v. Pagan,* 748 F.3d 13, 20 (1st Cir. 2014) (internal quotations omitted), particularly in class action ligation." *Medoff v. CVS Caremark Corp.,* No. 09-554, 2016 WL 632238, at *5 (D.R.I. Feb. 17, 2016) (citing *In re Tyco Int'l, Ltd. Multidistrict Litig.,* 535 F. Supp. 2d 249, 259 (D.N.H. 2007).

### B. The Proposed Settlement Should Be Preliminarily Approved

Consideration of all relevant factors demonstrates that the Settlement is likely to be finally approved under Rule 23(e)(2) and should therefore be preliminarily approved.

### 1. The Class Representative and Proposed Class Counsel Have Adequately Represented the Class

The adequacy determination under Rule 23(e)(2)(A) looks to whether "the interests of the class representatives do not conflict with the interests of any of the class members . . . and that Plaintiffs' counsel are qualified and experienced and provided vigorous representation during the course of the case." *Nat'l Ass'n of Deaf v. Massachusetts Inst. of Tech.,* No. 15-30024-KAR, 2020 WL 1495903, at *3 (D. Mass. Mar. 27, 2020) ("NAD") (citing *Andrews v. Bechtel Power Corp.,* 780 F.2d 124, 130 (1st Cir. 1985)). In citing *Andrews,* the *NAD* court expressly linked the adequate representation inquiry under Rule 23(e)(2)(A) to the adequacy inquiry required for class certification under Fed. R. Civ. P. 23(a)(4). *Accord, In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.*, 330 F.R.D. 11 (E.D.N.Y. 2019). This is a familiar inquiry. *See Amchem Products v. Windsor*, 521 U.S. 591, 625-26 (1997) (courts look at whether the representatives' interest are antagonistic to or in conflict with those of the class members). Where, as here, the injuries suffered by the named Plaintiff are the same as those that the class is alleged to have suffered, the adequacy requirement is usually satisfied. *Duhaime v. John Hancock Mutual Life Ins. Co.,* 177 F.R.D. 54, 63 (D. Mass. 1997).

Mr. Cruz has been an exemplary representative. He has spent significant time on behalf of

the putative class in this hard-fought litigation, gathering his relevant documents and providing them to counsel, responding to counsel's requests, reviewing documents and participating in settlement negotiations. Needham Decl. ¶ 43. His claims are the same as the claims of all Class Members, and the relief that he is seeking is calculated using exactly the same formula as that used for all Class Members.

In addition, proposed Class Counsel are well-qualified and have vigorously prosecuted this class action. B&G and IKR are active class action practitioners whose long experience in ERISA and class action litigation is demonstrated by the declarations attached to this memorandum. Needham Decl., ¶ 23 and Exh. C; Declaration of Gregory Y. Porter ("Porter Decl."), ¶¶ 3-5 and Exh. A thereto. In addition, Class Counsel are pioneers in bringing this and other contemporaneous litigation challenging actuarial equivalence.  Needham Decl., ¶ 23.[10]

The "adequacy of representation" factor of Rule 23(e)(2)(A) is met.

### 2.     The Proposed Settlement Was Negotiated at Arm's Length

Rule 23(e)(2)(B) instructs the court to consider whether the proposed settlement was negotiated at arm's length. There is typically an initial presumption that a proposed settlement is fair and reasonable when it was the result of arm's-length negotiations between experienced, capable counsel after meaningful discovery. *See, e.g.*, *Bezdek v. Vibram USA Inc.*, 79 F. Supp. 3d 324, 343 (D. Mass.), *aff'd*, 809 F.3d 78 (1st Cir. 2015) ("There is a presumption that a settlement

---

[10] *See, e.g., Herndon v. Huntington Ingalls Indust. Inc.,* No. 19-52, 2020 WL 5809965, at *1 (E.D. Va. Aug. 28, 2020) (cross-motions for summary judgment), *report and recommendation adopted sub nom. Herndon v. Huntington Ingalls Indus., Inc.,* No. 19-52, 2020 WL 5809996 (E.D. Va. Sept. 29, 2020); *Belknap v. Partners Healthcare Sys., Inc.,* No. 19-11437-FDS, 2020 WL 4506162 (D. Mass. Aug. 5, 2020) (motion to dismiss); *Smith v. Rockwell Automation, Inc.,* 438 F. Supp. 3d 912 (E.D. Wis. 2020) (same); *Duffy v. Anheuser-Busch Companies, LLC,* 449 F. Supp. 3d 882 (E.D. Mo. 2020) (same); *Smith v. U.S. Bancorp,* No. 18-3405, 2019 WL 2644204, at *1 (D. Minn. June 27, 2019) (same); *Torres v. Am. Airlines, Inc.,* 416 F. Supp. 3d 640 (N.D. Tex. 2019) (same).

is within the range of reasonableness when sufficient discovery has been provided and the parties have bargained at arms-length."); *accord, Sesto v. Prospect CharterCARE, LLC,* No. 18-328 , 2019 WL 4758161, at *3 (D.R.I. Sept. 30, 2019) (same); *Barnes v. FleetBoston Fin. Corp.,* No. 01-10395-NG, 2005 WL 8175898, at *2 (D. Mass. Dec. 22, 2005) (presumption of reasonableness where "settlement was reached after arms-length negotiations, that the proponent's attorneys have experience in similar cases, that there has been sufficient discovery to enable counsel to act intelligently"); *Rolland v. Cellucci*, 191 F.R.D. 3, 6 (D. Mass. 2000) (same); *Bussie v. Allmerica Fin. Corp.,* 50 F. Supp. 2d 59, 77 (D. Mass. 1999) (same).

Here, the parties engaged in substantial fact discovery during which Defendants produced thousands of pages of documents, including actuarial valuation reports about the Covered Plans for each year since 2011, internal memoranda regarding how Raytheon selected the actuarial assumptions used to value its pension liabilities and the core mortality tables and economic data upon which these valuations were based. Needham Decl., ¶ 8. While this fact discovery was aimed at the "threshold issue" of whether Mr. Cruz received an actuarially equivalent pension benefit from the Hourly Plan, it allowed proposed Class Counsel to also evaluate the strengths and weaknesses of the entire case because the documents contained substantial data about the Covered Plans.

After this fact discovery, the Parties then engaged in substantial expert discovery. On April 24, 2020, Plaintiff served a report from his expert, Dr. Serota, a Fellow of the Society of Actuaries and a former member of the Pension Committee of the Actuarial Standards Board, the organization that writes the standards of practice that actuaries must follow. Dkt. 61-8. On May 29, 2020, Defendants served a report from their expert, Thomas S. Terry, the former president of the American Academy of Actuaries, and Plaintiff served Dr. Serota's reply report on June 30, 2020.

14

Dkt. Nos. 56-11 (Terry) and 56-12 (Serota).  The three expert reports totaled over 240 pages and thousands of actuarial calculations.  After the exchange of expert reports, Dr. Serota and Mr. Terry were then deposed.  Dkt. Nos. 61-11 and 52-2.

