**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| Johnny Cruz, on behalf of himself and all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>Raytheon Company, Kelly B. Lappin, in her capacity as Plan Administrator for the Raytheon Company Pension Plan for Hourly Employees, the Raytheon Company Pension Plan for Salaried Employees, the Raytheon Non-Bargaining Retirement Plan, the Raytheon Bargaining Retirement Plan, and the Raytheon Retirement Plan for Engineers & Contractors, Inc. and Aircraft Credit Employees, and John/Jane Does 1-10,<br><br>Defendants. | Case No. 1:19-cv-11425-PBS |

# PLAINTIFF'S MEMORANDUM IN SUPPORT OF MOTION FOR FINAL APPROVAL OF CLASS SETTLEMENT

## TABLE OF CONTENTS


I. INTRODUCTION .......... 1

II. FACTUAL BACKGROUND .......... 2

A. Plaintiff's Complaint .......... 2

B. Motions Practice and Discovery .......... 3

C. Settlement Negotiations .......... 4

III. THE TERMS OF THE PROPOSED SETTLEMENT .......... 5

IV. ARGUMENT .......... 9

A. Standard And Process For Approval .......... 9

B. The Proposed Settlement Should Be Approved .......... 10

1. The Class Representative and Proposed Class Counsel Have Adequately Represented the Class .......... 10

2. The Proposed Settlement Was Negotiated at Arm's Length .......... 11

3. The Relief Provided for the Class is More Than Adequate .......... 13

a. The Costs, Risks, and Delay of Trial and Appeal .......... 13

b. The Effectiveness Of Distribution To The Settlement Class .......... 16

c. The Terms Of Any Proposed Award Of Attorneys' Fees, Including Timing Of Payment .......... 17

4. The Settlement Treats Class Members Equitably Relative to Each Other .......... 18

C. The Proposed Notice To Class Members Was Adequate .......... 19

V. THE COURT SHOULD CERTIFY THE CLASS .......... 19

CONCLUSION .......... 20

# TABLE OF AUTHORITIES

**Cases**

*Amara v. Cigna Corp.*, No. 01-2361, 2018 WL 6242496 (D. Conn. Nov. 29, 2018) .................. 17

*Amchem Products v. Windsor*, 521 U.S. 591 (1997) .................................................... 10

*Andrews v. Bechtel Power Corp.*,780 F.2d 124 (1st Cir. 1985) ............................................ 10

*Barnes v. FleetBoston Fin. Corp.*,
No. 01-10395, 2005 WL 8175898 (D. Mass. Dec. 22, 2005)........................................... 11

*Belknap v. Partners Healthcare Sys., Inc.*,
No. 19-11437, 2020 WL 4506162 (D. Mass. Aug. 5, 2020) ............................................ 11

*Bezdek v. Vibram USA Inc.*, 79 F. Supp. 3d 324 (D. Mass.)......................................................... 11

*Bezdek v. Vibram USA, Inc.*, 809 F.3d 78 (1st Cir. 2015) ..................................................... 11, 14

*Bussie v. Allmerica Fin. Corp.*, 50 F. Supp. 2d 59 (D. Mass. 1999) ..................................... 11, 17

*City P'ship Co. v. Atl. Acquisition Ltd. P'ship*, 100 F.3d 1041 (1st Cir. 1996)............................. 11

*Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579 (1993) ..................................................... 12

*Duffy v. Anheuser-Busch Companies, LLC*, 449 F. Supp. 3d 882 (E.D. Mo. 2020)..................... 11

*Duhaime v. John Hancock Mutual Life Ins. Co.*,177 F.R.D. 54 (D. Mass. 1997)........................ 10

*Figas v. Wells Fargo*, No. 08-4546, 2010 WL 2943155 (D. Minn. Apr. 6, 2010)....................... 15

*Herndon v. Huntington Ingalls Indus., Inc.*,
No. 19-52, 2020 WL 5809996 (E.D. Va. Sept. 29, 2020) ............................................ 2, 11

*Herndon v. Huntington Ingalls Indust. Inc.*,
No. 19-52, 2020 WL 5809965 (E.D. Va. Aug. 28, 2020)................................................ 11

*In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.*,
330 F.R.D. 11 (E.D.N.Y. 2019)........................................................................... 10

*In re Relafen Antitrust Litig.*, 231 F.R.D. 52 (D. Mass. 2005) .................................................... 14

*In re Tyco Int'l, Ltd. Multidistrict Litig.*, 535 F. Supp. 2d 249 (D.N.H. 2007)....................... 10, 15

*Kifafi v. Hilton Hotels Retirement Plan*, 999 F. Supp. 2d 88 (D. D.C. 2013) .............................. 17

*Medoff v. CVS Caremark Corp.*, No. 09-554, 2016 WL 632238 (D.R.I. Feb. 17, 2016)............. 10

*Nat'l Ass'n of Chain Drug Stores v. New England Carpenters Health Benefits Fund*, 582 F.3d 30 (1st Cir. 2009) .......... 14

*Nat'l Ass'n of Deaf v. Massachusetts Inst. of Tech.*, No. 15-30024, 2020 WL 1495903 (D. Mass. Mar. 27, 2020) .......... 10, 17, 19

*Phillips Petroleum Co. v. Shutts*, 472 U.S. 797 (1985) .......... 19

*Prince v. Eaton Vance Corp*., No. 18-12098, Dkt. 57 (D. Mass Sept. 24, 2019) .......... 15

*Richards-Donald v. Teachers Insurance and Annuity Ass'n of Amer*., No. 15-8040 Dkt. No. 55 (S.D.N.Y. Oct. 20, 2017) .......... 15

*Rolland v. Cellucci*, 191 F.R.D. 3 (D. Mass. 2000) .......... 11

*Sesto v. Prospect CharterCARE, LLC*, No. 18-328 , 2019 WL 4758161 (D.R.I. Sept. 30, 2019) .......... 11

*Sims v. BB&T Corp*., No. 15-732, 2019 WL 1993519 (M.D.N.C. May 6, 2019) .......... 15

*Smith v. Rockwell Automation, Inc.*, 438 F. Supp. 3d 912 (E.D. Wis. 2020) .......... 11

*Smith v. U.S. Bancorp,* No. 18-3405, 2019 WL 2644204 (D. Minn. June 27, 2019) .......... 11

*Torres v. Am. Airlines, Inc.,* 416 F. Supp. 3d 640 (N.D. Tex. 2019) .......... 11