At the end of this discovery, the Parties each moved for summary judgment in support of their respective positions.  Plaintiff's motion included a request to preclude Mr. Terry's opinions under *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579 (1993) and was supported by a memorandum of law and 29 separate exhibits.  Dkt. Nos. 54 and 56-1 – 56-29.  Defendants supported their motion with a memorandum of law and 14 separate exhibits.  Dkt. Nos. 50 and 52-1 – 52-14.  The Parties then filed memoranda in opposition to each other's motions for summary judgment.  Dkt. Nos. 62 and 64.   Particularly since this case was a "battle of the experts" concerning the reasonableness of actuarial assumptions, proposed Class Counsel had ample information to understand the strengths and weakness of the case prior to engaging in settlement discussions.

As discussed above, the negotiations that resulted in this Settlement began mid-September and continued over the fall through multiple teleconferences, conference calls, and written communications.   Needham Decl.,¶ 11.  Counsel for the Parties thoroughly discussed their evaluations of the strengths and weaknesses of the case, exchanged multiple settlement proposals, and in general vigorously defended their clients' interests.  *Id.*  After the Parties reached an agreement in principle on the key terms of the Settlement, they negotiated a Term Sheet that reduced those terms to writing.  *Id.,* ¶¶ 12-13.  The Term Sheet included provisions for exchange of plan data used to calculate benefits for each Class Member, so that Plaintiff's experts could confirm the calculations to be performed under the Settlement. *Id.,* ¶ 13. Importantly, the Parties did not negotiate the terms of the Settlement related to the maximum amount that Plaintiff could

request for attorneys' fees, costs and expenses or the Client Contribution Award until well after the Term Sheet was signed and the Parties had reached agreement on all other aspects of the Settlement. *Id.* at ¶ 15.

The extent of this litigation, the hard-fought negotiations between experienced attorneys for both sides, and the result for the Settlement Class are all testaments to the non-collusive nature of the settlement.  The fact that the Parties did not begin any discussion concerning the amount that Plaintiff would seek for attorneys' fees, expenses and a case contribution award until after the settlement terms were agreed to provides additional support for the conclusion that the settlement was the result of adversarial negotiations.  *NAD,* 2020 WL 1495903, at *4 (that parties did not negotiate attorneys' fees until after agreement had been reached on class-wide relief provided "a further indication that counsel placed their clients' interests firmly in first place"); *Bussie,* 50 F. Supp. 2d at 77 (D. Mass. 1999) (that parties "did not address the issue of Lead Counsel's remuneration until after reaching consensus on the terms of the Settlement also suggests that the settlement process was fair").

### 3.     The Relief Provided for the Class is More Than Adequate

Rule 23(e)(2)(C) provides the factors for adequate relief:

(i) the costs, risks, and delay of trial and appeal;

(ii) the effectiveness of any proposed method of distributing relief to the class, including the method of processing class-member claims;

(iii) the terms of any proposed award of attorney's fees, including timing of payment; and

(iv) any agreement required to be identified under Rule 23(e)(3).

Fed. R. Civ. P. 23(e)(2)(C). As discussed below, the proposed Settlement provides meaningful, immediate and continuing benefits to the Settlement Class, while avoiding potentially years more of costs and delays, and the risks inherent in all class action litigation if the case were to go to trial.

### a.      The Costs, Risks, and Delay of Trial and Appeal

Rule 23(e)(2)(C)(i) requires the court to consider the adequacy of class relief in light of the costs, risks, and delay of trial and appeal. This factor "'involves balancing the advantages and disadvantages of the proposed settlement as against the consequences of going to trial or other possible but perhaps unattainable variations on the proffered settlement.'" *Bezdek v. Vibram USA, Inc.,* 809 F.3d 78, 82 (1st Cir. 2015) (quoting *Nat'l Ass'n of Chain Drug Stores v. New England Carpenters Health Benefits Fund,* 582 F.3d 30, 44 (1st Cir. 2009)).

This litigation has been pending for a year and a half and would be much lengthier and more expensive if it were to proceed to full discovery, a contested motion for class certification, trial and possible appeals.  Pursuant to the Court's February 3, 2020 Order (Dkt. 34), the Parties' litigation focus has been on the "threshold issue" of whether Mr. Cruz is receiving a JSA that is actuarially equivalent to the SLA that he could have selected.  In the absence of the Settlement, the Parties would need to conduct full discovery related to the Covered Plans ***other than*** the Plan in which Cruz participated, followed by a contested motion to certify the class.  Trial, while focused, would primarily involve expert testimony.  *In re Relafen Antitrust Litig.,* 231 F.R.D. 52, 72 (D. Mass. 2005) (evaluation of settlement must take into account the cost of a trial "which promises to feature a battle of various experts").  Because no appellate court has, to date, directly considered Plaintiff's legal theory, the likelihood that the party that did not prevail at trial would take an appeal is high.

The risk of delay is particularly relevant here. ERISA class actions like this one tend to have significant life-cycles. For example, in *Tussey v. ABB, Inc.*, participants filed their action in 2006, received a trial verdict in 2012, saw that verdict reduced by the court of appeals in 2014 and eventually settled in 2019 — 13 years after filing. *Tussey v. ABB, Inc.*, 850 F.3d 951 (8th Cir. 2017) (remanding on damages); *Tussey v. ABB, Inc.*, No. 06-4305, Dkt. 869 (W.D. Mo. Aug. 16,

2019) (granting final approval of settlement). A 13-year delay does significant harm to class members already in retirement, many of whom are in their 60s and 70s. On the other hand, if the Settlement is approved, the Class will begin receiving higher monthly pension payments now, instead of years from now if the case were ultimately successful at trial.

The litigation risks in the case are also high. Mr. Cruz and Raytheon have vastly different views about Raytheon's actions, its potential liability and the likely outcome of the litigation. Plaintiff's core allegations regarding actuarial equivalence survived a motion to dismiss but is entirely untested on the merits. Moreover, as this Court recently held, even where a class has overcome dispositive motions, it is difficult to predict the outcome of a case that "raises complex and unresolved issues" under a federal statute. *NAD,* 2020 WL 1495903, at *4.

The key question — whether Class Members receive actuarially equivalent benefits — is one that can only be determined at trial through expert testimony. Plaintiff and Defendants each retained actuarial experts that provided radically different opinions on this issue. *See* ECF Nos. 52-1 and 61-8. Plaintiff is confident in his expert's opinion and believed that the opinion of Defendants' expert, Thomas Terry, was sufficiently lacking in credibility to move to exclude it (Dkt. 53). However, the results of any "battles of experts" are notoriously difficult to predict. And, even if the Court credited ***parts*** of Terry's testimony, it could reduce or eliminate altogether the damages that could be awarded. *In re Tyco Int'l, Ltd. Multidistrict Litig.,* 535 F. Supp. 2d 249, 260–61 (D.N.H. 2007) ("If, faced with conflicting expert testimony, the jury chose to embrace the most conservative estimate of damages, then the ultimate award might turn out to be less than the proposed settlement.").