*Tussey v. ABB, Inc*., 850 F.3d 951 (8th Cir. 2017) .......... 14

*Tussey v. ABB, Inc*., No. 06-4305, 2019 WL 3859763 (W.D. Mo. Aug. 16, 2019) .......... 14

*Urakhchin v. Allianz Asset Mgmt. of Amer., L.P.*, No. 15-1614, 2018 WL 8334858 (C.D. Cal. July 30, 2018) .......... 15

*Velazquez v. Massachusetts Fin. Services Co.*, No. 17-11249 Dkt. 108 (D. Mass Dec. 5, 2019) .......... 15

**Statutes**

Class Action Fairness Act ("CAFA") .......... 9

Employee Retirement Income Security Act of 1974 .......... 1, 3

ERISA § 205(d), 29 U.S.C. § 1055(d) .......... 2

ERISA § 205(e), 29 U.S.C. § 1055(e) .......... 2

ERISA § 205, 29 U.S.C. § 1055 .......... 1

**Rules**

Fed. R. Civ. P. 23(a) .......... 20

Fed. R. Civ. P. 23(a)(4) .......... 10

Fed. R. Civ. P. 23(b)(1) .......... 20

Fed. R. Civ. P. 23(b)(2) .......... 20

Fed. R. Civ. P. 23(c)(2) .......... 19

Fed. R. Civ. P. 23(e) .......... 9, 16

Fed. R. Civ. P. 23(e)(1)(B) .......... 19

Fed. R. Civ. P. 23(e)(2) .......... 10

Fed. R. Civ. P. 23(e)(2)(A) .......... 10

Fed. R. Civ. P. 23(e)(2)(C) .......... 13

Fed. R. Civ. P. 23(e)(2)(C)(i) .......... 13

Fed. R. Civ. P. 23(e)(2)(C)(iii) .......... 17

Fed. R. Civ. P. 23(e)(3) .......... 13

Fed. R. Civ. P. 23(g) .......... 20

Plaintiff Johnny Cruz, individually and on behalf of all other members of the Settlement Class, respectfully moves for final approval of the Settlement Agreement, which will resolve all claims against Defendants (collectively "Raytheon") in the above-captioned case. Plaintiff requests that the Court: (i) grant final approval of the Settlement; (ii) grant final certification of the Class for settlement purposes; (iii) find that notice to the Class satisfied due process; and (iv) enter the proposed Order for Final Judgment and Dismissal with Prejudice of this Action.

## I. INTRODUCTION

The proposed Settlement is an excellent result for the Class. It will increase Class Members' monthly pension benefits by 40 percent of their damages (less attorneys' fees and expenses), based on the damages methodology set out in the litigation report of Plaintiff's actuarial expert. The present value of the proposed Settlement is $59.17 million.

This case concerns Plaintiff's claim that certain Raytheon retirement plans (the "Covered Plans)[1] failed to comply with ERISA's actuarial equivalence requirements with respect to payments of Joint and Survivor Annuities ("JSA"), which provide benefits for the life of a participant and beneficiary, and Pre-Retirement Survivor Annuities ("PSA"), which provide benefits for surviving spouses of participants who die prior to retirement.

The settlement is outstanding in light of the substantial litigation risk. Plaintiff's legal theory is both cutting-edge and complex. It has not been litigated to judgment in any case and there are no appellate decisions on point. Only one case has proceeded through summary judgment.[2]

---

[1] The Covered Plans are the Raytheon Retirement Plan for Engineers & Contractors, Inc. and Aircraft Credit Employees ("RE&C Plan"); the Raytheon Bargaining Retirement Plan ("Bargaining Plan"); the Raytheon Company Pension Plan for Hourly Employees ("Hourly Plan"); the Raytheon Company Pension Plan for Salaried Employees ("Salaried Plan"); and the Raytheon Non-Bargaining Retirement Plan ("Non-Bargaining Plan"). *See* Settlement Agreement, § I.S.

[2] *See Herndon v. Huntington Ingalls Indus., Inc.*, No. 19-52, 2020 WL 5809996 (E.D. Va. Sept. 29, 2020).

Moreover, Defendants vigorously disputed the actuarial assumptions selected by Plaintiff's expert through their own expert witness, who opined that formulas used by the Covered Plans were entirely appropriate. Success at trial would depend on Plaintiff winning a "battle of the experts" in a highly technical field. For these reasons, and others discussed below, the Settlement is fair, reasonable and adequate, and Plaintiff requests that the Court grant this motion.

## II. FACTUAL BACKGROUND

### A. Plaintiff's Complaint

The Complaint alleges that the Covered Plans' JSAs were not actuarially equivalent to the single-life annuities ("SLAs") participants could have taken when they retired, and the PSAs did not provide the survivorship portion of a hypothetical JSA that was "actuarially equivalent" to the SLA the participant could have selected had the participant lived.[3] Dkt. 1, ¶¶ 19–22 (citing ERISA Section 205(d) and (e), 29 U.S.C. §§ 1055(d) and (e)). Two benefit forms are "actuarially equivalent" when they have the same present value, so long as the present values of both benefits are calculated using the same, reasonable actuarial assumptions. Dkt. 1, ¶¶ 27–30.

The actuarial assumptions used to calculate present values for purposes of determining actuarial equivalence involve mortality and interest rates. Needham Decl., ¶ 5. Mortality assumptions, which are generally based on a mortality table, estimate how many benefit payments will be made, based on the ages of the participant and (in the case of JSAs), the beneficiary. *Id.* Interest rate assumptions discount the value of expected future payments to present value. *Id.* When payments under one benefit option are likely to extend longer than those under another

[3] The annuities that must be actuarially equivalent to the SLA are the plan's "Qualified Joint and Survivor Annuity" (the "QJSA"), Qualified Optional Survivor Annuities ("QOSAs") and Qualified Pre-Retirement Survivor Annuities ("QPSAs"). *See* ERISA §205(d) and (e), 29 U.S.C. § 1055(d) and (e); *see also* Declaration of Douglas P. Needham ("Needham Decl."), ¶ 4.

option, the monthly payments under the first option will be lower to account for the likelihood that more payments will be made. But the present values of those two streams of benefits must be the same to satisfy actuarial equivalence.