A Settlement that provides 40 percent of the best possible recovery for the Class is an outstanding result in light of the likelihood of further lengthy, expensive litigation and the risk that

the Class would recover less – or possibly nothing at all.  A "settlement amount's ratio to the maximum potential recovery need not be the sole, or even dominant, consideration when assessing settlement's fairness."  *In re Global Crossing Sec. and ERISA Litig.*, 225 F.R.D. 436, 460 (S.D.N.Y. 2004); *In re IKON Office Solutions, Inc. Sec Litig.*, 194 F.R.D. 166, 184 (E.D. Pa. 2000). However, ERISA class settlements involving statutory claims that have been litigated much more frequently (and, thus, have more of a track-record) often settle for far lower amounts as a percentage of plaintiffs asserted damages. See, e.g., *Velazquez v. Massachusetts Fin. Services Co.*, No. 17-11249 Dkt. 108 (D. Mass Dec. 5, 2019) (approving settlement for 29% of maximum damages); *Prince v. Eaton Vance Corp.*, No. 18-12098, Dkt. 57 (D. Mass Sept. 24, 2019) (approving settlement for 23% of total damages); *Richards-Donald v. Teachers Insurance and Annuity Ass'n of Amer.*, No. 15-8040 (S.D.N.Y.) ($5 million settlement representing 11.6% of alleged damages); *Figas v. Wells Fargo*, No. 08-4546 (D. Minn.) ($17.5 million settlement representing 19.5% of alleged damages); *Sims v. BB&T Corp.*, No. 15-732, 2019 WL 1993519, *2 (M.D.N.C. May 6, 2019) ($24 million settlement representing 19% of alleged damages); *Urakhchin v. Allianz Asset Mgmt. of Amer., L.P.*, No. 15-1614, 2018 WL 8334858, *4 (C.D. Cal. July 30, 2018) ($12 million settlement representing 17.7% of maximum alleged damages). Moreover, in this case, the percentage is based on Plaintiff's expert's litigation analysis, not a reduced "reasonable best case" settlement damages number.

Ultimately, if approved by the Court, Class Members will receive a substantial amount of the shortfall, and without the burden and risks of further litigation. This "adequate relief" factor of Rule 23(e)(2)(C) weighs in favor of preliminary approval.

   **b.**  **The Effectiveness Of Distribution To The Settlement Class**

The Advisory Committee's Notes to the 2018 amendments to Rule 23(e) indicate that "[m]easuring the proposed relief may require evaluation of any proposed claims process. . . ."

Here, no such process is needed.  The Settlement Agreement will, if approved, increase Class Members' future monthly benefit payments.  There will be no need for Class Members to file claims or have those claims reviewed by a Claims Administrator.  Moreover, many people have their benefit checks deposited directly, and those who do not have a strong incentive to ensure that the Plan has their current address information, so that they can receive and promptly cash their benefits checks.  Thus, the increase in monthly benefits will result in the efficient and effective distribution of the Settlement's benefits.

The settlement is non-reversionary. The 40% figure was extensively negotiated and the payments will be made automatically and fully over the course of the Class Members' lives, ensuring that none of the settlement will be returned to Raytheon.

Finally, Class Members are receiving a distribution in the same form in which they were harmed; a shortfall in monthly benefits is being remedied by an increase in monthly benefits. Moreover, Class Members will not be responsible for a large tax payment on a lump sum award.[11] Accordingly, the distribution is most effective based on the claims alleged.

### c. The Terms Of Any Proposed Award Of Attorneys' Fees, Including Timing Of Payment

Rule 23(e)(2)(C)(iii) directs the Court to consider, as part of its evaluation of the fairness of the Settlement, provisions related to payment of attorneys' fees, including the timing of the payment.  The Advisory Committee's Notes on the 2018 Amendment indicates that "[u]ltimately, any award of attorney's fees must be evaluated under Rule 23(h), and no rigid limits exist for such awards. Nonetheless, the relief actually delivered to the class can be a significant factor in

---

[11] In the experience of Plaintiff's counsel, lump sum payments can have unintended consequences related to taxes and benefits, especially for retirees. The method of distribution here avoids that issue.

determining the appropriate fee award."

As noted above, the Parties did not begin negotiations with respect to the percentage of the class settlement that Plaintiff might seek to have awarded as attorneys' fees until after they signed the term sheet on class-wide relief – a "further indication that counsel placed their clients' interests firmly in first place." *NAD*, 2020 WL 1495903, at *4. Moreover, Plaintiff affirmatively declined to negotiate any sort of "clear sailing" provision. While Plaintiff agreed not to request more than $8.9 million as an award for the total amount of attorneys' fees, costs and expenses and a case contribution award, the Settlement in no way restricts Defendants' ability to object to whatever request Plaintiffs make.

Both the structure and the amount of this fee request are appropriate.

***Structure:*** The Settlement creates a definitely determinable increase in Class Members' monthly benefits. The present value of that agreed-upon stream of income is also definitely determinable based on the same actuarial calculation that forms the basis for Plaintiffs' claims, using mortality and interest rate assumptions that are reasonable at the time of Settlement, taking into account each Class Member's age and, where appropriate, the age of his or her beneficiary.

The present value of the Settlement provides, for purposes of analysis, a "common fund." Under the Settlement, the amount that the Defendants pay to Plaintiff for attorneys' fees, costs and expenses, as well as the case contribution award, will be subtracted from the present value of the total class-wide Settlement, and each Class Member's Gross Benefit Increase ("GBI") will be reduced by the same percentage to reflect this payment. Since the maximum amount that Plaintiff may request under the Settlement is approximately 15.04% of the total present value of the Settlement, if the Court were to award this amount, each Class Member's GBI would be reduced by that same 15.04 percentage. This is the same process that is used in any common fund case.

*See, e.g., Staton v. Boeing Co.,* 327 F.3d 938, 974 (9th Cir. 2003) (where it is possible to accurately ascertain the value of a settlement to individual class members, courts may "include such relief as part of the value of a common fund for purposes of applying the percentage method of determining fees"); *In re Puerto Rican Cabotage Antitrust Litig.,* 815 F. Supp. 2d 448, 459 n.13 (D.P.R. 2011) (basing its percentage fee award, in part, on the "actual tangible" value of future benefits "that are able to be calculated in the present."); *In re: Pharm. Indus. Average Wholesale Price Litig.,* No. 01-12257-PBS, 2008 WL 11389264, at *2 (D. Mass. Oct. 2, 2008) (awarding a percentage of an total settlement value that included the value of projected claims, *cy pres,* and the value of the fee and expense award itself).[12]

***Reasonableness of the Percentage:***   The Court has discretion to award attorneys' fees based on the "percentage of fund" method or the lodestar method.  *In re Neurontin Mktg. & Sales Practices Litig.,* 58 F. Supp. 3d 167, 170 (D. Mass. 2014) (citing *In re Thirteen Appeals,* 56 F.3d 295, 307 (1st Cir.1995)).  The reasonableness of a requested "percentage of fund" typically turns on several factors:

> "(1) the size of the fund and the number of persons benefitted; (2) the skill, experience, and efficiency of the attorneys involved; (3) the complexity and duration of the litigation; (4) the risks of the litigation; (5) the amount of time devoted to the case by counsel; (6) awards in similar cases; and (7) public policy considerations."