The Complaint alleges that Raytheon calculated Class Members' JSA and PSA benefits using outdated mortality and interest rate assumptions (or conversion factors based on outdated mortality and interest rate assumptions),[4] which caused benefit payments to be less than an "actuarially equivalent" amount. Dkt. 1, ¶¶ 1, 84, 89; *see also* Needham Decl., ¶ 5. In other words, the present values of Class Members' JSA and PSA benefits generally were less than what they were entitled to pursuant to ERISA's actuarial equivalence requirements. *Id.*

### B. Motions Practice and Discovery

On September 9, 2019, Defendants filed a Motion to Dismiss the Complaint. Dkt. 7. Plaintiff opposed Defendants' motion on September 30, 2019 (Dkt. 19), and Defendants filed a reply memorandum on October 18, 2019 (Dkt. 22). On December 9, 2019, the Court held a hearing on Defendants' motion to dismiss (Dkt. 26) and denied the motion on January 17, 2020. Dkt. 28.

On February 3, 2020, the Court entered a Scheduling Order identifying as a "threshold issue. . . . the question of whether the .90 conversion factor used" to calculate Mr. Cruz's JSA violated ERISA's actuarial equivalence requirement. Dkt. 34. Pursuant to the Scheduling Order, the Parties engaged in fact and expert discovery, including Defendants' production of thousands

---

[4] Plans can convert the monthly amount of SLAs to alternative forms of benefits by (1) specifying the actuarial assumptions that will be used (e.g., "the RP-2014 Mortality Table and a 3% interest rate"), (2) designating external sources for these assumptions that change over time (e.g., "the Mortality Table and interest rate designated by the Secretary of the Treasury to calculate lump-sum benefits"), or (3) specifying the "conversion factors" that are to be used to calculate alternative forms of benefits. For example, Plaintiff Cruz's plan used a 0.9 conversion factor to calculate JSAs, meaning that his monthly JSA benefit was 90% of what he would have received if he had selected an SLA. Critically, regardless of the methodology set forth in a plan, ERISA requires that alternative forms of benefits satisfy the statutory scheme's actuarial equivalence requirements.

of pages of documents, the exchange of expert reports and depositions of the Parties' respective actuarial experts. Dkt. 34. The Parties then moved for summary judgment and filed supporting and opposition briefs. Dkts. 49, 54, 62 & 64. Plaintiff also moved to exclude the testimony of Defendants' expert, Thomas Terry. Dkt. 53.

### C. Settlement Negotiations

While the motions were pending, the parties engaged in settlement negotiations. Needham Decl., ¶ 11. Initial discussions began in September of 2020 and continued over several months through teleconferences, conference calls, and written communications. The Parties debated the strengths and weaknesses of the case and exchanged multiple settlement proposals. *Id.*

The Parties reached agreement in principle on November 16, 2020 that Class Members would recover 40% of total calculated benefit shortfall both for past and future benefit payments, less any amounts awarded by the Court for attorneys' fees and expenses, as well as any case contribution award for the lead plaintiff. *Id.*, ¶ 12. The Parties informed the Court of this development during a November 19, 2020 conference. Dkt. 68. The Court set a January 27, 2021 hearing date to consider a Motion for Preliminary Approval. Dkt. 69.

The parties next negotiated a Term Sheet that reduced to writing the essential terms of the proposed Settlement. Needham Decl., ¶ 13. In the Term Sheet, which the Parties finalized on November 23, 2020, Defendants agreed to provide data necessary for Plaintiff's actuarial expert to review and opine on the damages calculations generated by applying the terms of the Settlement to the information maintained by the Covered Plans for each individual Class Member. *Id.*

Plaintiff's experts reviewed and analyzed the data provided by Defendants in accordance with the Term Sheet, and the Parties had several rounds of communications to refine the data to ensure that the Parties' respective experts agreed on the calculations. *Id.*, ¶ 14. The Parties also

began to negotiate the text of the detailed Settlement Agreement, which was finalized and executed on February 12, 2021; a copy is attached to the Needham Declaration as Exhibit A. *Id.*, ¶ 15.

On February 12, 2021, Plaintiff filed an unopposed motion for preliminary approval of the Settlement. Dkt. 76. The Court granted the motion on February 23, 2021, and entered an order: (i) preliminarily approving the Settlement; (ii) preliminarily certifying a non-opt-out class and appointing Plaintiff as class representative and his counsel as class counsel; (iii) approving the form and manner of notice; and (iv) setting a final approval hearing for June 2, 2021. Dkt. 79.

## III. THE TERMS OF THE PROPOSED SETTLEMENT

The material terms of the Agreement are summarized below:

(1) **Settlement Class***:* The Settlement Class is a non-opt out class defined as:

> (1) each participant in a Covered Plan who began receiving a JSA from such Covered Plan as of June 27, 2013 or later, and who received a monthly payment of that JSA benefit from such Covered Plan in December 2020 ("Participant Class Members"); (2) each beneficiary of a participant in a Covered Plan, where such participant began receiving a JSA from such Covered Plan as of June 27, 2013 or later and such beneficiary received a monthly payment of the survivor component of such JSA from such Covered Plan in December 2020 ("Beneficiary Class Members"); and (3) each surviving spouse of a participant in a Covered Plan, where such participant died on or after June 27, 2013, before the participant began to receive benefits from such Covered Plan, and such surviving spouse received a monthly payment of a PSA from such Covered Plan in December 2020 ("Surviving Spouse Class Members").

Settlement Agreement, § I.M.

(2) **Increased Benefit Payments**. The Plans will be amended and the benefits of participants or beneficiaries who were injured under Plaintiff's theory of the case will receive an increase to their future benefit payments. *Id.*, § III.B. The amendment is intended to provide Class Members with an increase in their benefit payments equal to 40 percent of the calculated shortfall in their past and future benefit payments, less any amounts awarded by the Court for attorneys' fees, expenses, and any case contribution award. *Id.*, § III.A. The shortfall calculation

uses the methodology for selecting actuarial assumptions set out in the expert report by Dr. Mitchell I. Serota (the "Serota Report") that Plaintiff filed in support of his Motion for Summary Judgment and his Motion to Exclude Testimony. Dkt. 61-8.[5] The steps required for this calculation are as follows:

(a) ***Calculating the Monthly Benefit Shortfall:*** Defendants' database shows the amount that each Class Member is receiving in benefits each month, and the form of benefit (JSA or PSA) that each Class Member is receiving. Based on that data, and on the terms of each of the Covered Plans related to the calculation of this form of benefit, Defendants have determined the amount of the SLA that Class Members (or, as relevant, the deceased plan participant associated with the Class Member) would have been entitled to at the time that they began to receive benefits. In the first step of the Settlement calculation, the amount of the SLA calculated by Defendants is converted to the form of benefit that each Class Member is receiving using the Serota Assumptions. If the JSA or PSA calculated with the Serota Assumptions is greater than the Class Members' current monthly benefit, the difference between the two amounts — the "Monthly Shortfall" — is used as the first input in the calculation of additional benefits under the Settlement. Settlement Agreement, §§ III.D.1.a.2, III.D.2.a.3 and III.D.3.a.1.[6]

(b) ***Calculating the Adjustment for Past Benefit Shortfalls:*** Although the Settlement Agreement only affects monthly benefit payments that will be made in the future, it ensures that Class Members are treated fairly regardless of whether they retired at the beginning or the end of the Class Period. This is done by aggregating each Class Member's Monthly Shortfall prior to December 31, 2020, with interest to December 31, 2020. The total amount of this past shortfall is then annuitized into monthly payments for the projected period of the JSA and PSA benefits using the Serota

---

[5] Serota's preferred actuarial assumptions (the "Serota Assumptions"), as set forth in his Report, were: (a) the mortality table in Raytheon's 715 Report (blended 50% male and 50% female) for the year ending before the Class Member retired; and (b) the discount rate based on the FTSE Above-Median Index (which closely tracks the rates in Raytheon's 715 reports for the Class Member's plan) for the December 31 prior to each Class Member's retirement. Serota Report, Dkt. 61-8, ¶ 102; *See also* Declaration of Mitchell I. Serota ("Serota Decl.") attached to the Needham Decl. as Exhibit B, ¶¶ 5–8.

[6] For a variety of reasons related to the interplay of the actuarial assumptions and the fact that some of the Plans, like Plaintiff's, used the same conversion factors regardless of the age at which participants retired, some Class Members are currently receiving more than what would be considered an actuarial equivalent benefit. This could happen, for example, where employees retired late and/or their beneficiaries were significantly younger. *See* Serota Decl., ¶ 16. Under the Settlement Agreement, Class Members will receive the ***greater*** of their current benefit amount or the amount recalculated in accordance with the Settlement Agreement. No Class Member will suffer a reduction in benefits. *See* Settlement Agreement, Exhibit B, § VI.A; Needham Decl., ¶ 21.

Assumptions.[7] In other words, the past shortfall amount is converted into future monthly payments using the actuarial assumptions that Plaintiffs' expert considers reasonable. The amount of these monthly payments, the "Additional Prospective Increase," is added to each Class Member's Monthly Shortfall. *Id.*, § III.D.4.

(c) ***Applying the Percentage Reduction:*** The Monthly Shortfall and the Additional Prospective Increase are both multiplied by 0.40 to reflect litigation risk, uncertainty and delay (the "Reduction Factor"). The result is the Gross Benefit Increase ("GBI"). Settlement Agreement, §§ III.D.1-4.

(d) ***Adjust for Court Award of Attorneys' Fees, Expenses and the Case Contribution Award:*** The final step in the calculation is to apply a percentage adjustment to each Class Member's GBI that is equal to the percentage of the Settlement's present value that the Court awards as attorneys' fees, expenses and case contribution award to Lead Plaintiff, if any. The GBI less this adjustment represents each Class Member's Net Benefit Increase ("NBI") — that is, the amount that their monthly benefits checks will increase. Settlement Agreement, §§ III.D.5.

**Example**: Plaintiff Cruz retired on November 1, 2015 and began receiving his pension benefits in the form of a 50% JSA that pays $1,021.33 each month. *See* Serota Decl., ¶ 24. The SLA that he could have selected when he retired would have paid $1,135.82 each month. *Id.*, ¶ 7. Using the Serota Assumptions to convert the $1,135.34 SLA, the 50% JSA would pay $1,066.31 each month. *Id.* Cruz's ***Monthly Shortfall*** — the difference between the 1,066.31 JSA calculated with the Serota Assumptions and the 1,021.33 JSA Cruz currently receives — is $44.98. *Id.*, ¶ 24.

With respect to the adjustment for past benefit payments, as of December 31, 2020, Cruz had received 62 benefit payments; the total shortfall over that period ($44.98 x 62 months) was $2,788.76. *Id.*, ¶ 25. Adding interest of 2.82%, Cruz's Past Shortfall Amount as of January 1, 2021 was $3,005.42. *Id.* Based on the current ages of Cruz and his wife and using the Serota Assumptions to annuitize the $3,005.42 Past Shortfall Amount, Cruz's ***Additional Prospective***

[7] The Serota Assumptions applicable to this step were based on the calculations done at the time that the Settlement was negotiated: the FTSE Above-Median Index rate of 2.82 percent coupled with the mortality rate assumptions in Raytheon's 715 Report for the year ending December 31, 2019, using a 50/50 gender blend. *See* Serota Decl., ¶ 13.

***Increase*** to future benefit payments is $13.00. *Id*.

The sum of Cruz's ***Monthly Shortall*** and his ***Additional Prospective Increase*** is $57.98. Applying the ***Reduction Factor*** of 40%, Cruz's ***GBI*** would be $23.19. *Id.* The present value of Cruz's GBI is $13,012. *Id.* If the Court were to award the amounts that Plaintiff has requested for Attorneys' fees, expenses, and the Case Contribution Award, which is approximately 15.04% of the present value of the Settlement, Cruz's benefit would be decreased by the same percentage. Plaintiff's NBI would be $19.70 ($23.19 x 84.96%), and his monthly benefits check would be increased by this amount.[8]

The ***average*** Class Member's net benefit increase under the Settlement, assuming the Court grants the full amount of Plaintiff's request for fees, expenses and a Case Contribution Award, is $21.40 each month. Needham Decl. ¶ 19. The present value of the average Class Member's net benefit under the Settlement is $4,737. *Id.*

(3) **Release**: Plaintiff and Class Members shall provide Defendants (and related parties) with a release of all claims arising on or before December 31, 2020 (1) that were brought, or could have been brought, arising out of or relating to the allegations in the Complaint, or (2) relating to the actuarial assumptions or factors used by the Covered Plans to calculate benefits. Notwithstanding the foregoing, the Settlement will not release individual claims by absent Class Members that are not related to conversion of a single-life annuity to a joint and survivor annuity or a preretirement survivor annuity. Settlement Agreement, § IV.A.