*Id.* (quoting *In re Lupron Mktg. & Sales Practices Litig.,* No. MDL 1430, 01–CV–10861–RGS,

---

[12] This case is thus exactly the opposite of *In re Volkswagen & Audi Warranty Extension Litig.,* 692 F.3d 4, 17 (1st Cir. 2012), where the court declined to award fees using the common fund doctrine because the fees were ***not*** "'spread around' among the parties benefitted" by the settlement.  Here, in contrast, there is "'reason for confidence that the costs [will] indeed be shifted with some exactitude to those benefiting.'"  *Id.* (quoting *Alyeska Pipeline Serv. Co. v. Wilderness Soc'y,* 421 U.S. 240, 264 n.39 (1975)). That is because every Class Member is receiving the same percentage gross benefit and fees and expenses will reduce every Class Member's gross benefit by exactly the same percentage.

2005 WL 2006833, at *3 (D. Mass. Aug. 17, 2005)).

Plaintiff will request that the Court award $8.9 million to cover attorneys' fees, costs, expenses and a case contribution award.  To date, proposed Class Counsel have already incurred over $325,000 in litigation expenses, primarily for expert reports and testimony. Significant additional work remains to be done in connection with final approval and settlement administration. The amount of Plaintiff's fee request, accordingly, will be less than $8,575,000, representing 14.4 % of the Settlement.[13]  That request is reasonable under the standards described in *Neurontin.*

*First,* the percentage requested is reasonable. "Standard awards in the First Circuit range from 20% at the low end to 33% at the high end. More commonly, courts in this Circuit award fees between 25% (the benchmark) and 30%." *Bettencourt v. Jeanne D'Arc Credit Union*, No. 17-12548-NMG, 2020 WL 3316223, at *2 (D. Mass. June 17, 2020) (citing cases); *Latorraca v. Centennial Techs. Inc.,* 834 F. Supp. 2d 25, 27–28 (D. Mass. 2011) (same).

Empirical research confirms this.  The present value of the benefits obtained in the Settlement is $59.2 million. Analyzing 458 class action settlements between 2009 and 2013, Professors Eisenberg, Miller and Germano found that the mean settlement had a value of $48.53 million, while the median settlement had a value of $3.93 million.  Theodore Eisenberg, Geoffrey Miller and Roy Germano, *Attorneys' Fees in Class Actions, 2009-2013,* ("Eisenberg Study"), Law & Econ. Research Paper Series (Dec. 2016), at 11. Of these settlements, the mean fee award was 27 percent, and the median award was 29 percent.  *Id*. at 11.  The same study found that, within

---

[13] "The prevailing view is that expenses are awarded in addition to the fee percentage."  Alba Conte, 1 Attorney Fee Awards § 2:19 (3d ed. 2019).  This follows from the "equitable principle that all reasonable expenses incurred in the creation of a fund for the benefit of a class are reimbursable proportionately by those who accept benefits from the fund . . . ."  *Id.*

the First Circuit, the mean percentage was 26 percent, and the median was 23 percent.  *Id.* at 12.

Both the mean and median percentage awards for ERISA cases was 26 percent.  *Id.* at 13.[14]

Plaintiff's request of a fee request equal to 14.4 percent is substantially lower than these averages.

*Second,* this case is highly complex, both legally and factually.  The case required detailed familiarity with not only the text of ERISA, but the ways in which the Retirement Equity Act modified and enhanced the statute's protections for actuarial equivalence.  *See, e.g.,* Plaintiff's Opposition to Defendants' Motion for Summary Judgment, Dkt. 65, at 6–7.  Counsel also needed to understand how the detailed regulations for ERISA, the Retirement Equity Act and the Tax Code related to the central issues in the case. Since the caselaw related to this area was undeveloped, Plaintiff could not rely on caselaw to provide a roadmap for how to litigate this case. Finally, Counsel also had to understand and explain the actuarial science behind the statutory requirement of "actuarial equivalence," which involved lengthy and detailed work with actuaries who are experts in the field.

*Third,* this case had a high degree of litigation risk.  As noted above, it centered on a novel legal theory.  When Plaintiff filed the case, in 2019, ***no*** cases had held that Plans were required to update the actuarial assumptions used to calculate benefits once those assumptions ceased to be reasonable.  *Cf. NAD,* 2020 WL 1495903, at *4 (noting the risk inherent in litigating "complex and unresolved" statutory claims).  Moreover, it was clear from the outset that if the case survived a motion to dismiss, it would turn into a battle of experts in a highly arcane field, the outcome of

---

[14] Approved fee awards for complex, innovative ERISA class actions are often higher. *See, e.g., Gordan v. Mass. Mutual Life Ins. Co.,* No. 13-30184, 2016 WL 11272044 (D. Mass. Nov. 3, 2016) (approving 33 1/3 percent attorneys' fee award in $30.9 million ERISA class action); *Bekker v. Neuberger Berman Group 401(k) Inv. Com.,* No. 16-cv-06123-LTS-BCM, 2020 WL 7043869 (S.D.N.Y. Dec. 1, 2020) (in an ERISA class action settlement, "Counsel's request for 28 percent of the common fund is reasonable and represents a discount compared to the norms in similar litigation").

which would be difficult to predict.  *Tyco,* 535 F. Supp. 2d at 260–61.

*Fourth,* Proposed Class Counsel are highly experienced attorneys with substantial background in ERISA cases.  IKR and B&G pioneered the legal theory at the heart of the case, and have jointly litigated many of the issues involved in ERISA's "actuarial equivalence" requirements.  *See supra* ftn. 11 and cases cited therein. Proposed Class Counsel's work on these cases allowed them to litigate this case through to settlement effectively and efficiently. Nonetheless, they have devoted a substantial amount of time to this case over two years.  Since it was first filed, Class Counsel have spent over 1970 hours litigating the case, including time spent researching the legal theory and working with the experts to draft the initial complaint, successfully responding to Defendants' motion to dismiss, engaging in discovery, reviewing relevant documents, working with experts on testimony, taking and defending expert depositions, preparing and responding to motions for summary judgment, preparing a motion to exclude testimony under *Daubert,* conducting settlement negotiations and confirmatory discovery, and drafting the present motion.  Needham Decl., ¶ 33; Porter Decl., ¶ 10. Moreover, counsel anticipates that considerable work still needs to be done in connection with final approval and administration.

*Fifth,* when Courts award a percentage of the fee, they may perform a "lodestar crosscheck" to determine whether the proposed fee is reasonable.  Here, proposed Class Counsel's lodestar in the case to date is over $1.4 million.  *See* Needham Decl., ¶ 33; Porter Decl., ¶ 10.  Thus, the requested fee (exclusive of expenses) represents a 6.1 multiple of counsel's lodestar as of the date of this filing.  This is well within the range of lodestar multiples that have been approved in this District.  For example, in *New England Carpenters Health Benefits Fund v. First Databank, Inc.,* No. 05-11148-PBS, 2009 WL 2408560, at *2 (D. Mass. Aug. 3, 2009), this Court awarded a 20 percent fee that represented an 8.3 lodestar multiple.  The Court also cited *In re Rite Aid Corp.*

*Sec. Litig.,* 146 F. Supp. 2d 706, 736 n. 44 (E.D. Pa. 2001), for the proposition that "a lodestar

multiplier in the range of 4.5 to 8.5 was 'unquestionably reasonable.'"  *New England Carpenters,*

2009 WL 2408560, at *2.  Similarly, in *Conley v. Sears, Roebuck & Co.,* 222 B.R. 181, 182 (D.

Mass.1998), this Court awarded a lodestar multiple equal to approximately 8.9 percent of the

Settlement.  *New England Carpenters,* 2009 WL 2408560, at *2.[15]

Sixth, public policy considerations favor Plaintiff's fee request.  As another court noted in

a recent case involving settlement involving complex and novel ERISA claims,

> Public policy considerations weigh in favor of granting the requested fees. In
> awarding attorneys' fees in common fund cases . . . [courts] have taken into account
> the social and economic value of class actions, and the need to encourage
> experienced and able counsel to undertake such litigation. Attorneys' fees should
> reflect the important public policy goal of providing lawyers with sufficient
> incentive to bring common fund cases that serve the public interest. Fee awards
> should also serve to encourage skilled counsel to represent those who seek redress
> for damages inflicted on entire classes of persons, and to discourage future alleged
> misconduct of a similar nature.
>
> This is especially true in ERISA class actions. . . . Congress passed ERISA to
> promote the important goals of protecting and preserving the retirement savings of
> American workers and [t]he ERISA statute specifically encourages private
> enforcement.