(4) **Identification of Class Members**: Class Members were identified using the Plans'

[8] The Settlement uses January 1, 2021 as the calculation date, and provides that Class Members will receive a lump-sum payment equal to the total amount of their net monthly benefit increase multiplied by the number of benefit payments they received from January 1, 2021 until the date that the begin receiving their new benefit amounts. Settlement Agreement, §§ III.D.

records, which show over 10,000 retirees in the Class. *See* Settlement Agreement, Appendix 1.

(5) **Notice and Administration**: Defendants agreed to pay for and provide notice to the Class and to governmental entities required under the Class Action Fairness Act ("CAFA"). Settlement Agreement, § II.B.1.

(6) **Attorneys' Fees and Expenses**: The Settlement Agreement provides that proposed Class Counsel Izard, Kindall & Raabe, LLP ("IKR") and Bailey & Glasser, LLP ("B&G") will request that this Court award attorneys' fees, plus expert and other litigation expenses in an amount not to exceed $8.9 million. Settlement Agreement, § II.B.2. The Settlement expressly provides that the Settlement is not conditioned upon the Court approving the requested amounts for fees, expenses or the Case Contribution Award. *Id.*, § II.B.3; *see* Needham Decl., ¶ 20.

(7) **Case Contribution Award**: The Settlement Agreement provides that proposed Class Counsel intends to request that the Court award a case contribution award to Mr. Cruz of up to $10,000. *Id.*, § II.F. That amount would reduce the amount Plaintiff may seek for attorney's fees and expenses. *Id.*

## IV. ARGUMENT

### A. Standard And Process For Approval

Fed. R. Civ. P. 23(e) requires court approval of a class action settlement. As this Court recently summarized,

> The factors by which a proposed settlement is judged are whether: (i) the class representatives and class counsel adequately represented the class; (ii) the proposed settlement was negotiated at arm's length; (iii) the relief obtained for the class is adequate; and (iv) the proposed settlement treats class members equitably relative to each other.

*Nat'l Ass'n of Deaf v. Massachusetts Inst. of Tech.* ("NAD"), No. 15-30024, 2020 WL 1495903, at *3 (D. Mass. Mar. 27, 2020) (citing Fed. R. Civ. P. 23(e)(2)). "The court performs this analysis in the shadow of the 'strong public policy in favor of settlements,' (internal quotations omitted),

particularly in class action litigation." *Medoff v. CVS Caremark Corp.*, No. 09-554, 2016 WL 632238, at *5 (D.R.I. Feb. 17, 2016) (citing *In re Tyco Int'l, Ltd. Multidistrict Litig.*, 535 F. Supp. 2d 249, 259 (D.N.H. 2007).

### B. The Proposed Settlement Should Be Approved

#### 1. The Class Representative and Proposed Class Counsel Have Adequately Represented the Class

The adequacy determination under Rule 23(e)(2)(A) looks to whether "the interests of the class representatives do not conflict with the interests of any of the class members . . . and that Plaintiffs' counsel are qualified and experienced and provided vigorous representation during the course of the case." *NAD*, 2020 WL 1495903, at *3 (citing *Andrews v. Bechtel Power Corp.*, 780 F.2d 124, 130 (1st Cir. 1985)). In citing *Andrews*, the *NAD* court expressly linked the adequate representation inquiry under Rule 23(e)(2)(A) to the adequacy inquiry required for class certification under Fed. R. Civ. P. 23(a)(4). *Accord, In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.*, 330 F.R.D. 11 (E.D.N.Y. 2019). This is a familiar inquiry. *See Amchem Products v. Windsor*, 521 U.S. 591, 625–26 (1997) (courts look at whether the representatives' interest are antagonistic to or in conflict with those of the class members). Where, as here, the injuries suffered by the named Plaintiff are the same as those that the class is alleged to have suffered, the adequacy requirement is usually satisfied. *Duhaime v. John Hancock Mutual Life Ins. Co.*, 177 F.R.D. 54, 63 (D. Mass. 1997).

Mr. Cruz has been an exemplary representative. He has spent significant time on behalf of the putative class, gathering his relevant documents and providing them to counsel, responding to counsel's requests, reviewing documents and participating in settlement negotiations. Needham Decl. ¶ 46. His claims are the same as the claims of all Class Members, and the relief he seeks is calculated using exactly the same formula as that used for all Class Members.

In addition, Class Counsel are well-qualified and have vigorously prosecuted this class action. IKR and B&G are active class action practitioners whose long experience in ERISA and class action litigation is demonstrated by the declarations attached to this memorandum. *See* Needham Decl., ¶ 25 and Exh. C; Declaration of Gregory Y. Porter ("Porter Decl."), Exh. A; Declaration of Charles Silver ("Silver Decl."), attached to the Needham Declaration as Exhibit I, ¶¶ 33-35. Further, Class Counsel are pioneers in bringing this and other contemporaneous litigation challenging actuarial equivalence. Needham Decl., ¶ 25.[9]

### 2. The Proposed Settlement Was Negotiated at Arm's Length

There is typically an initial presumption that a proposed settlement is fair and reasonable when it was the result of arm's-length negotiations between experienced, capable counsel after meaningful discovery. *See Bezdek v. Vibram USA Inc.*, 79 F. Supp. 3d 324, 343 (D. Mass.), *aff'd*, 809 F.3d 78 (1st Cir. 2015).[10] That presumption is merited here.

Prior to settlement negotiations, the parties engaged in substantial fact discovery, including the exchange of thousands of pages of documents, actuarial valuation reports for each of the Covered Plans since 2011, internal memoranda regarding how Raytheon selected the actuarial assumptions used to value its pension liabilities and the core mortality tables and economic data

[9] *See, e.g.*, *Herndon v. Huntington Ingalls Indust. Inc.*, No. 19-52, 2020 WL 5809965, at *1 (E.D. Va. Aug. 28, 2020) (cross-motions for summary judgment), *report and recommendation adopted sub nom. Herndon v. Huntington Ingalls Indus., Inc.*, No. 19-52, 2020 WL 5809996 (E.D. Va. Sept. 29, 2020); *Belknap v. Partners Healthcare Sys., Inc.*, No. 19-11437, 2020 WL 4506162 (D. Mass. Aug. 5, 2020) (motion to dismiss); *Smith v. Rockwell Automation, Inc.*, 438 F. Supp. 3d 912 (E.D. Wis. 2020) (same); *Duffy v. Anheuser-Busch Companies, LLC*, 449 F. Supp. 3d 882 (E.D. Mo. 2020) (same); *Smith v. U.S. Bancorp*, No. 18-3405, 2019 WL 2644204, at *1 (D. Minn. June 27, 2019) (same); *Torres v. Am. Airlines, Inc.*, 416 F. Supp. 3d 640 (N.D. Tex. 2019) (same).