*In re J.P. Morgan Stable Value Fund ERISA Litig.,* No. 12-CV-2548 (VSB), 2019 WL 4734396,

at *3–4 (S.D.N.Y. Sept. 23, 2019) (internal quotations and citations omitted).

---

[15] The lodestar calculation is based on the contemporaneous time records of IKR and B&G.
Needham Decl., ¶ 32; Porter Decl., ¶¶ 9-11.  The hourly rates for each attorney are the same rates
that have been approved in other ERISA class actions.  Needham Decl., ¶ 35; Porter Decl., ¶¶ 9-
11.  Moreover, the hourly rates charged by Plaintiff's counsel are generally lower than the rates
charged by opposing counsel, Covington & Burling LLP and Goodwin Procter LLP, as well as
other defense firms practicing in the ERISA area against which proposed Class Counsel have
frequently litigated.  Needham Decl., ¶¶ 37-39. Finally, proposed Class Counsel frequently work
cooperatively with other firms that do complex, nationwide ERISA class action work.  While each
firm has its own rate structure, in proposed Class Counsel's experience, the hourly rates of firms
that engage in this highly specialized nationwide practice are generally comparable.  *Id.* at ¶ 36.

### 4. The Settlement Treats Class Members Equitably Relative to Each Other

The Settlement treats Class Members equitably relative to each other by ensuring that each Class Member receives the same percentage of their alleged calculated damages. The dollar amount of the benefit that Class Members will receive from the Settlement will vary, because Class Members' damages vary. The dollar amount of each Class Members' damages depends on a number of interlocking factors — including the amount of benefits they receive, the actuarial assumptions used by the different Plans at issue, the actuarial assumptions that should have been used on retirement date, and the age of the participant and the age of the beneficiary on retirement date. But, each Class Member will receive the same *percentage* of their alleged damages.

Although the Settlement only provides a *prospective* increase in benefits, it ensures that Class Members who retired at an older age and/or earlier in the Class Period (and thus are likely, from an actuarial perspective, to have fewer future benefits payments) are treated equitably by annuitizing the aggregate shortfall of their past benefit payments and treating those annuitized past benefits the same as the Monthly Benefit Shortfall for purposes of the Settlement calculation.

Only Class Members who were not injured as a result of the Plans' actuarial assumptions or conversion factors used to calculate their JSAs or PSAs will receive no increase in their benefits checks.[16] This is appropriate. The statute requires that JSAs be at least the actuarial equivalent of SLAs and PSAs to be based on actuarially equivalent JSAs. Any Class Member who is receiving

---

[16] As noted above, there are a variety of reasons why this may be the case. For example, as discussed in Serota's Reply Report, the Hourly Plan in which Mr. Cruz participated used the same 0.9 conversion factor regardless of whether a participant began receiving benefits at age 55 or age 70. Because younger people have lower mortality rates than older people, the result of using a single factor resulted in participants who retired below the average age subsidizing those who retired above the average age. Dkt. 61-10, ¶¶ 18–30. For some participants, the amount of this age-based subsidy resulted in the calculation of a JSA or PSA benefit that was greater than it would have been had reasonable actuarial assumptions been applied.

a JSA or PSA that already meets or exceeds the statutory standard has suffered no injury.  The Settlement expressly provides that no Class Members' benefits may be ***diminished*** as a result of the Settlement.  Settlement Agreement, § I.CC.

### C.    The Proposed Notice To Class Members Is Adequate

Class Members are entitled to notice of any proposed settlement and an opportunity to object before it is finally approved by the Court. Manual for Complex Litig. (Fourth), § 21.31. The Court should "direct notice in a reasonable manner to all class members who would be bound by the proposal." *NAD*, 2020 WL 1495903, at *4 (quoting Fed. R. Civ. P. 23(e)(1)(B)).  The notice must "generally describes the terms of the settlement in sufficient detail to alert those with adverse viewpoints to investigate and to come forward and be heard." *Id.* (internal quotations and citations omitted).

Here the proposed method of notification is adequate. The proposed Notice, attached as Exhibit 2 to the Settlement Agreement, is clear and straightforward, providing Class Members with enough information to evaluate whether to object to the Settlement, as well as directions to the Settlement Website which will include further information. *Id.* Notice will be provided in the way Class Members are accustomed to receiving communications about their pensions from Raytheon and Class Members will not be required to submit a claim form or take any steps to receive the benefit of the Settlement. The Class Notice will also be posted to the Settlement Website. This proposed method of providing notice is adequate under Rule 23(c)(2). *Phillips Petroleum Co. v. Shutts*, 472 U.S. 797, 811 (1985) (individual mailed notice which clearly describes the case and Class Members' rights meets due process requirements).

## VI.    THE COURT SHOULD PRELIMINARILY CERTIFY THE CLASS

The Settlement Class meets all of the requirements of Fed. R. Civ. P. 23(a) and 23(b)(1) and (b)(2). Those requirements are addressed briefly here.

### A.    Rule 23(A)

#### 1.    Numerosity

The Class as defined easily meets Rule 23(a)'s numerosity requirement. The Class includes over 10,000 Class Members. Settlement Agreement, Appendix 1.  Joinder is simply a logistical impossibility. *See, e.g., Gorsey v. I.M. Simon & Co*., 121 F.R.D. 135, 138 (D. Mass. 1988) (800 to 900 member class made joinder impracticable). Indeed, "[no] minimum number of plaintiffs is required to maintain a suit as a class action, but generally if the named plaintiff demonstrates that the potential number of plaintiffs exceeds 40, the first prong of Rule 23(a) has been met." *Garcia– Rubiera v. Calderon,* 570 F.3d 443, 460 (1st Cir. 2009).