[10] *See also City P'ship Co. v. Atl. Acquisition Ltd. P'ship*, 100 F.3d 1041, 1043 (1st Cir. 1996); *Sesto v. Prospect CharterCARE, LLC*, No. 18-328, 2019 WL 4758161, at *3 (D.R.I. Sept. 30, 2019); *Barnes v. FleetBoston Fin. Corp.*, No. 01-10395, 2005 WL 8175898, at *2 (D. Mass. Dec. 22, 2005); *Rolland v. Cellucci*, 191 F.R.D. 3, 6 (D. Mass. 2000); *Bussie v. Allmerica Fin. Corp.*, 50 F. Supp. 2d 59, 77 (D. Mass. 1999).

upon which these valuations were based. Needham Decl., ¶ 8. While this fact discovery was aimed at the "threshold issue" of whether Mr. Cruz received an actuarially equivalent JSA from the Hourly Plan, the documents contained substantial data about the Covered Plans, permitting evaluation of the merits of the case as a whole. The Parties also engaged in substantial expert discovery. *Id.* Plaintiff's expert, Dr. Serota, is a Fellow of the Society of Actuaries and a former member of the Pension Committee of the Actuarial Standards Board. Serota Decl., ¶ 2. Defendant's expert, Thomas S. Terry, is the former president of the American Academy of Actuaries. Dr. Serota and Mr. Terry provided initial reports and Dr. Serota provided a reply; the three reports totaled over 240 pages and included thousands of actuarial calculations *See* Dkt. Nos. 61-8, 56-11 and 56-12. Both experts were also deposed. Needham Decl., ¶ 8.

Subsequently, the Parties each moved for summary judgment. Plaintiff's motion included a request to preclude Mr. Terry's opinions under *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579 (1993), and was supported by a memorandum of law and 29 separate exhibits. *See* Dkt. Nos. 54 and 56-1–29. Defendants supported their motion with a memorandum of law and 14 separate exhibits. Dkt. Nos. 50 and 52-1 – 52-14. The Parties then filed memoranda in opposition to each other's motions for summary judgment. Dkt. Nos. 62 and 64. Particularly since this case was a "battle of the experts" concerning the reasonableness of actuarial assumptions, proposed Class Counsel had ample information to understand the strengths and weakness of the case prior to engaging in settlement discussions.

As discussed above, the negotiations that resulted in this Settlement began mid-September and continued over the fall through multiple teleconferences, conference calls, and written communications. Needham Decl., ¶ 11. Counsel for the Parties thoroughly discussed their evaluations of the strengths and weaknesses of the case, exchanged multiple settlement proposals,

and in general vigorously defended their clients' interests. *Id.* After the Parties reached an agreement in principle on the key terms of the Settlement, they negotiated a Term Sheet that reduced those terms to writing. *Id.*, ¶ 13. The Term Sheet included provisions for exchange of plan data used to calculate benefits for each Class Member, so that Plaintiff's experts could confirm the calculations. *Id*. This cross-check was done before the Settlement was signed. *Id.* at ¶ 15.

The extent of this litigation, the hard-fought negotiations between experienced attorneys for both sides, and the result for the Settlement Class are all testaments to the non-collusive nature of the Settlement.

**3. The Relief Provided for the Class is More Than Adequate**

Rule 23(e)(2)(C) provides the factors for adequate relief:

(i) the costs, risks, and delay of trial and appeal;

(ii) the effectiveness of any proposed method of distributing relief to the class, including the method of processing class-member claims;

(iii) the terms of any proposed award of attorney's fees, including timing of payment; and

(iv) any agreement required to be identified under Rule 23(e)(3).

Fed. R. Civ. P. 23(e)(2)(C). As discussed below, the proposed Settlement provides meaningful, immediate and continuing benefits to the Settlement Class, while avoiding potentially years more of costs and delays, and the risks inherent in all class action litigation if the case were to go to trial.

**a. The Costs, Risks, and Delay of Trial and Appeal**

Rule 23(e)(2)(C)(i) requires the court to consider the adequacy of class relief in light of the costs, risks, and delay of trial and appeal. This factor "'involves balancing the advantages and disadvantages of the proposed settlement as against the consequences of going to trial or other possible but perhaps unattainable variations on the proffered settlement.'" *Bezdek v. Vibram USA, Inc.*, 809 F.3d 78, 82 (1st Cir. 2015) (quoting *Nat'l Ass'n of Chain Drug Stores v. New England*

*Carpenters Health Benefits Fund*, 582 F.3d 30, 44 (1st Cir. 2009)).

In an action advancing a novel and complex claim, further litigation would be expensive, resource-intensive and prolonged, and the ultimate outcome would be uncertain. In the absence of the Settlement, the Parties would need to conduct additional discovery related to the Covered Plans other than the Plan in which Cruz participated, followed by a contested motion to certify the class. Trial, while focused, would primarily involve expert testimony. *In re Relafen Antitrust Litig.*, 231 F.R.D. 52, 72 (D. Mass. 2005) (evaluation of settlement must take into account the cost of a trial "which promises to feature a battle of various experts"). Because no appellate court has, to date, directly considered Plaintiff's legal theory, the likelihood that the party that did not prevail at trial would take an appeal is high.

The risk of delay is particularly relevant here. ERISA class actions like this one tend to have significant life cycles. For example, in *Tussey v. ABB, Inc*., participants filed their action in 2006, received a trial verdict in 2012, saw that verdict reduced by the court of appeals in 2014 and eventually settled in 2019 — 13 years after filing. *See Tussey v. ABB, Inc*., 850 F.3d 951 (8th Cir. 2017) (remanding on damages); *Tussey v. ABB, Inc*., No. 06-4305, 2019 WL 3859763, Dkt. 869 (W.D. Mo. Aug. 16, 2019) (granting final approval of settlement). A 13-year delay does significant harm to class members already in retirement, many of whom are in their 60s and 70s. On the other hand, if the Settlement is approved, the Class will begin receiving higher monthly pension payments now.