#### 2.    Commonality

To meet the commonality requirement, the representative plaintiff is required to demonstrate that the proposed class members "have suffered the same injury." *Wal-Mart Stores, Inc. v. Dukes*, 131 S. Ct. 2541, 2551 (2011) (quoting *Gen. Tel. Co. of Sw. v. Falcon*, 457 U.S. 147, 157 (1982)). In other words, commonality requires that the claims of the class "depend upon a common contention . . . of such a nature that it is capable of class-wide resolution—which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke." *Id*. Even so, "commonality is a low hurdle." *Southern States Police Benevolent Ass'n v. First Choice Armor & Equip., Inc.,* 241 F.R.D. 85, 87 (D. Mass. 2007)). The questions of law and fact in this litigation are substantially identical among Class Members, namely, whether Raytheon's benefit calculation formulae failed to ensure that participants who selected JSAs and PSA would receive benefits that were actuarially equivalent to the SLA they could have selected. *See, e.g*., *Duhaime v. John Hancock Mutual Life Ins. Co.*, 177 F.R.D. 54, 63 (D. Mass. 1997) (each class member treated in similar manner); *Kaminiski v. Shawmut Credit Union*, 416 F. Supp. 1119, 1122–23 (D. Mass. 1976) (same).

### 3.      Typicality

"Generally speaking, typicality determines whether a sufficient relationship exists between the injury to the named plaintiff and the conduct affecting the class," and the "plaintiff's interests are 'aligned with those of the represented group.'" *Newberg* (5th ed.), § 3.29, at pp. 264–65. To be typical within the meaning of Rule 23 simply requires "that the named plaintiffs' claims arise from the same event or practice or course of conduct that gives rise to the claims of other class members, and are based on the same legal theory." *Walker v. Osterman Propane LLC,* 411 F. Supp. 3d 100, 111 (D. Mass. 2019). "Further, Rule 23(a)(3) tolerates even significant differences between the named plaintiff and the proposed class members as long as the named plaintiff's experience is 'reasonably coextensive' with the experiences of the rest of the class." *Ouadani v. Dynamex Operations E., LLC,* 405 F. Supp. 3d 149, 162 (D. Mass. 2019) (quoting *DaSilva v. Border Transfer of MA, Inc.,* 296 F. Supp. 3d 389, 405 (D. Mass. 2017)).

Plaintiff's claims are typical of those of Class Members and therefore meet Rule 23(a)'s typicality requirement. Like the claims of all Class Members, Plaintiff's claims arise from the allegations that Raytheon caused retirees to lose part of their vested retirement benefits by not offering benefits that are actuarially equivalent to a single life annuity.

It does not matter, for purposes of Rule 23, that applying the revised conversion factor will not increase the monthly pension payments for some Class Members.[17] The Class is defined to include those individuals who could have been harmed by Defendants' use of outdated mortality and interest rate assumptions when calculating their conversion factors and, ultimately, monthly

---

[17] This fact also does not affect standing, which is determined based on the class representative having been harmed. *In re Prudential Ins. Co. Am. Sales Practice Litig. Agent Actions,* 148 F.3d 283, 306–07 (3d Cir. 1998) (quoting 1 Newberg on Class Action §2.05 (3d ed. 1992); see also 1 Newberg on Class Actions § 2:7 (4th ed. 2008). The Class Representative's harm is established for purposes of standing. Serota Report, ECF 61-8, at ¶ 110.

pension payments. For some Class Members, their monthly payments have always been at least actuarially equivalent to the payments they would be entitled to using a reasonable conversation factor and, therefore, they would not individually have a claim.  There is no requirement that *every* member of a class must have been injured.  *In re Nexium Antitrust Litig.,* 777 F.3d 9, 23 (1st Cir. 2015); *accord, Messner v. Northshore Univ. HealthSystem*, 669 F.3d 802, 823 (7th Cir. 2012).

Class certification has been reviewed and upheld even after a determination that some members of the Class benefitted from defendants' failure to properly calculate pension benefits. *Amara v. Cigna Corp*., 775 F.3d 510 (2d Cir. 2014). In *Amara*, after trial, the Court ordered a defined benefit plan reformed in a way that would increase benefits for some, but not all, Class members. *Amara v. Cigna Corp.,* 775 F.3d 510 (2d Cir. 2014). Following that decision, the defendants moved to decertify the class, arguing that certain class members would be entitled to lower benefits under the reformed calculations. The Second Circuit rejected that argument because class members were "entitled to receive the difference in the value" between what they received and what they were entitled to under the reformed calculation — "payback of received benefits is not required." *Id*. at 521.

### 4.    Adequacy of Representation

Rule 23(a)(4) requires that plaintiff will fairly and adequately protect the interests of the class.  This requires a determination that, first, "the interests of the representative party will not conflict with the interests of any of the class members, and second, that counsel chosen by the representative party is qualified, experienced and able to vigorously conduct the proposed litigation." *Ouadani,* 405 F. Supp. 3d at 163 (quoting *Andrews v. Bechtel Power Corp.,* 780 F.2d 124, 130 (1st Cir. 1985).

Plaintiff has no interests that are antagonistic to or in conflict with the Class. *See Amchem Products v. Windsor*, 521 U.S. 591, 117 S. Ct. 2231, 2251 (1997) (courts look simply at whether

31

the representatives' interests are in any way antagonistic to or in conflict with those of the class members). To be disqualifying, any conflict must involve the subject matter of the suit and may not be merely minor or collateral. *Berman v. Narragansett Racing Ass'n, Inc.*, 414 F.2d 311, 317 (1st Cir. 1969), *cert. denied* 369 U.S. 1037. Where the injuries suffered by the named plaintiff are the same as those that the class is alleged to have suffered, the adequacy requirement is usually satisfied. *Duhaime v. John Hancock Mutual Life Ins. Co.,* 177 F.R.D. 54, 63 (D. Mass. 1997). Plaintiff has also retained qualified, experienced counsel to prosecute the litigation. *See infra* Section VI.D (discussing appointing of Class Counsel under Rule 23(g)).

A participant in an ERISA plan bringing an action concerning multiple plans is an adequate representative "as long as the gravamen of the plaintiff's challenges is to the general practices of the defendant which affect all of the plans." *Alves v. Harvard Pilgrim Health Care Inc*., 204 F. Supp. 2d 198, 205 (D. Mass. 2002) (quoting *Fallick v. Nationwide Mut. Ins. Co*., 162 F.3d 410, 422 (6th Cir. 1998)), *see also Bertella v. JetDirect Aviation, Inc*., No. 09-10527, 2010 WL 4103664, at *3 (D. Mass. Oct. 19, 2010). Thus, while Plaintiff Cruz was only a participant in ***one*** of the Covered Plans, he is a more than adequate representative of ***all*** of the Plans with respect to the claims made in this case. While the different Plans did not all use the same conversion factors or actuarial assumptions, the outdated formulas used by each Plan failed to ensure that JSA and PSA benefits were at least the actuarial equivalent of the SLAs the Plaintiffs could have selected.

### B.      Rule 23(B)(1)

As noted above, a class that meets all of the requirements of Rule 23(a)(1)-(4) may be certified if it satisfies ***one*** of the three subdivisions of Rule 23(b). *Amchem*, 521 U.S. at 614. Here, the Class may be certified under either subsection of Rule 23(b)(1). That Rule provides for certification where:

> the prosecution of separate actions by … individual members of the class

> would create a risk of (A) inconsistent or varying adjudications … which would establish incompatible standards for the party opposing the class, or (B) adjudications with respect to the individual members of the class which would be dispositive of the interest of the other members not parties to the adjudications.