The litigation risks in the case are also high. Mr. Cruz and Raytheon have vastly different views about Raytheon's actions, its potential liability and the likely outcome of the litigation. The key question — whether Class Members receive actuarially equivalent benefits — is one that can only be determined at trial through expert testimony. Plaintiff and Defendants each retained

actuarial experts that provided radically different opinions. *See* Dkt. Nos. 52-1 and 61-8. Plaintiff is confident in his expert's opinion and believed that the opinion of Defendants' expert, Mr. Terry, was sufficiently lacking in credibility to move to exclude it (Dkt. 53). However, the results of any "battles of experts" are notoriously difficult to predict. And, even if the Court credited ***parts*** of Terry's testimony, it could reduce or eliminate altogether the damages that could be awarded. *See In re Tyco Int'l, Ltd. Multidistrict Litig.*, 535 F. Supp. 2d 249, 260–61 (D.N.H. 2007) ("If, faced with conflicting expert testimony, the jury chose to embrace the most conservative estimate of damages, then the ultimate award might turn out to be less than the proposed settlement.").

The Settlement, which has a present value of $59.17 million and provides 40 percent of the best possible recovery for the Class, is an outstanding result that provides real, calculable relief to thousands of Participants and Beneficiaries and avoids the inherent expense and delay associated with trial and possible appeals. ERISA class settlements involving statutory claims that have been litigated much more frequently (and, thus, have more of a track-record) often settle for far lower amounts as a percentage of plaintiffs asserted damages.[11] Professor Silver found that this percentage compared favorably to many class action recoveries, including recoveries in securities, consumer and antitrust actions. Silver Decl. at ¶¶ 16-21. In particular, Professor Silver stated that a 40% recovery is excellent result in this case because it was based on a novel theory; in securities

[11] *See, e.g., Velazquez v. Massachusetts Fin. Services Co.*, No. 17-11249 Dkt. 108 (D. Mass Dec. 5, 2019) (approving settlement for 29% of maximum damages); *Prince v. Eaton Vance Corp.*, No. 18-12098, Dkt. 57 (D. Mass Sept. 24, 2019) (approving settlement for 23% of total damages); *Richards-Donald v. Teachers Insurance and Annuity Ass'n of Amer.*, No. 15-8040, Dkt. No. 55 (S.D.N.Y. Oct. 20, 2017) ($5 million settlement representing 11.6% of alleged damages); *Figas v. Wells Fargo*, No. 08-4546, 2010 WL 2943155 (D. Minn.) ($17.5 million settlement representing 19.5% of alleged damages); *Sims v. BB&T Corp.*, No. 15-732, 2019 WL 1993519, *2 (M.D.N.C. May 6, 2019) ($24 million settlement representing 19% of alleged damages); *Urakhchin v. Allianz Asset Mgmt. of Amer., L.P.*, No. 15-1614, 2018 WL 8334858, *4 (C.D. Cal. July 30, 2018) ($12 million settlement representing 17.7% of maximum alleged damages). *Velazquez, Prince* and *Richards-Donald* are unpublished and are included in Exhibit J to the Needham Declaration.

fraud cases, where the law is "extremely well developed" and "[e]very nuance has been litigated," settlements rarely approach 40% of losses. *Id.* ¶ 22. Moreover, in this case, the percentage is based on total damages calculated by Plaintiff's actuarial expert for litigation purposes, not a reduced "reasonable best case" damages estimate prepared for settlement purposes only.

**b. The Effectiveness Of Distribution To The Settlement Class**

The Advisory Committee's Notes to the 2018 amendments to Rule 23(e) indicate that "[m]easuring the proposed relief may require evaluation of any proposed claims process. . . ." Here, no such process is needed. The Settlement Agreement will, if approved, increase Class Members' future monthly benefit payments. *See* Settlement Agreement § III. There will be no need for Class Members to file claims or have those claims reviewed by a Claims Administrator. Moreover, many people have their benefit checks deposited directly, and those who do not have a strong incentive to ensure that the Plan has their current address information, so that they can receive and promptly cash their benefits checks. Thus, the increase in monthly benefits will result in the efficient and effective distribution of the Settlement's benefits. Additionally, the settlement is non-reversionary. Needham Decl., ¶ 20. The payments will be made automatically and fully over the course of the Class Members' lives. *Id.*

Finally, Class Members are receiving a distribution in the same form in which they were harmed; a shortfall in monthly benefits is being remedied by an increase in monthly benefits. Moreover, Class Members will not be responsible for a large tax payment on a lump sum award.[12] Accordingly, the distribution is most effective based on the claims alleged.

---

[12] Lump sum payments can have unintended consequences related to taxes and benefits, especially for retirees. The method of distribution here avoids that issue.

**c. The Terms Of Any Proposed Award Of Attorneys' Fees, Including Timing Of Payment**

Rule 23(e)(2)(C)(iii) directs the Court to consider, as part of its evaluation of the fairness of the Settlement, provisions related to payment of attorneys' fees, including the timing of the payment. These provisions are discussed in depth in the accompanying motion for an award of fees, expenses and a Case Contribution Award, and Plaintiff incorporates that brief by reference here. In summary: (1) the Settlement is not conditioned upon the Court awarding the requested attorneys' fees; (2) the Settlement provides a cap for the amount of fees and expenses Plaintiff may request, but does not restrict Defendants' ability to challenge lower requests; (3) the award is appropriately based on a percentage of the present value of the Settlement, consistent with numerous cases such as *Amara v. Cigna Corp.*, No. 01-2361, 2018 WL 6242496, at *3 (D. Conn. Nov. 29, 2018) and *Kifafi v. Hilton Hotels Retirement Plan*, 999 F. Supp. 2d 88 (D. D.C. 2013); (4) it is appropriate to award the fees at the conclusion of the case since there are no award-related contingencies (such as the filing or adjudication of claims); and (5) the requested percentage is low relative to other ERISA settlements and class action settlements in this District, and the lodestar multiplier is well within the range that has been approved by this Court.

It is also important to note that the Parties did not begin negotiating the percentage that Plaintiff might seek to have awarded as attorneys' fees until after they signed the term sheet on class-wide relief. Needham Decl., ¶ 15. Courts have found that this provides a "further indication that counsel placed their clients' interests firmly in first place." *NAD*, 2020 WL 1495903, at *4; *see also Bussie*, 50 F. Supp. 2d at 77 (that parties "did not address the issue of Lead Counsel's remuneration until after reaching consensus on the terms of the Settlement also suggests that the settlement process was fair"). Thus, nothing in the Settlement's provisions related to attorney's fees suggest that the Settlement is anything other than fair, reasonable and adequate.