Fed. R. Civ. P. 23(b)(1). Rule 23(b)(1)(A) "considers possible prejudice to the defendants, while 23(b)(1)(B) looks to possible prejudice to the putative class members." *In re Glob. Crossing Sec. and ERISA Litig.* 225 F.R.D. 436, 453 (S.D.N.Y. 2004). In both cases, the court is concerned with the problems that would be caused if each class member pursued his or her own lawsuit.

Rule 23(b)(1)(A) covers class action suits in which the defendant is "obligated by law to treat the members of the class alike . . . or where the [defendant] must treat all alike as a matter of practical necessity." *Amchem Prods. , Inc. v. Windsor,* 521 U.S. 591, 614 (1997). Here, the very purpose of ERISA is to "provide a uniform regulatory regime over employee benefit plans." *Aetna Health Inc. v. Davila*, 542 U.S. 200, 208 (2004). As part of that regime, ERISA requires that plan provisions be "applied consistently with respect to similarly situated claimants." 29 C.F.R. § 2560.503-1(b)(5). Accordingly, numerous courts have found that cases seeking to require recalculation or adjustment of benefits under an ERISA plan may be certified under Rule 23(b)(1).

> The Court can envision few better scenarios for certification under (b)(1)(A) or (b)(1)(B). As a fiduciary, Group Health is bound to follow the terms of the Plan. 29 U.S.C. § 1104(a)(1)(D). Moreover, ERISA requires that, "where appropriate," plan provisions must be "applied consistently with respect to similarly situated claimants." 29 C.F.R. § 2560.503–1(b)(5). Thus, were this Court to find that the Plan requires Defendants to act in a certain fashion, ERISA would require Group Health to act in a similar fashion toward all beneficiaries—the quintessential (b)(1)(B) scenario. And if another court were to interpret the Plan differently, it would trap Defendants in the inescapable legal quagmire of not being able to comply with one such judgment without violating the terms of another—a truly unwinnable position that (b)(1)(A) was enacted to remedy.

*Z.D. ex rel. J.D. v. Grp. Health Co-op.,* No. 11-1119, 2012 WL 1977962, at *7 (W.D. Wash. June 1, 2012) (internal citation and quotation omitted); *accord, West v. Cont'l Auto., Inc.,* No. 3:16-502, 2017 WL 2470633, at *3 (W.D.N.C. June 7, 2017) ("ERISA cases in which plaintiffs challenge

the computation of benefits are often certified under rule 23(b)(1)") (citing cases); *Pender v. Bank of Am. Corp.,* 269 F.R.D. 589, 598–99 (W.D.N.C. 2010) (same).[18]

Plaintiff is seeking to amend the Plans to require that all Class Members are receiving JSA and PSA benefits that satisfy the actuarial equivalence requirements under Section 205 of ERISA. The risk of establishing inconsistent standards under ERISA is particularly strong here, where the formulas for calculating JSA and PSA benefits are set out in the Plan documents.  Rev. Rul. 79-90, 1979-1 C.B. 155 (1979), specifically states that wherever any plan benefit calculations require the use of actuarial assumptions, "the assumptions to be used must be specified within the plan in a manner which precludes employer discretion."  And, as discussed above, 29 C.F.R. § 2560.503–1(b)(5) requires that such plan provisions be applied in a consistent fashion.  In the absence of class certification, Defendants facing multiple individual suits might be subject to incompatible rulings that would require them to apply the same plan terms in different ways for individual plan participants and beneficiaries.

Class certification is also appropriate under Rule 23(b)(1)(B).  *See Jones v. NovaStar Fin., Inc.,* 257 F.R.D. 181, 193 (W.D. Mo. 2009) ("Several courts have certified classes alleging breaches of ERISA fiduciary duties under  Rule 23(b)(1)(B)").  Because this action requires Plan amendments, it "will  influence a subsequent adjudication of the same claims brought by another

---

[18] *See also Meidl v. Aetna, Inc.,* No. 15-1319, 2017 WL 1831916, at *18 (D. Conn. May 4, 2017) (requirements of Rule 23(b)(1)(A) satisfied "because multiple putative class members share the same ERISA-governed insurance plan, because Aetna applied the same CPB to all putative class members, and because regulations call for consistent application of each plan's provisions"); *Mezyk v. U.S. Bank Pension Plan*, No. 3:09-384, 2012 WL 2913213, at *2 (S.D. Ill. July 16, 2012) (Rule 23(b)(1) satisfied where "prosecution of separate actions would establish incompatible standards of conduct for Defendants regarding . . . computation of pension benefits for all similarly situated participants"); *In re Citigroup Pension Plan ERISA Litig.,* 241 F.R.D. 172, 179–80 (S.D.N.Y. 2006) ("The language of subdivision (b)(1)(A), addressing the risk of "inconsistent adjudications," speaks directly to ERISA suits, because the defendants have a statutory obligation, as well as a fiduciary responsibility, to treat the members of the class alike.") (internal quotation omitted).

34

participant and . . . could effectively dispose of the other participants' actions on behalf of the Plan." *Krueger v. Ameriprise Fin., Inc.,* 304 F.R.D. 559, 577 (D. Minn. 2014).  Moreover, because "plaintiffs' claims seek 'plan-wide relief, there is a risk that failure to certify the class would leave future plaintiffs without relief.'" *Zilhaver v. UnitedHealth Grp., Inc.*, 646 F. Supp. 2d 1075, 1081 (D. Minn. 2009) (quoting *Jones*, 257 F.R.D. at 193).

### C.      Rule 23(B)(2)

Rule 23(b)(2) certification is appropriate where "the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole." Fed. R. Civ. P. 23(b)(2).  Here, the Covered Plans failed to ensure that JSA and PSA benefits were actuarially equivalent to SLAs, a failure that was common to all members of the Class, and one which can be remedied by reformation and recalculation of benefits.

Plaintiff also sought to have Class Member benefits increase in accordance with the reformed plans.  Such monetary relief is appropriate for a Rule 23(b)(2) class because it is "incidental" to the requested injunctive relief.  As the Second Circuit held in a case involving retroactive reformation of a pension plan, "incidental monetary relief may be sought on a class-wide basis pursuant to Rule 23(b)(2) . . . where it "flow[s] directly from liability to the class *as a whole* from claims forming the basis of . . . injunctive or declaratory relief." *Amara v. CIGNA Corp.,* 775 F.3d 510, 519–20 (2d Cir. 2014) (citing *Allison v. Citgo Petroleum Corp.,* 151 F.3d 402, 415 (5th Cir.1998) and *Johnson v. Meriter Health Servs. Emp. Ret. Plan,* 702 F.3d 364, 371 (7th Cir. 2012)). As the Seventh Circuit explained in *Johnson,* reformation in this context is essentially "a declaration of the rights that the plan confers and an injunction ordering [the defendant] to conform the text of the plan to the declaration." 702 F.3d at 371.  Monetary relief

that flows from the injunction does not defeat a 23(b)(2) class if it is "mechanical, formulaic, a task not for a trier of fact but for a computer program." *Id.* at 372.[19] That reasoning is sound. Historically, reformation is "a way station, a precursor to some other and final remedy." 1 Dan B. Dobbs, *Law of Remedies* § 4.3(7) at 618 (2d ed.1993); *see* 4 John Norton Pomeroy, *Equity Jurisprudence and Equitable Remedies* § 1375 (1905).