#### 4. The Settlement Treats Class Members Equitably Relative to Each Other

The Settlement treats Class Members equitably relative to each other by ensuring that each Class Member receives the same percentage of their alleged calculated damages. The dollar amount of the benefit that Class Members will receive from the Settlement will vary, because Class Members' damages vary. Class Members' damages depend on a number of interlocking factors, including the amount of benefits they receive, the actuarial assumptions used by the different Plans at issue, the actuarial assumptions that should have been used on retirement date, and the age of the participant and the age of the beneficiary on retirement date. But each Class Member will receive the same ***percentage*** of their alleged damages. Needham Decl., ¶ 21.

The manner in which the increase in Class Members' prospective benefits are calculated ensures that those who retired at an older age and/or earlier in the Class Period (and thus are likely, from an actuarial perspective, to have fewer future benefits payments) are treated equitably by annuitizing the aggregate shortfall of past benefit payments and treating those annuitized past benefits the same as the Monthly Benefit Shortfall for purposes of determining Class Members' increase in monthly benefits. *Id.*

Only Class Members who were injured as a result of the Plans' actuarial assumptions or conversion factors used to calculate their JSAs or PSAs will receive an increase in their monthly benefits.[13] This is appropriate. The statute requires that JSAs be at least the actuarial equivalent

[13] As noted above, there are a variety of reasons why some Class Members suffered no damages. *See* Serota Decl., ¶ 16. For example, as discussed in Serota's Reply Report, the Hourly Plan in which Mr. Cruz participated used the same 0.9 conversion factor regardless of whether a participant began receiving benefits at age 55 or age 70. Because younger people have lower mortality rates than older people, the result of using a single factor resulted in participants who retired below the average age subsidizing those who retired above the average age. Dkt. 61-10, ¶¶ 18–30. For some participants, the amount of this age-based subsidy resulted in the calculation of a JSA or PSA benefit that was greater than it would have been had reasonable actuarial

of SLAs and PSAs to be based on actuarially equivalent JSAs. Any Class Member who is receiving a JSA or PSA that already meets or exceeds the statutory standard has suffered no damages. The Settlement expressly provides that no Class Members' benefits may be ***diminished*** as a result of the Settlement. Settlement Agreement, § I.CC; Needham Decl., ¶ 21.

### C. The Proposed Notice To Class Members Was Adequate

In accordance with the Court's Preliminary Approval Order, the Court "direct[ed] notice in a reasonable manner to all class members who would be bound by the proposal." *NAD*, 2020 WL 1495903, at *4 (quoting Fed. R. Civ. P. 23(e)(1)(B)). The notice properly "describe[d] the terms of the settlement in sufficient detail to alert those with adverse viewpoints to investigate and to come forward and be heard." *Id.* (internal quotations and citations omitted). The Notice provided Class Members with clear explanations concerning the litigation and the proposed settlement, and informed each Class Member of the amount of their recalculated benefit in the event the Court approves the Settlement and the fee and expense request. *See* Notice (attached to Settlement Agreement as Exhibit B). The Notice explained how and when to object to the Settlement and provided directions to the Settlement Website. *See id*. Defendants sent 10,605 copies of the Class Notice by First-Class Mail on April 9, 2021, and the Settlement website, https://www.raytheonpensionsettlement.com/, which contains a copy of the Class Notice, the Settlement Agreement and exhibits, and the Court's Preliminary approval Order, went live on March 29, 2021. Needham Decl. ¶ 47. This proposed method of providing notice is adequate under Rule 23(c)(2). *See Phillips Petroleum Co. v. Shutts*, 472 U.S. 797, 811 (1985).

## V. THE COURT SHOULD CERTIFY THE CLASS

In the Preliminary Approval Order, the Court made a preliminary determination that

---

assumptions been applied.

Settlement Class meets all of the requirements of Fed. R. Civ. P. 23(a) and 23(b)(1) and (b)(2), and that Class Counsel met the requirements for appointment under Rule 23(g). Dkt. 79, at ¶ 3. There have been no changes in circumstance that would warrant revisiting those findings. Accordingly, Plaintiff requests that the Court certify the following for settlement purposes only a Rule 23(b)(1) and/or (b)(2) class comprised of the following persons:

> (1) each participant in a Covered Plan who began receiving a JSA from such Covered Plan as of June 27, 2013 or later, and who received a monthly payment of that JSA benefit in December 2020 ("Participant Class Members"); (2) each beneficiary of a participant in a Covered Plan, where such participant began receiving a JSA from such Covered Plan as of June 27, 2013 or later and such beneficiary received a monthly payment of the survivor component of such JSA in December 2020 ("Beneficiary Class Members"); and (3) each surviving spouse of a participant in a Covered Plan, where such participant died on or after June 27, 2013, before the participant began to receive benefits from such Covered Plan, and such surviving spouse received a monthly payment of a PSA from such Covered Plan in December 2020 ("Surviving Spouse Class Members").

Plaintiff further requests that the Court confirm the appointment of Plaintiff Johnny Cruz as the representative of the Settlement Class and confirm the appointment of IKR and B&G as Class Counsel.

## CONCLUSION

For the foregoing reasons, Plaintiff requests that this Court certify the Settlement Class and approve the Settlement.

Dated: April 16, 2021

_/s/ Douglas P. Needham_
Douglas P. Needham, BBO No. 671018
Robert A. Izard (*pro hac vice*)
Mark P. Kindall (*pro hac vice*)
**IZARD, KINDALL & RAABE LLP**
29 South Main Street, Suite 305
West Hartford, CT 06107
(860) 493-6292
(860) 493-6290 fax
dneedham@ikrlaw.com
rizard@ikrlaw.com
mkindall@ikrlaw.com

Gregory Y. Porter (*pro hac vice*)
Mark G. Boyko (*pro hac vice*)
Alexandra L. Serber (*pro hac vice*)
**BAILEY & GLASSER LLP**
1055 Thomas Jefferson Street, NW, Suite 540
Washington, DC 20007
(202) 463-2101
(202) 463-2103 fax
gporter@baileyglasser.com
mboyko@baileyglasser.com
aserber@baileyglasser.com

*Attorneys for Plaintiff and the Class*

## CERTIFICATE OF SERVICE

I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic File (NEF) on April 16, 2021.

*/s/ Douglas P. Needham*
Douglas P. Needham