The Class here is well suited to certification under Rule 23(b)(2).  The Settlement proposes to amend the Covered Plans to ensure Class Members' receipt of actuarially equivalent benefits. Pursuant to the terms of the Plans, as amended, Defendants will recalculate Class Member benefits by running a program.  This is "mechanical, formulaic, a task not for a trier of fact but for a computer program." *Johnson,* 702 F.3d at 372.

### D.      Rule 23(G)

A class certification order must "appoint class counsel under Fed. R. Civ. P. 23(g)." *Garcia v. E.J. Amusements of New Hampshire, Inc.,* 98 F. Supp. 3d 277, 292 (D. Mass. 2015) (quoting Fed. R. Civ. P. 23(c)(1)(B)).  Rule 23(g) directs courts to consider "the work counsel has done to identify or investigate potential claims; counsel's experience in complex actions, class actions, and

---

[19] This reasoning has been adopted by numerous courts.  *See, e.g., Baleja v. Northrop Grumman Space & Missions Sys. Corp.,* No. 17-235, 2020 WL 3213708, at *6 (C.D. Cal. Mar. 26, 2020) (citing *Johnson*); *Cunningham v. Wawa, Inc.,* 387 F. Supp. 3d 529, 544–45 (E.D. Pa. 2019) (certifying (b)(2) class where plaintiffs sought declaratory relief concerning their plan rights, an injunction requiring defendants to conform the text of the plan to the declaration, and monetary relief that "necessarily flows as a consequence of this equitable relief"); *Carter v. Arkema, Inc.,* No. 13-1241, 2018 WL 1613787, at *6 (W.D. Ky. Apr. 3, 2018) (certification under 23(b)(2) appropriate where "money that the subclass members ultimately receive will only be incidental to the Court's declaratory judgment reforming the plan"); *Rozo v. Principal Life Ins. Co.,* No. 14-463, 2017 WL 2292834, at *6 (S.D. Iowa May 12, 2017) (citing *Johnson* and holding that monetary relief that flowed from a class-wide injunction was appropriate for (b)(2) certification where it was "mechanical" and "formulaic"); *see also Mezyk v. U.S. Bank Pension Plan,* Nos. 09–384 and 10–696, 2011 WL 6729570 (S.D. Ill. Dec. 21, 2011); *Pender v. Bank of Am. Corp.,* 269 F.R.D. 589, 599 (W.D.N.C. 2010) ("declaratory relief would likely be a mere prelude to monetary relief, but that does not prevent Plaintiffs from maintaining their action under Rule 23(b)(2)").

similar cases; counsel's knowledge of the applicable law, and the resources that will be committed to the case." *Scott v. First Am. Title Ins. Co.,* No. 06-286, 2008 WL 4820498, at *2 (D.N.H. Nov. 5, 2008) (citing Fed. R. Civ. P. 23(g)).  These factors strongly support appointment of IKR and B&G as Class Counsel.

>    ***Proposed Class Counsel Thoroughly Investigated the Claims in the Case:***  This case required extensive investigation by proposed Class Counsel before the complaint was filed.  As discussed above, the legal research involved untested issues of statutory construction involving the text of ERISA and its amendment by Retirement Equity Act.  Counsel needed to understand how the detailed regulations for ERISA, the Retirement Equity Act and the Tax Code related to the determination of actuarial equivalence.  Moreover, Counsel had to work with an actuary to develop the factual foundation for the complaint.  Finally, proposed Class Counsel continued to refine the claims in the case through the briefings on the motions to dismiss, for summary judgment, and to exclude the testimony of Defendants' expert, as well as through fact and expert discovery.

>    ***Proposed Class Counsel Have Considerable Relevant Experience and Know the Applicable Law:***  As demonstrated by their attached firm resumes (Needham Decl., Exh. C; Porter Decl. Exh. A), IKR and B&G are among the leading firms in the country that handle nationwide ERISA class actions.  Together and separately, they have been appointed to represent plaintiffs in ERISA class actions in a multitude of cases.  *See, e.g., Nistra v. Reliance Tr. Co.,* No. 16-4773, 2018 WL 835341, at *5 (N.D. Ill. Feb. 13, 2018) (appointing B&G and IKR to represent plaintiffs in an ERISA class action); *Leber v. Citigroup 401(k) Plan Inv. Comm.,* 323 F.R.D. 145, 166 (S.D.N.Y. 2017) (appointing B&G co-counsel for an ERISA class, noting that "counsel and their respective firms have significant prior experience litigating ERISA class actions"); *In re Mercy Health ERISA Litig.,* No. 16-441, 2016 WL 8542891, at *2 (S.D. Ohio Dec. 2, 2016) (appointing

IKR co-lead counsel in a contested Rule 23(g) proceeding, noting the firm was "well-qualified to serve as class counsel in this complex ERISA matter"), *report and recommendation adopted,* No. 16-441, 2017 WL 1078589 (S.D. Ohio Mar. 21, 2017); *Harris v. Koenig,* 271 F.R.D. 383, 395 (D.D.C. 2010) (appointing B&G as co-counsel and noting its "extensive experience litigating ERISA class actions"). Moreover, proposed Class Counsel pioneered many of the issues involved in ERISA's "actuarial equivalence" requirements, and thus are uniquely qualified to represent the Class here. *See supra* ftn. 11 and cases cited therein.

*Proposed Class Counsel Have Committed Substantial Resources to the Litigation:* At this stage in the litigation, the record clearly establishes that B&G and IKR have committed the necessary resources to litigate the case aggressively. They have incurred over $325,000 in litigation expenses, primarily related to the development of crucial expert testimony, and have devoted over 1800 hours of time to the case. IKR and B&G recognize, moreover, that there is still considerable work to be done, including communications with Class Members, final approval of the Settlement, and review of all necessary calculations. The firms will provide the same resources and expertise to these remaining objectives as they have provided to date.

## VII.   CONCLUSION

The proposed class action Settlement Agreement is fair, reasonable, and adequate. For the foregoing reasons, the Plaintiff requests that this Court approve the Settlement Agreement on a preliminary basis so that Notice may be sent, schedule appropriate deadlines for various settlement requirements as reflected in the accompanying motion, and schedule a hearing for final approval of the Settlement.

Dated: February 12, 2021

/s/ Douglas P. Needham .
Douglas P. Needham, BBO No. 671018
Robert A. Izard (*pro hac vice*)
Mark P. Kindall (*pro hac vice*)
**IZARD, KINDALL & RAABE LLP**
29 South Main Street, Suite 305
West Hartford, CT 06107
(860) 493-6292
(860) 493-6290 fax
dneedham@ikrlaw.com
rizard@ikrlaw.com
mkindall@ikrlaw.com

Gregory Y. Porter (*pro hac vice*)
Mark G. Boyko (*pro hac vice*)
Alexandra L. Serber (*pro hac vice*)
**BAILEY & GLASSER LLP**
1055 Thomas Jefferson Street, NW, Suite 540
Washington, DC 20007
(202) 463-2101
(202) 463-2103 fax
gporter@baileyglasser.com
mboyko@baileyglasser.com
aserber@baileyglasser.com

*Attorneys for Plaintiff and the Class*

## CERTIFICATE OF SERVICE

I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic File (NEF) on February 12, 2021.


*/s/ Douglas P. Needham*
Douglas P. Needham